UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE NEMOURS AND
COMPANY C-8 PERSONAL INJURY
LITIGATION

CASE NO. 2:13-MD-2433

JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth P. Deavers

This document relates to:  <u>ALL ACTIONS</u>.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT UNDER
<u>RULE 56 OR FOR DETERMINATION OF ISSUES UNDER RULE 16(C)</u>**

**I.      INTRODUCTION**

Plaintiffs, through Co-Lead Counsel, submit this memorandum in support of their Motion

for Partial Summary Judgment under Rule 56 or For Determination of Issues under Rule 16(c) to

facilitate the just, speedy, and inexpensive disposition of these proceedings.  As explained below,

more than ten years of prior discovery, motion practice, and other proceedings during the first

phase of this and related litigation has resulted in the resolution of many facts and issues relevant

to these Multi-District Litigation proceedings (the "MDL").  Thus, to avoid the unnecessary,

duplicative, and wasteful expenditure by the parties and the Court of time and resources on any

such matters moving forward, Plaintiffs request that the Court issue an Order, pursuant to Civil

Rule 56 or, in the alternative, pursuant to Civil Rule 16(c), clarifying the status of such matters as

set forth below.

## II.     PROCEDURE FOR COLLATERAL ESTOPPEL DETERMINATION

Plaintiffs seek relief, in the alternative, pursuant to Civil Rules 56 and 16(c).  Rule 56(a) specifically provides that: "A party may move for summary judgment, identifying each claim or defense – *or the part of each claim* or defense – on which summary judgment is sought." Fed. R. Civ. P. 56 (a) (emphasis added).  Rule 56(g) states that if a court considers a summary judgment motion but does not grant it in its entirety, so that a trial is necessary, the court may "enter an order stating any material fact … that is not genuinely in dispute and treating the fact as established in the case." *See Doe v. Am. Nat'l Red Cross,* 848 F. Supp. 1228 n. 1 (S.D.W.Va. 1994) (citations omitted); *Neb. Pub. Power Dist. v. Gen. Elec. Co.*, 1979 WL 3949 (D. Neb. 1979); *see also* 18 James Wm. Moore, *et. al, Moore's Federal Practice* ¶ 132 at 132-1 (Matthew Bender 3d ed.) ("Whether raised offensively or defensively, issue preclusion questions may be resolved by summary judgment.").  Rule 16(c) provides that a court may "take appropriate action" with regard to "formulating and simplifying the issues" and "avoiding unnecessary proof and cumulative evidence." Fed. R. Civ. P. 16(c).  Rule 16(c) makes clear that, even if a court prefers not to grant partial summary judgment, it may nonetheless take other action to simplify the issues in the case.  Here, if the Court does not wish to grant partial summary judgment, it could still significantly simplify the issues in this case by entering Plaintiffs' proposed order estopping DuPont from taking a second bite at the apple and relitigating issues that it litigated - and lost – in the prior phase of this litigation.

## III.     FACTUAL/PROCEDURAL BACKGROUND

### A.     The Current MDL Arises From The 2005 Settlement Of A Class Action Filed in West Virginia State Court in 2001 Involving These Same Parties And Claims.

This MDL is the second phase of litigation first brought against DuPont over a decade ago over DuPont's contamination of drinking water supplies with the toxic, carcinogenic

chemical known as "C8." The original case, *Leach v. E. I. du Pont de Nemours & Co.*, No. 01-C-698 (Wood County W. Va. Cir. Ct.) ("*Leach* Case"), was filed as a class action on August 31, 2001, in West Virginia state court. The original class action complaint included claims that DuPont was liable under a variety of West Virginia common law tort theories for equitable, injunctive and declaratory relief, along with compensatory and punitive damages, as a result of drinking water contamination.[1] (Aff. of Robert A. Bilott in Support ("Bilott Aff.") Ex. A (*Leach* complaint)).

On April 10, 2002, the West Virginia trial court (the *"Leach* Court") certified the case to proceed as a mandatory, non-opt-out class action against DuPont with respect to "all common fact and legal issues relating to [DuPont's] underlying liability for all claims in this case," including the class members' claims for personal injury, wrongful death, and "liability for punitive damages," and "all fact and legal issues relating to Plaintiffs' claims for equitable, declaratory, and injunctive relief, including medical monitoring" (the "Common Issues"). *Leach v. E. I. du Pont de Nemours & Co.*, 2002 WL 1270121 (Wood County W. Va. Cir. Ct. April 2002) (attached to Bilott Aff. Ex. C.)

