UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

Civil Action 2:13-md-2433
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth P. Deavers

This document relates to: ALL CASES.

### DISPOSITIVE MOTIONS ORDER NO. 1
### Class Membership and Causation

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment Under Rule 56 or for Determination of Issues Under Rule 16(C) (ECF No. 820) and Defendant's Counter-Motion for Partial Summary Judgment Regarding Application of the *Leach* Settlement Agreement (ECF No. 1032). For the reasons that follow, the Court **DENIES** Defendant's Motion and **GRANTS IN PART** Plaintiffs' Motion.

**I.**

On August 31, 2001, a group of individuals filed a state court action in West Virginia against E.I. du Pont de Nemours and Company ("DuPont") captioned *Leach v. E. I. du Pont de Nemours & Co.*, No. 01-C-698 (Wood County W. Va. Cir. Ct.) ("*Leach* Case"). The plaintiffs in the *Leach* Case brought a variety of claims under West Virginia common law tort theories for equitable, injunctive and declaratory relief, along with compensatory and punitive damages, as a result of alleged drinking water contamination.

On April 10, 2002, the West Virginia trial court ("*Leach* Court") granted the plaintiffs' motion for class certification and certified a mandatory, non-opt-out class

> on behalf of a class of all persons whose drinking water is or has been contaminated with ammonium perfluorooctanoate (a/k/a/ "C-8") attributable to releases from DuPont's Washington Works plant (hereinafter "the Class") with respect to all issues relating to [DuPont's] underlying liability and Plaintiffs' claims for equitable, injunctive, and declaratory relief, including liability for punitive damages; all damage issues involving any determination of individual harm of the Class members and the amount of any punitive damages are hereby STAYED and RESERVED for later litigation . . . .

*Leach v. E.I. Du Pont de Nemours & Co.*, No. 01-C-608, 2002 WL 1270121, at *1 (W. Va. Cir. Ct. Apr. 10, 2002). The class included approximately 80,000 individual residents of the communities served by certain public water districts and private water sources that had allegedly been contaminated with C-8 discharged from DuPont's Washington Works plant.

In November 2004, the parties entered into a class-wide settlement of the *Leach* Case ("*Leach* Settlement Agreement"). On February 28, 2005, following appropriate class-wide notice, objection opportunities, full opt-out opportunities, and a final fairness hearing, the *Leach* Court entered a final order approving the *Leach* Settlement Agreement.

In the *Leach* Settlement Agreement, the parties fashioned a unique procedure to determine whether the approximately 80,000 individual class members would be permitted to file actions against DuPont based on any of the human diseases they believed had been caused by exposure to C-8. The procedure required DuPont and the plaintiffs to jointly select three completely independent, mutually-agreeable, appropriately credentialed epidemiologists ("Science Panel") to study human disease among the residents exposed to C-8 by the discharges from DuPont's Washington Works plant. (*Leach* Settlement Agreement "S.A." at §§ 12.2.1, 12.2.2; ECF No. 520-8.) The *Leach* Settlement Agreement defines the task as follows:

> The Science Panel shall develop and approve, by a vote of at least two members of the Science Panel, a protocol for a study of Human Disease among residents exposed to C-8 in the communities served by the Public Water Districts[1] and

---
[1] (S.A. § 2.1.1; Schedule 2.1.1(A)) (specifying the six Public Water Sources).

Covered Private Sources[2] and shall have the responsibility for conducting such study in accordance with such protocol (the "Community Study").

(S.A. § 12.2.2.)

Pursuant to the *Leach* Settlement Agreement, the parties chose the Science Panel, which established a protocol and studied numerous human diseases. The Agreement provided that the results of the Science Panel's study would be issued in either a "Probable Link Finding" or a "No Probable Link Finding" for each human disease the Panel studied. (S.A. § 12.2.3.)

In 2011 and 2012, the Science Panel delivered Probable Link Findings for the following human diseases ("Linked Diseases"): kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, diagnosed high cholesterol (hypercholesterolemia), and pregnancy-induced hypertension and preeclampsia. The *Leach* Settlement Agreement defines "Probable Link Finding" as follows:

> "Probable Link" shall mean that based upon the weight of the available scientific evidence, it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members.

