# EXHIBIT H

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

```
1          IN THE UNITED STATES DISTRICT COURT
2             SOUTHERN DISTRICT OF OHIO
3                EASTERN DIVISION
4    - - - - - - - - - - - - - - - -  X
                              :
5    IN RE: E.I. DU PONT DE NEMOURS AND :CASE NO.
     COMPANY C8 PERSONAL INJURY       : 2:13-MD-2433
6    LITIGATION                 :
                              :
7    THIS DOCUMENT RELATES TO:       :
                         :JUDGE EDMUND A.
8    BARTLETT ET AL V. E. I. DU PONT DE :SARGUS, JR.
     NEMOURS AND COMPANY, 2:13-CV-00170 :MAGISTRATE JUDGE
9    (S.D. OHIO 2013)            :ELIZABETH P.
     and                   :DEAVERS
10   WOLF V. E. I. DU PONT DE NEMOURS   :
     AND COMPANY, 2:14-CV-00095 (S.D.   :
11   OHIO 2014)                 :
     - - - - - - - - - - - - - - - -  X
12                  ST. LOUIS, MISSOURI
13                  WEDNESDAY, MARCH 18, 2015
14
15        VIDEOTAPED DEPOSITION OF DAVID MACINTOSH,
16   a witness herein for Plaintiff, called for
17   examination by counsel for Defendant, pursuant to
18   Notice, taken at 100 South Fourth Street, Suite 600,
19   St. Louis, Missouri, beginning at 9:03 a.m. and
20   ending at 1:10 p.m., Wednesday, March 18, 2015,
21   before Carrie A. Campbell, Certified Realtime
22   Reporter, Illinois, Texas Certified Shorthand
23   Reporter, Missouri Certified Court Reporter,
24   California Certified Shorthand Reporter No. 13121,
25   RPR.
```

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    APPEARANCES:

2      On behalf of the Plaintiff:

3       Gary J. Douglas

4       Lara J. Say

5       Rebecca Newman

6       DOUGLAS & LONDON, P.C.

7       59 Maiden Lane, Sixth Floor

8       New York, New York  10038

9       (212) 566-7500

10      gdouglas@douglasandlondon.com

11      lsay@douglasandlondon.com

12      rnewman@douglasandlondon.com

13

14      and

15

16      Ned McWilliams

17      LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY &

18      PROCTOR, P.A.

19      316 South Baylen Street, Suite 600

20      Pensacola, Florida  32502

21      (850) 435-7000

22      nmcwilliams@levinlaw.com

23

24      and

25

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1	Ashley Brittain-Landers

2	SCHLICHTER, BOGARD & DENTON, L.L.P.

3	100 South Fourth Street, Suite 900

4	St. Louis, Missouri 63102

5	(314) 621-6115

6	alanders@uselaws.com

7

8	On behalf of the Defendant:

9	Steven Fazio

10	SQUIRE PATTON BOGGS (US) LLP

11	127 Public Square, Suite 4900

12	Cleveland, Ohio  44114

13	(216) 479-8500

14	steven.fazio@squirepb.com

15

16	VIDEOGRAPHER:

17	LYNN REINA, CLVS

18

19

20

21

22

23

24

25

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1                          CONTENTS

2     THE WITNESS

3     DAVID MACINTOSH

4     EXAMINATIONS

5          BY MR. FAZIO................................   7

6

7                          EXHIBITS

8     No.  Description                          Page

9     1:    MacIntosh expert report                  8

10    2:    "Environmental Fate and Transport        13

11          Modeling for Perfluorooctanoic Acid

12          Emitted from the Washington Works

13          Facility in West Virginia"

14    3:    MacIntosh curriculum vitae               41

15    4:    MacIntosh statement of compensation        41

16    5:    MacIntosh trial or deposition testimony    41

17    6:    Materials relied on, reviewed and/or       41

18          considered by Expert Dr. David MacIntosh

19    7:    Attachment 4, Table 1                    42

20    8:    MacIntosh retention agreement            85

21    9:    MacIntosh invoices                       86

22    10:   Information related to Carla Bartlett     88

23    11:   Information related to John Wolf          90

24    12:   Residential history of John Wolf         91

25

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    13:    Record of information gathered when        93

2           speaking with Mr. Wolf

3    14:    Record of information gathered when        97

4           speaking with Ms. Bartlett

5    15:    Notes of Taeko Minegishi made on         110

6           January 7, 2015

7    16:    Photographs A - S                  112

8    17:    Supplemental materials reviewed and/or    118

9           considered by Expert Dr. David MacIntosh

10   18:    Notice of deposition of Dr. David        136

11          MacIntosh

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          VIDEOGRAPHER:  We are now on the record in

2     the matter of E.I. du Pont de Nemours and Company C8

3     Personal Litigation, cause number 2:13-MD-2433, in

4     the US District Court for the Southern District of

5     Ohio, Eastern Division.

6          Today's date is March 18, 2015.  The time

7     is 9:03 a.m.  This is the video-recorded deposition

8     of Dr. David MacIntosh, being taken at Schlicther,

9     Bogard & Denton, 100 South Fourth Street, Suite 600,

10    St. Louis, Missouri, 63102.

11         I am the camera operator.  My name is Lynn

12    Reina, certified legal video specialist, in

13    association with Alderson Reporting, located at 1155

14    Connecticut Avenue Northwest, Washington, DC.

15         The court reporter is Carrie Campbell,

16    also in association with Alderson Reporting.

17         Will all attorneys please identify

18    themselves and the parties they represent, beginning

19    with the party noticing this proceeding.

20         MR. FAZIO:  Steven Fazio with Squire

21    Patton Boggs on behalf of defendant DuPont.

22         MR. MCWILLIAMS:  Ned McWilliams on behalf

23    of the plaintiffs.

24         MS. SAY:  Lara Say on behalf of the

25    plaintiffs.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1          MS. NEWMAN:  Rebecca Newman on behalf of

2    the plaintiffs.

3          MR. DOUGLAS:  Gary Douglas on behalf of

4    the plaintiffs.

5          MS. LANDERS:  Ashley Brittain-Landers on

6    behalf of the plaintiffs.

7          VIDEOGRAPHER:  Will the court reporter

8    please administer the oath.

9

10   Whereupon,

11          DAVID MACINTOSH,

12   was called as a witness by counsel for Defendant and

13   having been duly sworn by the court reporter, was

14   examined and testified as follows:

15

16          DIRECT EXAMINATION

17   QUESTIONS BY MR. FAZIO:

18      Q.  Good morning, Dr. MacIntosh.

19      A.  Good morning, Mr. Fazio.

20      Q.  Could you tell me, what is your

21   profession, Dr. MacIntosh?

22      A.  I'm in a consulting profession.

23      Q.  Okay.  And specifically what kind of

24   consulting do you do?

25      A.  I do consulting in the area of

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    environmental health and engineering.

2        Q.   And who do you work for?

3        A.   I'm employed by a company that has the

4    name Environmental Health and Engineering,

5    Incorporated.

6        Q.   Okay.  You understand that you've been

7    identified as an expert witness in a case brought by

8    Carla Bartlett against DuPont?

9        A.   Yes.

10       Q.   Okay.  And you also understand that you've

11   been identified as an expert witness in a case

12   brought by John Wolf against DuPont; is that

13   correct?

14       A.   Yes.

15       Q.   Okay.  Is there any reason that you cannot

16   answer my questions fully and truthfully today?

17       A.   No.

18            (MacIntosh Exhibit 1 marked for

19            identification.)

20   QUESTIONS BY MR. FAZIO:

21       Q.   Doctor, you've been handed what's been

22   marked as Exhibit 1, which is the narrative portion

23   of the report that was served on the defendants in

24   this case.

25            Do you recognize that report, sir?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.  Yes, I do.

2      Q.  Okay.  Sir, can you tell me, what were you

3   asked to opine on in this case?

4      A.  I was asked to opine on whether

5   Ms. Bartlett and Mr. Wolf met the criteria for

6   inclusion in the class for PFOA-identified -- or

7   defined as part of a previous matter.  It appears on

8   page 3 of my report.

9      Q.  Okay.  And so when you say "PFOA," are you

10   talking about PFOA, or perfluorooctanoic acid?

11      A.  Yes.

12      Q.  Okay.  We might refer to that as C8 today

13   as well.  If I say "C8," you'll understand I'm

14   referring to PFOA?

15      A.  Yes.

16      Q.  Okay.  And so on page -- beginning on

17   page 2 and going to page 3, you have the research

18   question -- or a section of your report entitled

19   "Research Question," and you say that you were asked

20   to determine whether Bartlett -- Ms. Bartlett or

21   Mr. Wolf had sufficient exposure to PFOA through the

22   drinking water to qualify as class members under the

23   definition that follows on page 3.

24         Was that the only issue that you were

25   asked to opine on in this case?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.   Yes, that was the -- that was the question

2      that I was asked to answer.

3      Q.   Okay.  And I take it your answers are

4      summarized in section 3 on page 2 above where you

5      say "Summary of Opinions"?

6          MR. MCWILLIAMS:  Object to form.

7          THE WITNESS:  The -- yeah, my opinions

8      about whether they each had sufficient exposure to

9      qualify as class members are, indeed, presented

10     there in section 3.

11     QUESTIONS BY MR. FAZIO:

12     Q.   Okay.  And your opinion, as I understand

13     your report, is that both Ms. Bartlett and Mr. Wolf

14     were both class members?

15     A.   Yes.

16         MR. MCWILLIAMS:  Object to form.

17     QUESTIONS BY MR. FAZIO:

18     Q.   Okay.  And Ms. Bartlett became -- or first

19     met the criteria for class membership in December

20     of 1984; is that correct?

21     A.   Yes, that was what I found.

22     Q.   Okay.  And Ms. -- with regard to Mr. Wolf,

23     you found that he first met the criteria for class

24     membership no later than December of 2000; is that

25     correct?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.   Yes, again, that's what I found.

2      Q.   All right.  Tell me -- tell me about how

3    you went about determining whether they met the

4    criteria for class membership.

5      A.   Well, the approach that I followed is

6    described in the -- in the report, but I'm happy to

7    elaborate on that --

8      Q.   Yeah, please do.

9      A.   -- if you like.

10          All right.  Well, this was in -- in my

11   mind, an exposure assessment, and that's an activity

12   that I engage in routinely.  It's an area in which I

13   have training and education and a couple decades of

14   experience.

15          So I brought the totality of my -- of my

16   work history, my professional history, into this

17   matter.  And I also examined the work that had been

18   done specifically on evaluating exposures to PFOA by

19   members of that C8 science panel and their research

20   teams.

21     Q.   Okay.  Well, let's step through what's

22   described in section .6 -- or section 6.1, which is

23   entitled "Approach" on page 5.

24          I don't think we need to go into this into

25   great detail.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1        I mean, as I understand the work that

2    you've done, essentially you went and looked at

3    Mrs. Bartlett and Mr. Wolf's respective residential

4    histories; is that accurate?

5        MR. MCWILLIAMS:  Object to form.

6        THE WITNESS:  I did examine each of their

7    residential histories, yes.

8    QUESTIONS BY MR. FAZIO:

9        Q.  Okay.  And so you determined -- tried to

10    catalog where they lived and when they lived at

11    those various locations; is that accurate?

12        A.  I did.

13        I had information from various sources,

14    like their depositions, and there was some plaintiff

15    fact sheets that had residential history.  And then

16    I verified that, which is a normal thing to do in my

17    work, by examining public records and speaking with

18    them, too.

19        Q.  Okay.  And the materials that you reviewed

20    and the things you're relying on, I take it, are --

21    you've cited in your report in terms of determining

22    where they lived and when they lived there.

23        For Ms. Bartlett and Mr. Wolf, it's

24    summarized on pages -- or it's set forth on pages 6

25    through 10 of your report?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.   Yes, that's correct.

2      Q.   Okay.  And in terms of determining where

3   Mr. Wolf and where Ms. Bartlett lived and when they

4   lived there, the materials that you're relying on,

5   you've cited all those in the footnotes to your

6   report?

7      A.   Yes, I have.

8      Q.   Okay.  All right.  You mentioned examining

9   some work that the science panel had done.

10            (MacIntosh Exhibit 2 marked for

11             identification.)

12   QUESTIONS BY MR. FAZIO:

13      Q.   Handing you what's been marked as

14   Exhibit 2 --

15      A.   Okay.

16      Q.   -- which is an article from Environmental

17   Science and Technology entitled "Environmental Fate

18   and Transport Modeling for Perfluorooctanoic Acid

19   Emitted from the Washington Works Facility in West

20   Virginia," which was published in January of 2011.

21         Are you familiar with this article?

22      A.   Yes, I am.

23      Q.   Okay.  And when you were mentioning

24   earlier that you have looked at some of the modeling

25   work that the science panel had conducted, is this

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    specifically what you were referring to?

2         MR. MCWILLIAMS:  Object to form.

3         THE WITNESS:  This -- this document is one

4    of many that I examined.

5    QUESTIONS BY MR. FAZIO:

6         Q.  Okay.  Okay.  So in terms of estimating

7    the actual exposures for Mr. Wolf and Ms. Bartlett,

8    is this where -- was this the source of the data

9    that you relied on?

10        MR. MCWILLIAMS:  Object to form.

11        THE WITNESS:  This is one of the several

12   sources.  I would say this is a primary source.

13   It's -- it, in turn, references other data.

14   QUESTIONS BY MR. FAZIO:

15        Q.  Okay.

16        A.  And it's a culmination of -- it describes

17   the culmination of a modeling and analysis, exposure

18   assessment, effort undertaken by this group.

19        And so I looked at their other work as

20   well.

21        Q.  Okay.  Well, let's -- so let's go back to

22   Exhibit 1, page 5.

23        A.  Okay.

24        Q.  It's at the bottom of that page.  You say,

25   "With regard to PFOA levels in public drinking

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    water, I relied on the annual average concentrations

2    of PFOA for the Tuppers Plains-Chester Water

3    District and Lubeck Public Water District

4    attributable to the Washington Works Plant reported

5    by the panel in Figure 2 of Shin, et al., 2011."

6         So you were referring to this -- to

7    Exhibit 2 in that sentence, correct?

8         A.  Yes, I was, uh-huh.

9         Q.  Okay.  So we'll get to the other things

10   you considered in a few minutes.

11        A.  Okay.

12        Q.  But in terms of the work that you did here

13   in terms of quantifying the exposures, you relied

14   primarily on Exhibit 2?

15        MR. MCWILLIAMS:  Object to form.

16        THE WITNESS:  I did rely on this paper,

17   and as I said, it, in turn, references other

18   information.

19   QUESTIONS BY MR. FAZIO:

20        Q.  Okay.  Can you describe for me how it was

21   that you went about estimating the levels of PFOA in

22   the public drinking water for Tuppers Plains and

23   Lubeck using Shin -- the Shin 2011 article?

24        A.  Yes.

25        So I -- I reviewed and examined the

1    modeling methodology that was employed by the -- the

2    investigators, you know, or the authors of this

3    paper.

4            And I examined their other publications

5    that go into further detail about components of the

6    modeling, all of which -- or at least some of which

7    contribute to the predicted drinking water

8    concentrations that appear in this Exhibit 2.

9            And I, you know, made my own evaluation,

10   independent evaluation, of the validity and

11   reliability of the approach that they took and the

12   results that they obtained.  And I found their

13   approach to be -- and their results to be reliable.

14   They fit within the norms of my profession.

15           And having done that, I then relied on the

16   model or predicted water concentrations for each of

17   those districts as a function of time that are

18   reported in this Exhibit 2.

19   Q.   Okay.  And specifically how was it that

20   you went about extracting -- so Figure 2 is a -- is

21   a graph, right?

22   A.   Yes, it is.

23   Q.   Okay.  So how is it that you went about

24   extracting from the graph the numbers that you set

25   forth in your report --

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1        A.  Well --

2        Q.   -- for predicted PFOA concentrations?

3        A.   That's described in my report, too, but I

4    can -- I can just --

5        Q.   Yeah, why don't you --

6        A.   -- talk about it a little bit.

7             So the need there, what needs to be done,

8    is to identify a number that goes with each point on

9    the graph.

10            So we need to extract the number off of

11   the graph, in this case several numbers off of the

12   graph.  And the way I did that is to use a software

13   tool that's designed to do just that.  It's a tool

14   that digitizes an image like this, and then you can

15   scale that or align that digitized image to the

16   numerical axes, you know, the horizontal and the

17   vertical axis on this chart.

18            And from that the -- you'd put -- using

19   the software then you can pinpoint a portion or a

20   spot on a line, and then the software will return

21   the value that goes with that point.

22       Q.   Okay.  And so to be clear, Doctor -- so

23   Shin Figure 2, there are -- there are lines on Shin

24   Figure 2 which are the calibrated, predicted

25   concentrations that the science panel estimated, or

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    Shin and his coauthors estimated, and then there are

2    also points on that figure, correct?

3        A.  That's right.

4        Q.   And the points represent observed

5    concentrations, so actual measured -- measurements

6    of PFOA in drinking water or in water that were

7    observed during the periods of time indicated on the

8    graph, correct?

9        A.  Right.  That's my understanding.  Uh-huh.

10       Q.   And when you digitized this, were you

11   digitizing the lines, the points or both?

12       A.  I digitized the lines.

13       Q.  Okay.

14       A.  The -- well, I guess the -- I mean, the

15   points were digitized, too.  The values that I

16   extracted were from the lines.

17       Q.   Okay.  So the values that you extracted

18   were the calibrated, predicted concentrations

19   expressed in Figure 2?

20       A.  Correct.

21       Q.  Okay.  Now, I take it you had to do that

22   because the -- because Shin and his coauthors

23   haven't published the data that underlies Figure 2?

24       A.  I'm not aware of the -- like a tabulated

25   version of this chart that could have been used

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    instead.  So that's right.

