IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: E. I. DU PONT DE NEMOURS AND COMPANY C-8 PERSONAL INJURY LITIGATION | CASE NO. 2:13-MD-2433 |
| | JUDGE EDMUND A. SARGUS, JR. |
| **This document relates to:** | MAGISTRATE JUDGE ELIZABETH P. DEAVERS |
| ***Bartlett v. E. I. du Pont de Nemours and Company***, **Case No. 2:13-CV-0170** | |
| ***Wolf v. E. I. du Pont de Nemours and Company***, **Case No. 2:14-CV-0095** | |

---

### DUPONT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PUNITIVE DAMAGES IN THE BARTLETT AND WOLF CASES

---

Defendant E. I. du Pont de Nemours and Company ("DuPont") respectfully requests that this Court enter Partial Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure on the requests for punitive damages asserted by Trial Plaintiffs Carla Bartlett ("Mrs. Bartlett") and John Wolf ("Mr. Wolf") (together, "Trial Plaintiffs").  As explained in the attached Memorandum in Support, there is no evidence that DuPont acted with the requisite malice or expectation that there was a high probability that substantial harm would result from its actions, and there is no factual basis for punitive damages to be awarded in these cases.  Accordingly, DuPont respectfully requests that this Court enter an Order granting partial summary judgment in its favor, and denying Trial Plaintiffs' requests for punitive damages as a matter of law.

Respectfully submitted:

/s/ Damond R. Mace
Damond R. Mace (0017102) (Trial Attorney)
Stephen M. Fazio (0076873)

Stephanie E. Niehaus (0075511)
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114
(216) 479-8500 (Phone)
(216) 479-8780 (Fax)

C. Craig Woods (0010732)
Aaron T. Brogdon (0081858)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio  43215
(614) 365-2700 (Phone)
(614) 365-2499 (Fax)

Attorneys for Defendant E. I. du Pont de
Nemours and Company

---

## MEMORANDUM IN SUPPORT

---

### SUMMARY OF POINTS AND AUTHORITIES

Pursuant to Local Rule 7.2(3), DuPont submits the following summary of points and authorities cited:

I.     INTRODUCTION .................................................................................................. 1

II.     STATEMENT OF UNDISPUTED FACTS ........................................................ 2

    A.     DuPont's Historical Use and Knowledge Regarding PFOA ........................... 2

    B.     DuPont's Efforts and Measures to Control PFOA Emissions ...................... 13

    C.     DuPont's Communications and Collaboration with Regulators Regarding PFOA ........................................................................................ 13

    D.     The Timelines of the Two Trial Plaintiffs' Alleged Exposures and Diagnoses ................................................................................................... 17

III.     LAW AND ARGUMENT .................................................................................. 19

    A.     Standard of Review ....................................................................................... 19

    B.     Both Ohio and West Virginia Law Impose Heightened Punitive Damages Standards .................................................................................... 19

        1.     Ohio law requires evidence of actual malice to award punitive damages .................................................................................. 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 19

*Sierra Club v. ICG Hazard, LLC*, 2015 U.S. App. LEXIS 1283 (6th Cir. Jan. 27, 2015) ...................................................................................................................... 19

O.R.C. § 2315.21(C) .................................................................................................... 19

Fed. R. Civ. P. 56(c) .................................................................................................... 19

*Aristocrat Lakewood Nursing Home v. Mayne*, 729 N.E.2d 768 (Ohio Ct. App. 1999) ...................................................................................................................... 20

*Borror v. MarineMax of Ohio, Inc*., 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) .......................................................................................................... 20

*MacNeill v. Wyatt*, 917 F. Supp. 2d 726 (S.D. Ohio 2013) ........................................ 20

*Preston v. Murty*, 512 N.E.2d 1174 (Ohio 1987) ....................................................... 20

*Estate of Schmidt v. Derenia*, 822 N.E.2d 401 (Ohio Ct. App. 2004) ....................... 20

O.R.C. § 2315.21(D)(4) ............................................................................................... 20

*Calmes v. Goodyear Tire & Rubber Co*., 575 N.E.2d 416 (Ohio 1991) ...................... 21

*McCombs v. Meijer, Inc*., 395 F.3d 346 (6th Cir. 2005) ............................................. 21

*MCI WorldCom Network Servs., Inc. v. W.M. Brode Co*., 411 F. Supp. 2d 804 (N.D. Ohio 2006) ................................................................................................... 21

*Preston v. Murty*, 512 N.E.2d 1174 (Ohio 1987) ....................................................... 21

*Estate of Schmidt v. Derenia*, 822 N.E.2d 401 (Ohio Ct. App. 2004) .......................................... 21

    **2.**      **West Virginia law also requires evidence of malice** ............................ 21

WV Senate Bill No. 421 ........................................................................................................ 22
*AIG Domestic Claims, Inc. v. Hess Oil Co.*, 751 S.E.2d 31 (W. Va. 2013) ................................. 22
*Bennett v. 3 C Coal Co.*, 379 S.E.2d 388 (W. Va. 1989) ......................................................... 22
*Commonwealth Tire Co. v. Tri-State Tire Co.*, 193 S.E.2d 544 (W. Va. 1972) ........................ 22
*Fowler v. Kanawha Valley Fine Jewelry & Loan LLC*, 2015 U.S. Dist. LEXIS
    3761 (S.D. W. Va. Jan. 13, 2015) ........................................................................................... 22
*Graham v. A.T.S. Specialized, Inc.*, 2007 U.S. Dist. LEXIS 3463 (S.D. W. Va.
    Jan. 17, 2007) ......................................................................................................................... 22
*Jopling v. Bluefield Waterworks & Improvement Co.*, 74 S.E. 943 (W. Va. 1911) ................... 22

    **C.**      **DuPont Is Entitled to Summary Judgment on Punitive Damages**
             **Because There Is No Evidence of Malice or Criminal Indifference** ............. 22

*Alleman v. YRC*, 787 F. Supp. 2d 679 (N.D. Ohio 2011) ............................................................ 23
*Crouse v. Erie Ins. Co. & Cas. Co.*, 2013 U.S. Dist. LEXIS 113794 (S.D. W. Va.
    Aug. 13, 2013) ...................................................................................................................... 23
*MacNeill v. Wyatt*, 917 F. Supp. 2d 726 (S.D. Ohio 2013) ...................................................... 23
*MCI WorldCom Network Servs., Inc. v. W.M. Brode Co.*, 411 F. Supp. 2d 804
    (N.D. Ohio 2006) ................................................................................................................... 23
*McIntryre v. Advance Auto Parts*, 2007 U.S. Dist. LEXIS 1944 (N.D. Ohio Jan.
    10, 2007) ................................................................................................................................ 23
*Prestige Magazine Co. v. Panaprint, Inc.*, 2010 U.S. Dist. LEXIS 114097 (S.D.
    W. Va. Oct. 26, 2010) ........................................................................................................... 23
*Ross v. Home Depot USA Inc.*, 2014 U.S. Dist. LEXIS 133507 (S.D. Ohio) ............................ 23
*Snugglers' Meadow Farms, LLC v. Land O'Lakes, Inc.*, 2006 U.S. Dist. LEXIS
    7132 (N.D. Ohio Feb. 13, 2006) ........................................................................................... 23
*Springston v. Consol. Rail Corp.*, 130 F.3d 241 (6th Cir. 1997) .............................................. 23

    **1.**      ***Trial Plaintiffs cannot show that DuPont consciously***
             ***disregarded their safety or acted with malice or criminal***
             ***indifference to any civil obligation*** ........................................................ 24

*Ross v. Home Depot USA Inc.*, 2014 U.S. Dist. LEXIS 133507 (S.D. Ohio) ............................ 24
*Dee v. Borough of Dunmore*, 474 F. App'x 85 (3d Cir. 2012) ................................................. 25
*Noll v. Apex Surgical, LLC*, 2010 U.S. Dist. LEXIS 71136 (W.D. Okla. July 15,
    2010) ...................................................................................................................................... 25
*Philip Morris, Inc. v. Emerson*, 368 S.E.2d 268 (Va. 1988) ..................................................... 25
*Toole v. McClintock*, 999 F.2d 1430 (11th Cir. 1993) .............................................................. 25
*In re Miamisburg Train Derailment Litig.*, 725 N.E.2d 738 (Ohio Ct. App. 1999) ................. 26
*Richards v. Michelin Tire Corp.*, 21 F.3d 1048 (11th Cir. 1994) .............................................. 26
*Clark v. Chrysler Corp.*, 436 F.3d 594 (6th Cir. 2006) ............................................................. 27
*In re Miamisburg Train Derailment Litig.*, 725 N.E.2d 738 (Ohio Ct. App. 1999) ................. 27
*Satcher v. Honda Motor Co.*, 52 F.3d 1311 (5th Cir. 1995) ..................................................... 27

*McGee v. Home Depot*, 2013 Ohio App. LEXIS 4845 (Ohio Ct. App. Oct. 18, 2013) .......................................................................................................................... 28

*Ross v. Home Depot USA Inc*., 2014 U.S. Dist. LEXIS 133507 (S.D. Ohio) ............................ 28

*Wanke v. Lynn's Transp. Co.*, 836 F. Supp. 587 (N.D. Ind. 1993) ............................................ 28

*Ross v. Home Depot USA Inc*., 2014 U.S. Dist. LEXIS 133507 (S.D. Ohio) ............................ 29

           2.      ***Neither Trial Plaintiff can show that DuPont knew it was highly probable that substantial harm would result from DuPont's conduct*** ............................................................................................. 29

*Calmes v. Goodyear Tire & Rubber Co.*, 575 N.E.2d 416 (Ohio 1991) ..................................... 31

*Clark v. Chrysler Corp.*, 436 F.3d 594 (6th Cir. 2006) .............................................................. 31

