UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

Civil Action 2:13-md-2433
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth P. Deavers

This document relates to: <u>ALL CASES</u>.

## <u>DISPOSITIVE MOTIONS ORDER NO. 4</u>

### <u>Defendant's Motion for Partial Summary Judgment</u>

This matter is before the Court on Defendant's Motion for Partial Summary Judgment on

"Inapplicable Causes of Action" (ECF No. 1898), Plaintiffs' Memorandum in Opposition to

Defendant's Motion (ECF No. 2291), and Defendant's Reply in Support of its Motion (ECF No.

2481). For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN**

**PART** Defendant's Motion.

### I.

On August 31, 2001, a group of individuals filed a state court action in West Virginia

against E.I. du Pont de Nemours and Company ("DuPont") captioned *Leach v. E. I. du Pont de*

*Nemours & Co.*, No. 01-C-698 (Wood County W. Va. Cir. Ct.) ("*Leach* Case"). The plaintiffs in

the *Leach* Case brought a variety of claims under West Virginia common law tort theories for

equitable, injunctive and declaratory relief, along with compensatory and punitive damages, as a

result of alleged drinking water contamination.

On April 10, 2002, the West Virginia trial court ("*Leach* Court") granted the plaintiffs'
motion for class certification and certified a mandatory, non-opt-out class ("*Leach* Class"). The
*Leach* Class included approximately 80,000 individual residents of the communities served by
certain public water districts and private water sources that had allegedly been contaminated with
ammonium perfluorooctanoate ("C-8" or "PFOA") discharged from DuPont's Washington
Works plant. *Leach v. E.I. Du Pont de Nemours & Co.*, No. 01-C-608, 2002 WL 1270121, at *1
(W. Va. Cir. Ct. Apr. 10, 2002).

In November 2004, the parties entered into a class-wide settlement of the *Leach* Case
("*Leach* Settlement Agreement"). In the *Leach* Settlement Agreement, the parties fashioned a
unique procedure to determine whether the approximately 80,000 members of the *Leach* Class
would be permitted to file actions against DuPont based on any of the human diseases they
believed had been caused by exposure to C-8. The procedure required DuPont and the plaintiffs
to jointly select three completely independent, mutually-agreeable, appropriately credentialed
epidemiologists ("Science Panel") to study human disease among the residents exposed to C-8
by the discharges from DuPont's Washington Works plant. (*Leach* Settlement Agreement
"S.A." at §§ 12.2.1, 12.2.2; ECF No. 820-8.)

In 2011 and 2012, the Science Panel delivered Probable Link Findings for these human
diseases ("Linked Diseases"):  kidney cancer, testicular cancer, thyroid disease, ulcerative colitis,
diagnosed high cholesterol (hypercholesterolemia), and pregnancy-induced hypertension and
preeclampsia. Also in 2011 and 2012, the Science Panel delivered No Probable Link Findings
over forty other human diseases. The *Leach* Settlement Agreement provides for dismissal with
prejudice of any claims based upon any of these forty-one human diseases. The *Leach*
Settlement Agreement permits the individual members of the *Leach* Class who alleged claims

2

based upon any Linked Disease to pursue the claims "for personal injury and wrongful death, including but not limited to any claims for injunctive relief and special, general and punitive and any other damages whatsoever associated with such claims, that . . . relate to exposure to C-8 of Class Members" and DuPont agreed not to contest general causation in those actions. (S.A. § 3.3.)

The members of the *Leach* Class whose claims are based on one or more of the Linked Diseases began to file cases in West Virginia and Ohio. DuPont moved the United States Judicial Panel on Multidistrict Litigation for centralization of these individual actions pursuant to 28 U.S.C. § 1407. The Judicial Panel granted DuPont's request. On April 9, 2013, the Judicial Panel transferred the centralized this multidistrict litigation ("MDL") to this Court. Currently there are over 3,500 individual cases in this MDL.

On January 20, 2015, DuPont filed its Motion for Partial Summary Judgment on what it refers to as "inapplicable causes of action and claims for relief." (ECF No. 1898.) That Motion is ripe for review. (ECF Nos. 2291, 2481.)

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the

3

record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323.  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts").  Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234-35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

### III.

DuPont moves for summary judgment on "eight causes of action contained in the various complaints consolidated in this MDL." (DuPont's Mot. for Partial Summ. J. at 1; ECF No. 1898.)  Specifically, DuPont contends that it is entitled to judgment as a matter of law on any alleged causes of action for "(1) strict product liability; (2) [violations of] state consumer protection laws; (3) trespass to person; (4) conspiracy; (5) conscious pain and suffering; (6) battery; (7) ultrahazardous or abnormally dangerous activity; and (8) negligence per se and/or prima facie negligence [because none of these claims] can[] be maintained by any plaintiff in this MDL." *Id.*

4

The plaintiffs oppose DuPont's request for two reasons. First, the plaintiffs argue that moving for summary judgment on a global basis instead of permitting each individual member of the *Leach* Class to prove his or her claims under the individual facts of his or her own case causes due process concerns and is an inappropriate way to address the claims. Second, as to the specified complaints to which DuPont refers in its Motion, the plaintiffs contend that DuPont has failed to identify those portions of the record which demonstrate the absence of a genuine issue of material fact on any of the eight claims for relief.

## A. Global Relief

In their opposition memorandum, the plaintiffs contend that

> DuPont's entire Motion fails to the extent it seeks global summary judgment on Class Member preserved claims under the *Leach* Agreement. Each Class Member's right to pursue these types of claims against DuPont in their individual cases was contractually preserved, subject to being defeated only by the inability of an individual Class member to prove such claims under the individual facts of their own cases.

(Pls.' Mem. in Opp. at 7; ECF No. 2291.)

DuPont replies that the plaintiffs "are wrong in suggesting that DuPont has improperly moved for summary judgment based on specific representative complaints." (DuPont's Reply at 7; ECF No. 2481.) DuPont notes:

> The chart of representative complaints attached to DuPont's Inapplicable Claims Motion as Exhibit A . . . includes a *representative* complaint from each plaintiffs' firm that has appeared in this MDL. DuPont is moving for summary judgment on multiple claims and has identified exemplar complaints for each of those claims. . . . Plaintiffs have not disputed that, while there is no "master complaint" for this MDL, each plaintiffs' firm has filed substantially the same complaint on behalf of each of its clients. Further, the parties have already agreed that this is an appropriate procedure for addressing claims on a global basis, and there is nothing to prohibit this Court from entering the Orders that DuPont has sought. *See* Trans. of 9/10/2014 Status Conf. at 12:14–17:10 [ECF No. 1034].

*Id.* at 7, n. 4. Thus, it appears by these arguments and those lodged in its Motion that DuPont is requesting summary disposition of each of the identified eight claims against any individual plaintiff who asserts such a claim. (DuPont's Mot. for Partial Summ. J. at 1) (stating that the eight claims "cannot be maintained by any plaintiff in this MDL"). DuPont, however, also seems to take a contrary position in its Reply, indicating that it is *not* moving for global summary judgment:

> Moreover, the very process Plaintiffs now criticize was discussed and agreed to at the September 10, 2014 Status Conference. At that conference, DuPont clearly indicated it intended to file some motions for summary judgment using representative complaints to address global issues. Contrary to Plaintiffs' position now, everyone agreed at that conference that DuPont's anticipated approach was proper, *and that the rulings on such motions would be "instructive" on a global basis. See* Trans. of 9/10/2014 Status Conf. at 12:14–17:10 [ECF No. 1034]. Indeed, the [Plaintiffs' Steering Committee] acknowledged that the Court's rulings on representative complaints would be "helpful to the other lawyers" in understanding which claims are and are not viable in this MDL and that it is "typical" in these types of proceedings for initial rulings to "be pretty close to preclusive once the point is decided." *Id.* at 16:1–17:10.

*Id.* at 8 (emphasis added).

The Court disagrees with DuPont's assessment of the plaintiffs' position. That is, the plaintiffs do not criticize an approach whereby the Court's rulings on representative complaints would be instructive on a global basis. Indeed, that *is* the plaintiffs' position – ruling on the representative complaints can be dispositive *only* on the claims in the representative complaints and instructive to claims filed by other plaintiffs. (Pls.' Mem. in Opp. at 4–5) (indicating that they are "responding to DuPont's Motion only as to the specific complaints and specific claims actually cited by DuPont with respect to each of its arguments, and not with respect to any complaints or claims not so identified or cited"). The plaintiffs take issue with DuPont's request "to throw out entire categories of Class Member preserved claims, . . . . asking this Court to ignore the individualized facts of all of the *thousands* of Class Members for which individual

fact discovery[1] has not yet even begun, and grant summary judgment on entire categories of contractually-preserved claims across all complaints in this MDL, as if all of the Plaintiffs' claims, and facts in each case were identical." *Id.*

Thus, although it is unclear whether DuPont is moving for summary judgment as to all claims filed, it is clear that neither party objects to the Court making dispositive rulings on the specifically identified complaints, which of course, will be instructive to the other members of the *Leach* Class. Accordingly, to the extent that DuPont seeks this Court's decision on its Motion for Partial Summary Judgment to apply to each individual plaintiff who has asserted one of the eight "inapplicable" claims, it is **DENIED**.

## B. Summary Judgment

The Court will address DuPont's requests for summary judgment on each of the eight causes of action *seriatim*.

