UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

Civil Action 2:13-md-2433
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth Preston Deavers

This document relates to:

*Bartlett v. E. I. du Pont de Nemours and Company*, Case No. 2:13-CV-0170

*Wolf v. E. I. du Pont de Nemours and Company*, Case No. 2:14-CV-0095

## DISPOSITIVE MOTIONS ORDER NO. 7

### Defendant's Motion for Summary Judgment on Punitive Damages

This matter is before the Court on Defendant's Motion for Partial Summary Judgment on Punitive Damages in the Bartlett and Wolf Cases (ECF No. 2825), Plaintiffs' Memorandum in Opposition (ECF No. 3194), and Defendant's Reply (ECF No. 3557). For the reasons that follow, the Court **DENIES** Defendant's Motion.

### I.

Defendant E. I. du Pont de Nemours and Company ("DuPont") directs its Motion to the punitive damages claims brought by Plaintiff Carla Marie Bartlett and Plaintiff John M. Wolf, the first two Plaintiffs selected for trial ("Trial Plaintiffs") in this multidistrict litigation ("MDL"). Mrs. Bartlett's case is scheduled for trial on September 14, 2015, and Mr. Wolf will take his case to trial on November 30, 2015.

The Trial Plaintiffs both allege that they are members of the class ("*Leach* Class") of individuals who are permitted under a contractual agreement ("*Leach* Settlement Agreement") to file claims against DuPont based on injuries that they believe were caused by their exposure to ammonium perfluorooctanoate ("C-8" or "PFOA") discharged from DuPont's Washington Works plant. (*Leach* Settlement Agreement; ECF No. 820-8.) The *Leach* Settlement Agreement established a panel of appropriately credentialed epidemiologists ("Science Panel") to study human disease among the particular group of individuals who were exposed to C-8 by drinking water that was contaminated with C-8 that had been discharged from DuPont's Washington Works plant into their drinking water. *Id.* §§ 12.2.1, 12.2.2.

In 2011 and 2012, the Science Panel delivered Probable Link Findings for six human diseases ("Linked Diseases"). Mrs. Bartlett alleges that she suffered from kidney cancer and Mr. Wolf claims that he suffers from ulcerative colitis. Both of these human diseases are Linked Diseases. The Trial Plaintiffs and the other plaintiffs in the approximately 3500 cases in this MDL have alleged, *inter alia*, claims for personal injury and punitive damages.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The

burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234-35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

### III.

This Court has issued numerous decisions in this MDL. Some of the Dispositive Motions Orders ("DMOs") and Evidentiary Motions Orders ("EMOs") impact the instant analysis. To begin with, in DMO 3 the Court determined that Mrs. Bartlett's case will be tried under the law of Ohio, and that West Virginia law governs Mr. Wolf's claims. (DMO 3, Choice of Law; ECF No. 3551.)

**A. Standard for Punitive Damages**

Under Ohio law, punitive damages are recoverable in a tort action when compensatory damages have already been awarded and "the actions or omissions of th[e] defendant demonstrate malice or aggravated or egregious fraud." Ohio Rev. Code § 2315.21(C). An Ohio plaintiff bears the burden of establishing by clear and convincing evidence that he or she is

3

entitled to recover punitive damages. *Id.* § 2315.21(D)(4); *Charles R. Combs Trucking, Inc. v. Int'l Harvester Co.*, 12 Ohio St. 3d 241, 245 (1984). The "actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St. 3d 334, 336 (1987). The parties direct their arguments to the latter definition.

Similar to the standard under Ohio law, to sustain a claim for punitive damages under West Virginia law a plaintiff must show that the wrongful act was done "maliciously, wantonly, mischievously, or with criminal indifference to civil obligations." *Commonwealth Tire Co. v. Tri-State Tire Co.*, 193 S.E.2d 544, 549 (W. Va. 1972). The parties disagree as to whether West Virginia requires a clear and convincing or a preponderance of the evidence standard. West Virginia Senate Bill 421, which became effective June 8, 2015, sets the standard as clear and convincing. Mr. Wolf argues, however, that the statute is inapplicable to his claim because a statute that diminishes substantive rights is "not applied retroactively to events completed before the effective date of the statute . . . unless the statute provides explicitly for retroactive application." (Pls.' Mem. in Opp. at 34) (citing *Pub. Citizen, Inc. v. First Nat'l Bank in Fairmont*, 480 S.E.2d 538, 543-44 (W. Va. 1996) (citing cases)). Because the Court determines herein that even under the clear and convincing standard there are genuine issues of material fact as to whether the Trial Plaintiffs are entitled to punitive damages, it is unnecessary to resolve this dispute at this time. The parties may address the issue further when submitting their proposed jury instructions prior to Mr. Wolf's trial.

