UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

Civil Action 2:13-md-2433
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth P. Deavers

This document relates to:

*Bartlett v. E. I. du Pont de Nemours and Company*, Case No. 2:13-CV-0170

MOTIONS *IN LIMINE* ORDER NO. 3

Issues Related to the Tennant's Farm

This matter is before the Court on Defendant's Motion *in Limine* No. 15, To Exclude Any Statement or Suggestion that Cattle Disease or Cattle Deaths Have Been or Are Caused By C-8 (ECF No. 4073), and Plaintiff's Memorandum in Opposition (ECF No. 4158). For the reasons that follow, the Court **DENIES IN PART AND DENIES AS MOOT IN PART** Defendant's Motion.

I.

A. MDL

The litigation between the parties in this multidistrict litigation ("MDL") began in 2001 in a class action in West Virginia state court captioned *Leach v. E. I. du Pont de Nemours & Co.*, No. 01-C-698 (Wood County W. Va. Cir. Ct.) ("*Leach* Case"). The *Leach* Case ended in November 2004 when the parties entered into a class-wide settlement ("*Leach* Settlement Agreement"). ("S.A."; ECF No. 820-8.) Approximately 3,500 filed cases have been filed in

accordance with the *Leach* Settlement Agreement, which have been centralized in this MDL. The plaintiffs in this MDL all bring, inter alia, personal injury claims against Defendant E.I. du Pont de Nemours ("DuPont") for injuries they believe have been caused by their exposure to ammonium perfluorooctanoate ("C-8" or "PFOA") discharged from DuPont's Washington Works plant. Plaintiff Carla Marie Bartlett suffered from kidney cancer that she believes was caused by her exposure to C-8. Hers is the first case to be tried.

**B. Motion *in Limine***

In the early 1980s, DuPont purchased a portion of farm land from a local cattle rancher, Earl Tennant and his family. The Tennant's farm was located in Wood County, West Virginia, and ran adjacent to Dry Run Creek. DuPont utilized this land as an unlined landfill ("Dry Run Landfill"), in which it ultimately dumped 7,100 tons of sludge that was contaminated with, *inter alia*, C-8. On March 7, 1991, DuPont held an internal "C-8 Meeting" in which seven DuPont employees discussed several issues regarding C-8 including "[w]hat would be the effect of cows drinking water from the exit stream at Dry Run Landfill (100 ppb)?" (Pl.'s Mem. in Opp.; Ex. B to London Aff.; ECF No. 4158-3.)

In the late 1990s, Mr. Tennant and others contacted the United States Environmental Protection Agency ("EPA") about concerns of discharges from the Dry Run Landfill into the Dry Run Creek. Mr. Tennant had a herd of cattle that were dying and he believed that the discharges from the Dry Run Landfill could have been responsible. DuPont and the EPA each selected three veterinarians to be part of the "Cattle Team" to investigate the health of Mr. Tennant's herd of cattle. At the time the investigation began in 1999, Mr. Tennant had lost 176 cows and 200 calves, leaving 41 remaining herd animals. The Cattle Team unanimously concluded that the poor health of Mr. Tennant's cattle was the result of his "herd management practices," and that

2

"there was no evidence of toxicity associated with chemical contamination of the environment." (Report of Greg P. Sykes, VMD; ECF No. 2807-6.)

One of the veterinarians selected by DuPont was Gregory P. Sykes, VMD, a former DuPont scientist who had over a decade earlier analyzed C-8's carcinogenicity in rodents. Dr. Sykes is an expert witness for DuPont in the instant litigation. Dr. Sykes opines that the Cattle Team "thoroughly investigated the claim" that C-8 or other Dry Run Landfill chemicals were causing health problems in the Tennant herd, and that the Cattle Team found those claims to be unfounded. *Id.* at 2.

## II.

Neither the Federal Rules of Evidence nor the Federal Rules of Civil Procedure explicitly authorize a court to rule on an evidentiary motion *in limine*. The United States Supreme Court has noted, however, that the practice of ruling on such motions "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States,* 469 U.S. 38, 41 n. 4 (1984). The purpose of a motion *in limine* is to allow a court to rule on issues pertaining to evidence in advance of trial in order to avoid delay and ensure an evenhanded and expeditious trial. *See Ind. Ins. Co. v. Gen. Elec. Co.,* 326 F. Supp.2d 844, 846 (N.D. Ohio 2004) (citing *Jonasson v. Lutheran Child & Family Servs.,* 115 F.3d 436, 440 (7th Cir. 1997)). Notwithstanding this well-meaning purpose, courts are generally reluctant to grant broad exclusions of evidence *in limine*, because "a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Koch v. Koch Indus., Inc.,* 2 F. Supp.2d 1385, 1388 (D.Kan. 1998); *accord Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 712 (6th Cir. 1975).

