UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

Civil Action 2:13-md-2433
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth Preston Deavers

This document relates to:

*Bartlett v. E. I. du Pont de Nemours and
Company*, Case No. 2:13-CV-0170

## DISPOSITIVE MOTIONS ORDER NO. 9

### Defendant's Motion on Fraud and Emotional Distress

This matter is before the Court on Defendant's Motion for Partial Summary Judgment on Trial Plaintiff Carla Marie Bartlett's Fraud and Emotional Distress Claims (ECF No. 2815), Plaintiff's Memorandum in Opposition (ECF No. 3195), and Defendant's Reply (ECF No. 3559). For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion.

**I.**

The litigation between the parties in this multidistrict litigation ("MDL") began in 2001 in a class action in West Virginia state court captioned *Leach v. E. I. du Pont de Nemours & Co.*, No. 01-C-698 (Wood County W. Va. Cir. Ct.) ("*Leach* Case"). The *Leach* Case ended in 2005 when the parties finalized a class-wide settlement ("*Leach* Settlement Agreement"). ("S.A."; ECF No. 820-8.) In the *Leach* Settlement Agreement, the parties fashioned a unique procedure to determine whether the approximately 80,000 members of the class ("*Leach* Class") would be

permitted to file actions against Defendant E.I. du Pont de Nemours ("DuPont") based on any of the human diseases they believed had been caused by their exposure to ammonium perfluorooctanoate ("C-8" or "PFOA") discharged from DuPont's Washington Works plant. Approximately 3,500 filed cases were filed in accordance with the *Leach* Settlement Agreement and those actions are centralized in this MDL

    *Leach* Class member Carla Maris Bartlett suffered from kidney cancer that she believes was caused by her exposure to C-8. In Dispositive Motions Order No. 3 the Court determined that Ms. Bartlett's case will be tried under the law of Ohio. (DMO 3, Choice of Law; ECF No. 3551.) Among other claims, Ms. Bartlett has filed fraudulent misrepresentation and fraudulent concealment causes of action against DuPont, alleging that the company fraudulently misrepresented and concealed material information regarding C-8 from her with the intent to induce her to continue purchasing and ingesting water that DuPont knew was contaminated with dangerous levels of C-8. Ms. Bartlett highlights DuPont's representations that were made beginning in October 2000 with a letter to the Lubeck Water District that indicated that the C-8 levels found in the water were safe. She continues, citing the Court to numerous statements and press releases made by DuPont over the next decade in which it informed the public that C-8 was not harmful.

    Ms. Bartlett also alleges that DuPont intentionally and negligently inflicted emotional distress upon her, contending:

> Ms. Bartlett consumed tap water near DuPont's Washington Works facility for nearly her entire life. Specifically, Ms. Bartlett began consuming drinking water supplied by the Tuppers-Plains Chester Public Water District in Ohio ("Tuppers-Plains") in 1983. (*See* Expert Report of David L. MacIntosh ("MacIntosh Report") [ECF No. 2702-2] at 7.) She continued to consume water from Tuppers-Plains until 1989, and then again, beginning in 1993, up through the present. (*Id.*) During the period that Ms. Bartlett was consuming water from Tuppers-Plains prior to the finalization of the *Leach* Class Action Settlement Agreement in 2005

(the "Contract"), the concentration of C-8 in the Tuppers-Plains water ranged from 0.12-0.85 ppb - between approximately twice to over fifteen times higher than the 0.05 ppb C-8 concentration exposure threshold established under the parties' Contract for *Leach* Class Member status. (*See id.* at Attach 4.) Moreover, by 1996, when Ms. Bartlett was diagnosed with kidney cancer, she had been exposed to these elevated C8 drinking water concentration levels for six times longer than the one year durational requirement for *Leach* Class Member status that the parties had agreed to under the Contract. (*See id.* at 2-3; 6-8, Attach. 4.)

      As a result of her years of consuming the C-8-poisoned water that she was led to believe by DuPont was perfectly "safe," Ms. Bartlett eventually developed kidney cancer, a condition the independent "C-8 Science Panel" selected by the parties under their Contract found to have a "probable link" to *Leach* Class Member C-8 exposures. (*See e.g.,* Expert Report of Vitaly Margulis, M.D. [ECF No. 2811-4] ("Margulis Report"), at 7.) Ms. Bartlett explained that she did Margulis, M.D. [ECF No. 2811-4] ("Margulis Report"), at 7.)

(Pl.'s Mem. in Opp. at 14–15.)

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398

U.S. 144, 158-59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234-35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

### III.

In its current motion, DuPont moves for summary judgment on Ms. Bartlett's fraud claims and her emotional distress claims.

