UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

:   Civil Action 2:13-md-2433
    CHIEF JUDGE EDMUND A. SARGUS, JR.
    Magistrate Judge Elizabeth Preston Deavers

This document relates to:

*Bartlett v. E. I. du Pont de Nemours and Company*, Case No. 2:13-CV-0170

## DISPOSITIVE MOTIONS ORDER NO. 11

### Defendant's Motion for Judgment as a Matter of Law on Punitive Damages

This matter is before the Court on Defendant's Motion for Judgment as a Matter of Law on Carla Marie Bartlett's Claims ("Rule 50 Motion") (ECF No. 4227), Plaintiffs' Memorandum in Opposition (ECF No. 4229), and DuPont's Reply Brief (ECF No. 4230). For the reasons that follow, the Court **DENIES** Defendant's Motion.

### I.

Mrs. Bartlett alleges that she is a member of the class ("*Leach* Class") of individuals who are permitted under a contractual agreement ("*Leach* Settlement Agreement") to file claims against Defendant E. I. du Pont de Nemours and Company ("DuPont") based on injuries that they believe were caused by their exposure to ammonium perfluorooctanoate ("C-8" or "PFOA") discharged from DuPont's Washington Works plant. (*Leach* Settlement Agreement; ECF No. 820-8.) The *Leach* Settlement Agreement established a panel of appropriately credentialed epidemiologists ("Science Panel") to study whether there was a link between the human diseases

among the *Leach* Class and their consumption of the drinking water that had been contaminated with C-8. *Id.* §§ 12.2.1, 12.2.2. In 2011 and 2012, the Science Panel delivered Probable Link Findings for six human diseases ("Linked Diseases"). Mrs. Bartlett alleges that she suffered from kidney cancer, which is one of the Linked Diseases.

Mrs. Bartlett and the other plaintiffs in the approximately 3500 cases in this multidistrict litigation ("MDL") have alleged, *inter alia*, claims for personal injury and punitive damages. Mrs. Bartlett's trial began on September 14, 2015, and is the first bellwether trial in this MDL. DuPont had previously moved for summary judgment on all of the claims brought by Mrs. Bartlett. (ECF Nos. 3973, 4113, 4185, 4211.) Her claims for negligence, battery, negligent infliction of emotional distress, and punitive damages survived DuPont's motions. At the close of testimony on September 24, 2015, DuPont moved for judgment as a matter of law on all of these claims and objected to Mrs. Bartlett's counsels' questioning of the witnesses "about DuPont's alleged failure to disclose" information about the harmful effects of C-8 because it is "is irrelevant and prejudicial, and it underscores Plaintiff's lack of faith in her own case." (DuPont's Rule 50 Mot. at 1.) DuPont provided the Court with a written motion that has since been filed.

The Court recessed to review DuPont's Rule 50 Motion. The Court then reconvened and took oral argument on the Motion. From the bench the Court denied DuPont's Motion as it related to Mrs. Bartlett's negligence, battery, and emotional distress claims. The Court indicated that there had been no change in the evidence offered since it had issued its decisions on summary judgment with regard to those claims. That is, Mrs. Bartlett presented evidence that raised genuine issues of material fact as to each of these claims at the summary judgment juncture and has now done the same at trial.

2

The Court held in abeyance its decision on the punitive damages claim until the parties' briefed the issue. On September 26, 2015, Mrs. Bartlett filed her memorandum in opposition to the punitive damages portion of DuPont's Rule 50 Motion and on September 27, 2015, DuPont filed its reply brief.

## II.

Under Rule 50 of the Federal Rule of Civil Procedure, if a party has been "fully heard on an issue" and the trial court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (a) resolve the issue against the party; and (b) grant a motion for judgment as a matter of law on any claim that is dependent upon that issue. Fed. R. Civ. P. 50(a)(1). The inquiry for resolving a motion for judgment as a matter of law pursuant to Rule 50 is the same as the inquiry for resolving a motion for summary judgment pursuant to Rule 56. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 789, 794 (6th Cir. 2004). Evidence is viewed in the light most favorable to the nonmoving party and the court must determine if there is a genuine issue of material fact for the jury. *White*, 364 F.3d at 794. "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted).

