163

1        UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF OHIO
2            EASTERN DIVISION

3

IN RE:  E. I. du PONT de NEMOURS AND .  CASE NO. 2:13-md-2433
4  COMPANY C-8 PERSONAL LITIGATION      .
                                        .  COLUMBUS, OHIO
5                                       .  MAY 17, 2016
                                        .  9:00 A.M.
6                                       .
   . . . . . . . . . . . . . . . . . . .
7

TRANSCRIPT OF THE CONTINUED PROCEEDINGS OF THE FINAL PRETRIAL
8  CONFERENCE ON THE MOTIONS ON DEPOSITION DESIGNATIONS AND ADMISSIBILITY
   OF EXHIBITS BEFORE THE HONORABLE EDMUND A. SARGUS, JR., UNITED STATES
9  DISTRICT CHIEF JUDGE

10  APPEARANCES FOR THE PLAINTIFFS:

11  J. MICHAEL PAPANTONIO, ESQ.; TIMOTHY O'BRIEN, ESQ.; GARY DOUGLAS,
    ESQ.; DAVID BUTLER, ESQ.; ROBERT BILOTT, ESQ.; REBECCA NEWMAN, ESQ;
12  MICHAEL LONDON, ESQ.; JON CONLIN, ESQ.; CHRISTOPHER PAULOS, ESQ.; JEFF
    GADDY, ESQ; WESLEY BOWDEN, ESQ.; ASHLEY BRITTAIN-LANDERS, ESQ.; KATHY
13  A. BROWN, ESQ.

14  FOR THE DEFENDANT E. I. du PONT de NEMOURS AND COMPANY:

15  DAMOND R. MACE, ESQ.; C. CRAIG WOODS, ESQ.; JOHN GALL, ESQ.; STEPHEN
    M. FAZIO, ESQ.; STEPHANIE E. NIEHAUS, ESQ., AARON T. BROGDON, ESQ.;
16  JOHN BURLINGAME, ESQ.; NATHAN LEBER, ESQ.

17                        -   -   -

18

19

20

21

22

23

24

25        LAURA L. SAMUELS, OFFICIAL FEDERAL COURT REPORTER
                       (614) 719-3245

164

1                                    Tuesday Morning Session

2                                    May 17, 2016

3                                    -  -  -  -  -

4          THE COURT:  Good morning, counsel.  Well, as you might

5     imagine, we have some things to do today.  I think we all

6     understand if we don't finish it today, we will go into tomorrow,

7     but we'll take a crack at it and see how far along we are.

8              This is the last time we will be meeting before trial so

9     I thought we would go into what I would normally do in a normal

10    case.  I don't think I would call this a standard.

11             First of all -- but let's talk a little bit about

12    schedule.  The last time we essentially did five days a week.

13    There were a couple days that had some scheduling matters.  That's

14    sort of my inclination again.  I will hear from you if you see it

15    differently.  I think I mentioned to you we're going to be off on

16    June 9.  We are going to be on the court of appeals.  The day

17    before, we will probably finish at three o'clock.  But, otherwise,

18    I'm thinking of going from nine to five Monday through Friday.

19             Anybody see it differently?

20         MR. MACE:  Sounds fine, Your Honor.

21         THE COURT:  All right.  And then in terms of the venire,

22    as you know, we have sent out the written questionnaires.  And the

23    last time I thought this worked pretty well.  Each side had

24    someone with a -- Again, these are all in writing, so I can call

25    them piles in the literal sense of the responses, and there are --

1    Fran Green has prescreened them.  But I invite you to go ahead and

2    look at her work.  She has, I think, pre-qualified about 60

3    people, and this is a nonlegal qualification.  What she is looking

4    for is people with legitimate excuses who couldn't be in a

5    four-week trial, and people who are in the water districts.  The

6    same thing we did the last time.

7         So why don't you each pick one person.  We'll put all

8    these in a conference room.  And you should be able to do that

9    pretty much -- This is Tuesday.  We can do that this week.  And

10   then let me know right away if there are any issues.  We'll want

11   to resolve these.  And then Fran Green will go ahead and issue the

12   summons to the roughly 60 people, which turned out to be a good

13   number the last time we did this.  Okay.

14        You have also submitted your written proposed *voir dire*

15   questions.  And I don't think either side has lodged objections.

16   Is that correct?

17        MR. PAPANTONIO:  We haven't, judge.

18        MR. MACE:  We have not, Your Honor.

19        THE COURT:  All right.  And I think these are all fine.

20   There was one question on the defendant's side, this is one you

21   wouldn't see coming from me, but I just want to be careful.  If

22   you want to ask:  Is there anybody here who really wants to be on

23   the jury?  That's fine.  Don't ask the converse.  I don't want 50

24   hands to go up.  Nobody wants to be on the jury.  So you don't

25   want to encourage people to talk their way off.  But, you know,

166

1   I'm with you, you may have some heartburn about somebody who

2   really wants to be on the jury, and I will let you ask that

3   question.

4           So I am assuming as far as counsel table, we will have

5   Mr. Freeman.  And the attorneys on the defense side will have

6   Dr. Rickard again.  Or who do you expect?

7           MR. MACE:  I expect Laura Korte, K O R T E.

8           THE COURT:  Okay.  And if you remember, the last time I

9   introduced both to the jury, just so to make sure there are no

10  connections relationship wise or otherwise with the venire.

11          And we also did a separation of witnesses.  I am assuming

12  you will do that again.

13          MR. MACE:  Yes.  Now we had the exclusion last time that

14  experts were not excluded since they rely on some of the

15  testimony.  So --

16          THE COURT:  Is that still mutually agreeable?

17          MR. PAPANTONIO:  Yes, sir.

18          THE COURT:  And I think -- I know you know this, but

19  sometimes I think some lawyers are confused about what that means.

20  As I understand it, we have agreed that none of you will disclose

21  nor will the other witnesses disclose to witnesses who haven't

22  testified what's been going on in the trial.  If some new topic

23  comes up, you can explore that as long as you don't reveal to the

24  person you're talking to what's already been testified to.

25          Does everybody understand that?

167

1          MR. MACE:  Yes, sir.

2          MR. PAPANTONIO:  Yes, sir.

3          THE COURT:  All right.  I do want to spend a couple

4     moments, not a long time but a few moments, on what's coming a

5     year from now.

6          MR. MACE:  Your Honor, I have other housekeeping matters

7     while on that list.  We talked about having nine jurors for the

8     next trial --

9          THE COURT:  We talked about it.  That was the debate the

10    last time.

11         MR. MACE:  You had agreed to do it for the next trial.

12         THE COURT:  I don't remember that part.

13         MR. PAPANTONIO:  No, I don't remember --

14         THE COURT:  Listen.  This is what I'm trying to do in

15    this case, believe it or not, is apply the norm unless there is

16    something that would tell me that wouldn't work.  In every civil

17    jury trial that I have -- and I am pretty sure that goes for every

18    judge in the building -- we run with eight.

19         So you are asking me -- I don't personally see a great

20    deal of difference.  I think it's one of those things just given

21    group dynamics in most cases eight, nine, twelve, it's all going

22    to come out the same in probably 99 percent of the cases.  But I

23    am still inclined to go with eight.

24         And the last time, you know, we ended up -- We'll

25    probably do the same thing this time.  I will not swear everybody

1     until the second day.  Actually, probably the third day.  We will

2     have the first day of *voir dire*, second day of -- We'll swear them

3     in before opening.  So at the beginning of the second day.  But I

4     am inclined at this point to stay with what we have always done.

5            MR. MACE:  And you talked about we could screen the ones

6     that have been selected as prescreened to not come, not get

7     summoned this week --

8            THE COURT:  I mean you have a right.  If there's somebody

9     in there that you think shouldn't have been prescreened, let me

10    know.  And if -- you know, I think Fran Green is pretty good at

11    this, but if you see somebody in the 60 that you think shouldn't

12    be in there, but let's -- You can do that this week?  Because I

13    would like to get this resolved really by the end of the week, if

14    we can.

15           MR. PAPANTONIO:  Judge, we will have Dave Butler from our

16    team.

17           MR. MACE:  And we will have John Gall from our team.

18           THE COURT:  You think you can do this in the next day or

19    two?  You're going to them at -- I think we sent out 300 so -- but

20    it's, hopefully, not too time intensive.

21           MR. GALL:  If I understand Your Honor correctly, that you

22    have selected 60 -- you have prescreened 60 who are eligible.

23           THE COURT:  Just to be clear, I haven't looked at any of

24    them.  The person who does this, she has -- and her instruction

25    was to take out anybody who has a legitimate reason they can't

1    serve for four weeks, prepaid vacations, things of that sort.  And

2    the other would be if you have answered questions about you're in

3    one of those water districts.  Beyond that, the 60 would be -- I'm

4    sure there will be some people in the 60 who will probably have

5    some disqualifications.  But I think those are two big screening

6    questions so we don't have more people than we need.

7            MR. GALL:  So that's -- There are 240 that Fran has

8    preliminarily disqualified.

9            THE COURT:  Yes.

10           MR. GALL:  That's what you want us to look at this week.

11           THE COURT:  Yes.  Well, and I'd say just look at all of

12   them.  Look at the 60 as well.  What I really want to know if

13   there are objections to this process; and if there are, I would

14   like to address them, and we'll decide -- I mean she's good, but

15   you have the right to take another look at this.

16           MR. GALL:  Is -- Will they be available tomorrow, sir?

17           THE COURT:  Yes, yes, I'll make sure they are.  In fact,

18   I think she's gone Thursday and Friday.  So tomorrow is probably

19   the best day.  Otherwise, they will just be in our conference

20   room.  We can get still to them.  She won't be around to answer

21   any questions.

22           MR. GALL:  Just out of curiosity, are the stacks

23   available today?

24           THE COURT:  I think so.  In fact, I will make sure they

25   are.  Fran is pretty efficient.

170

1    MR. GALL:  Unless Mr. Mace changes his mind and gives me

2    a speaking role, I may ask to be excused and look at them today

3    possibly if we can even do that.

4    MR. PAPANTONIO:  We may do the same, judge.

5    THE COURT:  I had no idea that Mr. Mace had that kind of

6    control.  I'm not going to go any further with that.

7    MR. GALL:  He is younger than I am.  So --

8    MR. MACE:  Your Honor, the other half of that, so the

9    last time about a week in advance of the trial we got access to

10   the copies for the ones that were actually being summoned.  Do you

11   know when they would be available?

12   THE COURT:  We normally it -- it's not that I'm

13   distrusting, but we normally don't give them out until the

14   Wednesday before trial.  But I think with you understand

15   confidential.  You can share them with your clients.  No one else.

16   Just be careful because there is personal information included in

17   them.

18   MR. MACE:  Thank you, judge.  And breakout rooms, have

19   you decided which breakout rooms we'll have?

20   THE COURT:  It's going to be a little bit of a mess.  We

21   have a lot of externs here.  You're going to evict them.  There

22   will be rooms for each of you.  They will not be particularly --

23   We used to have, before I became chief, the office next door was a

24   conference room.  But now there are law clerks in there.  So one

25   of you will get the witness room, it's small, and one will get a

1    little bit of a messy conference room, but they are both in the

2    hallway here.  So one will be closer to the courtroom.  The other

3    will be a little bit bigger but down the hall.

4         MR. MACE:  We wanted to move in a refrigerator and some

5    water like we did last time.  So I was hoping we could figure that

6    out and make some arrangements.

7         THE COURT:  Well, one is bigger than the other.  We can

8    have you arm wrestle or flip a coin, whatever your preference is.

9    Do you -- There are -- Neither are little cubbyholes.  But I am

10   assuming you will have some witnesses hanging and a place to meet.

11        MR. MACE:  We had the small one the last time, but we

12   don't care one way or the other.

13        MR. PAPANTONIO:  Since they don't care, we will take the

14   bigger one.

15        THE COURT:  All right.

16        MR. MACE:  So we will take the room right next door.

17        THE COURT:  Yes.

18        MR. MACE:  Good.  Thank you.

19        THE COURT:  All right.  Anything else as far as just

20   about the mechanics of trial?

21        MR. MACE:  In terms of the logistics, judge, you said you

22   wouldn't mind if we brought in a table to put at the end of

23   counsel table between the rail and the side there.

24        THE COURT:  I mean I would like to see it, but I want to

25   accommodate you, sure.

172

1          MR. MACE:  Okay.  And then in terms of the graphic

2     display person and a legal assistant, that we could have, after

3     the trial starts not during jury selection, we could have the

4     first row behind the rail for staff.

5          THE COURT:  You can do that.  On both sides of the -- In

6     other words, you want the entire first row.

7          MR. MACE:  I would think.

8          THE COURT:  One will have one side, and one will have the

9     other, and we will make sure the seats are reserved.

10          MR. MACE:  Thank you, sir.

11          THE COURT:  You have all gotten a preview.  It's the same

12     technology in Judge Marbley's courtroom but a different display

13     system.

14          MR. O'BRIEN:  Your Honor, may the AV tech set up on the

15     Friday before trial?

16          THE COURT:  Sure.  I did want to spend a moment on the 40

17     cases a year issue.  I have got DuPont's memorandum preserving an

18     objection.  I've taken it in that vein.  But I want to be clear on

19     what my intention was.  First of all, I guess the question of the

20     plaintiffs:  How soon can you identify the 40 cases?

21          MR. LONDON:  Your Honor, Michael London, on this issue.

22     The 40 cases have been identified as well as put in the groups to

23     the defense.

24          THE COURT:  Have you exchanged them?

25          MR. LONDON:  We have, Your Honor.  We have exchanged

173

1    those contemporaneous with the letter over two weeks ago.

2            THE COURT:  So I want to be clear.  I didn't, in my view,

3    just delegate this to the plaintiffs.  I said we want to start

4    with the 40 cases with the most serious medical claims.  And one

5    reason I can't be involved in that, I would have no idea who they

6    would be.  If there's -- I will give the defendants an opportunity

7    to object if you don't think they don't meet that criteria.  But

8    that's the criteria.  It wasn't just to let the plaintiff's pick.

9    It would be with the caveat they would pick the most serious.  I

10   assume you have done that.  But you have the right to weigh in

11   with -- you will have the list how soon?

12           MR. MACE:  We stand on our papers, Your Honor.  So let's

13   get at it.

14           MR. LONDON:  And, Your Honor, with respect to the papers,

15   we understood Your Honor's ruling and directive in this regard for

16   plaintiffs to identify the most severe cases, which we did, which

17   we provided our justification for.  And we understood the

18   defendants would either, hopefully, accept that list, because

19   defendants represented that they haven't collected medical records

20   over the past three years, despite having authorizations, but then

21   elected not to follow Your Honor's directive and object based on

22   where we failed to meet the Court's criteria about being the most

23   severe.  But, instead, they filed an omnibus general objection --

24           THE COURT:  Well, and I get it.  But I just heard

25   Mr. Mace say that you're not going into case by case, and I think

174

1    that's where we leave this.

2          MR. LONDON:  And, Your Honor, we understood that, too.

3    We don't want to delay this process.  And we believe that they

4    couldn't object and, obviously, wouldn't.  And we provided them

5    discovery on these cases.  And we're moving forward on the

6    schedule, even a quicker schedule than CMO 17 contemplated.

7          THE COURT:  Well, the next thing that I would like to

8    achieve, and this is going to take lot of work on my part, is to

9    give you the schedule, the judges and the locations.  So I meant

10   doing a lot of work on that end.  And we're going to staffing

11   issues and, believe it or not in the federal government, we're

12   going to have parking issues.  But we will deal with that.

13         I have been waiting to hear from the defendants with the

14   idea of the St. Clairsville or Wheeling issue.  Have you thought

15   more about that?

16         MR. MACE:  Mr. Burlingame, I think, is going to --

17         MR. BURLINGAME:  Yes, Your Honor.  We are -- We will

18   stipulate to trying in Wheeling pursuant to your prior suggestions

19   on how that process would work.

20         THE COURT:  I promise you it will be a lot easier.  It is

21   a fully equipped federal courtroom.  The security will be all

22   there.  And keep in mind, if there's any issues with subpoenas, we

23   will do particular witnesses in St. Clairsville any time you

24   recommend.

25         MR. BURLINGAME:  Understood.

175

1       THE COURT:  We pay $400 a month to the County of Belmont

2   to have a courtroom available at any time.  And there will be one

3   any time we need.  But it will be very small.  But we'll pick the

4   jury probably not in the courtroom, probably in a larger hall

5   somewhere.  Just for the *voir dire*.  Then everything else, when we

6   have the jurors selected, we will go to the courtroom.  But, you

7   know, if there's any issue with subpoenas, we can fix that.

8       MR. BURLINGAME:  Understood.  And, Your Honor, we'll be

9   able to work out some kind of instructions to the jury as to why

10   they are crossing the river into West Virginia as Your Honor

11   previously said.

12       THE COURT:  Yes, they'll all -- and I know we've looked

13   at this, but they will be from an eight-county drawing.  So

14   anybody is coming in will be just about as close to Wheeling as

15   they are to St. Clairsville.

16       MR. BURLINGAME:  Thank you, Your Honor.

17       THE COURT:  Thank you.  And just as you know, there will

18   probably be two judges in Wheeling who will be doing some of

19   these.  So -- and they will come to St. Clairsville to pick the

20   jury, and they'll make the same representation.  If you have

21   witness problems, they'll move them back to St. Clairsville any

22   time we need.

23       MR. BURLINGAME:  Your Honor, before we move off of the 40

24   jury trials, if I may, we are eager to get the group one assigned.

25   We have a July 15 fact discovery cutoff, and we have expert

176

1     reports for all twelve of the group one cases.  Theirs are due in

2     August and ours in September.  So we really would like to have

3     those group one cases for sure identified so we can get moving

4     under the aggressive discovery schedule to which we agreed.

5                 THE COURT:  So the idea would be we would be doing these

6     over a ten-month cycle.  When you turned over the 40, they weren't

7     listed in order?

8                 MR. LONDON:  They were listed in order.  So he has the

9     group -- He has the twelve cases in group one, the twelve cases in

10    group two --

11                THE COURT:  Well, we can take the twelve and assume that

12    cases one, two, three and four, those go first.

13                MR. LONDON:  Your Honor, we -- we could do that, Your

14    Honor.  CMO directed that Your Honor would give it some thought

15    and decide it later.  But there is --

16                THE COURT:  When you decided --

17                MR. LONDON:  -- no method to those selected.

18                THE COURT:  When did the one through 40, didn't you pick

19    the one worst in terms of alleged damages to be first?

20                MR. LONDON:  No.

21                THE COURT:  You just picked the 40 in the --

22                MR. LONDON:  The 40 most severe, and we explained to them

23    we listed them based upon we characterized them in alphabetical

24    order.

25                THE COURT:  I want to be to, from the defendant's end, to

177

1    know which cases are going forward.  You just go one through 40.

2    Is there any problem with that?  One will be the first.  Two will

3    be the second.

4         MR. LONDON:  We have done that, judge.  So there are four

5    groups and -- I mean in group one the first case as we identified

6    to them is Ryan Balsley.

7         THE COURT:  And that's the case that you will offer as

8    the worst injury?

9         MR. LONDON:  It's a testicular cancer case.  I don't have

10   the actual facts --

11        THE COURT:  No -- In other words, can the defendants

12   assume that's the first one we're talking about?

13        MR. LONDON:  These are -- They can.  This process of

14   picking the actual sequence of the twelve trial cases in each

15   group, judge, was going to be subject to further discussion after

16   discovery.

17        THE COURT:  I don't think that's going to work too well.

18   I mean wouldn't you rather have the certainty of which cases are

19   going first?

20        MR. BURLINGAME:  Absolutely, Your Honor.

21        THE COURT:  I will let you pick the 40.  Then there's no

22   -- I mean there's a general objection to the 40, but not a

23   specific objection.  Why don't we take them one through 40.

24        MR. LONDON:  Judge, that's not what Steve and I

25   addressed.  But if they want to pick -- If that would be the

178

 1    sequence, we can certainly live with it.

 2              THE COURT:  Wouldn't that be the easier way?

 3              MR. BURLINGAME:  Your Honor, my core concern --

 4              THE COURT:  Knowing who they are.

 5              MR. BURLINGAME:  For certain, which ones are in group one

 6    and the order in which they are going to tried.  And, frankly,

 7    when we get to the right point -- I know you have a lot of

 8    logistics to cover -- but which, if any, of these would be subject

 9    to trial in Wheeling --

10              THE COURT:  Right.

11              MR. BURLINGAME:  -- versus here in Columbus.

12              MR. LONDON:  Your Honor, we're -- we don't have a strong

13    objection here.  When we contemplated CMO 17, that was submitted

14    on consent by both parties, we wrote the sequence of the trials

15    within each group will be decided by a subsequent Case Management

16    Order either bring agreement of the parties or by briefing to the

17    Court.

18              THE COURT:  I mean I just see if there were one or two

19    cases.  But we know, I know, what this does to all of you.  It's

20    going to be an enormous amount of work.  But that's why I think we

21    just need to walk in, you pick 40.  You think these all the, in

22    your view, serious.  Let's just one through 40, and everybody

23    knows it is the exact sequence.

24              MR. MACE:  Yes, sir.

25              MR. FAZIO:  To be clear, judge, they were ordered one

179

 1    through 40, and we also had a grouping that was established by the

 2    plaintiffs.  And so you want to take them alphabetic within each

 3    group terms of the trial sequence?  Or would you --

 4            THE COURT:  Unless somebody thinks this is outrageously

 5    unfair, why don't you just take the list as is.  They may not be

 6    assigned a number.  But if you go to the second group, the first

 7    name listed is the first one to go to trial in this group.

 8            MR. FAZIO:  So basically would be in the order you laid

 9    out in your letter?  In the grouping order?

10            MR. LONDON:  Yeah.

11            MR. FAZIO:  I'll tell you what, Your Honor.  Why don't

12    Mr. London and I confer about this --

13            THE COURT:  You just --

14            MR. FAZIO:  -- and just get back to you before the end of

15    the day.

16            MR. LONDON:  I think, the judge's order initially

17    contemplated to what's counsel concern is, it is an enormous

18    concern on our side, who is trying these cases, where they're

19    being tried, that is -- that is probably close to paramount

20    concern of these trials.

21            THE COURT:  Right.

22            MR. LONDON:  But we had contemplated that the grouping of

23    the trial be determined at the end of discovery.  The discovery in

24    group one ends in July.  So -- with those first trials being in

25    May.  So it's not as if we are deciding this fall.  We are

180

1    deciding trial sequence three months from now.

2              THE COURT:  Well --

3              MR. LONDON:  I can --

4              THE COURT:  -- if you want to meet and confer, I have no

5    problem.  If you can reach agreement on the system.  But if you

6    don't, the default is the order they came.

7              And to give you an idea of where I see the locations

8    being, we will probably do, you know, in St. Clairsville/Wheeling

9    of the 40, I am assuming probably six or seven.  I want to give

10   you firm dates on all these as soon as I can get everybody lined

11   up.  And the rest of them will be here.  There will be only two

12   locations, Columbus or there.  We don't have the facilities

13   available in Steubenville, even though it is a seat of court.  I

14   don't think a four-week trial is going to fit in common pleas

15   court with only a judge's office next door.  We would end up

16   evicting them.  And we don't have a lease anyway.  So those would

17   be the two.

18             And, again, just thinking ahead, I'm also modeling this

19   somewhat on the methods used, at least from the judge's

20   standpoint, on the tobacco cases.  And what typically happened

21   there is they -- the motions for summary judgment, not the motions

22   *in limine* but the motions for summary judgment, normally would be

23   handled probably by me.  That's subject to change, but that's my

24   initial thought, simply because I'm asking people to donate their

25   time, and that's -- that's going to be a big burden.

181

1          MR. PAPANTONIO:  Judge, would all of the dispositive

2     motions be handled -- because that's the whole concept of the MDL.

3          THE COURT:  Right.

4          MR. PAPANTONIO:  That's what we'll be talking about

5     today.  There has already been dispositive motions made, and now

6     they are reargued.  So at some point we will be able to go there

7     and have the list of dispositive decisions.  That's typically what

8     we do.

9          THE COURT:  And I'm -- not because I am trying to be a

10    tyrant, but I think the practical way and the best way to persuade

11    other judges to do this is to have me do that.  They come down

12    here basically for the trial.  And they would do -- I don't think

13    the trial judge normally wants someone else doing their motions *in*

14    *limine*.  But when you do that, you do it now, you can tell me

15    prior rulings, there will be a bigger universe by the time we get

16    to motions *in limine* for the cases starting in May.

17         MR. PAPANTONIO:  Yes, sir.

18         THE COURT:  And the last point, just trying to predict

19    the -- I was looking at the Sixth Circuit schedule.  So the last

20    brief is due in August, early August.  And you will probably get

21    oral argument in either in November or December.  And typically

22    the panel would like to get the decisions out in 30 days.  The

23    harder the case, sometimes the slower that can be.  But my best

24    estimate, you will get a decision by January or February.  So

25    something that DuPont is worried about, about going forward with

182

1    these issues in the court of appeals, hopefully they will be

2    resolved and maybe even sooner.  So we will see how that goes.

3          All right.  That's all I have until we get to the massive

4    number of depositions and exhibits objected to.  Anything else

5    before we get to that?

6          MR. PAPANTONIO:  No, sir.

7          MR. MACE:  I don't believe so, Your Honor.

8          THE COURT:  Any preference on depositions first or

9    exhibits?

10          MR. PAPANTONIO:  Judge, just a preface to this entire

11    thing, I reviewed all of this.  It looks like we are again moving

12    into the same issues that we have already moved into.  And, again,

13    my only point to this is this, is the whole purpose of the MDL to

14    have a dispositive motions decided on, and it allows everyone

15    involved to make decisions centered around those decisions.

16          The process of going in and rehashing the same thing, the

17    discussions with the discussions having taken place ad nauseam,

18    the whole purpose of the complex -- the manual on complex

19    litigation is to avoid exactly that.

20          THE COURT:  Right.  Well, I think that's true.  But I

21    also think that you each went through the first trial, weren't

22    exactly sure how it was going to be tried.  Now we have on the

23    plaintiff's -- or the defendant's side more documents that weren't

24    offered.  Sometimes things change.  I agree.  I am going to try to

25    be as consistent, unless I think I made a mistake, and maybe there

183

1    are one or two places here I will do that.  But I'm with you on

2    that.  That's the goal here.  I think that, as we do more of

3    these, we will have more of a baseline.  So --

4         Well, I suppose we should probably start, I normally on a

5    long hard task like to go to the one that's hardest and get that

6    over with.  Why don't we turn to the depositions.

7         I don't know how else to do this except to go through

8    this page by page.  You can see from my notes there are going to

9    be a bunch.  Let's start with Mr. Bowman.  Everyone with me?

10        MS. NIEHAUS:  Yes, Your Honor, and responding to

11   Mr. Papantonio's comments, the deposition for testimony for

12   Mr. Bowman was never ruled on first --

13        THE COURT:  I just want to be clear on.  When -- You have

14   said that in your briefs, and I don't think you meant it in an

15   improper way, but there were no exhibits, for example, sent to the

16   jury that were not ruled on.  Some exhibits weren't offered.  But

17   nothing went back to the jury that didn't have it admitted or not

18   admitted.

19        MS. NIEHAUS:  But the testimony of Mr. Bowman was never

20   played in the first trial.

21        THE COURT:  I just want to be clear.  So it wasn't ruled

22   on that for that reason.  It wasn't as though somebody played the

23   deposition, and I didn't rule on the objection.  I don't want to

24   leave that impression.

25        MS. NIEHAUS:  No, no.  There were some deposition

184

1      designations here that we're asking the Court to reconsider ruling

2      from the first case.  So for Mr. Bowman, there were no rulings

3      issued.  It was never played.  We just never -- We never addressed

4      this in the first case.

5                  THE COURT:  I understand, and I want to be clear, you can

6      ask me to change my mind.  You know, again, I would like to think

7      the more we do this, the less likely this becomes.  But we have

8      only had one trial so far.  So there are a few of these, and it is

9      on both sides, where we're going to look at things again, and we

10     will do that.

11                 So with Mr. Bowman, there's some easy ones.  The first

12     page is a reference to litigation dealing with C-8.  That's going

13     to come out.  That's just about five words.

14                 And likewise on the next page, there's reference to the

15     litigation.  This would be -- The first issue takes about the

16     first half of the page.  The red lines will come out.

17                 Then the issue about the destruction of evidence will

18     come out also.

19                 And then on page 6 at the bottom, lines 37:21 to 38:14

20     comes in.

21                 But then the last two words on 38:14, again gets back to

22     the lawsuit, other lawsuits, that comes out.

23                 MR. MACE:  You're leaving in the *Tennant* lawsuit

24     reference at 38:2 --

25                 THE COURT:  Yes, we -- because we're going to get into

185

1    that in some detail.  I am ruling there may be an opportunity for

2    a limiting instruction on either side.  If you want to do that,

3    make sure you do it at the right time.

4          All right.  And then on page 18, lines 70:2 through 70:13

5    will come out.  The rest will stay in.

6          MS. NIEHAUS:  Your Honor, page 10 there was --

7          THE COURT:  Did I miss one on 10?

8          MR. O'BRIEN:  That's the one that I had agreed to take

9    down.

10          MR. MACE:  You do?

11          MR. O'BRIEN:  Plaintiff agrees to take the --

12          MS. NIEHAUS:  I see.

13          MR. O'BRIEN:  So, I'm sorry, Your Honor, on page 18 --

14          THE COURT:  So line 70:2 through 70:13 will stay in.

15          70:14 through 18 -- I'm sorry, I have got it backwards.

16    70:2 through 70:13 will come out.

17          70:14 through 70:18 will stay in.

18          This is going to take a while.  Lots of pages here.

19          And I have already ruled on the issue of document

20    destruction.  Somebody without firsthand knowledge is just a

21    question without somebody laying a foundation.  So basically

22    everything red lined on page 20 is coming out.

23          MR. O'BRIEN:  Your Honor, just so -- Mr. Bowman, keep in

24    mind, was the gentleman who did the holdover, who instructed

25    Dr. Kennedy not to destroy.  So he's integrally involved in the

186

1    Kennedy process.

2              THE COURT:  And he's testify to that.

3              MR. PAPANTONIO:  I laid that foundation.

4              MR. O'BRIEN:  Yes, sir.

5              THE COURT:  That's my issue here was foundation.

6    Actually, I'm going to change my ruling on that.  It's going to

7    stay in.

8              And then on the next page, 21 -- Let me make sure I can

9    read my own notes here -- and I'm going to overrule that

10   objection.  That will stay in.

11             And then on page 22, on line 86:10 and 11, there's

12   reference to the class action lawsuit.  So that objection will be

13   sustained.

14             And then I believe the next sequence that starts on 87:7

15   on page 22 over to 88:5 is out by agreement.  So that's out.

16             MR. O'BRIEN:  87:7 through 87:10 by agreement.

17             THE COURT:  All right.  Well, then 87:23 to 88:5 is --

18   brings up other lawsuits.  So that's going to come out.

19             So the objections that start on 92:4 through about a page

20   and a half, 98:18, will stay in.

21             MS. NIEHAUS:  Your Honor, that's a different issue.  This

22   is the Dr. Staats issue.  She worked for the West Virginia

23   Department of Environmental Protection.  She was not an employee

24   of DuPont.  Mr. Bowman has -- I mean he may have had knowledge

25   that there were allegations about Dr. Staats.  But he had no way

187

1    of knowing what did or didn't happen with Dr. Staats.  There was

2    no implication that she actually, you know, intentionally

3    destroyed documents --

4         THE COURT:  Back me up.  This came into play in the last

5    trial.  So I want to hear from both sides.  Who is going to

6    testify about this spoliation issue?  Your position is this person

7    knew of secondhand, and that's the long and short of it.

8         MS. NIEHAUS:  Mr. Bowman is in-house counsel at DuPont.

9    This alleged destruction occurred at the West Virginia Department

10   of Environmental Protection.

11        MR. MACE:  There is another level of a problem here is

12   the question is presented assuming facts that they occurred:  You

13   know she destroyed documents.  It's not:  Did you hear an

14   allegation.  The other one was an allegation.

15        MS. NIEHAUS:  And she denied that.  And also any

16   documents that were --

17        THE COURT:  As I recall -- refresh my memory -- she had a

18   -- her position was that she just destroyed documents as a matter

19   of course.

20        MS. NIEHAUS:  In the ordinary course.  They are

21   calendaring notes.  They were preliminary notes.  Yes, that was

22   nothing was intentionally destroyed --

23        THE COURT:  Which we did have a finding from another

24   Court, which I excluded, but let me hear from the other side.

25        MR. PAPANTONIO:  Judge, there's much more to Staats than

188

1     that.  First of all, Staats is the person, judge, that DuPont

2     ordered to hire TERA.  TERA was the organization that conducted --

3          THE COURT:  Right, I remember that.

4          MR. PAPANTONIO:  And you may remember in the first trial

5     we actually had receipts in the ledger sheets where she actually

6     charged DuPont for meeting with DuPont in coming up with a

7     strategy.

8          THE COURT:  So my first question is:  Does this witness

9     testify to any knowledge of that?  Does he have firsthand

10    knowledge?

11         MR. O'BRIEN:  He says at 92:13, I do recall there was

12    some issue with her around retention of documents --

13         THE COURT:  92.

14         MR. O'BRIEN:  92:13, which was on page 24.

15         MS. NIEHAUS:  He recalled that because he knew that there

16    were allegations made in court about the destruction.  He doesn't

17    recall because he has a firsthand understanding.

18         THE COURT:  We really have two issues here.  One is

19    destruction of documents.  The other is personal knowledge.  I am

20    still focused on the second question.  So what does this witness

21    have as far as knowledge of all of this?

22         MR. PAPANTONIO:  Judge, he was the chief counsel -- he

23    was the person in charge of running the entire C-8 legal.  I don't

24    -- Tim is the one who reviewed -- I took his deposition.  I don't

25    have an independent recollection of what he said.

189

1          THE COURT:  Are there other witnesses on this, the

2     Dr. Staats --

3          MR. MACE:  You have Dr. Staats, Your Honor.

4          MR. PAPANTONIO:  Yes, sir, there are other witnesses.

5     First of all, we will definitely call Laura Korte on this as their

6     personal rep.

7          THE COURT:  My first concern, before we ever get to the

8     underlying issue, I don't to see any personal knowledge here.  He

9     may have position --

10         MR. O'BRIEN:  I may be speaking out of turn, by I'm

11    almost certain it's in the Reilly deposition because Reilly was

12    the environmental counsel during this time with respect to the CAT

13    Team meeting.

14         THE COURT:  I haven't prohibited you from offering

15    evidence about records being destroyed, but it will still have to

16    be someone with knowledge.

17         MR. PAPANTONIO:  Judge, I can't represent to the Court

18    that I did that in this deposition.  I can tell you that the story

19    of Staats ties directly into so many parts of this case.

20         THE COURT:  Okay.

21         MR. PAPANTONIO:  All the way from the CAT Team.

22         THE COURT:  I am not excluding it at this point, but with

23    regard to this --

24         MR. PAPANTONIO:  I don't know that I did in this witness.

25    And the best thing he may have said, I have a recollection of it.

190

1          MR. O'BRIEN:  Your Honor, in light of that, in light that

2     we can get it in through Mr. Reilly, we'll pull it down.

3          THE COURT:  That's 92:4.

4          MR. MACE:  Just for the record, we're not stipulating

5     that can get it in through Reilly.  We have the same issue.

6          THE COURT:  I understand.  We're just dealing with this

7     issue.  You certainly have the right to see differently in the

8     other witnesses.

9          But that takes us to 92:4 to 98:18.

10         I am not exactly sure what the objection is on page 26.

11         MS. NIEHAUS:  It carries over to the next page with the

12    marking of 360, and the objections are to the questioning of

13    Mr. Bowman regarding document 360.  He doesn't establish -- He

14    says, when did you have a chance to look through all the

15    documents?

16         And he says, about eleven years ago.

17         And then he goes on to question him about this document

18    without establishing that he ever -- had any familiarity with this

19    document.  And it's not just the:  Mr. Bowman, have you ever seen

20    this document before.  It's the:  Have you ever seen this document

21    before?  Or even no foundation laid that way.  And then reading

22    the document into the record.

23         THE COURT:  We have got on page 28 the question is:  You

24    made a recommendation about this.  Or your department made a

25    recommendation, he said, about using masks?

191

1              And he said, yes.

2              MS. NIEHAUS:  But preceding that is a lengthy reading

3      from the document, and then the question that has nothing to do

4      what was just read.

5              MR. PAPANTONIO:  Judge, what is remarkable about Bowman

6      is what he knew or should have known or what he could have done,

7      what he failed to do, what his position was.  He was the guy in

8      charge of legal.  He took no action.  And either he -- The jury

9      can conclude one or two things by the weight of the evidence:  A,

10     he's not telling the truth; or, B, the company was so -- was --

11             MS. NIEHAUS:  But, Your Honor --

12             THE COURT:  We have got thousands of these to go through.

13     We don't have time to spend.  If I had five objections, I would

14     give you each 20 minutes.  But we don't have that kind of

15     universe.

16             He is part of the decision-making process.  So the

17     objection is overruled.

18             And that takes us all the way over to page 29.  And I

19     think the question objected to is whether 3M and DuPont made the

20     C-8.

21             MS. NIEHAUS:  They were the only ones.  It says, just 3M

22     and DuPont that made C-8.  That's inaccurate.  DuPont didn't make

23     C-8 into well into the 2000s.  It's an inaccurate as to the time,

24     and it's inaccurate to the foundation.

25             MR. O'BRIEN:  It is a matter for cross-examination, which

192

1    they chose not to do.  He says, to my knowledge, that's accurate.

2         THE COURT:  I'm going to overrule the objection.

3         Then that takes us over to page 31.  Just a moment.  I'm

4    going to overrule the objection.  That takes us through from line

5    183:20 to 185:17.  And this has to do with the consent decree,

6    which we have gone up and down about, not with this witness, of

7    course.

8         MR. MACE:  For clarity, judge, this is one of the

9    documents that we had objected to in terms of it being a

10   preliminary document, an internal document where EPA was deciding

11   whether it was going to enter the consent decree.  558 is not the

12   consent decree.

13        MS. NIEHAUS:  And Mr. Bowman was also retired at this

14   time.  So this isn't even a situation where he was involved in

15   organization at the time the document --

16        THE COURT:  Just to be clear, what you are saying is not

17   in the record.  What he's describing it as is the consent decree.

18   That's what I assume we are talking about.  It doesn't say

19   anything about a preliminary consent decree.

20        MR. MACE:  We can look at the document.  Your Honor is

21   well familiar with it.  The fact is, as Ms. Niehaus is pointing

22   out, this witness has no knowledge of it.  This all occurred after

23   he retired.

24        MR. PAPANTONIO:  Judge, this is the document -- just to

25   help the Court with this, there are so many documents -- this is a

193

1    document that goes in and says that DuPont failed to disclose the

2    toxicology.  They failed to talk about the blood issues.  They

3    failed to talk about the water contamination.  This is absolutely

4    something --

5                THE COURT:  What year did he leave DuPont's employ?

6                MR. O'BRIEN:  He retired as a W-2 employee in or around

7    2005 but remained as a 1099 consultant for DuPont --

8                THE COURT:  Well, this is the 2004 consent decree, right?

9                MR. O'BRIEN:  Right.

10               THE COURT:  I mean the objection is overruled.

11               MR. MACE:  The allegations were made in '04.  The consent

12   decree was not entered until '05.

13               THE COURT:  But, again, he was involved in the relevant

14   time period.  So this document is coming in anyway with some

15   redactions, of course.  So the objection is overruled.

16               We get over to page 36, line 214:2.  This is going to be

17   a recurring theme.  Mr. Bilott's name is going to come out in the

18   testimony, and we will get to the documents.  To jump ahead, I'll

19   hear from you, we are going to take his name out leaving the Taft

20   firm in.  So as far as information and notice, that will come in.

21   But I will take out references to somebody trying a case.  So I

22   will take out from 20 -- 214:2 through 215:24.

23               And, actually, there's an objection to 216:1 to 216:5.

24   The question was fine, but the answer indicates no knowledge.  So

25   I'm going to take that out.

194

1          MS. NIEHAUS:  I'm sorry, Your Honor, your reference to

2     this again?

3          THE COURT:  Sure.  What's coming out is starting on 214:2

4     through 216:5 is out.

5          And the rest of the information on page 37 and through

6     line 217:13 will be in.

7          And the reference to Mr. Bilott, line 225:16 through

8     225:24, is out.

9          And then the rest of the page is in on page 38.

10         And the objections on page 39 are overruled.

11         And the objection regarding the Tennant farm starting on

12    341:8, that's on page 48 --

13         MR. O'BRIEN:  Your Honor, there were redactions.  And

14    what we had proposed in our response was to sync up the testimony

15    to redact out of the answers whatsoever specific words, because

16    this document was allowed in but certain words were required to be

17    redacted out.  We will simply sync up the testimony to reflect the

18    redactions in the Court's prior ruling on this document.

19         MS. NIEHAUS:  And our objection goes to the discussion of

20    this very issue by an attorney for settlement.  And the jury

21    shouldn't be able to infer any sort of liability because the

22    attorney is envisioning worst case scenarios.

23         THE COURT:  You can argue.  I don't disagree.  But I

24    don't think at this point I am ready to include it.  So that takes

25    us up to 345:6.

195

1        MR. MACE:  Would you give a limiting instruction on that?

2        THE COURT:  I would.  Just to be clear, we're going to

3    start -- it's the same objection basically starting on 341:8

4    through 345:2.  There will be some redactions.  But otherwise, the

5    objection is overruled.

6        And I'm going to overrule the objection on page 51.

7        And when we get to page 54, there are lines -- as I

8    understand the lines to be withdrawn on 361:16 through 361:21.

9    And the rest of that, 361:22 through 362:5, stays in.

10       And 362:13 through 362:24 are in.

11       And then --

12       MS. NIEHAUS:  Okay.

13       THE COURT:  And then on page 55, 363:23 through 364:2 is

14   out per agreement.

15       The next lines, 364:5 through 364:12, are in.

16       And lines 365:15 through 366:2 are out.

17       And then on the next page, 366:3 through 366:10 are out.

18       And that take us through the first of many depositions.

19       All right.  I think the next one only has a single

20   objection.

21       MR. O'BRIEN:  Dr. Cawley.

22       THE COURT:  It's the one that mentions other plaintiffs.

23   There's really no reason to offer that, is there?

24       MR. O'BRIEN:  Your Honor, there's actually objections

25   that I have got as well based on the prior motion *in limine* based

196

1    upon Dr. Cawley's causation opinion.  No, as to what's on the

2    page --

3              THE COURT:  It must be lines 8:12 through 8:15.

4              MR. O'BRIEN:  We agreed to take those out.

5              THE COURT:  There are more objections here.  I see them

6    now.  So that takes us over to lines 29:5, and I believe this was

7    covered in the motion *in limine* decision.

8              MS. NIEHAUS:  Not to make Tim's argument for him, but I

9    think there's one that starts at 20:16.

10             MR. MACE:  The shading is a little hard to read.

11             THE COURT:  Again, I am color blind.  Where?

12             MR. O'BRIEN:  On page 20, line 16.

13             THE COURT:  All right.  We're going to count that as a

14   colored objection --

15             MS. NIEHAUS:  It's not my objection.  It's Mr. O'Brien's.

16             THE COURT:  Blame it on Mr. O'Brien.

17             MS. NIEHAUS:  I'm going to blame it on Mr. O'Brien.

18             This I believe was subject to the motion *in limine* that

19   you had indicated that you would issue a ruling on.

20             THE COURT:  Yes.  We're going to hold those for the

21   decision.  I think that covers a lot that's in here, right?

22   That's the primary dispute?  So on this one I say we hold until

23   you get a decision, which will be fairly soon.  I'm a little busy.

24             MS. NIEHAUS:  Understood.

25             MR. MACE:  Join the club, Your Honor.

197

1          MS. NIEHAUS:  Our objection was at 103:8 to 103:21, which

2     I think plaintiffs have agreed will come out pending your ruling

3     as well.

4          MR. O'BRIEN:  Right.  So in other words, if the Court

5     grants our motion on causation, we would agree to take those down

6     because it's -- it would go to why she has no opinion --

7          MS. NIEHAUS:  If Your Honor doesn't grant that motion,

8     though --

9          THE COURT:  Then you are still objecting to it.

10          MS. NIEHAUS:  Objecting on the basis that --

11          THE COURT:  This is what I suggest we do.  Since there is

12     a motion pending, let's leave her for now.

13          MS. NIEHAUS:  All right.

14          THE COURT:  And then after you get the decision, we will

15     resolve it.

16          All right.  That takes us to Fayerweather.

17          MR. MACE:  Yes, sir.

18          THE COURT:  Little things to do to clear up.  You're

19     preserving -- On page 9 of her deposition there's an objection to

20     just the exhibit number.  That's preservation of the exhibit being

21     offered.  Objection to the exhibit.

22          MS. NIEHAUS:  Your Honor, we have preserved our

23     objections to any of the documents used in any of these

24     depositions.  I think we are going to move on to exhibit

25     discussions.  If there are any ruling on exhibits that impact the

198

1    designation --

2            THE COURT:  I understand.  We will treat that as alive

3    and well as far as an objection.  All right.

4            MS. NIEHAUS:  Our only objection to the testimony right

5    now for Dr. Fayerweather starts at 294:14, and that goes back to

6    our motion *in limine* on the handwritten notes.  And this is the

7    stretch of Dr. Fayerweather's testimony about Exhibit 39, which

8    are those handwritten notes that are not his and appear to be

9    notes from two separate meetings --

10           THE COURT:  We had this discussion before, but just to

11   make the record clear, he could not identify the handwriting.

12           MS. NIEHAUS:  Correct.

13           THE COURT:  He did say the document was consistent with

14   his recollection.

15           MS. NIEHAUS:  The first page.

16           THE COURT:  And the documents were produced by DuPont.

17           MS. NIEHAUS:  That document was produced from the file of

18   DuPont.  But there has been no testimony saying --

19           THE COURT:  I get it.

20           MS. NIEHAUS:  -- who took it down, where they came from,

21   what they mean --

22           THE COURT:  The first page described a meeting.  He could

23   remember being at the meeting but couldn't remember the

24   document --

25           MS. NIEHAUS:  The first page --

199

1          THE COURT:  -- and couldn't remember the handwriting.

2          MS. NIEHAUS:  Exhibit 38, just to put this in context,

3      Exhibit 38 to this deposition is Dr. Fayerweather's own notes from

4      a meeting that took place in October of 1991.  They fully

5      questioned him about that set of notes that he says he took no

6      part in.

7          There is a second set of notes, it is a three-page

8      document, that appears to be notes from two separate meetings, one

9      being that same October, 1991, meeting.  He said, yes, I don't

10     know who took these notes, generally consistent with my

11     recollection, which you just questioned me about, on my own notes.

12         Then there is a separate part of that document, it is

13     consecutively Bates numbered, but it's clearly the second two

14     pages of notes are from a separate meeting.  His name is not on

15     the document.  He doesn't recognize the handwriting.  He says it's

16     not consistent with any meeting he attended.

17         THE COURT:  Let me hear the response.

18         MR. O'BRIEN:  Your Honor, when it plays out with the

19     deposition, it's all part of a practice.  So if we take out a

20     specific one sentence, do you remember this one half of a sentence

21     or this one sentence, it's about what -- the discussion about

22     whether we do a study or do not do a study.  So --

23         THE COURT:  Wouldn't the notes -- So there is one set of

24     notes really aren't in question.  He confirmed those are

25     consistent.  There's another set of notes, the defense is saying,

200

1    we are not -- he didn't testify were consistent.

2         MR. MACE:  Yes, sir.

3         MR. BILOTT:  Your Honor, just one clarification.  These

4    two documents that are marked Exhibit 39 --

5         THE COURT:  Can anybody hand me a copy?  It would be

6    helpful to see.

7         MR. PAPANTONIO:  That would be very helpful for the

8    Court.

9         MR. BILOTT:  Exhibit 39 was produced by DuPont as one

10   document.  They referred to it as two separate notes, but it was

11   produced as one document, and the witness was questioned on it as

12   one document.

13        MS. NIEHAUS:  Your Honor, just because a document gets

14   stapled in discovery doesn't makes it one document.

15        THE COURT:  If I could see it, I also want to see -- tell

16   me generally what you think really is hurtful that the jury

17   shouldn't hear.

18        MS. NIEHAUS:  Sure.  This is the document that was

19   produced.

20        THE COURT:  The first page is not the issue, is it?

21        MS. NIEHAUS:  Well, the first page he says is consistent

22   but is still not his notes.  But the real issue that you

23   identified the last time was these second two pages.  And I would

24   point out --

25        MR. MACE:  So the record is clear, we're talking about P1

201

1    2543.2 and 3.

2         MS. NIEHAUS:  Right.  And if you look at the top of the

3    first page, Your Honor, his name is actually on that indicating

4    that he -- and it's consistent with his testimony, that he

5    attended that meeting in October of '91.  They're not his notes.

6         The second two pages are undated.  But there's also a

7    list of individuals --

8         THE COURT:  His name is on -- oh, here it is.

9         MR. MACE:  On the first page.

10        MS. NIEHAUS:  On the first page.  On the second two

11   pages, there's a list of individuals at the top.  I think it's

12   Playtis, Zipfel and Powers.  Fayerweather's name is not on it.  He

13   says that these two pages are not consistent with his

14   recollection.

15        MR. PAPANTONIO:  Whoa, whoa, whoa.  No, he does not --

16        MS. NIEHAUS:  Yes, he does.

17        THE COURT:  I want to hear -- Let me -- The second page,

18   by the way, I am not going to hold myself as a handwriting expert,

19   but it looks like the same handwriting.  That doesn't change much.

20   But having said that, I guess the question is:  Could the jury

21   infer this was all from the same meeting?

22        MR. PAPANTONIO:  Yes, sir.  Judge, if I might, we

23   assigned this particular document to Chris Paulos who is well

24   prepared on this document if you want to hear anything else.

25        THE COURT:  From your side -- I want to hear from you,

202

1    but let me just -- So this is back in '91.  What does it say or --

2    is that the date you understand it to be --

3          MS. NIEHAUS:  Well, the first document is dated.  The

4    second --

5          THE COURT:  I can't read it very well.

6          MS. NIEHAUS:  The first page says October something of

7    1999.

8          THE COURT:  All right.  And you are contending, you don't

9    know what the next two are.

10         MS. NIEHAUS:  The next two pages are from a different

11   meeting.  Now what Dr. Fayerweather says --

12         MR. PAPANTONIO:  No, they're not.

13         MS. NIEHAUS:  Mr. Papantonio, may I finish, please?

14         THE COURT:  He -- I mean -- You disagree on that.

15         MS. NIEHAUS:  The question is posed to him, does that --

16   the notes starting on page 2, pages 2 and 3, does that reflect

17   your recollection on discussions in conjunction --

18         THE COURT:  What line are we on?

19         MS. NIEHAUS:  -- yada, yada.  Well, this is actually in

20   the deposition testimony we provided to it in an exhibit.  It's

21   not in a designated portion of the testimony.

22         THE COURT:  All right.  Can I see that?

23         MS. NIEHAUS:  Sure.  And it's really this part down here

24   starting at 300:15 through 23.  It's that bottom right quadrant

25   there.  And he says, no, it's puzzling.  It looks like it's from a

1    totally different meeting.  And he says, it doesn't refresh his

2    recollection of anything.

3              MR. MACE:  And it's not consistent.

4              MR. PAULOS:  Well, Your Honor, of course, he is going to

5    say that because of what the content of the document says, which

6    is DuPont is going to wait and be sued until it does any sort of

7    research into C-8.  And that's why the witness is disavowing it.

8              THE COURT:  I want to get at the gravamen here.  These

9    notes are hard to read.  Where do you see that?

10             MS. NIEHAUS:  At the bottom --

11             THE COURT:  I see it.  At the bottom of the second page.

12   That's really what the issue is.

13             MS. NIEHAUS:  The notes are read to Dr. Fayerweather.  He

14   has no way to explain them.  He has no way to contextual them.

15   And he says they are not consistent with any meeting he attended.

16   The first page of notes is.  The second two pages are not.

17             THE COURT:  I get it.  I want to read this.  Hang on for

18   a second.  So --

19             MS. NIEHAUS:  Your Honor, here is page 301 as well.  If

20   you read pages 300 and 301 --

21             THE COURT:  Do you have the whole deposition?

22             MS. NIEHAUS:  I don't have the whole deposition.

23             THE COURT:  If you have 299.  That's what I am looking

24   for.

25             MS. NIEHAUS:  Here's the excerpt we provided with our

204

1    motion.

2             THE COURT:  Well, that's 293.  All right.

3             So refresh my memory.  Mr. Playtis is a witness in this

4    case.

5             MR. MACE:  Yes, sir.

6             THE COURT:  Has he been questioned about the document?

7             MS. NIEHAUS:  He was not at the *Bartlett* trial.

8             THE COURT:  Because his name is on page 2.  I presume

9    there's -- I don't know if -- It's really page 2 that is the issue

10   here.

11            MS. NIEHAUS:  It's pages 2 and 3.

12            MR. MACE:  For clarification, we don't have an objection

13   to the witness with firsthand knowledge of the notes or the

14   meeting that he was at.

15            THE COURT:  I'm just looking for a practical way.  Has

16   Playtis been questioned about the document?

17            MR. PAULOS:  Your Honor, Playtis wasn't questioned about

18   this document at the *Bartlett* trial.

19            THE COURT:  Is he coming to trial?

20            MR. MACE:  It's our expectation, Your Honor.

21            MR. PAPANTONIO:  Well --

22            MR. MACE:  Yes, he is.

23            MR. PAPANTONIO:  You will call Playtis?

24            MR. MACE:  Yes.

25            MR. PAPANTONIO:  Oh, okay.

205

1          THE COURT:  What's the problem if we let him be

2     questioned about this first?  Would you expect to be playing this

3     deposition before his -- Well, this will be in your case-in-chief.

4     That's the problem.

5          MR. PAPANTONIO:  Judge, to make this easier for the

6     Court, we will do that.  The thing they are worried about is this

7     is a powerful statement, let's wait until we get sued to take any

8     action.

9          THE COURT:  It seems to me the problem we have is this

10    issue of --

11         MR. PAPANTONIO:  Yes, sir.  There is no question of that.

12    I understand.

13         MS. NIEHAUS:  Your Honor, it doesn't solve the prejudice

14    entirely.  Asking Dr. Playtis:  Have you seen these notes?  Is

15    this consistent with your recollection?  When Dr. Playtis has an

16    opportunity to explain and put the statement in context is one

17    thing.  To allow this testimony at all, whether it comes before or

18    after Dr. Playtis's testimony --

19         THE COURT:  My point would be let's hear from

20    Dr. Playtis.

21         MS. NIEHAUS:  But then let's take it out of

22    Dr. Fayerweather because Dr. Fayerweather --

23         MR. MACE:  I think that's what he's saying.

24         THE COURT:  I'm thinking more of the order here.  I wish

25    I could make -- This is not Dr. --

206

1          MS. NIEHAUS:  This is Dr. Fayerweather, yes.

2          THE COURT:  The only problem I see is the sequence

3   because this would be in the plaintiff's case-in-chief, unless you

4   want to call Dr. Playtis on cross.

5          MR. PAPANTONIO:  I don't want to call him adversely.  No

6   doubt I will call Laura Korte, their representative.

7          THE COURT:  Well, how about leaving it -- I would like to

8   give you some finality here, but how about we do it this way.  We

9   will take this out for now.

10          MR. PAPANTONIO:  Yes, sir.

11          THE COURT:  And then we will have Dr. Playtis in your

12   case-in-chief.  We will see what he says.  He may end this matter.

13   If he doesn't, then we will readdress it, and you'll be able to

14   use this in rebuttal.

15          MR. PAPANTONIO:  Yes, sir.

16          MS. NIEHAUS:  Just to close the loop entirely on this, if

17   they are permitted to use this portion of the designated

18   testimony, we reserved our right in our separate submission and

19   hopefully we'd be allowed to designate additional testimony from

20   Dr. Fayerweather's transcript where he says that it's not

21   consistent with his recollection because that doesn't currently

22   appear in the designations.

23          THE COURT:  I'm being an optimist here.  If we end up

24   having this resolved once and for all by Dr. Playtis, then you may

25   not even need this witness or this exhibit here.  So that's how I

1    want to leave it for now.

2          MR. PAPANTONIO:  Judge, I do want to point out there are

3    consecutive documents and consecutive Bates stamps, and I don't

4    want the Court thinking we had just mixed up documents here.

5          THE COURT:  I mean there is no dispute about how they

6    were tendered and so on.  It's all a question of whether or not

7    the -- authentication basically.

8          So all right.  I think -- Correct me if I am wrong -- but

9    that covers all of page 19 and all of the issues through 299:17 on

10    page 20.

11          MS. NIEHAUS:  It's the entirety of the objection for

12    Dr. Fayerweather.

13          THE COURT:  Then there is something about Exhibit 40

14    that's flagged here.

15          MS. NIEHAUS:  That was just a preservation.

16          THE COURT:  All right.

17          MS. NIEHAUS:  Let me just double-check my notes.  But I

18    think the only objection for Dr. -- The only testimony objection

19    for Dr. Fayerweather was the objections we have just gone through

20    on the testimony.  Exhibit 40, we were preserving in the event

21    there was a ruling made with respect to that document when we get

22    to the exhibits --

23          THE COURT:  What's Exhibit 40?

24          MS. NIEHAUS:  P1 2544.

25          THE COURT:  Now I remember.  I'm kidding.

1          MS. NIEHAUS:  I'm actually not sure, but it may be an

2     exhibit that we have objected to --

3          THE COURT:  If there anything we need to address?

4          MS. NIEHAUS:  Not in this context, Your Honor.

5          THE COURT:  Now we get to -- Is this doctor or is it

6     Mr. Flaherty?  You're not a doctor.  So we have the issue of

7     availability.

8          MR. O'BRIEN:  There are two overriding objections to

9     Dr. Flaherty.  First is the availability issue.  He's a retained

10    expert, and he would come to trial if asked by Mr. Mace and his

11    team.  The second overriding general objection is you'll see

12    peppered throughout is really this issue of chain of custody by

13    these water samples.  They can't prove the evidence is what it is,

14    what it purports to be.

15         THE COURT:  Let's deal with the first one.  I think we

16    have this with -- two witnesses maybe?  Or just --

17         MS. NIEHAUS:  There's three, three experts, Mr. Flaherty,

18    Dr. Graham and Dr. Sykes, who live outside 100 miles of the

19    courthouse.  We've submitted a separate brief on this.

20         THE COURT:  I've read them both.  You take differing

21    views.  I guess the real question is:  Can you make the other side

22    produce their expert when they're beyond the subpoena power and

23    they've already been subject to a deposition.

24         You crossed this person.

25         MR. O'BRIEN:  We took his deposition, his discovery

209

1      deposition.

2              MR. PAPANTONIO:  Purely discovery.

3              MR. O'BRIEN:  A discovery deposition.  When you take a

4      discovery deposition, you're looking to find out what the opinions

5      are.  And so you're not unfairly surprised.

6              THE COURT:  You have got only two weeks from today.  One

7      way to solve this -- and I understand that.  Taking a discovery

8      deposition and taking a deposition for trial oftentimes is the

9      difference between night and day.  What about an option of

10     deposing him?

11             MR. PAPANTONIO:  Sure.

12             MR. O'BRIEN:  Yes.

13             THE COURT:  Does that work?  Then you don't get into an

14     issue of -- Obviously, live testimony is preferable, but there are

15     limitations, and that's what the subpoena rules are about.

16             MR. PAPANTONIO:  Judge, the focus, obviously, would be

17     there's no chain of custody on this material that they say is so.

18     And it's a genuine issue in this case.  It will be fairly narrow.

19             THE COURT:  All right.

20             MS. NIEHAUS:  Well, Your Honor, I don't know if

21     Mr. Flaherty, Dr. Graham or Dr. Sykes will be available for

22     deposition between now and trial.  I don't know.  This is the

23     first time it has been raised.  I actually believe Dr. Graham is

24     out of the country for a period of weeks, Your Honor.

25             MR. MACE:  And in fairness, Your Honor, they've known

210

1    that we intended to present by deposition for many months, and

2    they could have asked for the deposition at any point prior to

3    this time.

4          THE COURT:  Let's wait and see.  If they are out of the

5    country, perhaps even do a video or telephonic.

6          MR. PAPANTONIO:  We will find them wherever they are,

7    judge.

8          MS. NIEHAUS:  Your Honor, this raises a separate issue,

9    though.  We have designated the testimony of these experts on very

10    narrow issues.  Dr. Graham, for example, yes, there is a

11    discussion on the first piece of evidence.  But the plaintiff

12    still brought forward evidence in the *Bartlett* trial about the

13    reports of possible birth defects in rats and in the -- the

14    response of DuPont in removing women from the line.  And in

15    Dr. Graham's testimony, he specifically says those things were not

16    signals, that DuPont response was reasonable.  And we have

17    identified very narrow testimony, I think it's about 8 minutes

18    long or something along those lines.  And plaintiffs in response

19    identified pages and pages and pages of testimony.

20          I mean what we are seeking to introduce these witnesses

21    for are very, very narrow subjects.  And so plaintiffs shouldn't

22    be permitted to then, either by designation or at a deposition,

23    expand it way beyond the scope of that direct.

24          THE COURT:  Actually, you can.  There's a rule on that

25    actually.  Let me make sure I quote it exactly.  It has to do with

211

1    the scope of cross-examination.  Not all of you are Ohio lawyers,

2    but I always remember this is where the Ohio rule and the federal

3    rule are not the same.  The federal rule says that the scope of

4    cross is limited by the scope of direct, with an exception.  And

5    that exception is that if justified, then the scope of cross can

6    go to anything relevant, but it's as if on direct examination.

7           MR. PAPANTONIO:  Yes.

8           THE COURT:  So I don't think necessarily that, the fact

9    they're beyond the scope of the direct, is going to limit it.

10          MS. NIEHAUS:  But there are other considerations that the

11   evidence rules speak to in terms of efficiency, waste of time and

12   relevancy.

13          THE COURT:  You know, reading the transcript and not

14   having somebody at trial is pretty hard to decide.  I don't know

15   the entirety.  I am sure there's going to be some similarities.

16   But at this point I'm not just as a general matter going to say

17   they will exceed the scope of direct examination.  So I'm trying

18   to think of a good way to leave this.  But I will give the

19   plaintiffs one last shot at this.  Actually, I'm looking at Rule

20   611.

21          MR. PAPANTONIO:  Judge, here's the point.  The very fact

22   that they want this narrow use to say that we acted reasonable,

23   the entire case is surrounding the concept of reasonableness.

24          THE COURT:  I think that's the problem.  It happens a lot

25   where you can have a very narrow direct, but the cross takes in of

212

1    a lot of weeds.  So I am not prepared to exclude anything on that

2    basis at this point.  Some of this might go away with the

3    deposition.  Is that possible?

4          MR. O'BRIEN:  Yeah.

5          MR. PAPANTONIO:  Judge, we will go take depos of all of

6    these people.  Mr. Mace said we have had this time to do this.  We

7    have really -- We really need -- We need these decisions.  We

8    needed this hearing to where all this could be on the table.  The

9    Court has no way to figure this out without hearing this.  All you

10   are doing is reading.  It's almost impossible to figure out what

11   the issues are.  But so it's not like we have failed to do

12   something.  We will go take their depositions gladly.

13         THE COURT:  You are going to still offer some of this.

14   So we might as well go through some of the specific objections.

15   With regard to -- Again, we have literally thousands of pages to

16   go through, and time is somewhat short.  So help me out with the

17   designations here.  The beginning part of this is all DuPont's

18   designations, right?

19         MS. NIEHAUS:  Now the blue is actually plaintiff's

20   counter designations.  So you don't actually pick up our

21   designations -- this is part of our point is --

22         MR. MACE:  The point really on this, judge, is counter

23   designations.  The rule is different for live testimony as opposed

24   to depos.  The depo counter designation is supposed to be limited

25   to the topic, the subject of, and make it a rule of completeness.

213

1    This is not to get into a bunch of other things.

2         THE COURT:  This is the problem.  This is what I think of

3    why the Ohio rule is better.  Then all they have to do is after

4    your case-in-chief is to supply this as their -- part of their

5    impeachment.  So it's -- You know, you can't stop this.  That's

6    the Rule 611 we're talking about.  If you decide -- If you prevail

7    on their examination being beyond the scope of direct, they can

8    call a witness in their case.  So it's just we're chasing our

9    tails with this rule.  It never ends up with finality.  So on that

10   basis I am not prepared to exclude anything, but we need to go

11   through these line by line.

12        So the beginning part is offered.  This part about

13   availability in court, that's not for the jury to decide.  So

14   whatever we do with that, that's coming out.  That's on the first

15   page.  That's a legal matter.

16        And there's an objection to -- These pages aren't

17   numbered, but we will do it line by the line.

18        MR. MACE:  At the very top of the page.

19        THE COURT:  With us with poor eyes, it's hard to find.

20   Page 26, line 18 --

21        MS. NIEHAUS:  That objection is actually on the next

22   page.  It's this whole section of testimony that's highlighted

23   going over to page -- it ends on page 33, 33:22.

24        THE COURT:  These are chain of custody matters.

25        MS. NIEHAUS:  Right.  There's no allegation -- There's no

214

1    evidence whatsoever of tampering, for example.

2            MR. O'BRIEN:  It's their --

3            THE COURT:  I've read the -- You know, we need to move

4    forward.

5            MR. O'BRIEN:  It's their burden to establish.

6            THE COURT:  You're going to win this.  So the objection

7    is overruled.  We can put that in play.

8            Of course, you can come back with:  There's no evidence

9    of this.  So that's the --

10           Then we get over to page 45.  As I read this, is there

11   any knowledge of a witness -- how it was being sent from DuPont?

12           MS. NIEHAUS:  I'm just sorry, Your Honor?

13           THE COURT:  I'm on line -- page 45, actually page 47,

14   it's in the middle of the page.

15           MR. O'BRIEN:  Your Honor, there's really two separate --

16   in the highlighted testimony, there's really two separate -- The

17   question on 47:2 through 6 is clear stands on its own, a clean

18   question, a clean answer.  A written protocol regarding how

19   someone collected samples would've helped to ensure that people

20   properly collected these samples, correct?

21           And he says, yes.

22           And then the objection really addresses --

23           THE COURT:  I'm looking at, you don't recall there were

24   problems related to preparation and shipping.

25           He's with Exygen, right.

215

1    MR. MACE:  He was, yes.

2    THE COURT:  So that objection is overruled.

3    And then we're going to go over to --

4    MS. NIEHAUS:  Your Honor --

5    THE COURT:  You know what?  We need to move forward.

6    Page 49, really we're just talking about the dates,

7  aren't we?  That's lines 8 through 16.  That's not going to be an

8  issue, is it?

9    MS. NIEHAUS:  It's really about the fact whether there

10  was a first set.

11    THE COURT:  Well, he says he doesn't remember.  So

12  there's not much of an answer here.

13    MR. O'BRIEN:  Right.  But then they -- he is shown a

14  document about that first set of samples that were sent to him in

15  the next document.

16    THE COURT:  All right.  That objection is overruled.

17    Tell me about Dr. Kaiser.

18    MR. MACE:  She was a scientist at DuPont, Your Honor, the

19  chief analytical chemist.  And she's the one that retained Exygen

20  to do -- to get an improved water sampling test protocol.

21    THE COURT:  So in this document she writes, here's some

22  information on blood measurements in Exygen.

23    MR. MACE:  I'm sorry, sir, where are you at?

24    THE COURT:  I'm at the bottom -- actually page 50, line

25  19.

216

1          By the way, all the attorney objections in these should

2     come out.  I want to make sure that we all have that

3     understanding, that there is no reason to read that to the jury.

4          MR. MACE:  Yes, sir.

5          THE COURT:  So she writes, ignore the first paragraph on

6     water samples since we stopped that analysis due to preparation

7     and shipping problems.

8          MS. NIEHAUS:  And this objection really goes to the next

9     portion of it where she says -- First, she's reading from a

10    document.  She says, does that refresh your recollection?

11         And he says, no.

12         THE COURT:  Well, here's what I want to know.  So this is

13    an internal DuPont document not sent to him.  Is that your

14    position?

15         MS. NIEHAUS:  Yes, I believe so.

16         THE COURT:  So any reason I shouldn't accept that?

17         MR. O'BRIEN:  Well, because, number one, he's an expert.

18    He's not a fact witness.  Number two, they rely on Mary Kaiser's

19    statements to him about what we want to do with the -- with the

20    water samples.  And so evidence admissions from DuPont that are

21    internal for this expert to not have considered about this

22    shipping and chain of custody problems is proper.

23         THE COURT:  I want to get your view.  You're saying this

24    goes to tests that he was running.  And she has taken the view

25    that somewhat discredits the samples.

217

1        MR. O'BRIEN:  Correct.

2        THE COURT:  All right.  Normally, you know, he's an

3    expert and he's not with DuPont.  I am not going to take the view

4    as we have with other witnesses that knowledge is an issue with

5    him.  It's not.  But this goes to the work that he did?

6        MS. NIEHAUS:  Well, this goes to something internally

7    that was going on at DuPont --

8        THE COURT:  But respect to his work, though.

9        MR. MACE:  It's one occasion, Your Honor, that he wasn't

10    involved with.  And he said he had no knowledge of.  That's the

11    issue.  He has no personal knowledge of it.  So it was one

12    separate occasion that he wasn't involved with.  It's not some

13    general proposition.

14        MS. NIEHAUS:  It's a direction to somebody else, not to

15    Mr. Flaherty.

16        THE COURT:  Without more, I think we have to exclude

17    that.

18        Then this next, it starts on page 96, there's several

19    pages of objections regarding -- This also has to do with protocol

20    and monitoring, that same sort of chain of custody information.

21        MR. O'BRIEN:  Right.

22        THE COURT:  I'm going to overrule that objection.

23        MS. NIEHAUS:  Well, Your Honor, there's some inference in

24    here that chain of custody forms were destroyed.  And all Flaherty

25    testified to is that he didn't know that they were available and

218

1    didn't know the applicable record retention policy.  It is an

2    internal DuPont record retention that Flaherty has no control

3    over.  He's not a qualified witness to talk about that.

4            MR. O'BRIEN:  But he's an expert talking to the truth --

5    He's the only one on behalf of DuPont that's going to talk about

6    these water samples.

7            MR. MACE:  That's not true.  We have another expert as

8    well.

9            THE COURT:  Yes, but if it goes to the samples and the

10   testing, it's within his work assignment.  So I'm going to

11   overrule the objection.

12           And then we get over to page 111, and that takes us all

13   the way through 113.  So I'm trying to read my own notes here.

14   Just a second.  So as I understand this, there's a company selling

15   water filters?

16           MS. NIEHAUS:  Correct.  An advertisement that they put in

17   the paper.

18           THE COURT:  Does it refer to Exygen?  Is that what this

19   is about?

20           MR. MACE:  No, sir.

21           THE COURT:  He says he's not happy about it.  What was

22   that about?

23           MR. O'BRIEN:  This goes to the amount of samples.  So his

24   testimony is relevant to, well, I only had two samples, to show

25   that the filter worked.  It goes to the weight of his testimony

219

1    where he's making all these sweeping statements about the water

2    samples, and he has got the same quantity of samples as the filter

3    company.

4            THE COURT:  I'm not still not --

5            MR. MACE:  So this independent third-party company

6    heard --

7            MR. O'BRIEN:  I'm sorry, I wasn't finished with my

8    response.

9            MR. PAPANTONIO:  Could we finish our response, please?

10           THE COURT:  I'm going to listen to both of you.

11           MR. MACE:  -- that heard from the city about the C-8 in

12   the water, starting to try to advertise and sell filters for home

13   use.  So he was not involved with that, but he's being asked.

14           THE COURT:  He says he wasn't happy with the

15   advertisement.  What was that about?

16           MR. O'BRIEN:  Because they were representing that this

17   filter could take out of the C-8.  And he said with only two

18   samples, you can't make that representation.  So it's the issue of

19   the two samples.

20           THE COURT:  The two samples meaning --

21           MR. O'BRIEN:  Of water.

22           THE COURT:  That he tested?

23           MR. MACE:  No.

24           THE COURT:  The two samples that --

25           MR. O'BRIEN:  The third-party filter company tested.  So

220

1     it really goes to the scientific method.

2              MR. PAPANTONIO:  Judge, on the one hand, he's saying

3     throughout his testimony that the method they used, DuPont used,

4     was appropriate to figure out what the impact was.  Here, on the

5     other hand, he is saying it's inappropriate, basically same thing.

6              THE COURT:  He says, we did not give them permission to

7     use that data.  What's that about?

8              MR. O'BRIEN:  Because it was, frankly, the Exygen data.

9     I am sure if they have a trademark on it or copyright on it.  But

10    when you look at question that's asked --

11             THE COURT:  He used their data or the company used their

12    data to test?

13             MR. O'BRIEN:  The Exygen data.

14             MS. NIEHAUS:  Vapcon used Exygen's without permission in

15    the advertisement in the Parkersberg newspaper, and it was being

16    -- these products were being used for filtration on community

17    water taps or what's they were advertised for.  And he's saying

18    for that purpose, we did not feel that two samples was anywhere

19    near a sufficient sample size to verify that the filter worked.

20             THE COURT:  You are saying -- You guys know too much

21    about this.  Two samples, what's that referring to?

22             MS. NIEHAUS:  They are referring to -- he's referring to

23    the use of the Exygen data in this advertisement, and he's saying

24    it's an improper representation of the data in the advertisement.

25             MR. PAPANTONIO:  That's the weight of the evidence.

1          MR. O'BRIEN:  But here's the heart of the issue on this

2     line of questions so that Your Honor doesn't think it's collateral

3     or satellite.  He's says, well, they're making this representation

4     about this water sample, and we don't know where they got that

5     water from.

6          Then the question is asked, well, you don't know the

7     water where DuPont wanted you to measure came from?

8          And he says, no, I don't know.

9          It's the same problem.  It's the scientific method.  This

10     testimony is so rife with problems.

11          MS. NIEHAUS:  This article -- or this advertisement

12     they're seeking to put in front of Mr. Flaherty, I mean it's --

13          THE COURT:  Here is the problem that I have.  I don't

14     consider jurors less intelligent than I am.  But are they going to

15     see the advertisement?  Is that part of the deposition exhibit to

16     it?

17          MR. O'BRIEN:  We don't have to send the exhibit back at

18     all, simply his testimony.

19          THE COURT:  I read this and am thoroughly confused.

20          MR. O'BRIEN:  It really goes to the last -- beginning of

21     page 113, line 7, through 114, line 5.  That's the point of what

22     this question is.  Everything that you criticized this company

23     about, that applies to you as to what you are doing here for

24     DuPont as an expert as well.

25          THE COURT:  I am going to overrule the objection.

222

1          And I think that takes us to Veronica Freeman.

2          MR. O'BRIEN:  Your Honor, this one -- I believe she's

3     within subpoena power.  This is an availability issue.  If they

4     want to subpoena her, they can subpoena her at trial.

5          THE COURT:  What about the issue of the deposition?

6          MR. O'BRIEN:  They haven't shown that she's not --

7     unavailable.

8          THE COURT:  I am sorry, this is the wife of the

9     plaintiff?

10         MR. O'BRIEN:  Right.

11         THE COURT:  So the issue here is you can bring her to

12    trial.

13         MS. NIEHAUS:  If she appears live, we don't need to use

14    designations.  But there's no indication that she will be there

15    live.

16         MR. O'BRIEN:  She can subpoena -- my point is that she's

17    within the subpoena power.

18         THE COURT:  Listen.  Now I'm talking as the judge in the

19    case.  If you want her, she should be here.  And she's the spouse.

20    You didn't file a consortium claim so she's not a party.  I

21    suggest that you subpoena her, and that part goes away.

22         MS. NIEHAUS:  If for whatever reason she becomes

23    unavailable, we would --

24         THE COURT:  I mean if you can show me she's served and

25    didn't show up here, we can get into all of that, but I assume

223

1   you're going to have her here.

2          MR. O'BRIEN:  Right.  We're not going to send her to

3   where Dr. Graham is.

4          THE COURT:  I wouldn't want to be dealing with the

5   plaintiff's spouse.  She wouldn't enjoy meeting the marshals.

6          MR. DOUGLAS:  Unless you guys have some plans for her.

7   She's safe.

8          THE COURT:  All right.  So in Jacob Freeman, this is the

9   son?

10         MR. O'BRIEN:  Correct.

11         THE COURT:  He lives in El Paso.  So he may --

12         MR. O'BRIEN:  No.

13         THE COURT:  I'm sorry.  His brother lives in El Paso.

14  He's a student at Marietta College.  That's in the district.  Same

15  issue with him?

16         MR. O'BRIEN:  Right.

17         MS. NIEHAUS:  I believe at his deposition he testified

18  that he was spending the summer -- it may not be in the

19  designations actually, Your Honor, but I believe he testified that

20  he would be spending this summer in an internship in Arizona.

21         Mr. Leber, do you remember?

22         MR. LEBER:  That's accurate.

23         THE COURT:  Any reason he can't come back?

24         MR. O'BRIEN:  No.  If they tell me they want him here for

25  this trial, we will get him here.

224

1          THE COURT:  That takes care of him.

2          And this is Dr. Karrh?

3          MS. NIEHAUS:  As far as we know, the plaintiffs are going

4     to call --

5          THE COURT:  The problem is resolved.

6          MS. NIEHAUS:  Your Honor, we did skip over Dr. Graham I

7     believe.

8          MR. MACE:  I think he's putting him in the same camp as

9     the others, but there may have been some specifics he wants to

10    address.

11         THE COURT:  Graham came after Flaherty?

12         MR. PAPANTONIO:  Judge, maybe -- We're going to take

13    these people's depositions.  We will find Graham.  If he's in Pago

14    Pago, we will take his deposition.  So some of this may be a waste

15    of the Court's time.

16         MS. NIEHAUS:  Just to be clear on the record on our

17    position about Flaherty, Graham and Sykes being the experts,

18    they're 100 miles -- they reside 100 miles away from the

19    courthouse.  And the way we read the rule to mean that -- It's not

20    an issue of whether we procured -- whether we made a good faith

21    effort --

22         THE COURT:  Again, I'm not making any findings of that

23    sort.  But the whole issue goes away if they have an opportunity

24    for a trial type of deposition.  So if we can do that, I think

25    that matter is put to bed.

225

1        MR. MACE:  Once we talk to them, judge, we may be able to

2    confirm they may in fact be live, so there won't be a need for a

3    depo.

4        MR. PAPANTONIO:  And that's fine as long as they tell us

5    they're going to be live, they will be here to where we have a

6    chance --

7        THE COURT:  I assume you will do that.

8        MR. MACE:  Yes, sir.

9        THE COURT:  So Karrh is the one with no objections.

10    Then we get to Little.  And there are a few with him.

11        MR. O'BRIEN:  And, Your Honor, this is one that you have

12    ruled on extensively; and, of course, we have got a stipulation

13    pertaining to the exhibits about the foundation and authenticity

14    which carried over from *Bartlett* into the present case.

15        I just want to make sort of a general statement, if I

16    may, in two minutes or less.

17        THE COURT:  I have a watch on you.

18        MR. O'BRIEN:  Yes, Your Honor.  And I think it's

19    important to recognize that Your Honor spent a lot of time on

20    this, and this is an MDL, and the Court -- the rulings carry

21    forward.  Of course, interlocutory rulings can always be

22    reconsidered, but there should be a basis for it.  We have not

23    asked for because there were many, many, many pages of

24    Mr. Little's --

25        THE COURT:  I get it.  I try to be consistent, but I do

226

1    leave the option to either side to ask me to reconsider something,

2    that normally if I am consistent, I won't be granting many of

3    those, but you certainly have a shot.

4          MR. MACE:  Let me just clarify one thing that counsel

5    said because the stipulation that was agreed to was in writing,

6    and it was not as to everything on these documents.  It was 26

7    listed documents on authenticity.  But, though, we were not

8    waiving any of the objections to documents not stated.

9          MR. PAPANTONIO:  Well, we actually stated on the record

10   in front of His Honor, and we relied on that ruling, that it was

11   authenticity and foundation.  It was expressly on the record, and

12   I cite where it was.

13         And the judge asked Ms. Niehaus, is that correct?

14         And she said, yes.  But we reserve the right to object on

15   other grounds, that's correct, that we didn't as to hearsay or

16   what have you or 403 or those issues.  But authenticity and

17   foundation, those issue were off the table.

18         MR. MACE:  It wasn't foundation.

19         MS. NIEHAUS:  The agreement was that you didn't have to

20   introduce --

21         THE COURT:  Don't --

22         MS. NIEHAUS:  -- portions of the testimony --

23         THE COURT:  -- argue with each other.

24         MR. NIEHAUS:  The agreement was that plaintiffs didn't

25   have to introduce portions of other witness's testimony in order

227

1     to get the documents in.

2             But we still object to documents being put in front of

3     Mr. Little where he has no knowledge of them, where he can't

4     explain them or he can't contextualize them --

5             THE COURT:  You know, we are talking in generalities.  If

6     you have got specific objections, let's go to those.  It will be

7     simpler.  From my standpoint, I have I think a lot of recollection

8     of a very long trial, but my recollection is not perfect.  General

9     issues are harder to decide than specific questions.

10            All right.  So let's go to -- We are on page 23, and

11    we're on line 75.

12            MR. MACE:  There was an objection on 13.

13            MS. NIEHAUS:  13, Your Honor.

14            THE COURT:  You are calling me senile?

15            MR. MACE:  No, sir.

16            THE COURT:  All right.  Let's go to the top of the page.

17            Did you get to these letters a lot while you were the

18    plant manager?

19            This is referring to a letter from the West Virginia DEP,

20    right?

21            MS. NIEHAUS:  A letter that alleges violations of permits

22    and regulations.

23            THE COURT:  Yes.  Well, his recollection is:  I don't

24    recall.

25            That answer doesn't give much factual basis for the jury,

228

1    does it?

2        MS. NIEHAUS:  Well, the question is -- it's a loaded

3    question such that this would --

4        THE COURT:  I think I am tilting your way so far.  Isn't

5    that really the issue?  If he says, I don't recall, there's

6    nothing for the jury to factor in.

7        MR. O'BRIEN:  Well, I think it's important that he

8    doesn't recall.  It was a whopper to get and not recall it.

9        THE COURT:  This was the question is:  Did you get a lot?

10   Not a particular letter?

11       MR. O'BRIEN:  Did you get these letters a lot while you

12   were the plant manager at Washington Works such that you would

13   just kind of -- it would be kind of something that doesn't stick

14   out in your memory.  It's a fair question and a fair answer.

15       THE COURT:  I am going to overrule the objection.

16       MS. NIEHAUS:  Well, the --

17       THE COURT:  We need to go forward.  All right.  We're

18   going over to page 23.

19       MS. NIEHAUS:  Your Honor, this particular line of

20   questioning relates to a document.  It sets up questioning later

21   on in the transcript about a document LP 320.  So the question

22   here has no foundation as it's asked.  It's saying, anywhere did

23   you let the community know that internally DuPont scientists

24   regarded C-8 as highly toxic?  There is no foundation for asking

25   Mr. Little -- you know, he's saying, did you let them know this?

229

1    But there is no foundation for internal scientists regarding C-8

2    as highly toxic.  So this question has absolutely no foundation.

3            He then later revisits the line of questioning --

4            THE COURT:  Let's stay with that.  So the phrase you

5    really object to is highly toxic.

6            MS. NIEHAUS:  Well, I mean, yeah.  The implication is

7    that there are DuPont's scientists who regarded C-8 as highly

8    toxic, and there's no foundation for that.

9            MR. O'BRIEN:  It's right in the deposition.  Later on,

10   it's right in the deposition.

11           MS. NIEHAUS:  At this point there's been no foundation

12   for that.

13           MR. O'BRIEN:  107:24 through 108:21.

14           THE COURT:  Where are we?  107?

15           MS. NIEHAUS:  Then, Your Honor, we get to page 107.

16           THE COURT:  Let me read this first.  And there's

17   objections to this too, of course.  But let me just read it.

18   Direct me to a line.

19           MR. O'BRIEN:  It's --

20           MS. NIEHAUS:  It 107:10.

21           MR. O'BRIEN:  He was asking me.  So it's 107:24, and the

22   specific question is, highly toxic, 108:16 to 108:17, continues on

23   I believe.

24           MS. NIEHAUS:  Your Honor, the discussion is respect to

25   this document marked as LP 320 in the testimony.  And you will see

230

1       that the questioning, the line of questioning, putting aside

2       whether Mr. Little had any knowledge of this document, which was

3       created long before he was ever a plant manager, but it's a

4       complete misrepresentation of the document which on the very first

5       page, there's a list at the top that says, oral toxicity, highly

6       toxicity.  And then it goes down and talks about different types

7       of toxicity based on different --

8               THE COURT:  Highly toxic goes with inhalation toxicity,

9       which isn't alleged here.

10              MS. NIEHAUS:  Inhalation which is not alleged here.

11              THE COURT:  Listen to me.  I'm agreeing with you.  Let me

12      keep looking.  Is that the only place that highly toxic is used in

13      the document?

14              MS. NIEHAUS:  I believe so, Your Honor.

15              MR. O'BRIEN:  Highly toxic pervades these documents.

16      It's all over --

17              MR. PAPANTONIO:  That's just not true, judge.

18              THE COURT:  Let me tell you where I want to focus on here

19      because it's a narrow issue.  I have ruled -- this is one of the

20      witnesses that I have ruled can be questioned about documents

21      about which he did not have personal knowledge for two reasons.

22      One, because he is the public spokesperson.  So what he didn't

23      know that was in DuPont's knowledge is something that they can

24      hear about.  And, second, these are with documents that DuPont

25      supplied.  So there's no authenticity issues -- well, they may be

1       authenticity issues, but there's no claim these weren't in the

2       possession of DuPont.

3              But I still want to drill down.  This phrase "highly

4       toxic" that's an important question that has to have a foundation.

5       But this is the only place I see it so far on this document is

6       regard to inhalation, and that's not our case.

7              MR. O'BRIEN:  But it is.  The case doesn't begin and end.

8       It's how they acted all together.  Just as if -- well, Mr.

9       Freeman, who was not an employee.  But they come in and talk about

10      all the wonderful stuff they did for their employees.  It's not an

11      employee case.  It's not a worker's comp case.  But they introduce

12      it to show they are reasonable.

13             Here this is all about pollution.  And keep in mind that

14      there is -- this case is an air exposure but it's not about

15      proximate cause, Your Honor.

16             THE COURT:  But press release, this is getting into what

17      he said in a press release.  And the inference that you want the

18      jury to draw is that the corporation knew a lot more than what's

19      in this press release.

20             But highly toxic, that will apply to people inhaling

21      this.  That wasn't the water users.

22             MR. O'BRIEN:  It was talking about C-8 in general

23      because --

24             THE COURT:  I'm referring to the document, it says

25      inhalation toxicity.

232

1    MR. O'BRIEN:  Right.  But the point is if we pipeline all

2    this evidence, Your Honor, through, oh, it's only about the people

3    who ingested in same manner as Mr. Freeman did, that's not the

4    duty.

5    THE COURT:  Here's what I'm going to do.  We are going to

6    skin the cat.  The document does say highly toxic, but I think

7    you're entitled to an instruction, this has to do with inhalation

8    toxicity, not drinking water.  And I will tell the jury that, if

9    you wish.

10   MS. NIEHAUS:  And, Your Honor, could we also have the

11   jury know that this same document says, with respect to oral

12   toxicity, it says slightly toxic.

13   MR. O'BRIEN:  That's cross-examination, Your Honor.  They

14   can get this on cross-examination.

15   MS. NIEHAUS:  Your Honor, the plaintiffs can't at one --

16   THE COURT:  Well, the document -- Are you offering this

17   document?

18   MR. O'BRIEN:  We did offer the document.  The jury will

19   have the document.

20   THE COURT:  Assuming that's admissible, you will able to

21   use the document --

22   MR. PAPANTONIO:  Show it to their witness.

23   MS. NIEHAUS:  The fact is these questions are premised --

24   they are completely inaccurately premised.  And for the jury to

25   hear that without some other guidance and to have to wait then

233

1       until the document comes in at some point, they won't be able to

2       keep track of --

3               THE COURT:  I will give the instruction, and that's the

4       best we can do at this point.  Timing is another matter.  All

5       right.  So that stays in, but -- all right.

6               And I think that takes us over to page 30.  And I assume

7       that goes to the plaintiff's claim about knowledge and their

8       corporation.

9               MS. NIEHAUS:  This is the same document, Your Honor.

10              THE COURT:  Same document, so same ruling on that.

11              And then we're going to go to 44.  By the way, if you go

12      up to line 144:12, I don't think that should have read $350,000.

13              MR. O'BRIEN:  It doesn't play that way.  It's a typo.

14      The jury doesn't have to hear dollars.

15              THE COURT:  We will assume that the jury won't hear that.

16              And then the question is:  That's a big number.  It is a

17      lot of C-8.

18              The answer is:  It's a big number, yes.

19              He's the plant manager.  The objection is overruled.

20              And that takes us to page 51, starting at line 167:2.

21              MS. NIEHAUS:  Your Honor, this is another issue with

22      documents, and you've ruled that the plaintiffs can show

23      Mr. Little a document and ask him if he ever knew about it.  But

24      that shouldn't give them free license to then read the document

25      into the record.  Once -- especially in a document like this,

234

1    which was created long before Mr. Little ever became plant

2    manager.  All they are doing here is asking him to confirm if they

3    have read it correctly.

4         MR. O'BRIEN:  That's incorrect.  What it follows up with

5    is about, well, what you are communicating to employees is a lot

6    different than what you are communicating to the public.

7         THE COURT:  Again, I view this -- I can't remember a case

8    where I ever let people be examined by documents they haven't

9    seen.  I have already explained my reasoning.  I am staying with

10   that.

11        It begets the second problem, that there's a lot of

12   reading of the documents.  But I think that's just necessitated by

13   the way we are trying this case.  The issue is what did the

14   corporation know?  And that cuts both ways.  We will be getting

15   into some documents that DuPont wants to offer.  And the jury has

16   to get the mix, both pro and con here.  So there is some reading

17   the document.  I would urge you to do as little of this.  But in

18   depositions you can't fix it.  So at this point, the objection is

19   overruled.

20        That takes us over to page 57, the top of 58.  I'm going

21   to, starting at line 197:5 to 197:16, that will be -- the

22   objection will be sustained.

23        And then over on page 60, those objections are overruled.

24        That takes us to page 73, and the objection -- that's at

25   the bottom of 73, the first line of 74, that will be overruled.

235

1          That takes us to 82.  And that objection is going to be

2     overruled.

3          That takes us to the middle of page 83.  Overruled.

4          That takes us to 85.  And those objections will be

5     overruled -- I am sorry, page 86, not 85.

6          And 87, I think we've talked about this before.  Internal

7     core values sorts of statements, internal standards don't

8     determine the standard of care.  They may be relevant to the

9     determination of the standard of care.  When something like this

10    comes up, you are entitled to a limiting instruction if you ask

11    for it.  It would be along those lines, that the jury will make

12    this decision.  They will consider all relevant evidence.  This is

13    not the standard.  In other words, if DuPont has an internal

14    standard they exceed, that doesn't automatically constitute

15    negligence.  But this is something for the jury to consider.

16         MR. MACE:  Let me just make sure the record is clear,

17    when Your Honor is referring to page numbers, he's referring to

18    the lower right-hand corner of the document, which are the

19    excerpts that have been given to the Court, which will be made of

20    record.  He's not referring to depo page numbers.

21         THE COURT:  To be precise, it's the lower right hand

22    corner with the left number.

23         MR. MACE:  Yes, sir.

24         THE COURT:  There are two numbers.  Right?

25         MR. MACE:  But it's not the actual depo pages.

236

1        THE COURT:  All right.  So we get over to 106, and we

2    have this color problem, again, starting at 338:12.  Is this an

3    objection or --

4        MR. O'BRIEN:  No, I think that's just a text note who

5    designated that.

6        THE COURT:  That's fine.  I think that takes us to the

7    end then of Mr. Little.  So I will suggest we take a ten-minute

8    recess at this point.  I will see you back here in ten minutes.

9      (Recess from 10:30 to 10:40.)

10       THE COURT:  So I imagine if these documents alone didn't

11   produce a settlement, nothing will.  So I assume we're going to

12   trial.

13       All right.  Now we are to Mr. Reilly, and now this is the

14   one that's easy to remember because it's unusual for the

15   testimony.  Let me just first ask if we can winnow down what's new

16   or is it pretty much what we have been through before?

17       MS. NIEHAUS:  There is nothing new in terms of testimony

18   added for Mr. Reilly, but there are some objections that we are

19   renewing --

20       THE COURT:  And I want to preserve all those, make sure

21   we've done.  I guess what I am asking is there anything specific

22   that you would like me to consider to ask me to reconsider?

23       MS. NIEHAUS:  Well, I think there are some things that

24   were impacted about the motions *in limine*, but it looks like we're

25   mostly in a agreement on the numbers --

237

1          MR. O'BRIEN:  On the number of lawyers, there is one

2     class of objections that we agree with some of them on and --

3          THE COURT:  Let's see if we can work something out here

4     because I don't think it's helpful to the jury on two fronts, the

5     size of the EPA or the number of lawyers that DuPont has.  But I

6     don't want -- Either side can draw an inference the other side

7     would want to rebut.  Neither of those are going to be helpful to

8     the jurors.

9          MR. O'BRIEN:  For what it's worth, it's a little more --

10    It's a little different than that where, for instance, we agree

11    that when the question was asked, and you have 250 lawyers at

12    DuPont legal, we're taking that down.

13         THE COURT:  Right.

14         MR. O'BRIEN:  However, and you worked with five other

15    people in the environmental department, then what did you do.

16    That's all --

17         THE COURT:  I mean five doesn't have -- I mean there's

18    going to be more than five of you on each side, so that won't draw

19    any inference the wrong way.

20         So we would have an understanding on that about the size

21    of DuPont, the size of the EPA.  I don't think that means much to

22    a jury without a whole lot more testimony than what they're going

23    to hear.

24         MR. MACE:  I think that's right, unless they open the

25    door to something.  I mean their experts tried to make it sound at

238

1      some point in the prior trial where EPA didn't have the manpower

2      or money to pursue things.  So I don't think we need to go

3      there --

4              THE COURT:  I think on that -- I do remember that issue,

5      and I -- Again, it cuts both ways.  So not having the manpower is

6      one issue.  But making them sound like they're this behemoth is

7      another issue.  That's the comeback that would come with.  But I

8      don't think either of those are particularly edifying to the jury.

9              MR. PAPANTONIO:  We didn't raise it first the last time.

10     It came to us, gee whiz, the EPA didn't do anything.  The EPA is

11     this monstrosity.  And it sounded like the EPA was in charge of

12     independently being the steward for all the decisions that DuPont

13     made.

14             THE COURT:  What I would suggest that you stay away from

15     anything that infers they're a behemoth, on the one hand.  But it

16     is going to be one of the issues in the case with what the EPA did

17     or didn't do.  That's going to be in play.  It has to be.

18             MR. PAPANTONIO:  I agree, judge, but they still make it

19     relevant.  They actually make it sound like the EPA is better

20     equipped than they are.  When you get to that point, knowing that

21     the Haskell Laboratories is the premier laboratory in the world,

22     in the world during the time this was taking place, and they have

23     5,000 of this and 5,000 -- I think it's unfair -- Most jurors

24     believe -- they really do believe that the EPA has the ability to

25     or the FDA has the ability to test drugs, and the EPA has the

239

1    ability to do all this independently, and it just isn't how it

2    works.

3           THE COURT: Well, I don't think we're going to get a

4    final agreement on this. But I think the more each side tends in

5    that direction, the more latitude I'm going to give the other

6    side. So I would urge both sides to probably stay away from that.

7           Back with regard to anything additional that you would

8    like me to consider with Mr. Reilly? I've read this again, and I

9    know what the objections are.

10          MS. NIEHAUS: Well, I mean Your Honor the highlight

11   portions are the portions that we asked you to reconsider --

12          THE COURT: Well, we can go through each page if we have

13   to. There's a lot of them.

14          MS. NIEHAUS: I think probably Mr. O'Brien and I can work

15   out the issue on number of attorneys that accounts for a number of

16   the objections in here.

17          Your Honor, at page 58, lines 199:24 over to 201:9 on the

18   top of the following page, there's a line of questioning, it's

19   premised on this incorrect notion that DuPont was manufacturing

20   C-8 and putting it out in the environment. They were using it as

21   a processing aid. But also there is a direct question to Reilly:

22   You were not intentionally putting C-8 into somebody's drinking

23   water, would you?

24          And Mr. Reilly's response -- What Mr. Reilly -- while

25   there's no evidence that DuPont intentionally put C-8 in DuPont's

240

1    drinking water. The claim here is a negligence based claim. But

2    whatever Mr. Reilly personally might do or not do is irrelevant.

3                MR. O'BRIEN: They used Mr. Reilly's e-mails to show, oh,

4    look. Even Mr. Reilly didn't think there was anything wrong. So

5    it went into his mind set.

6                MS. NIEHAUS: It's defendant's position that Mr. Reilly's

7    e-mails should never have come in in the first place. Because we

8    added context to plaintiff's use of Mr. Reilly's e-mails, that's a

9    different issue. This is separate and apart from that.

10               MR. PAPANTONIO: Judge, Mr. Reilly was, again, involved

11   with C-8 from -- for years. And what they say is, no, we didn't

12   use Mr. Reilly -- They continually, continually, use Mr. Reilly --

13   I can think of three instances. One was where he said, gee, the

14   good news is we didn't find any problems with human beings.

15   That's in one of the documents. We didn't feel like we were doing

16   anything wrong. That certainly goes to what Reilly could have

17   known and should have known and failed to act on.

18               And so it's not just -- We are not randomly asking

19   somebody for a mental process. We're asking for a mental process

20   that is very significant in that it's driving -- it's in part the

21   conduct of this company. And so this -- Had this just been

22   somebody randomly we asked for their mental process, I get that.

23   But this is the guy driving the issues, who knows more about it

24   than most people.

25               THE COURT: I don't know how well you can fine tune this,

241

1      but I think what needs to come out is the word "intentionally."

2              MR. PAPANTONIO:  That's fine.

3              THE COURT:  Can you do that and still maintain the --

4              MR. PAPANTONIO:  I think we can, yes.

5              THE COURT:  It's on line 200:14 and 200:23.

6              MR. O'BRIEN:  We will take those out.

7              THE COURT:  Anything else?

8              MS. NIEHAUS:  On page 61, Your Honor, there's a portion

9      of the testimony at 208:1 7 to 209:12, this is a line of

10     questioning about the reason why Mr. Reilly's personal e-mails

11     were available here because they were kept on the company's

12     servers.

13             And, Your Honor, you may recall plaintiffs playing this

14     video portion Of Mr. Reilly's testimony several times.  Because at

15     the bottom Mr. Papantonio says, isn't that a good thing that they

16     kept your e-mails?

17             And Mr. Reilly's response is, you're saying it's a good

18     thing.  You can frame it any way you want.

19             And he laughs nervously when he is responding to the

20     question.

21             And plaintiffs have excerpted that portion of the

22     testimony and portrayed it as Mr. Reilly laughing sinisterly.  And

23     it's clear that he's laughing nervously.  This is an uncomfortable

24     situation for him.  We all understand that context.  I don't think

25     the jurors understand that context.

242

1      MR. PAPANTONIO:  Judge, the purpose of a deposition like

2  that is to capture the totality of what -- the response to a

3  question.  The truth is it wasn't the only time --

4      THE COURT:  I don't mean to interrupt, but I'm with you.

5  I think, first of all, I think it will clear up some question of:

6  How did this all come out?  And this will tell them why.  So I

7  think -- I don't want anybody misrepresented.  I remember the

8  testimony.  And what he is really saying is, I goofed.  I

9  shouldn't have put this on the DuPont e-mail system.  But that's

10  what the case -- that's the way of the facts as we find them.

11      MS. NIEHAUS:  Your Honor, that can be accomplished by

12  keeping in 208:17 to 209:4 where he's saying, I obviously didn't

13  understand or appreciate that.  That's life.

14      But that last portion, the 209:5 to 209:12 where Mr.

15  Papantonio is, frankly, just digging the knife in a little deeper

16  and saying, yeah, but that's a good thing, isn't this?  And then

17  Mr. Reilly laughs nervously, that part is very prejudicial when

18  it's played to the jury.

19      MR. PAPANTONIO:  One instruction that the jury gets is

20  that you can evaluate a witness's demeanor.  That's his demeanor.

21  And it was far worse than that, I can assure you.

22      THE COURT:  I have ruled.  It will stay in.

23      MR. PAPANTONIO:  Yes, sir.

24      MS. NIEHAUS:  Your Honor, I think you've ruled on our

25  objections on pages 71 through 75, and we've addressed those

243

1    issues with a limiting instruction.

2              THE COURT:  And I don't mean to cut off any objections

3    you want to lodge.  So we will note those again.

4              MS. NIEHAUS:  Your Honor, on page 79, starting at line

5    279:6, and then carrying over to page 82, line 285:9, this is the

6    portion of testimony, you will recall I think, where Mr. Reilly is

7    very crass, very unscientific and in informal terms describes his

8    understanding of how C-8 moves through the body.  And the

9    plaintiffs use this, this is a reading from a personal e-mail of

10   Mr. Reilly where he's describing it to -- I can't remember if it

11   was his son or his army friend -- but the plaintiffs then used

12   this description, a lawyer's description, of how C-8 moves through

13   the body, which is completely false and unsupported, and turn it

14   into an animated demonstrative at trial.  There is absolutely no

15   scientific basis for this, and to represent to the jury that an

16   environmental in-house lawyer at DuPont's description of how C-8

17   moves through the body is accurate is false and misleading.

18             MR. PAPANTONIO:  Well, judge, it's not misleading and

19   it's not --

20             THE COURT:  It's his e-mail.

21             MR. PAPANTONIO:  It's his e-mail.

22             THE COURT:  I think on that -- You know, you can bring

23   out any scientific invalidity, but at this point it will be

24   admitted.  I have already ruled that way.  It stays in.

25             MS. NIEHAUS:  Just for our record, we will reserve our

244

1    ability to object to animated demonstrative --

2            THE COURT:  You're not going to use that demonstrative,

3    are you?

4            MR. PAPANTONIO:  In the last trial, judge, we created a

5    demonstrative that explains -- that captured exactly, exactly,

6    what Reilly described.

7            THE COURT:  But isn't there -- Is there a doctor's

8    testimony to go with this?

9            MR. PAPANTONIO:  Oh, yes.

10           MR. O'BRIEN:  We will have an expert testify to this.

11           THE COURT:  So there won't be -- you're not going to be

12   holding out Mr. Reilly as an expert?

13           MR. PAPANTONIO:  No, no, no.

14           THE COURT:  And that's all I am referring to.

15           MS. NIEHAUS:  Again, we would just want to review that

16   for accuracy and reserve objections on accuracy.

17           THE COURT:  And page 92, I think we're -- you're

18   describing more -- this isn't the number of lawyers issue.  This

19   is just the number of people in the section, about five or six.

20           MS. NIEHAUS:  This is asking to count lawyers.  Again, I

21   think Mr. O'Brien and I can probably work through the testimony

22   regarding the number of lawyers.  If there is an issue, we can

23   bring that back.

24           THE COURT:  All right.

25           MS. NIEHAUS:  Your Honor, I think those are all the

245

1    objections to Mr. Reilly.

2          THE COURT:  All right.  And then this takes us to the

3    DeeAnn Staats, Dr. Staats.

4          MS. NIEHAUS:  Yes, she's a Ph.D. toxicologist who was in

5    -- she was an in-house toxicologist.  I mean she may have actually

6    been the first toxicologist employed in-house at WV DEP, and she

7    served as the leader of the CAT Team.

8          THE COURT:  Okay.

9          MS. NIEHAUS:  This is DuPont's testimony that we

10   affirmatively submitted.  We had a couple of sections where Your

11   Honor had ruled in the first Bellwether trial --

12         THE COURT:  Well, there are only handful here.  We can go

13   through these relatively quickly.  Correct me if I am wrong, but

14   the first one is on page 175 that's at issue?

15         MS. NIEHAUS:  That's the testimony that we would like you

16   to reconsider.

17         THE COURT:  I'm going to go through it page by page.  My

18   notes indicate there are about four or five.  I can go through

19   each one quickly.  I think that's the first one.

20         MS. NIEHAUS:  Yes, 175.

21         THE COURT:  And this was being asked by the plaintiff's

22   side?

23         MS. NIEHAUS:  We would like to include this testimony.

24   It was not included in the first run.

25         MR. O'BRIEN:  Dr. Staats has not been designated as an

1   expert witness in this case.  So a lot of what the objections

2   pertain really -- this is really opinion testimony.  This really

3   goes to --

4           MR. MACE:  The purpose, Your Honor, for this is coming in

5   for notice and knowledge, that DuPont is at these meetings where

6   she is making the discussions.  DuPont is at this deposition when

7   it was taken in 2002.  So it is hearing statements --

8           THE COURT:  The question starts, within your recent

9   statements in the public meetings.  Were their DuPont people at

10  those meetings?

11          MR. MACE:  They were, and they were also at the

12  deposition.

13          THE COURT:  It is right on the line.  To some extent it

14  is opinion.  To another extent it is a comment on studies.  I'm

15  going to overrule the objection.  That will come in.

16          MR. PAPANTONIO:  Judge, if I might point out, that is why

17  the destruction of documents and her being urged to hire TERA and

18  her billing DuPont for being a strategist becomes important

19  because it does balance that out.

20          THE COURT:  All right.

21          And then I think we get to page 354, starting with line

22  3.

23          MR. MACE:  Again, she's describing the process that was

24  used as part of this CAT Team that she has personal knowledge of.

25  And it goes to the notice and knowledge that DuPont had.

247

1          MR. O'BRIEN:  But it's her opinion that she is

2    bolstering.

3          MR. PAPANTONIO:  Totally.  Judge, the other part of this

4    that I think has been missed is the CAT Team wasn't even finished.

5    This was still going on when this deposition was taken.  Again,

6    she is right in Louisiana.  She's like -- she's an hour away.  We

7    don't mind taking her deposition either.

8          As this case has developed, there are certain things -- I

9    think her depo was taken 14 years ago.  That's my recollection.

10   Was it 14 years?  And during this time none of this was actually

11   developed.  So, judge, what they have Ms. Staats testifying about

12   is something that's incomplete information because when it's all

13   --

14         THE COURT:  When was this taken?

15         MS. NIEHAUS:  This deposition was given in 2002.

16   Mr. O'Brien is correct about that.  But Mr. Bilott took the

17   deposition --

18         MR. PAPANTONIO:  Right.

19         THE COURT:  I want to get the time frame because this is

20   long before the Science Panel, for example.  I think one of the

21   things we get into in her answer -- and this comes up a lot, and

22   we have dealt with this -- she is telling the jury a different

23   standard basically.

24         MR. PAPANTONIO:  Correct.

25         THE COURT:  You are entitled to it.  And sometimes that's

248

1   also part of the knowledge base of DuPont.  So it's admissible for

2   one purpose, not for another.  It is the classic time to get the

3   limiting instruction --

4           MR. MACE:  As to their argument, judge, it comes in with

5   a limiting instruction because it is part and parcel of what

6   DuPont knew at the relevant time.

7           MR. PAPANTONIO:  Judge, may I say this?  They say this is

8   what we knew.  Not exactly.  But all this was developed over time.

9   When this deposition was taken, I think Mr. Bilott was --

10  everything was incomplete.

11          THE COURT:  Right.

12          MR. PAPANTONIO:  We have never asked -- because I'm

13  trying to think at the last trial you didn't play Staats.  But I

14  think -- Did you?

15          MS. NIEHAUS:  We did not play Staats.

16          MR. PAPANTONIO:  Here's the problem.  Staats is going to

17  come up again and again.  And this is such an easy deposition.  We

18  would take her -- obviously we would -- you know, we would take

19  her as our witness there in Louisiana.  All this can be cleared

20  up.  Otherwise these rulings are really not fair to any plaintiff

21  that's in front of the Court because it's all incomplete.

22          THE COURT:  What's your view if they did a deposition of

23  her?

24          MR. MACE:  Your Honor has already ruled on this.  Anybody

25  who was deposed previously in the cases, they had to give notice

249

1    within, which we did for some witnesses, and --

2          THE COURT:  I mean I know this would be an exception.

3    The other two -- Now she's in a different category than the other

4    two.  They were your experts.  And I am assuming you were

5    expecting them to come to trial, and they're not, which is your

6    prerogative.  But this witness is not in that category.

7          MR. MACE:  And she's not in the control of any party.

8          THE COURT:  I assume she could be if we know where she

9    is.

10         MR. PAPANTONIO:  This problem is this is not the last

11   time we will see Staats.  Now in fairness to everybody here, the

12   Court, both sides, this case has developed and as the case

13   develops we find, for example the reason they didn't use Staats in

14   the first trial, I am not sure --

15         THE COURT:  Here is my -- First of all, it's a 2002

16   deposition.  It's pretty old.

17         MR. MACE:  So are a lot of the other ones, Your Honor.

18         THE COURT:  But this one especially -- I don't know.

19   What is your view of taking a deposition again?  If she can be

20   located and scheduled?

21         MR. PAPANTONIO:  She is a meditation teacher in -- where

22   did she move?  Baton Rouge, Louisiana.

23         MR. MACE:  The purpose of this deposition coming in --

24   and this is one of the ones we had very limited designations, and

25   they counter designated quite a bit, it goes to the notice and

250

1    knowledge back at the time in 2002.  Their point that the

2    knowledge developed is part and parcel of the point --

3          THE COURT:  That's why I am inclined -- There are two

4    issues.  If you can't agree, then I'm not going direct that you do

5    a deposition.  Is that what I' hearing?

6          MR. MACE:  Yes, sir.

7          THE COURT:  Staying with this, though, I see a couple of

8    problems.

9          MR. PAPANTONIO:  We had to cut out so much of this

10   because it's so incomplete, judge.

11         THE COURT:  Well, what I want this jury to be told right

12   off the bat, and I will give the instruction about when this is.

13   This is in 2002.  That's in the deposition, but that's a point

14   that can be easily lost.

15         On page 354, there is a paragraph that I am going to

16   strike where she essentially -- whatever word you want to call it

17   -- bolsters, defends, goes through why this is such good -- I mean

18   it's really opinion testimony.  So it's lines 4 through 20 that

19   will come out.  I'm letting her testify that the vote was

20   unanimous but not about why she thinks it's so strong.  Okay.

21         Then I think that takes us over to -- 412?

22         MR. MACE:  Yes, sir.

23         THE COURT:  Lines 1 through 16.

24         MR. O'BRIEN:  And this was actually, the Court had

25   previously ruled, this was out in the *Bartlett* case.

251

1         MR. MACE:  Again, our position would be, Your Honor, in

2 terms of notice and knowledge.  They can have the instruction the

3 Court has offered to them.  But in terms of what DuPont was being

4 told by this official at WVDEP back in 2002, that's what they were

5 being told.

6         MR. O'BRIEN:  That's not the question.  The question is

7 not what did you base this on or what did you say at some public

8 meeting at a high school.  It is:  What did you think, Dr. Staats?

9         THE COURT:  And her credentials are she's a Ph.D. --

10         MR. MACE:  In toxicology.

11         MR. BILOTT:  That's the concern, Your Honor, is this

12 witness shouldn't be allowed to talk about fact issues.  But she's

13 bringing brought in as essentially a backdoor, undisclosed expert.

14         THE COURT:  She does even say in my opinion.  That

15 doesn't answer it.  I mean that alone doesn't make it an opinion.

16 But -- and what your question, Mr. Bilott, I assume you were

17 taking this as -- not assuming this was going to be a trial

18 deposition.  I am going to strike lines -- it will be -- Let's

19 see.  Let me make sure I get this right.

20         MR. O'BRIEN:  It's really throughout.  I mean it's so

21 pervasive --

22         THE COURT:  1 through 16 will be out.

23         And that takes us over to 423.  This is --

24         MR. MACE:  There was one at the bottom, 413.

25         MS. NIEHAUS:  This was Mr. O'Brien's objection.

252

1          MR. O'BRIEN:  And this was one that the Court had

2     previously ruled out because it's opinion testimony.

3          THE COURT:  It's the same as the previous one.  She's

4     giving an opinion, and she's not an expert for this case.

5          MR. MACE:  All right.  But then 423 is a different point.

6          THE COURT:  What's your professional opinion?  That's

7     clearly looking for an opinion.

8          MR. O'BRIEN:  Her personal use, do you drink the water.

9          THE COURT:  We have two different lines here.  I'm on

10     413:22, 23 and 24, and then 414:1, 2 and 3 that comes out.

11          MR. MACE:  Understood.

12          THE COURT:  All right.  Let me explain the next one as I

13     see it.  So when scientists want to insult somebody, they use

14     anecdotal evidence, and this is exactly what this is.  This is not

15     a scientifically based question.  And they may come up with some

16     witnesses.  We had this happen before.  Study, knowledge, all that

17     stuff comes in.  Personal opinion about whether they drink the

18     water or not or whether they did drink the water, that's out here.

19          All right.  Then we get to the Walter Stewart.

20          MR. PAPANTONIO:  Judge, before we to that, if the Court

21     would please consider when this testimony does come up, it may be

22     more evident why her depo may have to be taken at some point.  I

23     understand the rulings here.  But it is one of those depos that is

24     screaming out for a second effort.

25          THE COURT:  All right.  Then we're going to Walter

253

1    Stewart.

2        MS. NIEHAUS:  And Mr. Brogdon may have some comments on

3    Mr. Stewart.  Mr. Stewart is one in particular, Your Honor, where

4    we wanted to reassert our general objections to any questioning of

5    Mr. Stewart based on documents that he had no personal knowledge,

6    he wasn't involved in creating the document, had never seen the

7    documents before.

8        Mr. Stewart was a low-level environmental consultant at

9    Washington Works facility.  He had responsibility for reporting to

10   the agencies.  But he had no managerial responsibility, had no

11   direct report.  He just doesn't fall in the category of somebody

12   who should have known anything really frankly.

13       THE COURT:  Let's take this question by question.  I

14   think that will make my task a little bit easier because I

15   remember what his position was.

16       MR. O'BRIEN:  He had primary responsibility for

17   management of environmental issues at Washington Works, making

18   sure they were in compliance with environmental regulations and

19   communicating.

20       THE COURT:  I get that.  That is the first objection.

21   It's on page -- Let's see.  On the lower right is page 10.  And

22   this goes with his duty.  So that objection is going to be

23   overruled.

24       So there's not a whole lot of objections in here, but

25   let's find them.

254

1      MS. NIEHAUS:  The next one is on page 208:12.

2      THE COURT:  What is the bottom number?

3      MS. NIEHAUS:  61.

4      THE COURT:  So he's asked about a memo, and his answer

5   is, I probably read the memo.

6      MS. NIEHAUS:  Well, it's a loaded question.  The question

7   is, did Mr. Zipfel make you aware that it was not the

8   environmental program determining whether TBSA -- the replacement

9   be further analyzed, but it was the business needs of DuPont that

10  ultimately determined whether to further explore TBSA?  That's

11  counsel testifying.  His own response is, I probably read the

12  memo.  It doesn't confirm that that's what the memo said or that

13  that was the actual decision.  There is no evidence that he would

14  have even been involved in the decision or have known about the

15  decision.

16      MR. O'BRIEN:  That's in the prior questions.  That's in

17  the prior questions about the document all throughout 203 and 205.

18      THE COURT:  Let's see.  So this document is dated July 7,

19  1987.  Where do you contend that this document's description and

20  questioning begins?  Backing up, the preceding colloquy.

21      MR. O'BRIEN:  I want to make sure that we're on the right

22  one.  I believe it begins at 205, line 8 -- or really the question

23  205, line 11, which is on page 60.

24      THE COURT:  We're marking as 1.818.  Is that the same

25  document we're talking about when we get to the objected part?

255

1          MR. O'BRIEN:  It says Zipfel.

2          THE COURT:  Near the last copy.  I see that.  Under the

3     heading by Dr. Karrh.

4          So it was communicated to you there was a high priority.

5          Yes.

6          All right.  I'm going to overrule the objection.  There's

7     enough -- It's not just the preceding question.  It's about a

8     whole page.  He was at the meeting.  He was copied on the memo.

9     He understood the sum and substance.

10          MS. NIEHAUS:  For our record, this is a --

11          THE COURT:  You know, we don't have time to keep beating

12     these into the ground.  I'm sorry.

13          Let's go to Sykes.  This is a counter designation

14     objection basically.

15          MR. O'BRIEN:  The overriding objection is -- the question

16     is about, well, they didn't even tell you C-8 was there.  So this

17     witness is an expert witness retained by DuPont for purposes of

18     saying, we did the Cattle Team investigation.  We found no --

19     something other than C-8 caused it.  And so most of the objected

20     to testimony is about:  But they didn't tell you about the C-8.

21     So it's really, you know, from the *Daubert* standpoint, I'm not

22     even sure it gets in because they haven't done a differential

23     etiology correctly to understand C-8.

24          THE COURT:  I mean my reading, what you are asking him is

25     if he considered certain substances.  The answer is no.

256

1          MR. O'BRIEN:  Yes.

2          THE COURT:  So the objection is overruled.

3          And then in the next set of objections, skip over to

4     starting on page 242.  And this has to do with what documents were

5     given.

6          MR. O'BRIEN:  Right.

7          MS. NIEHAUS:  I'm sorry, I need to catch up with you.

8          THE COURT:  I'm at the bottom left, 242:14.

9          MR. O'BRIEN:  And it's the same type of issue.  You

10    didn't consider the C-8 information --

11         MR. MACE:  I'm not seeing 242:14.

12         MR. O'BRIEN:  It's at the bottom of --

13         THE COURT:  I'm looking at it --

14         MS. NIEHAUS:  We had quite a number of objections that

15    came before.

16         THE COURT:  Actually, I didn't see them.  If you want to

17    take them back.  There are a couple.  I see them.

18         MR. MACE:  So we start at 109:23.

19         MS. NIEHAUS:  Or 108:23.

20         THE COURT:  Then we get over to 119:8.

21         MR. O'BRIEN:  That's the heart of the issue.

22         THE COURT:  I'm not sure I understand the objection

23    there.

24         MS. NIEHAUS:  Well, the portion that we designated of

25    Dr. Sykes' testimony is about the finding of the Cattle Team, and

257

1      I think plaintiff's counter designations and perhaps Your Honor

2      has already ruled on this, but plaintiff's counter designations go

3      far beyond and just that there are potential toxic effects of C-8

4      in cattle, there has actually been an instruction that the parties

5      have developed and the Court approved it --

6              THE COURT:  You can get the instruction.  But as I see

7      this, the report is going to come in.  What they didn't consider

8      that relates to this case is certainly part of it.  I'm going to

9      overrule the objection on page 118, and there's another one on

10     page 130 with the same issue.

11             Then I think that takes us to page 133.  And this, again,

12     will be considered --

13             MS. NIEHAUS:  Well, 132:20 to 134:3 -- 133:20 to 134.3 --

14             THE COURT:  Wait a minute.  You lost me there.  That's

15     what I just said.

16             MS. NIEHAUS:  So this is about he's saying, we were

17     deciding whether you were going to take this on, this is his

18     involvement in the Cattle Team.  He said, I was hoping to pass it

19     on to somebody else --

20             MR. MACE:  Actually, I think that's as to his testimony.

21     As to his getting involved and testifying in these cases, that's

22     what he's really testifying about there.  So it's really not

23     probative of anything in this case.  It's whether he's going to

24     come and be a witness.  DuPont had asked him to come in and be a

25     witness.

258

1          THE COURT:  He says he's not going to do it.

2          MR. MACE:  He said he would prefer not to do it.  He

3     tried to get us to call somebody else.

4          THE COURT:  Right.  If he did do it and was making money,

5     you can show bias with this.  But he's saying he's not going to do

6     it.

7          MR. O'BRIEN:  It goes to his motivation.  He didn't want

8     to do it.  He wasn't so fired up and driven to be thorough and

9     accurate that -- it wasn't a primary interest to him.  So it's

10    like an academic interest question to him.

11         THE COURT:  If he did take the work, then he'd be under

12    examination for --

13         MR. O'BRIEN:  Well, obviously he did take the work if

14    he's being put for deposition --

15         THE COURT:  You just can't --

16         MR. O'BRIEN:  Right.

17         THE COURT:  -- but you're doing more than this, is what

18    I'm reading this to say.  Is that accurate?

19         MR. MACE:  Yes, sir.

20         THE COURT:  I don't think this hurts either side all that

21    -- so if he's going to be asked, did you agree to do more of

22    those?  He's going to say, no.  Right?

23         MR. MACE:  Okay.

24         THE COURT:  I don't see any harm to either side.  We'll

25    leave that in.

259

1          All right.  Then we get to page 242.

2          MS. NIEHAUS:  Yes, Your Honor --

3          THE COURT:  Sort of the same issue, isn't this?  You're

4     objecting it's beyond the scope of your designation.

5          MS. NIEHAUS:  Well, no.  It also mischaracterizes the

6     report.  The report doesn't say that C-8 was a chemical of

7     concern.  It says it was a chemical of interest.  So the question

8     misrepresents the substance of the document.

9          MR. O'BRIEN:  He corrects the question.  The witness

10    corrects the question with the answer.

11         THE COURT:  I don't want the jury confused, but he says

12    it's of particular interest.  So he clears it up.  That objection

13    will be overruled.

14         Then we get to the bottom, it's now at the bottom of page

15    244.  This is an inner office memo.  And this, is it fair to say,

16    is what the expert wasn't given?

17         MR. O'BRIEN:  Right.

18         THE COURT:  I'm going to overrule that objection.

19         I think that takes us to 249.  I'm going to overrule --

20    Let me make sure -- Well, he disagrees with the premise of the

21    question.  He makes that clear.  You're going to take out, by the

22    way, there are some objections.  Those, of course, will all come

23    out.

24         MR. O'BRIEN:  The objections themselves, counsel's

25    objections.

260

1      THE COURT:  Leave the question and answer, but not the

2   objections.

3      All right.  This will take us to the end of page 256.

4   Those objections will be overruled.

5      Any objections on page 259 will be overruled.

6      That takes us to 261.  And this goes to what wasn't

7   considered.  So the objections on page 261 marked 263, 264 to 265

8   are overruled.

9      And correct me if I am wrong, I think that's somewhat at

10  the end.  And this is another --

11     MR. O'BRIEN:  Right.  This was a follow-up examination.

12  Counsel, Mr. Mace, had asked questions, and this was basically a

13  recross or a redirect at this point in response to the line of

14  questions that had been asked by Mr. Mace.

15     MS. NIEHAUS:  Your Honor, plaintiffs are making a general

16  objection based on the fact that they believe that insufficient

17  information was given to Dr. Sykes.  But that's all information

18  that you've just allowed in by way of cross-examination.  So I

19  mean their objection is cured by allowing them to ask all of this.

20     MR. O'BRIEN:  This is not our objection.  This is your

21  objection.

22     MS. NIEHAUS:  No, this is yours.

23     THE COURT:  Perhaps, I'm confused, you can't decide whose

24  objection --

25     MR. O'BRIEN:  Some of the yellow objections turned gray.

261

1            THE COURT:  I am not using these colors.

2            We are agreeing to leave these in?  Is that the long and

3      short.

4            MS. NIEHAUS:  We would like it in.

5            THE COURT:  It seems to me it goes with the

6      cross-examination.  So it will stay in.

7            MR. O'BRIEN:  I'm sorry I was confused, Your Honor.

8            THE COURT:  All right.  Who was on first is the question.

9            MR. O'BRIEN:  Yes, sir.

10           THE COURT:  Now we get to the last one, isn't it?

11     Clifton Webb.

12           MS. NIEHAUS:  Yes, Your Honor.

13           MR. O'BRIEN:  This has a whole bunch.

14           THE COURT:  This was played at the trial.

15           MR. O'BRIEN:  Yes, Your Honor.

16           THE COURT:  This is the vice president of the

17     governmental affairs.  He retired --

18           MS. NIEHAUS:  When he retired.

19           THE COURT:  And retired in March of 2009.

20           MS. NIEHAUS:  Yes, Your Honor.  But during the relevant

21     time period, when he was making the statements at issue here, he

22     was a supervisor of public affairs reporting to Kathleen Forte.

23           MR. PAPANTONIO:  And he had direct responsibility for

24     communications about C-8.

25           THE COURT:  We're going to start at page 6.  And that

1    objection will be overruled because the question does say, as you

2    communicated with the public.  So that's an important issue in the

3    Court's view.

4            MS. NIEHAUS:  Your Honor, but the issue --

5            THE COURT:  This is a preliminary question, first of all,

6    it's just a matter of did you share information, and I have

7    already ruled.

8            Let's go to page 10.

9            MR. O'BRIEN:  And this was a very detailed ruling that

10   the Court made, and the Court essentially said the testimony would

11   be allowed, but we will treat it essentially like 803(18).  The

12   article will not go back with the jury.

13           MS. NIEHAUS:  Your Honor, we would renew our objection to

14   the reading of -- Your Honor, ruled that newspaper articles in

15   which Mr. Webb was quoted could be used with Mr. Webb.  But what

16   plaintiffs have done here is read almost the entire substance of

17   the newspaper article into the record.

18           There is ample case law that newspaper articles are

19   classic hearsay, and there's -- again, there's no free license

20   here, there shouldn't be any free license to read documents into

21   the record.

22           THE COURT:  I ruled before that this goes to what DuPont

23   could know, and I'm not inclined to change the ruling.  I agree I

24   don't like documents read in that the witness can't necessarily

25   identify.  But if the document is not going back to the jury, you

263

1   have to have some idea what the article said.  I don't think it

2   crossed that line.  So the objection is overruled.  So that takes

3   us from 67:11 to 70:13.

4          That takes us over to 71:15.

5          MS. NIEHAUS:  This is the same objection, Your Honor.

6          MR. O'BRIEN:  Part of the same line of questioning you

7   just indicated your ruling on.

8          THE COURT:  So that objection will be overruled.

9          There are a couple objections here just about deposition

10  exhibits.  I assume those are taken care of?

11         MS. NIEHAUS:  That goes to the exhibit discussion.

12         THE COURT:  Okay.

13         MS. NIEHAUS:  The next testimonial objection is page

14  118:21, with page 27 at the bottom.  This is a similar issue.

15  It's not a newspaper article.  It's a scientific publication.

16         THE COURT:  The Dahlgren study, right?

17         MS. NIEHAUS:  Well, I think it's a number of different

18  studies that reference the Dahlgren study.

19         MR. O'BRIEN:  No -- I am sorry, Your Honor, Gilliland was

20  forwarding the Dahlgren study.  But the line of questions pertains

21  to the Dahlgren study.

22         MS. NIEHAUS:  And then there's additional questions

23  starting on page 29 about the Gilliland article.  Mr. Webb is a

24  public relations supervisor.  You know, again, there is a

25  difference here, you know -- we object to any document about which

264

1    he has no personal knowledge being put in front of him.  But even

2    if Your Honor will allow it, there is a difference of putting the

3    document in front of him and saying, do you have knowledge of this

4    and wholesale reading of the documents.  This in particular is a

5    newspaper article --

6         THE COURT:  How would the jury have any idea of what's in

7    the document if you're not going to send the document back?

8         MS. NIEHAUS:  Well, I mean, one, I think they have got

9    other witnesses, they have got expert witnesses they can question

10   about these documents.  But wholesale reading of the documents --

11        THE COURT:  I mean -- I agree there's a limitation on how

12   much of this, but it's not wholesale.  It's a long article.  I am

13   familiar with them.  My concern, frankly, is when we get to the

14   end of this, his opinion on whether animal studies are beneficial,

15   he's not a scientist.  I mean in terms of what he knew and the

16   corporation knew or didn't know, I'm with you.  But I think when

17   we get into questioning him about animal studies, that's beyond

18   his -- that's not -- he's a lay person --

19        MR. O'BRIEN:  I'm sorry, Your Honor, you are on what page

20   and line?

21        THE COURT:  Line 140:5 through 141:3, that will be

22   excluded, but the rest of that will stay in.

23        That takes us over to page 34.  Mr. Douglas keeps

24   referring to the jury and viewers at home.  I was hoping by that

25   it sounds like a '60s television influence.

265

1          MR. DOUGLAS:  I was very influenced by 1960s television

2     probably.

3          THE COURT:  And this is more what we just talked about

4     studies that --

5          MR. O'BRIEN:  Right.  Mr. Webb had made statements that

6     our data shows no problems with our workers who were exposed to a

7     much higher level.  This was undermining --

8          THE COURT:  Those objections are overruled.  That takes

9     us to line 155:22 through 161:06.  I believe that's the final

10    ones.

11         That finishes the depositions.  I am excited.  Thank you.

12    All right.

13         MR. MACE:  So the record is clear, both parties are

14    preserving all their objections which will be made of record for

15    appeal purposes, even though we haven't spent the Court's time

16    arguing each one of them.

17         THE COURT:  You can understand why I am not going to

18    reduce this to a written order.

19         MR. MACE:  Yes, sir.

20         THE COURT:  And certainly these are, you can assume, are

21    final.  If something changes, you will let me know.  They are

22    somewhat provisional.  But for appeal purposes at this point you

23    can assume they are final.

24         MR. PAPANTONIO:  Judge, one other thing.  Mike London

25    will put a notice -- I don't know how to go forward with this

1    trial without clearing up issues on Graham and Flaherty.  So we

2    have people in Europe right now working on another case in Europe.

3    If he's in Europe, we can take his depo there.

4         MS. NIEHAUS:  Dr. Graham?

5         MR. PAPANTONIO:  Yeah, you said he might be in Europe.

6         MS. NIEHAUS:  He is.  But, Your Honor, Dr. Graham is a

7    retired, mostly retired, physician.  I don't know how exactly how

8    old he is.  He's in his 70s.  I think he may be there on personal

9    or business reasons --

10         THE COURT:  Let me ask a blunt question.  I assume he's

11    going to be paid more than the lay witness fees, right?  He will

12    be charging somebody.

13         MR. PAPANTONIO:  Sure, he will charge us, I'm sure.  We

14    will --

15         THE COURT:  How long do you think this will take?

16         MR. PAPANTONIO:  I would think it can be cleared up

17    probably in about four hours maybe.

18         THE COURT:  And are you assuming he's on vacation in

19    Europe?

20         MS. NIEHAUS:  You know, I didn't actually ask him what

21    the purpose of his travels were.  But when we were getting our

22    trial schedules together --

23         THE COURT:  Let's make an attempt, see where this takes

24    us.  If there is a problem, you can let us know.

25         MR. PAPANTONIO:  And same with Flaherty.  We will be

267

1    wherever they need to be.  Because it does clear up -- Again, it's

2    one of those things, if we clear something up, going forward it

3    much easier to deal with the problem.  40 cases.

4         THE COURT:  All right.  So let me -- We're going to start

5    this before we break for lunch.  I assume you probably want to

6    start with the plaintiff's exhibits.

7         MR. MACE:  We may want to shuffle the chairs here.  We

8    have different people arguing.

9         THE COURT:  That's fine.

10        MR. MACE:  Why don't we get Mr. Brogdon and Mr. Leber up

11   here, please.  You're starting with the plaintiff's?

12        THE COURT:  Yes.

13        MR. PAPANTONIO:  Plaintiff's exhibits.

14        THE COURT:  Yes.

15        MR. PAPANTONIO:  As we're going forward with these trial

16   schedules, I don't think you have met everybody here.  These will

17   be people splitting up trial teams as we go forward.  So they are

18   going to be participating in these arguments because the next time

19   they may be trying the case.  So I just --

20        THE COURT:  Going forward on that, and we will have to

21   address this, you know, I told you these trying cases coming up,

22   they are all here, and this is for the final pretrial conference

23   to be meaningful.  When we get to the 40, we will use that same

24   rule with regard to the final pretrial conference.  So you will be

25   here at least one more time, and hopefully these objections will

268

1     thin out as we go.

2             MR. PAPANTONIO:  I didn't want the Court to think these

3     are pop ups.  They are doing this for a reason.  They will be

4     participants in these trials.

5             THE COURT:  That's fine.  Whenever you are ready, let me

6     know.

7             I want to make two general comments, one for each sets of

8     exhibits, defense and plaintiff's.  I have already ruled on the

9     issue of documents being used to cross-examine with certain

10    witnesses.  They have to be, you know, high level leadership role,

11    and these documents have to be produced by DuPont.

12            And I do want to tell you I have read and reread the

13    Sixth Circuit case that's been cited, that's the *Fambrough versus*

14    *Wal-Mart.*  I have to say I don't think that case has much

15    applicability here, but I'm not inclined to change the ruling that

16    I have done with the plaintiff's exhibits.  So that may or may not

17    speed us up here.

18            With regard to the defendant's exhibits, let me make a

19    general comment, and you can think about this over the lunch hour.

20    We're going to take a break, you will be glad to know.  So you

21    know, this case is -- at least half of the case is about what

22    DuPont knew.  And these are very triable propositions on both

23    sides.  You have been through a trial.  Plaintiffs have one view.

24    Defendants have another.

25            So the plaintiffs, I sort of look at this sort of an

269

1      either side of a seesaw.  The plaintiffs will use documents to

2      show this is what DuPont knew and acted on.  The defendants are

3      going to say, this is what we knew, and this is why we think this

4      is reasonable.

5              So when we get to the DuPont, it's a little bit of a

6      sticky wicket.  I think we can solve this problem, but I want to

7      give you an advance heads up.  So at least in terms of the rules

8      of evidence, what the plaintiffs are using are classic admissions

9      by a party opponent.  DuPont goes to these documents, it's not

10     necessarily so.  This may be business records and so on.  And they

11     are, I'm sure in DuPont's view, necessary to tell the story, what

12     they believe should be told to the jury about what they knew and

13     acted upon.  So the relevance in indisputable.

14             It would be an easier trial in terms of handling exhibits

15     if you have sort of a historical witness who goes through a lot of

16     this stuff.  I suppose to some extent that was Dr. Rickard.  But

17     it's simply a witness that says, these are in our files.  This is

18     what the corporation would have known on the studies that you

19     think, for example, they acted reasonably.  But just having them

20     produced without a witness to go with them makes it difficult.  I

21     am not suggesting that means they are excludable, but the analysis

22     is a much more complicated one.

23             MR. MACE:  There's another layer to that, Your Honor.  As

24     you recognized in the last trial that it is not only what DuPont

25     knew, but since it's a should have known case, it's what was

1    available in the scientific literature at the relevant time.

2              THE COURT:  You have got some exhibits to that extent --

3              MR. PAPANTONIO:  It's even more direct.  We have offered,

4    as you might recall, where they admit that they have been liable

5    for 32 years.  They admit it.

6              So I think that if I look at the dynamics of the last

7    trial, you have DuPont always pushing towards state of the art.

8    The state of the art typically -- is a typical defense.  But in

9    this case more so than most that I've tried, you actually have

10   inner office memos and letters saying, look.  We've been -- in

11   1984, for example, we have been liable for 32 years, kicking all

12   the way back to the time they started.

13             So I hear what the Court is saying as far as --

14             THE COURT:  Refresh my memory.

15             MR. PAPANTONIO:  Yes, sir.

16             THE COURT:  I know there is an enormous number of

17   documents from DuPont that you have used.  In terms of the state

18   of the art issue, did you offer studies or reports that there's no

19   evidence to show that DuPont had them at the time?  Or is it all

20   from their files I guess --

21             MR. PAPANTONIO:  No, it's from their files.  There's a

22   couple of things that they have objected to that the jury -- the

23   expert relied, and that didn't go back to the jury.  But it's not

24   just us.  It's their own scientific data --

25             MR. MACE:  I think that's the lion's share.  I think

1    there are some things that they cite.  Whether they actually use

2    them in the trial this time, we'll see.  There are things on their

3    list and considered by their experts that were not DuPont

4    documents.

5         THE COURT:  We will get into this document by document.

6    I want to get you a general -- A lot of these documents I have

7    already ruled on.  A lot I haven't.  But they are similar to the

8    documents I have ruled upon.

9         MR. PAPANTONIO:  There are so much of this, judge, that

10   is the weight of the evidence issue, it's notice issue.  They fall

11   into broadly a couple different areas.

12        And I guess right up front, I think we have to --

13   something has to be addressed of the fact that there was a very

14   specific order that was entered in this Court that said that for

15   both parties to play fair, there was a time limit on when we need

16   to object to particular documents.

17        Now Chris Paulos, for example, he was in charge of

18   documents, he will give you a history.  It wasn't just an

19   oversight.  We're talking about where we actually told them, look.

20   Here's our list.  Our list is the *Bartlett* case.  But these are

21   our documents.  There was no response to it whatsoever.

22        And so now we have -- There is an entire page that if you

23   look at page 3 of this document -- we have put together this

24   schematic of how these fell, the entire page is a page of

25   documents where DuPont simply failed to timely object.  Why they

272

1    did that, I don't know, but the CMO was very clear on this.  And

2    this was not a trap.  We wrote them and said, here's what we

3    found.

4           THE COURT:  And I'm with you.  Actually, I think it would

5    be more efficient to go through these as quickly as we can.  I

6    think some of these -- I actually have a lot of notes here to ask

7    you questions on both sides about how these are going to be used.

8    But I'm guessing -- in fact I'm sure you know how they are going

9    to be used.  But it's not always clear from me reading the

10   document.

11          MR. MACE:  Let me make sure the record is clear on the

12   statements that were made that they were inaccurate or

13   mischaracterized, that the plaintiffs designated over 8,000.

14   They, obviously, have no intention of using.  We timely responded

15   or objected to them.

16          THE COURT:  We're going to wade into them.

17          MR. MACE:  There were timely objections.

18          MR. PAPANTONIO:  There are 300 that you sent, but just to

19   be clear --

20          THE COURT:  Well, let's just start.  Plaintiff's 13.  The

21   only thing that I can see in here, there's a reference to the

22   class action.  And I think we all understand that's coming out.

23          MR. PAULOS:  Your Honor, you actually ruled on this in

24   the *Bartlett* case, and you redacted it.  And we just did not end

25   up using it in the *Bartlett* case.

273

1          MR. MACE:  That's one of the things, Your Honor, I think

2     the parties just haven't really gotten a chance have a meeting of

3     the minds on, but they have designated a number of documents that

4     have different versions that are redacted from *Bartlett.*  The

5     version they have marked here was not redacted.

6          THE COURT:  Let's see if this helps.  If we start with

7     the default position which is anything redacted in Bartlett will

8     be redacted in this case.  And if you want me to reconsider, you

9     will do that specially.  But, otherwise, we are going to start

10    with all these redactions will continue.

11         MR. PAPANTONIO:  Judge, is it going to bother you if

12    Carole Moore is going to actually hand me the document?

13         THE COURT:  That's fine.

14         MR. PAPANTONIO:  Thank you.

15         THE COURT:  There's a number of these that refers to

16    class action on the first page.  Those are all coming out, I

17    assume.

18         MR. PAPANTONIO:  Yes.  We don't have any intention.  Ay

19    reference to class action can be redacted very easily.

20         THE COURT:  All right.  So the Plaintiff's 13 will be

21    admissible with the redaction.

22         I want to be -- Plaintiff's 19.

23         MR. MACE:  This is one we feel strongly about, Your

24    Honor.  There are several in this first grouping we feel the most

25    strongly about.  And one of them, this is a hearsay article, a

274

1    news release.  Your Honor has already made his consideration on

2    the consent decree and what is or isn't going to come in.  But

3    these preliminary documents about announcements of allegations --

4           THE COURT:  You have all identified 803(8).  Both sides

5    have used this rule extensively.  It is used for reports they

6    like.  And it is used against reports they didn't like.  I think

7    this is 803(8).  But I also think this is a filing of the claim

8    notification where we are actually going to get into the consent

9    decree.  So I assume one of your arguments is:  Why are we getting

10   into the allegations?  We are going to get into the conclusion in

11   some detail.

12          MR. MACE:  Yes, sir.

13          THE COURT:  This is essentially a press release, right?

14          MR. PAPANTONIO:  It is, judge.  It's a news release.  It

15   was an EPA press release.  And it's just -- Again, it's almost

16   impossible, judge, to take any one document and say, this doesn't

17   rise to a particular level.  It is the totality of all of this

18   that should lead any responsible corporation to do what it should

19   do.

20          THE COURT:  Well, here's the thing.  I've actually gone

21   through every one of these in some detail, and there are some

22   press releases on the defense side, too.  And they also go with --

23   I remember the adoption of the Ohio EPA of the findings made by

24   the West Virginia DEP.  And there's a press release to that

25   effect.

275

1          Do we have an understanding -- and that's the same thing.

2     The findings are going to come in.  Do we need the press release?

3     Here the consent decree is going to come in.  Do we need the press

4     release?  Can we all agree that the press releases are out?

5          MR. MACE:  I think that's a good general rule, Your

6     Honor.  I think it gets into the purpose of document.  The only

7     reason we have this on your list is Your Honor had wanted -- if we

8     were going to go beyond saying state of the knowledge in the

9     general and say DuPont's state of the knowledge, we had to,

10    obviously, link it up that we knew about it.

11         THE COURT:  But the -- I'm thinking there are several

12    documents in a row.  One was the press release.  But there is a

13    decisional memorandum in there, too, from the Ohio EPA.  That's

14    separate from the press release.  As long as that's coming in, it

15    seems to me the press release is duplicative.

16         MR. MACE:  We would agree.

17         THE COURT:  We would take all the press releases out.

18         MR. PAPANTONIO:  That's fine, as long as all the DuPont

19    press releases --

20         THE COURT:  Those are governmental press releases.

21         MR. PAPANTONIO:  That's correct.  That's fine.  I think

22    we get to the same place the same way.

23         MR. MACE:  And just, you know, baby with the bath water,

24    there may be some minor exceptions on each side we want to argue

25    the general rule.

276

1          THE COURT:  We'll do a side-bar.

2          MR. PAPANTONIO:  In this case, for example, one exception

3     would be the press release that comes from Little Hocking where

4     they say, don't drink the water, and the next several days --

5          THE COURT:  Let me be clear.  I'm thinking exclusively of

6     the U.S. EPA, West Virginia DEP and Ohio EPA.

7          MR. PAPANTONIO:  Yes, we get that.

8          THE COURT:  We will have to take those exhibit by

9     exhibit.

10          MR. PAPANTONIO:  So that's coming out, is that the --

11          THE COURT:  That's Plaintiff's 19.

12          All right.  Then we get to Plaintiff's 25.  And I guess I

13     don't want to do each exhibit, but my inclination in this, aren't

14     we looking at a 803(8) exception?  This is an action by a public

15     body?

16          MR. MACE:  But the problem here, Your Honor, hearsay

17     within hearsay, and also the references to a class action

18     lawsuit --

19          THE COURT:  The class action is out.

20          MR. PAPANTONIO:  What's this even more interesting is

21     their discussion about with the community said that told them to

22     ignore this.  Basically their action in the community was to say,

23     ignore this action.  So this is on a lot of fronts.

24          THE COURT:  How about we just say under background,

25     trying to make that agreed -- Do we want to refer to a lawsuit at

277

1     all?

2               MR. MACE:  No, Your Honor.

3               THE COURT:  Since that's --

4               MR. PAPANTONIO:  We don't need that either.

5               MR. MACE:  The whole paragraph can come out.

6               THE COURT:  I'm looking at the second paragraph under the

7     heading background.

8               MR. PAPANTONIO:  Yeah.  I don't think --

9               THE COURT:  Take that whole paragraph out?

10              MR. MACE:  Yes.

11              MR. PAPANTONIO:  The first paragraph --

12              THE COURT:  Second.

13              MR. PAPANTONIO:  Yeah.  Let's see.

14              MR. MACE:  In August of 2008 --

15              MR. PAPANTONIO:  I want to be clear about this, judge.

16    The one I'm looking at right here is where they're talking about

17    where the concentration of Little Hocking being 7.69.  I don't

18    think that's the one you're referring to.

19              THE COURT:  No, the paragraph before that.

20              MR. PAPANTONIO:  That's fine.

21              THE COURT:  So that paragraph will come out.  And,

22    otherwise, this will come in.

23              MR. MACE:  Then, Your Honor, another issue on that one is

24    when you get down to the bottom of page 2 --

25              THE COURT:  Anything to do with the lawsuits comes out.

278

1          MR. PAPANTONIO:  We agree.

2          MR. MACE:  That whole bullet should come out because it

3     also gets into a characterization of the EPA's claims.

4          THE COURT:  All right.  That will come out, too.

5          MR. MACE:  Then the environmental working group, Your

6     Honor, this is hearsay within hearsay, two bullet points.

7          MR. PAPANTONIO:  We're moving very quickly here.  Did you

8     just decide to -- take the class action lawsuit out of that last

9     paragraph, I completely understand that.

10         THE COURT:  Now the issue is the paragraph before that,

11    studies by the --

12         MR. PAPANTONIO:  Well, here again, this is information --

13    The reason this is relevant, this is -- If you can consider this

14    another way, had they not taken -- Had they said yes to the folks

15    at Little Hocking, this is a problem.  These things that you have

16    been told, they really are a problem.  Instead, they did just the

17    opposite.  They actually started a spin campaign to try to

18    discredit this.

19         And so the idea of not being able to say, this is -- This

20    is very severe language.  Whether they agree with it or not, it is

21    fairly severe language.  But what do they do with the language?

22    Do they do further studies?  No.

23         THE COURT:  I get that part.  But here's the question.

24    803(8) says that the report is admissible under certain

25    conditions, and then there is a catch.  As long as the opponent

279

1    doesn't show the source of information or other circumstances

2    indicate a lack of trustworthiness.

3         What we have, the paragraph before that the second bullet

4    point, describes what the EPA did, that's a fact matter.

5         MR. PAPANTONIO:  Right.

6         THE COURT:  Then we get to the next paragraph, the

7    environmental working group study, that's where the problem comes

8    in because I am assuming you don't agree with those conclusions.

9         MR. MACE:  I have nobody I can cross-examine on that.

10        MR. PAPANTONIO:  No, no.  Judge --

11        THE COURT:  I get it.  It's -- The study is one thing.

12   It's the study being referenced what otherwise would be

13   admissible, a public document.

14        MR. PAPANTONIO:  I will take the Court's ruling whatever

15   you want to do on this, judge.  As long as the Court understands

16   that we are put in a position of them having stacks of information

17   like this and not taking action.  And this is so direct, judge,

18   that they -- this comes out.  And then within a matter of a week,

19   you have the plant manager saying, ignore all that.  It's not a

20   problem.  And that's very severe misdirection --

21        THE COURT:  The document is coming in.

22        MR. PAPANTONIO:  Yes.

23        THE COURT:  But the last two paragraphs on the second

24   page will come out.

25        MR. PAPANTONIO:  All right.

280

```
 1              MR. MACE:  In terms of witnesses, what witness are they
 2    allowed to use this with?
 3              THE COURT:  Well, you know, it's pretty much -- I don't
 4    know if you have it under seal, but it is self authenticating.
 5              MR. PAPANTONIO:  We are going to have Siegel talk about,
 6    what happens when a corporation is put on notice of information
 7    and then interferes with it from a public health standpoint.
 8    There is a whole discipline, judge, in public health, and the
 9    discipline comes down --
10              THE COURT:  He will be your witness.
11              MR. PAPANTONIO:  Yes, sir, he will be the witness.
12              THE COURT:  How will you use this?
13              MR. O'BRIEN:  Mr. Freeman actually received this, Your
14    Honor, from the law firm.
15              MR. PAPANTONIO:  But just to clear on the Court's
16    question, I will use this first with Dr. Siegel.
17              THE COURT:  Are we going to get into a fight about
18    whether it's authenticated or not?  All it needs to have is some
19    sort of statement --
20              MR. MACE:  As long as we're not going to get into a fight
21    on similar documents on the defense side, we're not going to have
22    a fight about it.
23              MR. PAPANTONIO:  Authentication -- We never made
24    authentication an issue.  There are some documents that don't come
25    from DuPont.  I mean there is no connection to DuPont.  We may
```

281

1    have some issues on that.

2            MR. MACE:  As with this one.

3            MR. PAPANTONIO:  No, no.  Judge, you -- they responded to

4    this document.  It's not as if this is being caught in a --

5            THE COURT:  Let's do this.  What nobody wants is a

6    surprise.  As we go through this, let me know if there's an

7    authentication issue.  I am assuming there is not unless you tell

8    me.  When we're talking about --

9            MR. PAPANTONIO:  Yes, sir.

10           THE COURT:  -- exclusively about public documents, EPA

11   documents, West Virginia DEP documents, all that sort of stuff.

12   So this one is a public document --

13           MR. MACE:  With that comment, judge, we preserve our

14   objections on some of these issues.  But in terms of what we are

15   going to specifically raise --

16           THE COURT:  Well, if you're going to preserve on

17   authentication, then all I ask for is to articulate to me as to

18   which documents because that's a problem that can be fixed.

19           MR. MACE:  Okay.

20           THE COURT:  As far as the rules, that can't be changed or

21   fixed.  This is a different problem.

22           Then we get to it, it looks to me as though -- Correct me

23   if I am wrong -- no, actually, I am wrong.  The next document is a

24   scientific study.

25           MR. MACE:  That one, again, is one of the ones --

282

1    Frankly, judge, there are only about ten of these that I'm really

2    jumping up and down about.

3          THE COURT:  Ten exhibits?

4          MR. MACE:  Ten of the ones that we're objecting to.  This

5    is a pretty important one to us because these are undisclosed

6    expert opinions by Mr. Dahlgren --

7          THE COURT:  Let me ask, counsel, how is it going to be

8    used?  Let me hear from you.

9          MR. PAPANTONIO:  Judge, this Dahlgren, if you recall --

10   again it has been a while since the trial -- they spent a lot of

11   time trying to discredit Dahlgren.

12         THE COURT:  You're going to use -- Should I assume --

13         MR. PAPANTONIO:  I'm going to use this through Dr.

14   Siegel.

15         THE COURT:  You'll have an expert talk about this.

16         MR. PAPANTONIO:  Yes, sir, no question.

17         THE COURT:  All right.

18         MR. PAPANTONIO:  No question.  And the idea from a public

19   health standpoint for them to ignore is just not acceptable.

20         THE COURT:  This goes to, somewhat, the state of the

21   knowledge.

22         MR. PAPANTONIO:  Yes, sir.

23         THE COURT:  And the last trial I think we agreed -- and

24   if we didn't, I ordered -- these are the kind of documents that

25   did not go back to the jury, right?

283

1          MR. MACE:  Right.  But in addition to that, Your Honor,

2     this witness, this unsworn witness, Dahlgren and others, are

3     making scientific statements.  To the extent they're going to

4     publish those or intend to publish with those with a separate

5     witnesses that I can't cross-examine --

6          MR. PAPANTONIO:  Well, judge --

7          THE COURT:  They are not coming into evidence.  So they

8     are not going to be admitted.

9          MR. PAPANTONIO:  No, they're not.

10          MR. MACE:  But there should also have a limiting

11     instruction, that this isn't for the truth of the matters -- the

12     opinions given.

13          THE COURT:  Well, I assume this is going to be classic an

14     expert relying on --

15          MR. PAPANTONIO:  Yes, sir.  This is one that was heavily

16     used in the last trial for this very purpose.  That's -- That's

17     the only thing we really did with it.

18          THE COURT:  I don't have a problem with a limiting

19     instruction.

20          MR. PAPANTONIO:  We crossed -- For example, substantively

21     we used it, but we also used it on cross-examination.  And it's

22     the kind of thing, for example with Laura Korte, would not have

23     known about this.  So substantively and impeachment wise, I would

24     think.

25          THE COURT:  All right.

284

1          MR. MACE:  I think there are some redactions that we need

2     to consider, Your Honor, and I don't want to take the Court's

3     time, but let me cover those with opposing counsel.

4          THE COURT:  Let me know if that doesn't work.

5          And then 220 is *The Columbus Dispatch* article.  This is

6     from 2004.  So not talking about an ancient document.  How would

7     you expect to use this?

8          MR. PAPANTONIO:  Judge, if you will look at the second

9     page, down about a fourth from the bottom, it says, there is no

10    scientific evidence that PFOA causes adverse health effects in any

11    segment of the human population.  Now this is Paul Bossert that

12    says this.  This is the DuPont's Washington Works plant manager.

13    The significance of this, again, comes down to this.  Siegel will

14    testify there is an entire discipline within public health

15    science, and one thing --

16         THE COURT:  Basically, this is about public statements

17    from DuPont.

18         MR. PAPANTONIO:  That's correct.  But not just the

19    statements what this does is this statement is being made in light

20    of the fact that, A, they have been called -- they have been

21    called down about cancer and a whole host of physical issues.  And

22    then they turn back around within a matter of weeks to make a

23    statement to the public, don't worry about this.  And the -- from

24    a public health --

25         THE COURT:  Let me ask you, so there is a lot more than

285

1    that in here.

2              MR. PAPANTONIO:  Yes, there is more to it.

3              THE COURT:  Are you willing to redact the rest of it and

4    leave in DuPont's statement?

5              MR. PAPANTONIO:  Well, except -- sure.  I there we can

6    work around that, judge.  That, to me, the operative importance of

7    this document is that even in light of what they have been told,

8    the plant manager is telling people, continue drinking the water.

9              MR. MACE:  It's got to be severely redacted.

10             THE COURT:  That's what I mean.

11             MR. MACE:  Extensive hearsay within hearsay and --

12             THE COURT:  Even the headline.  But I'm thinking start

13   with the section and the length, and you leave in the reporter's

14   name and the newspaper.  And then --

15             MR. BROGDON:  Your Honor, if I may add, I'm just adding,

16   what DuPont was saying, given the point in time, is not in

17   dispute.  I don't know if it's needed to show what DuPont was

18   saying.  There's other evidence of that.

19             MR. PAPANTONIO:  Well, no, this is -- judge --

20             THE COURT:  Let me just ask, this was a specific

21   interview given by Paul Bossert.

22             MR. PAPANTONIO:  That's correct.

23             THE COURT:  There will be testimony to that?

24             MR. PAPANTONIO:  Yes.  As a matter of fact, Mr. Freeman

25   is even quoted in this document.  They asked Mr. Freeman to give a

286

1    quote in this document.

2         THE COURT:  Well, it seems to me the only relevance of

3    this is the statement of DuPont.  Everything else is going to

4    be --

5         MR. PAPANTONIO:  I agree.

6         THE COURT:  So why don't we just take -- let's walk

7    through this with me.  Leave in section, length, eliminate

8    headline, keep in byline.  And then on the first page, everything

9    in the body would be redacted.

10        Then when we get to the second page, basically there's

11   going to be one paragraph towards the end which reads, in total

12   there is no scientific evidence that PFOA causes adverse human

13   health effects in any segment of the human population, says Paul

14   Bossert, manager of the Washington Works Plant.

15        MR. PAPANTONIO:  That accomplishes the whole purpose.

16        THE COURT:  Does that work?

17        MR. MACE:  Yes, sir.

18        THE COURT:  So we'll leave that in.  And we are right up

19   to the noon hour.  So we will have at least a few more documents

20   to go through.  I would suggest we take about a one-hour break at

21   this point.

22        MR. MACE:  Yes, sir.

23        THE COURT:  I will see you back here a little after one.

24      (Recess from 12:00 p.m. to 1:00 p.m.)

25

287

1                                    Tuesday Afternoon Session

2                                    May 17, 2015

3                          - - - - -

4         THE COURT:  All right.  So I think we concluded with the

5    article from *The Columbus Dispatch*.  That's done.

6         And now we'll get to 221.  Again, I know we have an

7    understanding of the redaction of things relating to the class

8    action or other lawsuits.  Does that take care of the --

9         MR. MACE:  Well, the thing is, Your Honor -- I'm sorry to

10   interrupt, Your Honor --

11        THE COURT:  Go ahead.

12        MR. MACE:  -- it's so replete with references to

13   lawsuits, class members, Judge Hill ruling.  I am not sure what

14   purpose they have in trying to get it in.  But it seems like

15   nothing would be left if you redacted all the portions.

16        THE COURT:  Fill me in on who the people.  Dawn Jackson

17   is the author.

18        MR. MACE:  Yes, sir.  She's a DuPont employee.

19        THE COURT:  At the plant?

20        MR. MACE:  Yes, community relations at the plant.

21        THE COURT:  And is this a public statement or is it a --

22        MR. PAULOS:  Your Honor, it's an e-mail from Dawn Jackson

23   forwarding basically a press release that was written by DuPont in

24   response to the recent ruling by Judge Hill regarding the class

25   case.

288

1          THE COURT:  You don't disagree, we need to walk through

2     this and take out anything that indicates a prior lawsuit.

3          MR. PAULOS:  Actually, Your Honor ruled on this in the

4     *Bartlett* matter.  We didn't use this in the Bartlett matter, but

5     Your Honor's ruling was any reference to the class case should be

6     redacted.  In fact, in my notes from the previous hearing show

7     that the first paragraph should be redacted and that the parties

8     would then meet and confer about removing any reference to the

9     lawsuit itself, but the remainder of the statement would stay in.

10          THE COURT:  So the first part, as far as I can tell, is

11     not a problem.  Then as for DuPont's reaction to Judge Hill's

12     ruling, that, of course, has to come out.  When we get to the

13     body, it looks like the first paragraph comes out, right?

14          MR. PAULOS:  That's Your Honor's previous ruling.

15          THE COURT:  And then how about the rest of it?

16          MR. PAULOS:  In looking at it, the most relevant portion

17     of it is, for us, is the last paragraph any reference to the

18     class, particularly in the second sentence where it says there is

19     no evidence to support a finding that the public or the class --

20          THE COURT:  We take out, or the class.

21          MR. PAULOS:  Exactly.

22          THE COURT:  With that out, the last paragraph, any

23     objections?

24          MR. MACE:  Let me just read it quickly, Your Honor.

25          No, not in the last paragraph.  But the paragraph before

289

1    is replete with litigation and class.

2            THE COURT:  Are you willing to eliminate the paragraph

3    before or do you care about that?

4            MR. PAULOS:  We can remove that, Your Honor.

5            THE COURT:  All right.  So basically what we are going to

6    have left is a little stringer at the top, one sentence and then

7    the last sentence.

8            MR. MACE:  Yes.

9            MR. PAULOS:  Correct.

10           THE COURT:  All right.  So that takes us to 316.  So I

11   have a whole series of these where I have the same question.  Give

12   me just a second.

13           I'm not sure what these are, so it's kind of hard to have

14   an opinion.  This is something from 1975.  And I guess how does

15   the plaintiff see that as being offered?

16           MR. PAULOS:  Your Honor, we are going to be using this to

17   show what DuPont was aware of at that time, what their methods of

18   disposal were at that time.

19           THE COURT:  All right.  Any objection?

20           MR. MACE:  Well, Your Honor, there's no witness with

21   firsthand knowledge that they were aware of.  What you had asked

22   us in the last trial, please alert you if there is a document that

23   they're trying to show that to the jury that we don't think there

24   is a witness with firsthand knowledge that can link it up.  This

25   falls in that category.  I don't think there's a witness that can

290

1    link this up.  I mean this is ten years before any facts that are

2    material to this case.  We think it has got marginal probative

3    value.  It has got no witness with firsthand knowledge that can

4    talk about.  And it's unfairly prejudicial in that we have no --

5    these were so long ago that we have no witness that can put it in

6    context or explain it.

7         THE COURT:  1975 doesn't seem that long ago to me.

8         MR. PAULOS:  Your Honor, our position is that it's an

9    admission.  It is a highly relevant time period.  It is also

10   indicative and goes towards the reasonableness or lack thereof of

11   DuPont's conduct at that time.  And as you can see from the face

12   of the document, it was used in Dr. Rickard's deposition and

13   presumably be able to testify about it just as he did at his

14   deposition.

15        THE COURT:  All right.  This I find to be sort of a

16   troublesome issue.  Obviously, it is preferable to have somebody

17   with knowledge that this came from DuPont.  I want this with a

18   witness.  And if you want an instruction that this is a historical

19   document found in the files for which there is no witness with

20   firsthand knowledge, I will be happy to give that.  But I think in

21   terms of the historical knowledge of DuPont, it would be relevant.

22   So I will overrule the objection.

23        MR. MACE:  Let me raise one other issue, judge.  It's the

24   second page, the first whole paragraph in the middle, makes

25   reference to the disposal at sea.  And you will recall there is no

291

1   witness with any firsthand knowledge about that.  We think it is

2   extra highly prejudicial and unfairly so, and it should be

3   redacted, the reference to disposal at sea.  I mean counsel could

4   not even confirm if that happened, when it happened.  Just

5   throwing it out there for an emotional play on the jury without --

6          MR. PAPANTONIO:  We are not putting it for an emotional

7   play.  They tampered with everything from disposal at sea, to come

8   up with carbon filters.  There is about five things they did.

9   This is just another one of them.  The Court ruled last time we

10  could use it one time.  And there was even an instruction given

11  that after that, it was not -- after the '70s, or whatever the

12  date is, it wasn't used anymore.  We agreed to that.  That is

13  exactly what we agreed to.  They agreed to it the last time.  We

14  agreed to it --

15         THE COURT:  As I read it, originally means not anymore,

16  and this is 1975.  So there's no dispute, is there, if there was

17  any dumping at sea, it ended before 1975.

18         MR. PAPANTONIO:  That is true.

19         THE COURT:  I will give a limiting instruction on that,

20  too.  The reason for the limiting instruction is because nobody

21  can testify to this.  I will point that out to the jury.

22         All right.  So 326, this is an agenda of C-8 review,

23  April, 1990.  I assume this is going to be offered for historical

24  knowledge.

25         MR. O'BRIEN:  It goes to historical knowledge.  Also

292

1  because Dr. Rickard in his testimony paints a different picture

2  with respect to this issue of the rat studies and its relevance to

3  humans and the notion of rat studies with respect to cancers is

4  you have to assume it's relevant; and even Staats testified to

5  that --

6            THE COURT:  Okay.

7            MR. O'BRIEN:  -- unless you can prove it's not relevant.

8  And this addresses that.  This is from Dr. Playtis's custodial

9  file.

10           THE COURT:  So what is the objection?

11           MR. MACE:  That they have no witness with firsthand

12  knowledge of this.

13           THE COURT:  But Playtis's file, wheres does this take us?

14           MR. O'BRIEN:  Pardon me?

15           THE COURT:  You said that Dr. Playtis had this in his

16  file.

17           MR. O'BRIEN:  Correct, it was produced from his custodial

18  file, and it's a DuPont document.  And, you know, it's very --

19           THE COURT:  Should I assume he doesn't have any

20  recollection?  It was just in his file?

21           MR. O'BRIEN:  It had been 25 years ago obviously, but

22  it's a stand alone admission.

23           THE COURT:  Well, if it was from his files, and he can

24  testify to that, I will overrule the objection.

25           MR. BILOTT:  Just for clarification, when we're saying

293

1     it's from his file, the Bates label on the far right-hand corner

2     that starts with AJP, DuPont explained to us in the *Leach*

3     litigation that that is the custodian's initials --

4              THE COURT:  That's Dr. Playtis?

5              MR. BILOTT:  Yes.

6              THE COURT:  All right.  Thank you.

7              335 is this -- looks like some sort of presentation

8     materials?

9              MR. MACE:  That's part of the issue, Your Honor, no

10    author, no authenticity, no -- nothing about this to try to hone

11    in on who did it when, what it ties into.

12             THE COURT:  We have got initials on the right, GK.

13             MR. BROGDON:  That's the position it was from the file of

14    Gerald Kennedy, but we don't know DuPont originated or from his

15    file he created a work in progress.

16             THE COURT:  Refresh my memory, is he testifying?

17             MR. BROGDON:  He's not.  He's a toxicologist that worked

18    at Haskell Laboratories.

19             THE COURT:  Does anybody else have any other witness with

20    any knowledge of this or testimony about it?

21             MR. PAULOS:  It was a document used in the deposition of

22    Dr. Rickard.  As DuPont has indicated, it did come from Gerry

23    Kennedy.

24             THE COURT:  What did Dr. Rickard say about it?

25             MR. PAULOS:  I don't have -- I don't have the ability to

294

1    tell the Court what his testimony was regarding --

2            THE COURT:  I can't imagine why you wouldn't be aware of

3    that.

4            Any recollection of what Dr. Rickard said?

5            MR. MACE:  No, sir.

6            MR. PAPANTONIO:  Judge, can I be heard on this?

7            THE COURT:  Sure.

8            MR. PAPANTONIO:  If they want to -- They are going to,

9    you are going to see, offer about five of these composite exhibits

10   where they gave presentations.  If they don't want theirs in, we

11   could pull this out.  We would agree to pull ours out if they

12   would agree to pull all of their exhibits they want to post.  They

13   have these -- I will stand up so you can hear me.  Pardon me.  But

14   what they're doing, they're going to have about five or six

15   similar kinds of documents where they said, well, this was shown

16   by this person.  This person saw this.  And it was a slide -- all

17   it is is a projector slide show.  Same thing.

18           MR. MACE:  If they want to put it on a horse trade list,

19   I am happy to deal with that, judge.  All we want to make sure the

20   same rules are on both sides for exhibits --

21           THE COURT:  Well, there are a series of these.  I

22   couldn't flyspeck each number.  I would call them power point

23   presentations or pre power point presentations that you each have

24   offered.  Why don't we hold this category, you can consult, and

25   maybe decide not to use any of them.

295

1    And then I think this is maybe we get into a -- no.

2    Let's just go to the next one.  This is a --

3    MR. MACE:  Part of the issue on this one, Your Honor,

4    there were multiple documents at the end.  There are several pages

5    that don't appear to go with the initial documents --

6    THE COURT:  So the initial is a study.  And should I

7    assume if an expert testifies to this, it wouldn't necessarily be

8    admitting it, but you wouldn't object to the testimony?

9    MR. MACE:  With the exception, Your Honor, it appears to

10   be a draft of, at least in the version that was produced to us, it

11   has got some striking through.  So I'm not sure this is the final

12   published study.

13   THE COURT:  Can that be pinned down?  This is a 1998

14   document.  I'm going to guess it's online.

15   MR. MACE:  There's some handwriting on it and other

16   things.  So I would have no problem with the study being treated

17   like the treating of the other studies.  Experts can refer to them

18   as long as they don't go back to the jury.  But this appears to be

19   a draft with a number of notations and no indication of who made

20   the notations.

21   MR. BILOTT:  Your Honor, again, this is a document that

22   came from Gerry Kennedy's file.  It was produced by DuPont from

23   Mr. Kennedy's file.  He was the author.  And it is a draft.  And I

24   think part of the most probative value here is the fact it's a

25   draft, to show what was taken out, what was put in --

296

1          THE COURT:  There's an e-mail at the end, second-to-last

2     page.

3          MR. BILOTT:  Again, that's how it was produced to us.

4          MR. MACE:  But it has no relation --

5          THE COURT:  To this document?

6          MR. MACE:  Right.  Page 59.60, .61, to my knowledge, have

7     no relationship to the cover.  And counsel's statement that

8     Kennedy was the author, he was one of the authors of the

9     typewritten portion, but I am not aware of any evidence that he's

10    the author to the strike through or the handwritten notes.

11         THE COURT:  Well -- and your position is these

12    handwritten notes came from your files?

13         MR. BILOTT:  Yes, Your Honor, as indicated by the Bates

14    label that DuPont put on --

15         THE COURT:  Is there any damage in the handwritten notes,

16    other than the fact that this document doesn't make it perfectly

17    plain?

18         MR. MACE:  I couldn't read some of them.

19         THE COURT:  This document, Ms. Niehaus and I discussed at

20    some length, and it has some pretty damaging stuff in it.  So it

21    makes a difference obviously.

22         MR. BROGDON:  One of the big problems, Your Honor, is

23    that we don't know whose they are, and we are not sure how to

24    interpret them.

25         MR.  MACE:  For example, Your Honor, over at .24, this is

297

1    some handwritten note that says, why was no -- it looks like repro

2    tox work done on C-8?  So they are going to use that to say that

3    DuPont was questioning that more studies should have been done

4    with some handwritten note that they can't even show who the

5    author was and when it was put on the document.

6         MR. BILOTT:  Your Honor, this goes to the knowledge of

7    DuPont at the time in '98, that their own scientist, Gerry

8    Kennedy, who was the head of their toxicology department on C-8

9    issues, knew about the chemical at the time and what he was doing

10   as far as referring to the article --

11        THE COURT:  I get that with the article, even if it's an

12   abstract and a draft.  I am sorry, even if it's a draft.  But the

13   handwritten portions, we are going to have people guessing.  Let's

14   start with the document that's most of the exhibit.  The document

15   is coming in but not the handwritten parts because I think that

16   would take us into the area of speculation.

17        Now let's go, there are two more pages -- actually

18   several, 342.59 and .60.  So this is an e-mail --

19        MR. PAULOS:  Yeah, Your Honor.  If it were DuPont's

20   objection, then we would certainly remove those pages --

21        THE COURT:  All right.

22        MR. PAULOS:  -- from the preceding draft report.

23        THE COURT:  So that will come out, those two pages, and

24   also a handwritten note at the end of that, that comes out.  The

25   study comes in but not the notes.

298

1          All right.  That takes us to 352.  Now this has a

2    reference to class action litigation.  I am assuming we take that

3    out.  Once this comes out, what else is there left to discuss?

4          MR. MACE:  That was the main issue, Your Honor, in the

5    context of the class action litigation.  It's -- So that sentence

6    -- that sentence would need to be redacted.

7          THE COURT:  All right.  We will take that out.  And the

8    rest will stay in.

9          Then we get to Plaintiff's Exhibit 354.  And I assume

10   this was more historical knowledge.

11         MR. O'BRIEN:  That's right, Your Honor.

12         THE COURT:  And the basis of the objection?

13         MR. MACE:  Again, maybe '66 is getting a little old even

14   for you.  But I mean you're talking about --

15         THE COURT:  I was in the sixth grade.

16         MR. MACE:  I am not sure Mr. Paulos was even born at this

17   time.

18         But we have got no witness with firsthand knowledge to

19   talk about these things, and I don't see any probative value in

20   any of the issues in this case.

21         MR. PAPANTONIO:  Judge, that class -- we keep hearing

22   that same class of argument.  The truth is that argument, whether

23   it's 1952 or it's 1966, the people who came after, after that

24   document was created, had a reason to go back and find out what

25   was going on in the company.  They could have, they should have,

299

1     and they did not.  As a matter of fact, in this case they even

2     covered it up.

3          THE COURT:  Is there anyone who can be questioned about

4     this?

5          MR. PAPANTONIO:  I will question Siegel because

6     Dr. Siegel talks about the idea that this is a continuing, a

7     continuing lack of public safety effort on the part of DuPont.  He

8     uses this to draw from a historical basis.

9          THE COURT:  Well, I want to be careful how it's used.  On

10    that basis I think it would be relevant.  I understand there is

11    not a witness with personal knowledge.  But it came from DuPont's

12    files.  But I do somewhere along the way want the jury educated

13    that this is from the files, not from a witness's testimony.

14         MR. MACE:  So we would be entitled if we asked for a

15    similar limiting instruction?

16         THE COURT:  Yes.  What I would pretty much say, this goes

17    back before any current employee was employed.

18         MR. PAPANTONIO:  Judge, could we add to that, what they

19    knew, should have known, could have known --

20         THE COURT:  Right.  This will go to what was known by the

21    defendant basically.

22         MR. PAPANTONIO:  Well --

23         THE COURT:  Or could have been.

24         MR. PAPANTONIO:  Could have been.  That's all we ask,

25    judge.  That's really where the public health issues centers

1    around, what they could have and should have known.

2            THE COURT:  I don't mean to split hairs, this is document

3    within the company.  That's why I call it known, as opposed to

4    independent investigation to go outside.

5            So 359, this is not self explanatory.  This is '79.  Are

6    we talking about the same issue basically?

7            MR. GADDY:  Yes.

8            THE COURT:  History?

9            MR. PAULOS:  Same issue.

10           MR. MACE:  It's also, Your Honor, in terms of context, we

11   have a partial document.  We have page 2 at the top of the first

12   page and page 2 at the top of the second page --

13           THE COURT:  So do we have the whole document?

14           MR. PAULOS:  This was in the form that it was produced to

15   us by DuPont.  It has DuPont Bates stamp.  It did come from

16   Dr. Playtis's file.

17           THE COURT:  So the number before and number after

18   wouldn't take us anywhere?

19           MR. PAULOS:  DuPont has produced it as a sequential

20   document from the file of Anthony Playtis.

21           THE COURT:  If there were pages to add to this, I would

22   consider it.  But if you delivered it this way, I think this is

23   the best we can do.  So that would be admitted.

24           And then 366, is this the same history?

25           MR. O'BRIEN:  This came in the first trial, several

1    witnesses.  And there's no reason the Court should be inconsistent

2    with your prior ruling.

3         MR. MACE:  And our issue was, Your Honor, we tried to

4    take a closer look this time.  You had asked us, I mean are there

5    any documents that are used where there are no witness with

6    firsthand knowledge that can talk about them?  Do you want to put

7    a little more outlook grease into those, the ones that would be

8    coming in anyway.  So this is one where we don't believe any of

9    the witnesses with firsthand knowledge are going to be at the

10   trial.  So there's no independent way for them to publish this

11   before the jury.

12        MR. O'BRIEN:  It' an admission.

13        MR. PAPANTONIO:  It's an admission, but it's the same

14   thing they continue to use.  We have witnesses, whether it's going

15   to be Petty, whether it's going to be Siegel, the witnesses are

16   going to say, look.  Did you evaluate the company's conduct based

17   on the historical data you reviewed?

18        They say, yes, we did.

19        And because of that evaluation, do you have an opinion

20   within a reasonable degree of scientific certainty whether or not

21   this was out of form for --

22        THE COURT:  If I take it in that direction, this would be

23   arguably what experts in this field rely upon in giving

24   opinions --

25        MR. PAPANTONIO:  Yes, and he would say -- excuse me.

302

1       THE COURT:  -- but that wouldn't make the document

2   admissible.  They can be testified to.  But they can be

3   relied upon --

4       MR. O'BRIEN:  Right, they're admissible as ancient

5   documents.  They are business records because they come from

6   DuPont.  So that's not the objection.  They just want to keep it

7   out because nobody can testify to it.  If that were the case, then

8   no tobacco case would have ever been tried because all these 1920s

9   and '30s documents would have been out.  So this is simply the

10  records of the company that show the history.

11      MR. MACE:  I am troubled, Your Honor, with these repeated

12  statements, well, I will have my expert talk about it because --

13      THE COURT:  Well --

14      MR. MACE:  -- experts can rely on but they don't get to

15  publish.  It's hearsay.

16      THE COURT:  So we're -- That's not going to get us to

17  admissibility.  It would get us to testimony, but that would be

18  it.  But there is the ancient document issue, and there's the

19  admission issue.  How do you see that?

20      MR. MACE:  The Court is about to abrogate the ancient

21  document exception, and I think that may happen before trial.

22      THE COURT:  Why would I be abrogating it?

23      MR. MACE:  Oh, no, not Your Honor.  The rules committee.

24      MR. PAPANTONIO:  It doesn't look like it has problems.

25      THE COURT:  We have the chair right up the street.

303

1    Should I call him?

2           MR. MACE:  Sure.

3           THE COURT:  Judge Sutton.

4           MR. MACE:  Which one?

5           THE COURT:  Judge Sutton.

6           MR. MACE:  Okay, great.

7           MR. PAPANTONIO:  This falls squarely on an admission both

8    from -- just on an ancient document standpoint, certainly it's an

9    admission by this company against interests in so many ways.

10          THE COURT:  What are they thinking of?  Moving the 20

11    years out or --

12          MR. MACE:  Eliminating the rule altogether.

13          THE COURT:  It was a lot longer when I was in law school.

14    I think it was -- I don't know if it was 40 or 50.  They cut it

15    down to 20.  It seemed like yesterday to me.

16          MR. PAPANTONIO:  Tobacco industry had heavily wanted

17    this, to do away with the ancient --

18          THE COURT:  It would be relevant to the testimony of the

19    expert.  That doesn't make it admissible.  But it's also an

20    admission.  It's also an ancient document.  So I'm going to let it

21    in.  If you want an instruction on this is from the company's

22    record, no witness with knowledge, I'm happy to give that.

23          All right.  And then we get to this is a letter to

24    administrator of the EPA from the Science Advisory Board.  What is

25    the issue here?

304

1        MR. MACE:  It's irrelevant, Your Honor, because this is

2    talking about, the second paragraph, talking about dispersions

3    being shipped to suppliers.  There's no showing that this is

4    relevant to any issues in Mr. Freeman's case.

5        THE COURT:  I'm sorry?  The second?

6        MR. MACE:  Second paragraph.  I think this has to do with

7    some of the shipments that were going out of the Dordrecht Plant.

8    So it doesn't deal with Washington Works.  But it deals with

9    supplier issues --

10       THE COURT:  Are we on the same document?

11       MR. MACE:  I'm on 368.  Apparently not.

12       THE COURT:  I am one ahead of you.  So okay.  So this is

13   from --

14       MR. MACE:  I don't see any probative value to this case,

15   Your Honor, is the basic objection.

16       THE COURT:  All right.  Let me hear from the plaintiff.

17       MR. PAULOS:  Your Honor, this document is highly

18   probative.  It shows DuPont evaluating their use of C-8, and their

19   specific use of C-5 requires -- or their specific Teflon recipes

20   require large amounts of C-8 but then also are transported through

21   the product as they ship it to the purchasers.  It also shows them

22   looking at their product line that they refer to as dispersion and

23   that the world can live without that product, that it's --

24       THE COURT:  What exactly is dispersion?  I have forgotten

25   how that came out the last trial.

1    MR. PAULOS:  Dispersion is when they manufacture the

2    Teflon, they make it into a powder, a flake or a cube and then

3    ship the powder, flake or cube --

4         THE COURT:  These cubes are dispersions.

5         MR. PAULOS:  And they refer to that product line as

6    dispersion.

7         MR. MACE:  I don't think that's accurate, Your Honor.

8         MR. O'BRIEN:  Well, the C-8 is a surfactant which makes

9    it disperse.

10        THE COURT:  How do you see it?

11        MR. MACE:  Dispersion, Your Honor, are liquid forms of

12   the products that contain some traces of C-8 in them that then are

13   burned off during the subsequent manufacturing process.  So

14   there's some dispersions sent between DuPont plants that then are

15   further processed.

16        MR. PAPANTONIO:  Judge, the interesting thing is if you

17   look at this document, they're talking about the fact they don't

18   even need this stuff.  Here they are arguing about, over the years

19   they are arguing about how do we increase the amounts?  How do we

20   increase the amount we are dumping into the river, into the air?

21   And here at this very point, at this date, they're saying, we

22   don't even need the stuff.

23        THE COURT:  Well, I think I get it.  I think there's some

24   relevance here in terms of the availability of the product and so

25   on and how this would go into the calculus of a negligence

1    analysis.  So I will overrule the objection.

2           Now we get to the one that I was talking about.  It's an

3    EPA document from the Science Advisory Board, Plaintiff's 377.

4           MR. MACE:  Again, Your Honor, I think this is a document,

5    they have no witness with firsthand knowledge of it, not an

6    ancient document.  It's a government document, not a document of

7    DuPont.  If it's something that an expert has reviewed and can

8    reply upon for his opinion, that's one thing.  They still don't

9    get to publish the contents.

10          THE COURT:  What about the findings of or report of

11   public body, 803(8)?

12          MR. MACE:  Well, it's a recommendation made by an SAB,

13   not about EPA.  So it's not by a government agency.  They have a

14   peer review group that they send some of the reports out to.  And

15   they did not adopt the recommendations of the SAB.

16          THE COURT:  Right, but it's a report of the -- of the

17   Science Advisory Board, isn't it?

18          MR. PAULOS:  That's correct, Your Honor.  It's a document

19   that's indicative of what was being known by regulators at the

20   time under the United States EPA letterhead.  It's discussing the

21   three quarters of the panel judged the weight of the evidence,

22   that it causes cancer in humans --

23          THE COURT:  I get it.  I'm going to admit it.  We're just

24   talking about the 20-year rule of ancient documents.  I think this

25   falls under 803(8).  It just says, a record or statement of a

307

1     public office.  It all has to do with set out the office

2     activities.  And there's an opportunity to show that the

3     information is unreliable or not trustworthy, but nothing like

4     that here.  So under that rule, I am going to admit the document.

5          And then we get to 384 and --

6          MR. MACE:  This, Your Honor, again, we believe is a

7     misleading document.  The first sentence, Your Honor, at the top

8     of the page, 384, so here's somebody inside of DuPont is making a

9     comment that we're going to put a hold on further proactive

10    communications with the public.  John, please confirm this.

11         This was due to arguments that Mr. Bilott and others were

12    making to the state court judge in the *Leach* case.  So they were

13    being prevented -- They're apparently going to use the argument --

14         THE COURT:  Your argument is it doesn't give the whole

15    picture.

16         MR. MACE:  It doesn't give the whole picture.  And --

17         THE COURT:  You are being prevented from communicating --

18         MR. MACE:  Right.

19         THE COURT:  -- making it look like you voluntarily -- Is

20    that the case?

21         MR. PAULOS:  Your Honor, this document was used without

22    objection in the *Bartlett* case, and Mr. Bilott can speak to what

23    was going on at the time that this document was created.

24         THE COURT:  So this is April 25, 2002.  Was there some

25    issue about communications in the class action pending?

308

1          MR. BILOTT:  Yes.

2          THE COURT:  So how did this work?

3          MR. BILOTT:  I believe the Court had just certified the

4     case as a class action at this point in April of 2002.

5          THE COURT:  Was there some direction from the Court about

6     not communicating on the part of DuPont with the members of the

7     class?

8          MR. BILOTT:  I don't know if we ever got a directive of

9     the Court.  I believe the *Leach* class counsel raised an issue

10    about counsel -- I think at this point in time DuPont had been

11    sending postcards, mass mailings, to the class members.  The judge

12    received one and raised the question about this, I believe.  Then

13    I think at this point DuPont made the decision to stop

14    communications.

15         THE COURT:  Well, we can do a couple things.  We can

16    exclude this.  We can explain it, although explaining it brings

17    into play the class action, so that isn't going to work.  You

18    don't disagree, the letter is not inaccurate.  The real story is

19    we have got a class action pending.  The communication was to

20    stop.

21         MR. PAPANTONIO:  Your Honor, we would agree with that.

22    With that stand alone, of course, they're going to want to say

23    that's something we did.  We sent letters out to doctors, and we

24    sent letters out to people.  This answers that.  They can't have

25    it both ways.  It's got to be one or the either.  Either we cut it

309

1    all out or the next thing that Mr. Mace is going to want to say,

2    well, gee whiz.  We sent cards out anybody.  We have no finding

3    that any cards were sent out.

4         THE COURT:  Right.  There are two parts of the document.

5    That's the first part.  I'm going to exclude that now, subject to

6    revisiting if you think the door has been opened.  Don't assume it

7    was, but address that if you need a side-bar or before we bring

8    the jury in the morning.

9         Let's go to the second part.  Is there anything there?

10        MR. PAULOS:  Yes, the second part is the e-mail below,

11   the e-mail we were just discussing, Your Honor, where DuPont

12   admits that they have been higher than their own CEGs in many of

13   the samples they have taken of water around the plant and around

14   the community.  We think that's highly probative and should come

15   in.

16        THE COURT:  What is DuPont's view?

17        MR. MACE:  We will stand.  I'm not going to reargue this

18   objection about the witness issue over and over.  I have heard you

19   on that.

20        THE COURT:  So we're going to leave out the first part of

21   this, with the possibility of having to get back into it.  So,

22   otherwise, the document is admissible.

23        Now what I want to tell you about this -- There are

24   several documents in here from Mr. Bilott and --

25        MR. BROGDON:  Your Honor, if I may, on 384, when you said

310

1    the first part, the text of the first e-mail, is it out?

2          THE COURT:  Yes, it's out.  Only the second half of the

3    document right now is going to come in.

4          MR. BROGDON:  The 4/24 e-mail is in.  That's all.

5          MR. PAPANTONIO:  With the reservation, judge, so I'm very

6    clear, when they open the door, we sent cards and we did all these

7    wonderful things.

8          THE COURT:  To reiterate, you know, all these are

9    preliminary rulings.  If something changes and you want me to

10   revisit any of these, I will.  But assume the ruling stands until

11   I tell you otherwise.

12         So with this next document, my thought is to take

13   Mr. Bilott's name off but have the firm letterhead still there.

14   So on page 1 on the left, his name would come out.  And the

15   signature line, it would come out.

16         With that redaction, what other issues -- We have got his

17   letter, and then we have got the Exygen report.  What are the

18   issues here?

19         MR. MACE:  I think after you do that, and I'm reading it

20   quickly, that may take care of our main concern.

21         THE COURT:  So that's 392.

22         And then --

23         MR. MACE:  We preserve all of our objections on the TSCA

24   action, but we're not going to reargue that.

25         THE COURT:  Then go to 399.  And this is the Dry Run

311

1    Landfill Report Response Team.

2         MR. MACE:  Your Honor, there's no indication of who the

3    author is.  You have got handwritten notations, no indication of

4    who the author of that is.

5         THE COURT:  So we have got an RAK.  Who would that be?

6         MR. BROGDON:  I don't know.  I'm trying to think who it

7    might be.  It doesn't come to mind.

8         THE COURT:  So it comes form DuPont.  We don't know who

9    RAK is.

10        MR. MACE:  Well, there were documents produced by others.

11        MR. PAPANTONIO:  No, there were not.

12        THE COURT:  Well, it's got a stamp on it of RAK.  Doesn't

13   that mean who gave it?

14        MR. MACE:  I don't think that's always the case, Your

15   Honor.

16        MR. BROGDON:  I don't know for sure, Your Honor.

17        MR. MACE:  They have subpoenas from various parties that

18   also had documents, I believe.

19        MR. BILOTT:  This is a DuPont document produced by a

20   DuPont witness.  This is a DuPont custodian's designation is RAK,

21   and I'm right now drawing a blank as to who RAK is, but that is a

22   DuPont employee.

23        MR. BROGDON:  I do think that's a DuPont document.  I

24   think that's correct.  I don't know who RAK is.

25        MR. O'BRIEN:  You can under the review team reports, RAK

312

1      at one of the technical review team report members.

2            THE COURT:  But this is historical.

3            MR. O'BRIEN:  Right.

4            THE COURT:  There are handwritten notes on here.  It

5      doesn't look to me -- and you can tell me if I am wrong -- those

6      don't really add or detract anything.

7            MR. MACE:  I don't believe so.  I don't see any probative

8      value to any of it is part of the problem.  But I agree with you

9      on the handwritten.

10           THE COURT:  On the top, attorney work product, if this

11     document is going to come in -- and I haven't decided yet -- maybe

12     that ought to come out, too.  Maybe I'm just confused.

13           So what's this document offered for?

14           MR. PAULOS:  This is -- This document is probative of

15     DuPont's mindset at the time in 1998 when the Dry Run Landfill was

16     being investigated for its containment of C-8 or its containing

17     C-8.  This shows what DuPont was doing to assess the situation, to

18     address the situation or not address the situation, what were the

19     issues that they were primary concerned with the C-8 that was

20     found in the Dry Run Landfill.

21           THE COURT:  Well, at this point I am going to admit it.

22           MR. BROGDON:  Your Honor, could we redact the attorney

23     work product?

24           THE COURT:  Yes.

25           MR. MACE:  The handwriting?

313

1           THE COURT:  We don't need the handwriting there, either,

2     do we?  I don't think there is anything probative.

3           MR. BROGDON:  So all the handwriting?

4           THE COURT:  Take out the handwriting including attorney

5     work product and attorney/client privilege.

6           MR. BROGDON:  Thank you, judge.

7           THE COURT:  Then we get to 402.  And take off the bottom

8     string of the Wood County West Virginia case.

9           MR. MACE:  The footer, yes, sir.

10          MR. BROGDON:  We have that on a previous documents as

11    well.

12          THE COURT:  Anything like that on here, that comes out.

13    We don't want anything identified --

14          MR. BROGDON:  I don't recall the number, but that was on

15    the previous number.

16          THE COURT:  That will come out.

17          So 402, anything else you need to talk about?

18          MR. MACE:  Yes, 402, again, no showing this has anything

19    to do with Washington Works or any relevance it has to the issues

20    in Mr. Freeman's case or how it ties in.

21          MR. PAULOS:  Your Honor, the subject line of the e-mail

22    is C-8 in water, and DuPont is discussing internally what they can

23    do to ensure that, that there's no human exposure to C-8 in

24    drinking water.  I think it ties directly to what was happening at

25    Washington Works and DuPont's internal considerations of how to

314

1    prevent human exposure to their toxic chemical.

2           THE COURT:  There are several names on it.

3           MR. O'BRIEN:  Rob Pinchot was a scientist who

4    specifically had responsibility at Washington Works, and this is

5    carried through several of the depositions.  He was the one that

6    was analyzing the model of the exposure, the outflow, Out Flow no.

7    5, what was getting into the river.  So Pinchot is a very key

8    feature to the emissions process in and their effort to reduce the

9    emissions.

10          THE COURT:  Now do you get his last from that?  I don't

11   see it on here.

12          MR. PAULOS:  It's here at the top of the e-mail.  It says

13   Robert F. Pinchot, December 8, 1999, 4:40.

14          THE COURT:  Okay.  I'm going to admit it.

15          MR. MACE:  With the footer taken off.

16          THE COURT:  With the footer off.

17          MR. BROGDON:  For the record, Exhibit 342 was the

18   previous one that has the same footer.

19          THE COURT:  That will come off.

20          MR. BROGDON:  To inform plaintiff's counsel on that.

21          MR. BILOTT:  I assume for clarification, any of these

22   that are being admitted that have a protected order stamp from any

23   of the cases that would be taken off.

24          THE COURT:  Taken off, yes.

25          403, this is, I assume, this is a scientific article, the

315

1    abstract.  What's the issue here?  There's some handwriting --

2            MR. MACE:  That's primarily it.  There's a bunch of

3    handwriting on here.  There's no indication of any --

4            THE COURT:  Any objection if we take the handwriting off?

5            MR. PAULOS:  We see no harm in the handwriting, if you

6    would like it redacted and blacked out.

7            THE COURT:  That will come off.  We will go from there.

8            All right.  Then we will get to 410.  And this, of

9    course, I ruled on before.  This was getting into the consent

10   decree.  Is this essentially the offering of the consent decree

11   itself?

12           MR. MACE:  Your Honor, this is actually a prior consent

13   decree.

14           THE COURT:  This is from a different year.  This is from

15   -- What's the date on this?

16           MR. BILOTT:  This U.S. EPA ordering DuPont to provide

17   clean water in 2002.

18           THE COURT:  And this is agreed to?

19           MR. MACE:  Well, I think this one, Your Honor, is one

20   that we're going to have to revisit with plaintiff's counsel on

21   potential redactions.

22           THE COURT:  So the document is not objected to.

23           MR. MACE:  Right.

24           THE COURT:  Some language.  All right.  Where are general

25   in talking, what are you thinking of?

316

1    MR. MACE:  Well, this was one -- frankly, Your Honor, we

2    haven't had a chance to go back and pull the copy.  There was

3    another copy of this I believe marked for the *Bartlett* trial,

4    agreed on with the redactions.  But I wanted to go back and find

5    them; and if there remain any issues, that I can raise them.

6    THE COURT:  All right.  We will hold on this one.  You

7    can resolve that hopefully.  If not, we can resolve it

8    differently.  All right.

9    411.  This is another -- I'm hoping this fits the

10    category we just talked about.  This is a display.

11    MR. MACE:  Yeah, I think it's in the horse trade

12    category, Your Honor, for lack of a better phrase.

13    THE COURT:  That one is going to disappear.

14    MR. MACE:  I think there are a couple things with -- so

15    for example on page .2, Your Honor, there is some reference to

16    litigation, the class action --

17    THE COURT:  Well, only if you -- that's on the assumption

18    that will be coming in.  Hopefully that's part of the order.

19    MR. MACE:  But even with the horse trade, we would like

20    that type of language redacted --

21    THE COURT:  No, I assume the horse trade means it's not

22    coming in at all.

23    MR. PAPANTONIO:  Judge, it's not coming in.  What's good

24    for us is good for them.

25    MR. MACE:  Well, the horse trade was either let them all

1    in or keep them all out.  What I'm saying is the horse trade is

2    we're all going to keep them in.

3        MR. PAPANTONIO:  Right now we're agreeing this goes out

4    in exchange for the idea that when you have something similar, it

5    goes out, too.

6        THE COURT:  I want to keep it all out, to tell you the

7    truth.  I will note for the record we have finished one first page

8    of the nine objections.  Only eight to go.

9        MR. MACE:  On this document, Your Honor, go to this, you

10   will recall I put a placeholder in terms of general statements.

11   So Bossert is likely to be a witness as he was in the first trial.

12   So this is his slide presentation that he gave.

13       THE COURT:  Argument --

14       MR. MACE:  So this is not using this in general.  This is

15   firsthand knowledge of the slide presentation.

16       MR. PAPANTONIO:  The only way to make this -- maybe

17   analysis by analysis.  Like, for example, the -- there's a

18   document that we use in -- it's Connecting the Dots, for example.

19   But I have the witness talking about that was actually involved

20   with that particular document.  Connecting the Dots is where they

21   are trying to figure out ways to keep this secret form the public.

22   That actually comes in from a witness that we're going to examine.

23   She's aware, that she responds to it.  That, you know, that's -- I

24   suppose both sides will have that.

25           So if they have a witness that's going to be responding

318

1    to particular ideas, I'm just talking about documents where

2    somebody is simply trying to offer some slide show, and there's no

3    discussion either way about:  Where does it come from?  What it's

4    about?  I understand that.

5            But with something like Connecting the Dots, we're

6    requesting the witness -- or if Bossert is going to testify about

7    that, we understand that.  We don't have any trouble with that.

8            THE COURT:  With the assumption this might be coming in,

9    it probably will be from that, what -- would you have an another

10   objection?

11           MR. MACE:  Over on page 2, at the bottom, so there's

12   references in the comment box, there's discussion about

13   litigation, class action --

14           THE COURT:  Right.  So that --

15           MR. MACE:  -- the City of Lubeck, that paragraph there

16   would be redacted.

17           THE COURT:  DuPont disputes the allegations and intends

18   to vigorous defend itself against the class action, that comes

19   out.  And a copy of the statement is in your packet, that will

20   come out.

21           MR. MACE:  The City of Lubeck is suing DuPont, that's

22   incorrect.  That whole paragraph.

23           THE COURT:  Any objection if we take that out?

24           MR. PAPANTONIO:  No, Your Honor.

25           THE COURT:  That all comes out.

319

1          All right.  Now we're on to page 2.  2002 e-mails, so

2     this has to do with monitoring issues.  On plaintiff's end, how do

3     you expect to use that?

4          MR. PAULOS:  Your Honor, this document -- this document

5     has reference to the confirmation of C-8 in animal carcinogens and

6     unknown relevance to humans we think it probative of the issues in

7     the case.  It also contains DuPont's discussion of the hazard

8     assessment of the chemical for PFOA or C-8.  It also discusses the

9     ways that C-8 is either ingested or absorbed by humans when they

10    come into contact with.

11         MR. PAPANTONIO:  Judge, one of the defenses, obviously,

12    is that all these animals were killed, it doesn't have any

13    relevance to humans.  This document pretty much sets that

14    straight.  This does have relevance to humans.

15         MR. MACE:  It's back to the witness.  They have no

16    witness with firsthand knowledge that's going to be able to talk

17    about this at trial.

18         THE COURT:  Any response to that?

19         MR. PAPANTONIO:  Yes.  We will have -- This is something

20    where Dr. Siegel, if you will recall the beginning of the

21    testimony, the very first questions that I asked him is that, the

22    doctor, is there relevance between what we find in laboratory

23    animals and human beings?  It is not just him we use to testify

24    about.

25         MR. MACE:  Again.  My statement was nobody with firsthand

320

1    or personal knowledge, the lack of personal, firsthand knowledge.

2         THE COURT:  We are talking about the expert aspect, he

3    can testify to this, but it will not necessarily come in as

4    evidence.  It's not an ancient document.

5         MR. PAULOS:  It's an admission, though, Your Honor.

6         THE COURT:  Right, an admission.  I'm going to overrule

7    the objection.

8         All right.  Then we get to an ancient document.

9         MR. O'BRIEN:  Your Honor, on these next two, 420, 422, I

10   believe they are just redactions issues, employee privacy issues.

11   We will agree --

12        MR. MACE:  Take the last names off.

13        THE COURT:  And that was 422 as well.

14        MR. O'BRIEN:  Yes, sir.

15        THE COURT:  All right.  Moving right along, 432, let me

16   just see one thing here.  432 is a scientific article?

17        MR. O'BRIEN:  Right.

18        THE COURT:  What's the issue here?

19        MR. MACE:  Again, Your Honor, this is an article that in

20   terms of an expert saying they relied on something, but in terms

21   of being able to publish, this is not a DuPont document.  This is

22   absent people that I would not be able to cross-examine.  It has

23   got undisclosed expert opinions in here.

24        THE COURT:  This would be a document one of the experts

25   on the plaintiff's side used in the analysis.  Didn't write it.

321

1    MR. O'BRIEN:  Right, under 803(18).  So it would not go

2    back to the jury, but it could be published.

3    MR. MACE:  We don't think they get to publish the

4    opinions of an undisclosed expert, Your Honor.

5    MR. O'BRIEN:  It's literature.

6    THE COURT:  Rule 703 says that you can rely on things

7    that need not be admissible.  But then 803(18), statements in

8    learned treatises, periodicals, or pamphlets.  It's actually under

9    B, established as a reliable authority by the testimony or

10   admission of the witness or by other expert testimony or by

11   judicial notice.  If admitted, the statement may be read into

12   evidence -- that will be exciting -- but may not be received as

13   exhibits.

14   MR. O'BRIEN:  So you publish it to the jury.

15   THE COURT:  Paragraphs, not talking about publishing the

16   whole document.

17   MR. O'BRIEN:  Right, and then in closing argument we can

18   argue what was published in front of the jury.

19   THE COURT:  That could go both ways.  Any objection if we

20   treat it on that basis?  It wouldn't go to the jury as an exhibit.

21   MR. MACE:  That's a start, Your Honor, but I think we

22   would also need, since they are not bringing in Post, Cohn or

23   Cooper, that I could cross-examine, we would need that limiting

24   instruction.

25   MR. O'BRIEN:  That is true of all learned treatises, that

322

1    they are what folks can rely upon.

2            THE COURT:  You have experts that are going to rely on

3    treatises, too, right?  You want to use those?

4            MR. MACE:  Probably.

5            THE COURT:  All right.  I just suggest you understand

6    that this is not going to go back, and.  You know, I would really

7    recommend you use this sparingly as far as reading it to the jury.

8    It has very scientific jargon to start with.

9            MR. PAPANTONIO:  Judge, we used about four paragraphs

10   last trial.  This came in in the exact way you are describing.

11           THE COURT:  Again, we will comply with both Rule 703 and

12   803(18).

13           So as far as the documents coming in, that's not going to

14   happen, but pieces can be read to the jury.  And, again, there is

15   a precondition the doctor has to say that it is reliable

16   authority, and so on.

17           I think that takes us to 435.  And --

18           MR. MACE:  Again, no witness, judge, with firsthand

19   knowledge is going to testify at the trial.  And also a number of

20   things that would have to be redacted if the Court is going to let

21   it in.

22           THE COURT:  So give me an overview of how the plaintiffs

23   see this.  There's a cause to be known -- or known to be caused, I

24   think that's someone's comment on an epidemiological study.

25           MR. PAULOS:  Yes, Your Honor.  There is an e-mail string

323

1   in which several DuPont employees, including Dr. Rickard, were

2   contained within and received these e-mails.  Basically this is

3   the Epidemiology Review Board who was reviewing DuPont's efforts

4   to study C-8 and obtained a copy of a press release that DuPont

5   had released to the public that had been picked up by Bloomberg

6   and circulated, and this is the critique of that public statement.

7   And Epidemiology Review Board is certainly concerned because it

8   appears to give the impression --

9           THE COURT:  Tell me about that board again.  I'm drawing

10  a blank.

11          MR. PAULOS:  The Epidemiology Review Board was a group of

12  individuals, scientists and academics, that were put together to

13  review the studies that DuPont was --

14          MR. O'BRIEN:  DuPont retained them.  DuPont retained

15  them, and eventually they were invited not to return.  So there's

16  an issue here of agency at the very least because they were

17  retained --

18          THE COURT:  You are going to argue they could have gone

19  forward and didn't.

20          MR. O'BRIEN:  That's right.

21          MR. MACE:  Your Honor, but this is a document, you will

22  seem from the Bates number, this is out of Wegman's files so it's

23  not a document that --

24          THE COURT:  Who's Wegman again?

25          MR. MACE:  Mr. Wegman was one of the people on this

324

1      independent Epi Review Board.  So it's not a DuPont document.

2              THE COURT:  I'm looking at the header.  These aren't

3      DuPont employees either.

4              MR. MACE:  No, there's no DuPont employee anywhere.

5              MR. BILOTT:  Just to be fair, Your Honor, these

6      epidemiologists, the people on the board, were under contract and

7      working for DuPont when they authored these.  This was within the

8      scope of employment as people on the Epidemiology Review Board

9      under contract with DuPont.

10             THE COURT:  You would have to prove that first.  I'm not

11     going to assume that, not that I don't take your word, but there

12     will have to be evidence.

13             MR. O'BRIEN:  And we could do that very easily through

14     Ms. Korte or Dr. Rickard, they all were there, and they knew very

15     well who the ERB was.  In fact, Dr. Rickard was copied on this

16     very e-mail, which is the second page.

17             MR. MACE:  Two additional issues, Your Honor.  One is --

18             THE COURT:  Let me stay --

19             MR. MACE:  Sorry, Your Honor.

20             THE COURT:  You could use this for Rickard.  He's on many

21     of these, or at least on some of them.

22             MR. PAPANTONIO:  Judge, this issue was used by Rickard

23     the last time.  If you recall, the Epidemiology Review Board sees

24     what DuPont is telling the public, and they say, don't tell the

25     public that.  Don't tell the public that this does not cause any

325

1    kind of human safety issues.  And then they do exactly the

2    opposite of the very people they hired.  They turned around and do

3    exactly the opposite of the epidemiologists they hired.

4            THE COURT:  Is Rickard familiar with the entire e-mails

5    chain?

6            MR. PAPANTONIO:  Yes.

7            MR. MACE:  No, Your Honor.

8            MR. PAPANTONIO:  Well, he testified about that the last

9    time.

10           MR. MACE:  I don't think that's accurate.

11           MR. O'BRIEN:  The issue that I am addressing is not so

12   much that he was copied on each one, but he can establish the

13   agency, the agency relationship.  And Ms. Korte can establish

14   that, that they were hired.  They were hired to accomplish a

15   specific purpose on behalf of DuPont at the behest of DuPont; and

16   these statements were made pursuant to these duties.  So it's an

17   agent's statement.  It doesn't have to be a W-2 employee.

18           MR. BROGDON:  Your Honor, these e-mails show, including

19   the e-mails to Dr. Rickard and a few others at the very bottom.

20   And then the e-mail string then excludes those people and is among

21   the board members themselves exclusive of DuPont employees,

22   showing that they separated and had a separate dialogue here that

23   Mr. -- Dr. Rickard was not part of.

24           THE COURT:  So who's David?

25           MR. O'BRIEN:  Wegman.

326

1          THE COURT:  David Wegman?

2          MR. O'BRIEN:  He was the chair of the ERB.

3          THE COURT:  And Jonathan Samet wrote to him.

4          MR. BROGDON:  Separately.  That's where the DuPont folks

5     were excluded to have a separate conversation.

6          MR. PAPANTONIO:  They weren't excluded, judge.  They were

7     included in this whole dialogue for up to the time that they

8     continued to ignore what their agents were telling them and then

9     published something directly in contradiction of what they were

10    told.

11         MR. MACE:  That's a false statement.

12         MR. BROGDON:  This is in reference to the e-mails only,

13    Your Honor --

14         THE COURT:  I don't think this e-mail is coming in by

15    itself.  It's going to take either proof of an agency or proof of

16    Rickard's knowledge.  Right now it's not in, but flag this, and

17    we'll talk about this after I hear some more testimony.

18         MR. MACE:  There were two further issues, Your Honor.

19    One is in the first paragraph, it has got an extraneous statement

20    halfway through.  I was on the phone today with Sol discussing a

21    related area of business interests, stopping a trial for business

22    reasons.  It had nothing to do with the case, and it's hearsay

23    within hearsay.

24         THE COURT:  We don't need that, do we?

25         MR. PAPANTONIO:  No.

1          MR. MACE:  And similarly, in the second paragraph, middle

2     of the bottom e-mail, it has got some multiple hearsay within

3     hearsay, shared your concerns with Mark, second paragraph in the

4     second e-mail, shared your concerns with Mark who was on the phone

5     with DuPont pushing for less certainty.

6          THE COURT:  I'm still not finding it.

7          MR. MACE:  I'm sorry, Your Honor.  Shared your concerns

8     with Mark on the phone with DuPont, about three or four levels of

9     hearsay in there.

10          THE COURT:  All right.

11          MR. MACE:  And, again, it's not a DuPont document.

12          THE COURT:  Well, that's going to come in in the same

13     category.  Let's see what Dr. Rickard says, if he has any

14     knowledge of this; and if there's an agency issue, you will have

15     to prove it.  So --

16          All right.  That takes us to 436.  And this is -- It's

17     going to be relied upon by one of the experts?

18          MR. DOUGLAS:  Yes, it's a learned treatise, same

19     exception.

20          THE COURT:  703 and 803(18).

21          MR. MACE:  Same issues, Your Honor.

22          THE COURT:  And that takes us to 523.

23          MR. MACE:  503, Your Honor.

24          THE COURT:  All right.

25          MR. MACE:  Wishful thinking.

328

1    THE COURT:  I am one ahead of you as usual.  503.

2    MR. MACE:  It's not hard to do.

3    This gets back into, Your Honor, these documents with no

4    witness with firsthand knowledge, references to disposal at sea,

5    things we think are highly prejudicial and should be excluded on

6    403, marginal, if any, probative value.

7    MR. O'BRIEN:  Your Honor, this is -- when you read it in

8    conjunction with the earlier one we talked about from 1966, in

9    that earlier one there's two things that are said.  Number one,

10   they admit that they know that it's toxic.  They refer to the

11   dispersant as toxic, and it's in the '66 time frame.  They talk

12   about how we can dispose of it.  Second thing that is talked about

13   in that early '66 document, well, let's dispose of it in an

14   unlined landfill, but we know it may leach.

15   So this also is part and parcel --

16   THE COURT:  Your expert is going to use this as the

17   company's history, knowledge, it's going to be from the company

18   that goes back this far.  But the question is whether it's

19   admissible.

20   MR. O'BRIEN:  Yes, Your Honor.

21   THE COURT:  Anything additional we need to discuss?

22   MR. MACE:  Not in addition to what we have talked about.

23   THE COURT:  It will come in.

24   MR. MACE:  With a potential limiting?

25   THE COURT:  If you want a limiting instruction, nobody

1    has personal knowledge, but it's within the DuPont records.

2            All right.  Now we get to 523.

3            MR. MACE:  This is one we did discuss during *Bartlett*,

4    Your Honor, maybe a different version of it, but there was

5    extensive portions of it that were redacted, and this copy was not

6    redacted.  It may be something we can work with counsel.

7            THE COURT:  Let's start with I am going to redact what I

8    did in the *Bartlett* trial.  If there's something additional?  Is

9    there some other issue you want to raise?

10           MR. PAULOS:  No, Your Honor, I was going to point out the

11   actual minutes of a DuPont Epidemiology Review Board meeting.  So

12   the very same folks that we were discussing in the earlier

13   e-mails.  And you will see the same folks who were the attendees

14   in the meeting were those that were discussing the DuPont press

15   release that they were taking issue with.  So this, again, shows

16   the agency relationship.

17           THE COURT:  I get that.  The only objection is you want

18   some redactions.

19           MR. MACE:  Yes, Your Honor.

20           THE COURT:  Why don't you work on those redactions.  If

21   there's an issue remaining, let me know.

22           MR. PAULOS:  We agreed on redactions in *Bartlett*, and we

23   will meet and confer and confirm that the redactions will remain.

24           THE COURT:  Then we get to 535.

25           MR. MACE:  Just to follow up Mr. Paulos' comments, Your

330

1    Honor said if there was anything else we wanted to raise with you

2    we could.  We just need to look at redactions.

3         THE COURT:  On that document.

4         MR. MACE:  Yes.

5         THE COURT:  And then we're to 535.

6         MR. MACE:  And this, again, Your Honor, no author.  I

7    don't even recognize the Bates number, not sure where this came

8    from, not sure what witness with personal knowledge they intend to

9    use this with --

10        THE COURT:  I am assuming that there's a journal called

11   *Environmental Health Perspectives* in January, 2010, a person by

12   the name of Melzer published a study?

13        MR. PAULOS:  That's correct.  Your Honor, this is a

14   DuPont document, it has a DuPont Bates stamp, and this is a

15   statement that DuPont is prepared to address --

16        THE COURT:  I'm sorry, a statement.  Not a --

17        MR. PAULOS:  This is a DuPont statement.  This is their

18   position in respect to the Melzer study.

19        MR. PAPANTONIO:  As late as 2010.

20        THE COURT:  There would be people around who would have

21   been at 2010 that are still there.

22        MR. MACE:  But whom?  I mean there's no identification of

23   who it's from and what the context was or anything else.

24        THE COURT:  I'm just talking out loud -- and you can

25   correct me if I'm wrong -- but a statement normally would be given

331

1    by the communications end, wouldn't it?

2         MR. MACE:  Is it not for them to prove up?  It's their

3    document they're trying to get in.

4         THE COURT:  It didn't come from DuPont, did it?

5         MR. PAULOS:  It has a DuPont Bates stamp number.

6         THE COURT:  I mean I'm not arguing with you, but it's got

7    a different numbering system.

8         MR. PAULOS:  This is one where Rob should chime in here,

9    he knows where these three letters or three numbers -- these are

10   from one of the class action cases, these Bates stamps.

11        MR. BILOTT:  In fact DuPont Bates number.

12        THE COURT:  In the *Leach* case?

13        MR. BILOTT:  It was either the *Leach* case or in the more

14   recent production after that.  But definitely it's a DuPont C-8

15   production.  It has their Bates number.

16        MR. BROGDON:  2015, postdated *Leach* by many years.

17        MR. BILOTT:  DuPont produced a number of additional

18   documents in the MDL at the beginning, and this is the Bates

19   number is from that.

20        MR. MACE:  We are not stipulating to that, Your Honor.

21   We just don't know.

22        THE COURT:  My ruling is going to turn on -- Whether

23   there is some authenticity issue, then we will deal with it

24   differently.  But if it came from DuPont, and I will give both

25   sides a chance to make sure that's the case, why don't you do that

332

1      and report back to me.

2              MR. MACE:  Yes, sir.

3              THE COURT:  All right.  That takes us to 545.

4              MR. O'BRIEN:  Which is a Reilly e-mail where they

5      suggested that it needs some redactions.  And what I would propose

6      simply really the paragraph that deals with C-8 and DuPont is the

7      second paragraph of the e-mail, and we're okay redacting the

8      other --

9              THE COURT:  So just one paragraph starting, with meeting

10     with EPA?

11             MR. O'BRIEN:  Yes, sir.

12             MR. MACE:  We think it's important -- Part of the issue

13     with the Reilly e-mails, and we preserve all of our objections, we

14     think they were made in the personal context.  We think it's

15     important to keep that in the context.

16             The paragraph we think needs to be redacted was the third

17     paragraph about President Bush, and that has no relevance to the

18     case, but that could have some emotional appeal to one side or the

19     other.

20             THE COURT:  There might be Republicans who take offense

21     at that in the jury.

22             MR. MACE:  There might be Hilary Clinton supporters.

23             MR. O'BRIEN:  The rule has been all the personal chatter

24     is out.  Just because they like the personal chatter, they can't

25     get it in.

333

1          THE COURT:  Well, let's start -- We want to do these a

2     paragraph at a time.  Bush spoke last evening, I can't deal with

3     looking at or listening to, that's coming out, that whole

4     paragraph.  That may -- it doesn't address Mr. O'Brien's issue,

5     but does amount to prejudicial and it doesn't have any probative

6     effect.

7          Now let's go paragraph by paragraph.  First paragraph,

8     this is all personal chatty sort of stuff.  Right?

9          MR. MACE:  I think the rest of it is, and you've already

10    ruled on the second paragraph.  So --

11         THE COURT:  So I am guessing your point is that this

12    context to there.  And when he does say something damaging, you

13    want the jurors to know this was a personal e-mail.

14         MR. MACE:  Casual.

15         THE COURT:  I think that's pretty obvious from the full

16    e-mail?

17         MR. O'BRIEN:  Right.  But the one thing in the deposition

18    of Reilly, the Court ruled because, you know, by the time the

19    examination -- Mr. Wood's examination of Mr. Reilly, you could

20    hear Lee Greenwood, God bless the USA, about these helicopters and

21    West Point and all this stuff.  It's just to show, hey, he's got a

22    son fighting Ben Laden in helicopters.  What is that relevant to

23    in this case?

24         THE COURT:  Well, I don't -- You don't see any big deal

25    to the first paragraph.

334

1          MR. O'BRIEN:  No, I don't.

2          THE COURT:  And second paragraph is why it is being

3     offered.

4          MR. O'BRIEN:  Right.

5          THE COURT:  The third paragraph is out.

6          And the fourth paragraph goes to what you're talking

7     about, right?

8          MR. O'BRIEN:  Right.

9          THE COURT:  Now I think, just to give it context, I'm

10    going to leave it all in, and we'll have to debate it as it comes

11    in.

12         MR. O'BRIEN:  But the Bush paragraph comes out.

13         THE COURT:  Comes out.  Everything else stays in.

14         Then we have another Reilly e-mail, 548.  And there's a

15    reference to Enron in there.

16         MR. MACE:  There are several, Your Honor.  Let's take it

17    paragraph by paragraph.

18         So the second line after the comma, our suit with the

19    wartime cleanup costs and now Aberdeen, that whole section there

20    has nothing --

21         THE COURT:  Where are you seeing that?

22         MR. MACE:  Yes, sir, second line after the comma, our

23    suit with the government.  And the mustard gas.  You will recall

24    that there was a mixup at the trial with people referring to the

25    mustard gas, that that was relevant here.

335

1          THE COURT:  So I'm inclined to take that out.

2          Anything else I need to hear from the plaintiff's side?

3          MR. PAULOS:  You actually ruled on redactions in

4     *Bartlett,* and this is a copy of the redacted version that we

5     prepared that was based on your rulings.

6          MR. MACE:  Thank you, counsel.

7          THE COURT:  Are you sure I left in this part about Enron?

8          MR. MACE:  And that was the thing -- that was the third.

9     This addressed the other two that I was going to raise, Your

10    Honor, but Enron was the third one.

11         THE COURT:  There really is no reason for the Enron

12    paragraph to remain in there.

13         MR. PAPANTONIO:  No.

14         THE COURT:  That comes out, too.  If I did that in the

15    other case, I am reversing myself, just for the record.

16         MR. BROGDON:  Is that the whole paragraph?

17         THE COURT:  Yes.  All right.  That's 548.

18         MR. PAULOS:  It wasn't used in the *Bartlett* trial, just

19    so you are aware of it.

20         THE COURT:  570, I'm going to guess this is the kind of

21    issue we are talking about.

22         MR. MACE:  Yes, Your Honor, and I am not going to waste

23    your time with rearguing the same thing.

24         THE COURT:  It will be admitted.

25         612, this looks like a version of the -- on our website

336

1    of Little Hocking Water Association?

2            MR. MACE:  Yes.  Your Honor, this is one that came out in

3    the heat of battle, you may recall during the trial, and Your

4    Honor went back and forth a couple of times on it.  At the end of

5    the day you had it with several redactions.  But this is just

6    replete with hearsay within hearsay.  It's not a DuPont

7    document --

8            THE COURT:  Does anybody have handy the redactions that

9    were made?  Because I know a lot of this will come out.

10           MR. O'BRIEN:  One of the things -- one of the huge things

11   that's different about this case from Ms. Bartlett's case is this

12   is a Little Hocking case.  And listed on DuPont's may call list is

13   Mr. Griffin, the author of this letter.

14           So, obviously, if DuPont is intending to offer

15   Mr. Griffin to come in here and testify, then, number one, I think

16   that the whole letter is fair game.  But number two, because it is

17   the Little Hocking Water Association, and DuPont in this case will

18   take the position based on what their other witnesses have said

19   that, oh, Little Hocking Water Association was in the loop,

20   there's a lot more on the probative side of this 403 than there

21   was in the *Bartlett* case because this was a Tuppers Plains case.

22           THE COURT:  Well, I'm looking at the redactions, and

23   there are many.

24           MR. MACE:  Your Honor --

25           THE COURT:  What else do you contend should be redacted?

337

1    MR. MACE: Well, the very first paragraph. Your Honor,

2    it's talking about 364 homes, 12,000 people, water taps, they are

3    contrary to Your Honor's statement this is a one-plaintiff case.

4    MR. O'BRIEN: Your Honor, this comes in through the

5    Brookmore data set. I mean it's throughout because it pertains to

6    the duty. The duty is --

7    THE COURT: What -- You know, I can't stop the jury from

8    inferring about who else would be affected because we are going to

9    see the water -- the way the water would get into the wells. But

10   I don't think we need to advertise the number of other people.

11   There are enough parts of this case. So --

12   MR. PAPANTONIO: Judge, the reason they want to come back

13   to these numbers, they want to paint the picture that Mr. Freeman

14   is some type of aberration. He's the only one sick, that he's the

15   only one that still has C-8 in his blood at 2000 times the level

16   it should be. And to put it in perspective, they leave the jury

17   believing that he's some type of oddball aberration that's simply

18   bringing a lawsuit.

19   THE COURT: Well, you know, I can see that. I can see

20   both issues here. I don't think the 12,000 people would be

21   particularly helpful, and it could be prejudicial. But he's not

22   on a well. I don't want anybody thinking that this is -- that he

23   is an aberration.

24   So the first line, I don't think anybody has any trouble

25   with, a nonprofit association incorporated in 1968.

338

1          MR. MACE:  True, Your Honor.

2          THE COURT:  And then how about we say Little Hocking

3    Water Association is the largest rural water system in Washington

4    County, period.

5          MR. MACE:  That takes care of my concerns with that

6    paragraph, Your Honor.

7          MR. O'BRIEN:  Your Honor, just so we're clear, we believe

8    duty -- It's not just about a proximate cause in this case.  It's

9    about the community.  We talk a lot about the community.  And I

10   think the jury has an understanding because the scope of duty --

11         THE COURT:  But I think they will get this, that it is

12   the largest rural water supply in the county.  I mean what I'm

13   hearing you say is when you're doing the calculus of risk analysis

14   as a juror, this wouldn't have anything to do with damages but

15   would have to do with risk taken in terms of the number of people

16   possibly affected.  Is that the argument?

17         MR. O'BRIEN:  Right.

18         MR. PAULOS:  It directly goes to DuPont's knowledge of

19   whether or not that C-8 in the water of this many homes or this

20   many people could lead to substantial likelihood of harm to these

21   people.  It's the greater number of people whose water is

22   contaminated more likelihood of substantial harm to cause.  We

23   think that is important for that sort of --

24         MR. MACE:  The best that argument would come in for

25   reprehensibility analysis in the second phase on punitive damages.

339

1          THE COURT:  For sure on that.  What I am thinking aloud

2     about it is -- I don't want -- I'm just using an analogy, I'm not

3     describing DuPont's conduct when I say this -- but if you're going

4     to build a dynamite plant in a city, that's the sort of argument

5     you're making.

6          MR. O'BRIEN:  Right.

7          MR. PAPANTONIO:  This is -- I opened with the line where

8     I say the DuPont knowingly polluted one of the biggest water wells

9     in this area.  They knew the span of it.  They knew the extent of

10    it.  I don't want to surprise the Court, that is part of my

11    opening statement.

12         THE COURT:  Refresh my memory.  The Little Hocking Water

13    Association is in the southern part of Washington County.  But the

14    water is drawn from -- where is wells?

15         MR. O'BRIEN:  Well field.

16         THE COURT:  Not from the river, a well field just like

17    the last case.

18         MR. PAPANTONIO:  And so when I talk -- I want the Court

19    to understand, I talk about them poisoning the largest well field

20    in that area, and I don't want --

21         MR. MACE:  We would object to this.  I'm sorry.  I

22    apologize for interrupting you.

23         THE COURT:  If there is some probative value there in

24    terms of calculation of risk.  There is a great potential for

25    prejudice, too.  I am going to give you a homework assignment.

1    Why don't you try to come up with something that allows some

2    reference, I don't want you to go into thousands and thousands, I

3    don't want that beaten into the ground, but we're not going to

4    talk about the class action but maybe some idea of the number of

5    people in this water system. I would at least consider mentioning

6    this is 12,000 people. Of course, that's not the universe. On

7    the plaintiff's side. You want to talk about and argue it's

8    larger than that, of course. I will give that some more thought.

9    For now we're going to stay with what I just said.

10    MR. PAPANTONIO: I will hold off on opening.

11    THE COURT: But I see some probative value, but I also

12    see some prejudice. If there's a way to do some limiting

13    instruction or skin it back a little bit, I'm open for

14    suggestions.

15    MR. PAPANTONIO: Judge, I may also point out as to Little

16    Hocking, Paustenbach, whether he is one of their employees, he

17    does an analysis of all this. He says -- He describes some size.

18    He actually shows what the absorption paths are for C-8. It's

19    very involved. But it's their witness that has come in the last

20    trial, has come in this trial, I am sure, but I think you have

21    already ruled on that one, but the point being that he does give

22    it sense of scale in that.

23    And so I just -- I don't want to get sideways on opening

24    statement. I do talk about Paustenbach's sense of scale. Nothing

25    beyond what Paustenbach says. Nothing about numbers. He says

341

1      it's the most polluted well along everywhere he tested.

2              THE COURT:  All right.  Well, I'm going to think about

3      that, and I would certainly give a limiting instruction that

4      anybody else can't possibly play into the damages to the

5      plaintiff, just the plaintiff's damages only.  But I don't think

6      that's going to solve the whole problem.  So we have covered that.

7      Anything else that hasn't been redacted?

8              MR. MACE:  Yes, the bottom of the first page, Your Honor,

9      the very last couple lines.

10             THE COURT:  The 12,000 people.  We will put in the same

11     consideration of the hold.

12             MR. MACE:  Frankly, I'm just finding the copy that was

13     previously redacted, but I had so many versions of it, and I am

14     not sure this is the final one.  So I will need to check that.

15             THE COURT:  All right.  Well, we'll leave this issue a

16     little bit open, but it will have to be -- Do you think you can

17     attempt to see if you can come up with a limiting instruction on

18     the issue?  Or do you just think that's -- you'll be

19     irreconcilable on your differences?

20             MR. PAPANTONIO:  I think the scale is an important issue

21     here because they honestly, with the things that we have already

22     seen they intend to argue, their intent is to make Freeman look

23     like an odd ball, to make Freeman look like an outlier.

24             THE COURT:  Here's -- you know, I'm not making a final

25     decision right now.  We will have to do it soon.  If you get into

342

1    the numbers, I will have to give a limiting instruction that the

2    jury can only consider injury to Mr. Freeman, no one else.

3            MR. PAPANTONIO:  Yes.

4            THE COURT:  That's true of the negligence phase; and if

5    we ever get to the second phase, that's true there as well.  It

6    gets a little more complicated, but I think everyone understands

7    it is his injury we're trying this case about.  I think we will

8    have to leave it at this point and get on with the rest of it.

9            Now 666.

10           MR. MACE:  Bad number.

11           THE COURT:  I was going to say if you're superstitious.

12   I should probably exclude this just on that basis alone.  This has

13   the one --

14           MR. BROGDON:  Next one, Your Honor?

15           THE COURT:  Right.  But this has to come out from Tuppers

16   Plains from the last time.  Anything else?

17           MR. MACE:  Yes, third paragraph, supposed to apply to

18   Pittsburgh, Superfund site in West Virginia, that's not Washington

19   Works.

20           THE COURT:  We'll take that out.

21           MR. MACE:  I think those are the main ones, Your Honor.

22           THE COURT:  A month after 9/11, talks about crashing a

23   plane.  All right.  666, that is going to come in with the

24   redaction.

25           MR. MACE:  We preserve our objections --

343

1          THE COURT:  I note that.

2          MR. MACE:  So 667, the second whole paragraph has nothing

3     to do with the issues in this case.  The third paragraph refers to

4     the class action suit.  That all should be redacted.

5          THE COURT:  All right.  So the second paragraph would

6     come out.  Third paragraph, there's -- it would be the second full

7     sentence, now have a class action suit from the users of the

8     public water supply.

9          MR. PAULOS:  Right.

10         THE COURT:  Everything else stays in?

11         MR. MACE:  Over our objections.

12         THE COURT:  Right.  All right.  682, Parkersburg News,

13    the purpose of this.  Now this has a statement if DuPont in this.

14    The way you dealt with *The Columbus Dispatch,* it was taken out

15    everything but that statement.  Will that work here?

16         MR. MACE:  Let's see who's saying it, though, judge.

17    Before you did it with a witness who was going to be testifying.

18         THE COURT:  Right.

19         MR. MACE:  Which was consistent with your past practice.

20         THE COURT:  This is a release.  It doesn't mention --

21    Well, there is a quote from Paul Bossert.  It's in the last column

22    of the second page on the right.

23         MR. MACE:  Yes.  Your practice in the last trial, when

24    there was a purported quote from a DuPont witness who was going to

25    be on the stand, they could ask about that.  But there's a heck of

344

1     a lot of hearsay --

2          THE COURT:  And that's what I -- The other witness is

3     quoted here.  They wouldn't be -- and this has a different

4     headline, too, than the *Dispatch* article.  I struck the headline,

5     if you remember.

6          So I would be inclined -- There's really not much here.

7     If you take out the two headlines, leave in the bureau chief's

8     name, I don't think that the fact box, that disputed fact, leave

9     that in, leave in the quotes from DuPont --

10         MR. PAPANTONIO:  Judge, I think this is -- I say we just

11    pass on this one.

12         THE COURT:  I'm sorry?

13         MR. PAPANTONIO:  I say we pass on this one.  We withdraw

14    this one.

15         THE COURT:  That makes it easier.  Thank you.

16         MR. O'BRIEN:  The only caveat, if they bring in Griffin,

17    we can revisit --

18         THE COURT:  I am not ruling whether you can cross-examine

19    the witness with it either, just as an exhibit.

20         MR. PAPANTONIO:  These are substantive exhibits at this

21    point.

22         THE COURT:  Right.  I mean that's always easy with a

23    newspaper article, is this your statement?  If somebody says, yes,

24    it's done.  If somebody says, no, then you have impeachment.

25         So 728.

345

1          MR. MACE:  Yes, sir.

2          THE COURT:  So this is a -- Is this from the West

3    Virginia Department of Environmental Protection, it's got that

4    designation at the bottom, should I assume?

5          MR. MACE:  Right, not a DuPont document, no indication of

6    what witness they would intend to use this for.

7          MR. BILOTT:  This was a document that was retrieved from

8    Dr. Staats' computer, a document she created.

9          THE COURT:  She didn't testify to it, did she?

10         MR. O'BRIEN:  Frankly, I don't know if it's in the depo

11   run or not.

12         MR. PAPANTONIO:  I don't know if --

13         THE COURT:  That was retrieved after --

14         MR. PAPANTONIO:  That's part of the problem with Staats.

15         THE COURT:  Well, it's hard to know from this under

16   803(8) if this is a record or statement of a public office.

17         MR. PAPANTONIO:  It is.  I mean it's tough to know.  I

18   agree with that.

19         MR. BROGDON:  I don't think we have any testimony as to

20   who the author was or -- it may have come from her file, but I

21   don't know if she wrote it or what the purpose was or how it was

22   kept.

23         MR. BILOTT:  It was produced by the State of West

24   Virginia, printed out things off of her computer file.  So it was

25   off Dr. Staats' computer.  It was produced by the State of West

346

1    Virginia to us.

2            THE COURT:  Well, we just ruled -- It says a record or

3    statement of a public office.  I don't think, for example, e-mails

4    are covered by that unless it's e-mail directing some official

5    action or it's a statement in an official way of a public office.

6    And from this, I can't tell if this is anything more than a public

7    official's file.

8            MR. PAPANTONIO:  Judge, we need some more time with the

9    documents because as it sits, I don't -- I agree with the Court.

10   But I just want to double-check on this.

11           THE COURT:  So we will hold on that.

12           MR. BILOTT:  Just to be clear, this was a -- Dr. Staats

13   or the state's calculation what she thought C-8 -- what Dr. Staats

14   had calculated to be a proper drinking water level of PFOA.

15           THE COURT:  Well -- and, you know, I certainly am not

16   saying that I disagree, but we need a record for that.

17           MR. PAPANTONIO:  Judge, so you can put this in

18   perspective, she makes this calculation on day one at 1 part per

19   billion, and then she increases it to 150 parts per billion after

20   -- after she starts this relationship with DuPont.  That was how

21   it was used.  That's typically what that's about.  But I do

22   understand the Court.  If I can have some time to try to tie it

23   up.

24           But the story is important in that she goes from 1 part

25   per billion, and then she develops this relationship with DuPont,

347

1    destroys that documents; and then all of a sudden, it's 150 parts

2    per billion.  So it's extremely probative, and I don't want to

3    give up on that document.

4          MR. BILOTT:  And part of that was, and this was one of

5    the ones that was destroyed and it was retrieved.

6          THE COURT:  I will give you a -- and as quickly as you

7    can exchange that with opposing counsel.  We will probably have a

8    telephone conference at some point on this.

9          MR. MACE:  And the other thing that I would raise, Your

10   Honor, and I don't think we have an agreement on this, that

11   similar to the footers, the headers that indicate the documents

12   were filed in court with some brief, those should come off.

13         THE COURT:  Where do you see that?

14         MR. MACE:  That was at the top of 72.

15         THE COURT:  All the headers come off.  No reference to

16   any other proceeding.

17         All right.  Then we get to Plaintiff's 763.  This is a

18   1986 document, Lubeck Public Service District Benefits to DuPont.

19   This has headers, too.  It would come off if this document is

20   admissible.  So how is this going to be used?

21         MR. PAULOS:  Your Honor, this is an internal DuPont

22   document at which DuPont is discussing the benefits of DuPont

23   purchasing the Lubeck wells.  We believe it's an admission and

24   demonstrates their knowledge of contamination of the wells at that

25   time and their internal thought process as to how to deal with the

1    C-8 contamination found in those particular wells.

2          MR. MACE:  Same argument as before, Your Honor, talking

3    about no document with nobody -- no witness with firsthand

4    knowledge.  In fact, I don't think there's even an identification

5    of who the author of it is or whose files it came from.

6          THE COURT:  It came from DuPont, but where in DuPont --

7          MR. BROGDON:  Which custodian's initials on it.

8          THE COURT:  I understand, and normally that would carry

9    the day.  But then we have this other issue, knowledge.  And

10   paragraph three, it seems to me, has some relevance to the

11   plaintiff's case.  So I'm going to overrule the objection.

12         MR. BROGDON:  With the redaction of the footers?

13         THE COURT:  They always come out.  The next few documents

14   look to have them as well.  Those all come out.

15         And then we get to 783.

16         MR. O'BRIEN:  I believe this is mainly completeness --

17   This chart appears in about 25 different documents.  I will just

18   sub out -- I will get the complete document and sub out 783 this

19   shows this was in the C-8 meeting at X date, I think that will

20   address Mr. Mace's concern.

21         THE COURT:  Does that cover it?

22         MR. MACE:  That should cover it.

23         THE COURT:  That was too easy.

24         MR. MACE:  And we still object.

25         THE COURT:  Next is 784.

349

1        MR. PAPANTONIO:  Judge, before we move to this, can we at

2    least get a couple things on the record about why there's this

3    long string of documents because I -- I think if the rules were

4    followed, this issue would have never been raised.  This is not an

5    issue of them simply overlooking filing objections for a day or

6    two days.  It's a matter of weeks.  After we go ahead and say,

7    here's our documents.  What are your objections?  And then -- So

8    all of a sudden now, by not playing with the rules, it's the same

9    rules we would have to play by, we're now giving them a second

10    chance to do -- At some point we have to follow the rules of this

11    Court.

12        MR. MACE:  That's a total mischaracterization --

13        THE COURT:  Just a second.  Are you done?

14        MR. PAPANTONIO:  Chris is the one that handled this.

15        MR. BROGDON:  I think I heard for the first time today

16    there may have been missed, and our objections were served several

17    weeks ago, which feels like kind of a got 'cha, to be honest.  If

18    there were a range of a few hundred documents, I have not heard of

19    it before today, and we would have addressed that.  There has been

20    amendments.

21        THE COURT:  I know we're going over some things we have

22    already ruled on, but we have had one trial, and everybody has a

23    chance to absorb and maybe think of doing things a bit different.

24    Maybe I have, too.  So I understand it seems like -- If we did

25    this in every case we tried, this will become really difficult.

350

1      MR. PAPANTONIO:  Yes, it will.

2      THE COURT:  I think we all understand we're not

3   anticipating doing this on every single one, but this is the first

4   run through.  And I don't mind reviewing some of these.  It has

5   taken a long time, but I think it's worth the effort.  So let's

6   keep going.

7      MR. BROGDON:  Thank you.

8      THE COURT:  So we're at 784.

9      MR. MACE:  That's another one of these scientific

10  articles, Your Honor.  If their point is they're intending to have

11  an expert witness refer to it, that's one thing, but it doesn't go

12  back to the jury, and you don't get to publish the hearsay out of

13  it.

14     MR. PAULOS:  This is another document, Your Honor, this

15  was disclosed in *Bartlett*.  That was presented to the Court for a

16  ruling in *Bartlett*.  And the ruling in the *Bartlett* case, that

17  this is a document subject to 803(18), would not go back to the

18  jury.

19     THE COURT:  And that's -- I think we are going to have a

20  number of these.  So we will just call that an article that was

21  used by an expert, and there could be some reference to as long as

22  an expert says it's reliable and so on, but not to go back to the

23  jury.

24     All right.  Then we get to 1055.

25     MR. O'BRIEN:  Yes, Your Honor.  This is a manuscript

351

1     which was in a publication from a scientific magazine journal

2     which is actually in DuPont's file.  And it stands for the

3     proposition that in 1986, there was information out there, the

4     state of the art, that there were publications that show it was

5     possible to remove fluorinated carbons from water.

6           THE COURT:  Is this going to be an expert --

7           MR. O'BRIEN:  Yes.

8           THE COURT:  So this is a translation.  Is it from a

9     scientific journal?

10          MR. O'BRIEN:  Yes, Acta Hydrochim --

11          THE COURT:  My subscription has expired.

12          MR. O'BRIEN:  You set me up.  That was good.

13          The journal references are up in the upper left-hand

14     corner, Your Honor.

15          THE COURT:  But basically your position is your experts

16     are going to say this was out there in the scientific

17     literature --

18          MR. O'BRIEN:  Consistent with what Dr. Playtis has

19     already testified about.

20          THE COURT:  So what's the basis for the objection?  That

21     we will treat this as an 803(18) matter again?

22          MR. MACE:  Yes, Your Honor.

23          MR. PAPANTONIO:  Yes, sir.

24          THE COURT:  Then we get to Plaintiff's 1100.  And who is

25     EDD at the bottom?

352

1        MR. BROGDON:  I don't believe that's a custodian.  I

2   believe that was a prefix used in a prior production.  Mr. Bilott

3   may know for sure, but I don't think that's an actual custodian

4   prefix, just a production prefix.

5        MR. O'BRIEN:  It's a DuPont production prefix.

6        THE COURT:  Anything else to talk about that we haven't

7   discussed?

8        MR. MACE:  Again, back to the issue of no witness with

9   firsthand knowledge is going to talk about this that I am aware

10  of.

11       THE COURT:  And this would be what the plaintiffs want to

12  use as historical knowledge?

13       MR. GADDY:  Historical knowledge about what DuPont knew

14  about the C-8 in 1966.

15       THE COURT:  That will be admitted.

16       And then 1102?

17       MR. PAULOS:  Your Honor, just real quick, I know that

18  Mr. Papantonio indicated that DuPont hadn't timely objected to the

19  document.  And just for the record, DuPont's objections were due

20  on April 27 to these documents.  We did not receive any objections

21  to documents on the Freeman exhibit list bearing Plaintiff's

22  Exhibit P1.1100 and to P1.1199.  There were no objections raised

23  to any documents that bear those exhibit numbers until last week

24  we received these objections.

25       MR. BROGDON:  I would need to get to back and look at,

353

1      Your Honor, if that was the case.  This is the first I have hard

2      of it today.  There were 8,000-some documents.  We missed a few

3      hundred.  We certainly could have cured that if there had been

4      some conversations, but there wasn't.  But our objections here

5      today stand.

6              THE COURT:  All right.  So let's jump over to 1102.

7              MR. MACE:  No indication, judge, of the author of this

8      document or why it's probative of anything in the case.

9              MR. O'BRIEN:  Your Honor, that's incorrect.  On page

10     1102.06, very clear, it says the origin, Washington Works

11     technical laboratory, prepared by C.J. Babcock, approved by the

12     medical coordination committee.  I mean this is the most

13     authenticated document you're going to see.

14             THE COURT:  This goes to historical knowledge?

15             MR. O'BRIEN:  Yes, Your Honor.  And it goes to the

16     historical knowledge about the toxicity specifically.

17             THE COURT:  I'm going to admit it.

18             And then we get to 1103.  What exactly is this?  It looks

19     like it's from the Ohio EPA of some sort.  It's in the DuPont

20     files.

21             MR. MACE:  Well, I'm not so sure.

22             THE COURT:  That's what the stamp indicates.  I don't

23     know if that's true or not.

24             MR. MACE:  I don't -- it has the OEPA stamp.

25             MR. BILOTT:  It has an OEPA, but it also indicates EID,

354

1    which means that it's a document produced to us --

2            THE COURT:  Right, that's the DuPont designation.  I get

3    it.  How would it be used?

4            MR. O'BRIEN:  Your Honor, one moment please.

5            MR. BROGDON:  The Bates number suggests that it was

6    originated with OEPA, and maybe made its way to a DuPont file, and

7    then it was produced.  But I don't know for sure.

8            MR. O'BRIEN:  This goes to the issue of the persistence

9    in the environment.  So this is not a new knowledge that Dr. Buck

10   came up with it in the 2000s.  This shows they had this knowledge

11   or had access to this knowledge back in the 1970s, about this very

12   persistence of C-8 in the environment.  And basically it stands

13   for the proposition that C-8 compared to organic waste simply does

14   not biodegrade.  It exists in perpetuity unless it's incinerated.

15           MR. MACE:  That's an inferential read there, Your Honor.

16   So the underlying document may have some dates from 3M.  But in

17   terms of when this got in a DuPont file, he's trying to represent,

18   counsel is trying to represent, that this was DuPont's knowledge

19   in the 1970s.  There is no indication of that.

20           What we know is that in the AR -- if you look at the

21   first page, Your Honor, it has got the AR EPA docket number on it.

22   So it became a publicly available document in the 2000s.  But if

23   terms of when it got in DuPont's files -- and, frankly, this has

24   got their number written --

25           THE COURT:  Where did you get the 2000 date?

355

1          MR. MACE:  Because this AR number is the file when EPA

2     opened up this chemical.

3          THE COURT:  In 2000 -- this is what year?

4          MR. MACE:  It started opening in the '80s with the report

5     on the false scare about the birth defects.  And then there was a

6     lot more --

7          THE COURT:  That's the came number from the --

8          MR. MACE:  The file number where these things were kept

9     by EPA.  So the fact that it has that on there shows that at best

10    it came into DuPont's possession long after the underlying

11    document.

12         MR. O'BRIEN:  But look at 1103.18, Your Honor, when they

13    are actually reference this, this is all publicly available stuff

14    that DuPont, like 3M went and did, could have looked at, hey, this

15    stuff is not going to break down.

16         THE COURT:  Where are you getting that?

17         MR. O'BRIEN:  The reference is in footnotes on page

18    1103.19, where there's articles from the '70s and '60s that they

19    were specifically relying upon --

20         THE COURT:  What I hear you two debating is when DuPont

21    would have known.  So it sounds to me either in the '70s.  You're

22    saying, on DuPont's side, the '80s.

23         MR. MACE:  It certainly was not the '70s.  And I suppose

24    somebody could track back with that 0489 -- Can you track back

25    when it became a public document?

356

1           MR. BROGDON:  We could.

2           THE COURT:  Here's what I recommend.  Unless we have

3     somebody with personal knowledge, we do have that number.  I don't

4     think it makes a lot of difference to the plaintiff, does it,

5     whether it's the '80s or '70s?

6           MR. O'BRIEN:  No.

7           THE COURT:  Then I'd suggest we say that it's that date.

8           MR. O'BRIEN:  That's fine.

9           MR. PAPANTONIO:  It's consistent with that, judge, and I

10    can either forward the document or we just now say we have been

11    incrementally liable for the past 32 years.  That's the precursor

12    to that.

13          MR. MACE:  I take it, Your Honor, you don't want me to do

14    closing after each document in rebuttal to Mr. Papantonio?

15          THE COURT:  Well, you know, I enjoy having you all here,

16    but we have to get through these.  We have got a lot of stuff --

17          MR. MACE:  I don't want the record to be that it's

18    unopposed on these various statements --

19          THE COURT:  You're not agreeing with the last statement.

20    I will note that.

21          MR. MACE:  Yes, sir.

22          THE COURT:  So 1115, this is a DuPont document from the

23    project engineering division.  This has to do with the

24    remediation.  Is that the thrust of this?

25          MR. O'BRIEN:  Remediation or how they could have gotten

357

1        rid of the emissions.

2                THE COURT:  Is this the same category?  You're offering

3        it for historical knowledge and planning --

4                MR. MACE:  We don't think they're going to have anybody

5        with firsthand knowledge to talk about it.  It has also got these

6        confidential stamps, which you've already addressed.

7                THE COURT:  These already will all come off.  So that

8        will be admitted.

9                Then we get to 1116.  And that's an easy one.  It's

10       blank.  Actually, there's something on there.

11               MR. MACE:  I think it's on the back, Your Honor.

12               THE COURT:  All right.  There is something here,

13       instructions forecast.

14               MR. O'BRIEN:  This one is simple.  There was a proposal

15       to do C-8 abatement in the amount of $3.5 million.  What did

16       DuPont authorize?  Nothing.  It's a simple document.

17               THE COURT:  Historical information, you are objecting --

18               MR. MACE:  No witness with firsthand knowledge.

19               THE COURT:  Same idea.  The objection will be overruled.

20       All right.  We're going to take a 15-minute break.  I would like

21       to keep going on this as long as we can, at least until five.  We

22       can get through probably at least half of this, but I think you

23       have understood you might have to come back tomorrow.

24               I do have a nine o'clock criminal matter.  So may we

25       should set this for maybe 9:30 or 10:00.  I will guess you all

358

1    have things to do between now and ten.

2              MR. MACE:  Get some sleep maybe.

3              THE COURT:  There you go.  Why don't we meet back here at

4    ten minutes after three.

5         (Recess from 2:50 p.m. to 3:10 p.m.)

6              THE COURT:  All right.  So we're making some headway.  By

7    my count we are at 1127.

8              MR. MACE:  Yes, Your Honor.

9              THE COURT:  And this is an e-mail.  And is this going to

10   be one of the documents we've talked about?  It looks like, part

11   of this at least, is a power point?  Something close to that?

12             MR. MACE:  The first part of it is, judge, and then over

13   at .17, it purports to be a memo, but the -- our issue is in terms

14   of what probative value, how is it going to be used and with whom.

15   And we don't see a lot of probative value to it and a waste of

16   time.

17             THE COURT:  Let's hear from the plaintiff.

18             MR. O'BRIEN:  Your Honor, this goes to a couple of

19   different things.  Number one, this document refers to the

20   hazards, which include exposure to PFOA, C-8, and also the ability

21   to remove PFOA by carbon absorption.

22             THE COURT:  Are we talking about the April 9, 2001,

23   document or the power point?

24             MR. O'BRIEN:  The power point that was attached to this

25   e-mail.

359

1          THE COURT:  Just to be clear, you don't want make to make

2     this part of the horse trade.

3          MR. O'BRIEN:  No, because this wasn't a communication to

4     the public.

5          THE COURT:  All right.

6          MR. O'BRIEN:  So if you look at on page 1127.14, there's

7     the identification of exposures to PFOA as a hazard.

8          MR. MACE:  I'm sorry, I missed the page.

9          MR. O'BRIEN:  .14.  And at .18, there's a discussion

10    about the ability to remove PFOA by carbon absorption.

11         THE COURT:  Your argument is primarily, there may be

12    others but historical, what was known in 2001.

13         MR. O'BRIEN:  That, and the feasibility of the

14    remediation.

15         THE COURT:  All right.  I think we've covered this again.

16    Anything additional?

17         MR. MACE:  I think this raises even more concerns.  I

18    don't know who the M, the little M in the corner, what that's

19    referring to.

20         THE COURT:  Do we know who the author is of this?

21         MR. O'BRIEN:  Walter Tong and Jay Schultz from DuPont.

22         THE COURT:  Which one are we talking about?  You said the

23    M?

24         MR. MACE:  All the slides have an M in the upper left

25    corner.

360

1          MR. PAPANTONIO:  So Walter Tong and Jay Schultz are

2    DuPont employees as identified on the cover page e-mail.

3          THE COURT:  And refresh my memory, the bottom

4    designation, EDD?

5          MR. O'BRIEN:  That's a DuPont production.

6          MR. MACE:  Which I'm not -- I have no knowledge one way

7    or the other.  Counsel is representing --

8          MR. BROGDON:  EDD is a DuPont prefix, Your Honor.

9          THE COURT:  And by the way, these all have the

10   confidential stamp at the bottom, and that's going to come off.

11   These are identified as a part of the historical records, and I'm

12   going to admit it.

13         Then we get to 1131.

14         MR. O'BRIEN:  I believe 1131 and 1132 are essentially the

15   same power point, another internal power point.  One has the

16   forwarding e-mail, and one does not.

17         THE COURT:  All right.  Anything else that you would like

18   me to consider?

19         MR. MACE:  Well, no witness with firsthand knowledge, so

20   the same issue.

21         THE COURT:  I'm going to admit both of those for

22   historical knowledge.

23         And that takes us to 1134 I think.  And this is an

24   environmental treatment waste approval form.

25         MR. O'BRIEN:  Right, Your Honor.  And so this, Your

361

1      Honor, goes to, particularly within light of the information about

2      Ms. Korte coming to trial, who was involved in the DuPont

3      sustainability initiatives, the information about the specified

4      treatment options, about the incineration or thermal treatment as

5      of 2001, clearly DuPont knew that was a consideration.  And also

6      the document talks about the PPE requirements with respect to this

7      waste.

8              So it's, you know, it's indicative of what could have

9      been done, what was known and specified treatment options which

10     could have been, through other documents we will show, was

11     available back in the 1980s.

12             THE COURT:  Anything additional?

13             MR. MACE:  There's handwriting on the document, Your

14     Honor, with no indication who it was.  We're also concerned about

15     misuse of the document.  It refers, if the Court would look at the

16     first page, waste name C-8, still heels, which I certainly

17     don't --

18             THE COURT:  Where do you see that?

19             MR. MACE:  I'm pointing, Your Honor, which I certainly

20     don't know what that is.  I don't know if counsel is representing

21     they know what that is, but to refer to this as being something

22     that's applicable to C-8 when it's applicable to something else

23     with no witness with firsthand knowledge to put it into context or

24     talk about what it is.

25             THE COURT:  What I heard was -- cross-examination?  For

362

1    Ms. Korte?  Or is it more than that?

2          MR. O'BRIEN:  No.  I intend to use it with Korte or

3    Dr. Rickard.

4          THE COURT:  So it would be at least involving questioning

5    of a witness.  Maybe the witness can tell us what that means.  I

6    have no idea.

7          MR. MACE:  But if they don't have firsthand knowledge --

8          THE COURT:  I'm going to reserve on that.  You can begin

9    your questioning.  We will see where that takes us.

10          MR. MACE:  Yes, sir.

11          MR. O'BRIEN:  And one important part of this document is

12    because DuPont made a point in the last trial to talk about, oh,

13    you can't get this C-8 into your body through bathing or swimming.

14    You don't have to worry about it.  Whereas, there is an admission

15    in this very document which says, this compound is absorbed by the

16    body and may be detected following ingestion, inhalation or skin

17    contact.

18          MR. MACE:  That's not an issue in this case, Your Honor.

19    Plaintiff is not claiming exposure through those routes.

20          THE COURT:  I think it has some -- If you want an

21    instruction on that, you can have it.  You're right.  There is no

22    claim here of skin contact.  But it goes back to the historical

23    evaluation of the risk.  So it can come in for that purpose.

24          MR. DOUGLAS:  The only thing that I would say is it is

25    part of the story, though, people bathed with what we know is C-8

363

1    contaminated water, you know, using it in the garden and so on and

2    so forth.

3         THE COURT:  So -- But at this point you're not prepared

4    to offer it cold.  It could be used for cross-examination in one

5    or two of the defense witnesses, it sounds like.

6         MR. O'BRIEN:  That's right.

7         THE COURT:  Then we go to 1136.  And this looks like an

8    e-mail to DuPont.

9         MR. MACE:  We are concerned, Your Honor, at the bottom of

10   the first page apparently some comments about a --

11        THE COURT:  Enron and other things.

12        MR. MACE:  Well --

13        THE COURT:  It's a complaint letter, isn't it?  So how

14   does this play in?

15        MR. MACE:  Right.  So you have got hearsay statements

16   being made by some third party.

17        THE COURT:  Ronald E. Curry, to be precise.

18        MR. MACE:  Extra space --

19        THE COURT:  How do you expect in fact to use it?

20        MR. PAPANTONIO:  I will use this with Mr. Bossert if he

21   came into court and testified that, oh, we did all this proactive

22   explaining, and you know what?  No one ever complained.  And I

23   have got something to impeach him with, that folks complained.

24        THE COURT:  Let's put this under complaint.  We will go

25   through this sentence by sentence.  But certainly if the statement

364

1   was made that nothing like this was ever received -- But you're

2   thinking it is, again, for cross-examination.

3           MR. O'BRIEN:  That's right, Your Honor.

4           THE COURT:  So we will get to 1138.  And what exactly is

5   this?

6           MR. O'BRIEN:  This is a document, an internal document,

7   from DuPont.  And it's DuPont's offices in Europe, but also copied

8   to folks who had responsibility for Washington Works, such as

9   Robert Ritchey on the bottom of the memo.

10          So this document -- is really two fold.  One is a

11  discussion that C-8 bioaccumulates in the body.  DuPont takes the

12  position that, oh, you drink C-8, and it doesn't really matter how

13  much C-8 you drink because it reaches a steady state quickly, and

14  there is no additional accumulation.  This was an admission that

15  was available to DuPont in 1993 --

16          THE COURT:  I am sorry, I do want to -- So Wayne Martin

17  gives this answer -- Really his answer or what precedes that?

18          MR. O'BRIEN:  I am looking at the uppermost in the

19  answers nos. 1 through 5.

20          THE COURT:  All right.

21          MR. O'BRIEN:  And also as you are reading this, the first

22  line of answer 5, we cannot tell the customer what level of C-8 is

23  safe.

24          THE COURT:  That's what you want to use it for.  This is

25  -- Wayne Martin is a DuPont employee?

365

1          MR. O'BRIEN:  That's right, Your Honor.

2          THE COURT:  And it's sent to?

3          MR. O'BRIEN:  To Danny Levy, who was in Switzerland, who

4     was a senior research engineer for DuPont.

5          THE COURT:  One DuPont employee to another.

6          MR. O'BRIEN:  That's right.

7          MR. MACE:  One of the issues, Your Honor, is no witness

8     with firsthand knowledge.  But also the context here, if you look

9     at the e-mail in the bottom of the first paragraph, it's talking

10    about dental care equipment.  And even up in the paragraph counsel

11    is referring to in no. 4 about the floss, dental floss, which has

12    nothing to do with this case, Mr. Freeman is not claiming he was

13    exposed through any dental floss.

14         MR. O'BRIEN:  But the point remains --

15         THE COURT:  Just for my edification, was there C-8 in

16    dental floss?

17         MR. MACE:  Not to my knowledge.  There was C-8 used to

18    coat various fibers in things.  There was always a dispute in

19    terms of how much of it ended up in the final product, in some of

20    the products.

21         MR. BILOTT:  Actually, plaintiffs would disagree.  There

22    was -- PFOA was used in the process for some dental flosses and

23    was used in some of the coatings that were used on dental floss.

24         THE COURT:  I'm just trying to use it to understand.

25    Going to paragraph 4 and 5, they mention, while we cannot

1    guarantee that this is a safe level, one could extract the floss

2    and analyze it for C-8, and then calculate the daily intake if all

3    the residual from the floss were swallowed.

4         MR. O'BRIEN:  Right, and he's specifically referencing

5    the CEG for drinking water when he makes that statement.  That's

6    the whole a point.

7         MR. BROGDON:  Your Honor, the e-mail below says, I have

8    seen some patents about PTFE floss.  And I think Teflon is

9    mentioned.  So this may be an academic exercise with the

10   discussion, if there were a floss, pursuing these patents with C-8

11   in it.  I don't think this speaks to something that is an actual

12   issue DuPont is dealing with and, again, outside the issues in

13   this case.

14        MR. O'BRIEN:  But it's still an admission.  It's still an

15   admission that they're considering --

16        THE COURT:  I guess, we don't know the customer.  I mean

17   do we know what kind of customer?  If this is a customer who is a

18   floss customer, that's one thing.  I'm not assuming that.  But do

19   we have any way of determining which customer they're referring

20   to?

21        MR. MACE:  I think it says below, refers to a large

22   manufacturer of dental care equipment, Jordan produced nylon floss

23   coated with our PTFE dispersion --

24        MR. BILOTT:  And the PTFE dispersion is what PFOA is used

25   in making.  That's how it gets involved in the floss.

367

1       THE COURT:  So it still comes back to C-8.

2       MR. O'BRIEN:  Right.  And specifically in paragraph 4,

3   they're making -- they're extrapolating from the drinking water,

4   which they say, we can't guarantee that it is safe.

5       THE COURT:  It mentions drinking water.  I'm going to

6   admit it.  I note the defense objection.  We will make this a

7   continuing objection to anything historical.

8       So 1139.  This one is not self explanatory.  What's it

9   going to be used for?

10      MR. O'BRIEN:  If you look under C-8 in solution, the

11  statement from Mr. Mangnus, C-8 surfactant is fed as a solution

12  into the polykettle.  Since it is shown to be toxic and a

13  carcinogen, part of the global DuPont C-8 strategy is to minimize

14  the exposure risk for our employees.

15      It is a very important admission.

16      THE COURT:  All right.  Anything else that you would like

17  me to consider?

18      MR. MACE:  Yes, Your Honor.  So we have got page 3 of 11,

19  so it's out of context.  It is not clear to me who the author is.

20      THE COURT:  Do you have the other eleven pages?

21      MR. PAPANTONIO:  This was how it was sent.

22      MR. O'BRIEN:  We can certainly look for this, but we know

23  that the statement is attributed to Rob Mangnus, an employee, that

24  it came from Roger Zipfel's file, that it was produced by DuPont.

25  So we can certainly look for the full body of the document to moot

368

1     that issue.  But I think the document itself --

2             THE COURT:  We have the issue of the other pages.

3     Anything else?

4             MR. MACE:  I don't think it's going to establish that Rob

5     Mangnus is a DuPont employee.  His name is not familiar to me.

6             THE COURT:  It is a DuPont-produced document, and the

7     file it came from is noted.  So without any other information, I

8     am going to find at this point it will be admissible.

9             1141.  So SHEA --

10            MR. O'BRIEN:  That's Safety Health Education

11    Association -- It's a -- It's what Playtis is in charge of at

12    Washington Works, Dr. Playtis.

13            MR. BILOTT:  Safety Health and Environmental Affairs.

14            MR. MACE:  No indication of an author, no Bates --

15            MR. O'BRIEN:  We will withdraw this.  This is a duplicate

16    of a prior document.  This is the one that you dealt with in 1131

17    and 1132.  So we don't need it.

18            THE COURT:  So we get to 1143.  It's a DuPont document.

19    But what issues do you have on the defendant's side?

20            MR. MACE:  No indication of the author, I don't see any

21    indication of the date, no context for it, no witness with

22    firsthand knowledge.

23            THE COURT:  Plaintiff's response?

24            MR. O'BRIEN:  Well, Your Honor, we can determine the date

25    in the contents, which is a 3M PFOA or PFOS announcement, which

369

1    all sitting in this room know was May, 2000.  And it has

2    Washington Works Qs and As.  And it came from DuPont's production.

3    That was a DuPont-originated document.  So it is a draft question

4    and answer that surrounds the time when one more company is

5    making, arguably, the right decision, and the other is not.

6         THE COURT:  Well, I'm going to admit it.  But I would

7    suggest we use something to establish the date so it's not

8    confusing.  And, again, for historical knowledge.

9         All right.  Then we get to 1146.  And that is what's

10   called a Corporate Remediation Group document.  What's the

11   objection?

12        MR. MACE:  No indication of how they're going to use it,

13   with what witness.  It refers back to some of these consent

14   orders.  There may be a need for some redactions in it.

15        THE COURT:  Well, is this going to be a document I should

16   assume will be testified to as this with one of your experts?

17   Obviously, that doesn't mean one has personal knowledge, but I

18   have already held this is a DuPont-produced document.

19        MR. O'BRIEN:  That's right.

20        MR. DOUGLAS:  Yes.

21        THE COURT:  You'll use an expert to put this in context.

22        MR. DOUGLAS:  Uh-huh.

23        THE COURT:  Redactions, anything --

24        MR. MACE:  The date, it should say date on the first

25   page.  It's blank.  I think the footers contain an '02 date.

370

1          THE COURT:  2002.

2          MR. MACE:  I will need to review it on redactions.  I am

3    not prepared to discuss that with you.

4          THE COURT: All right.  1147.  This is a 2000 DuPont

5    document.

6          MR. O'BRIEN:  Right, Your Honor.  This simply goes to the

7    feasibility of carbon-activated carbon removal of C-8 from

8    drinking water.

9          THE COURT:  All right.  And --

10         MR. MACE:  Again, it's --

11         THE COURT:  Who's the author?  Do we have any knowledge

12   of that?

13         MR. O'BRIEN:  Dr. Berti of DuPont's Central Research and

14   Development.

15         THE COURT:  Right on the first page.  We have a date,

16   too.  So we have a date.

17         MR. MACE:  Nobody with firsthand knowledge, Your Honor.

18   So you're going on your historical records.

19         THE COURT:  I note your objection.  Again, I note it was

20   produced by DuPont, but all right.

21         Again, we will get to 1155.  And what's the objection?

22         MR. MACE:  This is back -- Again, none of these that are

23   on here are going to be witnesses at trial, nobody with firsthand

24   personal knowledge.

25         THE COURT:  I don't mean to run over this, but if you

371

1    tell me it's the same objection, preserve your objection, and for

2    the reasons already expressed, this will come in.  But your

3    objection is preserved.

4              That's 1157.  I am sorry, that was --

5              MR. MACE:  That was 1155.

6              THE COURT:  Now we're doing 1157.  These are some notes

7    from Timothy Snow, 2001.

8              MR. MACE:  Similar objection, Your Honor.

9              THE COURT:  And you're offering it for historical

10   knowledge?

11             MR. O'BRIEN:  That's right, Your Honor.

12             THE COURT:  Preserving your objection, it will be

13   overruled.

14             And then 1159.

15             MR. MACE:  When, Your Honor, you're making that statement

16   for historical knowledge, you are making that comment that this

17   can be used in reference by an expert.  But you're not saying it

18   can be willy-nilly used with whatever witness comes to the stand?

19             THE COURT:  Well, I'm not saying it can't be used for

20   cause with the proper witness.  And I suppose you are entitled to

21   an instruction, it's not for the truth of the matter.  It's for

22   what DuPont did or didn't know at the time this document was

23   received.  So that's an option, too.

24             MR. MACE:  Thank you.

25             THE COURT:  That takes us to 1159.  Commercial

372

1    Manufacturing Overview is the title.  Anything additional we need

2    to talk about?

3              MR. MACE:  Yes, Your Honor.  This one in particular

4    didn't appear to have a date, an author, how they're going to use

5    it, with what witness.

6              THE COURT:  All right.

7              MR. MACE:  It has got a Roman IV on the first page, which

8    would indicate it's not -- Every page seems to have a page 38 of

9    38 or 40 of 40.  So there are apparently 37 pages missing.

10             THE COURT:  No offense to your numbering system, page 48

11   of 48, and the next document is 49 of 49.

12             MR. O'BRIEN:  A Word -- a flash once -- Word is the worst

13   processing.  We should all take to Word Perfect like you do in the

14   federal system.

15             THE COURT:  That's actually a controversial subject.

16             MR. O'BRIEN:  So much foolproof --

17             THE COURT:  We're migrating.  And for those of us who

18   have used Word Perfect for a long time, you know, the powers that

19   be haven't figured out a way to take your stage files and change

20   one to the other.  Instead, you have got to do each one

21   individually.  That's a pain.

22             MR. O'BRIEN:  And then you get to pagination --

23             THE COURT:  Some of you are asking yourselves:  What has

24   that got to do with the case?  The answer is nothing.

25             So what is this document going to be used for?

373

1          MR. O'BRIEN:  Your Honor, again, it would go to the

2    abatement strategy and the feasibility of doing that overview.

3          THE COURT:  All right.  Anything additional we haven't

4    talked about?

5          MR. BROGDON:  Just the footer.

6          MR. MACE:  The footer, we have talked about that.

7          THE COURT:  They will all come out.  And just in case we

8    missed one of these, that's true of all of them.

9          Then we get to 1164.  And this is a 2001 e-mail.

10          MR. O'BRIEN:  That's right.

11          THE COURT:  Anything additional from DuPont?

12          MR. MACE:  No, Your Honor, same issue.

13          THE WITNESS:  Firsthand knowledge.

14          THE COURT:  We will do the same.  The objection is

15    preserved.  That takes care of Volume 1 of 4.  Well, we're making

16    some headway.  In just a moment.  Give me the second one.

17          Now we're at Plaintiff's 1165.  Anything additional from

18    DuPont?

19          MR. MACE:  No, same issues, Your Honor.

20          THE COURT:  Same ruling.

21          And then 1167.

22          MR. MACE:  This one has the additional issues with no

23    author, and I don't see a date.

24          THE COURT:  So it's from DuPont's files, but it doesn't

25    indicate -- It does have some dates, PFOA concentrations, but it

374

1     doesn't tell us who the author is.

2           MR. BILOTT:  But it came from the file of H. David

3     Ramsey, HDR combined.

4           MR. O'BRIEN:  This is particularly important because of

5     Mr. Bossert's testimony and other DuPont employees' testimony that

6     DuPont has called that, oh, we didn't have any C-8 in our drinking

7     water.  Therefore, your argument about this cancer incident threat

8     registry and that everybody in the plant was exposed to C-8

9     through the drinking water is incorrect.  Well, this contradicts

10    that.  There is .5 parts per billion, up to .5 parts per billion

11    in the drinking water as of 1999.

12          THE COURT:  You get the last word.

13          MR. MACE:  Your Honor, that doesn't change the fact that

14    they don't have any way to authenticate the document.  There is no

15    author, no date, no compilation.  You kept out a very similar

16    document that I tried to get in at the *Bartlett* trial.

17          THE COURT:  Well, you're catching me cold on that one.

18    Can you tell me the number?

19          MR. MACE:  I think it was Defense Exhibit 623.

20          THE COURT:  All right.  And you're sure of that?

21          MR. MACE:  No, I'm not.

22          THE COURT:  I didn't think so.

23          Well, I try to be consistent, but I -- It would have been

24    helpful to have more information.  I know that wasn't plaintiff's

25    fault or anybody's fault.  But, you know, I am a big believer in

375

1    giving the jury the unadulterated facts.

2            I think this will come in, but I am prepared to tell the

3    jury that this is a DuPont file.  The date is not mentioned other

4    than what's on here.  That tells you the date of these

5    concentrations.  It doesn't tell you the date it hit the DuPont

6    file.  So we'll leave it at that.

7            And that takes us to 1168.

8            MR. MACE:  It's similar issues.

9            THE COURT:  Same ruling and same preservation of

10   objections.  It will be admitted.

11           That takes us to 1172.  Anything additional with regard

12   to this exhibit?

13           MR. MACE:  The same issues, Your Honor.

14           THE COURT:  Same ruling, same reservation.

15           Now 173.  Now I had some questions on this.  This

16   involves a meeting, and there's a line about the meeting was quite

17   emotional and about 1,000 people attended.  I am assuming that's

18   the reason that DuPont is objecting to it.

19           MR. MACE:  That's the second area.  The first issue,

20   you've already addressed, and we're preserving on that.  But then

21   there were redactions.

22           THE COURT:  So you are proposing to take that sentence

23   out.

24           MR. MACE:  Right.

25           MR. DOUGLAS:  What's the plaintiff's view?

376

1      MR. O'BRIEN:  The plaintiff's view is this testimony was

2   allowed with Mr. Bossert in the case because it's pertinent to the

3   issue of, well, how good was DuPont's communications system?

4   Their position was, oh, no, we were always open and forthcoming

5   over the years.  This makes it more probable that the public, who

6   was supposed to be the beneficiary, the intended beneficiary, of

7   that information didn't see it that way.  There was nothing in the

8   statement that the activity -- It's not a hearsay statement

9   itself.  This is just DuPont's assessment that the crowd was

10  upset.

11      THE COURT:  I'm trying to play this out.  If the jury

12  finds out there's an angry crowd, so what provable issue does that

13  go to?

14      MR. O'BRIEN:  It goes to the issue whether their prior

15  communications strategy was adequate.

16      THE COURT:  Why is that a triable issue?

17      MR. O'BRIEN:  Because it is part of their duty of care

18  because Dr. Siegel testifies not only a duty not to pollute, put a

19  toxin into the water supplies or anything which may end up in the

20  water supplies, but in the event you do, you have to develop -- be

21  open and transparent and give the unvarnished truth to the people

22  who may be affected by your activities.

23      THE COURT:  You're going to attempt to do that with a lot

24  of the documents we have already talked about.  But this is sort

25  of indirectly giving the opinion of a thousand people show up at a

377

1    meeting that are angry.

2         MR. O'BRIEN:  We only used it with Mr. Bossert's

3    assertion that everything was hunky-dory, and that's just not

4    true.

5         THE COURT:  I am inclined to see this as potential cross

6    depending on what he says.  If he says everybody was happy, then

7    obviously this refutes that.  But if he doesn't walk into

8    something like that, I think this information standing alone

9    wouldn't otherwise be probative.  So we will leave that as

10   possible cross-examination material and then address it.

11        MR. MACE:  For now at least that sentence is stricken.

12        THE COURT:  Let's do this.  We'll hear his testimony, and

13   then we can address this either at side-bar or outside of the

14   presence of the jury.  It's somewhat out of context.

15        MR. O'BRIEN:  I understand, Your Honor.

16        THE COURT:  1176.  Anything additional on this document?

17        MR. MACE:  Well, this has the additional -- So not only

18   the witness issue we have talked about, it's talking about

19   Capstone Product Stewardship.  I am not sure why counsel believes

20   this is probative in this case.

21        THE COURT:  What exactly is Capstone?  Capstone

22   Repellants?

23        MR. O'BRIEN:  That's what they subbed out.  So when they

24   basically got rid of the C-8 containing Teflon, the next

25   generation was called Capstone.  And I believe Laura Korte was at

378

1    the heart of that -- You can correct me if I'm wrong -- as part of

2    DuPont's sustainability issue initiative, and she's going to

3    testify, well, we made very aggressive efforts to replace, get rid

4    of.  We were ahead of the curve with it.

5            So what it goes to is we have to have some analysis of

6    the feasibility of an alternative design earlier because it

7    ultimately was --

8            THE COURT:  Just so I'm clear -- You know a lot more

9    about this than I do -- but this goes to the issue of some safer

10   alternative.

11           MR. O'BRIEN:  That's right.

12           THE COURT:  All right.  Anything to add?

13           MR. MACE:  Your Honor, it's in 2010, which is far -- ten

14   years beyond Mr. Freeman's cancer.  I mean there's no showing of

15   how this is probative --

16           MR. O'BRIEN:  Your Honor, you will recall from the last

17   trial where Dr. Rickard, and at trial Mr. Mace said, oh, and we

18   gave all this technology to everyone else.  We gave it.  We didn't

19   have to.  We beat the clock on the EPA.

20           So our argument with this document is:  You could have

21   beat the clock 20 years ago.

22           THE COURT:  Well --

23           MR. PAPANTONIO:  Excuse me, Your Honor.  The other part,

24   Your Honor, I just heard Mr. Mace mention DuPont has a continuing

25   duty because this is, each and every exposure is, a cumulative

379

1    process and the quality of the information they learned all the

2    way up to the time it was no longer exposed is significant.

3           THE COURT:  Well, I know there's going to be some debate

4    about the timing, but I'm going to let it in.  I will note the

5    objection.

6           Then we get to 1178.  This is a 2006 e-mail.

7           MR. MACE:  Well, one issue is just the one we talked

8    about that you dealt with on the witness issue.  We preserved on

9    that.

10           Then further that at .3, 1178.3 --

11           THE COURT:  Reference to the class action.

12           MR. MACE:  Reference of the settlement of the class

13    action.

14           THE COURT:  That will come out.

15           Anything else on the document?  There's a reference in

16    here, I don't know how you're going to use the whole document,

17    there's a reference to a different parts per billion issue.

18           MR. MACE:  Which page are you referring to?

19           THE COURT:  That's at the bottom of .5.

20           MR. MACE:  I think that's suggested by your other

21    rulings.

22           THE COURT:  All right.

23           MR. MACE:  All the way through, if we have any other

24    redactions, but we have the one.

25           THE COURT:  Then we get to 1179.

380

1          MR. PAPANTONIO:  Judge, we're so close to trial, if I

2     could I ask if DuPont wants to redact, we're fine with them simply

3     sending over to us what you feel needs to be redacted.  Unless

4     it's something way off base, you won't hear from us before the

5     start of the trial.

6          MR. MACE:  We have cooperated with that before.

7          THE COURT:  Good.  So 1179.  So this was a draft order.

8          MR. MACE:  Which is part of the issue, Your Honor.  So

9     with these various consent decrees over various time with various

10    entities.  But Your Honor has said the final consent decree can

11    have some relevance.

12         THE COURT:  Right.  And this e-mail that goes with it, is

13    there anything in the e-mail that you believe is probative?

14         MR. PAPANTONIO:  Judge, we don't need this document.

15         MR. O'BRIEN:  We don't need this.

16         THE COURT:  That will go out.  All right.

17         Then get to 1238.

18         MR. MACE:  This was the same witness issue that you have

19    dealt with, Your Honor.

20         THE COURT:  So it will be admitted as historical

21    knowledge.

22         1239.

23         MR. MACE:  1239.  So this is -- This is the same issue,

24    Your Honor.

25         THE COURT:  So with that preservation, it will be

381

1      admitted.

2              And it looks to me as though we have, starting with 1240,

3      1241, 1242, 1243, these are all articles from scientific journals.

4      Anything additional you want to talk about on these?

5              MR. MACE:  No, sir.  Well, let me check.  That was the

6      issue on 40.  On 41 -- I think these were all similar, Your Honor,

7      in terms of it has to come in in a certain way with a certain

8      witness, and they won't go back to the jury, and in terms of how

9      much can be published during the trial --

10             THE COURT:  Do we have an understanding on that?

11             MR. O'BRIEN:  Right.

12             MR. MACE:  Hopefully.

13             MR. BROGDON:  That's 1240 through --

14             MR. PAPANTONIO:  43, is that correct?

15             THE COURT:  Yes.

16             Then we get to 1271.

17             MR. MACE:  Ten seconds.

18             Yes, sir.  These were similar issues, Your Honor.

19             THE COURT:  Same ruling and same preservation of the

20     objection.

21             And then we get to 1272.

22             MR. MACE:  This also gets into a relevance/probative

23     value balancing under 403, Your Honor, in addition to the witness

24     issue you have already dealt with.

25             THE COURT:  This is essentially an allegation --

382

1        MR. MACE:  An allegation, yes, sir, of an issue that's

2    not at issue in this case.

3        THE COURT:  And it's made by -- A member of the public or

4    an employee?  I can't quite tell.

5        MR. MACE:  I think by an employee, an engineer, if you

6    look at the top of the first page.

7        THE COURT:  Okay.  So how would this be used and how

8    would it be relevant?

9        MR. PAULOS:  Your Honor, this document is relevant for

10   notice of harm to DuPont.  This document talks about specifically

11   regarding the difficulty of operators in the Teflon area having

12   difficulty conceiving children with their wives.  And this is a

13   complaint that DuPont received from their own employees about the

14   potential toxic harm of C-8 and the danger to those who were using

15   it on a daily basis.

16       THE COURT:  So play this out.  It's a complaint.  No

17   question.  It came from DuPont's files.  You don't have any

18   resolution of the complaint.  And the allegation about children,

19   that's been --

20       MR. MACE:  Ruled on.

21       THE COURT:  -- ruled on.  The Science Panel has ruled

22   that out, right?

23       MR. MACE:  Yes, sir.

24       MR. PAPANTONIO:  They did, Your Honor.  The only reason

25   this could be used, it's certainly relevant --

383

1      THE COURT:  It's a complaint.  That's really the

2  relevance.  Right?  So would you be using this only on cross, do

3  you expect, or would this be used more extensively?

4      MR. PAPANTONIO:  Judge, I think -- I think we can use

5  this on cross.

6      THE COURT:  Well -- and I think, again to round it out,

7  the fact -- there's the fact of a complaint.

8      MR. PAPANTONIO:  Right.

9      THE COURT:  The validity of the complaint is a different

10  matter.  So if we go beyond calling this a complaint, there's

11  going to have to be ferreted out what the accusation was.  It

12  wasn't accurate, and there was a finding to the contrary.  So I

13  think you would want to be careful how you use that.

14      MR. PAPANTONIO:  Yes.

15      THE COURT:  But the fact of the complaint, that alone

16  won't open any kind of door.  That's a fact.  All right.

17      Then we get to 1296, and there's aspirational goals of

18  DuPont.

19      MR. MACE:  Actually, Your Honor, 1296 does not appear to

20  be in my file.

21      Yes, Your Honor.  So we're getting into aspirational

22  statements, which are not the legal duty.

23      MR. O'BRIEN:  Your Honor has addressed through the CEGs

24  and the internal standards, the Court already resolved how to deal

25  with this.  So this is a commitment, a commitment that DuPont has

384

1   made, which the evidence will show it didn't live up.

2           The other important part of this, Your Honor --

3           THE COURT:  I believe we have discussed this.  This is

4   the sort of thing where I would say, there are many factors you

5   will consider in determining if there has been a breach in the

6   standard of care.  This is not the standard of care in this

7   document.  But it's something they may consider in determining the

8   appropriate standard of care.

9           MR. O'BRIEN:  That's right.

10          THE COURT:  Do you disagree with that?

11          MR. MACE:  I don't disagree that we're entitled to a

12  limiting instruction if you are going to allow them to use it.

13          THE COURT:  And I think we're going to get into this

14  again with the Rio declaration, which is the next document.  So I

15  feel pretty strongly about this DuPont commitment ideal.  And it

16  can be used the other way, too, of course, to say these are the

17  standards we held ourselves to.  So it goes both ways.

18          Now the Rio declaration.  You are objecting to this.

19          MR. MACE:  Strenuously, Your Honor.  This is one of the

20  ten jump up and down about.  You know this -- It gets into -- and

21  I know briefing is pending with on the precautionary principle and

22  these nonlegal standard of care.  But if you look at 1544.2, it

23  goes through this Rio declaration and the various statements of

24  policy that are totally not linked at all to what the legal duties

25  are in the United States.  Very misleading to the jury.

385

1      THE COURT:  And they're not binding.  But, of course,

2   neither were the DuPont statements.  But I think that the DuPont

3   statements have a lot more relationship to what we're doing in

4   this case.

5      I will hear from the plaintiff but --

6      MR. PAPANTONIO:  May I, judge, because this -- I'll --

7   Full disclosure.  The way this is used, this shows what they say

8   they're going to do in this statement.  This is the slide I intend

9   to use, for example.  After they say this, the very next thing

10  they do is they double the amount of output.

11     THE COURT:  But --

12     MR. PAPANTONIO:  So this is their statement of:  We are

13  in this -- This is a statement in fact to the shareholders, to

14  everyone --

15     THE COURT:  I have ruled this commitment, that's in.

16     MR. PAPANTONIO:  Okay.

17     THE COURT:  It's the Rio statement is what I am talking

18  about.

19     MR. O'BRIEN:  The Rio statement of the precautionary

20  principle is really the setup for what you just let in.  So we

21  don't argue that the declaration of the Rio Principle 15 has a

22  binding effect on the law.  Rather, it was helping to define what

23  appropriate conduct is.  And then DuPont brought this inhouse.

24  Essentially, it's like a statute, and they have implementing regs

25  for internal standards kind of thing.

386

1          THE COURT:  I mean I get that with the DuPont commitment

2     standard.  But, you know, this is from the United Nations Congress

3     of Human Environmental --

4          MR. O'BRIEN:  Keep in mind that the precautionary

5     principle did not begin in 1992.  That was just a codification of

6     what had been the expectation of industry for decades prior.

7          MR. MACE:  I object strenuously.

8          THE COURT:  Well, I appreciate this, and I certainly

9     don't mean to pour cold water on the Rio declaration, but I don't

10    think this fits in the case.  It takes us a little far a field.

11    The DuPont matter, that's coming in, but not the Rio declaration.

12         MR. PAPANTONIO:  And the precautionary principle is

13    still --

14         THE COURT:  That's independent of the Rio declaration.

15    That will still be in play.

16         MR. MACE:  Well, there are pending motions on that.

17         THE COURT:  Well, subject to my decision on the motions.

18         We have pending on that?

19         MR. MACE:  To exclude Redlich, and her whole testimony is

20    based on this inapplicable principle which reverses the

21    opposite --

22         THE COURT:  The motion *in limine* left out.  I get it.

23         MR. MACE:  Yes.

24         THE COURT:  And then an EPA document, which is 1545.

25         MR. MACE:  Yes, Your Honor.  So this is not a DuPont

387

1    document.  It's March of 2014.  It deals primarily with PFOS, not

2    PFOA.

3              MR. O'BRIEN:  Right.

4              THE COURT:  There is a lot in here.  This goes through

5    the state standards, what new states that add them.

6              MR. O'BRIEN:  Keep in mind one of the big features of the

7    last time we tried this case was DuPont's:  No agency has told us

8    that we have to have this emissions level.  The EPA has never

9    issued a drinking water level, an MCL level.

10             And so this 803(8) document addresses what efforts it has

11   taken so far to understand the issue.

12             MR. BILOTT:  DuPont has also repeatedly in the first

13   trial referenced older statements by EPA --

14             THE COURT:  I view this as 803(8), statements of a public

15   body, and I'm going to let it in.

16             1583.  This is from 1994.  Anything additional we haven't

17   discussed?

18             MR. MACE:  Same argument, Your Honor.

19             THE COURT:  Same decision, same preservation of DuPont.

20             Now we are dealing with 1584, I believe.  Anything

21   additional on that?

22             MR. MACE:  This is the same argument.

23             THE COURT:  Same ruling, preservation.

24             1727.  Is this the one -- This is not going to be one

25   that goes away with the horse trade?

388

1      MR. GADDY:  Judge, this an internal presentation, not one

2  to the public.

3      THE COURT:  Let me start off, there are a few things in

4  here.  Let's see.

5      MR. MACE:  It gets into a lot of sales and performance --

6      THE COURT:  That's what I have marked down.  Now if

7  there's a second phase of the trial --

8      MR. MACE:  Exactly.  That was our main concern.  We could

9  see where -- I'm not going to give up arguing for a second phase,

10  if we have a second phase, but I'm strenuously arguing that for

11  the compensatory phase, it should not be in.

12      MR. PAPANTONIO:  Judge, if I might be heard on this, this

13  ties into the bigger theme.  The big theme -- and there will be

14  testimony and documents about it -- they actually analyzed, if you

15  recall, they actually analyzed what the cost would be to do this

16  right, to incinerate.

17      THE COURT:  You want to be able to put this into

18  perspective, what the evidence is --

19      MR. PAPANTONIO:  Yes, sir.  At the end of the day what

20  they decide to do is they decide not to spend 15 cents per pound,

21  and they call that a victory.

22      THE COURT:  Well, let me ask you this.  There may be a

23  way out of this.  I am generally not inclined to get into the size

24  of the company in the non-punitive phase.  But 15 cents per pound,

25  what was, at that time, what was the price a pound of C-8 would

389

1      cost?

2              MR. PAPANTONIO:  Well, the document that we have --

3              THE COURT:  Actually, what it will sell for.

4              MR. PAPANTONIO:  I don't know.

5              THE COURT:  The reason that I asked, that would give some

6      relationship.

7              MR. PAPANTONIO:  Yes, sir.

8              MR. O'BRIEN:  We know how many pounds they were buying.

9              MR. PAPANTONIO:  We know what they were buying, but I

10     can't --

11             MR. O'BRIEN:  What their mass balance is.

12             THE COURT:  I mean you want to be able to say what -- Was

13     it three-and-a-half million dollars?  Wasn't that the number of --

14             MR. O'BRIEN:  No, that was between the capital costs of

15     creating a incineration facility and then the annual operating

16     costs.  So when you combine those in the first startup year, it

17     will be about 2.8 or 3 million dollars.

18             THE COURT:  You want to take that number and essentially

19     argue that is a relatively small number in terms of the size of

20     the plant and gross revenues and so on.

21             MR. O'BRIEN:  Right.

22             THE COURT:  In other words, it wasn't impractical.

23             But on the other hand, I want to keep out as much as we

24     can the financial size of the defendant.

25             MR. MACE:  What you allowed them to do in the *Bartlett*

390

1    trial, over our objection, they had a document that talked about

2    what the annual operating budget was for the plant.

3         MR. O'BRIEN:  We addressed that in our last motion *in*

4    *limine* hearing when -- we addressed it.  And we all came to an

5    agreement we would limit to the annual Washington Works operating

6    costs, not the whole DuPont, because they had introduced evidence

7    about, well, these are the efforts we took to -- of environmental

8    remediation across the plant.

9         THE COURT:  Refresh my memory, what were the operating

10   costs?

11        MR. O'BRIEN:  About $600 million a year.

12        MR. PAPANTONIO:  Judge, to help further, I'm going to use

13   this in opening also, and here's the point.  They actually have a

14   document where they say that this has been -- The way we have

15   arrived at these numbers is by controlling costs.  And so the

16   point being they have made cost decisions that they felt were more

17   important than the public health and environmental decisions.  And

18   it was not the --

19        THE COURT:  What I am trying to do -- I mean that's what

20   the debate is about.  I want to skin back as much as we can

21   matters that should be only considered if we ever get to punitive

22   damages.

23        MR. O'BRIEN:  Right, and that 12 to 15 cents a pound

24   doesn't come close to cross that --

25        THE COURT:  That's easy.  The 12 to 15 cents a pound, if

391

1    we could stay with that, that's really simple.

2            MR. MACE:  That's not what the document is about.  It's

3    fluoroproducts, Your Honor.  It is much broader than --

4    fluoroproducts encompasses much more than C-8.

5            MR. PAPANTONIO:  Judge, I hear your concern.  We can do

6    that.  I want to --

7            THE COURT:  If you can give it to them as 15 cents a

8    pound relates to .1 of a percent, that sort of thing.  That way we

9    don't get into the size of DuPont but gives the jury some

10   perspective of how this would impact the cost of operation of

11   production.

12           MR. PAPANTONIO:  There is one document where that 15

13   cents per pound talks about it would cost a million dollars to

14   build a facility to do this, and that it would be a million

15   dollars a year to maintain it.  That's all in one document.

16           MR. O'BRIEN:  Right.  It essentially says it's not a big

17   deal for the company company-wide.  But it's a bigger deal for the

18   business unit in Washington Works.  And it doesn't talk about,

19   because we've got to reach these levels or --

20           THE COURT:  The last time -- I want to be clear because I

21   don't have an independent recollection of this -- the last time I

22   let you get into the operating costs of the plant in the course of

23   a year?

24           MR. O'BRIEN:  That's right.

25           THE COURT:  Is that your recollection?

392

1       MR. MACE:  It is my recollection, Your Honor.

2       THE COURT:  Over your objection.

3       MR. MACE:  Over my objection.  And I'm looking for the

4   breakdown because I think in fairness, if your inclination is to

5   do that again, it ought to be -- We have explained to you that

6   this is a multi-business site.  So although the operating costs of

7   the plant is for all these things --

8       THE COURT:  It's not all for C-8.

9       MR. MACE:  Exactly.

10      THE COURT:  Here's my thought, if you can work out an

11  agreement on this.  I think the plaintiffs have the right to show

12  how much of an impact on the operation of the plant this would be.

13  And one easy way to do that is to -- I mention this -- is to sort

14  of flyspeck what -- In other words, the estimate was if you did

15  all this, it would add 15 cents per pound is what you are telling

16  me.

17      MR. PAPANTONIO:  To make it easy, if this develops in the

18  trial, great.  But in opening, this is all I intend to use.

19      THE COURT:  Here's the -- I think to solve this

20  throughout the trial, if you can come up with idea that 15 cents a

21  pound would represent, if you simply added that to the sale price

22  or whatever benchmark you are going to use, it will represent X

23  percentage of an increase, then they can both -- In other words,

24  that wouldn't expose the number of the plant's budget, but it

25  would still let the jury have some idea of what kind of impact or

393

1      lack of impact this would have had they put it in.

2                  Any chance we can do that?

3                  MR. MACE:  We're willing to try, Your Honor.

4                  MR. PAPANTONIO:  Judge, just so I understand, since we

5      are about a week out, would this be objectionable, to use this

6      document where they say 15 cents per pound, and if we didn't go

7      beyond that in opening --

8                  THE COURT:  Right.  But I mean the only problem -- and I

9      may be thinking too much like an economist, I don't know -- the

10     sale price is only 25 cents per pound, in which case that would be

11     a big increase; whereas if it were $100 a pound, this is

12     negligible.

13                 MR. O'BRIEN:  That's their comeback.  That's their

14     comeback rather than the threshold for admissibility.  That's

15     their comeback.  That's their explanation.

16                 THE COURT:  Again, if we are saying it is adding 15 cents

17     per pound, I don't know that product was sold for.  Is there some

18     way that you could say, this is what we would expect to make per

19     pound?

20                 MR. O'BRIEN:  We can show how many pounds a year they

21     were buying.  It's not a huge number.  It's not billions and

22     billions of pounds.

23                 THE COURT:  Well, what about what they paid for it per

24     pound?

25                 MR. O'BRIEN:  There are documents that address that, when

394

1    they went through recycling efforts, and it varied from year to

2    year.

3              THE COURT:  A rough number?

4              MR. O'BRIEN:  As I recall, it was, you know, we're

5    talking less than a 10 percent increase in raw costs, just in the

6    C-8 cost.

7              But part of the problem is they're tying all this up at

8    the same time where they're engaging in recycling efforts.  So

9    they have to buy less from 3M.  So a lot of these numbers are all

10   over the board.  But I think the issue really goes to that's their

11   comeback.  That's their explanation rather than -- because 12 to

12   15 cents is not so prejudicial.  It is what it is.

13             MR. PAPANTONIO:  Judge, if I might, there's another part

14   to this that might help a little bit.  There are a couple of other

15   documents where they characterize that they -- that the reason

16   they don't want to do this incineration is not because of

17   environmental.  It's because they find it economically painful.

18             So what we're having to do here is for me to be able to

19   conclude what does 15 cents per pound mean to them, I don't really

20   have -- I don't really have a way to do that.  I don't have a way

21   to say that's going to come down to, you know, to some fraction of

22   what the overall cost would be.

23             But I do have several documents that talk about the only

24   reason they don't do it is because they felt like it was -- they

25   didn't have to, and it was economically painful, and our

395

1    competitors are doing it, but we choose not to.

2         THE COURT:  So what's DuPont -- You contend the $600

3    million picked up other products.  So break that down.  What do

4    you say --

5         MR. MACE:  Your Honor --

6         THE COURT:  -- it should have been?

7         MR. MACE:  Volume wise in terms of the size of the plant

8    and the employees, about a quarter of the plant was the Teflon

9    production.  I have a project out now for somebody to try to get

10   behind this 600 number --

11        THE COURT:  A quarter of the employees --

12        MR. MACE:  Of the 2200 employees of the plant --

13        THE COURT:  That might give you some rough idea, but you

14   can't be sure --

15        MR. MACE:  That translates --

16        THE COURT:  -- that same percentage for the best evidence

17   is very good.

18        MR. MACE:  I'm trying to track down the very numbers you

19   are talking about.

20        MR. O'BRIEN:  We are not suing the Teflon division.  We

21   are suing DuPont.

22        THE COURT:  Right.  And I -- The 15 cents, I don't have a

23   problem with.  My problem is how the jurors -- That's not

24   inflammatory.  It doesn't have the size of DuPont behind it.  But

25   I am afraid it doesn't give the jurors a context of how that would

396

1    relate to -- you know, again, if it were a product that was 25

2    cents, if you add 15 cents, that obviously is a big chunk.  But if

3    it's $1,000 a pound, it's de minimus.

4            MR. O'BRIEN:  The question that you originally asked was

5    about a document where you saw two or three million bucks, and one

6    part was the capital costs and the other part was the operating

7    costs.  I believe it's in the same document where they address

8    this cost.

9            THE COURT:  That number I don't have a problem with, 15

10   cents a pound.  I don't have a problem with that.  It's what we

11   compare that to in terms of the DuPont size.  That's where I think

12   we are running into problems.

13           MR. MACE:  That's where, Your Honor, we get into the

14   abstract with all these things.  But on the document we were

15   talking about, this one, I have a strenuous argument that this one

16   should not, 1127, should not come in for compensatory damages.

17           THE COURT:  I am still thinking about this, but one other

18   option would be the plant's operating budget was $600 million, and

19   approximately one fourth of the plant was devoted to products

20   involving C-8.  That's another option.

21           MR. PAPANTONIO:  I think Mr. Mace did that very well in

22   the first trial on his own with his own witnesses.  I don't think

23   we need to have an instruction on his behalf.  It would be a

24   comment on the evidence.  I think Mr. Mace --

25           THE COURT:  Not so much an instruction, but what to do

397

1      when we get to the order of proof.

2              I mean you don't dispute what I just said, do you?

3              MR. MACE:  I don't.  And that's what I am trying to

4      inform this Court.  I am trying to see if we can't get some better

5      information instead of just guessing a quarter of the 600 million,

6      if we can find out what the background was on that.

7              THE COURT:  Well, I think that's as close as I can see it

8      right now.  I mean I'll give you, each side, additional time to

9      think about this.  The 15 cents is not a problem.  The cost of it

10     two-and-a-half million to install, a million to operate, that's

11     not a problem.  It's how we compare it to the rest of DuPont,

12     that's the issue.

13             But right now my inclination would be to say, it's a $600

14     million operating budget, and one forth of that roughly involves

15     C-8.  So I'm open for suggestion if you want to think about it.

16             MR. MACE:  Then you're going to hold on this particular

17     document?

18             THE COURT:  Well, I think it -- On the parts that have

19     record earnings and so on -- Does this document primarily go to

20     the issue we're talking about?

21             MR. PAPANTONIO:  Yes, sir.  Judge, I think I can make

22     this very simple with this document.  Show him the part.  So the

23     -- I don't intend to get -- I won't get into any other numbers

24     other than the 15 cents per pound that we talked about.

25             But what is so important they said, what they talk about

398

1    is they've had three outstanding years, and it's all been built

2    around the -- and that is on page 3 of this document.  It says,

3    three years of outstanding financial performance with 2000 our

4    best ever.  And they say, we build that on accelerating revenue

5    growth and sound cost management.  And it's the sound cost

6    management that becomes a big part of this.

7              THE COURT:  I don't have a problem with that page.

8              What I'm looking at is the sales, anything to do with the

9    raw financials that would be -- I think it starts on 1727.8.

10             MR. MACE:  Actually, I think it's .6, Your Honor.

11             THE COURT:  That's got things in it.  So 6, 7, 8, 11 --

12   and I think that's where the financials end.  Let's keep going.

13   No, 16 has financials.  Did I miss 9?

14             MR. BROGDON:  Yes.

15             THE COURT:  Anything with millions on it.  As far as good

16   years, that sort of thing, that's not a problem.  So 21 has

17   numbers.  This is for, as we now stand -- There's a motion

18   pending -- 16 and 25 is next.

19             MR. PAPANTONIO:  So 691 million, obviously their profit

20   is 130 million, you would not want.

21             THE COURT:  No.  Again, if I were to decide right now, I

22   will let you talk about the size of the plant and then some

23   language about the percentage involving C-8.

24             Then there's also numbers on 36.

25             MR. MACE:  And 30.

399

1          THE COURT:  That part is for attorney's fees, had nothing

2     with C-8.  All right.  Everybody likes attorney jokes, right?

3          1753?

4          MR. O'BRIEN:  Your Honor, there were two documents.  The

5     Covance document was inadvertently joined with the -- the e-mail

6     from October 14, 1999.  So it should have just been the Roger

7     Zipfel e-mail.  This was just looking at in isolation.  So we

8     would obviously divorce those two documents.

9          THE COURT:  Divorce granted.

10         MR. MACE:  My wife may be seeing you, Your Honor.

11         THE COURT:  Anything else on this that we haven't

12    discussed?

13         MR. MACE:  That was the main issue.  The other -- Let's

14    see.  Yes, that was the issue, Your Honor, of the document.  So it

15    will be just a one-page exhibit, I understand.

16         MR. O'BRIEN:  That's right.

17         THE COURT:  And 1769.

18         MR. MACE:  This was a similar issue, no witness with

19    firsthand knowledge.

20         THE COURT:  And that's been talked about already.  So

21    same ruling.  The objection is preserved.

22         1776.  Anything additional on this that we haven't

23    discussed?

24         MR. MACE:  Well, I think it's a combination of the

25    witness issue, but also the hearsay within hearsay, and the

400

1    statements about what isn't allowed in other countries, which

2    isn't, A, I don't think it's accurate; but, B, it's not relevant

3    here.

4           MR. O'BRIEN:  Your Honor, it's not speaking to the

5    regulations of other countries.  It's speaking to what DuPont is

6    doing in other countries and treating members -- treating folks

7    who live in other countries better than folks who live in the

8    middle Ohio valley.

9           THE COURT:  There's a lot in here.  You will have to help

10   me with this.  The first e-mail, Tom, Rob, it's signed capital A,

11   capital U, capital K, capital E.  Who would be that?

12          MR. O'BRIEN:  That is Auke Tuinsta, who I believe -- I'm

13   going to mess up the Chinese plant, DuPont plant.

14          THE COURT:  She's, as far as you know, you can tell, she

15   was a DuPont employee?

16          MR. O'BRIEN:  That's correct.  That's a DuPont address.

17          MR. MACE:  Well, it may be a DuPont address, but there

18   was a joint venture in China, Your Honor.  So they were given

19   DuPont e-mail addresses, even though they weren't DuPont

20   employees.

21          MR. O'BRIEN:  But you can tell from the context of the

22   e-mail that Auke is asking Pinchot, who is critically involved in

23   this, for guidance and for -- about how they in China at the

24   Shenzhen site deal with 40 pounds a year of C-8 in the waste

25   stream, which was a fraction of that the folks in the middle Ohio

401

1      valley were dealing with.

2              THE COURT:  Well, she's referring to not allowed in

3      streams in several countries.  How would that come in?

4              MR. O'BRIEN:  Because it goes to DuPont's knowledge.

5              THE COURT:  But then we would be -- I don't know what her

6      background is.  I don't know if she's qualified to make that

7      statement.  Do we have any idea what her position is?

8              MR. PAPANTONIO:  Judge, I can show you something that

9      really puts it more in perspective.  What they do is they actually

10     go around -- You might remember from the first trial -- they go

11     around to different plants in the United States, and they go to

12     different countries throughout the world.  And the reason they do

13     that is because they say there are -- Here's the document.  It's

14     document 1239.  Do you have that, Carole?  I can show it.

15     Basically, what they say is that a recent review of various plants

16     shows that some places are becoming environmental friendly.  They

17     are installing new incinerators in the system.

18              What they are trying to do is they're trying to decide:

19     What are we doing different from other people?  And, judge, they

20     don't just talk about United States.  They talk about Germany.

21     They talk about China -- excuse me.  This one talks about Germany.

22     They talk --

23              THE COURT:  Is it plants or laws we're talking about?

24              MR. PAPANTONIO:  These are plants.

25              THE COURT:  Well, I don't -- That's really -- That goes

402

1    to what I'm talking about.  I don't mind if we have the evidence

2    about how other plants are organized, what is essentially

3    available technology.

4         MR. MACE:  Yes, sir.

5         THE COURT:  That's one thing.

6         But this looks like an opinion on the law of a number of

7    countries.

8         MR. MACE:  Which we think is inaccurate and has no basis.

9         MR. PAPANTONIO:  It's different.  I just wanted to show

10   you where we were headed.

11        MR. O'BRIEN:  Either way, it is still notice.  It's still

12   notice.  In 1999, which was before Mr. --

13        THE COURT:  Let me put it this way.  If you present a

14   statute from the UK, I might think about that.  I'm not -- we are

15   too late in the trial, I'm not suggesting that.  So don't take it

16   that way.  But someone who really isn't very well identified, who

17   makes a statement like this in an e-mail, I am not prepared to say

18   she gets the final word on this.

19        MR. O'BRIEN:  So the complaint to DuPont about --

20        THE COURT:  Everything up to, and is not allowed in waste

21   streams in several countries, that's the phrase that I am focused

22   on.

23        MR. O'BRIEN:  Okay.  Got it.

24        THE COURT:  And that's just the beginning.  Anything else

25   that you would like to point me to?

403

1          MR. MACE:  That was the primary thing, Your Honor, in

2     addition to our prior objections --

3          THE COURT:  That objection will be noted.  And with that

4     one deletion, we will admit the document.

5          Then 2606.  Anything additional on that?

6          MR. MACE:  There was an addition to the prior objections,

7     Your Honor, the -- So in the first page it talks about, the second

8     line, about documents received from counsel.

9          THE COURT:  I'm sorry, 2606?

10         MR. MACE:  Yes, 2606, second line.

11         THE COURT:  Oh, and received from counsel.  Well, that

12    received from counsel part is -- can come out.

13         And anything additional?

14         MR. MACE:  Let's see.  The other was just the same

15    witness.  Well, this one is actually a little broader.  I guess it

16    says, prepared by ChemRisk at the bottom, but we don't have by

17    whom.  It says attachment 1C.  So we don't know the context of

18    this, what it came out of.

19         THE COURT:  That confidential, subject to protective

20    order, will come out.

21         MR. MACE:  There's no Bates number on it.

22         THE COURT:  Any idea where this came from the plaintiff's

23    side?

24         MR. O'BRIEN:  ChemRisk was a company retained by

25    Paustenbach.  ChemRisk was retained by DuPont to study this issue,

404

1    to study how the water supplies were being impacted by DuPont's

2    emission strategy and to make recommendations there to abate it.

3    So ChemRisk was retained by DuPont, paid by DuPont and resulted in

4    the Paustenbach article.

5            THE COURT:  Well, this goes to knowledge of DuPont,

6    right?

7            MR. O'BRIEN:  It does.  And it also goes to --

8            THE COURT:  But the problem -- I mean did -- Do you have

9    a way to show that this was -- I mean your assumption is DuPont

10   paid for this.  Is that your argument?

11           MR. O'BRIEN:  That's right.  And from the document

12   itself, that the information, the foundation for the information

13   which follows, is in the statement itself, that it was based upon

14   interviews with these DuPont employees, these Washington Works

15   personnel.

16           MR. MACE:  In that respect, I mean it's hearsay within

17   hearsay.  It's a part of a document, apparently attachment 1C.

18           THE COURT:  We don't have that.

19           MR. MACE:  There's no context --

20           THE COURT:  Do you expect to have any witness to testify

21   to this?

22           MR. O'BRIEN:  This is used with a witness they have

23   identified as coming to trial, which is Tai Wei Fu, and it was

24   used in his deposition.

25           THE COURT:  You identified him?

405

1          MR. O'BRIEN:  He did.

2          THE COURT:  To use it on cross?  Is that your proposal

3    or --

4          MR. O'BRIEN:  Yes.

5          MR. MACE:  A, Mr. Fu is a may call witness.  We haven't

6    committed that we're bringing him.  And so if they are saying that

7    if we bring him, they want to cross him.  But I'm not buying into

8    the representations they made that he identified this at his depo

9    or anything else.

10         THE COURT:  But I'm -- What I am saying is if he can

11   identify it, then you can call him, too.  I assume he is within

12   the district?

13         MR. MACE:  I have no idea, Your Honor.

14         THE COURT:  Do you have any knowledge of where he is

15   located?

16         MR. O'BRIEN:  The last I heard of Mr. Fu, he was, I

17   believe, in Delaware for DuPont.

18         THE COURT:  The State of Delaware.

19         MR. O'BRIEN:  Yes.

20         THE COURT:  There's a Delaware north of here.  Okay.

21         MR. O'BRIEN:  I didn't know that.

22         THE COURT:  Delaware County, City of Delaware, lots of

23   Delawares.

24         MR. PAPANTONIO:  I don't want the Court to think we're

25   going to call Mr. Fu.  The chance of us calling Mr. Fu, they are

406

1    zero.

2            MR. O'BRIEN:  Your Honor, there are so many other

3    documents that address this, I can pull this one down, and we can

4    establish this through our own experts who are familiar with

5    DuPont's description of their processes.  We don't even need this.

6            THE COURT:  All right.  3013.  1984 group.

7            MR. MACE:  This was a similar objection, Your Honor.

8            THE COURT:  All right.  So same ruling, note that the

9    objection is preserved.

10           And then this is 3128.  Now this is Dr. Karrh.

11           MR. MACE:  Yes, sir.

12           THE COURT:  Refresh my memory, is Dr. Karrh testifying?

13           MR. MACE:  Possibly through a deposition, you'll recall,

14   as played in the last trial.

15           THE COURT:  Is this for cross or what's the purpose on

16   plaintiff's side?

17           MR. GADDY:  Judge, this is a document authored by

18   Dr. Karrh -- Jeff Gaddy for the plaintiff -- who is a DuPont

19   employee, laying out his opinions on the company's duty of care.

20           THE COURT:  All right.  How would you expect to use that?

21   With him as the witness?  Or otherwise?

22           MR. BILOTT:  I believe this is testified to extensively

23   by --

24           MR. GADDY:  We'll be using with experts, Dr. Siegel or

25   Dr. Petty, as far as showing them the document and what's being

407

1    propounded by this.

2           MR. PAPANTONIO:  Judge, you may recall this in the last

3    trial.  We spent time talking about -- Basically what's happened

4    here is Mr. Karrh, who they're relying very heavily on as being

5    one of their important witnesses by way of deposition, Mr. Karrh

6    says, we have some duties.  And he's the guy in charge, judge.

7           THE COURT:  This is an article published in a science

8    journal?

9           MR. PAPANTONIO:  By Mr. Karrh -- Dr. Karrh.

10          THE COURT:  The New York Academy of Medicine.  So I hear

11   you're going to have an expert use this as --

12          MR. PAPANTONIO:  Yes, that's right.  They are talking

13   about their employee making a statement about a duty of care,

14   which is very clear:  We should tell the public.  We shouldn't

15   hide anything.  We need to being forthright because if we don't,

16   we're going to get in trouble.  That's what this says.

17          MR. MACE:  This goes to an aspirational statement, not

18   the legal duty.  We have made those arguments.

19          THE COURT:  Again, I will give you an instruction on that

20   any time you ask me to as far as that issue.  That's a sensitive

21   one.  So the objection is noted and overruled and preserved.

22          Then we get to 4449, the Dow Jones Sustainability

23   Indexes.

24          MR. O'BRIEN:  Your Honor, really it's the DuPont position

25   statement on biopersistent materials on the very last page, which

408

1      is similar to what we dealt with earlier regarding the 1994

2      commitment.

3              THE COURT:  So this will be aspirational, subject to the

4      same objection.

5              MR. O'BRIEN:  Yes, Your Honor.

6              THE COURT:  So anything else that you would like me to

7      consider?

8              MR. MACE:  No, Your Honor, preserved --

9              THE COURT:  It is preserved.  I will note your objection

10     and preserve and admit it.

11             Then we go to 4465.

12             MR. MACE:  This was the same issue we have been

13     discussing.  Both the witness issue as well as the prejudicial,

14     unfairly prejudicial, reference to disposal at sea that has no --

15             THE COURT:  Have we been through this?  Is this a

16     duplicate?  Is this the same?

17             MR. MACE:  It may be, Your Honor.

18             THE COURT:  Do we have an objection as to it being a

19     duplicate?  I think it is.  We don't want duplicatives of any

20     exhibits going in.

21             MR. PAULOS:  It is, Your Honor.

22             THE COURT:  So I'm not going to admit it twice.  I think

23     I already admitted it with the other numbers, but this exhibit

24     will be out.

25             All right.  Then we get to --

409

1          MR. PAULOS:  Just to be clear, this duplicate exhibit is

2     out, but the previous version of this is in.

3          THE COURT:  You only get one.  The other one is still in.

4          MR. MACE:  Our objection is preserved.

5          THE COURT:  Right.  And just on all of these as far as

6     what we have talked about.

7          So 4447.

8          MR. MACE:  Same objection, Your Honor.

9          THE COURT:  I have this one.  This may be a duplicate.

10         MR. MACE:  I believe it is.

11         MR. O'BRIEN:  Not to anything we have discussed today.

12    We discussed a different memo from Mr. Martin about dental floss.

13    But this is a different one than what we discussed earlier from

14    Mr. Martin.

15         MR. MACE:  Can we understand with Your Honor's guidance,

16    if it's a duplicate, we will take it down.

17         THE COURT:  If it's a duplicate.  We will take care of

18    it.  Let me know if there's a dispute about that.

19         MR. O'BRIEN:  Thank you, Your Honor.

20         THE COURT:  And that was 4447.

21         Then we get to 4828.  And this is the invoice from

22    Dr. Staats.

23         MR. PAULS:  That's correct, Your Honor.  DuPont has

24    objected as to a witness fee.

25         THE COURT:  Refresh my memory.  Are we assuming her

410

1    deposition is being offered?

2            MR. PAULS:  That's correct, Your Honor.  I believe it is.

3            THE COURT:  Was she questioned about this document?

4            MR. PAPANTONIO:  No, she was not, judge.  See, that was

5    part of the problem.  Some of this doesn't even develop until -- I

6    don't have the exact -- I can't remember the exact dates that this

7    happened.  But so much of this developed after because all of this

8    was taking place -- and, Rob, please correct me if I am misstating

9    this, I need to get this right --

10           MR. BILOTT:  One.

11           MR. PAPANTONIO:  This is on Staats 4828.  Here's where I

12   keep coming back to Staats because so much of developing -- this

13   is one of the things that was developing.  She goes as far as

14   saying, this is what I am charging because I sat down and planned

15   a strategy on what to do with C-8.  She's supposed to be a

16   governmental entity that is supporting the public.

17           THE COURT:  This is addressed to Paul Bossert, and he's

18   going to be testifying.

19           MR. PAPANTONIO:  Well, I don't know that he is.  I

20   can't --

21           MR. MACE:  That's the intention, Your Honor.

22           MR. PAPANTONIO:  He testified the last time, but I don't

23   know that he's -- I don't know if he's going to testify this time.

24   This is the fellow that was on the --

25           THE COURT:  This is the last trial, on the bills?

411

1          MR. PAPANTONIO:  I'm sorry?

2          THE COURT:  On Dr. Staats' bills, was he questioned on

3     that?

4          MR. MACE:  I don't recall one way or the other.

5          MR. O'BRIEN:  Yes, Your Honor, he was.

6          MR. PAPANTONIO:  I don't know what they're going to do --

7          THE COURT:  Obviously, if he had not been questioned, as

8     it now stands, it's not going to come in through her.  But it was

9     sent to Bossert.  So I assume -- as my memory -- remind me --

10         MR. PAPANTONIO:  I think the chance of them calling

11    Bossert is so remote, this is the fellow that was on the stand and

12    said, I've got kidney cancer.

13         MR. MACE:  No, that's misstated.  That's not what he

14    said, and it's not the fact.

15         MR. PAPANTONIO:  That is a fact, that he has kidney

16    cancer.

17         MR. MACE:  It isn't a fact.  He doesn't have kidney

18    cancer.  You're wrong on that.

19         THE COURT:  We're getting far afield.

20         MR. MACE:  He stated that many times.

21         THE COURT:  He lives in West Virginia?

22         MR. MACE:  No, sir.

23         THE COURT:  He lives in Ohio?

24         MR. MACE:  No, sir.

25         THE COURT:  Where does he live?

412

 1          MR. BROGDON:  North Carolina.

 2          THE COURT:  Okay.  So he is not subject to subpoena, but,

 3     you know, you have the prior testimony.

 4          MR. PAPANTONIO:  And we could publish through their prior

 5     testimony because --

 6          THE COURT:  Which is not usually a great way.

 7        (The court reporter requested time to get a battery charger.)

 8          THE COURT:  You're not to talk about anything to do with

 9     the case because we are waiting for a battery.

10       (Short recess.)

11          THE COURT:  All right.  So I think that resolves the

12     billing of Dr. Staats?

13          MR. MACE:  Well, I think there were two points.  One was

14     what witness they could use it with.  So I think you're saying

15     they could potentially use it with Mr. Bossert.  But, two, even if

16     they are allowed to use it, over at page .6, unless I missed other

17     ones, I saw at least three references of *Tennant versus DuPont*.

18     So we think those should be redacted.

19          THE COURT:  Those will come out.

20          MR. PAPANTONIO:  That's fine.

21          MR. MACE:  There may be some more, but that's the page

22     that I noticed them on.

23          MR. PAPANTONIO:  Judge, did you already make a ruling

24     there will be no mention of *Tennant?*  Because that's what --

25          MR. O'BRIEN:  The settlement.

413

1          MR. PAPANTONIO:  The settlement of *Tennant*.

2          THE COURT:  At the last trial we got into some testimony

3     about *Tennant*.

4          MR. MACE:  I believe what Your Honor's ruling --

5          THE COURT:  I gave a limiting instruction.

6          MR. MACE:  I believe what Your Honor's ruling was that we

7     were going to try to keep out prior lawsuits to the extent

8     possible.  There may be some incidental references to a claim or

9     the Tennant name, but to the extent --

10          THE COURT:  Minimized it as much as we could.

11          MR. MACE:  -- it could be redacted --

12          MR. PAPANTONIO:  The Capstone really brought it out the

13     last time is what I really thought --

14          THE COURT:  But I mean there is no reason to put it in

15     there, is there?

16          MR. PAPANTONIO:  Just take the name out, if we can.

17          THE COURT:  Let's do that.

18          That takes us to 5203.  I have things marked in here, the

19     second sentence about the headline in the Parkersburg paper.  That

20     goes out.  So will the subject line.  Is that the primary issue?

21          MR. MACE:  Yes, sir.

22          THE COURT:  Any objection if we redact that?

23          MR. GADDY:  That's fine, judge.

24          THE COURT:  So that will come out.

25          That takes us to 5416.

414

1          MR. MACE:  Your Honor, I'm not restating it every time,

2    preserving any objection to no witness with knowledge of any of

3    these.

4          THE COURT:  Absolutely.

5          MR. MACE:  This one was -- We preserved the Reilly

6    objections, but I thought Your Honor had taken out the poop

7    language.

8          THE COURT:  Well, this -- We had this discussion with the

9    other.  The only thing in this that I can see is relevant is the

10   paragraph that's towards the end starting with, noose tightening

11   on my favorite case.

12         MR. O'BRIEN:  That was specifically allowed over that

13   same objection, about the poop to the river.  You thought that was

14   innocuous enough, that it didn't rise to the other four-letter

15   word that Mr. Reilly used.

16         THE COURT:  Well, but the new issue is you're going to

17   argue with me you want the whole e-mail in, the personal chatter.

18   Actually, there's some profanities in it.

19         MR. MACE:  Yes --

20         MR. BROGDON:  I think we're back to the smoking and the

21   profanity I believe we talked about.

22         MR. MACE:  I think the first paragraph talked about the

23   ice and the hail.  I mean that makes it a personal --

24         THE COURT:  You want that in?  Are you arguing for that

25   to be in or out?

415

1        MR. MACE:  Yeah, I think there's no reason for that to

2   come out because that makes the context --

3        THE COURT:  The only thing, that F word in here, that's

4   towards the end.

5        MR. MACE:  It's hard for me to read my copy.

6        THE COURT:  Then we have the issue of the son leaving the

7   door open.  That's of great interest to the jury.

8        MR. MACE:  So maybe -- maybe you're right, judge.  Maybe

9   that all comes in.

10        THE COURT:  All right.  Why don't we take the first two

11   paragraphs out.  Actually, the first three.

12        MR. MACE:  Yes.  And then we would ask for the poop to

13   come out, Your Honor.

14        THE COURT:  That's out.  All right.

15        I think it's still pretty clear it's a personal e-mail by

16   the way it's signed off.

17        Then we get to 5496.  This is --

18        MR. MACE:  You had ruled before the CVs come in, but the

19   reports do not.

20        THE COURT:  Right.  That's it?  That issue about what we

21   do --

22        MR. DOUGLAS:  We're okay with the same way.

23        THE COURT:  And I have done it both ways depending on how

24   the parties agreed.  I think in this case they did not go back.

25        MR. MACE:  Right, the reports did not go back.

416

1    THE COURT:  The reports didn't.  And the CVs --

2    MR. MACE:  Did.

3    THE COURT:  You aren't happy with the CVs, but the other

4    part you're happy with.

5    MR. BILOTT:  I'm sorry, Your Honor, on the prior e-mail

6    -- I didn't have a copy in front of me -- did we redact more out

7    of it than what was redacted out before?

8    THE COURT:  Just the chatter part.  What's in here is

9    about noose tightening on my favorite case, which is this case.

10   So that's all in.

11   MR. MACE:  I thought you took the poop out.

12   THE LAW CLERK:  You previously left it in.

13   MR. BILOTT:  Previously, that was in, and I think you --

14   MR. MACE:  The first three paragraphs are --

15   THE COURT:  The only thing that's in is the last two

16   paragraphs, right?  That's what I have.

17   MR. BROGDON:  The first three paragraphs are out and the

18   poop reference --

19   MR. MACE:  The poop reference to be out.  I thought you

20   had agreed with that.

21   MR. BILOTT:  That's what we objected to.  We did think

22   that was relevant and should be in.  It goes to the mental -- what

23   the mindset was of --

24   MR. O'BRIEN:  It says I believe in the deposition --

25   THE COURT:  Take me to the line we're talking about.

417

1          MR. MACE:  The very last sentence of the second-to-last

2     paragraph, Your Honor, that would be both Scotchgard and the

3     material that 3M sells us.

4          THE COURT:  Yes, that's in.  I left that in the last

5     time, didn't I?

6          MR. O'BRIEN:  Yes, Your Honor.

7          THE COURT:  That's in.  That describes what the sentence

8     means.

9          All right.  Then we get to 7386.

10         MR. MACE:  This is similar to a prior document.  So I

11    think with regard to what Your Honor --

12         THE COURT:  There are some things in here.

13         MR. DOUGLAS:  There were some references to lawsuits.  We

14    agreed to redact things of that nature.  But there's a DuPont

15    document that we intend to use for the direct with our expert

16    related to the subject of fate and transport.

17         THE COURT:  So the references to the other lawsuits come

18    out.

19         Anything else from DuPont?

20         MR. MACE:  That was the primary one.  If I find any

21    others, I will contact Mr. Douglas.

22         MR. DOUGLAS:  Thank you.

23         THE COURT:  Then we get to -- By the way, those are

24    admitted, in other words, with those redactions.

25         Then we get to 7635.

418

1      MR. MACE:  Your Honor, your ruling is that these are

2 usable.  I mean your rulings today are not that these are admitted

3 for all purposes, are they?

4      THE COURT:  Well, I am not going to exclude them at this

5 point.  What's on your mind?

6      MR. MACE:  Well, this is the first time today you used

7 the word "admitted."  So we have been talking about use, who were

8 they going to be used with, what the parameters --

9      THE COURT:  I don't expect to go through this again.

10 This is to allow you to use -- I don't anybody displaying anything

11 to the jury that isn't going to be admitted.

12      MR. MACE:  Right.

13      THE COURT:  So I do think there's -- the two go together.

14 That's the whole point of the exercise.

15      MR. MACE:  But part of it is what witness it can be used

16 with.

17      THE COURT:  Right.  If you tell me we didn't -- that:

18 You've ruled on the exhibit, but this witness is a stranger to,

19 you may have to preserve a lot of that because I think we're going

20 to go through all this again.  And when we start the trial, you

21 should remind yourself to make that motion to me so it's preserved

22 again.

23      But, no, I intend this to be what we use to -- If I said

24 something is usable or admitted, you can certainly display it.  If

25 it's the wrong witness, you can let me know.

419

1          MR. MACE:  Understood.

2          THE COURT:  So 7635.  What's the issue from DuPont's

3    standpoint?

4          MR. MACE:  With the witness and firsthand knowledge.  But

5    beyond that for this one, Your Honor, this gets into the reference

6    in the second paragraph to something about a children's hospital

7    about 100 yards.  So it's an emotional play that under the 403

8    balancing --

9          THE COURT:  It says, we have one case where.  Where would

10   that be?  That's not our case, is it?

11         MR. MACE:  No, sir.

12         MR. GADDY:  Your Honor, this is an internal DuPont

13   document talking about the knowledge of DuPont at the time.  And

14   it doesn't -- To say it doesn't matter, that this is not

15   Washington Works, it's the state of the knowledge within DuPont as

16   to how they viewed C-8 and saw it, issues surrounding C-8.  In

17   that regard, I believe it's admissible.

18         THE COURT:  Well, at a minimum we would have to get back

19   to the instruction that says that there was some concern about

20   injuring children, but that was not borne out by the facts, right?

21         MR. GADDY:  I think that's correct.

22         MR. MACE:  We've already made the argument about the

23   witness issue.  We preserve on that.

24         But now we're asking that the first couple sentences of

25   the second paragraph be deleted.  It's unfairly prejudicial, far

420

1    outweighing any probative value.

2         MR. GADDY:  Well, judge, that's where we get that

3    limiting instruction.  And with that limiting instruction, that

4    concern goes away.

5         MR. MACE:  No, limiting instructions, the Sixth Circuit

6    is clear --

7         THE COURT:  Well, here's -- I can see both sides to a

8    point.  But I think it's whatever probative value here is going to

9    be outweighed by the fact that it's children at a hospital nearby,

10   but it's not our case.

11        MR. MACE:  Yes, sir.

12        THE COURT:  So I am going to take the first sentence.

13   Well, it will be the first two sentences --

14        MR. MACE:  Actually the third, too.

15        MR. BROGDON:  I think all three.

16        THE COURT:  Yes.  Those are out.

17        And that takes us to 8040.  That's not it.  Yes, it is

18   8040.

19        MR. MACE:  Yes, sir.  Maybe not.  8386.  7645.

20        MR. BROGDON:  We just did.

21        THE COURT:  Now 8040.  These are e-mails from Bernard

22   Reilly to various people at DuPont.  Gerald Kennedy is at

23   DuPont --

24        MR. MACE:  Yes, sir.

25        THE COURT:  Are you saying that the date he's -- He's at

421

1    DuPont, too, right?

2         MR. MACE:  This is the same issue, Your Honor.  You have

3    dealt with it.  We've preserved it.

4         MR. DOUGLAS:  That will be admitted with that objection

5    noted and preserved.

6         Then I get to what I assume -- 8195 is the MSDS, which we

7    had a lot of discussion about in the last trial.  Any objection to

8    that?

9         MR. PAPANTONIO:  Judge, to put in perspective, we offered

10   this.  The entire trial they talked about they had no notion that

11   it caused cancer.  What's very significant about this is on page

12   6, if you will take a look, halfway through, it talks about

13   cancer.  But more importantly, it's not just that we think it's

14   going to cause cancer.  They're so sure that it's going to cause

15   cancer that they actually show the studies, a 1983 study and a

16   1995 study, which are the studies that they rely on, which are

17   animal studies that were performed that tells them that this stuff

18   causes cancer.

19        THE COURT:  I admitted this the last time.

20        MR. PAPANTONIO:  Yes, sir.

21        MR. MACE:  You may recall, Your Honor, this came up on

22   the fly with kind of a surprise during the testimony, and this a

23   3M document.  There's no showing that it -- DuPont was an author

24   of it.  I guess they're going to represent that this came from

25   DuPont's files but no showing of when they had it.

422

1          THE COURT:  Well, this document is one that goes with the

2     product being purchased, right?

3          MR. PAPANTONIO:  Yes, sir.

4          MR. PAULOS:  That's correct.

5          MR. MACE:  Well, if there's testimony to that.

6          MR. PAPANTONIO:  That's -- The jury may conclude they had

7     never seen, but I don't know how they could.

8          THE COURT:  We may have to do some preliminary testimony

9     about how the MSDS is used.  And then at this point I'm --

10          MR. BROGDON:  I think there needs to be some foundation

11     here as well, Your Honor.  This is FC-118.  There is FC-143, which

12     is C-8 being used in the Teflon process.  There's a couple of

13     different chemicals at issue here.  So I think without a witness

14     to explain this, it's not clear the application.

15          MR. O'BRIEN:  Your Honor, the CAS number is right on the

16     face of the document, ammonium perfluorooctanoate.  That's what

17     we've been litigating for years and years and years.  And then

18     when you look at the cancer statement, I think --

19          THE COURT:  What you need to do is have someone describe

20     how it is used.

21          MR. O'BRIEN:  Sure.

22          THE COURT:  That's what we did the last time.  That's

23     going to be one of these where there's some sort of preliminary

24     foundation for this.  And at this point I'm ruling that it's

25     usable.

423

1          MR. PAULOS:  Just so Your Honor is aware, FC-143 is a dry

2     powder product.  And actually FC-118 a wet product that DuPont

3     specifically asked 3M to manufacture for it so it could be used in

4     processes at the Washington Works plant.

5          THE COURT:  All right.  Then we turn to 8227.

6          MR. MACE:  Again, Your Honor, this is a document with no

7     author, no date as to when it was created.

8          THE COURT:  So we have -- The most recent date in here is

9     1989.  It's a DuPont document.  Beyond that, what do we know about

10    it?

11         MR. PAULOS:  We know this came from the file of

12    Dr. Playtis.

13         THE COURT:  He was asked questions about that?

14         MR. PAULOS:  At the last trial I believe he was asked

15    questions, particularly with his history and experience with

16    C-8 --

17         MR. PAPANTONIO:  I didn't cover this at the last trial.

18    I will cover this at this trial with that representation.

19         THE COURT:  Well, let's do this.  This is one, don't show

20    this to the jury.  You can certainly question him about it.  And,

21    you know, obviously you can ask him if it came from his file,

22    those sorts of things.  And if he can give some information about

23    it, then I'm inclined to let it in.

24         Then to 8276.  And this was previously admitted.

25    Anything additional from DuPont?

424

1          MR. MACE:  Let me just look at it, Your Honor.  Yeah,

2     this is the same issue we have talked about.  We have preserved on

3     it.

4          THE COURT:  So the ruling and the objection is preserved.

5          8329, this has a lot of references to lawsuits.

6          MR. MACE:  Yes, sir.

7          THE COURT:  That's the main issue.  And we've talked

8     about the preserving.

9          MR. MACE:  Yes, sir.

10         THE COURT:  I propose we take out -- I think this is one

11    where you may have to make some reference to a complaint, but take

12    out a class action, and start with, a complaint was filed naming

13    DuPont -- well, I don't know.  Just try to take as much of this

14    out as possible.  And we just eliminate the first paragraph.

15    Second paragraph, eliminate, in the complaint, and start, it is

16    alleged that the presence has made the water unfit.

17         Anybody see any problem with that?

18         MR. MACE:  This is, again, Your Honor, if you think it's

19    important, any document like this we know how they're going to try

20    to use it with what witness.

21         MR. PAPANTONIO:  Well, judge, we're going to use this by

22    them come out and they say -- Again, this is as late at 2001 --

23    that there is no threat to human health.  This is after they know

24    about four kinds of cancer.  This is after they say, this is our

25    number one legal problem.  There's -- To say this and the face of

425

1    all the information they had certainly is probative, judge.

2          THE COURT:  Well, I'm going to let it in.  It's going to

3    take some redacting.  And I think the first paragraph goes out.

4    And --

5          MR. MACE:  You also ruled in the past that mere

6    allegations are not relevant to a whole lot.  So the fact that

7    allegations are being made --

8          THE COURT:  What's really relevant is on the back.  It's

9    the second page.

10         MR. PAPANTONIO:  Judge, I agree with that.  That, and

11    then -- the last paragraph, next-to-the-last paragraph, if all we

12    had in this, from the standpoint of what we're trying to show when

13    they say, we did everything to tell the public the truth --

14         THE COURT:  Right.  So how about if we just take, in

15    other words, the top of this standby statement --

16         MR. PAPANTONIO:  Yes, sir.

17         THE COURT:  -- skip everything on the first page after

18    that except the date, and go right to the questions and answers on

19    the second page.

20         MR. PAPANTONIO:  Well, no, we don't want to get into --

21    This fourth paragraph, judge, this is the only paragraph that I

22    was talking about --

23         THE COURT:  The part that DuPont has well established

24    guidelines?

25         MR. PAPANTONIO:  That was the only thing.

426

1      THE COURT:  There is no reference in there to any

2   lawsuits.

3      MR. PAPANTONIO:  No.

4      MR. MACE:  All right.  That addresses --

5      THE COURT:  We'll leave that one paragraph in on page 1.

6   It will still be headed as a standby statement.  Somebody might

7   have to retype this, to be blunt.

8      MR. PAPANTONIO:  Probably.

9      THE COURT:  Well, maybe not.  Just redact everything

10  except that one paragraph --

11     MR. PAPANTONIO:  And the date.

12     THE COURT:  And the date, and the second page will be on.

13     MR. PAPANTONIO:  Second page --

14     THE COURT:  Will be admitted.

15     MR. MACE:  Let me look at that, Your Honor.

16     MR. BROGDON:  I think we should redact paragraphs three,

17  four and five, Your Honor.

18     MR. PAPANTONIO:  On what?

19     MR. BROGDON:  The second page.

20     THE COURT:  Medical monitoring.

21     MR. BROGDON:  Medical monitoring and class action and

22  reference to the legal standard for medical monitoring, which is

23  not at issue here.

24     MR. MACE:  There's a reference to a complaint in

25  paragraph three as well.

427

1    MR. PAPANTONIO:  Judge, if I can respond, we went down

2  this last time.  Just because they use the word "medical

3  monitoring" doesn't mean anything.  They monitored their own

4  employees.  They failed to monitor the public.  That's why that

5  should stay in there.  Medical monitoring takes place.  Medical

6  monitoring is all they had to do with the public 20 years ago, and

7  they didn't do it.  This becomes an element of the case, that both

8  Siegel is going to talk about and Petty is going to talk about.

9    THE COURT:  There's reference in four to the Court order.

10 That, obviously, is going to come out.

11   MR. MACE:  And in three to the complaint.

12   MR. BROGDON:  Three starts with the complaint.

13   THE COURT:  Right.  That may have to be retyped.  In

14 three, what is medical monitoring?

15   MR. PAPANTONIO:  Right.

16   THE COURT:  And then I'm satisfied with three.

17   Then we get to four.  Four is all about the lawsuit,

18 isn't it?

19   MR. MACE:  Yes, sir.

20   MR. PAPANTONIO:  It doesn't add anything.  I agree with

21 that.

22   THE COURT:  And five is the same thing, isn't it?

23   MR. MACE:  Yes, sir.

24   MR. BROGDON:  Three seems to be what counsel wants.

25   MR. PAPANTONIO:  Yes.  Three is the only thing that we

428

1      legitimately should be able to have in that.

2              THE COURT:  One and two are in.  Three will read, just to

3      be clear, what is medical monitoring is the question.  And then

4      the answer will stand.

5              MR. BROGDON:  And four and five are redacted out.

6              THE COURT:  Four and five are out.

7              Then we get to 8351.  And --

8              MR. MACE:  It's another one when you were six years old,

9      Your Honor.

10             THE COURT:  1966.

11             MR. MACE:  So we preserve our objections.

12             THE COURT:  Well, I can't read this part of the first

13     page too well.  This is essentially what, from the plaintiff's

14     standpoint, this is being offered to show --

15             MR. GADDY:  Historical knowledge of DuPont.

16             THE COURT:  -- precisely.

17             MR. GADDY:  This talks about the toxicity issue as it

18     relates to aquatic life.

19             MR. PAPANTONIO:  All the way back to 1966, judge.

20             THE COURT:  It's from DuPont, so it's admitted as far as

21     historical knowledge, again with the right witness, but historical

22     knowledge.

23             8457.

24             MR. MACE:  Just a second.

25             THE COURT:  This is the testing of private wells, is that

429

1    correct?

2           MR. PAULOS:  That's correct, Your Honor.  This document

3    reflects the fact that DuPont had their personnel go and test

4    their home taps for the presence of C-8, and these are the results

5    that were discussed.

6           MR. MACE:  That was just similar -- same objection we're

7    making.

8           THE COURT:  With the objection noted and preserved, the

9    objection will be overruled, and the document will be admitted.

10          Then we get to 8397.  And anything additional on that?

11          MR. MACE:  This is a partial document.  I believe they

12   already have this in in a lengthier document several times.  So

13   these are excerpted pages out of a longer document --

14          THE COURT:  Part of another document?

15          MR. MACE:  Pardon me?

16          THE COURT:  Are they part of another document?

17          MR. MACE:  Yes, Your Honor.

18          THE COURT:  So we don't need them in twice, right?

19          MR. PAULOS:  Your Honor, I think Mr. Mace is confused.

20          MR. PAPANTONIO:  Judge --

21          MR. GADDY:  We don't need it in more than once, but I am

22   not convinced this is a duplicative at this point.

23          MR. PAPANTONIO:  I don't think it is, judge.

24          MR. GADDY:  We certainly don't have a problem with it

25   if --

430

1          THE COURT:  Well, we have an understanding if it's

2     duplicative --

3          MR. MACE:  Other than personal knowledge, that you have

4     already dealt with.

5          THE COURT:  This has a date on it, right?  At the bottom

6     6/84.

7          MR. MACE:  Yes, sir.

8          THE COURT:  All right.  This will be admitted subject to

9     the preservation of the objection.

10          MR. MACE:  And if it's duplicative, it will be withdrawn.

11          THE COURT:  On all of these.

12          MR. GADDY:  Yes.

13          THE COURT:  Then we get to 8516, a news release from

14     Little Hocking Water Association.

15          MR. MACE:  Again, Your Honor, we have hearsay within

16     hearsay.  We don't think this has any probative value --

17          THE COURT:  To be precise, you have educated me on it,

18     Little Hocking Water Association with the word "Inc." on the end,

19     you know it's not a government agency.  It's a nonprofit.  So it's

20     not going to be subject to 803(8).  What is the basis for -- Will

21     there be some testimony to this from any of the experts?

22          MR. PAULOS:  Well, first of all, as you know, Mr. Freeman

23     is a customer of the Little Hocking Water Association and would

24     have received these -- this news release and should be able to

25     testify -- he should be questioned about it and asked whether or

431

1    not he received this information, was notified of the information

2    that was contained within it.

3         MR. MACE:  Your Honor, our primary argument -- to cut

4    through this -- really the 12,000 people.

5         THE COURT:  The first paragraph.

6         MR. MACE:  Yes, sir.

7         THE COURT:  Well, let's take that first paragraph, it

8    reads, the Little Hocking Water Association serves people in

9    western Washington County.

10        MR. MACE:  Or you could make it, serves western

11   Washington County.

12        THE COURT:  You don't like the extra words in there?  Are

13   you going to rewrite their press release?

14        MR. MACE:  Well, I was trying to go with what they had,

15   which serves western --

16        THE COURT:  People.

17        MR. O'BRIEN:  Just say people.

18        MR. MACE:  People, okay.

19        MR. BROGDON:  Take out the 12,000.

20        THE COURT:  I'm testing my own memory here.  I know we

21   have talked about the 12,000.  I think I reserved on that, didn't

22   I, what to do with the number of people --

23        MR. PAPANTONIO:  Actually, you took it out, judge.

24        THE COURT:  I know we took out the 12,000, but didn't we

25   leave it open --

432

1          MR. GADDY:  Right.  You wanted us to come up with

2     something about how to represent that.

3          THE COURT:  The size of the people affected.

4          MR. GADDY:  Yes, sir.

5          THE COURT:  All right.

6          MR. MACE:  I think that was the primary issue, Your

7     Honor.  If we could redact that, then we preserve our objections,

8     and we can move on.

9          THE COURT:  That will be done.

10          Now this didn't come from the DuPont files, though?

11          MR. MACE:  No, I think they represented that may come in

12     with their plaintiff.

13          THE COURT:  All right.  And he can say he's seen this and

14     received it and so on.

15          MR. PAULOS:  We anticipate that, that that will be his

16     testimony, and we also believe we can use this with our experts in

17     discussing what was told to Little Hocking, when it was told to

18     Little Hocking, what Little Hocking did after DuPont informed them

19     about the contamination in the water.

20          THE COURT:  All right.  Then the next document, 8517,

21     this looks like an official document.  It was published in the

22     Federal Register.  What is the issue here?

23          MR. MACE:  Let me get up with Your Honor.

24          So, again, it's what witness, Your Honor.  This to me,

25     Your Honor, would be a document that might have some use with the

433

1    right expert.  But beyond that --

2         THE COURT:  Right.

3         MR. MACE:  And in terms of how much of it could get read

4    to the jury and certainly wouldn't go back to the jury.

5         MR. GADDY:  Judge, I think it works like all the other

6    treatise documents.  We will introduce with an expert witness and

7    have the witness talk about it before we agree it won't go back to

8    the jury.

9         THE COURT:  Let's go back to what Mr. Mace said.  This

10   comes up a lot in cases.  I'm admitting these assuming that a

11   person -- You still have to have a witness qualified to testify

12   to.  With the last document, of course, the lay witness, that

13   wouldn't work.

14        MR. MACE:  That was my concern.  It's not admissible

15   for --

16        MR. PAPANTONIO:  We have an epidemiologist who is also a

17   public health strategist.

18        MR. MACE:  And that was my concern.  I was raising that

19   with your earlier comment.

20        THE COURT:  Understood.

21        Then we get to a chart that states pounds of C-8

22   disposed, and I'm pretty sure we've gotten into this before.

23        MR. PAULOS:  That's correct, Your Honor.  You admitted

24   this as a FRE 1006 summary, and that's exactly what this is.  This

25   is a chart that is derived from -- If Your Honor will flip to the

434

1    last two pages of the document?  All of the documents contained

2    and bearing these Bates stamps are documents that were produced by

3    DuPont regarding its emissions to the river --

4          THE COURT:  Backup documentation basically.

5          MR. PAULOS:  -- and we have provided all these documents

6    in binders to both DuPont and to the Court to review the accuracy

7    of these charts and compare and confirm --

8          MR. MACE:  To save some wind, Your Honor, our concern, as

9    noted, was just that everybody recognizes this is a demonstrative

10   aid.  It wouldn't go back to the jury.

11        MR. O'BRIEN:  But it is not a demonstrative aid.  This is

12   a 1006 summary.  So this is -- and it went back to the jury in the

13   first trial.  So 1006 allows it to be admitted substantively.

14        THE COURT:  Yes.  I mean if it's simply a compendium, in

15   other words it's not a display, your argument is it's coming from

16   the evidence itself.

17        MR. PAPANTONIO:  Judge, I want to point out in the entire

18   trial, not one issue was raised about the accuracy of anything

19   displayed, not one document was questioned, not one number was

20   questioned that went back.

21        THE COURT:  1006 doesn't say whether it goes back to the

22   jury or not.  It doesn't say it doesn't.

23        MR. PAPANTONIO:  It's substantive evidence.

24        THE COURT:  Unless there is an objection or some issue

25   about the math and so on.  But the backup documentation is not in

435

1    dispute, right?

2          MR. BROGDON:  Well, the backup documents are not charts.

3    They're not displayed --

4          THE COURT:  I mean it's displayed differently but --

5          MR. BROGDON:  The data, I think --

6          THE COURT:  If you look --

7          MR. BROGDON:  -- is not in dispute.

8          THE COURT:  All right.  And the data that is displayed on

9    these charts is not -- there's no complaint these charts aren't

10   accurate, is there?

11         MR. MACE:  Well, they have added some lines and things,

12   Your Honor -- but I mean the data gives you points, okay?

13         THE COURT:  Well, you don't disagree that this should be

14   used.  They can be used.  The only issue is whether it goes back

15   to the jury.

16         MR. BROGDON:  I think we make arguments about 403,

17   misleading, accuracy and so forth.  But the data, the underlying

18   data, I think is not disputed.  It's a different way of displaying

19   it.

20         THE COURT:  You can use this, and you can address it at

21   the end of the trial whether it goes back to the jury, and I will

22   have another look at Rule 1006, evidence rule.

23         Then we get to Plaintiff's 2.47.  This is a copy of a

24   check.

25         MR. DOUGLAS:  I guess these next four, or actually the

436

1      last five, are all interrelated, and if I could just address them

2      as a whole.

3            THE COURT:  That has to do with essentially the class

4      membership.

5            MR. DOUGLAS:  Dr. MacIntosh would rely on in his

6      professional exposure analysis.  And if I understand correctly the

7      objection, it should not go back to the jury, and that's fine with

8      us as long as we're free to discuss the documents -- Dr. MacIntosh

9      can discuss it --

10           THE COURT:  That takes care of it?

11           MR. MACE:  That is our objection for 47, 48, 49 and 65,

12     P2., those numbers.

13           THE COURT:  Well, I think that's everything on the

14     plaintiff's side, isn't it?

15           MR. MACE:  Well, there's 71.  Let me see what that one

16     is.

17           THE COURT:  This is a --

18           MR. BROGDON:  To preserve our objections.

19           MR. DOUGLAS:  That was an affidavit that we obtained to

20     simplify the issue.

21           THE COURT:  P2.71?  I just have a blank page.  Oh, the

22     back.  Okay.

23           MR. BROGDON:  It's a records --

24           THE COURT:  A records custodian affidavit.

25           MR. DOUGLAS:  Yes.  It's simply to establish that one

437

1    fact, that Mr. Freeman was provided with Little Hocking water.

2            THE COURT:  I want to ask you:  Do we need this?  Because

3    if we do, it's got the 12,000 people, 4,000 water taps in it.

4            MR. MACE:  I don't think we do need it because we've

5    already stipulated he is a class member.

6            THE COURT:  Right, but can you stipulate to the records?

7    I don't you to waive an objection.  In other words, the records

8    produced by the general manager of Little Hocking Water

9    Association as being public records, true and accurate.  Otherwise

10   we need his affidavit.  His affidavit has nothing to do with --

11           MR. MACE:  No, we're not going to dispute this

12   particular --

13           THE COURT:  So you won't use the affidavit, but we can

14   treat the documents as having been authenticated properly and so

15   on.

16           MR. DOUGLAS:  Right, I understand that in fact there is

17   no dispute over the fact that Mr. Freeman was supplied with Little

18   Hocking water in 1993 to present.  Right?

19           MR. MACE:  Correct.

20           THE COURT:  I think we've had enough for one day.  We are

21   going to come back and do more tomorrow.  Why don't we plan on

22   meeting at ten with defendant's exhibits and get you on your way.

23   Have a nice evening.

24                              -  -  -

25

438

1                     C E R T I F I C A T E

2                          - - -

3        I, Laura L. Samuels, do hereby certify that the foregoing is

4 a true and correct transcript of the Continued Proceedings of the

5 Final Pretrial Conference Hearing on the Deposition Designations and

6 Admissibility of Exhibits in the case of: E. I. du Pont de Nemours

7 and Company C-8 Personal Litigation, case no. 2:13-md-2433, before the

8 Honorable Edmund A. Sargus, Jr., Chief Judge, and the Honorable

9 Elizabeth Preston Deavers, Magistrate Judge, in the United States

10 District Court, Southern District of Ohio, Eastern Division, on the

11 date indicated, reported by me in shorthand and transcribed by me or

12 under my supervision.

13

14

15

16

17                                    /s/ Laura L. Samuels

18                                    Laura L. Samuels
                                   Official Federal Court Reporter

19

20

21

22

23

24

25