With respect to all non-Common Issues in the case, the *Leach* Court specifically "stayed and reserved" for "litigation after resolution of the common Class issues," all "matters requiring individualized proof of damages, including each class member's specific personal injuries" and "all damage issues involving any determination of individual harm of the Class members and the amount of any punitive damages" and "the calculation of individual damages of the individual Class members." (Bilott Aff. Ex. C at 1, 27.)

---

[1] The original *Leach* litigation resulted from an even earlier case filed against DuPont in West Virginia federal court in 1998, styled *Tennant v. E.I. du Pont de Nemours & Co., Inc.*, No. 6:99-0488 (S.D. W.Va.), during which C8 contamination of certain area drinking water supplies was first uncovered. (Bilott Aff. Ex. B.)

After three years of vigorously-contested litigation, involving extensive discovery and motion practice, including three issues taken to the West Virginia Supreme Court of Appeals, the parties entered into a class-wide settlement in November 2004, through a written settlement agreement that was freely negotiated, drafted, and executed by the parties (the "*Leach* Settlement"). (*Id.* Exs. D, E.)  Following appropriate class-wide notice, objection opportunities, full opt-out opportunities, and a final fairness hearing, the *Leach* Court entered a final order approving the *Leach* Settlement on February 28, 2005 (the "Final Order"). (*Id.* Ex. E.) No party, including DuPont, ever disputed that the *Leach* Court had jurisdiction to resolve such matters on behalf of any party, or disputed that the *Leach* Court retained jurisdiction over matters falling within the scope of the settlement. (*Id.* Ex. Q (DuPont's lead counsel in the *Leach* Case confirms that the *Leach* "Court had authority to approve the Settlement Agreement, which in essence is a contract between the Class Members and DuPont" and that the *Leach* "Court has retained jurisdiction over this matter to enforce the terms of that Agreement when necessary.")) Because no portion of the Final Order was appealed by anyone, it became "Final" under the terms of the *Leach* Settlement later in 2005. (*Id.* Ex. D § 1.23.)

Under the final *Leach* Settlement, the parties agreed that certain class-wide claims (defined in the agreement as "Initial Released Claims") would be immediately released and dismissed with prejudice, upon final approval of the settlement, in exchange for certain initial, class-wide benefits to be provided by DuPont. (*Id.* Ex. D § 3.2.)  With respect to the remaining claims, which included the class members' claims for "personal injury and wrongful death" and "punitive and any other damages whatsoever associated with such claims," the parties agreed that any final resolution of those claims (defined in the settlement agreement as "Conditionally Released Claims") would be stayed and that any applicable statutes of limitations would

continue to be tolled pending an independent "scientific" resolution of certain common issues impacting all such claims. (*Id.* Ex. D §§ 3.3, 6.)

More specifically, the parties agreed that, rather than proceed to trial on any of the remaining Conditionally Released Claims and force a lay jury to try to choose between competing evidence/experts on the highly complex, scientific issue of whether C8 is capable of causing serious disease in humans at the dose/exposure levels actually experienced by the class members, the parties would submit the matter to a jointly-selected, independent panel of three epidemiologists (the "C8 Science Panel") for resolution.[2] The Science Panel's independent, science-based decision on the matter would be final and binding on all parties for purposes of eventual resolution of all *Leach* Class Members' Conditionally Released Claims. (*Id.* Ex. D §§ 3, 12, Ex. Q.) The parties further agreed that, until such time as the Science Panel resolved those issues – in the form of final determinations as to whether any "probable links" exist between "exposure to C-8 and a particular Human Disease among Class Members"[3] - all *Leach* Class Members would be barred from attempting to pursue any final resolution of their Conditionally Released Claims, as originally asserted through the *Leach* Case class complaint. (*Id.* Ex. D §§ 3, 6.) The parties further agreed that, when the final "probable link" determinations were released by the Science Panel, all the Class Members' remaining Conditionally Released Claims would be released at that time, and dismissed with prejudice, except for "those Conditionally Released Claims in which the specific Human Disease(s) for which a Probable Link Finding has been delivered is/are at issue" (hereinafter "Linked Disease PI Claims"). (*Id.* Ex. D § 3.3.) As for those remaining Linked Disease PI Claims, the parties further agreed that the conditional release

---

[2] *See* Bilott Aff. Ex. Q (DuPont's counsel confirms that "the parties elected to remove this complex scientific question from the courtroom where it would be decided by lay people sitting on a jury. We elected to put the question to epidemiologists….").
[3] *Id.*, Ex. D § 1.49 (defining "Probable Link").

set forth in Section 3.3 of the *Leach* Settlement would never become effective, and Class

Members would be free to "pursue" the final resolution of those claims against DuPont, once the

final "probable links" were identified. (*Id.* Ex. D §§ 3.3, 6.)