(S.A. § 1.49.)

Also in 2011 and 2012, the Science Panel delivered No Probable Link Findings for the human diseases of rheumatoid arthritis, lupus, type 1 diabetes, Chrohn's disease, multiple sclerosis, Parkinson's disease, liver disease, stroke, osteoarthritis, attention deficit disorders and learning disabilities in children, chronic kidney disease, asthma, chronic obstructive airways disease, common infections such as influenza, thyroid cancer, liver cancer, pancreatic cancer, breast cancer, prostate cancer, melanoma, preterm birth or low birth weight, miscarriage or stillbirth, and birth defects.

---

[2] (S.A.; Schedule 2.1.1(B)) (listing the Covered Private Sources, which are defined in Section 2.1.1 of the *Leach* Settlement Agreement as "private water source within the geographic boundaries of the Public Water Districts that is the individual's sole source of drinking water at the location").

3

Because the Science Panel delivered a Probable Link Finding as to the six Linked Diseases, the *Leach* Settlement Agreement permits the individual class members to pursue the claims "for personal injury and wrongful death, including but not limited to any claims for injunctive relief and special, general and punitive and any other damages whatsoever associated with such claims, that . . . relate to exposure to C-8 of Class Members" and DuPont agreed not to contest general causation in those actions. (S.A. § 3.3.) DuPont retained the right to contest specific causation and to assert any other defenses not barred by the *Leach* Settlement Agreement. Section 3.3 of the Agreement provides in relevant part:

> Upon delivery of any Probable Link Finding to the Administrator, Defendant [DuPont] agrees that, in any personal injury or wrongful death action brought by, on behalf of, or otherwise pertaining to a Class Member, Defendant [DuPont] will not contest the issue of General Causation between C-8 and any Human Disease(s) as to which a Probable Link Finding has been delivered, but reserves the right to contest Specific Causation and damages as to any individual Class Member or plaintiff and to assert any other defenses not barred by this Agreement. . . .

(S.A. § 3.3.)

The parties defined general and specific causation as follows:

> "General Causation" shall mean that it is probable that exposure to C-8 is capable of causing a particular Human Disease.
>
> . . . .
>
> "Specific Causation" shall mean that it is probable that exposure to C-8 caused a particular Human Disease in a specific individual.

(S.A. §§ 1.25, 1.60.)

Alternatively, the *Leach* Settlement Agreement provided that if the Science Panel delivered a No Probable Link Finding (*i.e.*, that it is not more likely than not there is link between exposure to C-8 and a particular human disease among class members), the individual class members are forever barred from bringing personal injury or wrongful death claims against

4

DuPont based on injury or death allegedly resulting from those human diseases. Another portion of Section 3.3 of the *Leach* Settlement Agreement addresses this issue:

> [T]he Named Plaintiffs on their own behalf and on behalf of the Class Members, release and forever discharge [DuPont] from any and all claims, losses, damages, attorneys' fees, costs, and expenses, whether asserted or not, accrued or not, known or unknown, for personal injury and wrongful death, including but not limited to any claims for injunctive relief and special, general and punitive and any other damages whatsoever associated with such claims, that: (a) relate to exposure to C-8 of Class Members from any and all pathways including, but not limited to, air, water and soil; (b) are based on the same factual predicate as raised in the Lawsuit; and (c) relate to any Human Disease for which the Science Panel has delivered a No Association Finding or No Probable Link Finding to the Administrator as described in Section 12.2.3 (collectively the "Conditionally Released Claims"). This release is intended to include the release of unknown and unsuspected claims, as well as any claim or right obtained by assignment. . . .

(S.A. § 3.3.)