2       Q.   When you actually do the conversion,

3    what's the -- you actually -- you select particular

4    points in time on the lines?

5       A.   Right.

6       Q.   Is that -- that's the way that it works?

7       A.   Right.

8       Q.   Okay.  So you don't -- doesn't produce

9    a -- it doesn't take the entire line and estimate

10   for -- strike that.

11          I'll take it -- go back.

12          So you selected particular points in time

13   on each of the lines?

14      A.   Correct.

15      Q.   Okay.  How did you determine where you

16   were going to put those points?

17      A.   I did that by digitizing the X axis -- so

18   that's time, right? -- and by equally spacing

19   the distance in between tick marks on the lines.

20          Say, for example, between 1980 and 1990,

21   you can then infer where on that horizontal axis you

22   would find 1981 and '82 and '83 and so on.

23          And then in that software you can have the

24   software put the -- a grid line in that inferred

25   year -- point for the year, and then you can go up

Unsigned                                                    Page  19

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    that -- that now vertical line, see where it

2    intersects the curve for the drinking water

3    concentrations and then pinpoint that point, mark

4    that point on the curve.

5        Q.  Okay.  So the -- you essentially estimated

6    between -- on the X axis, you essentially estimated

7    where the years would begin for each of the years

8    you were considering?

9        MR. MCWILLIAMS:  Object to form.

10       THE WITNESS:  Yeah, where the years would

11   be.  Not necessarily begin, but where they would be.

12   QUESTIONS BY MR. FAZIO:

13       Q.  Okay.  And so the software itself actually

14   produces -- the output of the software actually

15   tells you what the value of the line would be right

16   at the mark -- at the point that you're asking?

17       A.  That's correct.

18       Q.  Is that correct?

19       A.  That's correct, yeah.

20       Q.  Okay.  Now, as I understand your report,

21   you describe the values that you determined for

22   Ms. Bartlett and Mr. Wolf as average annual values;

23   is that correct?

24       A.  Yes.  They are annual average values.

25   That's the increment in time that the Shin, et al.,

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    provided estimates.

2        Q.   Okay.  So your understanding is that each

3    one of those points -- so if you, for example, were

4    looking at Ms. Bartlett in 1997 --

5        A.   Uh-huh.

6        Q.   -- and you put a point on the line for

7    Tuppers Plains in 1997 where it intersected the line

8    for Tuppers Plains in Shin Figure 2, that would

9    actually be equivalent to the annual average?

10       A.   That's -- yes, that's what I -- that's

11   what I did, and that's what I believe to be the case

12   here, yeah.

13       Q.   Okay.  So you didn't actually average

14   anything.  You just extracted the data directly from

15   Shin Figure 2?

16       A.   That's right.

17       Q.   Okay.  Now, you -- in your report you

18   describe a sensitivity analysis?

19       A.   Yes.

20       Q.   Can you tell me exactly how you performed

21   this sensitivity analysis?

22       A.   Yes.

23           So the purpose of the sensitivity analysis

24   was to characterize the amount of variability that

25   one could expect to arise from one individual

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    performing that procedure that we just went through,

2    that we just described, right?  Marking the spot and

3    extracting the number.

4          Because it's -- even though the software

5    digitizes the figure, pinpointing the spot and also

6    aligning the axes is done by the user.  And so it's

7    possible that different people could do it somewhat

8    different and get somewhat different results.

9          And so I recognized that that was a

10   potential source of uncertainty, and I wanted to

11   characterize the magnitude of that uncertainty.

12         So what I did was had a dozen people -- I

13   was one of them -- in my firm get trained on how to

14   use the software and then apply the software to

15   extract the values for each of the years.  And then

16   I compared the extracted values across the -- the

17   individuals.

18         And I wanted to know how -- I wanted to

19   know the extent of the agreement between these

20   extracted -- of these extracted values among these

21   people.

22   Q.   Okay.  So you -- let me just step through

23   what you just talked about.

24   A.   Sure.

25   Q.   So first you talked about you trained --

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1   well, first you talked about training 12 people.

2        Was there any special significance to

3   using 12 people or it was just --

4        A.  I wanted to be able to have a -- yeah,

5   there was some significance.

6        Q.  Okay.

7        A.  I wanted to have a large enough set of

8   observations to characterize the central tendency of

9   this uncertainty and the distribution of the -- the

10  dispersion, you know, of the uncertainty, too.

11       Q.  Okay.  And then you said that you trained

12  them.

13        What sort of training were people given on

14  how to use the software?

15       A.   They were -- well, one of my staff members

16  learned how to use the software, became quite adept

17  at it, and then, in turn, gave each of these 11

18  people, besides herself, training on how to use it.

19  So the mechanics of using the software.

20        And also, you know, here's what you do to

21  align the axes.  You use, you know, this pull-down

22  menu and -- you know, with this click.  And then

23  here's what you need to do to extract a point.

24        So they had training to that level.  And

25  then they went and did it.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    Q.   Okay.  And who was the staff member that

2    did this training for you?

3    A.   That was Taeko Minegishi.

4    Q.   And just so we're clear, the software

5    we're talking about is something called the Engauge

6    Digitizer?

7    A.   That's right.

8    Q.   Okay.  And that's -- is that -- that's

9    freeware, something that you can just download from

10   the Internet, or do you have to pay for it?

11   A.   It's downloaded from the Internet.  I

12   don't recall.  We might have had to pay.

13   Q.   Okay.  Have you ever used this technique

14   before in any of your other work?

15   A.   I've certainly extracted information from

16   charts before.  I don't know that I've actually used

17   the Engauge Digitizer tool for doing it previously.

18   Q.   Was there any particular reason you chose

19   Engauge over some other software platform?

20   A.   I found it to be a common -- a commonly

21   used software, and then I cited some examples of its

22   use in -- in my report.

23   Q.   Now, you say you were one of the people

24   who engaged in this sensitivity analysis?

25   A.   I did.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      Q.   The original extraction from Shin

2    Figure 2, did you personally do that, or was that a

3    member of your staff?

4         MR. MCWILLIAMS:  Object to form.

5         THE WITNESS:  The original?

6    QUESTIONS BY MR. FAZIO:

7      Q.  Uh-huh.

8      A.  What do you mean by "the original"?

9      Q.   So as I understand it, there were -- the

10    values from Shin Figure 2 were extracted 13 times,

11    correct?

12     A.   12, I believe it was.

13     Q.  Oh, it was 12?

14     A.  Uh-huh.

15     Q.   So 12 times.

16         So did you -- and you personally conducted

17    one of those 12 extractions; is that correct?

18     A.  Yes, I did.

19     Q.   Okay.  Now, the values ultimately that

20    you -- that you report in your -- in Exhibit 1, your

21    expert report --

22     A.  Uh-huh.

23     Q.   -- were those from -- were those the ones

24    you personally extracted, or were those from someone

25    else?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    A.  You know, I don't remember, but I would

2    guess it was either mine or the average of all 12.

3    But I'm not sure.  I can find out, but I'm not sure.

4    Q.  Okay.

5    A.  I just don't recall as we sit here.

6    Q.  Okay.  So you're not sure if it was -- if

7    there was one particular one that was chosen or if

8    it was averaged?

9    A.  Like I said, I don't recall as I sit here,

10   but I do know that the overall variability among the

11   12 people was quite small.  But it's -- that's

12   described in footnote 20 of my report.

13   Q.  So aside from placing the points onto this

14   grid in the Engauge Digitizer, are there any other

15   assumptions that need to be made in performing this

16   analysis?

17       MR. MCWILLIAMS:  Object to form.

18       THE WITNESS:  Well, I mentioned one

19   already, and I'm not sure if you were incorporating

20   that into your question or not, but that's -- you

21   also have to align the axes.

22   QUESTIONS BY MR. FAZIO:

23   Q.  Okay.

24   A.  So that's part of it.

25   Q.  So align the axes, and then you need to

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1   identify the specific points that you're attempting

2   to extract the values for.

3            Is there anything else that you need to do

4   where the user makes -- elects -- makes some sort of

5   election about how the software is going to be run?

6       A.   Not that I recall.

7            There may be some ones, but those would be

8   the primary elections, as you put it --

9       Q.   Okay.

10      A.   -- that I recall right now.

11      Q.   Are there any other assumptions that go

12  into how you perform the analysis --

13           MR. MCWILLIAMS:  Objection.

14  QUESTIONS BY MR. FAZIO:

15      Q.   -- other than what you've already

16  described for us?

17           MR. MCWILLIAMS:  Object to form.

18           THE WITNESS:  Like I said, I don't -- I

19  don't recall if there were any other specific ones

20  right now, but I'd be happy to look into that and

21  answer the question more fully if -- if needed.

22  QUESTIONS BY MR. FAZIO:

23      Q.   Now, Doctor, the sensitivity analysis that

24  you conducted, really what you're doing is

25  determining the consistency with which the data is

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1   being extracted from Shin Figure 2; is that correct?

2       A.   That was -- that's a fair way of

3   describing the objective.

4       Q.   All right.  And so the sensitivity

5   analysis, it doesn't evaluate the underlying

6   accuracy of the Shin model; is that correct?

7       A.   Right.  That was a separate activity.

8       Q.   Okay.  We touched on this a few minutes

9   ago, but I want to make sure I'm clear on it.

10        So Figure 2, the lines represent the

11  calibrated predicted concentrations, and I think you

12  testified that the points are actual observations

13  where there were water samples taken and reported.

14        And you -- you relied on the lines,

15  correct?

16      A.   Yes, I relied on the lines for the

17  extraction that we just discussed.

18      Q.   Okay.  So the points that appear on Shin

19  Figure 2, do those factor into your analysis in any

20  way?

21        MR. MCWILLIAMS:  Object to form.

22        THE WITNESS:  The points that appear on

23  Figure 2 are definitely information that I

24  considered.

25

1    QUESTIONS BY MR. FAZIO:

2       Q.   Okay.  And how did you consider them?

3       A.   Well, I -- in part, in the way that

4    they're presented here in the paper, which is as a

5    reference against which the predicted values, the

6    lines, can be evaluated.

7       Q.   Okay.

8       A.   So what the authors of this paper were

9    doing was comparing their predicted drinking water

10   concentrations of PFOA to measured values of PFOA

11   in -- from the drinking water systems in an effort

12   to characterize the performance of their modeling.

13      Q.   Okay.  So we talked about the model a

14   couple times --

15      A.   Uh-huh.

16      Q.   -- but let's -- it's actually -- let's

17   talk a little bit about specifically what Shin did

18   because it's a little bit more complicated than just

19   the model.

20          So there are actually a series of models

21   that are linked together; is that correct?

22      A.   I agree, yes.

23      Q.   Okay.  There's an air dispersion model?

24      A.   Yes.

25      Q.   Okay.  There's a vadose zone model?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    A.  Yes.

2    Q.  Okay.  What does the vadose zone model

3  estimate?

4    A.  So the vadose zone model is characterizing

5  transport of PFOA from the surface of the soil down

6  through -- as it percolates through underlying soil,

7  and eventually having the potential to reach the

8  underlying aquifer.

9    Q.  And then there's also a surface water

10  model; is that correct?

11    A.  That's correct.

12    Q.  Okay.  And then ultimately there's a

13  groundwater model?

14    A.  Correct.

15    Q.  And actually there are two groundwater

16  models, are there not?  One MODFLOW and then

17  something called MP3DMS {sic}?

18    A.  That's right.

19    Q.  Okay.  And those models are all linked

20  together in -- to form the ultimate -- ultimately

21  the predictions that appear in Shin Figure 2?

22    A.  Yeah, that's right.

23    It was, I would say, quite an extensive

24  effort on the part of these investigators to link

25  those models to produce the -- the results that

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    appear in this paper.

2        Q.   Would you agree with me it's a complex set

3    of models?

4        MR. MCWILLIAMS:  Object to form.

5        THE WITNESS:  I think a lot of models are

6    complex.  There's no doubt about it.

7        I think that the -- the complexity, if you

8    will, of the effort is -- of this particular effort

9    is expanded beyond the complexity that you would

10   have in just applying any one of these models.

11       And I'll tell you, in part, that's one of

12   the reasons why it's -- the agreement between the

13   predicted and observed drinking water concentrations

14   is high, in my mind.

15       You know, despite the complexity of the

16   models, the need -- the need for information that

17   these models have, that when put together, they can

18   produce reasonable estimates of the drinking water

19   concentrations of PFOA.

20   QUESTIONS BY MR. FAZIO:

21       Q.   Doctor, were you personally involved in

22   any way in the work of the C8 science panel?

23       A.   No, I was not involved in any way.

24       Q.   Was EH&E, your company, involved?

25       A.   No, not that I'm aware of.

1    Q.   Okay.  So you weren't involved in

2    gathering any of the data or making any of the

3    analyses that's reflected in the Shin 2011 paper?

4    A.   No, I was not.

5    Q.   Have you ever spoken to Dr. Shin or any of

6    his coauthors about how they conducted the modeling?

7    A.   I have not spoken with Dr. Shin.  I have

8    spoken with Barry Ryan, who is one of the coauthors.

9    Q.   And you talked to Barry Ryan about the

10   modeling work they did in this case?

11   A.   I talked to him about it generally over

12   time.

13   Q.   Okay.

14   A.   He and I have known each other since -- in

15   1992, and we're colleagues and work -- kind of like

16   professional friends, and so we talk from time to

17   time.  And sometimes we talk about what we're doing.

18   Sometimes we talk about our families.  And so we've

19   discussed some of what they've been doing over time.

20   Q.   So -- well, tell me -- so I understand you

21   may have a personal relationship.

22   A.   Uh-huh.

23   Q.   And obviously I'm not asking you to tell

24   me about your conversations with Dr. Ryan as it

25   involves your families.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.   Okay.

2      Q.   But as it involves the modeling or the

3   work that the C8 science panel has done in -- you

4   know, in this case -- or not in this case, but the

5   C8 science panel has done --

6      A.   Uh-huh.

7      Q.   -- why don't you tell me about the

8   conversations you've had with him.

9          How many times do you think you've spoken

10  with Dr. -- or with -- I assume it's Dr. Ryan?

11     A.   Yeah, Dr. Ryan.

12     Q.   -- Dr. Ryan about the work that was done

13  by the C8 science panel?

14     A.   Oh, I couldn't say for sure, but I'd say

15  somewhere -- a few.  Less than three.  You know, we

16  don't see each other as much anymore as we used to,

17  and this work wasn't done that long ago, so there's

18  not that many occasions for us to talk about it.

19     Q.   All right.  So what was -- so the first

20  time that you remember talking to him, what were the

21  circumstances that led to the conversation about the

22  work they were doing?

23     A.   Oh, I don't even know.  I don't --

24  honestly, I don't, Steve -- Mr. Fazio.  It could

25  have been on the phone.  It could have been at a

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    conference.  It could have been -- who knows.  I

2    really don't recall.

3        Q.   Okay.  Do you recall from any of your

4    conversations with Dr. Ryan specifically what he

5    told you about the modeling work that was being

6    done?

7        A.   Not specifically.

8             I could tell you generally that he was --

9    conveyed that he was excited and interested in this

10   body of work that they were doing, and he was

11   particularly excited about the opportunity to link

12   all these models together.

13            He's a -- he's an academic researcher.

14   The opportunity to do work like this motivates him.

15   So it was that kind of discussion.

16       Q.   And so, Doctor, tell me, when do you

17   recall these conversations occurring?

18       A.   Over the last, on and off, maybe five

19   years, something like that.  You know, like I said,

20   I talk to him every now and then.

21       Q.   Did you ever reach out to or speak with

22   Dr. Ryan specifically to obtain information for your

23   use in this case?

24       A.   No, I did not talk to him specifically to

25   get information in this case.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1     Q.   Okay.  Have you ever had any

2   communications with him, whether spoken or

3   otherwise, regarding work that the science panel or

4   work that's -- that was done in -- relating to the

5   science panel?

6          Did you ever communicate with him in any

7   way to obtain information that you would be using --

8   you used in this case?

9     A.   No.

10    Q.   Okay.  So is it fair to say that your

11  communications with Dr. Ryan, they were just -- it

12  was a general professional discussion about the work

13  that he was doing?

14    A.   I think that's right, yeah.

15    Q.   Okay.

16    A.   Uh-huh.

17    Q.    And you're not relying in -- on any of

18  those conversations in -- as a basis for your

19  opinions in this case?

20    A.   No.

21    Q.    All right.  You mentioned Dr. Ryan.

22          Were there any other -- any other people

23  that you've talked to from either the C8 science

24  panel or any of the Shin coauthors regarding the

25  modeling work that was done?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.   No.

2      Q.   Did you have access to any of the input or

3   output files for any of the models described in Shin

4   2011?

5      A.   Not that I'm aware of, no.

6      Q.   Is there a circumstance where you would

7   have access to them and you would not know it?

8         MR. MCWILLIAMS:  Object to form.

9         THE WITNESS:  I don't think so.

10   QUESTIONS BY MR. FAZIO:

11      Q.   Okay.  Now, you touched on this earlier,

12   but I think you indicated that you took some steps

13   to verify or validate the modeling done by Shin; is

14   that correct?

15      A.   I did.

16      Q.   Okay.  Tell me what you did in that

17   regard.

18      A.   Well, did a couple things in general and

19   then many specifically.

20         The couple things in general were to --

21   one was to review the literature produced by the

22   investigators who did this work, and the other was

23   to form my own conceptual model of the -- what I

24   would expect to be the case, you know, be the

25   situation, with regard to transport and fate of PFOA

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    in this area.

2         And then, you know, I put those two pieces

3    of information together to -- to form an opinion of

4    my own about the reliability of their work.

5    Q.   Okay.  Well, let's talk -- we'll take this

6    out of order.