*MCI WorldCom Network Servs., Inc. v. W.M. Brode Co.*, 411 F. Supp. 2d 804 (N.D. Ohio 2006) ..................................................................................................... 31

*Owens-Corning Fiberglas Corp v. Garrett*, 682 A.2d 1143 (Md. 1996) ................................... 31

*Preston v. Murty*, 512 N.E.2d 1174 (Ohio 1987) ....................................................................... 31

*Satcher v. Honda Motor Co.*, 52 F.3d 1311 (5th Cir. 1995) ....................................................... 31

**IV.    CONCLUSION** ................................................................................................. 31

# I.     INTRODUCTION

As a matter of law, based on the undisputed facts, DuPont has not engaged in any conduct that would allow the imposition of punitive damages under Ohio or West Virginia's heightened standards, both of which require plaintiffs to show ***actual malice*** by a clear and convincing standard.  Indeed, rather than any malice or disregard for safety, the evidence instead shows that DuPont exhibited a *proactive concern* for safety in its use of PFOA at its Washington Works plant, consistently going beyond the regulatory requirements and the typical conduct of most chemical companies.  Among many other things, as shown below in this brief, in an effort to have a safe environment for its workers and the community, it is undisputed that DuPont:

- Complied with all MSDS (material safety data sheets) and safe handling instructions received from the manufacturer and supplier of PFOA, 3M Company ("3M"), and timely acted upon other information supplied by 3M;

- Took the initiative to independently study and gather information related to PFOA, notwithstanding the fact that it was not the manufacturer of the chemical, and no law or regulation required it to do so;

- Proactively set extremely conservative guidance levels for exposure to PFOA that had safety factors 100s and 1,000 times below where adverse effects had been seen in animal studies, and that were far below the safe lifetime exposure levels that were subsequently set by ACGIH, 3M and the West Virginia C8 Assessment of Toxicity Team ("CATT");

- Monitored personal and area PFOA exposure levels, blood levels, and the health of its workers who came into contact with PFOA, and added scrubbers and filters to reduce emissions to maintain the exposure levels below all the guidance exposure limits established for workers by ACGIH, 3M and DuPont;

- Monitored community exposure levels and kept community levels of exposure far below where any harm was expected based on the animal studies, and far below the much higher workplace exposures that had not been found to cause any disease in 3M workers or DuPont workers;

- Kept its employees (who lived in the community, with their families and friends) informed about the results of animal and other scientific studies on PFOA;

- Responded to and reasonably acted upon new information relating to PFOA as it was received;

- Pursued more precise, more sensitive, more selective and more accurate analytical methods for measuring trace levels of PFOA;

- Developed and adopted new measures and equipment to control PFOA emissions; and

- Communicated and worked with regulatory agencies to evaluate and voluntarily limit PFOA emissions and exposures.

In addition, the undisputed evidence shows that while taking the above steps, ***DuPont never believed that there was any probability that PFOA exposure at the extremely low levels found in drinking water around the Washington Works plant would cause human disease.***

Accordingly, while it will be for a jury to evaluate the negligence claims and the reasonableness of DuPont's conduct with regard to PFOA over the years, no reasonable jury could find that DuPont acted with the requisite mental state to warrant an award of punitive damages, and DuPont is entitled to partial summary judgment on this issue.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    DuPont's Historical Use and Knowledge Regarding PFOA

DuPont opened its Washington Works facility in Washington, West Virginia in the early 1940s. *See* Tr. of Aug. 27, 2014 Depo. of Robert W. Rickard, Ph.D. ("Rickard Depo.") at 50:9-14; *Bartlett* Cmpt. at ¶ 3; *Wolf* Cmpt. at ¶ 3. Since that time, Washington Works has remained in continuous operation as one of the Parkersburg area's largest employers and manufacturing facilities, with approximately 2,000 employees, most of whom live locally in the communities surrounding the plant.[1] Over the years, the plant has made nylon, butacite and numerous other products that have not involved the use of PFOA.

---

[1] *See* Interview with K. Boelter, Du Pont Washington Works Plant Manager, *available at* http://www.wvcommerce.org/business/successstories.

In **1951**, DuPont began purchasing PFOA from 3M, and using it in part of the Washington Works plant, as a processing aid in a limited number of its manufacturing processes. *See* Rickard Depo. at 50:15-23; *Bartlett* Cmpt. at ¶ 15; *Wolf* Cmpt. at ¶ 15.

PFOA is *a surfactant* (like a detergent or soap), that is *stable, non-reactive, and chemically and thermally stable*. Jan. 2015 Expert Report of Robert W. Rickard, Ph.D., D.A.B.T. ("Rickard Report") [ECF No. 2807, Ex. D] at 4, 13. Based on its chemical properties, one would not expect PFOA to have significant biological activity or potent toxicity. *Id.*

For more than 50 years, from 1951 until 2002, *DuPont purchased its PFOA from 3M*, which manufactured PFOA and a number of other perfluorinated chemicals at its facility in Cottage Grove, Minnesota. Jan. 29, 2015 Report of Thomas C. Voltaggio ("Voltaggio Report") [ECF No. 2807, Ex. G] at 27; *see also* Rickard Depo. at 30:19-20, 51:1-7; Tr. of Mar. 5, 2015 Depo. of Barry S. Levy, M.D., MPH ("Levy Depo.") [ECF No. 2809, Ex. G] at 44:15-20; Tr. of Mar. 12, 2015 Depo. of Michael B. Siegel, MD, MPH ("Siegel Depo.") [ECF No. 2809, Ex. J] at 109:3-11, 111:23-112:1. Throughout this period, 3M was actively involved in health and toxicology issues related to PFOA, and DuPont monitored the data and research being gathered and conducted by 3M. *See* Rickard Depo. at 63:1-3; Levy Depo. at 44:24-45:14.

3M also supplied DuPont with material safety data sheets ("MSDS") that provided PFOA usage and handling instructions and information regarding any known hazards. *See* Rickard Depo. at 30:19-20, 51:1-22; Levy Depo. at 44:15-20; Siegel Depo. at 109:3-11, 111:23-112:1. *3M also repeatedly told DuPont that 3M was <u>not</u> seeing <u>any</u> adverse health effects in 3M's workers*, and that 3M's workers (who were actually making PFOA) were being *exposed to higher levels of PFOA than the workers using it at Washington Works*. *See, e.g.*, Memo from

B. McKusick to F. E. French, Jr. (July 23, 1979) (RL001743-45); Memo from R.J. Burger to various recipients (June 12, 1980) (EID083457-EID083461).[2]

In May of **1978**, 3M informed DuPont that it had collected blood samples from 3M workers who had manufactured and worked directly with PFOA, and that, while it was not seeing any adverse health effects in the 3M workers, the blood samples contained some elevated levels of organic fluorine. *See Bartlett* Cmpt. at ¶¶ 20-21; *Wolf* Cmpt. at ¶¶ 20-21; *see also* Rickard Depo. at 73:12-17, 92:2-8; Siegel Depo. at 164:16-17. Promptly after receiving this information from 3M, DuPont relayed it to all the workers in the fluoropolymers area at DuPont's Washington Works plant who might be exposed to PFOA and, despite the absence of any regulatory screening level or requirement to do so, DuPont began monitoring the blood of its employees who were working with PFOA, and ***DuPont proactively pursued*** internal processes involving highly trained toxicologists, epidemiologists, industrial hygiene specialists and medical experts to determine ***protective screening levels for PFOA with large factors of safety built into them***, to guard against any health issues. *See* Memo from C.H. Foshee (June 27, 1978) (EID510221-EID510226).

Specifically, unlike most other companies (which commonly sit back and wait for the government or someone else to set a guidance exposure level), DuPont's Acceptable Exposure Limit ("AEL") Committee voluntarily set a provisional occupational exposure limit (AEL) for PFOA in 1978, making DuPont the very first organization to set a guidance exposure level for PFOA. Rickard Report at 26; *see also* Rickard Depo. at 109:13-21; Levy Depo. at 169:10-16; Siegel Depo. at 56:11-14.[3] Importantly, the AELs set by this Committee were *not* lines of

---

[2] Copies of these and other documents cited herein are attached to the supporting Declaration of Robert W. Rickard, Ph.D., D.A.B.T., attached hereto as Exhibit 1.

[3] DuPont's AEL Committee, which was comprised of a cross section of scientific expertise, included experts in toxicology, industrial hygiene, occupational medicine, pathology and epidemiology. See

demarcation between safe and dangerous concentrations, but were ***conservatively set at levels far below the level at which any adverse health effects might be expected***.  *See* Rickard Report at 26-27; Voltaggio Report at 25.  The AEL was stated as an air exposure, but if converted to exposure from drinking water, it was the equivalent of ***50 ppb*** in drinking water, a level that was set with two orders of magnitude of safety factor below (100 times smaller than) the most sensitive endpoint from any of the animal studies (the most sensitive effect seen in the animal studies was reversible liver weight effects in rats, and only seen when they were exposed to very high levels of PFOA).  Rickard Report at 26-27; Voltaggio Report at 25.

In the years that followed, the AEL Committee regularly reevaluated the PFOA AEL to be sure that it remained conservative with many safety factors in place as additional tests and studies on PFOA were done by DuPont, 3M and others.  *See* Rickard Report at 27; Rickard Depo. at 161:3-8, 187:22-188:10.  For example, when the first animal test results came back that indicated extremely high doses of PFOA could cause certain types of cancer in rats, DuPont told its employees, and evaluation by the AEL Committee determined that the AEL was already highly protective, and had already been set at a level 1,000 times below the lowest exposure in the rat study that had shown cancer (DuPont also noted that the study was not a direct indicator of similar health effects in humans in any event).  *See* Memo from R.D. Lanyon (Mar. 24, 1988) (EID510258) ("The AEL Committee has recently received and subsequently reviewed the 3M Company's results of a two-year rat feeding study.  The review indicates that the existing AEL . . . provides a 1000-fold safety factor below any health effect observed in this new study or in previous studies."); *see also* Rickard Report at 27; Voltaggio Report at 26; Siegel Depo. at 59:13-17.