### 1. Strict Product Liability

DuPont refers to the strict product liability claims filed by Jeanne Baker, Terry Pugh, Tina Dowdy, Sheila J. Lowther, John M. Wolf, and David Freeman. (DuPont's Mot. for Partial Summ. J., Ex. A; ECF No. 1898-1.) Product liability claims in Ohio are governed by the Ohio Product Liability Act ("OPLA"), Ohio Rev. Code § 2307.71(B). Under the OPLA, a product liability cause of action may arise from any of the following:

---

[1] To the extent the plaintiffs allude to the argument that they need more discovery before they can respond to DuPont's Motion for Partial Summary Judgment as it relates to the identified complaints, their position is without merit. First, the Court finds that there is sufficient evidence before it to engage in the task at hand. Second, even if the plaintiffs believe that they need more discovery before they can appropriately respond to DuPont's Motion, Rule 56(d) of the Federal Rules of Civil Procedure provides the appropriate vehicle to raise that argument. *See* Fed. R. Civ. P. 56(d) ("When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."). Nowhere in their opposition memorandum do the plaintiffs contend that more evidence is needed before the Court could determine the issues before it, nor have they appropriately moved for more discovery under Rule 56(d).

(a) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;

(b) Any warning or instruction, or lack of warning or instruction, associated with that product;

(c) Any failure of that product to conform to any relevant representation or warranty.

Ohio Rev. Code § 2307.71(A)(13).   This section of the OPLA also indicates that a claim may be only be brought against a "manufacturer or supplier."  *Id.*

A "manufacturer" is "a person engaged in a business to design, formulate, produce, create, make, construct, assemble, or rebuild a product or a component of a product."  *Id.* § 2307.71(A)(9).  The OPLA defines a "supplier" as either of the following:

(i) A person that, in the course of a business conducted for the purpose, sells, distributes, leases, prepares, blends, packages, labels, or otherwise participates in the placing of a product in the stream of commerce;

(ii) A person that, in the course of a business conducted for the purpose, installs, repairs, or maintains any aspect of a product that allegedly causes harm.

Ohio Rev. Code § 2307.71(A)(15)(a).

The common law of West Virginia is nearly identical to the OPLA.  In a case decided under West Virginia law, the Fourth Circuit explained:

The doctrine of strict liability in tort was formulated specifically for litigation between manufacturer and customers arising out of a sale of products.  *See* 63 Am.Jur.2d *Products Liability* § 529, at 727.  It "applies to both the manufacturer and the seller, who are engaged in the business of selling such product which is expected to and does reach the user without substantial change in the condition in which it was sold."  *Morningstar [v. Black & Decker Mfg. Co.],* 162 W.Va. 857 (1979).

*Kaiser Aluminum & Chem. Corp. v. Westinghouse Elec. Corp.,* 981 F.2d 136, 139 (4th Cir. 1992).

In its Motion, DuPont contends that "[a]ll of these product liability causes of action are based generally on allegations that DuPont 'conspired to distribute' drinking water containing C-8 and/or 'permitted' drinking water containing C-8 'to be placed into the stream of commerce . . . which water was not reasonably safe for intended users, thus making the product defective, *Lowther* Cmpt. at ¶ 172 (Ex. A, Tab 6); *see also Baker* Cmpt. at ¶ 59 (Ex. A, Tab 1)." (DuPont's Mot. for Partial Summ. J. at 4.)  DuPont maintains that these "claims fail as a matter of law (under both Ohio and West Virginia law) because DuPont was not a supplier or manufacturer of drinking water to plaintiffs or anyone else." *Id.*  Additionally, DuPont asserts that it is entitled to summary judgment on the claims of the plaintiffs who filed pursuant to the common law of Ohio (*i.e.*, Ms. Baker and Mr. Pugh), because the OPLA abrogated all Ohio common law product liability claims.  *Id.* at 4 (citing to Ohio Rev. Code § 2307.71(B); *Piskura v. Taser Int'l.*, 2012 U.S. Dist. LEXIS 155216, at *53 (S.D. Ohio Oct. 29, 2012)).

The plaintiffs respond that DuPont's arguments miss the mark.  That is, the plaintiffs maintain that they do not contend DuPont is a supplier or manufacturer of drinking water.  Instead, the plaintiffs assert that their "product liability claims allege that DuPont is liable as a manufacturer of C-8." (Pls' Mem. in Opp. at 8.)  The plaintiffs state:

> It is undisputed that C-8 was used at DuPont's Washington Work's plant in the production of Teflon. (*See, e.g.*, Second MSJ Aff. Ex. DD (DuPont Answer in *Little Hocking Water Ass'n* case ¶39) (ECF No. 1205-33))  It is also undisputed that DuPont purchased C-8 from the 3M company from the early 1950s until 2002, (*id.* ¶ 37), when DuPont began producing the chemical at its Fayetteville, North Carolina plant.

(Pls.' Mem. in Opp. at 10.)  Additionally, the plaintiffs contend that, while the OPLA may abrogate common law claims, it does not apply to those causes of action that accrued prior to the Act's passage in 2005.  *Id.* at 9 (citing *Wimbuch v.Wyeth*, 619 F.3d 632, 639 (6th Cir. 2010)).

In reply, DuPont argues that the plaintiffs did not allege that DuPont is a manufacturer of C-8; that the complaints clearly allege that DuPont placed defective *drinking water* into the stream of commerce.  (DuPont's Reply at 10) (citing as an example the Baker Complaint at ¶ 58–62, alleging, *inter alia*: "The Defendant actively conspired to distribute the contaminated drinking water in an unreasonably dangerous and defective condition and permitted the contaminated drinking water to be placed in the stream of commerce").  DuPont suggests that the plaintiffs' current articulation of their claims is an attempt to "amend their pleadings through their brief to allege that DuPont can be held liable under Ohio and West Virginia products liability laws as a 'manufacturer' of C-8[,]" which is procedurally inappropriate.  *Id.* at 11 (citing *Goodson v. Bank of Am., N.A.*, No. 14-5419, 2015 U.S. App. LEXIS 1565, at *11 (6th Cir. Jan. 28, 2015) ("A plaintiff may not raise a new theory for the first time in opposition to summary judgment because to permit a plaintiff to do otherwise would subject defendants to unfair surprise.").  DuPont further contends that, even if the plaintiffs were permitted to amend their complaints to allege that DuPont is a manufacturer of C-8, the claims still fail because, *inter alia*, the plaintiffs do not contend that their claims arose from DuPont's allege manufacture of C-8.  DuPont's arguments are well taken.

A "'product liability claim' means a claim or cause of action that is asserted in a civil action . . . that seeks to recover compensatory damages from a manufacturer or supplier . . . that allegedly arose from . . . [t]he design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing *of that product*."  Ohio Rev. Code § 2307.71(13) (emphasis added); *see also Kaiser Aluminum & Chem. Corp.*, 981 F.2d at 139 (West Virginia strict product liability law applicable to those "who are engaged in the business of selling such product"); *Hissom v. American Tobacco Co.*, 1997 U.S. Dist. LEXIS 23198 (S.D. W. Va. Oct. 3, 1997)

10

(strict liability law "applies to both the manufacturer and the seller, who are engaged in the business of selling such product . . . ."). In other words, if the plaintiffs are claiming that DuPont is strictly liable to them for its manufacture and/or sale of C-8, their injuries must have arisen from DuPont's manufacture of C-8. However, the plaintiffs make no allegations about being harmed in any way by DuPont's manufacture of C-8. The plaintiffs allege in their complaints and argue in their memorandum in opposition to DuPont's summary judgment motion that they were harmed by DuPont's release of C-8 into their water supply during its manufacture of Teflon. The plaintiffs nowhere allege or argue that DuPont contaminated the plaintiffs' drinking water supply when it began producing C-8 in 2002. Indeed, it is not disputed that DuPont never manufactured C-8 at its Water Works plant and only manufactured C-8 in North Carolina. As DuPont correctly points out, "there is a complete disconnect between any product sold into the stream of commerce and the plaintiffs' alleged injuries." (DuPont's Reply at 14.)

Consequently, the plaintiffs have failed to raise any genuine issue of material fact as to their strict liability claims. Accordingly, the Court **GRANTS** DuPont's Motion as it relates to the strict product liability claims brought by Jeanne Baker, Terry Pugh, Tina Dowdy, Sheila J. Lowther, John M. Wolf, and David Freeman.

### 2. State Consumer Protection Laws

The plaintiffs Jeanne Baker and Terry Pugh filed claims under the Ohio Consumer Sales Practices Act ("CSPA"), Ohio Rev. Code § 1345.01 *et seq*., and Tina Dowdy, John M. Wolf, and David Freeman brought claims pursuant to the West Virginia Consumer Credit and Protection Act ("CCPA"), W. Va. Code §§ 46A-6-101, 102. (DuPont's Mot. for Partial Summ. J., Ex. A.) Ohio's CSPA prohibits any "supplier" from "commit[ing] an unfair or deceptive act or practice in connection with a consumer transaction." Ohio Rev. Code § 1345.02(A). A "supplier" is an

entity "engaged in the business of effecting or soliciting consumer transactions, whether or not

the person deals directly with the consumer." Ohio Rev. Code § 1345.01(C). Similarly, the

West Virginia CCPA creates a cause of action against a "seller or lessor" of goods. W. Va. Code

§ 46A-6-106(a). West Virginia's CCPA also requires that a consumer provide notice of the

alleged violation to the seller or lessor and give the seller or lessor twenty days in which to make

an offer of cure. W.Va. Code § 46A-6-106(c).