4

## B. Analysis

DuPont moves for summary judgment on the issue of punitive damages, arguing that "no reasonable jury could find that DuPont acted with the requisite mental state to warrant an award of punitive damages." (DuPont's Mot. for Summ. J. at 2.) To support its position, DuPont offers the following:

> As a matter of law, based on the undisputed facts, DuPont has not engaged in any conduct that would allow the imposition of punitive damages under Ohio or West Virginia's heightened standards, both of which require plaintiffs to show ***actual malice*** by a clear and convincing standard. Indeed, rather than any malice or disregard for safety, the evidence instead shows that DuPont exhibited a *proactive concern* for safety in its use of PFOA at its Washington Works plant, consistently going beyond the regulatory requirements and the typical conduct of most chemical companies. Among many other things, as shown below in this brief, in an effort to have a safe environment for its workers and the community, it is undisputed that DuPont:
>
> • Complied with all MSDS (material safety data sheets) and safe handling instructions received from the manufacturer and supplier of PFOA, 3M Company ("3M"), and timely acted upon other information supplied by 3M;
>
> • Took the initiative to independently study and gather information related to PFOA, notwithstanding the fact that it was not the manufacturer of the chemical, and no law or regulation required it to do so;
>
> • Proactively set extremely conservative guidance levels for exposure to PFOA that had safety factors 100s and 1,000 times below where adverse effects had been seen in animal studies, and that were far below the safe lifetime exposure levels that were subsequently set by [the American Conference of Governmental Industrial Hygienists ("ACGIH"), 3M and the West Virginia C-8 Assessment of Toxicity Team ("CATT");
>
> • Monitored personal and area PFOA exposure levels, blood levels, and the health of its workers who came into contact with PFOA, and added scrubbers and filters to reduce emissions to maintain the exposure levels below all the guidance exposure limits established for workers by ACGIH, 3M and DuPont;

- Monitored community exposure levels and kept community levels of exposure far below where any harm was expected based on the animal studies, and far below the much higher workplace exposures that had not been found to cause any disease in 3M workers or DuPont workers;

- Kept its employees (who lived in the community, with their families and friends) informed about the results of animal and other scientific studies on PFOA;

- Responded to and reasonably acted upon new information relating to PFOA as it was received;

- Pursued more precise, more sensitive, more selective and more accurate analytical methods for measuring trace levels of PFOA;

- Developed and adopted new measures and equipment to control PFOA emissions; and

- Communicated and worked with regulatory agencies to evaluate and voluntarily limit PFOA emissions and exposures.

In addition, the undisputed evidence shows that while taking the above steps, ***DuPont never believed that there was any probability that PFOA exposure at the extremely low levels found in drinking water around the Washington Works plant would cause human disease.***

(DuPont's Mot. for Summ. J. at 1–2.) DuPont relies upon evidence in the historical record, which spans decades and encompasses millions of documents, and the opinions of numerous defense expert witnesses to support the above-listed facts.

The Trial Plaintiffs respond that the facts set forth by DuPont are not undisputed, nor are the conclusions reached from consideration of those facts. The Trial Plaintiffs rely on the same historical record and numerous expert witness' opinions offered to support their position that a reasonable jury could conclude that the evidence clearly and convincing shows that DuPont's conduct was sufficiently egregious to warrant the imposition of punitive damages. This Court agrees.

The Trial Plaintiffs offer expert testimony that directly disputes much of the evidence upon which DuPont relies. The Court addressed the admissibility of these expert witnesses and the testimony they offer in EMO1, EMO 2 and EMO 3. (ECF Nos. 4079, 4129, 4178.) A review of those decisions leaves no doubt that the parties vigorously dispute what DuPont knew about the potential dangers of C-8 and when it knew it. By way of example, the Trial Plaintiffs offer admissible expert testimony of the following:

- DuPont knew about the nature, extent, and significance of C-8 and its concentration and hazards to its employees, the public, governmental agencies, and the environment and yet increased its release of C-8 from the Washington Works plant. (Steven Amter, B.S., M.S., Expert Report at ECF No. 2702-2; Dep. Tr. at ECF No. 3066-3.)

- DuPont discharged vast quantities of C-8 into the environment around the Washington Works plant resulting in contamination of area drinking water supplies and failed to disclose the contamination to regulators and those exposed to the contaminated drinking water, despite early (1950s and 1970s) concerns about 1) danger to groundwater, 2) environmental persistence, 3) toxicity and biopersistence, 4) landfilling, and 5) risks to employees. *Id.*

- Methods used by DuPont to measure the concentration of PFOA in water are not accurate and have led to reported levels of PFOA in drinking water supplies that are lower than the true value. (James S. Smith, Ph.D., CPC, Expert Report at ECF No. 3441-9; Dep. Tr. at ECF No. 2809-12.)

- DuPont was aware that the PFOA levels in drinking water were reported lower than the true concentration values, and DuPont had the knowledge and expertise to correct the discrepancy in the data. *Id.*

- DuPont's analytical sampling and analysis during the three decades of qualitative and quantitative analysis of PFOA for the health and safety of employees and the Washington Works plant community are questionable due to accuracy, precision, representativeness, completeness, and comparability concerns. DuPont's analysis led to the underestimation and underreporting of PFOA concentrations. *Id.*

- DuPont failed to adequately follow up on positive findings from animal studies and human epidemiology studies on C-8 risks/diseases. (Barry S. Levy, M.D., M.P.H., Expert Report at ECF No. 2702-4; Dep. Tr. at ECF No. 2809-7).