3

To obtain the exclusion of evidence under such a motion, a party must prove that the evidence is clearly inadmissible on all potential grounds. *See Ind. Ins. Co.,* 326 F. Supp.2d at 846; *Koch,* 2 F.Supp.2d at 1388; *cf. Luce,* 469 U.S. at 41. "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Ind. Ins. Co.,* 326 F. Supp.2d at 846.

### III.

DuPont "requests that this Court preclude Trial Plaintiff Carla Bartlett, her witnesses, and/or her counsel from making any statement or suggestion at trial that C-8 has caused or causes cattle disease or cattle deaths." (DuPont's Mot. at 1.) DuPont argues that "any statement or suggestion that C-8 has caused or causes cattle disease or cattle death is unsupported and would be misleading to the jury and unfairly prejudicial to DuPont." *Id.* (citing Fed. R. Evid. 401, 402, 403). Specifically, DuPont contends that the evidence is not relevant because "[a]ny purported relationship between claims of cattle disease from exposure to various substances from a landfill is simply not of consequence to the issues in Mrs. Bartlett's case," and "the relevant time period in Mrs. Bartlett's case to determine whether DuPont's conduct was reasonable in light of any purported foreseeable risk of harm to community members from PFOA exposure is at least several years prior to the 1997 diagnosis and removal of her kidney cancer." *Id.* at 5–6.

Mrs. Bartlett responds that, first, she does not intend to offer evidence or make any suggestion that C-8 has caused or causes cattle disease or death in cattle. This portion of DuPont's Motion is therefore moot.

Second, Mrs. Bartlett contends that the purpose of the evidence she seeks to present regarding the cattle and the Cattle Team's investigation is:

> (1) to demonstrate that DuPont's response to claims of harm to the cattle and public concerns regarding the Dry Run Landfill through the Cattle Team investigation were unreasonable, were not designed to fully inform the public and scientists about the toxicity of C-8 or its presence in the environment, and were calculated to keep the issue of C-8's contamination in the water supply hidden; and (2) to rebut DuPont's claim that it has at all times acted "proactively" with regard to C8 and the public's safety, including during its communications with US EPA .

*Id.* at 5.

Mrs. Bartlett points out that the only information DuPont provided to the Cattle Team regarding C-8, according to Dr. Sykes, was a single page that listed several chemicals characterized as possibly being present in "*de minimus*" amounts at the Dry Run Landfill. (Sykes Dep. at 181; Ex. D, London Aff.; 4158-5.) Mrs. Bartlett argues that "[t]his characterization of C-8's presence at the Dry Run Landfill was a blatant falsehood." *Id.* at 4. Mrs. Bartlett maintains that this evidence is relevant and that it is not unfairly prejudicial, misleading, confusing, or a waste of time. Mrs. Bartlett's arguments are well taken.

This Court has denied motions *in limine* to exclude evidence post-dating an injury when it is relevant to the plaintiff's state law claim or is properly used for impeachment purposes. In *Musgrave v. Breg, Inc.*, No. 2:09-CV-01029, 2011 WL 4502032 (S.D. Ohio Sept 28, 2011), an element of the plaintiff's claim was the foreseeability of risk. The Court explained:

> [T]he Court finds that evidence created post-surgery may be relevant to show what Breg should have known at the time of manufacture and distribution, particularly if this evidence indicates that there was information available or information that was actually in possession of Breg during the time of manufacture and/or distribution of the pain pump at issue here. Consequently, the Court cannot say that all of the evidence created post-surgery is irrelevant.

*Id.* at *4.

Similarly, here the Court finds that the evidence offered by Mrs. Bartlett may be relevant to show that at the time the Cattle Team was investigating, DuPont failed to provide it with

5

information it possessed regarding C-8. A reasonable jury could infer that DuPont's action, failure to act, or concealment is inconsistent with its claim that it acted proactively at all times with regard to C-8.

## IV.

Based on the foregoing, the Court **DENIES IN PART AND DENIES AS MOOT IN PART** DuPont's Motion *in Limine* No. 15, To Exclude Any Statement or Suggestion that Cattle Disease or Cattle Deaths Have Been or Are Caused By C-8 in accordance with this Opinion and Order. (ECF No. 4073.) As with all *in limine* decisions, this ruling is subject to modification should the facts or circumstances at trial differ from that which has been presented in the pre-trial motion and memoranda.

**IT IS SO ORDERED.**

8-31-2015
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**

6