#### A. Fraud

In Ohio, the elements of a cause of action for fraudulent misrepresentation or concealment are (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with the knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. *Burr v. Bd. of Cnty. Comm'rs of Stark Cnty.*, 23 Ohio St. 3d 69, 73 (1986). "Where the alleged misrepresentation is . . . silence [*i.e.*, concealment], the silence will constitute a misrepresentation only if the circumstances are such that the law recognizes a duty to speak." *Schulman v. Wolske & Blue Co., L.P.A.*, 125 Ohio App. 3d 365, 372 (10th Dis. Ct. App. 1998). "The duty to speak does not depend on the existence of a fiduciary relationship between

4

the parties. It may arise in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence." *Cent. States Stamping Co. v. Terminal Equip. Co.*, 727 F.2d 1405, 1408 (6th Cir. 1984) (citing *Smith v. Patterson,* 33 Ohio St. 70, 75-76 (1877)).

DuPont argues, *inter alia*, that it is entitled to summary judgment because Ms. Bartlett offers no evidence that (1) DuPont ever made any representation to her, or was in a special relationship with her sufficient to create a duty to disclose, (2) the statements are material to the transaction at hand, or (3) that she relied on any statement or concealment.

### 1. Representation or Concealment

DuPont maintains that Ms. Bartlett cannot meet the first element of her fraud claim because "there is no evidence that DuPont ever made any representation to her." (DuPont's Mot. at 5.) Ms. Bartlett does not dispute that DuPont made no affirmative representation directly to her, and instead, contends that "DuPont's affirmative statements to the public regarding C-8 were material, false and misleading." (Pl.'s Mem. in Opp. at 23.) Affirmative statements to the public constitute a representation sufficient to meet this element of a fraudulent misrepresentation claim.

As to Ms. Bartlett's fraudulent concealment claim, she asserts:

First, DuPont had or assumed a duty to disclose material information regarding C-8, because it represented itself to be, and knew that Ms. Bartlett and similarly situated individuals would interpret DuPont to be, a definitive source of information regarding the true nature, characteristics, and dangers of C-8 and whether there was any reason to be concerned about any C-8 in their drinking water. Ms. Bartlett and other members of communities near the Washington Works plant placed their trust in DuPont, because of DuPont's unique position of knowledge regarding C-8, and DuPont knew (and intended) that such confidence was placed in it.

Second, DuPont had or assumed a duty to disclose because it knew but concealed the true nature, characteristics, extent, and dangers of C-8

5

contamination, despite knowing that the concealed information made its prior, contemporaneous, and future affirmative statements about C-8 false and misleading. . . .

(Pl.'s Mem. in Opp. at 24.)

DuPont replies that Ms. "Bartlett cites *no* authority for the proposition that a company can be liable for a fraudulent non-disclosure when, as here, the plaintiff and defendant are strangers. In *every case* cited by Plaintiff for the proposition that a non-disclosure can be the basis for a fraud claim, there was a clear and direct relationship between the parties." (DuPont's Reply at 6.) DuPont concludes that because there is no special relationship between it and Ms. Bartlett, Ohio law does not impose upon it any duty to speak. This Court agrees.

DuPont correctly highlights that Ohio courts find a duty to disclose only where there is special relationship of confidence between the parties. Every case upon which Ms. Bartlett relies reflects this principle. In *Baughman v. State Farm Mutual Automobile Insurance Company*, the court found a special relationship between State Farm and its insureds because the company's "business procedures clearly emphasize the creation of a 'good neighbor' relationship with insureds and 'trust' is a central theme of its business plan." No. 22204, 2005 WL 3556406, at *5 (9th Dist. Ohio Ct. App. Dec. 30, 2005) ("We are persuaded by evidence that State Farm markets itself as a trustworthy insurance agency upon which customers can rely to help them make the best decisions regarding their insurance policies. Moreover, State Farm instructs its agents to develop long-term trusting relationships with their policyholders and informs agents that they can develop these relationships through honesty, integrity and by looking out for their client's best interest.").

Similarly, in *Central States Stamping Company*, *supra*, the plaintiff was contemplating entering into a contract and contacted the potential counter-party's bank seeking assurances

6

directly from it that the potential counter-party had kept its financial commitments to the bank in the past. *Cent. States Stamping Co.*, 727 F.2d at 1407 (Sixth Circuit interpreting Ohio law). The bank Vice President assured the plaintiff that its borrower did keep its commitments despite its knowledge that its borrower was in default on two loans. The court held that given that the plaintiff was clearly relying on the bank's advice and the bank knew it, once the bank undertook to advise the plaintiff, it had a duty to disclose the borrower's true financial condition.