## III.

DuPont posits that Mrs. Bartlett has been fully heard on her case and judgment as a matter of law is warranted because there is no legally sufficient evidentiary basis for a jury to find for her on her claim of punitive damages.

### A. Punitive Damages Standard

As this Court stated in Dispositive Motions Order No. 7 ("DMO 7"), under Ohio law punitive damages are recoverable in a tort action when compensatory damages have already been awarded and "the actions or omissions of th[e] defendant demonstrate malice or aggravated or egregious fraud." (ECF No. 4185) (quoting Ohio Rev. Code § 2315.21(C)). An Ohio plaintiff bears the burden of establishing by clear and convincing evidence that he or she is entitled to recover punitive damages. *Id.* § 2315.21(D)(4); *Charles R. Combs Trucking, Inc. v. Int'l Harvester Co.*, 12 Ohio St. 3d 241, 245 (1984). The Ohio Supreme Court established the punitive damages standard in *Preston v. Murty*:

> We therefore hold that actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

32 Ohio St. 3d 334, 336 (1987). The parties in the instant action direct their arguments to the latter definition.

The Preston court also directed that

> before submitting the issue of punitive damages to the jury, a trial court must review the evidence to determine if reasonable minds can differ as to whether the party was aware his or her act had a great probability of causing substantial harm. Furthermore, the court must determine that sufficient evidence is presented revealing that the party consciously disregarded the injured party's rights or safety. If submitted to the jury, the trial court should give an instruction in accordance with the law we announce today.

*Id.*

### B. Analysis

DuPont contends that it is entitled to judgment as a matter of law because

> [a]t the conclusion of her case, Plaintiff has submitted no evidence (much less clear and convincing evidence) that DuPont acted with the requisite malice by showing a conscious disregard for Plaintiff's health and safety, and that DuPont

4

> knew there was "near certainty" of substantial harm. Indeed, all of the evidence demonstrates that DuPont regularly and diligently analyzed the potential health impacts of C-8 for decades and, on the basis of this careful evaluation, DuPont never believed that the low levels of C-8 observed in the community were likely to cause *any harm*.

(DuPont's Rule 50 Mot. at 4.) This Court, however, disagrees.

First, DuPont points out that in her opposition memorandum "Mrs. Bartlett fails to address, much less mention, the 'near certainty' test applied by the Ohio Supreme Court and by district courts in this Circuit when evaluating demands for punitive damages." (DuPont's Reply at 1) (emphasis removed). In its Rule 50 Motion, DuPont set out this standard as follows:

> "For punitive damages to be appropriate . . . [s]ubstantial harm must be a near certain consequence of the defendant's actions." *Terek v. Finkbiner*, 2015 U.S. Dist. LEXIS 124939, at *6 (N.D. Ohio Sept. 18, 2015) (emphasis added) (citing *Motorists Mut. Inc. Co. v. Said*, 590 N.E.2d 1228 (Ohio 1992)); *see also Kuebler v. Gemini Transp.*, 2013 U.S. Dist. LEXIS 172769, at *12 (S.D. Ohio Dec. 9, 2013) (actual malice "requires consciousness of the near certainty [] that substantial harm will be caused by the tortious behavior").

(DuPont's Rule 50 Mot. at 4.)

In reviewing the test first set forth in *Preston v. Murty*, the Ohio Supreme Court has indicated that "near certainty" and "great probability" are simply two ways of articulating the same concept. *Motorists Mut. Inc. Co. v. Said*, 63 Ohio St. 3d at 696 ("malice requires consciousness of the near certainty, or otherwise stated 'great probability,' that substantial harm will be caused by the tortious behavior"). Thus, the Court finds no improper avoidance of the applicable standard in Mrs. Bartlett's memorandum in opposition by referring to only to the phrase "great probability" instead of "near certainty."