In addition, the parties specifically agreed that, if "probable links" were found, DuPont

would be forever barred from disputing "General Causation" between C8 and any such "linked"

disease with respect to any *Leach* Class Member's remaining Linked Disease PI Claims,

preserving only the right to challenge "Specific Causation and damages as to any individual

Class member" and those other "defenses not barred by" the *Leach* Settlement. (*Id.* Ex. D § 3.3.)

"General Causation" is expressly defined in the *Leach* Settlement to "mean that it is probable

that exposure to C-8 is capable of causing" the "linked" disease(s). (*Id.* Ex. D § 1.25.) "Specific

Causation" is defined to mean "that it is probable that exposure to C-8 caused a particular

["linked" disease] in a specific individual." (*Id.* Ex. D § 1.60.)

Incorporated within the scope of "General Causation" issues resolved by any "probable

link" finding by the Science Panel is the issue of whether any *Leach* Class Member had a

sufficient threshold exposure to or "dose" of C8 to cause the "linked" disease. DuPont has never

disputed that C8 is capable of causing some type of harm to humans at some level of exposure.

(*Id.* Exs. R at 54 (RFAs 147-148), S at 24, U at 18.) Rather, what was disputed was whether C8

could cause any such harm to humans at a specific exposure/dose levels. According to DuPont,

there can be no finding of "General Causation" without necessarily establishing the dose at

which such harm could occur. As DuPont stated to a federal court in West Virginia in a related

Prior Action, "[r]eliable science necessarily incorporates dose when assessing whether a

substance is capable of causing harm (general causation) . . . dose is a necessary consideration

fundamental to any general causation opinion." (*Id.* Ex. V at 9.) Thus, according to DuPont,

"General causation is the scientific determination as to whether or not the chemical in question is capable of causing a particular condition in the general population *at some specified dose*." (*Id.* Ex. T at 6.) (emphasis added).

Consequently, when defining the "probable link" that would be sufficient to satisfy DuPont that "General Causation" had been resolved for these plaintiffs, the parties agreed that there could be no "probable link" to any such disease(s), unless the "link" is found by the Science Panel to exist "*among Class Members*." (*Id.* Ex. D § 1.49.) (emphasis added) "Class Members" are expressly defined by the parties to include only those individuals who consumed water for at least one year from water supplies contaminated with a minimum exposure level or "dose" of 0.05 part per billion ("ppb") or more of C8. (*Id.* Ex. D § 2.1.1.) Thus, by limiting the Science Panel to finding only those "probable links" that actually exist "among Class Members," the parties insured that only "links" existing among persons with the minimum exposure/dose level of C8 required to be a *Leach* Class Member could serve as the basis for any *Leach* Class Member Linked Disease PI Claims to move forward. (*Id.* Ex. U at 7-8) (DuPont explains to federal court in related C8 Prior Action that the "Science Panel will . . . make a determination of whether it is more likely than not that PFOA exposure *at the levels experienced by residents of communities in West Virginia and Ohio* is capable of causing serious latent disease") (emphasis added); *id.* Ex. Q ("DuPont agreed to resolve this case through this novel settlement because the Science Panel would offer a scientific answer to the important fundamental question: Is PFOA exposure *as experienced by the class* capable of causing serious latent disease?") (emphasis added); *id.* Ex. W at 40-41 (DuPont's lead counsel in *Leach* explains during final fairness hearing that Science Panel will resolve "the heart of the question of whether C8 is related to or causes any human disease in this community *with the C8 at the levels that it is in the water*.")

(emphasis added). Consequently, as long as an individual qualifies as a "Class Member," the individual, by definition, necessarily has the requisite minimum dose/exposure to C8 sufficient for the existence of any "probable links" ultimately found by the Science Panel.

With respect to the scope of *Leach* class membership, the parties agreed that "Class Members" include those described within Section 2.1.1 of the *Leach* Settlement who had not "opted out" of the class or waived their class membership through the procedures set forth in that agreement. (*Id.* Ex. D at § 1.11.) Those individuals who had either opted out or had chosen to waive their Class Member status were all specifically identified by the time the *Leach* Settlement was approved. (*Id.* Exs. F, E at 9-10.) Through written notice to the Class Members, reviewed and approved by the *Leach* Court, the parties confirmed that individuals qualify as *Leach* Class Members if they have, for at least one year prior to December 4, 2004, consumed water from any one or more of six specified public water supplies or certain specifically-identified private water sources in which C8 had been detected at or above 0.05 ppb. (*Id.* Exs. G, H) A list of those qualifying private water sources was prepared to assist in Class Member identification. (*Id.* Ex. P.)