After the Science Panel delivered its Probable Link Findings and its No Probable Link Findings, the individual class members whose claims are based on one or more of the Linked Diseases began to file cases in West Virginia and Ohio. DuPont moved the United States Judicial Panel on Multidistrict Litigation for centralization of these individual actions pursuant to 28 U.S.C. § 1407. The Judicial Panel granted DuPont's request. On April 9, 2013, the Judicial Panel transferred the centralized action to this Court. In the Transfer Order the Judicial Panel described the individual cases that make up this multidistrict litigation ("MDL") as follows:

> All the actions are personal injury or wrongful death actions arising out of plaintiffs' alleged ingestion of drinking water contaminated with a chemical, C-8 (also known as perfluorooctanoic acid (PFOA) or ammonium perfluorooctanoate (APFO)), discharged from DuPont's Washington Works Plant near Parkersburg, West Virginia. All of the plaintiffs in this litigation allege that they suffer or suffered from one or more of six diseases identified as potentially linked to C-8 exposure by a study conducted as part of a 2005 settlement between DuPont and a class of approximately 80,000 persons residing in six water districts allegedly contaminated by C-8 from the Washington Works Plant [("*Leach* Settlement Agreement")]. See *Leach v. E.I. Du Pont de Nemours & Co.*, No. 01-C-608 (W. Va. Cir. Ct.).

5

(Transfer Order; ECF No. 1 at 1.)

Currently there are approximately 1,500 individual cases in this MDL. The parties have informed the Court that there will likely be approximately 2,500 by the end of January 2015.

On September 3, 2014, Plaintiffs filed their Motion for Partial Summary Judgment Under Rule 56 or for Determination of Issues Under Rule 16(C) (ECF No. 820), and on September 29, 2014, DuPont responded in opposition to that motion (ECF No. 1031). Also on September 29, 2014, DuPont filed its Counter-Motion for Partial Summary Judgment Regarding Application of the *Leach* Settlement Agreement. (ECF No. 1032.) On October 13, 2014, Plaintiffs filed their reply in support of their dispositive motion (ECF No. 1152), and on October 23, 2014, Plaintiffs filed their memorandum in opposition to DuPont's Counter-Motion for Partial Summary Judgment (ECF No. 1209). On November 11, 2014, DuPont filed its reply in support of its Counter-Motion for Partial Summary Judgment (ECF No. 1407).

On November 13, 2014, the Court held oral argument on the parties' dispositive motions ("Motions Hearing"). (Transcript ("Tr."); ECF No. 1519.)

## II.

Initially the Court notes that in their dispositive motion, Plaintiffs argue, *inter alia*, that the doctrine of collateral estoppel binds DuPont to the previously agreed-upon resolution of certain aspects of the individual class members' claims currently before this Court. DuPont disagrees with Plaintiffs' position related to collateral estoppel. The Court finds it unnecessary to address this issue because Plaintiffs and DuPont both agree, and this Court finds, that the parties are bound by the *Leach* Settlement Agreement and that it dictates the result of the issues currently before the Court.

6

Also, the Court heard some argument at the Motions Hearing and received some briefing from the parties related to whether Ohio or West Virginia law will be applied to the individual actions in this MDL. As the Court indicated at the Motions Hearing, it shall permit briefing on this issue before making any final determination. This issue shall be discussed at the next in-person status conference.

With regard to the dispositive motions, DuPont and Plaintiffs ask the Court to make certain findings regarding the individual plaintiffs' burden in proving their cases-in-chief. The Court finds that it needs more context to rule on many of the issues raised in the parties' motions. At the Motions Hearing, however, the parties clarified their positions on Plaintiffs' burdens related to class membership and certain aspects of causation. The Court will address each of these issues to the extent it finds appropriate at this stage of the litigation.

As to class membership, both sides agree, and this Court finds, that as part of the individual plaintiffs' cases, they must show that they are a class member and that they have one or more of the Linked Diseases. To prove class membership, a plaintiff must show that he or she, "for the period of at least one year," has "consumed drinking water containing .05 ppb or greater of C-8 attributable to releases from [DuPont's] Washington Works" plant from any of the "six specified Public Water Districts" or any of the Covered Private Sources named in the *Leach* Settlement Agreement. (S.A. § 2.1.1.)