7         You say --

8    A.   Okay.

9    Q.   -- you created your own conceptual model.

10        What do you mean by "conceptual model"?

11   A.   I mean a mental model of how I would

12   expect the PFOA to move through the environment and

13   what -- and the kind of pieces of information one

14   would need to -- to estimate or simulate that

15   transport and fate.  And I did that based on my own

16   experiences, my own training and education in this

17   field.

18        You know, it starts with -- with having

19   some understanding of how the material's released

20   and, you know, the disposition of the release, in

21   what media, over what time periods, and it also --

22   early on one needs to have some understanding of the

23   physical and chemical properties of the chemical

24   because those can influence the transport and fate,

25   will influence the transport and fate.

1        And then knowing that the material was

2    discharged to surface water and to air, you know, I

3    formed a -- my own ideas about how that transport

4    could be simulated and how -- again, the pieces of

5    information one would need to perform that type of

6    estimation.

7        And then part of that mental model, too,

8    was where I would expect the PFOA to appear in the

9    environment and in relative amounts.

10        And then I took that through -- from the

11    groundwater or drinking water itself and extended it

12    to considering the potential for accumulation in

13    people, drinkers or consumers of the water.

14    Q.   So -- I'm sorry.

15        MR. MCWILLIAMS:  Are you finished?

16    QUESTIONS BY MR. FAZIO:

17    Q.   Sorry, I didn't mean to interrupt your

18    answer.

19    A.   No, that's all right.

20    Q.   I wasn't sure if you were finished or --

21    A.   I was hoping to answer it.  I hope you're

22    getting an answer that's useful to you.

23        So those are the kinds of steps, right,

24    that went into forming this con -- my own conceptual

25    model.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    Q.   Okay.  And so when you -- "conceptual

2    model," I think you referred to it as a mental

3    model.  This is you sitting down and thinking

4    through the problem of -- you know, if you were

5    going to answer this question, if you were going to

6    do the modeling yourself, sort of conceptually how

7    you would go about doing it.

8        Is that a fair characterization?

9    A.   How -- how I would go about doing it and

10   my priors on what I would expect to find.

11       Yeah, I think that's -- that's really it.

12   And again, that's based on my own experience and

13   training and education, having done modeling and

14   measurements that -- that relate to this type of

15   problem.

16   Q.   Now, sir, so I -- so we're clear, you

17   actually haven't -- you haven't done any modeling

18   yourself in this case; is that correct?

19   A.   That's right.  That's right.

20   Q.   Okay.

21   A.   The types of modeling done here parallel

22   the types of exposure and assessment activities that

23   people in my field do and which I've done.

24   Q.   And so you haven't -- so you haven't done

25   any modeling specific to this case.

1      Have you gone out and taken any -- done

2   any kind of sampling in this case, any water

3   sampling, air sampling, blood sampling, of any kind?

4     A.  No, I have not done any sampling for PFOA

5   or related species in this matter.

6     Q.  And, Doctor, just so I'm clear in my -- or

7   it's clear to you in my questions, when I say "you,"

8   I'm referring to you and EH&E as well.

9      So if somebody went out and did it on your

10  behalf, obviously I'm -- I'd like you to respond --

11    A.  I will.  I understand.  Thank you for

12  clarifying that.

13    Q.  Okay.  So you described this mental model,

14  conceptual model, process that you went through, and

15  then you also said that you reviewed the literature

16  produced by the investigators.

17      So tell me about that.

18      What literature did you review?

19    A.  Well, that material --

20      MR. MCWILLIAMS:  If it's all right, I'd

21  like to give get him a copy of his entire report,

22  not just --

23      MR. FAZIO:  Oh, yeah, that's fine.

24      THE WITNESS:  Okay.  Thank you.

25      MR. FAZIO:  That's fine.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1       THE WITNESS:  Yeah.  That literature is

2    identified in the report.

3       MR. FAZIO:  Okay.  That's, I think,

4    attachment -- at the end of your report.

5       MR. MCWILLIAMS:  You want to make it an

6    exhibit?  I mean, I don't mean to interrupt --

7       MR. FAZIO:  I'm going to.  I'm going to.

8    I just wasn't -- I'm kind of jumping kind of ahead.

9       MR. MCWILLIAMS:  You might want -- just to

10   make the record clean, you might want to go ahead

11   and mark those -- the rest of his report.

12      MR. FAZIO:  Yeah, that's fine.

13      MR. MCWILLIAMS:  I'll take that back.

14         (MacIntosh Exhibits 3, 4, 5 and 6

15          marked for identification.)

16   QUESTIONS BY MR. FAZIO:

17      Q.  I think with the additional exhibits that

18   you've just been handed, which are marked 3 through

19   6, that's --

20      A.  Right.

21      Q.  Constitutes your complete report?

22      A.  Yes.

23      Q.  Okay.

24      MR. MCWILLIAMS:  Are you missing a table,

25   maybe?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1          THE WITNESS:  And then there's 4 and 5.

2          MR. FAZIO:  Oh, sorry, sorry.  Attachment

3     4.

4          THE WITNESS:  Oh, wait, I have 4.

5          Wait a second.  Sorry, my -- my mistake.

6          MR. MCWILLIAMS:  You do?

7          THE WITNESS:  3, 4, 5 and 6 is right here.

8          MR. FAZIO:  Sorry, we're missing -- yeah,

9     I'm sorry.  He was pointing out that we were missing

10    attachment 4, so we need to mark that one as well.

11         THE WITNESS:  Yeah, I got confused between

12    the attachment numbers and the exhibit numbers.

13    But, yeah, we're good.

14             (MacIntosh Exhibit 7 marked for

15             identification.)

16    QUESTIONS BY MR. FAZIO:

17       Q.   All right.  Doctor, so we're talking about

18    the literature that you considered.

19       A.   Uh-huh.

20       Q.   And so you -- there was an attachment to

21    your report entitled "Materials Relied on, Reviewed

22    and/or Considered By Dr. David MacIntosh."

23         Do you have that in front of you?

24       A.   Yes, I do.  It's Exhibit 6.

25         MR. MCWILLIAMS:  And I'm sorry, we're

1    still talking about his conceptual model?  Is that

2    correct?

3            MR. FAZIO:  No, we talked about his

4    conceptual model, and then he also said that he

5    wouldn't -- he reviewed the literature produced by

6    the investigators.

7            MR. MCWILLIAMS:  So separate from the --

8            MR. FAZIO:  Yeah.

9            MR. MCWILLIAMS:  Okay.

10   QUESTIONS BY MR. FAZIO:

11       Q.   So, Doctor, the materials that -- when you

12   said that you had reviewed literature produced by

13   the investigators, the literature that you reviewed

14   is -- was listed on Exhibit 6?

15       A.   It's listed on Exhibit 6 as well as in the

16   main body of my report in the footnotes.

17       Q.   Okay.  So which particular documents or

18   literature were you -- did you use in determining

19   whether you thought Exhibit 2, Shin 2011, was

20   reliable for your purposes in this case?

21       A.   Well, I examined in -- let's see.  I'm

22   looking at Exhibit 6, page 1 of 4, and I'm looking

23   at the -- let's see.

24            Sorry, I'm thinking about the depositions

25   of James Cox and Donald Poole, but I'll have to come

1    back to those.  I need to think about those a little

2    more, recall those a little more.

3           But now I'm moving down into the section

4    entitled "Literature," page 1.

5           So certainly the paper by Paustenbach; the

6    Bartell; the next one, the Frisbee paper; the

7    Steenland paper.

8           Yeah, the ATSCR document had some

9    information on -- some of the information I

10   considered on physical and chemical properties.

11          The Hoffman paper; the Seals paper.

12          Let's see.  The top of page 2 where it

13   says "Shin," that's the paper we've been talking

14   about.  However, there's the next one by Shin.

15   That's the serum PFOA paper.  That's how I think of

16   it.

17          The next one by Shin, it's modeling the

18   air soil transport pathways.  Certainly that.

19          And I'd say more indirectly, but then

20   the -- the Vieira paper assessing the spatial

21   distribution.

22          Looking at that Bartell abstract, the

23   impact of exposure uncertainty is helpful.

24          So it's not -- if it's in addition to that

25   literature, you know, what I think -- here, your

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    question was about the literature from the C8

2    science panel team of investigators, but I also

3    looked at and considered for evaluating the

4    reliability of their modeling work some of the

5    reports listed in the Document section that begins

6    on page 2.

7        Q.  Okay.  Which documents were those?

8        A.  Primarily the second one on page 3.  It's

9    a 2008 data assessment report.

10       Q.  Are those all of them?

11       A.  The ones that are listed there.

12       Q.  Okay.

13       A.  And then, like I said, there are others in

14   here, in the body of the report.

15           Actually, I believe that the documents

16   that are in the body of the report also appear in

17   here, some of them.

18       Q.  Okay.  You mentioned a moment ago the 2008

19   data assessment report.

20       A.  Uh-huh.

21       Q.  How is it that you used that in coming to

22   your opinions about the validity and reliability of

23   the Shin modeling?

24           MR. MCWILLIAMS:  Object to form.

25           THE WITNESS:  The data assessment report

1   has some information on measured levels of PFOA in

2   various media, including drinking water.  And so I

3   examined that information and found it to be

4   generally consistent with the predicted values by

5   Shin, et al.

6   QUESTIONS BY MR. FAZIO:

7       Q.   Okay.  Well, and that leads me to another

8   question.

9           I mean, so did you -- to what extent did

10  you -- well, strike that.

11          Did you compare the values that you

12  estimated based on Shin Figure 2 to actual PFOA

13  levels in water samples from these various water

14  districts?

15      A.   In a general way through -- by, one,

16  examining the figure that we've been talking about

17  in Shin, that Figure 2, and also by examining the

18  range of the concentrations reported for some of the

19  water districts in that 2008 data report to the

20  predicted values in Shin.

21      Q.   Okay.  But did you conduct any sort of

22  formal analysis on that?

23      A.   I wouldn't -- I'm not sure what you mean

24  by "formal analysis," but I confirmed for myself

25  that these observed values were in the same range as

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1     the predicted values.

2         Q.   But you didn't go ahead and do any sort of

3     statistical analysis to determine the difference

4     between what was observed in that data and what you

5     estimated based on Shin Figure 2?

6         A.   Not in an explicit analysis of the data.

7     By "explicit" I mean like a detailed statistical

8     analysis, as you say.

9             No, I haven't done that.

10        Q.   Okay.  So that you compared them, but you

11    compared them somewhat informally; is that fair to

12    say?

13            MR. MCWILLIAMS:  Object to form.

14            THE WITNESS:  I did, but at the same time

15    I reviewed the more formal evaluation of the

16    predicted and observed values that appears in the

17    Shin paper.

18    QUESTIONS BY MR. FAZIO:

19        Q.   Okay.  So we got -- we got on to this

20    topic because I started asking you about if you had

21    done anything to verify or validate Shin's modeling.

22        A.   Okay.

23        Q.   And you described to me you had reviewed

24    the literature -- well, you started off by saying --

25    describing a conceptual model that you had sort of

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    thought through yourself, and that you -- you then

2    reviewed the literature.  And you went through the

3    literature that -- that you, in fact, reviewed, and

4    you talked a little bit about the data.

5         Aside from the things we've discussed, was

6    there anything else you did to verify or validate

7    the modeling that was done by Shin?

8    A.   Well, those are the -- those are the

9    primary activities in their -- you know, in terms of

10   like blocks of activity, and there are more specific

11   activities within those.

12   Q.   Okay.

13   A.   So I think we're in a good spot.

14   Q.   Okay.  Well, tell me more specifically

15   within the blocks, to use your term, what is it that

16   you specifically did?

17   A.   Well, let's see.  In terms of the --

18   relating the conceptual model to what I learned was

19   done by the -- by the investigators and observed

20   what was done, no, I -- I saw that their working

21   incorporated all of the major elements that I would

22   expect to see in an assessment of this type.

23        I saw that they encountered some of the

24   same challenges that I would expect to -- to

25   encounter if I were to undertake that activity.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1          I -- so I think that's -- that's maybe --

2      it's a good way to describe the conceptual model

3      part.

4          For the papers themselves and reviewing

5      their work, you know, I looked to -- just to see if

6      there was internal consistency among their -- their

7      various pieces of work.

8          I looked to see if their results were

9      generally what you would expect given the

10     observations of the serum PFOA, PFOA concentrations

11     that had been measured in people and in the drinking

12     water.

13         I looked, examined, the extent to which

14     they addressed the completeness, or gaps in

15     information that they might need to perform these

16     analyses, you know, how they addressed the -- any

17     uncertainty and how they kind of, again,

18     cross-checked their own work.

19         And I found that their work conformed with

20     the -- the normal practices in my profession.

21     Q.   Doctor, a minute ago you -- in talking

22     about the conceptual model, you used the word

23     "challenges" in the modeling.

24         What did you mean by "challenges"?

25     A.   Well, there are always challenges in any

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    exposure assessment, whether it's measurement-based

2    or modeling-based.  And a lot of it has to do with

3    the availability of information that -- that in an

4    ideal world, which never exists, but, you know,

5    would be available to -- to an assessor.

6           So, you know, this is a historical

7    exposure reconstruction, and so there's a need to

8    gather information over time.  But a tremendous

9    amount of effort was put into that.  That's very

10   clear from the published works.

11          There's a need for information on the

12   properties of the chemical itself.  For some

13   chemicals that's not so much of a challenge; for

14   others it can be more of a challenge.  I think PFOA

15   is in that latter group.

16          They had -- certainly had computational

17   challenges because they had -- I mean the modeling,

18   transport and fate, over five -- approximately five

19   decades on an annual basis, and they're linking all

20   these models, as you so correctly pointed out

21   earlier this morning.  And there are, you know, run

22   time issues, there's capacity on your servers or

23   other computer kind of issues to deal with.

24          There's data processing to manage the

25   information, output from one model and get it

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    conformed -- in the right format to be an input to

2    the next model.

3         Those are some of the challenges.

4    Q.   So, Doctor, in your evaluation of the

5    modeling that -- that Shin and his colleagues

6    undertook, were there any specific instances where

7    you would have either used a different assumption or

8    taken a different approach than Shin and his

9    colleagues?

10    A.   Not that I know of.  Not that I can

11    identify right now.  You know, but at the same time,

12    I wasn't doing the work in conjunction with them, so

13    I couldn't -- I couldn't be certain about any

14    specific challenges that they were facing at any

15    certain time.

16    Q.   So, Doctor, I want to make sure I fully

17    understand this.

18         So we've been talking about things that

19    you've done to verify or validate the modeling done

20    by Shin and his colleagues.  And we talked about the

21    literature review, and you talked about your

22    conceptual model, and we talked a little bit about

23    some of the challenges of doing this kind of

24    modeling.

25         And thus far, it sounds like all of your

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      evaluation of Shin's work was -- was qualitative.

2          Is that a fair statement?

3          MR. MCWILLIAMS:  Object to form.

4      QUESTIONS BY MR. FAZIO:

5      Q.   Well, let me -- actually, let me withdraw

6      that.  Let me ask you a different question.

7          Did you do any sort of quantitative

8      analysis to determine the accuracy of the Shin

9      model?

10     A.   Well, I did -- let me think about that for

11     a second.

12         You know, every analysis that I do is

13     likely to have some quantitative aspect to it.  It's

14     just a question of degree, you know, how -- how

15     extensive the quantitative analysis is.

16         So I'm going to say, for example, here in

17     the Shin work, you know, one of the things that they

18     do is compare the predicted average annual

19     concentration for a water district to the

20     corresponding observed.  And that's a process that

21     they use to evaluate the model performance and to

22     calibrate the model.

23         So I examined what they did, right?  Their

24     procedure.  I looked at their tables.  I considered

25     the -- the -- their calibration factors and their

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    approach in a quantitative way.

2         I find that -- you know, I observed that

3    their -- they are reporting that their observed

4    concentrations are -- I'm sorry, their predicted

5    concentrations are on average within a factor of 2

6    across the individual water districts of the

7    observed.

8         So I would say that's a quantitative

9    analysis.  I wouldn't say it's an in-depth

10   quantitative analysis, but it's certainly

11   quantitative.

12        So as I said, it's really a matter of

13   degree.

14   Q.   Doctor, you mentioned a -- a minute ago

15   that one of the challenges was the pro -- the

16   property of the chemical itself in doing this

17   modeling.

18        Do you recall that?

19   A.   Yes.

20   Q.   Okay.  So tell me, why are the properties

21   of the chemical itself a challenge in the modeling?

22   A.   Well, from what -- from what I have

23   learned about PFOA is that -- let me back up a

24   second.

25        Some -- there are -- in this type of

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    exposure analysis, it's common to require

2    information on certain properties of the chemical

3    that influence how it moves through the environment.

4    Those are given -- there are many different terms

5    that are applied to those -- those properties, and

6    many of them relate to the affinity that a chemical

7    will have for a certain type of material and the

8    converse, you know, its potential to move from that

9    same type of material.

10        And for many chemicals, those properties

11   are fairly well characterized.  Things like the

12   octanol-water partition coefficient or the Henry's

13   law constant or the octanol carbon -- or the organic

14   carbon water coefficient.

15        And from what I've learned looking into

16   PFOA is that some of those -- those properties for

17   that chemical are less well understood in comparison

18   to many other chemicals.  So that's a challenge.

19   Q.   In terms of the challenges associated with

20   the chemical properties of PFOA, were any of those

21   issues, in your view, material -- strike that.

22        With respect to the chemical properties of

23   PFOA in the modeling work that Shin did, were there

24   any chemical properties that were used in Shin

25   that -- were there any instances in which you would

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    have used a different value for that property?

2        A.   I can't say for sure because I didn't do

3    the work myself, you know, either with them or in

4    parallel.  So I -- I can't really say for sure --

5        Q.   Just don't have --

6        A.   -- as I sit here, no.

7        Q.   I'm sorry.  You just don't have an opinion

8    on that?