---

DuPont "Acceptable Exposure Limits (AEL) List – Preface" (EID137839); Voltaggio Report at 25; *see also* Levy Depo. at 169:19-23.

- 5 -

Follow-up reviews of employee medical records by both 3M and DuPont did not show any human disease associated with PFOA. 3M's medical director informed DuPont that no adverse liver effects or other health effects had been observed among 3M's workers manufacturing and exposed to PFOA at higher levels than the exposures to DuPont's employees. *See* Memo from B.C. McKusick (July 23, 1979) (EID107173-EID107175) (note that PFOA was also known by the 3M trade name FC-143).[4] Throughout, DuPont continued to inform its exposed workers, who lived in the communities surrounding Washington Works, of the results of animal studies and ongoing observation of the employees. *See, e.g.*, Memo from R.J. Burger (June 12, 1980) (EID083457-EID083461).

Over the years, 3M, the manufacturer and supplier of PFOA, continued to conduct studies of its workers, repeatedly telling DuPont throughout the 1970s, 80s, and 90s that it was not observing any adverse health effects in the 3M workers who had been exposed to high levels of PFOA (including persons with exposures and internal doses that were several orders of magnitude higher than the levels Mrs. Bartlett and Mr. Wolf claim here). *See* Rickard Report at 29 (quoting MSDS from 3M as saying: "The presence of organic fluorochemicals in the blood of the general population and subpopulations, such as workers has been published dating back to the 1970's. 3M's epidemiological study of its own workers indicates no adverse effects."); Rickard Depo. at 72:23-73:4, 93:9-24; Siegel Depo. at 115:21-116:5.[5]

---

[4] Trial Plaintiffs' experts do not – and cannot – dispute that it was reasonable for DuPont to rely, at least in part, on the 3M medical doctor's statements. *See, e.g.*, Siegel Depo. at 116:11-24 ("I absolutely believe that if . . . that's what the 3M director said, that . . . . there would be no reason to think he wasn't telling the truth."); Amter Depo. at 158:22-159:5 ("I think it's reasonable to elicit, consider and analyze the information coming from another chemical company who was the supplier of materials to DuPont. … It was information that was both useful and necessary for DuPont to have.").

[5] Over the relevant time, numerous similar statements have been made by various government agencies and officials. *See, e.g*, Remarks of West Virginia Department of Environmental Protection (WVDEP) Ground Water Program Manager, D. Watkins, Little Hocking Water Ass'n Meeting (Jan. 15, **2002**), at 31:19-21 (***"I'll tell you right now there are no***

There was a false alarm in **1981**, when 3M reported to both the US EPA and DuPont that results from a preliminary test indicated eye defects in the pups of laboratory rats exposed to large amounts of PFOA. *Bartlett* Cmpt. at ¶ 27; *Wolf* Cmpt. at ¶ 27. Proactively, DuPont immediately acted upon this information by communicating the results of the study to all potentially affected employees, reassigning all potentially-exposed women of childbearing years to other areas of the plant, and notifying the Director of the West Virginia Air Pollution Control Commission and the Chief of the West Virginia Division of Water Resources of the study results and the amounts of the Washington Works' air and water emissions of PFOA. *See* Letter from A.C. Huston of DuPont to C. Beard II of W. Va. Air Pollution Control Comm'n (June 9, 1981) (EID079491); Letter from A.C. Huston of DuPont to D. Robinson of W. Va. Div. of Water Res. (June 9, 1981) (EID079493); *see also* Voltaggio Report at 28. Between them, DuPont and 3M also promptly initiated four animal studies, none of which showed any birth defects caused by PFOA, even at very high doses.

Ultimately, after DuPont had proactively taken all of the above precautionary measures, it was confirmed by independent reviewers for the National Institutes of Health ("NIH") and the National Institute of Neurological Diseases and Blindness that the effects reported in 3M's preliminary rat study, which had been reported to the US EPA, plant employees, and numerous others in the public, were an artifact of how the tissue slides had been prepared, and were not birth defects or related to PFOA exposure at all. *See* Memo from J.G. Aftosis to B.C. McKusick

*known health effects at this time related to C-8. And you can quote me.*") (emphasis added); Letter from E. Page, M.D., M.P.H. of NIOSH to B. Lewis (July 31, **2001**) (000266036) (noting history of PFOA use by 3M and noting that "[e]xposures to PFOA . . . at the levels encountered at 3M facilities *have not been associated with adverse health effects*") (emphasis added); Letter from H. Frumkin of Agency for Toxic Substances & Disease Registry to B. Taylor of W. Va. Dep't of Health & Human Servs. (Feb. 10, **2009**) ("[H]ighly exposed workers, with serum PFOA levels similar to or higher than those seen in area residents, *did not show obvious clinical abnormalities associated with PFOA exposures*.") (emphasis added).

(Oct. 23, 1981) (EID072186); Memo from C.F. Reinhardt & B.W. Karrh to H.E. Serenbetz (Feb. 22, 1982) (EID096458-EID096459).  While the birth defects scare had proven to be a false alarm, it was one that DuPont had taken very seriously and responded to proactively, with great caution and concern for safety.  *See* Voltaggio Report at 28.

Throughout the relevant time, DuPont instituted numerous safety precautions for its employees, controlling and reducing exposures, monitoring blood levels of PFOA, maintaining health registries, and conducting periodic surveillance reports to monitor employee health for all of the workers at Washington Works, not just those working with and most heavily exposed to PFOA.  Siegel Depo. at 52:10-14, 127:23-24; *see also* Rickard Depo. at 134:18-135:1.  Indeed, ***even one of PSC's proffered "corporate conduct" experts acknowledges that DuPont was proactive and reasonable in how it was trying to protect employees***.  Siegel Depo. at 181:11-20.

On-site plant physicians in the 1980s "carefully" monitored and tracked employee blood levels over time, with the corresponding health data consistently showing no evidence of disease in persons with relatively high blood levels of PFOA—blood levels several orders of magnitude higher than those measures in Mrs. Bartlett or Mr. Wolf.  Siegel Depo. at 70:9-12, 128:1-7; *see also* Rickard Depo. at 134:11-17, 136:24-137:5; Rickard Report at 7-10.  The monitoring also showed that the emissions controls were effective and employee blood levels were coming down. *See, e.g.*, Memo from R.D. Lanyon to H.A. Smith (June 14, 1989) (EID080548-EID080564).

In **1984**, DuPont began to collect water samples from the surrounding community and test the samples for trace levels of PFOA.  *See* Memo from J.F. Doughty to J.A. Schmid (August 29, 1984) (EID079096-7).  ***DuPont employees who lived in the community and drank the water, along with their spouses and families, were actively involved in gathering and analyzing the test results, which included samples from their own homes***.  *See id.*  ***The results*** of the tests

showed PFOA concentrations that were far below DuPont's conservative AEL, and *very far below any levels believed to have any potential harmful impact on humans*. *See* internal Memo from J.F. Doughty to J.A Schmid (June 14, 1984) (EID079098-9) ("The concentrations are *very low and in my judgment are not cause for concern*.").

In the mid-1980s, the American Conference of Governmental Industrial Hygienists ("ACGIH"), an independent organization devoted to occupational and environmental health, set a screening level for PFOA that demonstrated how conservatively DuPont had set its AEL.[6] The ACGIH regularly sets and publishes threshold limit values ("TLVs") as guidelines for entire working life exposures (40 years) that are based on a review of existing peer-reviewed scientific literature. ACGIH sets the levels where it believes nearly all workers may be repeatedly exposed without any adverse health effects. Rickard Report at 28-29. In the mid-1980s, the *ACGIH set its TLV for PFOA at a level equivalent to 500 ppb* in drinking water. *See id.* This TLV was *10 times higher than the AEL established by DuPont* in 1979. Rickard Report at 29; Voltaggio Report at 27.[7] Similarly, when *3M*, the manufacturer and supplier of PFOA, first set a safe exposure limit for PFOA in the mid-1980s, it did so at level that was *also 10 times higher* than DuPont's earlier, more conservative limit. *See* Voltaggio Report at 27; Rickard Depo. at 219:19-220:8; Siegel Depo. at 65:16-21, 66:19-67:13, 68:14-19, 120:6-17.[8]

---

[6] Trial Plaintiffs' experts agree—as they must—that ACGIH is a credible organization. *See, e.g.*, Siegel Depo. at 67:6-7; Smith Depo. at 57:17-20. ACGIH's Chemical Substances TLV Committee was comprised of scientists from NIOSH, OSHA, NCI, the U.S. Navy, and professors from a number of universities.

[7] The ACGIH lowered their guidance value in the mid-1990s, such that it ended up being the same as DuPont's AEL. *See* Rickard Report at 29. Today, in 2015, the ACGIH remains at the same number as DuPont's AEL – the equivalent of *50 ppb* in drinking water. *See id.*

[8] As discussed more below, later, in 2002, a team of ten toxicologists assembled by the WVDEP, including representatives from US EPA and the Agency for Toxics Substances Disease Registry (ATSDR) determined that a *lifetime exposure to 150 ppb of PFOA in drinking water was expected to have no risk of any adverse human health effects*. *See* WVDEP, "Final Ammonium Perfluorooctanoate

Beginning in the late 1980s, and finalized in **1991**, DuPont also proactively set an exposure guideline for PFOA, known as a Community Exposure Guideline ("CEG"), with even more factors of safety added onto those used in the AEL. *See* Memo from G.L. Kennedy, Jr. to H.A. Smith (July 10, 1989) (EID072207-12). Like the AEL, DuPont's CEG was not a demarcation line marking the level at which adverse effects might be expected. *See* DuPont "Community Exposure Guidelines (CEGs)" (EID137840) ("Exposure above the CEG will not necessarily result in any adverse effects."). Rather, it was set more than 1,000 times below the lowest level where adverse effects had been seen in the animal studies, so that if the CEG level was reached, it would merely serve as ***an extremely conservative trigger to "evaluate what action, if any, should be taken***." *Id.* (emphasis supplied); *see also* Rickard Report at 28; Voltaggio Report at 25; Rickard Depo. at 187:2-14; *Bartlett* Cmpt. at ¶ 54; *Wolf* Cmpt. at ¶ 54; Levy Depo. at 98:24-99:1; Siegel Depo. at 71:7-10.