The plaintiffs allege that "DuPont was connected to the subject consumer transactions

because it 'effect[ed] or solicit[ed]' water sales" to the plaintiffs in the following ways:

> (1) Co-drafting and sending to local water customers correspondence designed to conceal the presence of C-8 at dangerous levels in public drinking water and misleading local water suppliers, media, and the public as to the significance and danger of the C-8 in the water;

> (2) Engaging in efforts to mislead government regulators, water purveyors, and water customers as to the nature/danger of the C-8 in drinking water by fabricating new safety levels or "screening levels" for C-8 in drinking water that were up to 150 times higher than the one used internally by DuPont;

> (3) Repeatedly citing these same higher safety/screening levels in communications disseminated to the public (including local water consumers), including in a May 2002 DuPont press release representing that C-8 levels in the affected areas' drinking water were "not harmful;"

> (4) Falsely stating in press releases, including an August 2004 press release, that the higher safety and/or screening levels represent "EPA's safety guidance for drinking water," and that there was no known scientific evidence indicating that C-8 exposure has harmful health or environmental effects;

> (5) Reviewing and approving press releases stating that C-8 in Plaintiffs' drinking water is "perfectly safe"; and

> (6) Making a number of public statements generally denying the harmfulness of C-8.

(Pls.' Mem. in Opp. at 11–12.) In essence, the plaintiffs' claims are based upon the allegations

that DuPont co-drafted, aided in publishing, and encouraged dissemination and circulation of

written information through correspondence to the public in order to induce the plaintiffs to enter into a consumer transaction to purchase drinking water from their local water districts. Ms. Dowdy and Mssrs. Wolf and Freeman additionally argue that the West Virginia CCPA's notice requirement is not applicable to their claims, and even if it were, a notice of DuPont's violations was provided by the *Leach* Class, which is sufficient to meet the notice requirement.

Contrarily, DuPont maintains that even if the plaintiffs' allegations were true, they do not constitute a "consumer transaction" for purposes of the Ohio CSPA. (DuPont's Mot. for Partial Summ. J. at 8) (citing *Eisenberg v. Anheuser-Busch, Inc.*, No. 1:04 CV 1081, 2006 U.S. Dist. LEXIS 4058, at *35 (N.D. Ohio Feb. 1, 2006) (finding that "advertising and mass marketing efforts . . . do not constitute a 'consumer transaction' for purposes of the [O]CSPA."). Similarly, DuPont asserts that the plaintiffs do not allege that it is a seller or lessor of goods, which is required under the West Virginia CCPA. *Id.* (citing *Perry v. Tri-State Chrysler Jeep, LLC*, No. 3:08-0104, 2008 U.S. Dist. LEXIS 33218, at *12 (S.D. W. Va. Apr. 16, 2008) (must be a seller of the goods)). The plaintiffs disagree, arguing:

> [DuPont's] activities also qualify as "solicitation" under the OCSPA. For example, DuPont's communications in the present dispute are analogous to those in *Ferron v. Dish Network, LLC*, 961 N.E.2d 705, 713 (Ohio Ct. App. 2011), in which a television advertisement made a specific offer for services and "urged viewers" to call a toll-free number to enter contracts. The court found the advertisement, which targeted viewers and "asked for [an] immediate response or reaction," constituted "solicitation" under the OCSPA. *Id.* at 712.
>
> Because DuPont acted as a "supplier" and engaged in "solicitation," it is subject to liability under the OCSPA.

(Pls.' Mem. in Opp. at 12–13.) DuPont replies that the plaintiffs' position is without merit and that the only case upon which the plaintiffs' rely to support their position is inapposite. This Court agrees.

13

The *Ferron* court found that the plaintiffs had adequately alleged a "solicitation" under Ohio's CSPA where the defendant's television advertisements for *its own* satellite television service and products included "specific offers" and asked for "immediate response or reaction" from potential customers. *Id.* at 712. That situation stands in stark contrast to DuPont's alleged statements about the environmental quality of the drinking water around the Washington Works plant. The plaintiffs do not allege that DuPont attempted to solicit business for its own product as did the defendant in *Ferron*. The plaintiffs allege only that DuPont's statements were intended to induce parties to enter into consumer transactions with unrelated water districts. Without more, this conduct cannot form the basis for a consumer protection claim against DuPont.

With regard to their claims under West Virginia's CCPA, the plaintiffs' argue only the following:

> The term "seller" is to be construed broadly under the WVCCPA. *See, e.g.*, *McCoy v. S. Energy Homes, Inc.*, 2012 WL 1409533, *11-12 (S.D. W. Va. Apr. 23, 2012) (assignee of the original seller treated as a statutory "seller" and therefore subject to WVCCPA). DuPont's targeted efforts to induce consumers to continue buying contaminated water (as described in the preceding paragraphs) should be seen as more than sufficient to render DuPont a "seller" under the statute.

(Pls.' Mem. in Opp. at 14.)

This Court, however, disagrees. Even a broad interpretation of the term "seller" cannot transform DuPont into a seller of drinking water. The uncontroverted evidence in the record shows that DuPont has never "effected or solicited" water sales. Consequently, the plaintiffs have failed to raise any genuine issue of material fact as to their consumer protection claims. Therefore, the Court **GRANTS** DuPont's Motion on the consumer protection claims brought by Jeanne Baker, Terry Pugh, Tina Dowdy, John M. Wolf, and David Freeman.

### 3. Conspiracy

DuPont refers to the conspiracy claims alleged by Jeanne Baker, Terry Pugh, Tina Dowdy, John M. Wolf, David Freeman, Georgette Bergdorf, Earl Edgar Frum, Sheila J. Lowther, and Carla Marie Bartlett.  Under both Ohio and West Virginia law, a civil conspiracy is a derivative claim and cannot be maintained absent an underlying tort that is actionable without the conspiracy.  *See Williams v. Aetna Fin. Co.,* 83 Ohio St.3d 464, 475 (1998) ("A civil conspiracy claim cannot succeed without an underlying unlawful act."); *Dunn v. Rockwell*, 225 W. Va. 43, 57 (2009) ("A civil conspiracy is not a per se, stand-alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s).").

The plaintiffs base their civil conspiracy claims on either their product liability claims or their consumer protection claims.  As explained *supra*, the product liability and consumer protection claims of Messrs. Pugh, Wolf, and Freeman and Mses. Baker, Dowdy, and Lowther have not survived DuPont's request for judgment on them.  Consequently, these plaintiffs' conspiracy claims fail as well.  DuPont, however, has not moved for summary judgment on the claims of Mses. Bergdorf and Bartlett or Mr. Frum.  The Court will, therefore, address these plaintiffs' civil conspiracy claims when their underlying tort claims are before it.

Accordingly, the Court **GRANTS** DuPont's Motion as it relates to the conspiracy claims of the plaintiffs Terry Pugh, John M. Wolf, David Freeman, Jeanne Baker, Tina Dowdy and Sheila J. Lowther and **DENIES** without prejudice DuPont's Motion on the conspiracy claims of the plaintiffs Georgette Bergdorf, Carla Marie Bartlett, and Earl Edgar Frum.

#### 4. **Trespass to Person**

DuPont refers to the trespass to person claims filed by Jeanne Baker, Terry Pugh, Tina Dowdy, Sharon Arnott, Sheila J. Lowther, John M. Wolf, and David Freeman.  (DuPont's Mot. for Partial Summ. J., Ex. A.)  These plaintiffs allege that DuPont trespassed upon their bodies and/or blood by releasing C-8 into their drinking water.  *See e.g.*, *Baker* Cmpt. at ¶ 76 (referring to "the presence and continuing presence of the Materials onto and into the bodies of Plaintiff" as a "continuing trespass."); *Lowther* Cmpt. at ¶ 208  (referring to "trespass . . . upon Plaintiff's blood and/or body").  DuPont asserts that it is entitled to summary judgment on these claims because neither Ohio nor West Virginia recognizes a cause of action for trespass to persons. This Court agrees.

Under West Virginia law, "[a] trespass is 'an entry on another man's ground without lawful authority, and doing some damage, however inconsiderable, to his real property.'" *Rhodes v. E.I. du Pont de Nemours & Co.*, 657 F. Supp. 2d 751, 771 (S.D. W. Va. 2009) *aff'd in part, appeal dismissed in part,* 636 F.3d 88 (4th Cir. 2011) (citing *Hark v. Mountain Fork Lumber Co.,* 127 W.Va. 586 (1945) (internal citation and quotation marks omitted); Prosser and Keeton on the Law of Torts § 13, at 70 (5th ed.1984) ("Any intentional use of another's real property, without authorization and without a privilege by law to do so, is actionable as a trespass without regard to harm.")).  Similarly, under Ohio law "'[t]respass is the unlawful entry upon the property of another.'"  *Davis v. Widman*, 184 Ohio App. 3d 705, 718 (2009) (quoting *Chance v. BP Chems., Inc.*, 77 Ohio St.3d 17, 24 (1996)).  "The elements of trespass include '(1) an unauthorized intentional act, and (2) entry upon land in the possession of another.'"  *Id.* (quoting *Brown v. Scioto Cty. Bd. of Commrs.*, 87 Ohio App.3d 704, 716 (Ohio Ct. App. 1993)).

The plaintiffs oppose DuPont's request to dismiss these claims on two grounds. First, the plaintiffs contend that their trespass to person claims were preserved for resolution on the merits in the *Leach* Settlement Agreement, and second, "[n]o Ohio or West Virginia state court has ever said that such claims are not allowed."