- DuPont misled government officials and the general public about the health and safety of C-8 and its presence in drinking water. *Id.*

- DuPont failed to adequately inform its employees and consumers of drinking water about the health risks of C-8. *Id.*

- DuPont violated established scientific standards in interpreting the results of C-8 health studies, manipulating its health standards and deviating from scientific principles. (Michael B. Siegel, M.D., M.P.H., Expert Report at ECF No. 2702-5; Dep. Tr. at 2809-10.)

This evidence disputes DuPont's claim that it "never believed that there was any probability that PFOA exposure at the extremely low levels found in drinking water around the Washington Works plant would cause human disease."

Further, the Trial Plaintiffs point to evidence that they contend shows that DuPont itself was aware that its conduct exhibited actual malice at least by 2000, fifteen years ago, when its in-house counsel handling the C-8 litigation addressed it in an email:

> We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives. Bernie [Reilly] and I have been unsuccessful in even engaging the clients in any meaningful discussion of the subject. Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical.

(Pls.' Mem. in Opp. at 3) (citing, *inter alia*, Plaintiffs' Third MSJ Aff. Ex. C, Tab 35 at 204; ECF No. 2820-4).

The Trial Plaintiffs additionally highlight evidence in the historical record regarding what they assert is a "deliberate, intentional corporate strategy to 'shape the debate at all levels,' [that was] aggressively pursued by DuPont" as reflected in a letter from one of DuPont's consulting firms, the Weinberg Group:

> The primary focus of this endeavor is to strive to create the climate and conditions

> that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. This would facilitate the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm. We would also lay the foundation for creating *Daubert* precedent to discourage additional lawsuits. . . . This battle must be won in the minds of the regulators, judges, potential jurors, and the plaintiff's bar. . . . Manufacturers must be the aggressors.

(Pls. Mem. in Opp. at 4–5) (citing Ex. H; ECF No. 3194-9). The proposal also included a plan to "construct[] a study to establish . . . that PFOA is safe," "illustrate how epidemiological association has little or nothing to do with individual causation" and "shape the *Daubert* standards in ways most beneficial" to DuPont. *Id.*

While DuPont denies that it accepted the proposals offered by the Weinberg Group, the Trial Plaintiffs contend that DuPont's actions belie its assertion. For example, DuPont offers the former senior Vice President of The Weinberg Group, Douglas L. Weed, M.D., M.P.H., Ph.D., as an expert witness who opines that the epidemiological association data on C-8 has little or nothing to do with individual causation.[1] The Trial Plaintiffs maintain that this is exactly what the Weinberg Group suggested in its proposal.

The very issue before this Court was addressed in a well-reasoned decision of a sister district court in another C-8 groundwater contamination case. In *Paulson v. 3M Co.*, No. 82-C2-04-6309, slip op. at 6-7 (Minn. Dist. Ct. Mar. 13, 2009), the defendant 3M moved for summary judgment on the plaintiffs' punitive damages claims. (Pls. Third Mot. for Summ. J., Ex. E; ECF No 2820-6.) Minnesota applies a clear and convincing standard to claims for punitive damages. In denying the defendant's motion, the Court stated:

> This Court notes that the parties have presented literally thousands of documents and exhibits to support their respective positions on the punitive damages claims. . . . Plaintiffs' evidence, if taken alone, would allow a reasonable fact finder to conclude Defendant had acted with deliberate disregard to Plaintiffs['] rights and/or safety. . . . Defendant staunchly defended its actions and provided a

---

[1] See EMO 1 for a discussion of the admissibility of Dr. Weed's testimony. (ECF No. 4079.)

9

detailed accounting of the efforts it has undertaken over the years to safeguard the public from possible contamination.

This Court cannot weigh these competing contentions and draw conclusions about the evidence, that is not the function of the Court on a motion for summary judgment. The Court is not prepared to conclude that no rational trier of fact could find for the Plaintiffs on their punitive damages claims.

*Id.* at 20–21.

Similarly, in the case *sub judice*, believing the Trial Plaintiff's evidence as true and drawing all justifiable inferences in their favor, a reasonable jury could find the evidence shows that DuPont knew that C-8 was harmful, that it purposefully manipulated or used inadequate scientific studies to support its position, and/or that it provided false information to the public about the dangers of C-8. If the jury came to those conclusions, it could reasonably find the evidence clearly and convincingly showed that DuPont's conscious disregard of the rights and safety of the *Leach* Class had a great probability of causing substantial harm and/or that its actions were done maliciously, wantonly, mischievously, or with criminal indifference to civil obligations. Consequently, there are genuine issues of material fact that prevent this Court from determining the punitive damages issue as a matter of law.

### IV.

Based on the foregoing, the Court **DENIES** Defendant's Motion for Partial Summary Judgment on Punitive Damages in the Bartlett and Wolf Cases. (ECF No. 2825.)

**IT IS SO ORDERED.**

8-19-2015
DATE

EDMUND A. SARGUS, JR.
CHIEF UNITED STATES DISTRICT JUDGE