Finally, in *Miles v. Perpetual Savings & Loan Company*, the buyer of a house was informed by the seller's agent that the house was in "good, sound condition." 58 Ohio St.2d 97, 100. Prior to closing, the real estate broker learned that the house was, in fact, infested with termites but failed to notify the buyer that its representation had become subject to material qualification. Nondisclosure coupled with the hidden nature of the impairment, entitled the plaintiffs to rely upon the broker's prior representation with regard to the overall soundness of property and imposed a duty upon the broker to disclose to the buyer the existence of the termite infestation.

It is apparent that the nature of the relationships in these cases is qualitatively different from the nature of the relationship between DuPont and Ms. Bartlett. Consequently, even when believing all Ms. Bartlett's evidence, and drawing all justifiable inferences in her favor, she has failed to show any facts upon which the Court could find a special relationship with DuPont sufficient to create a duty to disclose. Accordingly, DuPont is entitled to summary judgment on her fraudulent concealment claim.

### 2. Materiality

DuPont contends that all of the affirmative statements about which Ms. Bartlett complains were not made until after 1997, which is the date she was diagnosed with kidney

cancer. Therefore, DuPont concludes that these statements are irrelevant to her claims.

However, Ms. Bartlett does not claim that she relied on these statements prior to her 1997

diagnosis, but instead suggests that the statements are relevant to the harm she suffered from her

continued consumption, from 1999 to 2012, of water contaminated with C-8. Thus, to the extent

that Ms. Bartlett relied upon these statements and they caused her harm, they are material.

### 3. Reliance

Ms. Bartlett argues that her continued consumption of water contaminated with C-8

shows justifiable reliance. She, however, offers no evidence of her reliance on any of DuPont's

representations. Indeed, Ms. Bartlett admits that she never read or heard anything from DuPont

about the water nor did she have any knowledge of whether DuPont ever made any

representations about C-8 or water quality. (Dep. at 164-165; ECF No. 3119-1.) Without

knowledge of the representations made by DuPont, she could not have relied upon them.

Consequently, Ms. Bartlett fails to raise any issue of material fact which if decided in her favor

would make a showing sufficient to establish the existence of this element of her fraud claim.

Accordingly, DuPont is entitled to summary judgment on her claim for fraudulent

misrepresentation.

### B. Intentional and/or Negligent Infliction of Emotional Distress

It is well accepted that intentional emotional distress claims "may entirely appropriately

be dealt with on summary judgment or in a motion to dismiss." *Miller v. Currie,* 50 F.3d 373,

377–78 (6th Cir. 1995); *Kurtz v. Harcourt Brace Jovanovich, Inc.*, 69 Ohio App.3d 267, 272 (8th

Dist. Ohio Ct. App. 1990). A claim for intentional infliction of emotional distress requires proof

> 1) that the actor either intended to cause emotional distress or knew or should
> have known that actions taken would result in serious emotional distress to the
> plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go
> beyond all possible bounds of decency and was such that it can be considered as

8

> utterly intolerable in a civilized community; 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that 'no reasonable man could be expected to endure it[.]

*Kovacs v. Bauer*, 118 Ohio App. 3d 591, 595 (8th Dist. Ohio Ct. App. 1996) (citations and quotation marks omitted). The last element requires emotional injury which is both severe and debilitating. *Paugh v. Hanks*, 451 6 Ohio St.3d 72, 78 (Ohio 1983) (citing *Schultz v. Barberton Glass Co.,* 4 Ohio St.3d 131 (1983) ("Serious emotional distress can be as severe and debilitating as physical injury and is no less deserving of redress.")). Further, "a non-exhaustive litany of some examples of serious emotional distress should include traumatically induced neurosis, psychosis, chronic depression, or phobia." *Id.* (citation omitted).

Ohio courts have also recognized a cause of action for negligent infliction of emotional distress based on "an increased fear of developing cancer," when the plaintiff was "aware that [s]he, in fact, possesses an increased statistical likelihood of developing cancer, and, from this knowledge, springs a reasonable apprehension which manifests itself as emotional distress." *Slane v. MetaMateria Partners, L.L.C.*, 176 Ohio App.3d 459, 467 (10th Dist. Ohio Ct. App. 2008) (citation omitted); *see also Cantrell v. GAF Corp.*, 999 F.2d 1007, 1012 (6th Cir. Ohio 1993) ("Cancerphobia is a claimed present injury consisting of mental anxiety and distress over contracting cancer in the future, as opposed to risk of cancer, which is a potential physical predisposition of developing cancer in the future.") (quoting *Lavelle v. Owens–Corning Fiberglas Corp.*, 30 Ohio Misc.2d 11 (1987)).