Second, DuPont contends that Mrs. Bartlett is attempting to breathe life into a failure to disclose cause of action that this Court dismissed on summary judgment. The Court disagrees

5

with this assessment. As this Court has explained when evaluating punitive damages claims under Ohio law:

> The Ohio Supreme Court has also noted that "it is rarely possible to prove actual malice otherwise than by conduct and surrounding circumstances." *Villella v. Waikem Motors, Inc.*, 45 Ohio St. 3d 36, 543 N.E.2d 464, 466–67 (Ohio 1989) (citing *Davis v. Tunison*, 168 Ohio St. 471, 155 N.E.2d 904, 907 (Ohio 1959), overruled on other grounds in *Moskovitz v. Mt. Sinai Medical Center*, 69 Ohio St. 3d 638, 1994 Ohio 324, 635 N.E.2d 331 (Ohio 1994)).
>
> "[A]ctual malice may be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross." *Id.* at 467 [(citing *Columbus Finance, Inc. v. Howard*, 42 Ohio St. 2d 178, 184 (1975); Rubeck v. Huffman, 54 Ohio St. 2d 20, 23 (1978))].

*Pullins v. Klimley*, Case No. 3:05-CV-082, Fed. Sec. L. Rep. (CCH) P94, 551, 2008 U.S. Dist. LEXIS 3467, at *116 (S.D. Ohio Jan. 7, 2008). Thus, the evidence related to DuPont's possession of information that it chose not to disseminate to the public or to disseminate in limited fora while simultaneously depositing C-8 into drinking water sources informs the "actual malice" determination the jury must make.

Third, with regard to the evidence that Mrs. Bartlett has offered to support her punitive damages claim, it is generally the same evidence that this Court found raised genuine issues of material fact necessitating submission of the claim to the jury. (DMO 7 at 7–8.) Initially, the Court notes that it is undisputed that DuPont discharged C-8 into the environment around the Washington Works plant, including into the Ohio River, resulting in the contamination of area drinking water supplies. (*See* Sept. 23, 2015 Tr. at 33:7-22; 40:11-15 (Dr. Petty testified that DuPont was dumping tens of thousands of pounds C-8 into the Ohio River); 48:5-12: (DuPont was discharging more than 80 percent of its C-8 input back into the environment); P1.13001 (charts demonstrating increasing C-8 emissions into the environment between 1951 and 2000)).

6

DuPont also admits that it knows of no other source of C-8 that contributed to the contamination of Mrs. Bartlett's drinking water. (Sept. 28, 2015 Tr. Admission Read Into Record.)

At trial, Mrs. Bartlett offered evidence that DuPont released the C-8 into the Ohio River, despite its own internal 1991 memorandum that stated that C-8 should not be discharged to surface water, (P1.925.6; Sept. 23, 2015 Tr. at 116:21-117:4), and a 1986 warning by the 3M Company, the manufacturer of the C-8, that C-8 should only be disposed of through incineration at a specially designated, properly lined, landfill for hazardous chemicals, (D265; Sept. 16, 2015 Tr. at 2-40:15 to 2-41:1; *see also* Sept. 23, 2015 Tr. at 7-110:1-5 (Mrs. Bartlett's expert witness Stephen E. Petty, P.E., C.I.H., C.S.P.[1] testified that from an industrial hygiene standpoint and environmental risk assessment standpoint, DuPont should have followed 3M's recommendation). That warning from 3M Company came on the second page of a 2-page Material Safety Data Sheet ("MSDS"), which is a formal document that is required by the United States Occupational Safety and Health Administration that contains information about the characteristics and actual or potential hazards of exposure to chemicals, or other potentially dangerous substances, and information on safe working procedures when handling chemical products, storage, disposal, and how to respond effectively to exposure situations. *MSDS*, Business Dictionary.com, http://www. businessdictionary.com/ definition/material-safety-data-sheet-MSDS.html#ixzz3n7xpOnz5. (P1.823.21.) DuPont did not dispose of the C-8 in either of the two recommended manners and instead released the C-8 into surface waters, unlined landfills, and the air in ever increasing amounts. (Sept. 16, 2015 Tr. at 2-57:21-24.) Dr. Petty testified that to properly incinerate C-8 would only have cost less than 0.2 percent of the Washington Works' annual operating cost. *Id.* at 7-96:5-23. DuPont provided information to the West

---

[1] Mr. Petty is a chemical engineer with experience in industrial health and safety, forensic engineering, and environmental engineering. Mr. Petty is a Certified Professional Engineer, a Certified Industrial Hygienist, and a Certified Safety Professional.