Upon entry of the *Leach* Court's Final Order on February 28, 2005, the *Leach* Class Members' "Initially Released Claims" were "dismissed with prejudice," with the Court holding that the remaining Conditionally Released Claims of the Class Members would be dismissed "if, and only if the conditions for release of such claims set forth in Section 3.3 of the Settlement are met." (*Id.* Ex. E at 12.) As noted above, Section 3.3 provides that no such claims would be either released or dismissed unless and until the Science Panel found no "probable link" sufficient to allow the claims to move forward. (*Id.* Ex. D § 3.3.) The *Leach* Court did not decertify any aspect of the class issues affecting the remaining Linked Disease PI Claims that it had certified

for class treatment in its original class certification order from 2002, nor have the parties requested any such decertification since entry of the Final Order or release of the final "probable link" determinations. (*Id.* Exs. D, E.)

With respect to what aspects of the remaining Linked Disease PI Claims would remain for litigation between the parties once the "probable link" issues were resolved, the *Leach* Court noted in its Final Order that it understood the terms of the settlement to eliminate the need for the Class Members "to wait for the uncertain outcome of a lengthy trial nor face the possibility of no recovery," because the "terms of the Settlement adequately address any claims by Class Members for personal injury … in the event that the Science Panel finds a Probable Link." (*Id.* Ex. E at 7.) Moreover, the *Leach* Court expressly found that, upon approval of the *Leach* Settlement, there would be "no remaining issues to be litigated in this matter, as the Settlement sets forth adequately the agreed upon mechanism to determine whether . . . some Class Members may pursue individual claims against DuPont." (*Id.* Ex. E at 11.) Neither the *Leach* Settlement nor the *Leach* Court's final approval Order redefined or changed the manner in which the Court characterized what were "individual" versus class-wide claims/issues in its original class certification order from 2002. The *Leach* Court did, however, retain jurisdiction over any remaining class-wide issues under the *Leach* Settlement, and continues to oversee *Leach* class issues to this day. (*Id.* Exs. E at 12, D § 14.2, Q at 1.)

In November 2012, the parties jointly notified the *Leach* Court that the Science Panel had completed its work and had found "probable links" between C8 exposure among Class Members and: 1) kidney cancer; 2) testicular cancer; 3) thyroid disease; 4) ulcerative colitis; 5) diagnosed high cholesterol (hypercholesterolemia); and 6) pregnancy-induced hypertension/preeclampsia

(the "Linked Diseases").[4] (*Id.* Ex. I.)  Shortly thereafter, class-wide notice was approved by the *Leach* Court and sent to the *Leach* Class Members notifying them of the "probable link" findings, and advising that DuPont's agreement to toll any applicable statutes of limitations under the *Leach* Settlement would expire on January 28, 2013, for any of the Linked Disease personal injury claims that the Class members were now, once again, free to "pursue." (*Id.* Ex. H.)

After release of the final "probable link" reports, individual *Leach* Class Members began filing new complaints in various state and federal courts in an effort to pursue final resolution of the individual aspects of their previously stayed/reserved Linked Disease PI Claims.  DuPont promptly moved to consolidate all of those cases with one federal court to proceed as an MDL on the grounds that the cases all "arise in the wake of" the *Leach* Settlement and assert "the same core factual allegations regarding DuPont's conduct" and "similar legal theories of liability," even though there may be "individual factual issues and defenses unique to each plaintiff." (*Id.* Ex. N at 3)[5]  In response, this MDL was created to coordinate resolution of the remaining common issues by Order of the United States Judicial Panel on Multidistrict Litigation, entered on April 9, 2013. (*Id.* Ex. O.)

**B.     The Parties Have Acknowledged That The Current MDL Proceedings Are The Second Phase of the *Leach* Litigation Governed By The *Leach* Settlement Terms.**

The parties have acknowledged that the current MDL proceedings are essentially the "second phase" of the *Leach* litigation that was initiated against DuPont in West Virginia state

_____

[4] Importantly, the Science Panel did not find a "Probable Link" to exist between C-8 exposure and many other diseases.
[5] DuPont did not assert that final resolution of any of these newly-filed complaints of *Leach* Class Members through such MDL proceedings still required resolution of any Common Issues that the *Leach* Court had originally certified and had never released, dismissed, or decertified, which arguably would have divested the MDL court of jurisdiction over any such Common Issues.  *See, e.g., Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976); *Ackerman v. ExxonMobil,* 734 F.3d 237 (4th Cir. 2013).