Relative to the issue of causation, the parties disagree on the function of the Probable Link Findings. The parties agree that they are bound by the Findings. DuPont, however, argues that it that it is permitted to "point[] out the nuances and the limitations of the Science Panel's findings." (Tr. at 27.) DuPont further argues that the Science Panel's Probable Link Findings "include the reasoning and the clarifications on what they did find and, just as importantly, what

7

they did not find." (Tr. at 24.) DuPont scrutinizes the epidemiological analysis within the Science Panel's findings, pointing out:

> And when you look at the probable linked reports, the way they [the Science Panel] did their analysis was the way epidemiologists do it. They look at groups of people, estimated doses, and they compare the lower exposure to the higher exposure.
>
> But when you look through them, they only found associations of increased risk with the highest exposure groups, not with the lowest.

(Tr. at 34.)

DuPont concludes that because of these "limitations" within the Science Panel's Probable Link Findings, it is the individual plaintiffs' burden to show, as part of proving specific causation, "at least two things: What their individual dose was, one; and two, that that dose was sufficient to cause the disease at issue." (Tr. at 37; Tr. at 40) ("that they have to show what their individual dose was; and two, come forward with reliable scientific evidence that says, that particular dosage was sufficient to cause."). In other words, DuPont's position is that the Probable Link Findings may not apply to a particular plaintiff, such as those plaintiffs who were in the lowest exposure groups.[3] DuPont posits that dosages of C-8 for individual plaintiffs must be examined and a determination must be made as to whether the Probable Link Finding applies to the individual.

Plaintiffs counter that the parties agreed contractually in the *Leach* Settlement Agreement that "any issue about the C-8 dosage and whether it's sufficient to have caused this [Linked Disease] is off the table." (Tr. at 37, 44, 45, 51.) Plaintiffs maintain that the dosage level of C-8

---

[3] DuPont suggests that the Findings contain other limitations, including certain objective criteria such as male versus female, main versus prospective analysis, inclusion or exclusion of experience before onset of elevated exposure. (Tr. at 26.)

8

that can cause these diseases is a general causation issue, which DuPont clearly agreed to not contest. This Court agrees.

For several reasons, DuPont's analysis is not tenable under the *Leach* Settlement Agreement. First, the unambiguous language of the *Leach* Settlement Agreement unequivocally provides for application of the Probable Link Finding to any class member with the Linked Disease for which the finding was issued, and that for those individuals DuPont waived the right to challenge general causation. Specifically, the Science Panel was tasked with determining whether "it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease *among Class Members*." (S.A. § 1.49) (emphasis added). The way in which the Science Panel was required to make such a finding was for the Panel to establish "a protocol for *a study of Human Disease among residents exposed to C-8* in the communities served by the Public Water Districts and Covered Private Sources," *i.e.*, to study human disease among the *Leach* class members. (S.A. § 12.2.2) (emphasis added).

If the Science Panel found that it was "more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members," the Panel then issued a Probable Link Finding for that specific disease and DuPont waived its right to challenge whether "it is probable that exposure to C-8 is capable of causing" the Linked Disease, *i.e.*, general causation. (S.A. § 3.3) ("Upon delivery of any Probable Link Finding . . . [DuPont] agrees that, *in any personal injury or wrongful death action brought by, on behalf of, or otherwise pertaining to a Class Member,* Defendant [DuPont] *will not contest the issue of General Causation* between C-8 and any Human Disease(s) as to which a Probable Link Finding has been delivered . . . .") (emphasis added). DuPont cannot now prevent a class member from the benefit of such a finding by pointing out the "limitations" in the objective criteria and/or protocols the Science

9

Panel utilized to make its conclusions or by extrapolating from the Science Panel's analysis what the Panel "did not find" in its Probable Link Finding.

Indeed, in the introduction to each Science Panel Probable Link Finding and No Probable Link Finding, the Panel states:

> One part of the [*Leach*] Settlement [Agreement] was the creation of a Science Panel, consisting of three epidemiologists, *to conduct research in the community* in order to evaluate whether there is a probable link between [C-8] exposure and any human disease. A "probable link" in this setting is defined in the Settlement Agreement to mean that given the available scientific evidence, it is more likely than not that *among Class Members a connection exists* between [C-8] exposure and a particular human disease.

http://www.c8sciencepanel.org/prob_link.html (emphasis added).