9        A.   I think the ones that they used were

10   reasonable.  They talk about them, and they

11   certainly thought about it.  And I think their

12   ultimate reasoning is transparent and understandable

13   and reasonable.

14           I mean, in my mind, the proof is kind of

15   in the pudding in that the predicted values for the

16   groundwater agree well with the observed, and the

17   same is true for the serum PFOA concentrations.

18       Q.   Well, Doctor, let's -- in terms of the

19   agreement with the observed values as it relates to

20   Shin Figure 2, the observed values primarily -- that

21   were used primarily were observed after 2000; is

22   that correct?

23       A.   Yes, that's right.  Yeah.

24       Q.   Okay.  I think -- or in the paper itself

25   it describes there were some from, I think, 1998 on,

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    but they primarily were from 2000 on; is that right?

2       A.   Right.  I think primarily 2000 through

3    2007.

4       Q.   Okay.  And yet the Shin model actually

5    goes back to as far as 1950; isn't that correct?

6       A.   It does.

7       Q.   Okay.  And so when they calibrated -- when

8    Shin calibrated the model, they calibrated it

9    primarily against observed values from 2000 to

10   approximately 2010; is that right?

11      A.   Right.

12      Q.   Okay.  Are you aware of any samples taken

13   from the public water supply from Tuppers Plains

14   that were analyzed for PFOA content prior to 1997?

15      A.   There may be some, but I'm not -- I'm not

16   aware of them.  And if they are, they might be in

17   the -- I would expect them to be in the group of

18   measurements that are -- for which the accuracy is

19   dubious, because I think the analytical chemistry

20   methods were being still developed at that time.

21      Q.   In forming your opinions about class --

22   actually, you know what?  We've been going for about

23   an hour.

24          Do you want to take a break, or are you

25   good to go for a little bit longer?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.   Let's take just a quick break.  Just

2    short.

3           VIDEOGRAPHER:  Off the record.

4            (Off the record at 10:08 a.m.)

5           VIDEOGRAPHER:  The time is 10:19 a.m.  We

6    are back on the record.

7    QUESTIONS BY MR. FAZIO:

8      Q.   Doctor, just before the break we had been

9    talking a little bit about challenges in modeling of

10   the type that Shin and his colleagues undertook, and

11   you said to me that one of the challenges was data

12   over time and then we discussed the property, the

13   physical properties, of the chemical itself and the

14   computational challenges.

15         Were there any other challenges in this

16   kind of modeling that you identified in the course

17   of your work on this case?

18     A.   Well, I may have, but those are the ones

19   that come to mind right now, and despite those

20   challenges, it's -- you know, their modeling results

21   agreed well with the observations that were

22   available.

23     Q.   And so you say they "agreed well."

24         I think earlier you indicated that the

25   predicted values that Shin and his colleagues

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    observed were within about a factor of 2 of the

2    observed results.

3         Is that correct?

4    A.   On average they were within a factor of 2.

5    That's what's reported in their work, uh-huh.

6    That's for the concentrations of the PFOA on an

7    annual basis in the drinking water of the different

8    districts, the seven districts.

9    Q.   Did you do anything to analyze --

10   actually, strike that.  You've already answered that

11   question.

12        Your comparison -- you compared the annual

13   average values that you extracted from Shin Figure 2

14   to some of the sampling data.

15        I think you mentioned the data from the

16   MOU in 2008; is that correct?

17   A.   I don't know if that was the MOU in 2008,

18   but that data -- what's it called? -- the data

19   assessment report from 2008.

20   Q.   Okay.

21   A.   Yeah.

22   Q.   Did you compare the results that you

23   extracted from Shin Figure 2 to any other data sets?

24   A.   Well, it's either some information

25   presented -- after my report I compared it to

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    information that appeared in a report of a

2    Mr. Washburn.

3        Q.  Okay.

4        A.  Because he has a couple of tables that

5    were in there.

6        Q.   And that was after you completed your

7    report?

8        A.  Yeah.

9        Q.  Okay.

10       A.  I received that after I completed my

11   report.

12       Q.  Okay.  Prior to completing your report,

13   though, were there any other data sets that you --

14   where you compared the results on your attachment 4

15   to any other sets of data that reflect observed

16   concentrations of PFOA in water for either Tuppers

17   Plains or -- we'll refer to it as New Lubeck.

18       A.  Uh-huh.  Uh-huh.

19           I'm trying to recall if I did or not.  You

20   know, if other measurement data appear in the -- in

21   the literature that I reviewed and considered and

22   rely upon and I certainly made that comparison to, I

23   just don't recall right now.

24       Q.   So just to close -- close the loop on

25   this, have you told me now everything you did to

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    verify or validate the modeling work done by Shin

2    and his colleagues that underlies Figure 2?

3       A.   No.

4       Q.   Okay.  Tell me, what else did you do?

5       A.   Well, I drilled down, so to speak, you

6    know, looked in more detail at their work.

7           For example, as I mentioned, I did -- you

8    know, I examined other parts of their work that

9    relate to the reliability of the groundwater model

10   predictions.

11          So starting at kind of the end, maybe it

12   would be -- say, left to right, it would be, you

13   know, the end of the sequence of events or

14   processes, you know, we could look at the serum PFOA

15   concentrations that are estimated and provided in

16   another paper that Shin was the first coauthor of --

17   or first author of.

18          And that's relevant because the drinking

19   water intake of PFOA is one of the primary or one of

20   the important routes of exposure for -- for this

21   community.

22          And so for the -- in the serum -- the

23   predicted serum PFOA concentrations agreed well with

24   the observed serum PFOA concentrations that were

25   collected in 2005 and '6 by the C8 -- as part of the

Unsigned                                    Page  60

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    C8 health study.

2         And "agreed well," what I mean is the

3    correlation coefficient between the predicted and

4    observed was moderate to strong.  In the range of .6

5    to .7 as a correlation coefficient, it's good when

6    you're comparing predicted values to observed values

7    for individual people, which is what they were

8    doing.

9         It also -- I think it was about 60 percent

10   or so of all their predicted serum concentrations

11   were within a factor of 2 of the corresponding

12   observed predictions.  That's also very good

13   agreement.  And I know that based on similar work of

14   my own that I've done, although it wasn't PFOA

15   related.

16        And another reason that that serum

17   information that's -- the concordance of the

18   predicted and observed serum information is relevant

19   is that it's related to the persistence of PFOA in

20   the body.

21        So that persistence is described in this

22   literature as a half-life of PFOA in the body.  And

23   there are a range of estimates generally between a

24   little more than two years to about three and a half

25   years for that -- that half-life.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1        And so what that means is that it -- with

2    a half-life of, say, three years, as an example, you

3    know, it takes -- it would take about a decade or so

4    for all of the PFOA in a person's body at a given

5    time to be cleared from that body.

6        So that means that the values -- the serum

7    PFOA predicted at a given point in time are

8    dependent upon the serum PFOA predicted in the prior

9    year and the year before that and the year before

10    that and the year before that.

11        So in other words, to get it right in a

12    given year means that you -- you have to get it

13    right in the prior years, too.

14        So when I see that they're in agreement in

15    the predicted serum PFOA, observed serum PFOA, is

16    quite good based on these 2005 measurements.  That

17    tells me that the prior years must have been

18    reasonable, too, and on target.  So that's one.

19        Another is if you start at kind of the

20    other end of the chain, like the emissions.  So to

21    get the -- the serum PFOA right and the

22    groundwater -- and the drinking water PFOA right,

23    you -- you almost certainly need to have the

24    emissions be reasonable estimates, too.

25        In the period when the drinking water

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1   concentrations predicted by Shin, et al., were

2   compared to the observed drinking water

3   concentrations, again, is approximately 2000, 2007.

4   So if you look at the emission rates that Shin, et

5   al., used, they had two primary sources; one was

6   data that -- on emissions that had been gathered and

7   assessed by Paustenbach, et al., and are described

8   in their paper.  And Paustenbach, et al., estimated

9   emissions from, I think it was, 1951 through 2003,

10  so into the period when this evaluation of agreement

11  with observed was performed.

12        The second source was some more recent

13  information on emissions that were cited as coming

14  from DuPont, and that was for 2004 and '5, I think,

15  maybe '6, too.

16        So why this is relevant in my mind is that

17  when we see reasonable concordance between observed

18  and predicted drinking water concentrations in 2000,

19  2007, we know that those predictions are, in part,

20  based on emission rates that -- and I see that those

21  emission -- the source of those emission rate

22  estimates is the same in the -- or included in the

23  2000 through 2007 period as was used for the prior

24  years.  That makes me think, too, that the prior

25  years are probably reasonable for the prior years of

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    estimated PFOA in drinking water are reasonable.

2         And there's another paper that Shin was

3    also the first author on.  It appeared in

4    Atmospheric Environment, and in that paper they were

5    focused on the air modeling.

6         And what they were doing was, you know,

7    with the air modeling, they -- they have the

8    emissions that go into the model, and then you have

9    the movement of the PFOA in the atmosphere carried

10   by the wind and scavenged out of the atmosphere by

11   rain and falling to the ground.  That's called dry

12   deposition.  And anyhow -- but, you know, the PFOA

13   lands on the surface soil.

14        And then as we talked about earlier this

15   morning, some of that PFOA can percolate down

16   through the surface soil into the underlying soil,

17   that vadose zone.

18        So what they did in this paper published

19   in Atmospheric Environment was compared the

20   predicted accumulation of PFOA in soil, surface

21   soil, to the observed -- to observed data also from

22   that 2000, 2007-ish time period, I think it was, and

23   they compared the predicted subsurface PFOA

24   concentrations in soil to the observed data, too.

25   And those -- there was good agreement there as well.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1        So that lets a reviewer like myself

2    understand that intermediate components of their

3    linked models were reasonable, as well as the kind

4    of outcome, we could call it, right, the end point

5    drinking water concentrations in the serum PFOA, and

6    to link that to this evaluation period for the

7    drinking water concentrations when there are, you

8    know, observations available to the prior period is

9    this.

10        So in Exhibit 2 -- you know, I think it's

11    Exhibit 2 -- they talk about transport time, so time

12    for PFOA to move through this environmental system

13    that they're simulating.  And they say that one of

14    the -- the phases in the transport sequence that's

15    the longest is this period in the vadose zone, or

16    moving from the surface soil to the subsurface and

17    into the aquifer.  And they said based on the inputs

18    that they have in the model, that time would be

19    about 11 years.

20        So that says that predicted drinking water

21    concentrations in a given year are, in part,

22    dependent upon the predicted accumulation in soil

23    over the prior decade or so.

24        And because these models are linked in

25    time, where they would run one model per year, the

1    first model for the year, take the output, put it

2    into the second model, right, and then run the first

3    model again for the next year and put that output

4    into the second model.  So all these models are

5    linked in time.

6         So it would be very -- I would be very

7    surprised if they got reasonable and what I consider

8    to be reliable modeling results in the 2000, 2007

9    period and also to have incorrect or unreliable

10   results earlier.  I just don't see that making

11   sense.

12        Q.  So, Doctor, you mentioned a few minutes

13   ago in your answer that you -- you made some

14   reference to serum PFOA -- or serum PFOA levels --

15        A.  Uh-huh.

16        Q.  -- so levels of PFOA in blood.

17        Do you recall that?

18        A.  Yes.

19        Q.  Okay.  Now, in your work on this case,

20   isn't it true that the criteria for class membership

21   really has nothing to do with the levels of PFOA in

22   a person's blood?

23        Is that accurate?

24        MR. MCWILLIAMS:  Object to form.

25        THE WITNESS:  Yeah, I'm looking at the

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1     criteria for class membership on page 3 of my

2     report, and it makes no mention of levels of PFOA in

3     the body of a person.

4     QUESTIONS BY MR. FAZIO:

5          Q.   Okay.  And in your report, can -- is there

6     any place in this report where you have ever

7     discussed serum PFOA levels for any member of the

8     class?

9          A.   I wouldn't think so, but it's certainly

10    among the information that I reviewed and

11    considered.

12         Q.   Okay.  You haven't expressed any opinions

13    about that in your report?

14         MR. MCWILLIAMS:  Object to form.

15    QUESTIONS BY MR. FAZIO:

16         Q.   Isn't that correct?

17         MR. MCWILLIAMS:  About what?

18         MR. FAZIO:  About PFOA levels in blood for

19    any member of the class.

20         THE WITNESS:  I --

21         MR. MCWILLIAMS:  Same objection.  It

22    doesn't make any sense.

23         THE WITNESS:  If you're asking me did I

24    make mention of measured serum PFOA for either

25    Ms. Bartlett or Mr. Wolf, no, I don't think I did.

1          We can go back here and check.

2          I did mention briefly the half-life in

3     people on page 3 and 4 --

4          MR. MCWILLIAMS:  Are we talking about the

5     body of his report or materials considered?

6          MR. FAZIO:  The body of his report.

7          MR. MCWILLIAMS:  And only the body of his

8     report?

9          MR. FAZIO:  Yeah.

10          MR. MCWILLIAMS:  Okay.

11     QUESTIONS BY MR. FAZIO:

12     Q.   Doctor, so was there a reason that you

13     extracted data from Shin Figure 2 rather than simply

14     using the results of water sampling in the districts

15     in forming your opinions about Ms. Bartlett or

16     Mr. Wolf's membership in the class?

17     A.   Well, I wanted to have a consistent source

18     of information for each of the years that I was

19     evaluating, and these predicted concentrations that

20     appear in this Shin paper are a source of that

21     information.  Where the measured values are not

22     available -- there are no measured values that I'm

23     aware of that are available prior to about 2000.

24          But that's not uncommon.  That's what

25     models are used for.  Models are most useful --

1    well, models can be useful in many ways, and one of

2    the ways that they're -- situations in which they're

3    absolutely necessary is when you want to understand

4    what conditions may be like in the future.  So, of

5    course, there's no possibility of measurements for

6    time that hasn't occurred yet.

7        And then models can also be quite useful

8    for time periods in the past where you don't have

9    measurements.  That's a common use of models.

10    Q.   Doctor, your report talks only about

11    exposures that Mr. -- or Ms. Bartlett and Mr. Wolf

12    may have had from drinking water.

13        Have you done anything to quantify

14    Ms. Bartlett or Mr. Wolf's potential exposure from

15    any other source of PFOA at the time you created --

16    you created your report or completed your report?

17    A.   I looked at the -- I reviewed the air

18    modeling done by the C8 investigator group as well

19    as the analogous work that was done by Paustenbach,

20    et al., and I overlaid at the locations of

21    Ms. Bartlett and Mr. Wolf with the modeling, the air

22    modeling, domains indicated by -- in the Shin, et

23    al., body of work.

24        And it appeared to me that Mr. Wolf would

25    be in an area that -- it looks like he's in an area

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    where the modeling was done, but it wasn't -- I

2    didn't do anything more than that because my focus

3    was on determining whether or not Ms. Wolf --

4    Ms. Bartlett and Mr. Wolf met the class criteria.

5        Q.   So the extent -- the extent to which you

6    considered potential air exposure was just simply

7    overlaying or plotting where Ms. Bartlett and

8    Mr. Wolf would have been against the air modeling

9    domain; is that correct?

10       MR. MCWILLIAMS:  Object to form.

11       THE WITNESS:  I think I did that.  I just

12   wanted to, you know, deepen my knowledge.

13   QUESTIONS BY MR. FAZIO:

14       Q.   So you didn't do anything else with

15   respect to potential air exposure; is that correct?

16       A.   Not that I recall.

17       Q.   Okay.  What about any other kind of

18   exposure?

19       A.   No, I didn't -- I did not consider any

20   other route or pathway of exposure quantitatively

21   or really qualitatively either, although I

22   recognized that those -- those may, and probably

23   did, exist.

24       Q.   Now, I didn't see anything in your report

25   about this, but I want to be clear about it.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1           I take it you're not going to be offering

2    any opinions at trial concerning the alleged health

3    consequences of exposure to PFOA?

4       A.  I think that would be unlikely.

5       Q.  Okay.  So is that unlikely or no?

6           MR. MCWILLIAMS:  Object to form.  Asked

7    and answered.

8           THE WITNESS:  Well, I'll answer questions

9    that are asked of me.  It's certainly not a question

10   that's been asked of me at this time.

11   QUESTIONS BY MR. FAZIO:

12      Q.  Okay.  All right.  Let's take a look at

13   attachment 4 to your report, which is the table.

14      A.  Oh, all right.  Okay.

15      Q.  All right.  So attachment 4 is, I think

16   we've discussed, is -- these are the values that you

17   extracted from Shin Figure 2 using the Engauge

18   Digitizer; is that correct?

19      A.  That's right.

20      Q.  And in the left-hand column there are

21   values for Ms. Bartlett, and in the right-hand

22   column there are values for Mr. Wolf, right?

23      A.  Correct.

24      Q.  For Mr. Bartlett -- or, I'm sorry,

25   Ms. Bartlett, the analysis begins in 1983?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1     A.   Yes.

2     Q.   What was the significance of 1983?

3     A.   1983, I have to think back about it, but I

4  think that's the year -- the first year that I could

5  identify when -- and verify that she was occupying a

6  residence that was receiving public water.

7     Q.   Okay.  And so you've not done anything to

8  quantify any alleged exposure to PFOA for

9  Ms. Bartlett prior to 1983?

10       MR. MCWILLIAMS:  Object to form.

11  Misstates evidence.

12       THE WITNESS:  Could you repeat the

13  question, please?

14  QUESTIONS BY MR. FAZIO:

15     Q.   I asked:  Have you done anything to

16  quantify any alleged exposure for Ms. Bartlett to

17  PFOA in drinking water prior to 1983?

18       MR. MCWILLIAMS:  Same objection.

19       You don't understand this table.

20       THE WITNESS:  Well, I guess in a sense I

21  did, and I -- I asked the question for myself to

22  answer, you know, was her -- did I see any evidence

23  that she was a consumer of public water prior to

24  1983, and I did not see that.

25

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    QUESTIONS BY MR. FAZIO:

2        Q.   Prior to 1983, what was the source of

3    Ms. Bartlett's drinking water, if you know?

4        A.   I think that -- I've been thinking about

5    what I've learned here, and I believe that prior to

6    '83 she -- she lived with her parents in the home

7    where she grew up as a child, and they were

8    receiving water from a spring or well.

9        Q.   Did you have any information concerning

10   any potential PFOA exposure via her drinking water

11   prior to 1983?

12       A.   No, I don't have any information on that.

13       Q.   All right.  And so Mr. Wolf, your analysis

14   begins in 1999.

15           I take it that's the first year you could

16   establish that he was in any water district where he

17   would have been exposed to PFOA?

18       A.   Yes, that's correct.

19       Q.   Okay.  And then both -- for both

20   Ms. Bartlett and Mr. Wolf, your analysis ends in

21   2005.

22           Why did you choose to end the analysis in

23   2005?

24       A.   I chose to end the analysis there for a

25   couple of reasons.  One was that the -- that was the

Unsigned

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1   end of the time period reported in this Shin paper

2   in Environmental Science and Technology that we've

3   been discussing, and the other is that it's my

4   understanding that shortly after 2005, systems were

5   put in place in these public water districts to

6   remove or otherwise lower the concentrations of PFOA

7   in the drinking water.

8      Q.  Okay.  And at that point, any exposure to

9   PFOA by drinking water would have ceased; is that

10  true?

11     A.  I don't know that it absolutely ceased.

12  I've looked a little bit at some of that data

13  because there's been measurements since that time,

14  but certainly in general the concentrations were

15  lowered substantially and in most cases nondetect.

16     Q.  And so attachment 4, these are estimated

17  annual average PFOA concentrations in the Tuppers

18  Plains and Lubeck water supplies based on the

19  modeling done by Shin.

20      As a practical matter, on any given day or

21  week, the amount of PFOA in the water could have

22  been below these annual averages, correct?

23      MR. MCWILLIAMS:  Object to form.

24      THE WITNESS:  I suppose that it could be,

25  but if it was below, then it would -- on one day it

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    would necessarily have to be above on another time

2    for that average to work out.

3    QUESTIONS BY MR. FAZIO:

4        Q.   Okay.  And you can't say what the actual

5    concentration of PFOA was for any of the times that

6    either Ms. Bartlett or Mr. Wolf actually was

7    drinking the water; is that accurate?

8            MR. MCWILLIAMS:  Object to form.

9            THE WITNESS:  Well, it wasn't necessarily

10   in the scope of my work.

11           My work was to understand whether or not

12   they met the criteria for inclusion in the class.

13   QUESTIONS BY MR. FAZIO:

14       Q.   And you're not claiming that at the PFOA

15   levels estimated on attachment 4 that DuPont should

16   have known that PFOA would harm anyone, are you?

17           MR. MCWILLIAMS:  Object to form.

18           THE WITNESS:  I don't have an opinion at

19   this time on knowledge or harm, no.

20   QUESTIONS BY MR. FAZIO:

21       Q.   Doctor, let's go back to Exhibit 1.

22           In footnote 41 --

23       A.   Okay.

24       Q.   -- which is on page 7, you describe a

25   personal communication with Mrs. Bartlett.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1          Do you see that?

2      A.  I'm sorry.

3      Q.  Are you okay?

4      A.  Yeah.  I noticed that some of my breakfast

5  appeared on my shirt.

6          Cover that up.

7      Q.  Sorry, Doctor.

8          All right.  So footnote 41, page --

9  page 7, you describe a personal communication with

10  Ms. Bartlett.

11          Do you see that?

12      A.  I do.

13      Q.  Okay.  Was that the only time you've

14  spoken with Ms. Bartlett prior to issuing your

15  report?

16      A.  No.  There was a second time.  I believe

17  that's -- yeah, look at footnote 28.

18      Q.  Oh, okay I see.

19          So there were two times:  December 8,

20  2014, and November 10, 2014.  Those were the two

21  times you had communications with her prior to

22  issuing your report?

23      A.  I'm sorry, could you repeat the dates that

24  you just posed in the question?

25      Q.  So in footnote 28 you say December 8,

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    2014, and then on footnote 41 you're saying

2    November 10, 2014.

3        A.  That's correct.

4        Q.  Okay.  So those were the two times that

5    you recall speaking with her prior to issuing your

6    report?

7        A.  Yes.

8        Q.  Okay.  So tell me what was -- let's start

9    with the November 10, 2014 conversation.

10        Can you tell me, what was discussed in

11    that conversation?

12        A.  Yes.

13        So the content of the discussion is

14    described there in the second paragraph on page 7.

15    So we talked about -- I asked her questions about

16    where she lived along US 50 East and the nature of

17    her housing situation and the -- what she understood

18    to be the source of the water that was, you know, in

19    her house that she -- in the tap of her house.

20        Q.  Okay.  Anything else you discussed during

21    that call?

22        A.  Not that I recall.

23        Q.  And why was it necessary for you to talk

24    to Ms. Bartlett about the -- the issues you just

25    described?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    A.   Uh-huh.  Well, there's the period of time

2   where she lived on this US 50 East address and --

3   but for which I didn't have any veri -- evidence, if

4   you will, of her use of water, public water, and I

5   wanted to understand that better.  And that's why I

6   talked to her.

7    Q.   Okay.

8    A.   And what I learned is what it says in the

9   report here, is that she and her husband lived in a

10   trailer, as she calls it, on property owned by a

11   Mr. and Mrs. Depoy, and that the water -- indeed,

12   the trailer that she resided in received water, it

13   had flowing water in it, and that that water came

14   from the Depoys' water meter, which, in turn, was

15   connected to the Tuppers Plains Public Water

16   District.

17    Q.   Did you take any notes from that call?

18    A.   No, I don't have any notes.  I just

19   incorporated them right into the report as I was

20   writing it.

21    Q.   All right.  So the -- do you recall any --

22   well, before we move on.

23       So do you recall anything else from the

24   November 10, 2014 conversation you haven't told me

25   about already?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.  I don't.

2      Q.  So let's talk about the December 8, 2014

3   conversation.

4          What was the --

5      A.  Okay.

6      Q.  What was the nature of that conversation?

7      A.  Sure.

8          I'm just going to look at the sentence

9   that goes with that footnote.

10          Right.  Okay.  Refreshes my memory.

11          So there was a similar situation as to

12   what I just described when Ms. Bartlett lived along

13   US 50, but different time period, different

14   location.

15          So the time period is earlier now, it's in

16   the '80s, and she lived along Lottridge Road.  So

17   she had described in previous testimony, maybe in

18   the, like, deposition or plaintiff fact sheet or

19   elsewhere, that she lived at 2540 Lottridge Road

20   with her parents in a home, and she lived in that

21   home up through, I think it was, 1986.

22          And at some point in '86, she no longer

23   resided in the home with her parents but instead

24   moved into a trailer that was on the property owned

25   by her parents.  So adjacent to her parents' home

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    where she was living previously.

2         So I wanted to understand what the source

3    of water was when she lived in that trailer because

4    there were no -- I could not find any records from

5    the Tuppers Plains Water District that showed an

6    account in her name for that '86 to '89 time period.

7         Q.   Okay.  Anything -- I'm sorry, were you

8    done?

9         A.   Not quite.

10        Q.   Okay.

11        A.   So I -- I asked her about that.  I wanted

12   to understand that better.

13        Q.   Okay.

14        A.   And what she told me was that the trailer

15   that she lived in did have flowing public water that

16   was connected to a water meter that was under a

17   different account.

18        Q.   Okay.  Anything else from that

19   conversation that you recall?

20        A.   I asked her about the possibility of

21   receiving information about -- let's see.

22        I asked her if she thought it was possible

23   for us to get records from the Tuppers

24   Plains-Chester Water District on the accounts

25   that -- that she -- her trailer may have been

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    connected to, and she thought that was not very

2    probable.

3        Q.  Okay.

4        A.  That was the only other thing we

5    discussed.

6        Q.  Okay.  Did you take any notes during that

7    conversation?

8        A.  No, I didn't -- I did not take any notes.

9        Q.  Aside from those two communications, did

10   you have any other communications with Mrs. Bartlett

11   prior to issuing your report?

12       A.  Not that I'm aware of.  Not that I recall.

13       Q.  Did you have any communications with

14   Mr. Bartlett prior to issuing your report?

15       A.  No.

16       Q.  Okay.  And aside from any communications

17   you might have had with the attorneys, did you have

18   any communications with anyone else relating to

19   Mrs. Bartlett's case that are not disclosed in your

20   report?

21       A.  Let's see.  My colleagues at EH&E, but I

22   can't think of anyone else.

23       Q.  All right.  So footnote 64, you describe

24   a -- a communication with Mr. Wolf on November 25,

25   2014.

Unsigned                                              Page  81

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1        A.   Yes.

2        Q.   Okay.  Tell me about that communication.

3             What was the purpose of speaking to

4    Mr. Wolf on -- in November of 2014?

5        A.   Uh-huh.

6             So the purpose of my communication with

7    Mr. Wolf on that day was for me to gather additional

8    information about his residential history.  And I

9    wanted to do that because there was -- I felt there

10   was some ambiguity in the information I had, and I

11   wanted to clarify that, resolve that ambiguity,

12   which I was able to do.

13       Q.   Okay.  So tell me, what was the ambiguity

14   you were trying to clarify?

15       A.   You know, it turns out that some of

16   these -- these parcels in that area, this Wildwood

17   Avenue or Wildwood Drive area in Parkersburg, that

18   they have two addresses.

19            And in his deposition or plaintiff fact

20   sheet, there was some kind of back and forth between

21   a couple of addresses for the -- for a given time

22   period.  And I -- and I wanted to understand whether

23   he lived in two different places at a given time

24   period or one.  And so I was able to clarify that.

25            And it turned out it was one, and it just

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    has to -- these -- these parcels were reidentified

2    as the -- with addresses as the neighborhood seemed

3    to evolve over time.

4         So more specifically, he made mention to

5    getting 911 -- right, 911, I think -- related

6    reasons for renumbering these parcels in terms of

7    street number and road name.

8    Q.  So ultimately he was in the same location;

9    it just was -- the address actually changed.

10        Is that what you're saying?

11   A.  Yeah, the address changed.

12        And if you look into the parcel records,

13   you can actually find both addresses.  And so I was

14   able to verify that through the public records.

15   Q.  Okay.  What else do you recall from your

16   conversation with Mr. Wolf in November of 2014?

17   A.  Oh, I asked him then -- and actually this

18   holds for Ms. Bartlett, too.  So go back to the

19   prior question you asked me about her, was there

20   anything else we discussed.

21        I asked him about his use of the drinking

22   water in his home.  I said -- I asked him if -- if

23   he consumed that water.  I asked him if it was his

24   primary source of water, his most -- the source he

25   drew upon most frequently.  And he said, yes.

1        And I -- in one of the prior conversations

2    with Ms. Bartlett, I asked her the same thing, and

3    she said yes as well.

4       Q.   Okay.  Anything else from your

5    November 2014 conversation with Mr. Wolf?

6       A.   Not that I recall.

7       Q.   Have you ever had any other -- did you

8    have any other communications with Mr. Wolf prior to

9    issuing your report in December of 2014?

10      A.   No.

11      Q.   And I apologize if I asked you this

12   already.

13       Were there any notes from your

14   conversation with Mr. Wolf?

15      A.   No, I don't have any.  I incorporated them

16   into the report as well.

17      Q.   Did anybody else participate in the

18   conversation, in your conversation with Mr. Wolf?

19      A.   Not that I remember, no.

20      Q.   Okay.  And going back to the conversations

21   you had with Ms. Bartlett, did anybody else

22   participate in those conversations?

23      A.   I think one of my colleagues was on those

24   calls and perhaps one of the attorneys, too.

25      Q.   Okay.  Which colleague would have been on

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    the calls?

2        A.   Same one I mentioned before, Taeko

3    Minegishi.

4        Q.   All right, Doctor.  Today we were provided

5    with a -- some additional documents in response to

6    our -- to the notice of deposition.

7        A.   Okay.

8        Q.   I want to go through these --

9        A.   All right.

10            (MacIntosh Exhibit 8 marked for

11            identification.)

12   QUESTIONS BY MR. FAZIO:

13       Q.   -- briefly with you.

14            Doctor, you were handed what's been

15   marked, I think, as Exhibit 8 to the deposition.

16   And this appears to be --

17            Well, can you identify this for me?

18       A.   Yes.

19            This is a retention agreement between my

20   firm and our client.

21       Q.   Okay.  And I note that the letter itself

22   is dated August 15, 2013, and it was signed -- is

23   that your signature --

24       A.   That is.

25       Q.   -- on the second page?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.  Yes.

2      Q.  Okay.  And you signed this on October 30,

3   2013?

4      A.  Yes.

5      Q.  Okay.  Did you do any work prior to

6   October 30, 2013?

7      A.  No.  Not that I recall.

8          (MacIntosh Exhibit 9 marked for

9          identification.)

10  QUESTIONS BY MR. FAZIO:

11     Q.  Doctor, you've been handed what's been

12  marked as Exhibit 9.

13         Can you identify this for me?

14     A.  Yes.

15         These are invoices from my employer to

16  Mr. McWilliams.

17     Q.  So, Doctor, I noted that the first invoice

18  is dated October 17, 2014.

19     A.  Okay.  October 17th, okay.

20     Q.  Did you do -- when did you first start

21  working on forming your opinions in this case?

22     A.  In -- let's see.  In the time period

23  that's referenced by this invoice.  So in

24  September 2014.

25     Q.  Doctor, I noticed at the bottom there's a

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1   reference to an outstanding invoice from August

2   of 2014?

3        A.  Oh, yeah.  Uh-huh.

4        Q.  Would that have been related to your work

5   in this case?

6        A.  Yes.  Yes.  Actually, yeah.

7            So we gathered some documents early on,

8   and there was an -- I must have invoiced for, yeah.

9   Because then I began to review them but really

10  didn't do anything else.

11       Q.  Okay.  So to the best of your

12  recollection, your work started somewhere between

13  August and October of 2014?

14       A.  Yeah.

15           So maybe it would have -- if the invoice

16  date is August, so that means it was for work in

17  July.  So I think it would have been probably

18  July 2014.

19       Q.  And you'd be able to produce a copy of

20  that invoice to your -- to counsel?

21       A.  I should be able to.

22       Q.  All right.  In the last -- the last

23  invoice we have here is for February 16, 2015.

24       A.  Yes.

25       Q.  Do you have -- is there any outstanding

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    work that you have not yet billed for?

2        A.   Well, preparation for today.

3        Q.   Okay.  Anything else?

4        A.   Not that I can think of.

5            (MacIntosh Exhibit 10 marked for

6            identification.)

7    QUESTIONS BY MR. FAZIO:

8        Q.   Doctor, you're being handed what's been

9    marked as Exhibit 10.

10       A.   Okay.

11       Q.   Can you identify that for me, please, sir?

12       A.   Exhibit 10 is a document that I prepared.

13       Q.   Okay.  And can you describe for me what it

14   is?

15       A.   Yeah, I can.

16           It's a -- it's a directory or a listing of

17   information related to Carla Bartlett's residential

18   history and water connections to the Tuppers Plains

19   District.

20       Q.   Okay.  So on the -- the first page of

21   this, there's a summary.

22           Is this a summary of the documents that

23   follow?

24       A.   Yes.

25       Q.   Okay.  And when did you prepare this --

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    this document, Exhibit 14?  Or, I'm sorry,

2    Exhibit 10?

3        A.   I prepared this in, I believe it was,

4    December 2014.

5        Q.   Was this prepared before or after you

6    issued your report?

7        A.   I prepared this after I issued my report.

8        Q.   Okay.  And the documents that are -- that

9    are provided in Exhibit 10, were these all documents

10   that you had prior to issuing your report in this

11   case?

12       A.   I believe they are.  I think they're all

13   cited in my report.

14       Q.   To the best of your knowledge, these are

15   all things that were cited in your report?

16       A.   To the best of my knowledge.

17           We could go through and check them off one

18   by one if you like, but that is to the best of my

19   knowledge.

20           I think it's possible that maybe some of

21   these images like this one on, let's see, page 2,

22   3 -- it's the fifth page may -- I don't know if I

23   had that before.  I might have.  But we can check

24   again if you would like.

25           But that image is drawn from the public

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    records.

2        Q.   So you're saying on page 5 of Exhibit 10,

3    this image?

4        A.  Let's see.  Yeah.  Yes.  That one.

5            But it's just -- it's a screenshot right

6    from the public records that are available online.

7        Q.   Okay.  And when you say "the public

8    records available online," can you tell me

9    specifically where you got this?

10       A.   I believe it comes from the Athens County,

11   Ohio, property records.

12               (MacIntosh Exhibit 11 marked for

13               identification.)

14   QUESTIONS BY MR. FAZIO:

15       Q.   Okay.  Doctor, you've been handed what's

16   been marked as Exhibit 11.

17           Can you identify that for me?

18       A.  Yes.

19           This is another document that I prepared.

20   It's analogous to the one we just examined in

21   Exhibit 10 for Ms. Bartlett, but instead it's --

22   relates to Mr. Wolf.

23       Q.   Okay.  Could you just take a minute to

24   review it quickly and let me know if there's

25   anything in here that you believe you came into

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    possession of after you issued your report in this

2    case?

3        A.   Yes, I will do that.

4            I believe this is all material that I had

5    before issuing my report.

6                (MacIntosh Exhibit 12 marked for

7                identification.)

8    QUESTIONS BY MR. FAZIO:

9        Q.   Doctor, you've been handed what's been

10   marked as Exhibit 12 to your deposition.

11           Can you identify this for me?

12       A.   Yes.

13           This is a document that I prepared.

14       Q.   Okay.

15       A.   It's a residential history of -- for

16   Mr. Wolf focused on the periods when he lived in the

17   Parkersburg -- in Parkersburg and in -- in buildings

18   that were connected to the Lubeck Public Service

19   District Water.

20       Q.   Okay.  And what's the relevance of the

21   Historic Events column on the far right-hand side?

22       A.   Oh, this was -- so I prepared this in

23   anticipation of talking with Mr. Wolf, and I -- and

24   I wanted to talk to him to prepare for today, to

25   prepare for the deposition, and just to be a better

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    resource to the jury.  And I wanted to talk to him

2    about his historic water use and to -- and, you

3    know, this was back in time, and I wanted to help

4    him get his mind into those time periods.

5         And one way that people do that in my

6    field is to bring up events that many people

7    remember, because it can help them just get into the

8    context of the time and space of what they were

9    doing at that point in their lives.

10   Q.   So this was something that you were -- you

11   developed for your own use in a conversation after

12   you issued your report in this case, with -- I'm

13   sorry, in a conversation with Mr. Wolf after you

14   issued your report in this case?

15   A.   Yes, that's right, as I was preparing for

16   this deposition and later stages of this project.

17   Q.   Okay.  Well, why was it necessary to -- to

18   develop this kind of tool if you had already

19   established what his addresses were at these various

20   points in time?

21   A.   Oh, it wasn't necessary to establish the

22   opinions that appear in my report.  I was -- I just

23   wanted to be as prepared as I could for today, and

24   I -- I thought it would be helpful to gather

25   information that could bolster my -- you know, the

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1   information I had already, and that was my

2   objective.

3       Q.   So this was something you prepared not

4   just for your conversation with Mr. Wolf but for the

5   deposition today; is that accurate?

6       A.   It's part of my preparation, uh-huh.

7           (MacIntosh Exhibit 13 marked for

8            identification.)

9   QUESTIONS BY MR. FAZIO:

10      Q.   I'm handing you what has been marked as

11  Exhibit 13.

12      A.   Yes.

13      Q.   Give me just a second.  I'll give counsel

14  a copy.

15      A.   Okay.

16      Q.   Can you tell me what this is, Doctor?

17      A.   Yes.

18          Exhibit 13 is a record of information that

19  I gathered when speaking with Mr. Wolf in

20  January 2015, and it was part of what I did to

21  prepare for today and for the future.

22      Q.   All right.  So, Doctor, this is an

23  interview -- so the interview occurred on January 7,

24  2015; is that accurate?

25      A.   That's right.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      Q.   Okay.  And so what was the purpose of this

2   interview?

3      A.   Again, it was to prepare for today, this

4   deposition, and to gather more refined information

5   about Mr. Wolf's use of tap water in his residences.

6      Q.   Okay.  So under general notes on page 1 --

7      A.   Uh-huh.

8      Q.   -- it says -- it says, "Remember seeing

9   stuff flowing in the water when visiting mom in the

10  '80s."

11     A.   Uh-huh.

12     Q.   Is that something that Mr. Wolf said to

13  you?

14     A.   Yes.

15     Q.   Okay.

16     A.   That is.

17     Q.   And to be clear, this was an interview

18  with both Mr. and Mrs. Wolf?

19     A.   Mr. and Mrs. Wolf were present.

20     Q.   Okay.  Were all of the responses that are

21  contained in Exhibit 13, did they come from Mr. Wolf

22  alone, or did Mrs. -- did Mrs. Wolf offer

23  information as well?

24     A.   Mrs. Wolf offered information from time to

25  time, but the responses that are recorded here came

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    from him.

2        Q.   All right.  So this -- this note,

3    "remember seeing stuff floating in the water when

4    visiting mom in the '80s," it's something that

5    Mr. Wolf said to you?

6        A.   Yes.

7        Q.   Okay.  And where did mom live?

8        A.   She lived in Parkersburg, I believe.

9        Q.   Okay.  Do you know where in Parkersburg?

10       A.   I don't recall right now.  We might have

11   that information.

12       Q.   And did you ever make any kind of

13   determination of what the, quote, unquote, stuff was

14   in the water?

15       A.   No, it was -- no, outside my scope.  It

16   was...

17       Q.   Are you done with your answer?

18       A.   Yes, sorry.

19       Q.   Oh, that's okay.  Sorry.

20           Doctor, can we agree that you would not be

21   able to see PFOA in water?

22       A.   I -- I haven't attempted to answer that

23   question.

24       Q.   Okay.  So you don't have an opinion one

25   way or another?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.  No.

2      Q.  Okay.  So, Doctor, on page 3 there's a --

3  a table that it looks like you used in your

4  discussions with the Wolfs.

5          Is that accurate?

6      A.  Yeah, that's correct.

7      Q.  Okay.  Who filled -- whose writing appears

8  on this?

9      A.  That is my writing.

10      Q.  That's your writing.

11          Okay.  Is this table, this interview form

12  that you've used, which is Exhibit 13, is this

13  something that you created for the purposes of this

14  case?

15      A.  Yes, it is something that I created for --

16  for use in my work, but it's drawn upon and adapted

17  from other questionnaires that I've developed or

18  used over time.

19      Q.  And when specifically did you develop

20  this -- this particular questionnaire for your use

21  in this case?

22      A.  Certainly prior to January 7th.  I don't

23  recall exactly.

24      Q.  Okay.  Do you recall if it was before or

25  after you issued your report in this case?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.   Oh, I believe it was developed after

2    because it was part of my preparation for going

3    forward where we are now.

4          (MacIntosh Exhibit 14 marked for

5          identification.)

6    QUESTIONS BY MR. FAZIO:

7      Q.   So, Doctor, you've been handed what's been

8    marked as Exhibit 14.

9          Can you identify this for me?

10     A.   Yes.

11         Exhibit 14 is the record of the

12   information that I gathered from Ms. Bartlett when I

13   visited her on January 7th --

14     Q.   Okay.

15     A.   -- this year.

16     Q.   And to go -- let's go back to Mr. Wolf,

17   Mr. and Mrs. Wolf, for a minute.

18         Did you actually -- did you meet with the

19   Wolfs in person on January 7, 2015?

20     A.   Yes, I did.

21     Q.   Okay.  And where did that meeting take

22   place?

23     A.   We met at their residence.

24     Q.   All right.  So tell me about your meeting

25   with Ms. Bartlett on the 17th.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1          Was it -- first of all, who was present at

2     the meeting?

3          A.  People present at the meeting with

4     Ms. Bartlett on January 7, 2015, were myself, my

5     colleague, Taeko Minegishi, Ms. Bartlett, her

6     husband, John Bartlett, and Mr. Don Harper.

7          Q.  And who is Mr. Harper?

8          A.  Mr. Harper is a resident of that area who

9     I asked to be present.

10         Q.  Okay.  And what were the circumstances

11    under which you came to ask Mr. Harper to be

12    present?

13         A.  I wanted to -- part of my -- as part of my

14    preparation, I wanted to have -- I wanted to see

15    these water connections.  And Mr. Harper is in the

16    profession of installing water lines, and I thought

17    it would be helpful to have someone there who could

18    point out features and describe the process to me.

19         Q.  Okay.  And how is it that you came to be

20    acquainted with Mr. Harper?

21         A.  I was introduced to him -- to Mr. Harper

22    by my -- by EH&E's client in this matter.

23         Q.  Okay.  So by the lawyers?

24         A.  Yes.

25         Q.  And you say that Mr. Harper is in the

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    business of installing water meters?

2        A.  No.

3            My understanding is that his business is

4    installing water lines on -- on -- you know, for

5    community water systems, and he may very well do

6    other things, too.

7        Q.  Do you know who Mr. Harper's employer is?

8        A.  I think he's self-employed.  I believe he

9    has his own business.

10       Q.  Do you know the name of that business?

11       A.  I don't recall right now.

12       Q.  How would you go about getting in contact

13   with Mr. Harper if you needed him?

14       A.  I have -- I believe I have telephone

15   contact information for him and e-mail contact

16   information for him.

17       Q.  And so when is it that you first became

18   acquainted with Mr. Harper?

19       A.  I first became acquainted with Mr. Harper

20   in December of 2014.

21       Q.  And was Mr. Harper also present in your

22   January 7, 2015 meeting with the Wolfs?

23       A.  No.

24       Q.  He was not.

25           Any particular reason why he was -- he

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    participated in the meeting with Mr. and

2    Mrs. Bartlett but not with Mr. and Mrs. Wolf?

3         A.   I didn't think it was necessary to have

4    him there in the meeting with the Wolfs.

5         Q.   Okay.  Why is that?

6         A.   I -- I didn't -- because I did not intend

7    to examine the water meters at the Wolf residence

8    because I -- there was no -- I didn't think there

9    was a need to.

10        Q.   Were you relying on Mr. Harper in any way

11   in forming your opinions in this case?

12        A.   No.

13        Q.   So what is it that Mr. Harper -- how did

14   Mr. -- strike that.

15             So you go and you meet with -- with the

16   Bartletts, and this is -- you met with them at 3933

17   Lottridge Road; is that correct?

18        A.   Oh, that's a mistake.  No, that -- I'm

19   glad you mentioned that.  That's 3933 Roadside Park

20   Road, their current residence.

21        Q.   All right.  You say, "General notes.  Walk

22   around the house with Don Harper and Carla's

23   husband, John Bartlett.  Saw the old -- saw water

24   meter, paren, old, close paren, at Depoys' old house

25   and old water spigot for the old trailer they lived

Unsigned                                          Page 100

1    in.  Also identified the current water meter."  And

2    then it says, paren, "well."

3        A.  Correct.

4        Q.  Okay.  So I take it that while you were --

5    during this meeting, you actually inspected this

6    piece of property; is that --

7        A.  Yeah.  So that walk around the house would

8    be really their property.

9        Q.  Okay.  And so you -- this was the outside

10   of the house?

11       A.  Correct.

12       Q.  Okay.  And so that was with Mr. Harper and

13   Mr. Bartlett?

14       A.  Yes.

15       Q.  Okay.  Did Mrs. Bartlett participate in

16   that?

17       A.  No.

18       Q.  Okay.  And you went and you looked at the

19   old water meter.

20           What was the significance of going to look

21   at the old water meter, if any?

22       A.  Well, if you recall from our prior

23   discussion today, there was a time when Ms. Bartlett

24   lived in a trailer on the property owned by the

25   Depoys and received -- and that trailer received

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    water that was piped from the Depoys' residence.

2        So I was interested in observing the --

3    the water meter that served the Depoy residence at

4    that time.

5        Q.   And what was it that you hoped to learn

6    from the water meter?

7        A.   I wanted to see that it was there, that it

8    truly existed.  And I also wanted to understand what

9    people -- I've read in these depositions and the

10   like about taps being installed, and I wanted to see

11   for myself what people were -- were referring to

12   when they used a term like "tap" or "the meter."

13       Q.   You say, "Also identified the current

14   water meter, open paren, well, close paren."

15       What does that mean, sir?

16       A.   So currently the -- and since -- in my

17   report.  But since, I think, the late '90s, the

18   Bartlett residence has been connected directly to

19   the Tuppers Plains Water District and has its own

20   meter and account.  And so it's that -- it's the

21   meter that's associated with their current account

22   that I mean by the "current water meter."

23       And then when it says "well" in

24   parentheses, that's in reference to the physical

25   disposition of the meter, which is below grade,

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    surrounded by a container that Mr. Harper and

2    Mr. Bartlett referred to as a well.

3        Q.   Okay.  So the meter itself is located

4    below grade?

5        A.   That's what -- yeah.

6        Q.   So it's not well -- they're not receiving

7    well water?

8        A.   Right.

9            I was concerned that that might be

10   misconstrued, but that's not it.

11       Q.   Okay.

12       A.   It's just -- that's the term the -- of

13   art, perhaps, that the -- Mr. Bartlett and

14   Mr. Harper used when talking about the physical

15   location of that meter.

16       Q.   So let's go back to Mr. Harper for a

17   minute.

18           Has Mr. Harper provided you with any of

19   the documents that you relied on in this case?

20       A.   No.

21       Q.   Okay.  Aside from the January 7, 2015

22   meeting with the Bartletts, have you had any other

23   communications with Mr. Harper?

24       A.   Not since then, no.

25       Q.   Did you have any prior to that?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.  I did communicate with him to coordinate

2   the logistics of the meeting and also to provide him

3   with background information on the locations of

4   interest to me.

5      Q.  And what was it that you expected him to

6   do with that background information?

7      A.  To familiarize himself with these

8   locations, to -- so that he could be prepared to

9   visit these locations in my company.

10     Q.  Okay.  And what -- and what is it that you

11  expected him to do during this visit?

12     A.  I expected him to -- to look at these

13  water meters and say, yeah or no, that's a water

14  meter.  You know, that's what we do in this part of

15  the country at these times.

16     And that's what he did.

17     Q.  Is it something you -- you didn't feel

18  qualified to do yourself?

19     MR. MCWILLIAMS:  Object to form.

20     THE WITNESS:  I don't know if I would say

21  that I didn't feel qualified.  But I know what the

22  water meter looks like in properties that I've owned

23  over time, but I -- I felt it would be helpful to

24  have someone local, with local expertise, to confirm

25  what I saw.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    QUESTIONS BY MR. FAZIO:

2        Q.   All right.  So tell me what -- what you

3    know -- I mean, so you mentioned to me that

4    Mr. Harper has some experience installing water

5    lines in and around this community.

6            Is that accurate?

7        A.  That's my understanding.

8        Q.  Okay.  What else do you know about

9    Mr. Harper's background?

10       A.  I believe that he's been in that

11   profession for an extended period of time, perhaps

12   his whole life.  I think he's quite familiar with

13   the -- with at least some aspects of the public

14   water districts in that area.

15           He told me that he had even -- that he

16   thinks his company had installed some of the Tuppers

17   Plains lines along US 50.

18       Q.  Okay.  And so I think earlier you

19   mentioned he was self-employed.

20           Is that his own -- the -- his company or a

21   company that he previously worked for actually

22   installed these lines in Tuppers Plains?

23       A.  I think it's his company.

24       Q.  Okay.

25       A.  But that's just my recollection.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      Q.   And you don't recall the name of his

2    company?

3      A.   I don't recall the name.

4      Q.   Do you recall his e-mail address?

5      A.   Not offhand.

6      Q.   Do you recall if he ever worked for any of

7    the public water districts that are at issue in this

8    litigation?

9      A.   I don't know.

10      Q.   Anything else you can tell me about

11    Mr. Harper?

12      A.   Not -- probably that's not of relevance.

13      Q.   Okay.

14      A.   I can describe him to you, what he looks

15    like and things like that.

16      Q.   Approximately how old would you say

17    Mr. Harper is?

18      A.   I would say Mr. Harper's 60 years old,

19    perhaps.

20      Q.   Okay.  Do you know where he lives?

21      A.   No.

22        I mean, he might have told me he lives in

23    Parkersburg, but I'm not sure.

24      Q.   Doctor, so page -- there's some notes on

25    page 6 of Exhibit 14.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.  Okay.

2      Q.  Can you tell me what these are?

3      A.  Yes.

4          These are notes that were taken during the

5   interview and conversation with Ms. Bartlett.

6      Q.  Okay.  And so what did Ms. Bartlett tell

7   you about buying Tuppers Plains water while at 4945

8   Sand Ridge Road?

9      A.  Exactly what the notes here say.  There

10  was a period back in the early '90s when she,

11  Ms. Bartlett, and her husband lived at the address

12  shown here, 4945 Sand Ridge Road, and I believe that

13  they were drawing water from a well.

14         But she told me when meeting with her that

15  occasionally she bought water from Tuppers Plains.

16  That -- that was the extent of it.

17     Q.  And did she tell you sort of mechanically

18  how that happened?

19         How does one go about buying water from a

20  water district if you're on well?

21     A.  She described -- she and her husband

22  described having a tank and a tank being on a --

23  on -- sounded like to me on the back of a pickup

24  truck and being filled and then driven to the

25  location where the water would be used.

Unsigned                                          Page  107

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      Q.   And was this water that was used for

2   drinking?

3      A.  I don't know.

4      Q.   She didn't indicate?

5      A.  I don't recall.

6      Q.   Okay.  And the bottom note there says,

7   "Bought the trailer while Sand Ridge Road, then

8   moved to Roadside Park."

9      A.  Uh-huh.

10     Q.   Is that the -- that's the trailer that we

11  discussed earlier that she lived in?

12     A.   Right.

13        So what that note means is that she and

14  her husband purchased a trailer when they had lived

15  at the Sand Ridge Road address, and they

16  installed -- had that trailer installed at the

17  Roadside Park address, which was on the Depoys'

18  property.

19     Q.   Sir, on page 7?

20     A.   Yes.

21        Which one is that?

22     Q.  I'm sorry, I'm on -- it's Exhibit 14.

23     A.  Okay.

24     Q.   Under Notes, the third row down, can you

25  tell me what that says?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1     A.   Notes.  Wait, I'm sorry, what page are you

2     on?  5?

3     Q.   7.

4     A.   7.

5     Q.   Page 7.

6          MR. MCWILLIAMS:  I think it's different

7     exhibit, Dave.

8          THE WITNESS:  Am I on the wrong --

9          MR. FAZIO:  Exhibit 14.

10         THE WITNESS:  Show me that page again?

11         MR. FAZIO:  This is your interview form

12    for Mr. and Mrs. Bartlett.

13         THE WITNESS:  Yes.  Yeah, which one with

14    which notes?

15    QUESTIONS BY MR. FAZIO:

16         Q.   I'm talking about this one here.

17         A.   Okay.  There's several that look similar.

18         Q.   Yeah, if you look --

19         A.   Okay, I'm with you.

20         Q.   Okay.  So you're on page 7 of Exhibit 14

21    now?

22         A.   Yes.

23         Q.   Okay.  So third row down.  Can you just

24    explain -- is this your handwriting again, or is

25    this someone else's?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.   That's my handwriting.

2      Q.   Okay.  Can you just read that for me?

3      A.   Yes.

4          So the -- in the Notes column, third row

5    down, I wrote, "Summer can be up to two gallons per

6    day among Carla, John and Alex."

7          And that was in reference to the amount of

8    tea that they would collectively consume.  You know,

9    upper bound, I think, summer, could be up to how

10   much iced tea made -- or tea made from tap water

11   that they may consume.

12              (MacIntosh Exhibit 15 marked for

13              identification.)

14   QUESTIONS BY MR. FAZIO:

15     Q.   All right.  You've been handed what's been

16   marked as Exhibit 15?

17     A.   Yes.

18     Q.   Can you go ahead and tell me what this is?

19     A.   Yes.

20         This is a copy of notes that my colleague,

21   Taeko Minegishi, made on January 7, 2015, in

22   reference to information that we gathered while --

23   while at -- while meeting with Ms. Bartlett.

24     Q.   So in the upper right-hand corner it says

25   "19846."

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1          What's the significance of --

2          A.   That number is a number that identifies

3     the project within my firm.

4          Q.   Okay.  Is this a summary of all of the

5     photos that were taken, or is -- is it the photos

6     just being referred to above the line, the top of

7     page 1 of Exhibit 15?

8          A.   It's -- where it says "photo" and then

9     there are three entries below that --

10         Q.   Uh-huh.

11         A.   -- "Depoys' water line, water meter,

12    original hookup," it's just a reference to the areas

13    from which we obtained photos while there.

14         MR. FAZIO:  Okay.  Ned, are these photos

15    all from Bartlett, or is there an mixture of

16    Bartlett and Wolf here?

17         MR. MCWILLIAMS:  I'm not sure.  I would

18    ask him.

19    QUESTIONS BY MR. FAZIO:

20         Q.   So, Doctor, is there -- are these all of

21    the photos that have -- we were provided with a

22    group of photos.

23         A.   Uh-huh.

24         Q.   Are these all related to Ms. Bartlett, or

25    are some of these Wolf and some of these Bartlett?

1      A.   Some are Wolf and some are Bartlett.  It's

2   easy to separate them.

3      Q.   Okay.  So let's go ahead and we'll just

4   mark them all together.

5      A.   Okay.

6           (MacIntosh Exhibit 16 marked for

7           identification.)

8   QUESTIONS BY MR. FAZIO:

9      Q.   Doctor, this is what's been marked as

10  Exhibit 16.

11     A.   Okay.

12     Q.   All right.  Doctor, why don't just tell me

13  briefly what we have in Exhibit 16.

14     A.   Okay.  We have --

15          MR. MCWILLIAMS:  Can I make a

16  recommendation you maybe A, B, C these.  Otherwise,

17  we have no idea what he's talking about.

18          MR. FAZIO:  Yeah, actually, why don't you

19  handwrite a number on the bottom.

20          THE WITNESS:  Sure.  Red?

21          MR. FAZIO:  Yeah, just go ahead and --

22  red's fine.  Let's just go ahead and number them so

23  it's clear what we're talking about.

24          THE WITNESS:  Okay.  There's a lot of

25  glare here so I'll move.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      Okay.  So I'll number or indicate the

2    first one is A, and this is a photograph of

3    Lottridge Road, the area of Lottridge Road where

4    Ms. Bartlett resided from her early youth

5    through 1989.

6        MR. FAZIO:  You --

7        MR. MCWILLIAMS:  Probably just put the "A"

8    and then the --

9        THE WITNESS:  Oh, I don't need to write

10   what it is?

11       QUESTIONS BY MR. FAZIO:

12   Q.  Yeah, you don't need to write what it is.

13   Just show a number on each of them so it's clear on

14   the record.  Show -- she's writing down everything

15   you're saying.

16   A.  Okay.  Thank you.

17       B is -- B is an online image of the same

18   area on Lottridge Road.

19       Oh, I'm sorry about A.  It's also an

20   online image.  My mistake.  It's not a photograph

21   that we took at the time.

22       C, also an online image of County Road 53,

23   which I believe -- my recollection is Lottridge Road

24   also.

25       Yeah.  Same with D, Lottridge Road, online

Unsigned                                        Page  113

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    image.

2         E, Lottridge Road image, and this is

3    showing what I understand to be the residence of

4    Ms. Bartlett's sister.

5         F is also an online image.  This is of the

6    residence where Ms. Bartlett resided when she was a

7    child and teenager and young adult.  And then

8    there's some marking on it that I made during the --

9    and a note that I took during the conversation --

10   oh, it's also -- part of the marking is from

11   Mr. Bartlett, Carla's husband, and it's indicating

12   approximately where you would expect the water meter

13   to be at Carla's parents' home on Lottridge Road.

14        Okay.  G is a photograph taken during our

15   inspection of the property on January 7, 2015.  This

16   is on the side of the former Depoy residence on

17   Roadside Park Road.  It's showing an outdoor spigot.

18   That's G.

19        H is a photograph of the water meter cover

20   at -- adjacent to this spigot that's shown in

21   photograph G.  So this is -- this is the cover of

22   the water meter that was associated with the Depoy

23   Tuppers Plains District water account.

24        I is the same area as G and H, just backed

25   up a little bit so you can see the side of the

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    building, the spigot.

2         J is a sensor or communication device that

3    my understanding is that the water district uses

4    when reading the water meter at the Depoy residence.

5         K is a photograph of the current residence

6    of Ms. Bartlett.  It shows a water spigot in the

7    front that I was informed was installed when the

8    Depoy -- when -- actually I don't know when it was

9    installed, but it was there when the Bartletts first

10   began to reside in this location.

11        L is another image of that same spigot

12   shown on K.

13        M is a photograph of the water meter

14   cover -- the cover for the water meter that serves

15   the Depoy -- the Bartlett residence currently.

16        So that's all Bartlett.

17   Q.  Okay.

18   A.  N is now -- well, this is a photograph of

19   a mailbox that was there on January 7, 2015, at an

20   address 6 Wildwood Road in Parkersburg, but also was

21   identified as 60, 6-0, Wildwood Road.  The intent

22   was to get a photograph that showed both of those

23   numerical addresses are for the same location.  It's

24   hard to see in the photo.

25        O is another photo of that same mailbox

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    area.

2        P is -- I know what's -- I know what's in

3    the dark, and that's the building that goes with the

4    mailbox, but you can't see it.

5        Q is an online image -- oh, we're back at

6    the Bartlett residence again.  So it's an online

7    image of where they live at present.  And there are

8    markings on this image that were made by both me and

9    Mr. Bartlett, and the markings indicate where the

10   trailer they lived in originally at this location

11   was located.

12       R is another online image of the Roadside

13   Park area for Ms. Bartlett.

14       S is the same general type of image as R.

15       Q.  Can you just hand me the exhibit for one

16   second?

17       A.  Sure.  Yes.

18       Q.  Thank you.

19       A.  You're welcome.

20       MR. FAZIO:  Do we want to take an earlier

21   lunch break, a slightly early lunch break, and get

22   that out of the way?

23       Or actually, when is your lunch arriving?

24       MR. MCWILLIAMS:  I think at noon, but how

25   much longer do you think you have?

1          MR. FAZIO:  I don't think I have very

2   much.  I mean, maybe a half hour at most.

3          Actually, it will helpful to me to take a

4   break so I can just get organized.

5          THE WITNESS:  Let's do that.

6          MR. MCWILLIAMS:  You just want to -- let's

7   go off the record.

8          MR. FAZIO:  Yeah, let's off the record.

9          VIDEOGRAPHER:  We're off the record.

10      (Off the record at 11:45 a.m.)

11          (Whereupon, at 11:45 a.m., the

12          deposition in the above-entitled

13          matter was recessed, to reconvene at

14          12:30 p.m., this same day.)

15

16

17

18

19

20

21

22

23

24

25

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1          AFTERNOON SESSION

2                      (12:32 p.m.)

3      Whereupon,

4          DAVID MACINTOSH,

5      the witness herein, called for examination by

6      Counsel for Defendant and having been previously

7      duly sworn, was further examined and testified as

8      follows:

9          VIDEOGRAPHER:  The time is 12:32 p.m.

10     We're back on the record.

11          (MacIntosh Exhibit 17 marked for

12          identification.)

13      EXAMINATION BY COUNSEL FOR DEFENDANT (RESUMED)

14     QUESTIONS BY MR. FAZIO:

15      Q.  Doctor, I'm handing you what's been marked

16     as Exhibit 17.

17          Can you identify that for me?

18      A.  Yes.

19      Q.  Okay.  What is that?

20      A.  This is a -- Exhibit 17 is a list of

21     materials that I've reviewed or considered following

22     submission of my report in December 2014.

23      Q.  Okay.  So these were all things that you

24     reviewed after -- after you completed your report in

25     December of '14?

1    A.  No.  No.  I'm -- actually --

2        MR. MCWILLIAMS:  Yeah, this is -- this is

3    the supplemental one.

4        THE WITNESS:  Uh-huh.

5        Although at least one of these -- there

6    may be a little -- like this on page 2, Ms. Vieira,

7    I certainly looked at before I reviewed -- before

8    submitting my report.

9    QUESTIONS BY MR. FAZIO:

10    Q.  Doctor, just so the record's clear, I

11    mean, these are things that -- is this a mixture of

12    things -- some things you saw before you issued your

13    report and some things you saw after?

14    A.  I think it's intended to be after, but I

15    just identified...

16        MR. MCWILLIAMS:  And I'll just put on the

17    record this was prepared by counsel, so it's -- I

18    mean it's important to let him -- it's very possible

19    that we, you know, made a mistake.

20        So this was not prepared by Dr. MacIntosh,

21    but...

22    QUESTIONS BY MR. FAZIO:

23    Q.  So, Doctor, why don't you take a minute to

24    review it and let me know if there are things on

25    this list that you saw before you issued your report

1    in December of 2014.

2       A.  Okay.

3          Okay.  I'm all set.

4       Q.  All right.  So can you tell me, were

5    these -- what, if any, of these things were things

6    that you reviewed or considered prior to issuing

7    your report in December of 2014?

8       A.  Yes.

9         I -- I identified three.  All three are in

10   the table titled "Literature."

11      Q.  Okay.

12      A.  One is the -- the first entry begins

13   "Barry."

14        Second is the third entry, begins

15   "Calafat."

16        And the third is the final entry that

17   begins "Vieira."

18      Q.  And so everything else on Exhibit 17 are

19   things that you reviewed or were provided after you

20   issued your report in December of 2014, other than

21   the three things you just identified?

22      A.  That's right.  Materials that I examined

23   and considered to prepare for today.

24      Q.  All right.  Doctor, is there any

25   particular reason why those three entries were not

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1  included in the list of materials you considered

2  when you issued your report in December 2015 -- or,

3  I'm sorry, 2014?

4      A.  I don't know of any particular reason.

5      Q.   The attached Exhibit 6, which was attached

6  to your report, is that something that you prepared,

7  or was that prepared for you by counsel?

8      A.   That was prepared by counsel.

9      MR. MCWILLIAMS:  Let me find it for you.

10      THE WITNESS:  Yeah.  Right.

11      Thank you.  Uh-huh.

12  QUESTIONS BY MR. FAZIO:

13      Q.   So obviously any -- for any of the -- on

14  Exhibit 17, any of the documents that you did not

15  have in your possession prior to issuing your

16  report, you did not rely on those in forming your

17  opinions as expressed in your December 2014 report,

18  correct?

19      A.   I think that's correct, although some of

20  these documents are cited in documents I did rely

21  on, so I was aware of them.

22      Q.   Doctor, on exhibit -- Exhibit 6, a couple

23  questions for you.

24      On page 3 of 4, about a third of the way

25  down there's an entry that just says, "C8 project

Unsigned

Page  121

1    survey introduction."

2         Can you tell me what that is and where you

3    got it?

4         A.  I don't recall what that is.  If you pull

5    it up, I'd be happy to review it and let you know.

6         Q.   Well, then the next entry down is Vieira.

7    It says:  Geographic Patterns of Cancer Study, paren

8    PowerPoint, close paren.

9         Do you know where you obtained that?

10        A.   That was provided to me by counsel.

11        Q.   Okay.  And then finally just says "C8

12   science panel public slide presentation."

13        Do you -- can you tell me which slide

14   presentation that is?

15        A.  No, not offhand.

16        Q.  Okay.

17        A.  But we could certainly look at it and

18   identify it that way.

19        MR. FAZIO:  Can you -- would you be

20   willing to produce those to us so we know exactly

21   what it is that he's referring to?

22        MR. MCWILLIAMS:  Yeah.  If you could just

23   send me a request at the end of the deposition.

24        MR. FAZIO:  Yes.

25        MR. MCWILLIAMS:  I'm quite confident it's

1    stuff that's been produced in discovery.

2        MR. FAZIO:  Okay.  Yeah, and it may just

3    be --

4        MR. MCWILLIAMS:  I think it's a poor

5    description on our end, sorry.

6        MR. FAZIO:  It's okay.

7    QUESTIONS BY MR. FAZIO:

8        Q.   All right.  So anything else that you

9    considered in forming your opinions as expressed in

10   your December 2014 report that are not listed either

11   in the footnotes or the body of your report itself

12   or in Exhibit 6 or as you've indicated on

13   Exhibit 17?

14       A.   Well, the materials that you just

15   identified, as well as the totality of my experience

16   and education and training.

17       Q.   Right.  Okay.

18           But I'm talking about specific -- the

19   specific documents that you were considering in

20   forming your opinion.  I'm not talking about your --

21   your experience.

22           Between the three things we just

23   identified -- the three documents we just

24   identified, the body of your report, Exhibit 6 and

25   Exhibit 17, those are all the specific -- documents

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    you specifically reviewed and considered in forming

2    your opinions as expressed in your December 2014

3    report?

4        A.   My intent was to provide them all, yes.

5        Q.   All right.  Doctor, let's pull up -- if

6    you'll pull out Exhibit 3 here, your CV.

7        A.   Okay.

8        Q.   This was a copy of the CV that was

9    provided to us with your report.

10           Is there anything that needs to be done to

11   bring this up to date?

12           Do you have any publications or

13   presentations or relevant experience that have

14   arisen since you provided this CV to us?

15       A.   Let's see.  I know one item that's kind of

16   a housekeeping that should be updated.  It's in the

17   background section, so it's not in the -- the group

18   of -- the categories you just mentioned.

19           So the -- under background, the third

20   item, it says, "2009 to dash, adjunct associate

21   professor of environmental health, Harvard School of

22   Public Health, Boston."  The name of the school

23   changed in the last six months or so.

24       Q.   Really?

25       A.   To the -- I think the CT Chan Harvard

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    School of Public Health.  They made a big donation.

2        Q.   Okay.

3        A.   So --

4        Q.   But otherwise, your role there is the

5    same?

6        A.   My role is same, but it's just we were all

7    instructed to update references to the name.

8        Q.   The sign on the building has changed

9    and --

10       A.   Yes, so I just want to get that on the

11   record.

12       Q.   I'll send a note to your boss.

13       A.   Thank you.  Duly complied with policy.

14       Q.   All right.  So you -- as I understand,

15   you've been an adjunct professor at -- I'm going to

16   continue referring to it as the Harvard School of

17   Public Health.

18       A.   Okay.

19       Q.   Since 2009, that's correct?

20       A.   Yes.  Yes.

21       Q.   Okay.  Currently, what percentage of your

22   time is devoted to teaching or research

23   responsibilities at Harvard?

24       A.   I would say about 10 percent.

25       Q.   Okay.  And between teaching and research,

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    how does it break down?

2        A.   Oh, it's mostly teaching.  So it's

3    95 percent teaching.

4        Q.   Okay.

5        A.   Right now.

6        Q.   Does it change over time?

7        A.   It has changed over time, but previously I

8    was on the committee of -- of a doctoral student,

9    and that took some time.  But even then it was

10   probably 80/20, teaching/research.

11       Q.   And you identify one course that you

12   teach.

13          Are there -- is there any -- are there any

14   other courses that you teach besides -- I think

15   there's an environmental -- or exposure assessment

16   course you teach?

17       A.   Yes, I do teach that course, Fundamentals

18   of Human Exposure Assessment, and that's the sole

19   course that I teach there.

20       Q.   Have you ever taught any other courses

21   there?

22       A.   No.  I've lectured in some classes, but I

23   never -- I haven't been responsible for other

24   classes.

25       Q.   So that's a situation wherein some other

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    faculty member asked you to come in and give a talk

2    about a particular topic?

3        A.   Right.

4        Q.   Of your -- of the publications that you've

5    listed in your CV, are there any that you contend

6    are particularly relevant to your opinions in this

7    case?

8        A.   Well, I think they're all relevant to some

9    degree because they inform my -- or comprise my

10   experience, in part.  I think that there are several

11   that are probably more -- more relevant than others.

12       Q.   Okay.

13       A.   That's because they deal with subject

14   matter that is analogous to some of the work that I

15   reviewed and upon which I based my opinions.

16       Q.   Okay.  Why don't you just identify those

17   for me.

18       A.   Okay.  Well, I think the -- the very first

19   one -- or, I'm sorry, I'm looking at this in reverse

20   chronology.

21           So on -- see, I'm the first author.  It's

22   on the bottom -- these pages aren't numbered,

23   unfortunately.

24           MR. MCWILLIAMS:  Would you want to have

25   him mark it?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1          MR. FAZIO:  Say again?

2          MR. MCWILLIAMS:  Just a question.  Just

3    mark the ones --

4          MR. FAZIO:  Yeah, if you want to just

5    number the pages --

6          MR. MCWILLIAMS:  No, I meant mark the

7    individual papers that you thought --

8          MR. FAZIO:  Yeah, why don't you go ahead

9    and mark the papers that you think are relevant.

10         THE WITNESS:  Well, I'll just put a mark

11   by it.

12         I think that one is because there's -- it

13   was transport and fate modeling based on

14   partitioning principles and time-dependent

15   accumulation and excretion or loss of material.  And

16   that's -- those principles certainly are used in the

17   retrospective assessment performed by the science

18   panel.

19   QUESTIONS BY MR. FAZIO:

20    Q.   And, Doctor, why won't you just go ahead

21   and mark the ones that you think are relevant, and

22   then we can -- I can follow up with you on.

23         MR. MCWILLIAMS:  Particularly relevant?

24   Because I think he testified that he thinks they're

25   all relevant.

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1        MR. FAZIO:  Yeah, that's fair.

2    Particularly relevant.

3        THE WITNESS:  Particularly relevant?

4    QUESTIONS BY MR. FAZIO:

5        Q.  Yeah.

6        A.  All right.  All right.

7            I was inclined to check more, but I

8    refrained and selected the ones I think are most

9    highly relevant.

10       Q.  Okay.  And so you just indicated by a

11   checkmark next to the particular -- the papers that

12   you --

13       A.  I did.

14       Q.  Okay.  And that's on Exhibit 3?

15       A.  Yes.

16       Q.  Okay.  Doctor, have you ever -- prior to

17   this case, have you ever done any work involving

18   PFOA?

19       A.  No, I have not worked with PFOA prior to

20   working on this case.

21           My area of expertise is in exposure

22   assessment and risk analysis for chemical hazards

23   and other types of hazards.  PFOA clearly is a

24   chemical.  It fits in my domain.

25       Q.  Any prior work involving PFOS?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1        Are you familiar with PFOS?

2    A.  I am familiar with that.

3        No, the same response as to your question

4  about PFOA.

5    Q.  Okay.  How about just perfluoronated

6  compounds generally, any work involving

7  perfluoronated compounds generally?

8        Prior to this -- your work in this case.

9    A.  No, not specifically.

10    Q.  I noted in your -- in the description of

11  your background either from your CV or your report

12  that you've done some work for 3M in the past?

13    A.  I have.

14    Q.  Okay.  And what sort of work have you done

15  for 3M?

16    A.  The work that I've done with 3M is related

17  to indoor air quality within homes.

18    Q.  And was that -- was that a litigation

19  matter or was that a general consulting matter?

20    A.  General consulting.

21    Q.  And what was the indoor air concern that

22  you were addressing?

23    A.  Oh, it -- we were addressing constituents

24  of indoor air that can be a cause or contributor of

25  airways -- upper airways and lower airways

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1   aggravation or illness.

2       Q.   And was this in a particular geographic

3   area?

4       A.   No.  No.  No.  Although I think some of

5   our analysis was centered on a geographic area.  I

6   don't remember which one now, but it was -- we were

7   evaluating the efficacy or expected efficacy of 3M

8   products for filtering indoor air.

9           So the question is how much, if at all,

10  would you expect those products to reduce exposures,

11  and what benefits public health-wise could you

12  expect.

13      Q.   I see.

14          And approximately when did you do that

15  work?

16      A.   Let's see.  I worked with them, let's say,

17  on and off for the last -- over the last three or

18  four years.

19      Q.   Is that -- is that project ongoing?

20      A.   No.

21      Q.   Have you done any other projects for them,

22  for 3M?

23      A.   No, not that I can recall.

24      Q.   All right.  Doctor, if you'd pull out

25  Exhibit 5 --

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.   Okay.

2      Q.   -- it's attachment 3 to your report, your

3   list of trial and deposition testimony in the last

4   four years.

5      A.   Yes.

6      Q.   Okay.  So let's just run through these

7   quickly.

8          The first case that's listed there, BP

9   1330 Connecticut Avenue, LLC, versus Burger 1300 --

10   I assume that's Connecticut Avenue, LLC?

11     A.   Yes.

12     Q.   What was that case about?

13     A.   That was about concerns about indoor air

14   quality impacts in -- in a commercial office

15   building in Washington, DC.

16     Q.   And who retained you in that case?

17     A.   Counsel who represented the defendant.

18     Q.   And who was that?

19     A.   This Burger 1300 Connecticut Avenue.

20     Q.   No, I'm sorry.  Who was the counsel, not

21   who was the defendant?

22     A.   Sorry.

23         I don't remember the person's name.

24     Q.   And what was the nature of your testimony

25   in that case?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.  Let's see.  The nature of my testimony

2   was -- it was potential impacts of emissions from

3   the defendant's facility on indoor air quality in

4   this commercial building.

5      Q.  And what sort of facility was the

6   defendant's facility?

7      A.  It was a restaurant.

8      Q.  It was a -- sorry?

9      A.  A restaurant.

10     Q.  A restaurant?

11     A.  Uh-huh.

12     Q.  Okay.  You testified at trial; is that

13  accurate?

14     A.  I did.

15     Q.  Okay.  And were you deposed?

16     A.  I don't believe so.

17     Q.  Okay.  Atwood versus Weyerhauser?

18     A.  Yes.

19     Q.  Next one down, tell me about that case.

20        What was your role in that case?

21     A.  My role was exposure analysis for reduced

22  sulfur compounds that originated from a pulp and

23  paper mill.

24     Q.  Okay.  And you testified on behalf of the

25  plaintiff in that case?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1       A.   Yes.  I was retained by counsel for the

2    plaintiff.

3       Q.   And so it indicates here you were deposed.

4            Was there trial testimony?

5       A.   No.

6       Q.   Bearden?  The next one down?

7       A.   Yes.

8       Q.   Okay.  What was that case about?

9       A.   That case was about potential residential

10   indoor air quality impacts associated with operation

11   of a commercial air cleaning device, an electronic

12   air cleaner.

13      Q.   So it was a commercial air cleaning

14   device, you said?

15      A.   Commercial, I mean, it's -- it's available

16   to purchase by people like you and I.

17      Q.   Okay.  And what was the nature of your

18   testimony in that case?

19      A.   The nature of my testimony was about -- or

20   the nature of my testimony was that ozone

21   concentrations in -- in a home, or in a pair of

22   homes, and potential association with the air

23   cleaning device.

24      Q.   And the last one, Town of Lexington, it

25   says, versus Pharmacia versus Pharmacia.

1          I'm assuming that's --

2     A.   That doesn't seem right.

3     Q.   I'm assuming that's a typo.

4          What was that case about?

5     A.   That -- that case was about a chemical

6  known as polychlorinated biphenyl and its former use

7  in certain building materials.

8     Q.   And what was the nature of your testimony

9  in that case?

10     A.   The nature of my testimony was the

11  disposition of these -- of this chemical and the

12  associated materials in buildings and approaches for

13  mitigating that -- those chemicals in those

14  buildings.

15     Q.   And that's the town of Lexington,

16  Massachusetts?

17     A.   That is.

18     Q.   And you were deposed.

19          Was there trial testimony in that case?

20     A.   No.

21     Q.   Okay.  Is the case still ongoing?

22     A.   Yes.

23     Q.   Is it the only one on this list that's

24  still ongoing?

25     A.   No.  The Bearden and Rehberger is ongoing,

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1   I believe.

2       Q.   Have you ever been a party to a lawsuit?

3       A.   Myself?  Not that I know of, no.

4       Q.   You personally have never been?

5       A.   No.

6       Q.   Okay.  Have you ever had any of your

7   opinions or testimony limited or excluded in any of

8   the cases you've worked on?

9       A.   Yes, it happened once.

10      Q.   Tell me about that.

11           When did that happen?

12      A.   That happened in 2000 -- mid 2000s,

13  approximately.

14      Q.   And what court did that occur in?

15      A.   That occurred in --

16      Q.   If you recall.

17      A.   It was a court in Delaware.

18      Q.   Okay.  Delaware.

19           Any other times your testimony has been

20  limited or excluded?

21      A.   No.

22           (MacIntosh Exhibit 18 marked for

23           identification.)

24

25  QUESTIONS BY MR. FAZIO:

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      Q.   Doctor, I'm handing you what's been marked

2    as Exhibit 18.

3           Sorry to throw it at you there.

4           That's the notice of deposition for

5    today's deposition.

6           Have you seen that before?

7      A.   Yes, this was sent to me.

8      Q.   Okay.  Could you just flip to the back

9    page of it?

10          There's a list of materials that we

11   asked you to brought {sic}, and counsel produced a

12   number of documents today in response to that.

13          Is there anything else on that list that

14   you think is responsive that you didn't provide to

15   counsel?

16          MR. MCWILLIAMS:  Well, I'll just note for

17   the record that we did file objections to the notice

18   as beyond what's required under the rules --

19          MR. FAZIO:  Okay.

20          MR. MCWILLIAMS:  -- and we guided

21   Dr. MacIntosh with respect to what was produced,

22   so...

23          MR. FAZIO:  Okay.

24

25   QUESTIONS BY MR. FAZIO:

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      Q.   So to the best of your knowledge, you've

2   produced everything responsive that's required under

3   the notice?

4          MR. MCWILLIAMS:  He provided everything I

5   asked him to provide.

6          MR. FAZIO:  Okay.  Fair enough.  All

7   right.

8   QUESTIONS BY MR. FAZIO:

9      Q.   Doctor, over the past five years, what

10   percentage of your work would you say has been

11   litigation related?

12          MR. MCWILLIAMS:  You mean by time or by

13   income or...

14   QUESTIONS BY MR. FAZIO:

15      Q.   By -- let's say by time.

16      A.   Me personally?

17          I would say a third, approximately.

18      Q.   And when you're retained in a litigation

19   matter -- take a step back.

20          Does your personal income vary depending

21   on the amount of work you're bringing into EH&E?

22      A.   No.

23      Q.   No.

24          You just have a salary, and you receive

25   your salary and --

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    A.   That's correct.

2    Q.   All right.  And your work on litigation

3    matters, the revenue that's generated from those

4    cases all goes to EH&E?

5    A.   Yes.

6    Q.   Do you have an ownership interest in EH&E?

7    A.   Well, we're -- I do.  We're an employee --

8    what are we -- an ESOP.  So it's an employee stock

9    ownership program.  So every employee who's been

10   with the company for I think it's at least a year,

11   what would you say, accrues a portion of the equity.

12   Q.   And how many employees does EH&E have,

13   roughly?

14   A.   Yeah, I think it's about 85 if you include

15   people who are full-time and people who are

16   part-time.

17   Q.   And I think you mentioned the office is in

18   Needham; is that correct?

19   A.   Yeah, Needham, Massachusetts.

20   Q.   Okay.  Are there any other offices?

21   A.   No, we don't have any other offices.

22   Q.   Prior to working -- well, have you ever

23   worked with a -- anyone from the law firm of

24   Douglas & London in the past?

25   Aside from this case?

1      A.   Yes.  I've worked with them.  I haven't

2    been retained by them.

3      Q.   Okay.  And what was the context that you

4    worked with them in?

5      A.   It was data analysis related to a

6    litigation matter.

7      Q.   And was this a litigation matter you were

8    disclosed in, to the best of your knowledge?

9          MR. MCWILLIAMS:  No.

10         THE WITNESS:  Not to my knowledge.

11         MR. MCWILLIAMS:  It was not disclosed.

12         MR. FAZIO:  It was not disclosed.

13         QUESTIONS BY MR. FAZIO:

14     Q.   Aside from that case, any other cases

15   where you've worked with Douglas & London?  This

16   case and the case you just referred to?

17     A.   Not that I recall.

18     Q.   Okay.  How about the law firm of Cory

19   Watson, are you familiar with that law firm?

20     A.   No.

21     Q.   Okay.  Taft Stettinius, are you familiar

22   with Taft Stettinius?

23     A.   I think I've heard the name.

24     Q.   Okay.  Have you ever -- to the best of you

25   knowledge, have you ever been retained by Taft?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1      A.  No.

2      Q.  Okay.  And you've been retained in the

3   past by the law firm of Levin Papantonio, correct?

4      A.  Yes, I have.

5      Q.  Okay.  Over the years, how many times

6   would you say you've been retained by Levin

7   Papantonio?

8      A.  I can think of four, including this one.

9      Q.  And across these four cases, can you give

10   me an estimate of how much you've been paid, or EH&E

11   has been paid?

12      MR. MCWILLIAMS:  Object to form.

13      THE WITNESS:  Well, EH&E charges a client

14   like Levin Papantonio for the time that we work on

15   the matter.

16      I mean, I could guess.  I don't know --

17   QUESTIONS BY MR. FAZIO:

18      Q.  Well, give me your best estimate if you

19   can.

20      A.  I would guess -- I would guesstimate or

21   guess maybe $800,000.

22      Q.  Over the four cases?

23      A.  Yes.

24      Q.  Okay.  What did you do to prepare for your

25   deposition today?

1      A.   Well, I reviewed my report, I reviewed the

2      material I received subsequent to my report, and

3      I -- which -- including the information that I

4      gathered that we talked about earlier in January

5      that I did explicitly to prepare for this deposition

6      and any future needs.

7          Let's see.  I came to St. Louis

8      yesterday -- no, Monday night, and I -- and I met

9      with Mr. McWilliams and others yesterday for about

10     three hours, and we just reviewed my report.

11     Q.   Anything else that you did to prepare?

12     A.   Those are the major activities.

13     Q.   Did your -- at your meeting yesterday, did

14     you review any documents in preparation for your

15     deposition?

16     A.   Let's see.  I reviewed my report.  I --

17     that I recall.  May have reviewed some of the

18     papers, so like the Shin water distribution, you

19     know, drinking water modeling paper that we

20     discussed earlier today.

21     Q.   Had you reviewed -- did you review any

22     documents that you hadn't seen before yesterday?

23     A.   No, I don't recall doing that.

24     Q.   Okay.  All right.  Doctor, obviously the

25     point of today's deposition was to make sure that

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1    the defendant has a complete understanding of the

2    opinions you're going to give at trial.  And we've

3    talked extensively about the opinions set forth in

4    your December 8, 2014 report and the bases for those

5    reports -- or the basis for those opinions.

6          Is there anything about the opinions that

7    you express in your December 8, 2014 report that we

8    haven't fully discussed today?

9          MR. MCWILLIAMS:  Object to form.

10          THE WITNESS:  Well, I think -- I think

11    it's more of a question for you.

12          Certainly we didn't pull out every single

13    document associated with a footnote in my report,

14    but I leave that to you to decide if you want to

15    look at that or not.  But I do believe that we

16    covered the crux of it.

17    QUESTIONS BY MR. FAZIO:

18      Q.   Okay.  And the opinions that you intend to

19    testify to at trial are contained within your

20    December 8, 2014 report?

21      A.   Well, as I said before, I'm -- I will

22    answer any other questions that are posed to me, you

23    know, today or in -- in the future.

24      Q.   Doctor, have you been asked to do any

25    additional work on this case?

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1        A.   No.

2        Q.   And do you have -- currently have any

3    plans to do any work on this case?

4        A.   No.

5            MR. FAZIO:  Okay.  All right.  Doctor,

6    that's all I have for now.  Thank you for your time.

7            THE WITNESS:  Thank you.

8            MR. MCWILLIAMS:  Let's go off the record.

9            VIDEOGRAPHER:  We're off the record.

10           (Off the record at 1:09 p.m.)

11           MR. MCWILLIAMS:  I have no questions.

12           Thank you for your time, Doctor.

13           THE WITNESS:  You're welcome.

14           MR. DOUGLAS:  We had sent notice to

15   defense counsel, to Damond Mace specifically, that

16   we were withdrawing a Dr. Stein and Dr. DeYoung as

17   experts for the -- the trial.  And, therefore, their

18   depositions were no longer necessary.

19           And just wanted to give you guys notice

20   they would not -- those deps weren't going forward.

21           We hadn't heard back from Damond.  I

22   wanted to make sure that the message was --

23           MR. FAZIO:  The message got passed along.

24   Thank you.

25           (Deposition concluded at 1:10 p.m.)

Expert 2015-3-18 MacIntosh  3/30/2015  2:13:00 PM

1          CERTIFICATE OF DEPONENT

2

3     I hereby certify that I have read and examined the

4     foregoing transcript, and the same is a true and

5     accurate record of the testimony given by me.

6     Any additions or corrections that I feel are

7     necessary, I will attach on a separate sheet of

8     paper to the original transcript.

9

10          _____

11             Signature of Deponent

12

13    I hereby certify that the individual representing

14    himself/herself to be the above-named individual,

15    appeared before me this _____ day of _____,

16    2015, and executed the above certificate in my

17    presence.

18

19          _____

20             NOTARY PUBLIC IN AND FOR

21

22          _____

23                County Name

24

25    MY COMMISSION EXPIRES:

1    DEPOSITION OFFICER'S CERTIFICATION

2    I, Carrie A. Campbell, Registered

3 Professional Reporter, Certified Realtime Reporter,

4 a Certified Shorthand Reporter in the State of

5 Missouri and Illinois, certify:

6    That the foregoing proceedings were taken

7 before me at the time and place therein set forth,

8 at which time the witness was put under oath by me.

9    That the testimony of the witness and all

10 objections made at the time of the examination were

11 recorded stenographically by me and were thereafter

12 transcribed.

13    That the foregoing is a true and correct

14 transcript of my shorthand notes so taken.

15    I further certify that I am not a relative

16 or employee of any attorney or of any of the

17 parties, nor financially interested in the action.

18    I declared under penalty of perjury under

19 the laws of the State of Missouri that the foregoing

20 is true and correct.

21    Dated this date:  March 29, 2015

22

23  _____

24  CARRIE A. CAMPBELL, RPR CRR CSR CCR

25