Trial Plaintiffs' experts acknowledge that very few companies were proactive enough to use these kinds of community exposure guidelines. *See, e.g.*, Siegel Depo. at 65:12-14 ("I don't believe that there were any other companies that were doing . . . more in terms of setting levels."); Levy Depo. at 171:21-172:7.

Based upon the PFOA AEL (which already had an extremely large, built-in safety factor), DuPont established a drinking water CEG of *3 ppb*, based on the assumption that an individual's exposure would only come from drinking water, that the person would be in a sensitive sub-population, and assuming 24-hours-per-day 7-days-per-week exposure. *See* Voltaggio Report at 25; Rickard Report at 28 *see also* Rickard Depo. at 189:6-7; Siegel Depo. at

---

(C8) Assessment of Toxicity Team (CATT) Report" (Aug. 2002) (GHS005332-GHS005377); *see also* Voltaggio Report at 38-39. This also shows how conservative, proactive and protective DuPont's AEL was, and why trace levels found in drinking water should not have been cause for concern.

72:17-73:18.[9]  Rickard Report at 28.  This guidance was incredibly conservative for persons like Mrs. Bartlett and Mr. Wolf, because both are and have been active in the work force, neither is in a sensitive subpopulation, and neither claims that he or she drank water continuously 24 hours a day, 7 days a week.  *See* Plaintiff Fact Sheet of Carla Bartlett, *In re E. I. du Pont de Nemours & Co. C-8 Personal Injury Litig.*, MDL No. 2433, ECF No. 68-1 (S.D. Ohio Oct. 24, 2013); Plaintiff Fact Sheet of John Wolf, *In re E. I. du Pont de Nemours & Co. C-8 Personal Injury Litig.*, MDL No. 2433 (S.D. Ohio Jan. 27, 2014).

In 1993, DuPont scientists reviewed results from a DuPont two-year feeding study in rats and additional epidemiology studies.  Rickard Report at 27.  Based on the results of these studies, the existing AEL and CEGs were reviewed and it was determined that they still provided very large margins of safety, with ample protection against potential adverse health effects in humans.  *Id.*  In 1999, results from a six-month monkey study were evaluated.  *Id.*  Again, DuPont's exposure guidelines were determined to continue to be protective of potential adverse health effects, with ample levels of safety factors.  *Id.*

As late as 2000, the MSDS that 3M supplied with the PFOA (FC-143) sold to DuPont indicated that "there are no known human health effects from anticipated exposure" to PFOA and that 3M's "epidemiological study of its own workers indicates no adverse effects."  Rickard Report at 29 (quoting 2000 MSDS from 3M).  3M also established a biological limit value of *5 ppm*—*parts per <u>million</u>*-- for PFOA in the blood serum of its PFOA production workers, noting that at this level (which is many orders of magnitude higher than that claimed by any plaintiff in the MDL), ***even if present on a chronic basis, PFOA was <u>not</u> expected to pose a significant risk of adverse health effects***.  *See* 3M, "Documentation of an Occupational Biological Limit Value

---

[9] If an individual's exposure to PFOA was 80% from air and 20% from drinking water, the CEG was set at 1 ppb.  *See* Rickard Report at 28.  However, neither Mrs. Bartlett nor Mr. Wolf is claiming air exposure to PFOA.

(BLV) for Perfluorooctanoate" (Mar. 22, 2000) (GK012123-29). In 2002, 3M established a lifetime drinking water advisory for PFOA of *70 ppb*, assuming that the individual's exposure was only coming from drinking water. Rickard Report at 30-31. In connection with this number, 3M indicated that "PFOA concentrations in water in excess" of 70 ppb should not automatically "be interpreted to represent excess risk." *Id.* at 30.

At the same time 3M was gathering and providing data and research on PFOA exposure, DuPont proactively conducted its own extensive review of worker exposure and potential health effects, as well as evaluating and developing more accurate analytical methods for measuring PFOA. *See* Jan. 28, 2015 Report of Shane A. Snyder, Ph.D. ("Snyder Report") [ ECF No. 2807, Ex. E] at 17-26. In addition to the extensive blood testing of its workers and monitoring of exposures that followed the 1978 3M notification about 3M employee blood levels of PFOA, and before any regulation from the state or federal government agencies charged with protecting the health of workers and the public, DuPont had over the years taken the initiative to conduct its own research, through its Haskell Laboratory, on chemicals such as PFOA. *See* Rickard Depo. at 41:20-42:1; Levy Depo. at 167:2-15; Siegel Depo. at 53:24-54:14 (admitting that Haskell Laboratory was established more than thirty years before the creation of the US EPA, OSHA, NIOSH, or any of the other federal government agencies charged with protecting the environment or public health).

Notably, PFOA is to this day an unregulated chemical. Also, ***there were no scientific studies—toxicology, epidemiology or otherwise—prior to 2011 (the year of the first Science Panel Probable Link Report) that showed any association between human disease and the very low, trace amounts of exposure to PFOA that was reaching the community outside the***

***Washington Works plant***. *See* Voltaggio Report at 5; Rickard Report at 7-10; Siegel Depo. at 28:15-29:8, 30:15-22, 145:15-146:19.[10]

**B.    DuPont's Efforts and Measures to Control PFOA Emissions**

From at least the **1960's**, and later while gathering and studying PFOA data and analyzing the information on PFOA that it received from 3M and others, DuPont instituted a number of process controls and operational changes in a proactive effort to reduce its PFOA emissions and the exposures to people. Some of the PFOA emissions control measures put in place at Washington Works included scrubbers, carbon filtration, and other equipment. *See* Voltaggio Report at 29-30; Siegel Depo. at 50:22-51:1, 156:22-25; Smith Depo. at 43:21-25. DuPont also moved from using powdered PFOA to liquid PFOA to reduce dermal and respiratory exposure and to "protect the workers," as well as researching potential replacements for PFOA in its manufacturing processes. Voltaggio Report at 30; Siegel Depo. at 156:3-17. Over time, these control measures were very effective in substantially reducing PFOA emissions

---

[10] As of April 2015, no federal Maximum Contaminant Level ("MCL")—the legal threshold limit on the amount of a substance that is allowed in public water systems under the Safe Drinking Water Act—has been established for PFOA (although there are drinking water MCLs for a number of potentially hazardous chemicals, such as cadmium, arsenic, and benzene, as well as for radiation). *See* Voltaggio Report at 33-34; Siegel Depo. at 28:15-29:8, 30:15-22.

Further, ***into the 2000s, independent scholars and researchers were unable to find a causal connection between PFOA exposure and human disease***. *See* K. Steeland et al., "Epidemiologic Evidence on the Health Effects of Perfluorooctanoic Acid (PFOA), Env'tl Health Perspectives, 118:1100-1108 (Aug. ***2010***) ("Epidemiologic evidence remains limited, and ***to date data are insufficient to draw firm conclusions regarding the role of PFOA for any of the diseases of concern***."); E. Emmett et al., "Community Exposure to Perfluorooctanoate: Relationships Between Serum Levels and Certain Health Parameters," J. of Occupational and Env'tl Med., 48:771-779 (Aug. ***2006***) (finding ***no association between PFOA exposure and any of the health enpoints studied***).

Indeed, ***Trial Plaintiffs' own experts are unable to point to any scientific evidence before 2011 that demonstrated that PFOA caused any disease in humans at the low levels of exposure reaching the community***. *See, e.g*, Amter Depo. at 163:16-164:12.

from the Washington Works plant; for example, between 2000 and 2006, DuPont reduced total plant-wide releases of PFOA in both water and air by more than 99%.  Voltaggio Report at 30.

**C.    DuPont's Communications and Collaboration with Regulators Regarding PFOA**

Even some of Trial Plaintiffs' experts admit that DuPont has *not* violated any law or regulation regarding the use, handling, disposal or emissions of PFOA.  *See* Siegel Depo. 31:25-32:4. To the contrary, DuPont has been proactive in voluntarily communicating and working with state and federal regulatory agencies to evaluate and control exposures to PFOA in the workplace and community, as was 3M over the years.  *See* Voltaggio Report at 38-47.

DuPont was notifying federal and state agencies, including the West Virginia Department of Environmental Protection, US EPA, and others about the presence of PFOA in the water and air emissions from the Washington Works' plant as early as 1981. *See* Voltaggio Report at 5; June 9, 1981 report to USEPA and WVDEP (EID478262), June 9, 1981 Letter to W. Va. Air Pollution Control Comm'n  (EID079491), June 9, 1981 Letter to W. Va. Div. of Water Res. (EID079491).

Moreover, in 1985 and 1989, respectively, DuPont reported to the US EPA and Lubeck Public Service District that PFOA had been detected in outside wells.  *See* Letter from H.V. Bradley of DuPont to W. Packard of Lubeck Pub. Serv. Dist. (June 13, 1989) (LUB000934-LUB000935); *see also* Siegel Depo. at 204:15-205:1.

In June of 1999, DuPont reported to the US EPA the existence of PFOA in a drinking water well at a level of 1.9 ppb.  Siegel Depo. at 140:6-9.  In 2000 and 2001, DuPont also sent multiple submissions and notices to the US EPA, pursuant to Section 8(e) of the Toxic Substances Control Act ("TSCA"), in which DuPont informed the US EPA of the results of various studies related to PFOA.  *See* TSCA 8(e) Submission (Mar. 21, 2000) (US EPA 4997); TSCA 8(e) Submission (May 8, 2000) (US EPA 4998-9); TSCA 8(e) Submission (Dec. 12,

- 14 -

2000) (US EPA 5000-1); TSCA 8(e) Notice (Feb. 5, 2001) (US EPA 5006-7); TSCA 8(e) Notice (Mar. 9, 2001) (US EPA 5008-9). DuPont was also in regular communication with 3M over the years regarding PFOA, and was aware that 3M had been periodically sending PFOA-related TSCA Section 8(e) submissions and notices to the US EPA in connection with its manufacturing operations since the early 1980s. *See, e.g.,* 3M TSCA 8(e) Submissions (June 16, 1981) (8EHQ-0681-0394S), (March 22, 1982) (8EHQ-0382-0373/4S), (October 16, 1987) (8EHQ-0381-0394S).[11]

In addition to notifying regulatory agencies about its use and knowledge of PFOA, DuPont also voluntarily entered into several agreements with regulatory agencies, and has voluntarily spent many millions of dollars, to further study PFOA and reduce human exposure. *See* Voltaggio Report at 38-46. For example, on November 14, 2001, DuPont voluntarily entered into and funded tasks related to a Consent Order with the WVDEP, including tasks to assess the presence of PFOA in numerous areas surrounding Washington Works and establish screening levels to determine whether any remedial measures would be required. *See* Voltaggio Report at 38 (citing Consent Order Issued Pursuant to Articles 5 and 12, Chapter 22 and Article 1, Chapter 16 of the West Virginia Code, Order No. GWR-2001 (Nov. 14, 2001)).

---

[11] Trial Plaintiffs are expected to refer to the fact that, in 2004, the US EPA filed complaints against DuPont, alleging that the company violated TSCA and RCRA by failing to report information to the US EPA about PFOA. *See* First Am. Cmpt., *In the Matter of E.I. du Pont de Nemours & Co.*, Docket Nos. TSCA-HQ-2004-0016, RCRA-HQ-2004-0016 (Oct. 13, 2004); Cmpt*., In the Matter of E.I. du Pont de Nemours & Co*., TSCA-HQ-2005-5001 (Dec. 6, 2004). It should be emphasized that this issue involved claims that DuPont had not met certain technical reporting obligations under the TSCA rules (not anything relating to the actual use, handling, or emissions of PFOA), and DuPont vigorously disputed the allegations. An Administrative Law Judge determined, *inter alia*, that there were genuine issues of material fact concerning the US EPA's TSCA and RCRA claims. The parties subsequently entered into a settlement, under which DuPont denied the allegations, the parties agreed that there were no findings of liability, and DuPont agreed to pay a fine. Pursuant to the plain terms of the Agreement, the parties agreed that the settlement should <u>*not*</u> "be taken as an admission of liability." Consent Agreement, *In the Matter of E.I. du Pont de Nemours & Co*., Docket Nos. TSCA-HQ-2004-0016, RCRA-HQ-2004-0016, TSCA-HQ-2005-5001, ¶¶ 2-4 (Dec. 14, 2005).

Among these tasks was the formation by West Virginia DEP of a "C8 Assessment of Toxicity Team" ("CATT") to assess the toxicity and risk to human health of exposure to PFOA, and set appropriate screening levels that would be protective of health.  *Id.*  ***The leader of the C8 Assessment of Toxicity Team was Dr. Dee Ann Staats, a PhD toxicologist employed by WV DEP who lived in the area, and was drinking the impacted water along with other members of her family****.  See* June 7, 2002 Depo. of Dee Ann Staats ("Staats Depo.") at 423:7-13.[12]   The CATT included scientists from WVDEP, West Virginia Bureau of Public Health, US EPA Region III, Agency for Toxic Substances and Disease Registry ("ATSDR"), TERA, National Institute for Chemical Studies ("NICS"), an expert from Marshall University on communicating environmental health risks to the public, a representative and consultant from DuPont, and observers from Ohio EPA and 3M.  *Id.*  Following review of the scientific information available on PFOA, the toxicologists on the CATT concluded that ***no risk of deleterious effects are expected with lifetime exposure to* <u>150 ppb</u> *of PFOA in drinking water****.  See* WVDEP, "Final Ammonium Perfluorooctanoate (C8) Assessment of Toxicity Team (CATT) Report," at 33 & 35 (Aug. 2002) (GHS005332-GHS005377).[13]

Following the establishment of the CATT screening level, Ohio EPA assigned an OEPA toxicologist to review the work that had been done by the CATT Team.  *See* Ohio EPA Memo from C. Hafner to C. Jones (Dec. 5, 2002) (WVDEP000609-12). As seen in that internal state

---

[12] Notably, in subsequent sworn testimony, Dr. Staats also testified that, in her professional opinion, chronic exposure to PFOA in drinking water at a level ***below 10 ppb did not pose any deleterious, harmful, or poisonous effects to humans****.  See* Staats Depo. at 412:1-16, 413:22-414:3.

[13] In March 2002, the US EPA and DuPont signed another Consent Order, in which they acknowledged that PFOA was not a contaminant for which a national drinking water regulation had been established, but agreed to use 14 µg/l (equivalent of 14 ppb) of PFOA as a temporary threshold, and that DuPont would supply alternate drinking water for areas where the measured levels of PFOA in drinking water exceeded that amount.  Voltaggio Report at 39-40; *see also* Siegel Depo. at 56:1-9.

- 16 -

agency memo, **Ohio EPA concluded that "the screening levels developed by the CATT are reasonable, scientifically defensible and health protective**," "the process followed established EPA guidance," and that: "all samples of drinking water were below the screening level. As a result, **no adverse health effects would be expected to occur in populations using the contaminated water as a source of drinking water**." *Id.* (emphasis supplied).

Despite these external confirmations of the extremely conservative level of DuPont's AEL and CEG, and the independent determinations that there was no risk of harmful effects to humans from the minute, trace levels of PFOA that were in the drinking water, DuPont proactively continued to reduce emissions from the plant even further, and continued efforts to find replacement materials so it could reduce and eliminate the use of PFOA.  *See* Voltaggio Report at 24-31, 38-47.  In 2006, **US EPA recognized DuPont as a proactive company with respect to PFOA**, and DuPont made a commitment to the US EPA that it would continue its significant reductions of PFOA releases into the environment, and committed to making efforts to eliminate the need to make, buy, or use PFOA by 2015.  Voltaggio Report at 46 ("DuPont led the way on this [PFOA Stewardship] initiative, and was the first of eight companies that committed to a 95 percent reduction of PFOA emissions by 2010 and committed to working toward total elimination of PFOA by 2015."); *see* S. Johnson (US EPA) Letter to C. Holliday, Jr. (Jan. 25, 2006).  DuPont proactively exceeded its commitment, and eliminated PFOA from its fluoropolymers manufacturing process by June 2013—two and a half years ahead of schedule.  Voltaggio Report at 46-47.

**D.    The Timelines of the Two Trial Plaintiffs' Alleged Exposures and Diagnoses**

Mrs. Bartlett was diagnosed with kidney cancer in **1997**.  Dec. 8, 2014 Report of Vitaly Margulis ("Margulis Report") [ECF No. 2811, Ex. D] at 5.  Dr. Margulis testifed that, based on the typical growth rate for the type of tumor that Mrs. Bartlett had, her tumor probably started at

least by 1991. Margulis Deposition at 45:13-23.[14] *At no point prior to 1991, or prior to Mrs. Bartlett's diagnosis in 1997, were there any toxicological, epidemiological, or other scientific studies that showed PFOA being able to cause kidney cancer or any other human disease at the relatively low exposure levels being claimed by Mrs. Bartlett*. *See* Rickard Report at 7; Jan. 28, 2015 Report of Samuel M. Cohen, M.D., Ph.D. ("Cohen Report") [ECF No. 2807, Ex. A] at 5; Jan. 27, 2015 Report of Douglas L. Weed, M.D., M.P.H., Ph.D. ("Weed Report") [ECF No. 2807, Ex. I] at 43.

Mrs. Bartlett claims that she was exposed to PFOA in her drinking water from September 1983 through 1989 and from 1993 through 2005, when she allegedly consumed water from the Tuppers Plains-Chester Water District. Dec. 8, 2014 Report of David L. MacIntosh, ScD, CIH ("MacIntosh Report) [ECF No. 2809, Ex. H] at 8 & Attachment 4; *see also* Jan. 2015 Report of Stephen T. Washburn ("Washburn Report") [ECF No. 2807, Ex. H] at 18.

Mr. Wolf was diagnosed with ulcerative colitis in August *2012*. *Id.* at 21. *At no point prior to Mr. Wolf's diagnosis in 2012 were there any toxicological, epidemiological, or other scientific studies showing that PFOA was able to cause ulcerative colitis at all, much less at the exposure levels claimed by Mr. Wolf*. *See* Rickard Report at 9; Weed Report at 44. Mr. Wolf claims that he was exposed to PFOA in his drinking water starting in 1999, when he began consuming water from the Lubeck Public Service District. Washburn Report at 22. *Mr. Wolf's exposure to PFOA in his drinking water essentially ended, at the latest, by approximately June 2007, when a GAC filtration system paid for by DuPont became operational for the Lubeck*

---

[14] Plaintiffs did not produce Dr. Margulis for deposition in this case until April 1, 2015, and a final transcript is not yet available. Accordingly, the citations to his testimony are to the rough transcript provided by the court reporter following the deposition. DuPont will supplement this Motion with a copy of the final transcript and any adjusted citations to that transcript when it is received. *See* Tr. of 2/26/2015 Status Conference [ECF No. 2560] at 10:24–12:9.

*Public Service District*, reducing PFOA concentrations in drinking water for that district to essentially non-detectable levels. *Id.*

### III.    LAW AND ARGUMENT

**A.    Standard of Review**

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under this well-established standard, summary judgment is proper whenever the non-moving party fails to bear his or her burden of proof on a particular issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The non-moving party may not rest upon the allegations of his or her pleadings, but must set forth, through competent and material evidence, specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 322. The "mere existence of a scintilla of evidence" is not enough. *Sierra Club v. ICG Hazard, LLC*, 2015 U.S. App. LEXIS 1283, at *6 (6th Cir. Jan. 27, 2015) (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008)).

**B.    Both Ohio and West Virginia Law Impose Heightened Punitive Damages Standards**

Trial Plaintiffs cannot meet their burden of proof on the issue of punitive damages, as there is no evidence (much less clear and convincing evidence) that DuPont acted with the requisite malice, consciously disregarded Trial Plaintiffs' health and safety, or knew that it was highly probable that they would suffer *any* harm, much less substantial harm. To the contrary, the undisputed facts demonstrate that DuPont acted reasonably, responsibly, and proactively with regard to PFOA. Accordingly, this Court should enter summary judgment in DuPont's favor on the issue of punitive damages.

### 1. Ohio law requires evidence of actual malice to award punitive damages

Under Ohio law, punitive damages are recoverable in a tort action only if compensatory damages have already been awarded and "the actions or omissions of th[e] defendant demonstrate malice or aggravated or egregious fraud." O.R.C. § 2315.21(C). An Ohio plaintiff like Bartlett[15] bears the burden of establishing that he or she is entitled to recover punitive damages "by clear and convincing evidence" and, even in cases of alleged fraud, must establish not only the elements of the tort itself but also that the fraud is "aggravated by the existence of malice or ill will." O.R.C. § 2315.21(D)(4); *Borror v. MarineMax of Ohio, Inc.*, 2007 Ohio App. LEXIS 525, at *35 (Ohio Ct. App. Feb. 9, 2007) (quoting *Charles R. Combs Trucking, Inc. v. Int'l Harvester Co.*, 466 N.E.2d 883, 888 (Ohio 1984)); *see also Aristocrat Lakewood Nursing Home v. Mayne*, 729 N.E.2d 768, 783-84 (Ohio Ct. App. 1999) (holding that, to recover punitive damages, there must be a showing that defendant acted with the "aggravated mental state" of "actual malice," which is distinct from the mental state necessary to establish the underlying fraud); Ohio Jury Instructions CV 315.37 (fraud is "aggravated" if accompanied by the existence of "malice or ill will").

Mrs. Bartlett can only satisfy her burden of showing "malice" if she can show by clear and convincing evidence[16] that DuPont acted with (1) hatred, ill will, or a spirit of revenge, or (2) "conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 512 N.E.2d 1174, 1176 (Ohio 1987) (noting that

---

[15] DuPont hereby incorporates by reference its Brief Regarding Choice of Law [ECF No. 2284] and its Response Brief Regarding Choice of Law [ECF No. 2416], in which it explained that the choice-of-law analysis in these MDL proceedings requires that the substantive law of the place where an individual plaintiff's alleged injury occurred governs that plaintiff's claims.

[16] As the Court knows, "clear and convincing evidence" is the quantum of evidence that "will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Estate of Schmidt v. Derenia*, 822 N.E.2d 401, 405 (Ohio Ct. App. 2004) (quoting *Cross v. Ledford*, 120 N.E.2d 118 (Ohio 1954)).

the "principle inherent in the award of punitive damages is that something more than mere negligence is always required"). Under the second prong of this test,[17] the Defendant must be shown to "possess knowledge of the harm that might be caused by his behavior, and nevertheless, *consciously disregard* the injured party's rights or safety . . . ." *McCombs v. Meijer, Inc.*, 395 F.3d 346, 355-56 (6th Cir. 2005) (citing *Preston*, 512 N.E.2d at 1176) (emphasis added). Furthermore, there must be a *great probability* that *substantial* harm will result. *Preston*, 512 N.E.2d at 1176 ("great probability" necessary because there must be more than "negligence"; and "substantial harm" necessary because it "better reflect[s] the element of outrage required to find actual malice").

The mere possibility of harm is *not* sufficient. *See MCI WorldCom Network Servs., Inc. v. W.M. Brode Co.*, 411 F. Supp. 2d 804, 812 (N.D. Ohio 2006) (granting summary judgment because the "potential for serious threat" did not demonstrate that defendant "consciously disregarded the rights and safety of persons"); *Calmes v. Goodyear Tire & Rubber Co.*, 575 N.E.2d 416, 420 (Ohio 1991) ("[M]ere foreseeability cannot be equated with great probability."); *Preston*, 512 N.E.2d at 1176 ("A possibility or probability is not enough[.]"). The plaintiff's burden of proof is high, and "[a]ny less callous mental state" will not "incur that level of societal outrage necessary to justify an award of punitive damages." *Estate of Schmidt*, 822 N.E.2d at 405 (finding that even though the jury "could clearly conclude that [the defendant] made a series of errors that directly led to [the plaintiff's] death," the defendant was "not motivated by a complete disregard for the safety of others," and punitive damages were thus unwarranted).

---

[17] Trial Plaintiffs have not alleged that DuPont's conduct was characterized by hatred, ill will, or a spirit of revenge. *See generally Bartlett* Cmpt.; *Wolf* Cmpt. Accordingly, only the second definition of malice is at issue. *See MacNeill v. Wyatt*, 917 F. Supp. 2d 726, 730 (S.D. Ohio 2013).

### 2. *West Virginia law also requires evidence of malice*

To sustain a claim for punitive damages under West Virginia law, a plaintiff like Wolf[18] bears a similarly-high "clear and convincing" burden,[19] and must show that the wrongful act was done "maliciously, wantonly, mischievously, or with criminal indifference to civil obligations." *Commonwealth Tire Co. v. Tri-State Tire Co.*, 193 S.E.2d 544, 549 (W. Va. 1972). As in Ohio, evidence of "actual malice" is required. *AIG Domestic Claims, Inc. v. Hess Oil Co*., 751 S.E.2d 31, 40-41 (W. Va. 2013); *see also Commonwealth Tire*, 193 S.E.2d at 549 (a wrongful act done "without malice" constitutes "no basis for [punitive] damages"); *Jopling v. Bluefield Waterworks & Improvement Co*., 74 S.E. 943, 945 (W. Va. 1911) ("To justify the recovery of [punitive] damages, there must be evidence in some form of malice.").

This necessitates "more than a showing of simple negligence." *Bennett v. 3 C Coal Co.*, 379 S.E.2d 388, 394 (W. Va. 1989). Indeed, in determining whether conduct is malicious, willful, or wanton, West Virginia courts look at whether the defendant acted in utter "*disregard* of a risk *known* to [it] or so obvious that [the defendant] must be taken to have been aware of it, and so great as to make it *highly probable* that harm would follow." *See Graham v. A.T.S. Specialized, Inc*., 2007 U.S. Dist. LEXIS 3463, at \*4-5 (S.D. W. Va. Jan. 17, 2007) (emphasis added). Accordingly, an award of punitive damages is reserved for "extreme and egregious bad conduct" and "is the exception, not the rule," and the "level of bad conduct on the part of the

---

[18] DuPont hereby incorporates by reference its Brief Regarding Choice of Law [ECF No. 2284] and its Response Brief Regarding Choice of Law [ECF No. 2416], in which it explained that the choice-of-law analysis in these MDL proceedings requires that the substantive law of the place where an individual plaintiff's alleged injury occurred governs that plaintiff's claims.

[19] Last month, the West Virginia Legislature passed Senate Bill No. 421, which clarifies that punitive damages can only be awarded in a civil action where a plaintiff establishes by "clear and convincing evidence" that defendant acted with "actual malice" toward the plaintiff or a "conscious," reckless, and outrageous indifference to the health, safety, and welfare of others. *See* Senate Bill No. 421 (passed Mar. 10, 2015).

defendant must be very high in order to meet the punitive standard." *Fowler v. Kanawha Valley Fine Jewelry & Loan LLC*, 2015 U.S. Dist. LEXIS 3761, at *16 (S.D. W. Va. Jan. 13, 2015).

**C.    DuPont Is Entitled to Summary Judgment on Punitive Damages Because There Is No Evidence of Malice or Criminal Indifference**

Courts applying Ohio and West Virginia law have both routinely held that summary judgment should be granted in the defendant's favor where the plaintiff cannot produce evidence of malice. *See, e.g.*, *Springton v. Consol. Rail Corp.,* 130 F.3d 241, 245-46 (6th Cir. 1997); *MacNeill v. Wyatt*, 917 F. Supp. 2d 726, 729-32 (S.D. Ohio 2013); *Alleman v. YRC*, 787 F. Supp. 2d 679, 684-86 (N.D. Ohio 2011); *MCI World Com Network Servs*., 411 F. Supp. 2d at 812; *Crouse v. Erie Ins. Co. & Cas. Co.*, 2013 U.S. Dist. LEXIS 113794, at *18 (S.D. W. Va. Aug. 13, 2013); *Prestige Magazine Co. v. Panaprint, Inc.*, 2010 U.S. Dist. LEXIS 114097, at *17 (S.D. W. Va. Oct. 26, 2010); *McIntryre v. Advance Auto Parts*, 2007 U.S. Dist. LEXIS 1944, at *82-84 (N.D. Ohio Jan. 10, 2007); *Snugglers' Meadow Farms, LLC v. Land O'Lakes, Inc.*, 2006 U.S. Dist. LEXIS 7132, at *8-13 (N.D. Ohio Feb. 13, 2006).

In *Ross v. Home Depot USA Inc*., 2014 U.S. Dist. LEXIS 133507 (S.D. Ohio), this Court applied and explained Ohio's punitive damages standard in the context of a summary judgment motion like this one, noting at the outset the Ohio Supreme Court's admonishment that "before submitting the issue of punitive damages to the jury, a *trial court must review the evidence to determine if reasonable minds can differ as to **whether the party was aware** his or her act had a **great probability** of causing **substantial harm***." *Ross*, 2014 U.S. Dist. LEXIS 133507, *5 (emphasis added) (citing *Preston*, 512 N.E.2d at 1176).

In doing so, the Court further explained, the Court's focus must be on whether sufficient evidence exists to demonstrate a conscious disregard for the plaintiff's rights or safety, taking into consideration such facts as "[t]he duration of the offensive conduct, … [a]n apparent lack of

concern for the rights of others, …[k]knowledge of adverse consequences…, [and t]he probability that harm will occur to others from that conduct." *Id*. In finding that the plaintiff in *Ross* had *not* presented sufficient evidence to survive summary judgment, this Court noted the Ohio and U.S. Supreme Courts' observance that "punitive damages are 'quasi-criminal punishment,' which are 'specifically designed … to make clear that the defendant's misconduct was especially reprehensible.'" *Id*. at *13 (quoting *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 54 (1991)).

Here, as in *Ross*, DuPont is entitled to summary judgment on Trial Plaintiffs' claims for punitive damages because they can identify no facts from which a reasonable jury could conclude that DuPont's proactive approach to the use of an unregulated chemical with no known health effects at the relevant levels of exposure was so "reprehensible" as to warrant the imposition of a "quasi-criminal punishment." *See id*.

As a threshold matter, Trial Plaintiffs' own hand-selected and high paid experts do not even <u>contend</u> – nor could they – that DuPont harbored or acted upon any actual malice. *See, e.g.*, Siegel Depo. at 130:4-9; Smith Depo. at 10:13-17. Indeed, Trial Plaintiffs have no evidence that DuPont (1) acted "maliciously, wantonly, mischievously, or with criminal indifference to civil obligations" (in the case of West Virginia plaintiff Wolf); or (2) consciously disregarded her safety or knew of a high probability that substantial harm would occur (in the case of Ohio plaintiff Bartlett). Accordingly, summary judgment should be entered.

1. ***Trial Plaintiffs cannot show that DuPont consciously disregarded their safety or acted with malice or criminal indifference to any civil obligation***

*First*, it is undisputed that DuPont was proactive with regard to the stewardship of its use of PFOA. Indeed, several of Trial Plaintiffs' experts have acknowledged and/or conceded that DuPont acted reasonably and prudently[20] in:

- monitoring the health of employees exposed to PFOA (whose exposure levels far exceeded that of Bartlett or Wolf or other non-DuPont employees in the community);

- setting conservative occupational exposure limits and community exposure guidelines (e.g., AELs and CEGs) for PFOA with very significant built-in safety factors;

- taking steps to reduce PFOA emissions, and to search for alternatives to PFOA;

- working with regulatory agencies to evaluate and control PFOA exposures; and

- voluntarily agreeing to discontinue its use of PFOA.[21]

This conduct—which demonstrates proactive <u>*concern*</u> for the safety of others, rather than a <u>*disregard*</u> for it—is enough alone to preclude a clear and convincing finding that DuPont was

---

[20] *See, e.g.*, Siegel Depo. at 50:22-51:12; Smith Depo. at 44:1-45:2 (admitting that it was reasonable to add equipment that reduced PFOA emissions); Smith Depo. at 46:7-19 (admitting that it was reasonable to develop better analytical methods for measuring PFOA); Siegel Depo. at 57:19-58:3, 60:22-61:3 (" . . . the fact that DuPont had set an AEL in 1979 was [] what I would consider, an example of following the duty of care. I believe that they were on the right track in setting that level and in taking precautions to protect their workers at that point in time."); Siegel Depo. at 65:12-14 ("I don't believe that there were any other companies that were doing . . .more in terms of setting levels."); Levy Depo. at 171:21-172:7 (admitting that the AEL Committee was the "type of committee that has the potential to be beneficial to employees and, by extension, community members"); Siegel Depo. at 53:16-22, 128:1-19 (admitting that it was reasonable to monitor health of employees); Siegel Depo. at 114:22-115:4 ("I believe that DuPont exercised extreme care in making sure that they protected their workers from exposure."); Siegel Depo. at 138:25-139:11 (admitting that it was reasonable to inform employees about results of various animal studies); Siegel Depo. at 204:15-205:10 (admitting that it was reasonable for DuPont to inform the government about its air and water emissions of PFOA).

[21] It should also be emphasized that in connection with its discontinuation of the use of PFOA, DuPont funded and successfully accomplished the invention and subsequent commercial and global regulatory process for the replacement surfactant. As reflected on the Congressional record in DuPont's Chief Sustainability Officer testified in 2010 that this was a multi-million dollar, global undertaking. *See* http://www.epw.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=e4eab882-a990-4dac-869a-899886626fe5 ("We had to seek and receive over 70 product registrations from various regulatory agencies. Over 300 of our scientists, engineers and business people have been working on this for several years, and it has required $200 million in R&D investments and another $100 million in capital investment.").

consciously indifferent to the safety of others.[22]  While Trial Plaintiffs may quibble with whether DuPont took all of the correct actions at all the correct times, and seek to establish a factual issue regarding _negligence_, they have _no evidence_ that DuPont harbored malice and knew of and _consciously disregarded_ an actual _great probability_ of _substantial harm_ to Mrs. Bartlett's or Mr. Wolf's health or safety.  Much less can Trial Plaintiffs present the evidence required to meet the required clear and convincing standard.

   _Second_, it is undisputed that DuPont took all of the foregoing actions despite the absence of any statutory or regulatory obligation to do so, belying any suggestion that it acted with indifference or disregard for the safety of others.  _See, e.g._, Siegel Depo. at 31:25-32:4.[23]  As numerous courts have recognized, compliance with statutory or regulatory standards is evidence that a defendant did not exhibit the sort of conscious disregard for safety necessary to support an award of punitive damages.  _See, e.g._, _In re Miamisburg Train Derailment Litig._, 725 N.E.2d 738, 752 (Ohio Ct. App. 1999); _Richards v. Michelin Tire Corp._, 21 F.3d 1048, 1059 (11th Cir. 1994) ("JNOV should be granted in [defendant's] favor" on punitive damages where "the record

---

   [22] _See Toole v. McClintock_, 999 F.2d 1430, 1436 (11th Cir. 1993) (finding that, while "[m]ore could have been done or said," defendant's conduct showed "regard" for others and that there was therefore insufficient evidence to permit the issue of punitive damages to go to the jury); _Dee v. Borough of Dunmore_, 474 F. App'x 85, 89 (3d Cir. 2012) (vacating award of punitive damages where defendant's conduct "was not so flagrant as to warrant punitive damages, particularly because there was legitimate concern for the safety of [] citizens"); _Noll v. Apex Surgical, LLC_, 2010 U.S. Dist. LEXIS 71136, at *20-21 (W.D. Okla. July 15, 2010) (granting summary judgment in favor of defendant where it "took steps to modify" the product at issue "to avoid additional problems"); _Philip Morris, Inc. v. Emerson_, 368 S.E.2d 268, 283-84 (Va. 1988) (punitive damages not warranted where defendant's conduct demonstrates "some concern for the safety of others").

   [23] As noted earlier, Trial Plaintiffs may point to the complaints filed by the US EPA, alleging that DuPont violated TSCA and RCRA, to suggest that DuPont violated a regulatory obligation, but even if such evidence were admissible (and DuPont respectfully submits that it is not), such an argument would be misguided.  The allegations in the US EPA's complaints are just that—allegations.  An Administrative Law Judge determined there were disputed issues on the facts and application of TSCA and RCRA, and the subsequent settlement agreement between DuPont and US EPA made clear that DuPont denied the allegations and that "nothing" in the agreement "should be taken as an admission of liability."  _See_ Consent Agreement, _In the Matter of E. I. du Pont de Nemours and Company_, Docket Nos. TSCA-HQ-2004-0016, RCRA-HQ-2004-0016, TSCA-HQ-2005-5001, ¶¶ 2-4 (Dec. 14, 2005).

demonstrates that [the defendant] complied with all requisite" federal standards because compliance with federal regulations is "evidence of due care"); *see also* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 36, at 233 n.41 (5th ed. 1984) ("In most contexts . . . compliance with a statutory standard should bar liability for punitive damages.").

In *Miamisburg Train Derailment*, for instance—a case where a train carrying yellow phosphorus derailed and spilled it contents, ignited, and created a cloud of phosphorous smoke that some considered "toxic"—the court found that the defendant tank car companies were entitled to partial summary judgment on the question of punitive damages. 725 N.E.2d at 741-42, 751-53. In reaching this conclusion, the court noted that the defendants had been compliant with applicable regulations, which "overwhelm[ed] any suggestion that appellees acted with conscious disregard for safety." *Id.* at 752. The court thus saw "no factual questions in th[e] case that would warrant submitting the issue of punitive damages to a jury." *Id.* According to the court, "no reasonable person could reconcile the [defendants'] compliance with the regulation in question with the notion that their behavior was somehow 'outrageous, flagrant, or criminal.'" *Id.* As a matter of law, the plaintiff's case was "insufficient to support a finding of malice." *Id.* at 753.

Here, Trial Plaintiffs' case for punitive damages is even weaker than that of the plaintiffs in *Miamisburg Trail Derailment*. DuPont not only <u>*complied*</u> with applicable laws and regulations, but also voluntarily went <u>*far above and beyond*</u> any such requirements, setting its own very conservative exposure guidelines for the unregulated chemical PFOA in the absence of any regulatory direction, taking the initiative to work with regulatory agencies in the evaluation and control of PFOA exposures within the workplace and the community, and voluntarily agreeing to discontinue its use of PFOA, notwithstanding the lack of any regulatory requirement

to do so (to name just a few of its many proactive actions). *See* Siegel Depo. at 28:15-29:8, 30:15-22; 56:1-9; 140:6-9. For all of these reasons, the undisputed evidence is insufficient as a matter of law to warrant an award of punitive damages. *See Clark v. Chrysler Corp.*, 436 F.3d 594, 603-04 (6th Cir. 2006) (holding that defendant's failure to test in a particular manner did not "evince a level of indifference to or reckless disregard for the safety of others" where regulators did not require the test); *see also Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1317 (5th Cir. 1995) (vacating punitive damage award because no reasonable jury could conclude that defendant's conduct rose to the level of "malice" or "ruthless disregard" where no government agency had ever required the design feature at issue).

*Third*, while Trial Plaintiffs claim that DuPont failed to meet its own internal standards and guidelines, *see, e.g.*, *Bartlett* Am Cmplt. at ¶ 22, *Wolf* Cmplt. at ¶ 22, the mere fact that DuPont attempted to go above and beyond what it was required to do by applicable law cannot be held against it, and cannot be used as a basis to award punitive damages. This Court has recognized that even where a company fails to adhere to its own policies, such failure is insufficient to demonstrate the actual malice required for punitive damages.

For example, in *Ross*, this Court explained that the defendant company's failure to follow its own policies did "not amount to a conscious disregard for the safety of [plaintiff] and other customers" and could not form a basis for imposing punitive damages. Ross, 2014 U.S. Dist. LEXIS 133507, *11; *see also Wanke v. Lynn's Transp. Co.*, 836 F. Supp. 587, 602 (N.D. Ind. 1993) (holding that defendant's failure to follow "all of its own policies" did "not suffice to establish the mental state required for an award of punitive damages"). Were this not the rule, proactive companies like DuPont would be punished for setting high standards or goals, discouraging them from taking steps to improve safety, and discouraging proactive conduct. *See*

*McGee v. Home Depot*, 2013 Ohio App. LEXIS 4845, at *7 (Ohio Ct. App. Oct. 18, 2013) ("Imposition of a duty on the basis of aspirational policies like this one would discourage worthy but non-mandatory efforts to promote safety and amount to a rule that makes law out of the cliché, 'No good deed goes unpunished . . . . [and] would also result in almost unlimited potential liability.").[24]  Accordingly, any attempt by Trial Plaintiffs to point to alleged failures by DuPont to adhere to its own standards or screening levels (which had 100s or 1000s of levels of safety factors built into them) as evidence of conscious disregard for safety cannot form the basis for an award of punitive damages.

*Fourth*, the undisputed facts show that DuPont reasonably relied on both information from its supplier 3M (*see* note 3, *infra*) and numerous public pronouncements from regulators and others regarding the absence of any adverse health effects at the relatively low levels of human exposure (*see* note 4, *infra*, noting statements of WV DEP and NIOSH) and endorsements of screening levels much higher than its own.  While Trial Plaintiffs may argue that this creates a fact issue that precludes summary judgment regarding negligence, they cannot dispute that there is *no* basis on these facts for a jury to determine that DuPont acted with malice.

Both DuPont and 3M were informing regulators as early as the early 1980s of the presence of PFOA in emissions and the available data and research regarding potential health effects.  *See, e.g.*, EID478262, EID079491, EID079491.  Thus, PFOA clearly was no secret to these regulators, agencies who were charged with protecting the public, and whose own assessment, years after DuPont's, resulted in the CATT's safe lifetime 150 ppb screening level for drinking water, which was a joint effort between representatives of West Virginia DEP, US

---

[24] While Trial Plaintiffs may seek to rely on e-mail correspondence from DuPont employees expressing unease about the *public perception* of PFOA as a basis for their punitive damages claims, any such reliance would be misplaced.  Those e-mails express concern about whether DuPont would be perceived as meeting its high internal standards, not actual malice.

EPA, and others and was subsequently reviewed and endorsed by Ohio EPA.  *See* WVDEP, "Final Ammonium Perfluorooctanoate (C8) Assessment of Toxicity Team (CATT) Report," at 33 & 35 (Aug. 2002) (GHS005332-GHS005377); Ohio EPA Memo from C. Hafner to C. Jones (Dec. 5, 2002) (WVDEP000609-12).  Against this backdrop, Trial Plaintiffs cannot reasonably argue that DuPont's actions – which were well-known and caused no apparent concern to regulators – were the sort of "reprehensible" conduct that would warrant the imposition of "quasi-criminal punishment."  *See Ross*, 2014 U.S. Dist. LEXIS 133507, *6 (quoting *Haslip*, 499 U.S. at 54).

In sum, DuPont's extensive voluntary efforts demonstrate a concern for the safety of others that precludes an award of punitive damages as a matter of law.

### 2. *Neither Trial Plaintiff can show that DuPont knew it was highly probable that substantial harm would result from DuPont's conduct*

Finally, Trial Plaintiffs cannot show any actual knowledge by DuPont that its conduct had a great probability of causing substantial harm.  Indeed, during the relevant timeframes of their alleged exposures (i.e., 1983-89 and 1993-2005 for Ms. Bartlett and 1999-2007 for Mr. Wolf), no scientific literature had even suggested a connection between Trial Plaintiffs' claimed illnesses and PFOA.  Further, DuPont had *no* knowledge or expectation based upon any of the animal studies, 3M's extensive research, and/or DuPont's own monitoring of its workers that there was _any_ likelihood of _any_ harm at the relatively low levels found outside the plant, let alone a "high probability" of "substantial harm."  Indeed, this position (no expectation of harm from the levels of exposure at issue) was echoed by regulators and others throughout the relevant timeframe.  *See* note 4, *infra* (noting public statements of WV DEP and NIOSH).  During the relevant times for the claims by Bartlett and Wolf, Trial Plaintiffs have no evidence of any state-of-the-art knowledge of *any* increased risk of _any_ harm from low community levels of exposure,

much less a _significantly increased_ risk of _substantial_ harm. This is particularly true in light of the fact that:

- 3M, the manufacturer and supplier of PFOA, repeatedly informed DuPont that it was not seeing any adverse health effects in 3M workers exposed to far higher doses or concentrations of PFOA.

- Animal studies and other scientific literature had not established any causal connection between PFOA and any human disease, even at levels of exposure far higher than community levels of exposure.

- AELs and CEGs were set by DuPont at very conservative levels with extremely large factors of safety, such that no threat to public health would be expected even if PFOA exposure levels reached or slightly exceeded those levels.

- From the 1960s, and increasingly over time, DuPont put PFOA emissions control measures in place at its Washington Works facility that substantially reduced exposures, by more than 99%.

- Despite many years of investigation by US EPA and other agencies charged with protecting the public health, no federal drinking water standard had been established for PFOA (although such standards existed for a number of other chemicals).

At most, Trial Plaintiffs may argue that there was a "genuine dispute in the scientific community," _see Satcher_, 52 F.3d at 1317, as to whether PFOA could cause a disease in humans and, if so, at what level of exposure that may occur. But this type of debate has been held insufficient as a matter of law to support a finding of malice in the contest of punitive damages. _See Clark_, 436 F.3d at 602-603 ("good-faith dispute" regarding necessity of testing could not support punitive damages); _MCI World Com Network Servs_., 411 F. Supp. 2d at 812; _Calmes_, 575 N.E.2d at 420; _Preston_, 512 N.E.2d at 1176.[25]

---

[25] Further, it would be inappropriate for Trial Plaintiffs to ask this Court to look at the facts in hindsight and view DuPont's past conduct through the lens of more recent knowledge. _See Owens-Corning Fiberglas Corp v. Garrett_, 682 A.2d 1143, 1166-67 (Md. 1996) (vacating punitive damage award that was based on "hindsight," finding that nobody in 1968, "not even the medical experts who were researching and discovering the links between asbestos and cancer," believed that asbestos needed to be immediately eliminated in its entirety).

In short, DuPont had no knowledge, nor any reason to believe, based on the information available to it at the time, that there was a high probability of substantial harm to humans from the relatively low levels of PFOA reaching the community. *See* Rickard Rep. at 7-10.

## IV.   CONCLUSION

For the reasons above, and in the interests of justice, DuPont respectfully requests that this Court enter partial summary judgment in its favor on the issue of punitive damages. The undisputed facts show that DuPont did *not* act with malice, did *not* consciously disregard Trial Plaintiffs' health or safety, and *never* believed that there was *any* probability, much less a high probability, that substantial harm would result from the relatively low levels of PFOA that were reaching the community. Accordingly, Trial Plaintiffs cannot meet the clear and convincing evidence of malice standard required for punitive damages to go to the jury, and DuPont respectfully requests that this Court grant summary judgment on this issue.

Respectfully submitted:


/s/ Damond R. Mace
Damond R. Mace (0017102) (Trial Attorney)
Stephen M. Fazio (0076873)
Stephanie E. Niehaus (0075511)
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114
(216) 479-8500 (Phone)
(216) 479-8780 (Fax)

C. Craig Woods (0010732)
Aaron T. Brogdon (0081858)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio  43215
(614) 365-2700 (Phone)
(614) 365-2499 (Fax)

Attorneys for Defendant E. I. du Pont de
Nemours and Company

## <u>CERTIFICATE OF SERVICE</u>

A true and correct copy of the foregoing was electronically filed with this Court's CM/ECF system on this 6th day of April 2015, and was thus served automatically upon all counsel of record for this matter.


/s/ Damond R. Mace
Damond R. Mace (0017102)