### a. Preservation Under the *Leach* Settlement Agreement

The plaintiffs contend that for DuPont "to argue now that no such [trespass to person] claim should even be recognized as existing, let alone preserved for resolution on its merits in this MDL is both wholly inconsistent with the understanding of the parties over the last decade of this litigation and the express written agreement of the parties." (Pls.' Mem. in Opp. at 16–17.) Plaintiffs explain:

> DuPont fails to reveal that this precise "trespass to person" claim was among the claims specifically asserted against DuPont during the first phase of the *Leach* litigation, was a claim that DuPont chose not to move to dismiss, and was among the claims DuPont expressly promised would be preserved here for all Class Members. (*See* First MSJ Aff. Ex. A (¶¶ 95- 100 (original *Leach* complaint claim for trespass to person)) (ECF No. 820-5); Bilott Aff. Exs. A-B & ¶7)

*Id*. at 16.

The Court understands the plaintiffs' position to be that because the parties agreed to preserve the trespass to person claims alleged in the *Leach* Case, DuPont cannot now argue that no such claim is viable under the applicable state law. The plaintiffs suggest that DuPont's request for judgment as a matter of law on these claims does not satisfy the *Leach* Settlement Agreement, which provides for preservation of the claims for resolution on their merits. This Court, however, disagrees with that assessment. There is nothing incongruent about preserving a claim for later disposition on the merits and for that disposition to be dismissal based on failure to state a viable claim. Indeed, it cannot be otherwise. A court is not at liberty to change a state's common law based upon the agreement between two private parties.

### b. Trespass to Person Allegations

The plaintiffs' allegations address the actions DuPont took when it released C-8 into the water surrounding its Water Works plant and the effect the C-8 had on their bodies once they ingested it. However, antecedent to addressing whether these allegations can provide the basis for a trespass to person claim, the Court must first determine whether Ohio and/or West Virginia recognize such a claim. DuPont contends that a search of Ohio law reveals that no modern cases reference a cause of action for trespass to persons. DuPont continues that, "if such a cause of action ever existed, it was long ago replaced by the torts of 'assault' and 'battery.' *See Cooper v. Rowley*, 29 Ohio St. 547, 550 (Ohio 1876) ('By the code, the words "assault" and "battery" were substituted for the words "trespass to the person . . . .')." (DuPont's Mot. for Partial Summ. J. at 10.) DuPont further contends that West Virginia too does not recognize a trespass to person claim, citing to a federal district court interpreting that state's law in the context of C-8 litigation. Specifically, in *Rhodes v. E. I. du Pont de Nemours and Co*., the court rejected "any sort of trespass claim based on the entry of PFOA into [the plaintiffs'] bodies," stating that the "plaintiffs have offered no case law, and I am aware of none, in which a court has held that the infusion of a chemical into a person's blood may qualify as a trespass." 657 F. Supp. 2d 751, 772, n. 18 (S.D. W. Va. 2009).

The plaintiffs respond that "DuPont has failed to show that Ohio or West Virginia would refuse to recognize a trespass to person claim for personal injury in the context of this litigation, involving this highly unusual and unique chemical." (Pls.' Mem. in Opp. at 16.) The plaintiffs attempt to distinguish *Rhodes* by pointing out that "the court held only that it did not believe West Virginia would allow such a trespass claim to move forward where the plaintiff[s] w[ere] not claiming a traditionally-recognized tort 'injury'. . . . [and instead] were claiming only that

the trespass at issue put them at an '*increased risk*' of a disease in the future –not that the trespass had actually caused any disease yet." *Id.* at 17. The plaintiffs' arguments are not well taken.

First, it is incorrect to say that DuPont has failed to show that Ohio or West Virginia would refuse to recognize a trespass to person claim for personal injury in a case involving the C-8. DuPont relies on *Rhodes*, a class action filed against DuPont in West Virginia state court by residential customers of water districts alleging claims for negligence; gross negligence; reckless, willful, and wanton conduct; private nuisance; past and continuing trespass; past and continuing battery; medical monitoring; and public nuisance for DuPont's discharge of C-8 into their drinking water. The *Rhodes* court held that the plaintiffs' blood/bodies did not constitute "property" for purposes of a trespass claim. In reviewing West Virginia law, the court focused on whether blood constitutes "property" on which a trespass can occur in the first instance, finding that it did not. The court explained:

> The plaintiffs based their trespass claim not only on the entry of PFOA onto their real property, but also the entry of PFOA into their bodies. (2d Am. Class Action Compl. ¶¶ 104–109.) The plaintiffs specifically argue that blood can constitute "property" and presumably be the subject of a trespass action. (Mem. Opp'n Mot. Summ. J. 17 n. 24.) This assertion demonstrates the plaintiffs' fundamental misunderstanding of the tort of trespass. Trespass definitionally involves an interference with the possession of real or personal property. The plaintiffs have offered no case law, and I am aware of none, in which a court has held that the infusion of a chemical into a person's blood may qualify as a trespass. Such violations of a person's body fall more properly within the scope of personal injury torts such as battery. The plaintiffs may not evade the requirements of battery or other torts involving bodily injury by reframing the invasion of their bodies as an invasion of property.

*Rhodes v. E.I. du Pont de Nemours & Co.*, 657 F. Supp. 2d at 772. This Court agrees with that analysis.

Second, as DuPont correctly points out, the "[p]laintiffs cannot simply advance an unrecognized, novel cause of action and claim that it must be viable because no court has held that it is not viable." (DuPont's Reply at 25.) The plaintiffs' argument is circular. That is, the premise (*i.e.*, no court has held that trespass to person is not a viable claim) provides no independent ground or evidence for the conclusion (*i.e.*, that trespass to person is a viable claim).

The plaintiffs offer no case to support their contention that Ohio and/or West Virginia recognize a cause of action for trespass to persons and this Court finds none. There is no persuasive reason to recognize this claim in the face of the dearth of supportive case law for the plaintiffs' position. Accordingly, the Court **GRANTS** DuPont's Motion as it relates to the trespass to person claims of Jeanne Baker, Terry Pugh, Tina Dowdy, Sharon Arnott, Sheila J. Lowther, John M. Wolf, and David Freeman.

### 5. Conscious Pain and Suffering

DuPont cites to the complaints filed by Ronald Bachtel and Charles Cotton. Both of these complaints were filed under Ohio law and both allege claims for wrongful death and separate claims for conscious pain and suffering. DuPont relies upon *Fantozzi v. Sandusky Cement Products Co.*, 597 N.E.2d 474, 482 (Ohio 1992) for the proposition that "pain and suffering is not a separate cause of action, but rather an element of damages under" Ohio law. (DuPont's Mot. for Partial Summ. J. at 17.) DuPont contends that *Moskovitz* "demonstrates that pain and suffering is merely a compensable harm, not a stand-alone cause of action. . . . [by] affirm[ing] a jury verdict of $2 million for damages of which '[the] bulk of the award was obviously for the pain and suffering of the decedent.'" (DuPont's Mot. for Partial Summ. J. at 40) (citing *Moskovitz v. Mt. Sinai Medical Ctr.*, 69 Ohio St.3d 638, 654–57 (Ohio 1994)). DuPont's arguments are not well taken.

First, as the plaintiffs correctly highlight, the Sixth Circuit in *Hageman v. Signal L. P. Gas, Inc.*, specifically stated:

> Under Ohio law, an action for pain and suffering is a cause of action separate and distinct from a wrongful death action. *Klema v. St. Elizabeth's Hospital of Youngstown*, 170 Ohio St. 519 (1960); *Karr v. Sixt*, 146 Ohio St. 527 (1946). In *Klema, supra,* the Ohio Supreme Court said:
>
> > "Although originating in the same wrongful act or neglect, the two claims are quite distinct, no part of either being embraced in the other.  One is for the wrong to the injured person, and is confined to his personal loss and suffering before he died, while the other is for the wrong to the beneficiaries, and is confined to their pecuniary loss through his death.  One begins where the other ends, and a recovery upon both in the same action is not a double recovery for a single wrong but a single recovery for a double wrong."  170 Ohio St. at 521, quoting *St. Louis, Iron Mountain & Southern R. R. v. Craft*, 237 U.S. 648, 658.

486 F.2d 479, 483 (6th Cir. 1973).

Second, the *Moskovitz* case relied upon by DuPont is another example of the Ohio Supreme Court recognizing the availability of damages for the wrongful death and separately for the conscious pain and suffering of the decedent.  The *Maskovitz* the court reviewed a jury award that was alleged to be excessive.  The Ohio Supreme Court found that "$2 million award on the survival claim" was not excessive because "[t]he bulk of the award was obviously for the pain and suffering Moskovitz experienced in the final year of her life . . . ."  *Moskovitz*, 69 Ohio St. 3d at 655.  The court went on to consider the "jury's $1.25 million award for wrongful death," finding that it too was not manifestly excessive.  Thus, Ohio permits a stand-alone survival claim for the pain and suffering a decedent underwent before death in the same case as a wrongful death claim.

Accordingly, the Court **DENIES** DuPont's Motion as it relates to the conscious pain and suffering claims filed by Ronald Bachtel and Charles Cotton.

21

**6. Battery**

DuPont cites to the battery claims alleged by Jeanne Baker, Terry Pugh, Tina Dowdy, Kanndies Carter, Sheila J. Lowther, John M. Wolf, David Freeman, and Carla Marie Bartlett. These causes of action generally are based on the following or similar allegations: "DuPont's intentional acts and/or omissions were done with the knowledge and/or belief that the invasion, contact, and/or presence of C-8 with, onto, and/or into Plaintiff's blood and/or body were substantially certain to result from those acts and/or omissions." (*Lowther* Cmpt. at ¶ 205; ECF No. 1898, Ex. A, Tab 6.)

The parties do not dispute that, to recover for civil battery under Ohio or West Virginia law, the plaintiff must prove an intentional and harmful or offensive contact. *See Anderson v. St. Francis-St. George Hosp.*, 77 Ohio St.3d 82, 84 (Ohio 1996); *Rhodes*, 657 F. Supp. 2d at 773. The parties disagree as to the definition of "intent" and whether the plaintiffs have produced sufficient evidence to raise an issue of material fact as to DuPont's intent. The plaintiffs maintain that Ohio and West Virginia apply the "substantially certain" standard to determine whether DuPont acted with the requisite intent to prove a battery.

DuPont, however, argues that "[i]n both Ohio and West Virginia, to prove an intentional contact where there has been no alleged direct, physical contact between the plaintiff and the defendant, the plaintiff must demonstrate that the defendant acted with the *actual purpose* to come into contact with the plaintiff." (DuPont's Mot. for Partial Summ. J. at 14–15) (citing *Leichtman v. WLW Jacor Commc'n*, 92 Ohio App.3d 232 (Ohio Ct. App. 1st Dist. 1994) and *Funeral Servs. by Gregory, Inc. v. Bluefield Cmty. Hosp.*, 186 W.Va. 424 overruled in non-relevant part by *Courtney v. Courtney*, 190 W. Va. 126 (1993)). DuPont further argues that, even if this Court were to apply "a lesser 'substantial certainty' standard for battery cases

involving indirect contact, the plaintiff must still be able to demonstrate that the defendant acted

with substantial certainty that his conduct would lead to contact with *that specific plaintiff*." *Id.*

at 15 (*Powell v.Tosh*, 929 F. Supp. 2d 691, 708 (W.D. Ky. 2013); *Rose v. Braciszewski*, No.

285316, 2009 Mich. App. LEXIS 2110, at *12–14 (Mich. Ct. App. Oct. 13, 2009)).  DuPont's

arguments are not well taken.

The Ohio Supreme Court relies upon the Restatement (Second) of Torts for its definition

of a battery.  *See Love v. City of Port Clinton*, 37 Ohio St. 3d 98 (Ohio 1988).  The level of intent

that is required under the Restatement is explained by an Ohio appellate court:

> A person is liable for battery if he acts intending to cause a harmful or offensive
> contact with another person, and a harmful contact results. Restatement of the
> Law 2d, Torts (1965), 25-26, Section 13. An offensive contact is that which
> would be offensive to a reasonable sense of personal dignity.  Prosser, Law of
> Torts (4 Ed. 1971) 37, Section 9.  Intent, an essential element of an action based
> on assault or battery, denotes that the actor either desires to cause a harmful or
> offensive contact, *or knows with substantial certainty that his act will bring about
> a harmful or offensive* contact. 6 Ohio Jurisprudence 3d (1978, Supp.1995),
> Assault-Civil Aspects, Section 5.

*Wheeler v. Hagood*, No. CA95-03-025, 1995 WL 540424, at *1 (Ohio Ct. App. Sept. 11, 1995)

(emphasis added).

DuPont does not address *Wheeler v. Hagood* in its Reply, and instead relies again upon

*Leichtman* as well as the law from other jurisdictions to support its claim that the harm must be

directed to a particular plaintiff.  However, the law from other jurisdictions is incongruent with

the law of Ohio on this issue and, *Leichtman* is inapposite.   That is, the *Leichtman* plaintiff

alleged a battery based upon the intentional blowing of smoke into his face "for the purpose of

causing physical discomfort, humiliation and distress." *Leichtman*, 92 Ohio App. 3d at 234.  As

the plaintiffs correctly note, this case pertained to a defendant who did not dispute that he

actually intended to blow smoke in the plaintiff's face. *Id.* at 235. Thus, extrapolation from this line of smoking cases is unwarranted.

With regard to West Virginia law, DuPont's reliance upon *Funeral Servs. by Gregory, Inc.* is unavailing. That case does not stand for the proposition that the plaintiffs must show that DuPont acted with actual purpose to contact them with C-8. West Virginia, like Ohio, relies upon the Restatement of Torts to define battery and its elements. Indeed, the case upon which DuPont relies to support its position indicates that a substantial certainty standard applies:

> The Restatement (Second) of Torts, § 13(a) and (b) (1965), states that: "[a]n actor is subject to liability to another for battery if (a) he acts *intending* to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." (Emphasis added.) The word "intent" in the Restatement denotes that "the actor desires to cause the consequences of his act, *or that he believes that the consequences are substantially certain to result from it.*" *Id.* at § 8A.

*Funeral Servs. by Gregory, Inc.*, 186 W. Va. at 427 (second emphasis added).

The only additional case upon which DuPont relies is addressed in its Reply:

> Plaintiffs again fail in their efforts to distinguish *Rhodes v. E. I. du Pont de Nemours and Co.*, 657 F. Supp. 2d 751 (S.D. W. Va. 2009), which dismissed battery claims based on alleged exposure to PFOA. *See* Opp. at 27–28. Plaintiffs fail to explain how *Rhodes* is in any way contrary to DuPont's argument here that Plaintiffs do not and cannot show that DuPont acted with the actual purpose of coming into contact with and harming any of them.

(DuPont's Reply at 29.) This case too is of no help to DuPont.

The *Rhodes* court's analysis was not directed at DuPont's intent, but rather, was directed at the harmful or offensive contact with the plaintiffs. The court did not dismiss the battery claims because there was insufficient evidence that DuPont acted with *the intent to cause* a harmful or offensive contact. Rather, the court found that the plaintiffs presented no evidence that they suffered any harmful or offensive contact. The *Rhodes* court explained:

McClenathan [*v. Rhone–Poulenc, Inc.*, 926 F. Supp. 1272 (S.D. W.Va.1996)] stands for the proposition that "mere . . . inhalation" of chemicals cannot support a battery claim, absent more of a showing of "harmful or offensive conduct." The plaintiffs have made no such showing. They have presented no evidence that they have suffered any harmful or offensive contact. A harmful bodily contact is contact resulting in "any physical impairment of the condition of another's body, or physical pain or illness." Restatement (Second) of Torts § 15 (1965). The plaintiffs concede that they are not "currently suffering from any particular manifest illness or disease as a result of their PFOA exposure." (Mem. Opp'n Mot. Summ. J. 9.) The plaintiffs' experts testify in their reports that the plaintiffs have experienced an increased risk of different diseases as a result of their exposure to PFOA, but they do not assert that the plaintiffs have suffered any physical harm yet. (See Hill Aff. Ex. 27 at 29–30; Id. Ex. 28 at 37–49.) *Absent any such demonstration that their contact with PFOA caused them harm, or that the PFOA present in their blood has altered the structure or function of some body part, the plaintiffs cannot sustain their battery claim based on the mere presence of PFOA in their blood.*

*Rhodes*, 657 F. Supp. 2d at 773. Unlike the plaintiffs in *Rhodes* who claimed only that they had an increased risk of disease, the plaintiffs in the case *sub judice* have provided evidence that they are "suffering from a particular manifest illness or disease," allegedly caused by DuPont's conduct.

When taking the evidence in the light most favorable to the plaintiffs, the Court concludes that they have set forth specific facts showing that there is a genuine issue as to whether DuPont knew with substantial certainty that its act of releasing C-8 from its Water Works plant would bring about a harmful or offensive contact, and whether a harmful or offensive contact resulted. Accordingly, the Court **DENIES** DuPont's Motion as it relates to the battery claims alleged by Jeanne Baker, Terry Pugh, Tina Dowdy, Kanndies Carter, Sheila J. Lowther, John M. Wolf, David Freeman, and Carla Marie Bartlett.

### 7. Ultrahazardous or Abnormally Dangerous Activity

DuPont cites to the ultrahazardous/abnormally dangerous activity claims alleged by Sharon Arnott, John M. Wolf, David Freeman, and Carla Marie Bartlett. These plaintiffs seek to

impose strict liability on DuPont for the use, generation, and/or release of C-8 from the Washington Works plant, which they contend constitutes abnormally dangerous or ultrahazardous activity.

The types of activities that qualify as ultrahazardous/abnormally dangerous is quite limited. *See Caveny v.Raven Arms Co.*, 665 F. Supp. 530, 532 (S.D. Ohio 1987) *aff'd,* 849 F.2d 608 (6th Cir. 1988) ("[T]he ultrahazardous activity doctrine, as defendant points out, is narrow in scope."). To come within the doctrine, courts have found that the activity must have an immediate, high risk of great physical harm to those in close proximity, which high risk cannot be reduced through the exercise of due care. *Caveny*, 665 F. Supp. at 532. It is generally something atypical for the area in which it occurs. *In re Flood Litig.*, 607 S.E.2d 863, 874 (W. Va. 2004).

Both Ohio and West Virginia look to the Restatement (Second) of Torts, which establishes the elements of strict liability for harm caused by abnormally dangerous activity. *See In re Flood Litig.*, 216 W. Va. 534, 545 (2004); *Hirsch v. CSX Transp., Inc.*, No. 1:07-cv-3512, 2008 U.S. Dist. LEXIS 124211, at *13–14 (N.D. Ohio Oct. 22, 2008) (citing *Doherty v. Ohio State Univ.*, No. 89AP-746, 1990 Ohio App. LEXIS 2696, 1990 WL 86772, at *6 n.1 (Ohio Ct. App. June 26, 1990) ("Although Restatement Section 519 has never been explicitly adopted by the court of Ohio, the rule nevertheless appears to be an accurate restatement of Ohio law on this issue.") and *Dartron Corp. v. Uniroyal Chem. Co..*, 893 F. Supp. 730 (N.D. Ohio 1995) (interpreting Ohio case law regarding strict liability and using the Restatement's approach)); *see also Caveny*, 665 F. Supp. at  531 (S.D. Ohio 1987) ("Ohio courts have long imposed absolute liability on persons engaging in ultrahazardous activities even when due care has been exercised."). The Restatement provides in relevant part:

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Restatement (Second) of Torts § 519. Additionally, the following factors are relevant to determining whether an activity is abnormally dangerous:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is out-weighed by its dangerous attributes.

Restatement (Second) of Torts § 520.

DuPont contends that the Washington Works plant is located on the Ohio River, in a community where manufacturing and industrial operations are common, and that there is no evidence that use of C-8 at the plant placed any plaintiff at an immediate, high risk of great physical harm. However, DuPont argues that regardless of these facts, well established authority dictates that the dispositive issue here is subsection (c) in section 119 of the Restatement, *i.e.*, the reasonable care factor. DuPont points to the complaint of Ms. Bartlett as an example of the allegations the plaintiffs make regarding the measures DuPont could have taken to reduce the alleged risks associated with C-8 such as using scrubbers for plant stacks and/or installing carbon filtration systems. DuPont explains:

Plaintiffs' effort to minimize or ignore the importance of the "reasonable care factor" of Section 520(c) of the Second Restatement of Torts (the "Restatement") is contradicted by myriad decisions from across the country. For example, in *Ind. H. B. R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174 (7th Cir. 1990), Judge Posner relied solely on Section 520(c) to find that the defendant's handling of the toxic chemical acrylonitrile was not abnormally dangerous, opining that the "baseline common law regime of tort liability is negligence . . . [and] [w]hen it is a workable regime, because the hazards of the activity can be avoided by being careful (which is to say, nonnegligent), there is no need to switch to strict liability." *Id.* at 1177. Indeed, Judge Posner suggested that the factors in Section 520 of the Restatement should be "reordered . . . [to] start with (c)" so the importance of each factor could be more "perspicuous." *Id.; see also* Gerald W. Boston, *Strict Liability for Abnormally Dangerous Activity: The Negligence Barrier*, 36 San Diego L. Rev. 597 ("[T]he overwhelming majority of decisions regard proof of the inability to eliminate the risk as **indispensable**.") (emphasis supplied).

(DuPont's Reply at 31.)

The plaintiffs contend that "[t]he Restatement's 'reasonable care' factor requires a court to consider (as one factor among many) a defendant's 'inability to *eliminate* the risk by the exercise of reasonable care[; however,] DuPont incorrectly uses the words "mitigate[]" and "eliminate" interchangeably." (Pls.' Mem. in Opp. at 36.) This Court disagrees.

While the Restatement does refer to an inability to "eliminate" a risk, Comment (h) to Section 520 clarifies that this is the proper interpretation of the "reasonable care" factor:

It is not necessary, for the factor stated in Clause (c) to apply, that the risk be one that no conceivable precautions or care could eliminate. What is referred to here is the unavoidable risk remaining in the activity, even though the actor has taken all reasonable precautions in advance and has exercised all reasonable care in his operation, so that he is not negligent.

Restatement (Second) of Torts, § 520, cmt. h. Thus, the inquiry goes only to elimination of the high degree of risk of an activity, not all risk. *See also Arlington Forest Assoc. v. Exxon Corp*, 774 F. Supp. 387, 390 (E.D. Va. 1991) (finding that Section 520(c) "does not contemplate that all risk be capable of elimination by due care" because a "straight-forward reading of the text" suggests that the phrases "the risk in § 520(c) refers back to the high degree of risk of some harm

in § 520(a)."); *New Meadows Holding Co. v. Wash. Water Power Co.*, 687 P.2d 212, 216 (Wash. 1984) ("As to factor (c), the phrase 'the risk' plainly refers to the 'high degree of risk' mentioned in factor (a). Thus, factor (c) addresses itself to the question of whether, through the exercise of ordinary care, the risk inherent in an activity can be reduced to the point where it can no longer be characterized as a 'high degree of risk.'").

The plaintiffs also argue that "pollution from manufacturing emissions is exactly the type of conduct that courts have historically found to be ultrahazardous/abnormally dangerous." (Pls.' Mem. in Opp. at 36.) The plaintiffs state that "West Virginia's highest court has specifically identified a factory's emission of noxious gases as a classic example of activity subject to strict liability . . . ." *Id.* at 37 (citing *In re Flood Litig.*, 216 W. Va. 544–45) ("The conditions and activities to which the [strict liability] rule has been applied have followed the English pattern. They include [. . . ] factories emitting smoke, dust or noxious gases in the midst of a town [. . . .]")). At first blush, this case seems to support the plaintiffs' position. However, a closer look at the noxious gas cases and the other typical cases in which abnormally dangerous activities negates that conclusion.

That is, the Restatement specifically addresses this issue, stating that "[t]ypical abnormally dangerous activities, under the rule stated in this Section, include: Water collected in quantity in unsuitable or dangerous place . . . Explosives in quantity in a dangerous place . . . Inflammable liquids in quantity in the midst of a city . . . Blasting, in the midst of a city . . . Pile driving, with abnormal risk to surroundings . . . Release into air of poisonous gas or dust . . . Drilling oil wells or operating refineries in thickly settled communities . . . production of atomic energy . . . ." Restatement (Second) of Torts § 519 (1977) (case citations omitted). The majority of these categories are qualitatively distinct from the use, storage, and release of a

production aid such as C-8. As this Court has explained, "the activities recognized as ultrahazardous are limited to those activities that pose a danger to persons in close proximity to the activity such as blasting, storing water and storage of explosives." *Caveny,* 665 F. Supp. at 531 (citations omitted).

The most analogous group of cases are the ones upon which the plaintiffs rely, *i.e.*, the poisonous gas or dust cases: "*Luthringer v. Moore*, 31 Cal.2d 489, 190 P.2d 1 (1948) (fumigation with cyanide gas); *Gotreaux v. Gary*, 232 La. 373, 94 So.2d 293 (1957), appeal transferred, 80 So.2d 578 (crop dusting); *Dutton v. Rocky Mt. Phosphates*, 151 Mont. 54, 438 P.2d 674 (1968) (fluorine); *Young v. Darter*, 363 P.2d 829 (Okla. 1961) (herbicide spray); *Loe v. Lenhardt*, 227 Or. 242, 362 P.2d 312 (1961) (crop dusting)." Restatement (Second) of Torts § 519 (1977). Yet, those cases focus on the activity itself as being abnormally dangerous – not simply the conditions that result. For example, fumigation with cyanide gas, dusting crops with poison, and releasing fluoride from phosphate rock have been found abnormally dangerous activities – not the resulting harm the activities caused.

Consequently, the Court finds that a strict liability claim for ultrahazardous/abnormally dangerous activities cannot lie under Ohio or West Virginia law for DuPont's handling and release of C-8 in and from its Washington Works plant. Thus, the Court **GRANTS** DuPont's Motion as it relates to the ultrahazardous/abnormally dangerous activity claims alleged by Sharon Arnott, John M. Wolf, David Freeman, and Carla Marie Bartlett.

### 8. Negligence Per Se and/or Prima Facie Negligence

Some plaintiffs have filed state law negligence per se or negligence claims for violations of Ohio, West Virginia, and/or federal statutes.

### a. Alleged Violations of Ohio Statutes

The Ohio Supreme Court explains that violations of certain Ohio statutes can be the basis

of a claim for negligence per se:

> [W]here a statute sets forth "'a positive and definite standard of care . . . whereby
> a jury may determine whether there has been a violation thereof by finding a
> single issue of fact,'" a violation of that statute constitutes negligence per se.
> *Chambers v. St. Mary's School* (1998), 82 Ohio St.3d 563, 565, quoting *Eisenhuth
> v. Moneyhon, supra,* 161 Ohio St. [367] 374–375, [(1954)].

*Mann v. Northgate Investors, L.L.C.*, 138 Ohio St. 3d 175, 182–83 (2014) (parallel citations

omitted).  DuPont addresses the negligence per se claims filed by Jeanne Baker, Terry Pugh,

David Freemen, and Carla Marie Bartlett.  These claims are based upon alleged violations of

Ohio's Water Pollution Control Act ("WPCA"), Ohio Rev. Code § 6111 *et seq*., and Ohio's

Public Nuisance Statute, Ohio Rev, Code § 3767 *et seq.*

DuPont maintains that a negligence per se claim requires the threshold inquiry of whether

the underlying statute upon which the violation is based provides for a private right of action.

Ohio and federal courts interpreting Ohio law support this contention.  (DuPont's Mot. for Partial

Summ. J. at 22–23) (citing *Ashtabula River Corp. Group II v. Conrail, Inc.*, 549 F. Supp. 2d 981,

988-89 (N.D. Ohio 2008), *Uland v. S.E. Johnson Cos.*, 1997 Ohio App. LEXIS 6112, at *43, n.

15 (Ohio Ct. App. Mar. 3, 1997); *Nielsen v. Ford Motor Co.*, 113 Ohio App. 3d 495 (1996)).

DuPont highlights *Ashtabula River*, wherein the Northern District of Ohio rejected the

contention that negligence per se claims can be based on either Ohio's Public Nuisance Statute

or its WPCA because the General Assembly did not confer a right to bring a private cause of

action under these statutes.  549 F. Supp. 2d at 988–89.

The plaintiffs respond that *Ashtabula River* "has never been cited as authority on this

issue and, in fact, has been strongly criticized by at least two federal courts for its legal reasoning

in general.  (Pls.' Mem. in Opp. at 39) (citing *Hobart Corp. v. Waste Mngmt. of Ohio*, 840 F.

Supp. 2d 1013, 1036 n.19 (S.D. Ohio 2011) (*Ashatubla* is not "properly grounded"); *Board of Cty. Comm'rs. v. Brown Group Retail, Inc.*, 598 F. Supp. 2d 1185, 1193 (D. Colo. 2009) ("as *Ashtabula River* cites no relevant law in support and appears contrary to prevailing case law in this Circuit, as well as the Federal Rules - I decline to follow").

   Further, the plaintiffs contend that *Ashtabula River* and *Uland* are "outliers," with *Ashtabula River* being "strongly criticized" and *Uland* having "never been cited by the Supreme Court of Ohio on this topic, despite being issued nearly eighteen years ago." *Id*. The plaintiffs rely upon *Mann*, *supra*, a case in which the Ohio Supreme Court held that "a landlord [owes] to a tenant's guest the statutory duties under [the Landlord-Tenant Act] R.C. 5321.04(A)(3) and that a breach of that duty constitutes negligence per se." 138 Ohio St. 3d at 175. The plaintiffs invite this Court to extrapolate from this case that no threshold finding of a private right of action is required for any negligence per se claim to lie under Ohio law. *Id*. at 40 (citing *Tiegs v. Watts*, 954 P.2d 877 (Wash. 1998) (affirming jury verdict finding defendant liable under negligence per se theory for violating state Water Pollution Control Act)). The Court declines the plaintiffs' invitation and finds their arguments unpersuasive.

   First, as DuPont correctly points out, *Ashtabula River* has not been criticized for its holding related to the statutes at issue here but it has actually been cited by *this* Court for the exact proposition that is under consideration:

> Courts in Ohio have recognized that there is no private right of action under [Ohio's Public Nuisance Statute] Chapter 6111, but [that it] instead charges the state government with enforcing its provisions.

*Spears v. Chrysler LLC*, 2009 U.S. Dist. LEXIS 130632, at *21 (S.D. Ohio Apr. 22, 2009), *adopted on this ground by Spears v. Chrysler*, 2011 U.S. Dist. LEXIS 12014, at *25 (S.D. Ohio

Feb. 8, 2011). *Ashtabula River* also addresses accurately and specifically Ohio's WPCA, finding

that there is no private right of action exits under it either:

> [Ohio's WPCA,] Ohio Revised Code § 3767.03 provides a list of governmental entities with standing to bring an action to abate the nuisance and refers to non-governmental entities who have standing: "any person who is a citizen of the county in which the nuisance exists may bring an action in equity in the name of the state . . . to abate the nuisance and perpetually enjoin the person maintaining the nuisance from further maintaining it." Count IV does not allege that plaintiff is a "person who is a citizen of the county in which the nuisance exists." Nor does the Complaint allege that plaintiff is making the claim in the name of the state, or that it is seeking relief in equity.
>
> Plaintiff does not dispute that it is not a governmental entity authorized to bring an enforcement action or an authorized non-governmental actor. . . . The Court will not permit plaintiff to override the statutory language in this manner.

*Ashtabula River*, 549 F. Supp. 2d at 989.

Further, the criticism the plaintiffs assert has been lodged against *Ashtabula River*

because its conclusion was not "properly grounded" was on a separate point of law that is not at

issue here, *i.e.*, whether the Comprehensive Environmental Response, Compensation, and

Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA") preempts state law when a

plaintiff's CERCLA and state law claims seek recovery of the same response costs. Specifically,

the *Hobart Corp.* court noted: "This Court determines that the *Vine Street* decision is properly

grounded on the language of CERCLA Section 114, but the *Ashtabula River* decision is not."

*Hobart Corp.*, 840 F. Supp. 2d at 1036 n. 19.

Second, the fact that *Uland* has never been cited by that state's highest court does not

bestow outlier status upon it. An outlier refers to a case that stands for a proposition that is

distant from the conclusion on that issue found by all other courts to have considered the issue.

The plaintiffs provide no Ohio case that even considers the issue, let alone a group of cases that

holds differently than *Uland*. The Sixth Circuit directs that "[w]here a state's highest court has

not spoken on a precise issue, a federal court, sitting in a diversity case, may not disregard a decision of the state appellate court on point, 'unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.' " *Pratt v. Brown Machine Co., Div. of John Brown, Inc.*, 855 F.2d 1225, 1239 (6th Cir. 1988) (quoting *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1140 (6th Cir. 1986)). Here, there is no persuasive data to convince this Court that the Ohio Supreme Court would disagree with *Uland*.

Consequently, this Court finds that because there is no private right of action under either the Ohio WPCA or the Ohio Public Nuisance Statute, no claim of negligence per se can lie based upon either of these statutes. *See Uland*, 1997 Ohio App. LEXIS 6112, at *43, n. 15 ("Any claim based on R.C. Chapter 6111 regarding 'waters of the State' is inapplicable because no private right of action exists under that chapter."); *Nielsen v. Ford Motor Co.*, 681 N.E.2d 470, 474 (Ohio 1996) ("It is a basic doctrine of statutory construction that when the legislature has authorized an action to be instituted by a particular person or office, the suit may not be instituted by another.")). Accordingly, the Court **GRANTS** DuPont's Motion as it relates to the negligence per se claims brought by Jeanne Baker, Terry Pugh, David Freemen, and Carla Marie Bartlett.

### b. Alleged Violations of West Virginia Statutes

DuPont refers in its Motion to the negligence claims brought by Tina Dowdy, Sheila J. Lowther and John M. Wolf. These plaintiffs allege that DuPont's violations of West Virginia's Water Pollution Control Act, W. Va. Code § § 22-11-1 *et seq*. and its Consumer Credit and Protection Act, W. Va. Code §§ 46A-6-101 *et seq*. can provide the basis of their claims of negligence. Initially, the Court notes that the plaintiffs' claims based upon the alleged violation of the West Virginia CCPA cannot survive because the plaintiffs' claims based on that Act do

34

not survive DuPont's Motion, as discussed *supra*. The Court will, therefore, only address the claims based upon the alleged violations of West Virginia's WPCA.

Unlike Ohio, West Virginia does not recognize negligence per se claims based upon alleged violations of statutes. Instead, in certain situations, "a violation of a statute could give rise to a common law negligence action." *Arbaugh v. Bd. of Educ., Cnty. of Pendleton*, 214 W. Va. 677, 681 (2003). "'In order to be actionable, such violation must be the proximate cause of the plaintiff's injury." *Id*. (citation omitted).

Both parties agree that there is no West Virginia case law addressing whether violation of the WPCA can support a claim for prima facie negligence. The plaintiffs contend that, unlike Ohio law, West Virginia does not require a showing that a statute provides for a private right of action when the statute can be viewed as one for the public safety. (Pls.' Mem. in Opp. at 41) (extrapolating from law considering motor vehicle statutes, building code ordinances, and suits against mining companies).

DuPont disagrees, maintaining that the Supreme Court of West Virginia has clearly held that before the violation of any statute can be the basis of a common law negligence action, a court must first determine whether a private cause of action is created by the statute. *See Arbaugh v. Bd. of Educ., Cnty. of Pendleton*, 214 W. Va. 677, 681 (2003) (considering child abuse reporting statute, the court states: "We went on to say in *Yourtee* that '[w]henever a violation of a statute is the centerpiece of a theory of liability, the question arises whether the statute creates an implied private cause of action.' 196 W.Va. at 688."). DuPont continues that, "where the cause of action under a statute is not based on negligence, a violation of that statute does not provide prima facie evidence of negligence. (DuPont's Mot. for Partial Summ. J. at 25) (citing *Shawkey v. Lowe's Home Ctrs., Inc.*, 2011 U.S. Dist. LEXIS 34768, at *13 (S.D. W. Va.

Mar. 30, 2011) (finding "untenable" plaintiffs' position that alleged violations of unlawful detention statute provided *prima facie* evidence of negligence and dismissing claims of prima facie evidence)).  DuPont asserts that the cause of action appropriate for the conduct about which the plaintiffs complain is public nuisance.  *Id.* (citing *Taylor v. Culloden Public Service District,* 214 W.Va. 639 (2003)).  *See also Rhodes*, 657 F. Supp. 2d at 769–71 (public nuisance suits to address environmental harms available but only if the plaintiffs have suffered a special injury different in kind from that of the public in general).

This Court is not persuaded that West Virginia would recognize a negligence claim based on an environmental statute that does not provide for a private right of action.  Based on this and the complete absence of case law on the issue, this Court is restrained from recognizing a new claim for relief for negligence based on an alleged violation of West Virginia's WPCA.  Consequently, the Court **GRANTS** DuPont's Motion as it relates to the prima facie negligence claims brought by Tina Dowdy, Sheila J. Lowther, and John M. Wolf.

### c. Alleged Violations of Federal Statutes

DuPont addresses the negligence per se claims based upon federal statutes filed by Sheila J. Lowther, John M. Wolf, David Freeman, and Carla Marie Bartlett.  The plaintiffs allege claims for negligence per se based upon DuPont's alleged violations of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 *et seq.*,  the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300 *et seq.*, and the Resource Conservation and Recovery Act/Solid Waste Disposal Act ("RCRA"), 42 U.S.C. § 6901 *et seq*.  The parties agree that none of these statutes provides for a private right of action, which DuPont contends dictates that the plaintiffs' negligence per se claims cannot survive.  *See also Boone v. DuBose*, 718 F. Supp. 479, 484 (M.D. La. 1988) (the TSCA, CWA, SDWA, and RCRA do not

"permit a private right of action for the recovery of compensatory damages"). DuPont provides several cases that have considered this exact issue under each of these statutes and have concluded that no state law negligence claim would lie. (DuPont's Mot. for Partial Summ. J. at 26–28) (citing, *inter alia*, *Short v. Ultramar Diamond Shamrock*, 46 F. Supp. 2d 1199, 1200–01 (D. Kan. 1999) ("Plaintiffs cannot use the theory of negligence per se to bootstrap a private cause of action for damages when one [a private cause of action for damages] is not provided for by the RCRA."); *325-343 E. 56th St. Corp. v. Mobil Oil Corp.*, 906 F. Supp. 669, 687–88 (D. D.C. 1995) ("Having found no express or implied private cause of action for money damages under RCRA, and finding a Congressional intent that the RCRA citizen suit provisions serve only to allow private plaintiffs to act as 'private attorney generals,' the court determines that Plaintiff's negligence per se claim for violations of 40 C.F.R. Pts. 280-8 (RCRA regulations) should be dismissed."); *Batton v. Georgia Gulf*, 261 F. Supp. 2d 575, 598 (M.D. La. 2003) (recognizing certain state law claims may be available for enforcement of the conduct prescribed by the statute, but "the SDWA does not permit a private right of action for the recovery of compensatory damages"); *Sanford Street Local Dev. v.Textron, Inc.*, 768 F. Supp. 1218, 1224 (W.D. Mich. 1991) (denying negligence per se claim because TSCA provided no private remedy), *vacated on other grounds*, 805 F. Supp. 29 (W.D. Mich. 1991); *Brewer v. Ravan*, 680 F. Supp. 1176, 1184 (M.D. Tenn. 1988) ("[E]ven a cursory reading of TSCA's civil penalty provision reveals that only the Administrator of the EPA may assess civil penalties against violators of the TSCA."); *In re TVA Ash Spill Litig.*, 89 Fed. R. Evid. Serv. (Callaghan) 259, 2012 U.S. Dist. LEXIS 122231, at *203–08 (E.D. Tenn. 2012) (dismissing negligence per se claims predicated on the CWA and the RCRA in reliance on cases that "have concluded that

negligence per se claims premised on the RCRA and the CWA are not actionable because private rights of action do not exist under those statutes)).

The plaintiffs, however, argue that the United States Supreme Court has recognized that "[t]he violation of federal statutes and regulations is commonly given negligence per se effect in state tort proceedings." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 318-19 (2005) (citation omitted) (considering federal question jurisdiction in quiet title action in state court against tax sale purchaser).  Thus, the plaintiffs conclude:

> Even though a plaintiff may not assert a private cause of action under a federal statute as a federal cause of action, that statute might nevertheless serve as a standard of conduct which, if breached, gives rise to an action for common law negligence. *Hofbauer v. Northwestern Nat'l Bank of Rochester*, 700 F.2d 1197, 1201 (8th Cir. 1983); *see also In re: Bendectin Litig.*, 857 F.2d 290, 314 (6th Cir. 1988) (recognizing "that a mere congressional intent to preclude a private right of action at the federal level for violations of [a federal law] would not necessarily indicate that Congress intended to preclude a state remedy under a theory of negligence per se."); *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 582 (7th Cir. 2012) ("[There is no] general rule that where a state common law theory provides for liability for conduct that is also violative of federal law, a suit under the state common law is prohibited so long as the federal law does not provide for a private right of action.").  Indeed, absent some preemptive congressional action, the field is left open for states to apply whatever standard of care they choose.

(Pls.' Mem. in Opp. at 44–45.)

DuPont replies that its position is not inconsistent with the cases upon which the plaintiffs rely.  That is, DuPont does not dispute that a violation of federal statutes may give rise to a state law claim of negligence.  DuPont explains that the cases upon which the plaintiffs rely "confirm that, assuming Congress did not intend to foreclose all private enforcement of a federal statute, the treatment of a violation of that statute for purposes of negligence per se claims will be a question of state law."  (Reply at 38.)  This Court agrees.

The Sixth Circuit has recognized that the "congressional decision not to provide a private cause of action under [a federal statute] becomes quite important in considering the propriety of

a state negligence per se action for violation of the [federal statute]." *In re Bendectin Litig.*, 857 F.2d 290, 313-14 (6th Cir. 1988). It thus "may be that a decision by Congress not to create a private remedy is intended to preclude all private enforcement." *Id.* "If that is so, then a state cause of action that makes relief available to private individuals for violation of the [federal statute] is pre-empted." *Id.* As DuPont correctly argues, state courts, or federal courts exercising diversity jurisdiction, that have addressed this issue have generally decided to prohibit private causes of action for negligence per se, reasoning that legislative intent and principles of federalism and separation of powers caution against it. *See e.g.*, *See Myers v. United States*, 17 F.3d 890 (6th Cir. 1994); *Wentwood Woodside I LP v. GMAC Commercial Mortg. Corp.*, 419 F.3d 310, 323 (5th Cir. 2005) (finding that federal statute would not give rise to a private right of action under state law for negligence per se); *Callahan v. Country Wide Home Loans, Inc.*, 2006 U.S. Dist. LEXIS 51217, at *6–7 (N.D. Fla. July 26, 2006) (noting that state courts may choose not to allow state law claims based on the violation of a federal statute if it would upset the federal scheme); *R.B.J. Apartments, Inc. v. Gate City Sav. & Loan Ass'n*, 315 N.W.2d 284, 290 (N.D. 1982) (refusing to recognize state law cause of action for violation of federal statute, reasoning that separation of powers and federalism concerns direct against adopting a federal statute as the standard of care in a negligence case where the statute allows no private right of action).

In *Myers*, the Sixth Circuit addressed this issue under the Federal Tort Claims Act ("FTCA"). Affirming the district court, the Sixth Circuit held:

> Finally, the plaintiffs' claim must fail because, were we to permit them to proceed on the basis of negligence per se, we would, in effect, be permitting a private cause of action under the Act. This we refuse to do.
>
> . . . .

Plaintiffs' attempt to apply the negligence per se doctrine to these facts, if successful, would provide a means of making the government liable as an insurer for every private party's violation of a federal regulatory scheme. Where Congress has refused to create an express cause of action for the government's breach of a regulatory scheme, we decline to infer a cause of action under the FTCA through a misapplication of negligence per se principles.

*Myers v. United States*, 17 F.3d 890, 901 (6th Cir. 1994) (parallel citation omitted).

This Court finds the same reasoning applicable here. The wealth of case law cited above[2] persuades the Court that recognition of state law negligence per se claims under these federal statutes is in essence permitting a private cause of action where Congress intended none to lie. Accordingly, the Court **GRANTS** DuPont's Motion as it relates to the negligence per se claims based upon federal statutes that were brought by Sheila J. Lowther, John M. Wolf, David Freeman and Carla Marie Bartlett.

## IV.

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** DuPont's Motion for Partial Summary Judgment on Inapplicable Causes of Action. (ECF No. 1898.) Specifically, the Court **DENIES** DuPont's Motion to the extent that it seeks this Court's decision to apply to each individual plaintiff who has asserted one of the eight "inapplicable" claims. Asnd as to the specified complaints the Court:

1. **GRANTS** DuPont's Motion as it relates to the strict product liability claims brought by Jeanne Baker, Terry Pugh, Tina Dowdy, Sheila J. Lowther, John M. Wolf, and David Freeman;

---

[2] The Court acknowledges that the case law is not completely consistent in this area and that some courts have recognized state law negligence claims under a federal statute that has not provided a private right of action. (Pls.' Mem. in Opp. at 43–44) (citing, *inter alia*, *Lozar v. Birds Eye Foods*, 678 F Supp.2d 589, 601-604 (W.D. Mich. 2009) (denying request to dismiss for failure to state a claim a negligence per se cause of action based upon violation of the RCRA). However, these cases appear to represent the minority position and, additionally, this Court finds them less persuasive than the numerous ones DuPont has relied upon. *See id.* (*no* case has cited to this one for the relevant proposition at issue here).

2.  **GRANTS** DuPont's Motion on the consumer protection claims brought by Jeanne Baker, Terry Pugh, Tina Dowdy, John M. Wolf, and David Freeman;

3.  **GRANTS** DuPont's Motion as it relates to the conspiracy claims of the plaintiffs Terry Pugh, John M. Wolf, David Freeman, Jeanne Baker, Tina Dowdy, and Sheila J. Lowther and **DENIES** without prejudice the conspiracy claims of the plaintiffs Georgette Bergdorf, Carla Marie Bartlett, and Earl Edgar Frum;

4.  **GRANTS** DuPont's Motion as it relates to the trespass to person claims of Jeanne Baker, Terry Pugh, Tina Dowdy, Sharon Arnott, Sheila J. Lowther, John M. Wolf, and David Freeman;

5.  **DENIES** DuPont's Motion as it relates to the conscious pain and suffering claims filed by Ronald Bachtel, and Charles Cotton.

6.  **DENIES** DuPont's Motion as it relates to the battery claims alleges by Jeanne Baker, Terry Pugh, Tina Dowdy, Kanndies Carter, Sheila J. Lowther, John M. Wolf, David Freeman, and Carla Marie Bartlett;

7.  **GRANTS** DuPont's Motion as it relates to the ultrahazardous/abnormally dangerous activities claims alleged by Sharon Arnott, John M. Wolf, David Freeman, and Carla Marie Bartlett; and,

8.  **GRANTS** DuPont's Motion as it relates to the negligence per se claims and/or prima facie negligence claims brought by Jeanne Baker, Terry Pugh, David Freemen, Carla Marie Bartlett, Sheila J. Lowther, John M. Wolf, and Tina Dowdy.

**IT IS SO ORDERED.**

_7-6-2015_
**DATE**

_μ C f_
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**

41