Ms. Bartlett contends, *inter alia*, that her emotional distress is severe and debilitating. To support her position

> Ms. Bartlett explained that she did not suffer from anxiety before she learned she had kidney cancer. (*Id.* at 80:23-81:8.) When the doctor first told Ms. Bartlett she had cancer, she was afraid and "scared to death," because she "had a little

9

baby . . . and . . . a stepson." (*Id.* at 86:22-87:1.) Because of the cancer, Ms. Bartlett faced the terrifying prospect of surgery:

> I remember being so afraid that I was going to die. I remember telling my husband to make sure that both of the boys knew that I loved them . . . I recall being scared that I might not (sic) never see my children again, I might never come home again. (*Id.* at 92:19- 93:6.)

Ms. Bartlett's surgery, which involved cutting out a part of her kidney, left her with a 13-inch scar. (*Id.* at 89:12-13.) The surgery was very painful and Ms. Bartlett endured a six-month recovery during which she lived with severe pain and discomfort and could not lift her newborn son. (*See* Aff. Ex. GG at 8 (Ms. Bartlett's responses to Interrogatory No. 8).) Ms. Bartlett's treating doctor and surgeon, Robert Bahnson, M.D., confirmed that the surgeon removed part of her rib, which increased her pain. (*See* Dep, Tr. of Robert R. Bahnson, M.D. [ECF No. 3119-2] ("Bahnson Fact Depo.") at 31:6-32:1.)

. . . .

In sum, Ms. Bartlett must live every day of the rest of her life with the fear of a cancer diagnosis at a risk greater than the general populace both because of the cancer *and* her exposure to C-8.

Although she has not been formally diagnosed with depression, Ms. Bartlett receives care from a doctor for her depression and takes generic medication to treat it. (*See* Bartlett Dep. at 112:22-114:11; *see also* Aff. Ex. GG at 8 (Ms. Bartlett's response to Interrogatory No. 8) (confirming continued mild pain and discomfort and decreased kidney function).) She is not aware of any cause for her depression other than the cancer: "[E]very day you worry and you're afraid that the cancer is going to come back." (*Id.* at 114:6-8.) Ms. Bartlett further testified that the cancer affects her life to this day, because she looks "at the 13-inch scar every day of my life and it's there as a reminder every day that I had kidney cancer, and you know, it could come back." (*Id.* at 121:16-122:1.) Ms. Bartlett would not be living with this physical reminder and fear had it not been for the kidney cancer. Additionally, Ms. Bartlett's father died in 1998 as a result of kidney and pancreatic cancer—only one year after Ms. Bartlett's kidney cancer surgery. (*Id.* at 134:8-21.)

The cancer has also affected Ms. Bartlett's life through weight gain as a result of the depression triggered by her cancer. (*Id.* at 117:14-118:12.) Notably, Dr. Margulis also has opined that mental suffering is attributed to being diagnosed with cancer and recovering from cancer surgery, and Ms. Bartlett can expect to endure mental suffering for this reason. (*See* Margulis Dep. at 110:16-111:3.); Margulis Report at 7 (Dr. Margulis opines that the kidney cancer has caused emotional distress and concludes that "as a result of her kidney cancer . . . (Ms. Bartlett) has suffered from both depression and weight gain").) Ms. Bartlett also explained that she cannot garden, because it causes too much pain at the site of her surgery scar, although she was previously an avid gardener. (*See* Bartlett

10

> Dep. at 124:1-125:12.) The surgery also limits her walking and working around the house. (*See* Aff. Ex. GG (Ms. Bartlett's response to Interrogatory No. 8).) Ms. Bartlett must live with depression, a 13-inch surgical scar, surgical pain, and the memory of the cancer-related death of her father as constant reminders of her cancer and a lifelong risk of it returning.

(Pl.'s Mem. in Opp. at 15–18. )

The Court finds that when accepting all of Ms. Bartlett's evidence as true and drawing all justifiable inferences in her favor, the evidence fails to constitute severe and debilitating injury under Ohio law regarding intentional infliction of emotional harm. Fear that her cancer will return, pain at her surgery scar, weight gain, inability to engage in gardening, and seeking help for depression thirteen years after her cancer surgery are insufficient to meet the high standard required under Ohio law. *See e.g. Lafferty v. Coopers & Lybrand*, 841 F.2d 1126 (6th Cir. 1988) (finding insufficient "severe stress," the symptoms of which included headaches, stomach problems, and weight loss; seeing psychiatrist who was also a social friend on six occasions; consulting a physician, who prescribed medication that plaintiff believes were a tranquilizer and a stomach relaxant); *Jones v. Washington*, 67 Ohio App.3d 176 (6th Dist. Ohio Ct. App. 1990) (recurring nightmares did not constitute showing of sufficient psychic injury); *McCarthy v. Cleveland Hts.*, 65 Ohio App.3d 216 (8th Dist. Ohio Ct. App. 1989) (depression requiring psychological counseling not sufficiently severe); *Lynn v. Allied Corp.*, 41 Ohio App.3d 392 (8th Dist. Ohio Ct. App. 1987) (distraught and hysterical feelings, crying, and elevated blood pressure not sufficiently serious). Accordingly, DuPont's is entitled to summary judgment on Ms. Bartlett's claim for intentional infliction of emotional distress.

However, this same evidence presented by Ms. Bartlett does raise genuine issues of material fact regarding her negligent infliction of emotional distress claim. In that regard, DuPont argues that Ms. Bartlett "offers no evidence that she is at an increased statistical

likelihood of a recurrence of her cancer, or that her claimed emotional distress flows from her

awareness of any increased likelihood." (DuPont's Reply at 12.)  This Court, however,

disagrees.

Plaintiff offers the following to support her contention that she suffered from an

increased fear of developing cancer:

> Ms. Bartlett was told to keep a close eye on the kidney, because she was told there
> is always a chance it can come back. (*See* Bartlett Dep. at 97:15-19.)  For ten
> years, Ms. Bartlett had to undergo annual ultrasounds of the kidney and bi-annual
> chest x-rays, because she was at an increased risk of cancer in her chest. (*Id.* at
> 97:1-10, 101:7-9.)  Her treating doctors also have recommended that she undergo
> bi-annual ultrasounds of the kidney and occasional chest x-rays. (*Id.* at 102:4-16.)
>
> Along these lines, Dr. Bahnson confirmed that Ms. Bartlett "needs life-
> long monitoring" and discharged her from care only so she could have a doctor
> closer to her home. (*See* Dep. Tr. of Robert R. Bahnson. M.D. [ECF No. 2809-1]
> ("Bahnson Expert Dep.") at 14:14-20.)  Dr. Margulis similarly concluded that Ms.
> Bartlett remains at an increased risk for developing renal cell cancer and other
> cancer and that she will continue to need CT scans and/or MRIs her entire life,
> because someone may have a recurrence of kidney cancer even twenty years after
> the initial diagnosis. (*See* Dep. Tr. of Vitaly Margulis, M.D. [ECF No. 3066-1]
> ("Margulis Dep.") at 105:7-24.)  Consistent with this lifelong monitoring, no
> doctor has said that there will be a day when Ms. Bartlett will no longer have an
> increased risk of cancer recurrence.  Ms. Bartlett will, therefore, never be fully
> cured of cancer.  Dr. Bahnson also confirmed that Ms. Bartlett should receive
> more treatment because of her C-8 exposure. (*See* Bahnson Expert Dep. at 95:7-
> 96:1.)  Dr. Margulis similarly concluded that the rest of Ms. Bartlett's kidneys are
> at risk of development of subsequent cancer due to the C-8 exposure. (*See*
> Margulis Dep. at 105:21-24.)  In sum, Ms. Bartlett must live every day of the rest
> of her life with the fear of a cancer diagnosis at a risk greater than the general
> populace both because of the cancer and her exposure to C-8.

(Pl.'s Mem. in Opp. at 16 – 17.)

From this evidence, a reasonable jury could find that Ms. Bartlett was "aware that [s]he,

in fact, possesses an increased statistical likelihood of developing cancer, and, from this

knowledge, spring[] a reasonable apprehension which manifests itself as emotional distress."

Therefore, the Court finds that DuPont is entitled to summary judgment on Ms. Bartlett's

intentional infliction of emotional distress claim. Her negligent infliction of emotional distress claim, however, survives DuPont's Motion.

## IV.

In accordance with this Opinion and Order, the Court **GRANTS IN PART AND DENIES IN PART** DuPont's Motion for Partial Summary Judgment on Trial Plaintiff Carla Marie Bartlett's Fraud and Emotional Distress Claims. (ECF No. 2815.) Specifically, the Court **GRANTS** DuPont's Motion as it relates to Ms. Bartlett's fraud claims and her claim of intentional infliction of emotional distress and **DENIES** the Motion as it relates to her claim for negligent infliction of emotional distress.

**IT IS SO ORDERED.**

___9 - 2 - 2015___
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**