Virginia environmental regulators about C-8 by providing them with only the first page of the MSDS. The information on safe disposal was on the second page of the MSDS that DuPont did not provide to the regulators. (P1.823.21; Sept. 18, 2015 Tr. 4-205:9-16.)

Mrs. Bartlett highlights in her opposition memorandum, some of the additional evidence presented at trial that she contends supports her punitive damages claim as follows:

- DuPont was aware of C-8's toxicity as early as the 1950s. (*See, e.g.*, P1.309; P1.513; P1.567; P1.568; Sept. 16, 2015 Tr. at 2-35:12 to 2-36:23.)

- In the 1960s, DuPont had knowledge that C-8 was toxic and had adverse liver effects in dogs and rats. (*See, e.g.*, P1.567; P1-568; Sept. 16, 2015 Tr. at 2-53:17-22.)

- By 1966, DuPont was aware that C-8 could leach into groundwater, (*see, e.g.*, Sept. 23, 2015 Tr. 125:24-126:10), and by 1991 was aware that groundwater monitoring outside the unlined landfill it was using to dispose of C-8 were showing high concentrations of C-8 meaning that C-8 had escaped the landfill and was in the groundwater, (*see, e.g.*, Sept. 23, 2015 Tr. 125:7-23.)

- In 1978, an article authored by DuPont's Medical Director, Dr. Bruce Karrh, was published in which Dr. Karrh acknowledged that DuPont has a duty to report potential health hazards related to the materials it handles at its manufacturing facilities. (P1.8016.)

- In 1978, DuPont initiated a program measuring C-8 levels in the blood of workers potentially exposed to C-8, and assessing potential health effects that may be correlated with C-8 exposure. (*See, e.g.*, P1.8016.) DuPont tested its own workers while ignoring risks to the community. (*See, e.g.*, Sept. 16, 2015 Tr. at 2-89:25 to 2-90:5.)

- DuPont established an Acceptable Exposure Limits ("AEL") Committee, consisting of those who DuPont considers to be experts in toxicology, industrial hygiene, occupational medicine, pathology, and epidemiology, which assists in DuPont's efforts to perform continuing risk analysis of chemicals used by DuPont at its facilities, such as C-8. (*See, e.g.*, P1.359; P1.353(C).)

- By 1979, DuPont set a provisional AEL for C-8 at 0.01 mg/m3. (*See, e.g.*, P1.359) Also in 1979, DuPont conducted a study which concluded that monkeys died when subjected to a 30 mg/kg day dosage of C-8. (*See, e.g.*, Sept. 16, 2015 Tr. at 2-159:24 to 2-160-3.)

8

- By 1980, DuPont was aware that fluorides were detected in the blood of its own employees. (*See, e.g.*, P1.420; P1.360.) Despite this knowledge, DuPont did not notify the surrounding communities of the dangers associated with C-8. (*See, e.g.*, Sept. 16, 2015 Tr. at 2-74:1-15.)

- In 1982, DuPont was aware that C-8 is bioaccumulative and "is retained in the blood for a long time," (P1.363), and cautioned its employees about donating blood, (*see, e.g.*, Sept. 16, 2015 Tr. at 2-80:1-9.)

- In 1982, DuPont was aware that C-8 was being emitted into the local community and Ohio River from its plant emissions, with DuPont's own Medical Director writing that "[t]here is obviously great potential for current or future exposure of members of the local community from emissions leaving the Plant perimeter" and that all "available practical steps be taken to reduce this exposure." (P1.1.363; *see e.g.,* also (P1.3183.2 (DuPont Medical Director noting "need to continue to pursue those programs aimed at reducing the public exposure to C-8 as vigorously as we can" in June 1987).)

- By 1984, DuPont was aware that C-8 was present in local drinking water supplies, (*see, e.g.*, Sept. 16, 2015 Tr. at 2-86:10-11), and, during a DuPont C-8 meeting in Wilmington in May 1984, "there was consensus reached that the issue which will decide future action is one of corporate image, and corporate liability . . . as we are already liable for the past 32 years of operation," (P1.366).

- In 1986, DuPont was specifically warned by 3M that C-8 should only be disposed of through incineration or disposal at a proper landfill, which means that disposal into water bodies is not a proper disposal method. (D265; Sept. 16, 2015 Tr. at 2-40:15 to 2-41:1.)

- DuPont was aware of the biopersistence of C-8 as early as 1984. (*See, e.g.*, Sept. 16, 2015 Tr. at 2-85:25-2 to 2-86:1.)

- Although DuPont was aware of replacement technologies that could have reduced or even eliminated emissions of C-8 into the environment by 1984, DuPont did not do so in order to save money. (*See, e.g.*, Sept. 23, 2015 Tr. 131:18; 136:20-137:5; 147:25-148:2.)

- According to Plaintiff's expert, [Michael B. Siegel, M.D., M.P.H.],[2] "[DuPont] had evidence of a substantial risk to the community" by 1984. (Sept. 17, 2015 Tr. at 3-30:5-6.) Dr. Siegel also testified that, even though DuPont conducted its own studies regarding the toxicity of C-8, DuPont "didn't communicate [the results]" and "[w]hen they found out that there were substantial hazards, they didn't communicate that to the public. (Sept. 17, 2015 Tr. at 3-76:6-10.)

---

[2] Dr. Siegel is an epidemiologist, public health specialist, and medical doctor.

- In 1986 DuPont was warned that C-8 should only be disposed of through incineration or disposal at a proper landfill, (*see, e.g.*, D265; 2-40:15 to 2-41:1), but DuPont chose not to dispose of C-8 in either of these recommended manners, (*see, e.g.*, Sept. 16, 2015 Tr. at 2-57:21-24), even though there was "no reason it couldn't have been applied to [the C-8] waste stream in that time frame" (Sept. 23, 2015 Tr. 47:14-21).

- On October 20, 1986, a DuPont employee noted that "Wilmington management is concerned about the possible liability resulting from long-term C-8 exposure to its employees and to the population in the surrounding communities those down-river from the [Washington Works] plant.'" (P1.823.)

- By July 1987, DuPont recognized the need to establish "maximum safe C-8 in blood and C-8 in drinking water levels" and that, "once a safe level is established, those personnel exceeding 50% of this level will be required to be removed from the exposure area." (Sept. 23, 2015 Tr. 7-59:6 to 7-61:5.)

- In 1988, DuPont recognized C-8 as a "small c" or possible human carcinogen and recommended a Community Exposure Guideline ("CEG") for C-8 of 1 ppb in community drinking water. (*See, e.g.*, P1.372.) Despite DuPont's knowledge that C-8 was a possible carcinogen, DuPont failed to notify regulatory agencies or the community. (*See, e.g.*, Sept. 16 Tr. at 2-60:3-10, 2-65:11-18, 2-86:6-8.)

- In 1989 DuPont was aware of excess kidney and other urinary cancers among its Washington Works employees. (*See, e.g.*, P1.2538.2.)

- Despite being aware of the presence of C-8 in public drinking water supplies as early as 1984, DuPont never publicly disclosed the contamination to area water consumers, through at least 1991, even though it had prepared standby press releases that were drafted to inform the public about the contamination. (*See, e.g.*, P1.519.)

- DuPont understood that persons exposed to C-8 would be accumulating C-8 in their blood, (*see, e.g.*, Sept. 26, 2015 Tr. at 2-28:23 to 2-29:16), and, in 1992, was concerned that "toxicity issues associated with C-8 exposure could turn it into the #1 DuPont torte [sic] issue," (P1.8276.2).

- By 1988, certain DuPont employees possessed data indicating that the total number of observed and expected cancer cases from 1956 through 1983 among DuPont's Washington Works plant male employees indicated observed levels of both kidney and testicular cancer cases among such employees that were higher than what DuPont characterized as "expected" for such employees. (P1.2538.)

- In 1991, DuPont knew it exceeded its own standards for C-8 in drinking water in samples taken from the Lubeck Public Water District but did not advise those actually drinking the water of such information. (*See, e.g.*, P1.1517.)

- In 1995, an internal DuPont documents states: "We are concerned about the potential long-term human health effects of these materials considering they all appear to have long biological half lives." (*See, e.g.*, P1.2094.)

- By 1999, DuPont was aware that acute C-8 exposure had adverse human health effects via ingestion, inhalation or dermal contact and communicated this to its employees. (P1.320; P1.360.)

- In November 2000, DuPont's in-house counsel handling C-8 litigation matters, John Bowman, sent an email to DuPont's General Counsel stating: "Getting out in front and acting responsibly can undercut and reduce the potential for punitives. Bernie and I have been unsuccessful in even engaging the clients in any meaningful discussion on the subject. Our story is not a good one, we continue to increase our emission into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical." (P1.176.)

- In November 2000, Mr. Bowman stated "we need to make more of an effort to get the business to look into what we can do to get the Lubeck community a clean source of water or filter the C-8 out of the water." (P1.176.)

- In 2001, DuPont's in-house counsel handling C-8 environmental matters, Bernard Reilly, states in an email: "We also have learned that not only do we have people drinking our famous surfactant, but levels in the ambient air above our guidelines . . . we should have checked this years ago and take steps to remedy." (P1.5368.)

- Mr. Reilly also confirmed in 2001 that "our analytical technique [for measuring C-8 in water] has very poor recovery, often 25%, so any results we get should be multiplied by a factor of 4 or 5. However, that has not been the practice, so we have been telling the agencies results that surely are low. Not a pretty situation, especially since we have been telling the drinking water folks not to worry, results have been under the level we deem 'safe' of 1 ppb." (P1.17.) On this same issue, Mr. Reilly also stated in 2001 "we are exceeding the levels we say we set as our own guideline, mostly because no one bothered to do the air modeling until now, and our water test has [been] completely inadequate …. I have been telling the business to get out all the bad news . . . . Too bad the business wants to hunker down as though everything will not come out in the litigation, god knows how they could be so clueless . . . ." (P1.93.)

- In 2003, despite DuPont's knowledge of the dangers associated with C-8, DuPont adopted a C-8 Communications Plan that would "not raise awareness/concerns where there are none." (P1.5053.)

11

Case: 2:13-md-02433-EAS Doc #: 4235 Filed: 10/01/15 Page: 12 of 15 PAGEID #: 81776

- By 2004, DuPont was aware of very high levels of C-8 in the blood of community members who drank C-8 contaminated water but did not report that information to regulators. (P1.558.8). According to [United States Environmental Protection Agency ("EPA")] there was also evidence that DuPont "became aware of levels of [C-8] exceeding 1 ppb coming out of the tap in homes in the 1980's but did not report those data to EPA as required by TSCA." (*Id.*)

- In 2004, DuPont's in-house toxicologist, Dr. Rickard stated that "[C-8] is not a human carcinogen and there are not known health effects associated with [C-8]. . . . In fact, the more we study [C-8] the more confident we are in our conclusions that [C-8] is safe." (P1.352.) According to Plaintiff's expert, "this is an irresponsible statement for [DuPont] to make in the year 2003 to say that there are no health effects, because at that point the evidence clearly showed that there was actually substantial potential health risks. And so to say no health effects is basically drawing a conclusion that wasn't warranted by the data and is very misleading to the public." (Sept. 18 Tr. at 192:18-24.)

- If DuPont had provided EPA with the information it possessed regarding C-8, EPA very well might have regulated the chemical much sooner (See, e.g., Sept. 17 Tr. at 3-25:12-25; P1.558.)

(Pl.'s Mem. in Opp. at 15–19.) Mrs. Bartlett also offered as evidence of the administrative proceeding that the EPA initiated against DuPont in 2004, in which the EPA alleged that DuPont failed to comply with certain reporting requirements relating to C-8 under certain federal statutes and that the EPA's efforts to investigate C-8 might have been more expeditious if the data had been received sooner.

DuPont takes issue with this evidence, highlighting for example, Dr. Siegel's testimony in which he "acknowledge[ed] that there were '[n]o known health effects' from C-8 during the period in question," and that he merely testified that "DuPont should have been aware of a 'potential' health risk," (Reply at 2–3) (citing Sept. 18, 2015 Trial Tr. at 270:11-12), and that he did not "believe that there were adequate studies done to answer the question of whether it was harmful until the -- some of these studies in the late 2000s when they had a huge number of Samples," Sept. 18, 2015 Trial Tr. at 270:2-6 (emphasis added). DuPont contends that this and other highlighted testimony of Mr. Petty cannot be a relied upon to show a "conscious disregard

12

of the near certainty of substantial harm when Plaintiff's own expert admits that there was still a question about whether there was any harm at all." (DuPont Reply at 4.) DuPont maintains this testimony is dissimilar to those in the cases relied upon by Mrs. Bartlett that show a defendant had actual knowledge that harm was nearly certain to occur, and each nevertheless went through with its conduct that injured the plaintiffs. *See Solly v. Manville Corp.*, No. 91-3081, 91-3196, 91-3082, 1992 U.S. App. LEXIS 14030, *20-21 (6th Cir. 1992) (summarizing "substantial evidence" showing that "defendant had knowledge of the hazards of asbestos exposure" and "acted in conscious disregard of the injured parties' safety); *Gillham v. Admiral Corp.*, 523 F.2d 102, 109 (6th Cir. 1975) (finding that defendant "was informed" of the risks, but failed to alter its conduct "[i]n spite of this knowledge"). Again, this Court disagrees.

Taken in context, Dr. Siegel's testimony related to his opinion that the information DuPont had in its possession was sufficient to put it on notice that substantial harm was nearly certain if it continued to release C-8 into the environment. Taking his testimony in the context of the questioning and the exchange with counsel, and viewing it as the Court must in the light most favorable to Mrs. Bartlett, Dr. Siegel's testimony supports Mrs. Bartlett's claim that she is entitled to punitive damages.

Additionally, the Court agrees with Mrs. Bartlett that this case is analogous to those she relied upon such as *Solly*, in which the Sixth Circuit evaluated similar evidence and found it sufficient to send the claim to the jury:

> Roby asserts that there was substantial testimony that defendant knew about the probable hazards of exposure to asbestos. For example, in a letter dated March 12, 1943, to defendant's director of research, it was stated that Kaylo had the makings of "a first class hazard." There was another letter in November 1944 in which the director of one of defendant's laboratories was told that Kaylo constituted a hazard "either to employees engaged in the manufacture of it or to others in the use or installation of it." There were also tests which found "unmistakable evidence of asbestosis" in laboratory animals. There was

13

>   additional evidence which, in total, suggested that defendant had knowledge of the hazards of asbestos exposure, yet permitted its continued use without warning to those exposed to the product. This evidence substantially supported a conclusion that defendant acted in conscious disregard of the injured parties' safety.

1992 U.S. App. LEXIS 14030, at *20–21.

The evidence before this Court in total, viewing it as required under Rule 50, is similar in that a reasonable jury could find that DuPont has known since the 1960s that C-8 is toxic, has known since the 1970s that it will build up, accumulate, and persist in the blood of humans exposed, has known since 1984 that C-8 was in community drinking water supplies near its Washington Works plant, knew that the "low levels" of C-8 in the water would accumulate in the blood of an individual to a level that was not being measured, did not inform the public or regulators of this knowledge, failed to utilize the best available scientific methodology to test the toxicity of C-8, had recommendations from its medical director, lawyers, epidemiologists, toxicologists, and peer review boards to stop and/or reduce the amount of C-8 released into the environment because of the known and foreseeable risks, and continued to increase C-8 releases in significant amounts.

Based on the foregoing, and the additional evidence presented at trial and not specified *supra*, the Court finds that "reasonable minds can differ as to whether [DuPont] was aware [its] act[s] had a great probability of causing substantial harm. . . . [and] that sufficient evidence [has been] presented revealing that [DuPont] consciously disregarded [Mrs. Bartlett]'s rights or safety." *Preston v. Murty*, 32 Ohio St. 3d at 336. Accordingly, a reasonable jury would have a legally sufficient evidentiary basis to find for Mrs. Bartlett on her punitive damages claim.

The Court emphasizes that it has merely determined that there is sufficient evidence for the jury to consider punitive damages. The Court makes no finding as to whether Mrs. Bartlett is

entitled to such damages. If, and only if, the jury finds in favor of Mrs. Bartlett, the same jury will decide if she is entitled to punitive damages, and if so, an appropriate amount.

### IV.

For the reasons set forth above, the Court **DENIES** DuPont's Rule 50 Motion. (ECF No. 4227.)

**IT IS SO ORDERED.**

10-1-2015
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**

15