court over a decade ago, with many of the relevant facts and legal issues having been litigated and resolved through several other related "Prior Actions" against DuPont involving C8. (*See, e.g.*, Transcript of the Proceedings of the Status Conf. of Sept. 12, 2013 (Doc. No. 54) at 7-15.) As such, this Court has noted in its Orders that many of the legal and factual issues that normally would have required extensive, coordinated litigation and determinations by this Court already have been resolved. (*See, e.g.,* Agreed Protective Order (Doc. No. 27) at 3-5; Case Mgmt. Order ("CMO") No. 2 (Doc. No. 30) at 2; Pretrial Order ("PTO") No. 6 (Doc. No. 32) at 2 ("the prior Leach and related litigation against DuPont involving C8 issues resulted in . . . resolution of some legal issues"); (PTO No. 7 (Doc. No. 33) at 1-2; PTO No. 8 (Doc. No. 50) at 1-2; Stipulation & Agreed Order Regarding Discovery & Use of Electronically Stored Info. (Doc. No. 65) at 1-2.) This Court encouraged the parties early in these MDL proceedings to identify the nature and scope of such resolved issues, so as to avoid any unnecessary delay and expense in addressing the remaining issues. (*See, e.g.,* PTO No. 7 (Doc. No. 33) at 2 ("the Court urged the parties to identify potential issues of law that are amenable to early resolution to avoid unnecessary discovery.")

In response, counsel for the MDL Plaintiffs' Steering Committee (the "PSC") served a short set of requests for admissions ("RFAs") and proposed stipulations on DuPont on October 1, 2013, which were designed as an attempt to identify the resolved issues and clarify which issues remained for resolution through this MDL. (*Id.* Ex. J.) Unfortunately, DuPont advised the PSC on December 9, 2013, that it would not admit the basic facts set forth in the RFAs or agree to any of the proposed stipulations. (*Id.* Ex. K.) After additional efforts by the PSC to secure such admissions and stipulations from DuPont voluntarily, (*Id.* Ex. L), DuPont eventually revealed in a letter to the PSC dated January 8, 2014, that it did not believe this was an "appropriate stage"

in this litigation to identify such issues and that DuPont would not be inclined to do so "without further discovery efforts by both sides." (*Id.* Ex. M at 3.) Thus, over the next several months, the parties engaged in and completed an additional phase of discovery with respect to the initial bellwether discovery cases. (*See* CMO 6 (Doc. No. 194.)[6]

## IV.    ARGUMENT

Under the doctrine of collateral estoppel, "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties." Restatement (Second) of Judgments § 27 (1982). "It has come to be widely accepted that usually little good and much harm can come from allowing a determined [party] to retry the same issues in exhausting fashion against successive [parties]." *McLaughlin v. Bradlee*, 803 F.2d 1197, 1204 (D.C. Cir. 1986). District courts are granted "broad discretion to determine when [collateral estoppel] should be applied." *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 331 (1979).

As stated *supra*, the *Leach* Class Members and DuPont mutually agreed more than nine years ago that ultimate resolution of the "individual" aspects of any of their Conditionally Released Claims that remained after conclusion of the Science Panel's work would be governed by the terms of the *Leach* Settlement. That settlement was approved through a final, non-appealable Court Order binding on such parties in addition to being a binding written contract. Under elementary principles of prior adjudication, judgments in properly entertained class actions are binding on class members and defendants in subsequent litigation on any issue actually litigated and to which a final determination has been made. *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984); *Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1213

---

[6] As the Court is aware, DuPont later requested that the 12 fact witness depositions that the PSC sought of DuPont witnesses during this bellwether discovery period be postponed until after DuPont's own bellwether case discovery was complete, because DuPont's counsel was too busy.

n.10 (6th Cir. 1997) (citation omitted).  To determine whether collateral estoppel, or issue

preclusion, applies, the Sixth Circuit has explained that a prior decision shall have preclusive

effect on an issue raised in a later case if the following conditions are met: "(1) the precise issue

raised in the present case must have been raised and actually litigated in the prior proceeding; (2)

determination of the issue must have been necessary to the outcome of the prior proceeding; (3)

the prior proceeding must have resulted in a final judgment on the merits; and (4) the party

against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in

the prior proceeding." *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 908 (6th Cir.

2001) (citations omitted).<sup>7</sup>

 If the prior proceeding was in state court, federal courts are required to give preclusive

effect to a state-court judgment only if the rendering state court would do the same. *Gooch v.

Life Investors Ins. Co. of Am.*, 672 F.3d 402, 419 (6th Cir. 2012) (citation omitted).  Under West

Virginia law, collateral estoppel will bar the relitigation of an issue if: (1) The issue previously

decided is identical to the one presented in the action in question; (2) there is a final adjudication

on the merits of the prior action; (3) the party against whom the doctrine is invoked *was a party

or in privity* with a party to a prior action; and (4) the party against whom the doctrine is raised

had a full and fair opportunity to litigate the issue in the prior action. *State ex rel. McGraw v.

Johnson & Johnson,* 226 W.Va. 677, 687-88 (2010).

 As set forth in section II *supra*, all of these factors are satisfied here.  The parties resolved

class-wide Common Issues in the litigation through an agreed, written contract and settlement

agreement approved through an order entered by a West Virginia court.  The terms of the

agreement were freely negotiated and approved through a final court order, entered in 2005, after

---

<sup>7</sup> Plaintiffs' case involves mutuality of parties, therefore the additional elements required by *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322 (1979) are not applicable because they only apply to *non-mutual* offensive issue preclusion.

full and fair opportunity for either party to object and/or appeal. As such, the terms, conditions and all agreed-upon issues within the Final Order remain binding on these same parties for purposes of this MDL.

Also, the mere fact that the *Leach* case was settled prior to trial does not preclude the application of estoppel doctrines, because the settlement was the result of an official court order, as opposed to a mere contractual settlement. *See Blakely v. U.S.*, 276 F.3d 853 (6th Cir. 2002); *Lindell v. Landis Corp. 401(k) Plan*, 640 F. Supp.2d 11, 16 (D.D.C. 2009) ("[t]o have preclusive effect, a court judgment must be rendered in some form; otherwise a settlement agreement on its own is effective only as a contract."). Additionally, an order approving a class action settlement is not treated any differently than a judgment in an individual action and is entitled to the same preclusive effect as a judgment after trial. *See Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1213 n.10 (6th Cir. 1997) ("The usual principles of . . . collateral estoppel (issue preclusion) apply in class actions.") (citing *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984)); *Gooch*, 672 F.3d at 418 ("A state judgment entered in a class action like any other judgment entered in a state judicial proceeding, is presumptively entitled to full faith and credit . . . .") (citation and internal quotations omitted).

DuPont's refusal to admit to the most basic findings, facts, and issues that were agreed to as part of the *Leach* Settlement is similar to attempts by the tobacco defendants to avoid being collaterally bound by findings from class action proceedings in subsequent individual damage cases. As discussed below, these attempts were rejected by numerous Florida state courts and the Eleventh Circuit.

In *Engle v. Liggett Group, Inc.*, 945 So.2d 1246 (Fla. 2006), the Supreme Court of Florida reversed, in part, a lower court decision that reversed a final judgment entered in a

smokers' class action lawsuit that sought damages against cigarette companies and industry

organizations for alleged smoking-related injuries.  For the purposes of this case, the relevant

part of the decision involved the decertification of the class with the instruction to the lower

court that, notwithstanding decertification, the trial court's rulings and findings from Phase I of

the class trial were to have res judicata[8] effect on the individual class members' subsequent

individual cases. *Id.*  The court held that "the [*Engle*] Phase I common liability jury determined

general causation . . . , which leaves specific or individual causation . . . to be determined on an

individual basis.  [D]efendants may defend against the establishment of individual causation, for

example, by proving that the disease at issue was the result of a genetic predisposition, exposure

to an occupational hazard, or something unrelated to the plaintiff's addiction to smoking . . . ."

*Phillip Morris v. Douglas*, 110 So.3d 419, 428 (Fla. 2013) (citing *Engle*, 945 So.2d at 1254-55).

Therefore, for a plaintiff to prevail on a subsequent individual claim, he or she was required to

establish (i) membership in the class; (ii) individual causation; and (iii) damages. *Id.* at 430.

On March 14, 2013, the Florida Supreme Court revisited this issue in a subsequent

individual smoker case, *Phillip Morris v. Douglas*, 110 S.3d 419, where the defendants

challenged the validity of the *Engle* decision. *Id.*  The court rejected the defendants' challenges

holding:

- common class action liability findings had res judicata effect on individual class plaintiffs' individual damages actions;
- application of res judicata did not violate tobacco companies' due process rights or constitute an arbitrary deprivation of tobacco companies' property;
- res judicata, rather than issue preclusion, applied to individual class action

---

[8] Some courts use the term res judicata as a collective term to describe claim preclusion *and* issue preclusion. As the Eleventh Circuit explained, "[w]hether the Supreme Court of Florida calls the relevant doctrine issue preclusion, claim preclusion, or something else, is no concern for us."  *Walker v. R.J. Reynolds Tobacco Co.*, 734 F.3d 1278, 1289 (11th Cir. 2013).  "State courts are free to attach such descriptive labels to litigations before them as they may choose and to attribute to them such consequences as they think appropriate under state constitutions and laws, subject to the requirements of the Constitution of the United States." *Id.*

> plaintiffs' damages claims; and

- judgment in phase I class action trial was a final judgment, for purposes of res judicata effect.

*Id.* at 432.

In reaching its decision, the *Douglas* court stated that its decision in *Engle* "allowing the common liability findings to stand would serve no purpose and would in fact be obliterated if the *Engle* defendants were permitted to relitigate matters pertaining to their conduct." *Id.* at 429.

> By holding that the Phase I findings are entitled to "res judicata *effect*," our decision in *Engle* allowed members of the decertified class to pick up litigation of the approved six causes of action right where the class left off—i.e., with the *Engle* defendants' common liability for those claims established. As we recognized in *Engle*, 945 So.2d at 1269, those individual damages actions would not revisit the aspects of the *Engle* claims resolved by the Phase I findings, but would focus only on the remaining individual aspects of the claims specific to each plaintiff.

*Id.* at 432 (emphasis added).

The court also rejected the defendant's claim that that the *Engle* judgment was not a final judgment on the merits for purposes of res judicata, stating that "judgment is upon the merits when it amounts to a declaration of the law as to the respective rights and duties of the parties based upon the ultimate facts disclosed by the pleadings and evidence and upon which the right of recovery depends, irrespective of formal, technical, or dilatory objections or contentions." *Id.* at 433.

In a subsequent case, R.J. Reynolds challenged the Florida Supreme Court's recent decisions on these issues, arguing that the application of res judicata in later suits filed by individual smokers violates its constitutional right to due process of law. *Walker v. R.J. Reynolds Tobacco Co.*, 734 F.3d 1278, 1280 (11th Cir. 2013). The Full Faith and Credit Act requires federal courts to "give preclusive effect to a state court judgment to the same extent as would courts of the state in which the judgment was entered" subject to due process limitations. *Id.* at

1286 (citations omitted). The Eleventh Circuit's inquiry, therefore, was a narrow one: "whether giving full faith and credit to the decision in *Engle*, as interpreted by *Douglas*, would arbitrarily deprive R.J. Reynolds of its property without due process of law." *Id.* at 1287 (citation omitted).

The Eleventh Circuit rejected the tobacco company's argument, stating that it "had a full and fair opportunity to litigate the issues of common liability" and such "opportunity to be heard is an essential requisite of due process of law in judicial proceedings." *Id.* (citation omitted). Specific issues were decided in the prior litigation and the Florida Supreme Court "made the necessary findings when it explained that the approved findings from Phase I go to the defendants' underlying conduct which is common to all class members and will not change from case to case and that the approved Phase I findings are specific enough to establish certain elements of the plaintiffs' claims." *Id.* at 1289.

## V.   CONCLUSION

In recognition of the relationship between the current MDL claims and the first phase of the *Leach* Case and related Prior Actions, this Court first suggested over a year ago that the parties try to voluntarily identify the nature and scope of the already-resolved issues. Despite numerous good-faith attempts by the PSC to comply with this directive, DuPont has made clear that it is unwilling to so do without first imposing additional expense and delay through more discovery and litigation. This position is not only contrary to the letter and spirit of the judicially-approved *Leach* Settlement, but it also conflicts with specific statements made by DuPont's lead trial counsel during the February 28, 2005 Fairness Hearing for that settlement. At this hearing, DuPont's counsel testified in support of the settlement agreement and the agreed-upon findings saying that, "at the end of the day, DuPont is a science company and believes in science, and we . . . want to put this issue to bed period . . . and we believe we can

through this impartial [Science] panel." (Bilott Aff. Ex. W at 43.)  As evidenced by this statement and the court approved settlement, DuPont clearly manifested an intent to be collaterally bound by the terms of the settlement and its current attempts to evade or distance itself from the findings of the trial court should not be permitted.  Most importantly, there are some 70,000 innocent men, women, and children who drank water that was poisoned with C8. Many of these individuals have contracted or have now died from potentially life-threatening diseases, including cancer, as a result of DuPont's actions and inactions.  These plaintiffs, who have been waiting for over *twelve years* for their day in court, are entitled to the most efficient and timely resolution of their claims as possible.

Therefore, in order to avoid any further unnecessary expense and delay, Plaintiffs respectfully request, pursuant to either Civil Rules 56 or 16(c) and the terms of the *Leach* Settlement and related Final Order, that this Court enter an Order clarifying that the following matters/issues have been resolved/established for purposes of this "second phase" of the *Leach* litigation, and that DuPont is barred from challenging/disputing any such matters/issues for any purpose in these MDL proceedings[9]:

1.    Any plaintiff in this MDL who is not listed on Attachment A and who has, for at least one year prior to December 4, 2004, consumed water from any one or more of the public or private drinking water sources listed in Attachment B  is a *Leach* "Class Member" within the meaning of the *Leach* Settlement. (Ex. D § 1.11, Ex. E at 9-10, Ex. F, Ex. G, Ex. H, Ex. P.)

2.    DuPont cannot dispute or challenge any *Leach* Class Member's claim that such Class Member's Conditionally Released Claims were first filed against DuPont by August 30, 2001, in a West Virginia state court, to be resolved under West Virginia law. (Ex. A at 1, Ex. C at 1.)

3.    DuPont cannot challenge or dispute that the *Leach* Court had jurisdiction to resolve all aspects of each *Leach* Class Member's Conditionally Released Claims that were certified for class treatment by such court in 2002, as the time to

---

[9] All capitalized terms in the following numbered paragraphs shall have the same meaning as that set forth in the *Leach* Settlement and Final Order.

challenge and/or appeal any/all such jurisdiction has expired and/or DuPont has expressly waived any such challenge through its agreement to the *Leach* Settlement and Final Order and its acceptance of benefits thereunder, including Class Member releases and/or dismissals of such claims. (Ex. D §§ 1.23 & 3, Ex. E, Ex. I, Ex. Q.)

4. DuPont shall be barred from asserting any defense to liability for a *Leach* Class Member's non-released or dismissed Conditionally Released Claims that is common to all such *Leach* Class Member claims and is unrelated to either Specific Causation or damages. (Ex. C, Ex. D §§ 1 & 3, Ex. E § V.)

5. *Leach* Class Members and DuPont shall be barred from disputing or challenging that the C8 Science Panel found Probable Links with each of the following Human Diseases: 1) Kidney cancer; 2) testicular cancer; 3) ulcerative colitis; 4) thyroid disease; 5) pregnancy-induced hypertension/preeclampsia; and 6) medically-diagnosed high cholesterol (hypercholesterolemia). (Ex. I at 3.)

6. *Leach* Class Members and DuPont shall be barred from disputing or challenging General Causation with respect to any *Leach* Class Members' Conditionally Released Claims in which kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, pregnancy-induced hypertension/preeclampsia, or medically-diagnosed high cholesterol (hypercholesterolemia) is/are at issue. (Ex. D § 3, Ex. E § V, Ex. I at 3.)

7. DuPont cannot challenge or dispute that each of the Probable Links found by the C8 Science Panel were found to exist among those Plaintiffs meeting the definition of *Leach* Class Member. (Ex. D §§ 1 & 3, Ex. E § V, Ex. I at 3, Ex. Q Ex. U at 7-8, Ex. W at 40-41.)

8. DuPont shall be barred from asserting that any Plaintiff meeting the definition of *Leach* Class Member must demonstrate any additional proof of dose or exposure to C8 beyond that necessary to prove *Leach* Class Member status in order to prove any of their Conditionally Released Claims. (*Id.*)

9. DuPont shall be barred from challenging or disputing the accuracy, validity, or admissibility of any of the work or data generated by or on behalf of the C8 Science Panel or its agents that was funded by DuPont through the *Leach* Settlement, including but not limited to any actual or modeled C8 present, past, or historic, exposure and/or dose data for any *Leach* Class Member and any purported verification or confirmation by such persons of medical records confirming the diagnosis of a Human Disease in a *Leach* Class Member. (Ex. D §§ 1, 3, & 12, Ex. E § V, Ex. I at 3.)

10. DuPont cannot challenge or dispute that the running of any statute of limitations applicable to any *Leach* Class Member's Conditionally Released Claims was tolled between August 30, 2001, and January 28, 2013. (Ex. D § 6, Ex. H.)

Respectfully submitted,

/s/ Michael A. London____
Michael A. London
Douglas & London, PC
59 Maiden Lane, 6th Floor
New York, NY 10038
Telephone:212-566-7500
Fax: 212-566-7501
Email: mlondon@douglasandlondon.com

Robert A. Bilott
Taft, Stettinius & Hollister LLP
425 Walnut St.
Suite 1800
Cincinnati, OH 45202-3957
Telephone: 513-381-3828
Fax: 513-381-0205
Email: bilott@taftlaw.com

Jon C. Conlin
Cory Watson Crowder & DeGaris
2131 Magnolia Ave., Suite 200
Birmingham, AL 35205
Telephone: 205-328-2200
Fax: 205-324-7896
Email: jconlin@cwcd.com

*Plaintiffs' Steering Committee Co-Lead Counsel*