Second, as Plaintiffs correctly point out, the limitations and non-findings in the Probable Link Findings highlighted by DuPont are taken from "one of the many studies that the science panel looked at. That wasn't their overall conclusion." (Tr. at 47.) They appropriately highlight that the Science Panel "did not limit [its Finding] to only certain exposure groups or only people that were quartile one versus quartile two -- they said the link existed among that entire group." (Tr. at 11.)

The inquiry in which DuPont engages is directed at the objective criteria and protocols the Science Panel utilized in reaching its conclusion that "it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members." (S.A. § 1.49.) The *Leach* Settlement Agreement explicitly provides that the Science Panel shall agree on "objective criteria" and "protocols" to evaluate the available evidence for the purpose of making a Probable Link or a No Probable Link Finding. (S.A. §§ 12.2.3(a); 12.2.3(b)). The *Leach* Settlement Agreement prevents DuPont from challenging the protocols utilized by the Science

10

Panel in analyzing the presence or absence of a probable link between a particular human disease and C-8.

Third, DuPont's contention would operate to permit suits by *Leach* class members who suffer or suffered from a condition for which the Science Panel found no probable link to C-8. Instead of being barred from forever bringing a claim for her disease, such a plaintiff could "point out the nuances and the limitations of the Science Panel's findings" to show how her dosage of C-8 prevents the No Probable Link Finding from being applied to her. Obviously, this analysis is prohibited by the unambiguous language of the *Leach* Settlement Agreement. Just as all of the *Leach* class members are foreclosed from challenging the objective criteria and/or protocols utilized by the Science Panel in reaching its No Probable Link Findings, DuPont is foreclosed from challenging the objective criteria and/or protocols utilized by the Science Panel in reaching its Probable Link Findings.

Last, the Court finds unpersuasive DuPont's contention that, in spite of the clear contractual language, toxic tort case law informs what the parties meant by general causation because the parties used the same language in the *Leach* Settlement Agreement that is used in that case law. (Tr. at 28–29) ("[T]he general causation in the settlement agreement is defined the same way consistent with general tort case law, the substance is capable of causing a disease."). In relying on a body of toxic tort federal case law, the Ohio Supreme Court defined general causation as "'whether a substance is capable of causing a particular injury or condition in the general population.'" *Terry v. Caputo*, 115 Ohio St. 3d 351, 355 (2007) (citations omitted). That definition, however, is not the same as the one utilized in the *Leach* Settlement Agreement. The *Leach* Settlement Agreement defines general causation to "mean that it is probable that exposure to C-8 is capable of causing a particular Human Disease." (S.A. § 1.25.) The

Agreement does not include the phrase "in the general population." Nor could it have included that phrase and remain consistent with the other provisions of the Agreement. As the Court just outlined, the Settlement Agreement definitively states that the Science Panel was tasked with studying diseases among the class members exposed to C-8 and determining whether there is a link between that exposure and a human disease among those class members.

Accordingly, the Court concludes that if the individual plaintiffs prove that they are a *Leach* Class member and that they suffer or suffered from a Linked Disease, the Probable Link Finding is applicable to them. This means, for example, that the individual plaintiffs are not required to come forward with evidence proving that their individual dosage of C-8 is sufficient to permit the Probable Link Finding to be applied to them. Under these circumstances, by agreeing to the *Leach* settlement, DuPont has contractually agreed to a finding of general causation.

### III.

Based on the foregoing, the Court **DENIES** DuPont's Counter-Motion for Partial Summary Judgment Regarding Application of the *Leach* Settlement Agreement (ECF No. 1032) and **GRANTS IN PART** Plaintiffs' Motion for Partial Summary Judgment Under Rule 56 or for Determination of Issues Under Rule 16(C) (ECF No. 820) in accordance with this Opinion and Order.

**IT IS SO ORDERED.**

12-17-2014
DATE

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE