439

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION

 3

      IN RE:  E. I. du PONT de NEMOURS AND .  CASE NO. 2:13-md-2433
 4    COMPANY C-8 PERSONAL LITIGATION        .
                                             .  COLUMBUS, OHIO
 5                                           .  MAY 18, 2016
                                             .  10:00 A.M.
 6                                           .
      . . . . . . . . . . . . . . . . . . . .
 7

      TRANSCRIPT OF THE CONTINUED PROCEEDINGS OF THE FINAL PRETRIAL
 8    CONFERENCE ON THE MOTIONS ON DEPOSITION DESIGNATIONS AND ADMISSIBILITY
      OF EXHIBITS BEFORE THE HONORABLE EDMUND A. SARGUS, JR., UNITED STATES
 9    DISTRICT CHIEF JUDGE

10    APPEARANCES FOR THE PLAINTIFFS:

11    J. MICHAEL PAPANTONIO, ESQ.; TIMOTHY O'BRIEN, ESQ.; GARY DOUGLAS,
      ESQ.; DAVID BUTLER, ESQ.; ROBERT BILOTT, ESQ.; REBECCA NEWMAN, ESQ;
12    MICHAEL LONDON, ESQ.; JON CONLIN, ESQ.; CHRISTOPHER PAULOS, ESQ.; JEFF
      GADDY, ESQ; WESLEY BOWDEN, ESQ.; ASHLEY BRITTAIN-LANDERS, ESQ.; KATHY
13    A. BROWN, ESQ.

14    FOR THE DEFENDANT E. I. du PONT de NEMOURS AND COMPANY:

15    DAMOND R. MACE, ESQ.; C. CRAIG WOODS, ESQ.; JOHN GALL, ESQ.; STEPHEN
      M. FAZIO, ESQ.; STEPHANIE E. NIEHAUS, ESQ., AARON T. BROGDON, ESQ.;
16    JOHN BURLINGAME, ESQ.; NATHAN LEBER, ESQ.

17                              -  -  -

18

19

20

21

22

23

24

25           LAURA L. SAMUELS, OFFICIAL FEDERAL COURT REPORTER
                              (614) 719-3245
```

440

```
1                              Wednesday Morning Session

2                              May 18, 2016

3                      -  -  -  -  -

4         THE COURT:  Okay.  We finished up with the plaintiff's

5    exhibits yesterday, and now we'll turn to the issues with the

6    DuPont exhibits.

7         MR. O'BRIEN:  Your Honor, Tim O'Brien for Mr. Freeman.

8         It may make sense at this juncture to address the

9    supplemental filing on the pollution of the Ohio River and whether

10   that passes Daubert muster for purposes of cross-examination.

11        THE COURT:  Well, that was filed -- Tuesday?  Monday?

12        MR. MACE:  Monday night.

13        THE COURT:  All right.  I just skimmed this.  I am not

14   prepared to make a decision.  We can take a break, and I can

15   review -- you haven't responded to it, right?

16        MR. O'BRIEN:  Right.  Remember at the last motion in

17   limine, we said, well, if it was -- we would take a look at it and

18   either make the decision to argue it orally or request briefing on

19   it, and we think we are prepared to argue it.  So whenever Your

20   Honor has an opportunity, perhaps today, we can argue it.

21        MR. MACE:  We think it's a tail wagging the dog.  We

22   should focus on the defense exhibits and then deal with that

23   later, if Your Honor has time.

24        MR. PAPANTONIO:  So much of the --

25        THE COURT:  This is what -- you know, as a preliminary
```

441

1        issue, and that is how it ties into expert testimony, it seems to

2        me there's a lot of argument to be made.  It's completely

3        collateral.  It's what they call in criminal law an *et tu* defense,

4        which is prohibited.  But it is somewhat dependant on what's in

5        front of me as far as the record.

6              How many of these documents would be involved with that

7        particular issue would you say?

8              MR. MACE:  I don't think any of these, judge.

9              THE COURT:  Well, then that makes it easy, doesn't it?  I

10       mean you want a ruling on that issue --

11             MR. O'BRIEN:  Well, there are a few documents in there

12       about, I think about emissions into the river of nitrates, or

13       something like that, to tie it into --

14             THE COURT:  Well, you both flag me when we get to one of

15       those --

16             MR. O'BRIEN:  Yes, Your Honor.

17             THE COURT:  -- and we will hold on that until I decide

18       the motion.

19             MR. MACE:  Yes, sir.

20             MR. BILOTT:  Your Honor, there was one of the

21       housekeeping issues from yesterday.  One of the documents that

22       came up, P1.535, which was a document that I think there was some

23       discussion about, whether we could show that was actually produced

24       by DuPont.  And after the conference, I went back to our paralegal

25       who was able to pull out the DuPont production letter from March

442

1    15, 2010, and the document was on a disk produced by DuPont in the

2    *Rowe versus DuPont* prior C-8 production.  And a paralegal went

3    back, opened the disk, and the document was on that disk.

4         THE COURT:  All right.  Take a look at that and tell me

5    if there's any disagreement, but, hopefully, that puts the matter

6    to rest.

7         MR. MACE:  And, Your Honor, what did counsel say?

8    P1.535?

9         MR. BILOTT:  Yes.  I have a copy of the production letter

10   if DuPont would like to look at that.

11        MR. MACE:  Thank you very much, counsel.  I appreciate

12   it.

13        THE COURT:  All right.  So we'll just jump right in here.

14   And this is going to be D.10.  Let me see if I can group these.  I

15   want to first go through for what it's offered, and then I want to

16   hear from, of course, the party objecting.  So D.10, should we

17   group this under something --

18        MR. MACE:  You're looking at D.20, Your Honor.  You're

19   always ahead of us.

20        THE COURT:  This is a document -- I remember this

21   document from the trial.  It's already been admitted, right?

22        MR. MACE:  Yes, sir.

23        THE COURT:  In the first trial.  This was a letter to the

24   union that is at the plant, right?

25        MR. MACE:  Well, it's union at some of the other plants.

443

1    I don't think this is a union at this plant. But there's no doubt

2    that this is on the public docket, and there is no doubt this was

3    in DuPont's possession.

4         THE COURT: What was the issue here on the plaintiff's

5    side?

6         MR. PAULOS: The issue here -- Your Honor, Chris Paulos

7    for the plaintiff -- is that it is a letter addressed to Mr. Brian

8    Lewis from the PACE International Union who represents workers at

9    the 3M plant, and it was written by Elena Page from the Department

10   of Health and Human Services. There is no evidence to suggest

11   that this was in DuPont's file. On the face of the document, it's

12   not addressed to somebody at DuPont. It's not discussing any --

13   discussions with DuPont between DuPont and HHS. And there is no

14   witness that DuPont has to either authenticate this or to confirm

15   that it was received by Brian Lewis and to testify to the contents

16   of the document.

17        MR. BILOTT: One clarification, Your Honor, as far as the

18   production clarification. The 3M Bates number indicates that it

19   was actually produced by The 3M Company in litigation, and then it

20   was actually then produced to DuPont in that case years and years

21   later.

22        THE COURT: Okay. All right.

23        MR. MACE: Three main points, Your Honor. One is you

24   will recall this came up in cross-examination of the plaintiff's

25   expert who was testifying about the state of the science as it

444

1   developed.  So this shows the state of the science as NIOSH saw it

2   as of 2001.  It's a just a public document.  Also --

3          THE COURT:  That sometimes -- It's a letter, but it looks

4   fairly official.  What makes you say it's a public document as

5   opposed to just a letter from -- I always think of this as a

6   public report, which means that members of the public can find

7   this, even if it's hard.  It's out there.  It's a public

8   statement.  Does it reach that level?

9          MR. MACE:  I believe it does, Your Honor, and it's self

10  authenticating with the Department of Health and Human Services.

11  There's no contention that it's not authentic.

12         In terms of DuPont's possession, which you will recall we

13  had this double issue last time, if DuPont was just presenting

14  something to say the state of the science, we didn't have to show

15  DuPont had possession of it.  If we wanted to say it was something

16  we had notice of, obviously, we will have to link it up.

17         THE COURT:  This doesn't go to notice.  It goes to the

18  state of the science.

19         MR. MACE:  It actually goes to both because counsel -- I

20  will get a copy for you.  As counsel has indicated, some of these

21  documents were obtained and produced to DuPont.  So it was the

22  state of the science as of 2001.  But then no later than 2004,

23  June of 2004, it was in DuPont's possession because it was

24  produced by Mr. Bilott to DuPont.

25         MR. PAPANTONIO:  Judge, the idea of the state of the art

445

1    is to suggest that the defendant understood what the development

2    with the science was and that they relied on that knowledge.

3    That's just not the case here.  This is a -- This is a matter of

4    simply going back and finding some documents that might agree with

5    them in retrospect.  That is not how state of the art is developed

6    in a case like this.

7              MR. MACE:  So we're going to be able to link that up,

8    judge, with both on the state of the science with the defense --

9    I'm sorry, with the plaintiff's experts who were cross-examined

10   about this at their depositions and at trial the first time around

11   and with Dr. Rickard in terms of DuPont having possession of this

12   and considering it.

13             THE COURT:  I think this goes for one thing and one thing

14   only, notice after June 2 of 2004.  That's the date this was sent

15   by Mr. Bilott to counsel for the defendant.  All right.

16             That takes us to 20.

17             MR. MACE:  Yes, sir.  If you want me to speak first or

18   the plaintiffs to speak first?

19             THE COURT:  This is a 2000 document.  What is this about?

20             MR. PAPANTONIO:  Judge, we will speak first on these

21   documents.  Chris, are you handling this document?

22             MR. PAULOS:  Your Honor, this is Defense Exhibit D.20,

23   and it's titled Documentation of Occupational Biological Limit

24   Value, BLV, for 3M.  We believe that this falls under the purview

25   of the limiting instruction the Court has used in *Bartlett*

1      regarding --

2              THE COURT:  In other words this, this has a standard in

3      it that doesn't apply in our case.  It goes to historical

4      knowledge.  And you want me to say that this is used to show in

5      general what DuPont knew at the time but not to in any way

6      contradict that the standard would apply in this case, right?

7              MR. PAULOS:  Yes, Your Honor.  Also we're unsure when

8      DuPont actually received this document.  It is a 3M, as you can

9      see, it is a restricted 3M internal document.  It does bear a

10     Bates stamp from DuPont.  But if they want to use it as notice,

11     they have to prove when they obtained it.

12             THE COURT:  Are you going to be able to tell that?

13             MR. MACE:  I will be able to tell that.  But it's also

14     relevant on the state of the science, and it was one of the

15     reliance materials for several of the plaintiff's experts.  This

16     is part of their backup data they were cross-examined about, and

17     it was admitted in the *Bartlett* case.

18             THE COURT:  It's a lot easier on what DuPont knew, we can

19     push it in that category, that's a simple issue.  It's a little

20     harder when it comes to the general state of the science.  But it

21     has got a DuPont number on it.  It would be helpful if somebody

22     could testify as to when it was known to DuPont.  But, otherwise,

23     at this the point I'm not going to exclude it.  And I just note,

24     again, these were documents that were admitted in the last trial.

25             All right.  Then we get to 25.  And this is a letter to

1    DuPont from the U.S. EPA.  What's the issue here?

2           MR. PAULOS:  All right.  Your Honor, Chris Paulos for the

3    plaintiff.  This is a letter --

4           THE COURT:  Let me break this -- There's a letter, and I

5    noticed there was a press conference at the end.  Is that the

6    issue?

7           MR. PAULOS:  Exactly.  I believe this falls under the

8    ruling that we had yesterday regarding press releases from public

9    entities.  There's also a --

10          MR. MACE:  We have no problem with that, Your Honor.  The

11   letter itself is what was supposed to be --

12          THE COURT:  The we'll delete the back part of this.

13          MR. PAULOS:  The telephone conference -- or testimony,

14   should I say, transcript that was provided we think --

15          THE COURT:  One thing is that the jury would have no idea

16   what an operator is on the telephone.

17          MR. MACE:  So the document numbering doesn't get

18   confused, judge, we may re-mark it with a -- I think it's already

19   in the documents with just a letter, but we may refer to this as a

20   different number at trial as just the letter.

21          THE COURT:  All right.  Okay.

22          MR. PAULOS:  So the record is clear, I believe Your

23   Honor's ruling is that what is marked as D.25, the only thing

24   allowed in would be pages 25, 25 .2, 25.3.

25          THE COURT:  Does that make sense?

448

1          MR. MACE:  I think it's just 25 and 25.1 is the letter,

2     Your Honor.  That's what -- we'll limit it to that.

3          MR. PAULOS:  Okay.  We're fine with that.

4          THE COURT:  So the next document -- and correct me if I

5     am wrong -- this is the case that resulted in the consent decree

6     and the -- What are we calling it?  We are at EPA?  Penalty?  It's

7     in the consent decree language, but -- you can correct me if I'm

8     wrong -- we're talking about the same matter, right?

9          MR. MACE:  It's related to the consent decree related to

10    TSCA.

11         THE COURT:  So this is the order essentially denying

12    summary judgment is the way it works out, right?

13         MR. PAULOS:  That's correct, Your Honor.  We believe,

14    based on your guidance at the MLI hearing, that this is an

15    extraneous document.  The only things coming in will be the

16    memorandum and the consent order itself, and this would be the

17    document secondary to those two documents that you said would be

18    allowed in.

19         THE COURT:  What do you see as the probative value of

20    this?

21         MR. MACE:  We believe that the plaintiffs are going to

22    open the door to this with their experts because although you

23    asked the parties to focus on the consent decree, you've already

24    indicated you're going to let them talk about 558, although

25    redacted, which is the government's internal consideration of

449

1    whether to enter into the settlement with DuPont.  We believe the

2    plaintiff's corporate conduct experts is anything similar to what

3    they did in *Bartlett*, they're going to expand that farther and

4    subject to cross --

5            THE COURT:  I think you noticed, but the trouble this

6    simply says this is disputed fact, and it's finding that the case

7    has to go forward.

8            MR. MACE:  But it's a disputed fact on the main -- what

9    they're trying to argue is the main probative value of TSCA.  They

10   are saying that is not --

11           THE COURT:  Right, but let me ask you this.  Isn't this

12   -- As I read this, this was DuPont's motion only.

13           MR. MACE:  No, sir.  There were cross motions.

14           THE COURT:  There were cross motions.  Everybody agrees

15   to that?

16           MR. PAPANTONIO:  Yes, sir.

17           THE COURT:  So, in other words, the government was also

18   denied -- in fact, that was the purpose of the summary judgment.

19           MR. MACE:  That's true.

20           THE COURT:  So your argument is it showed there was a

21   disputed fact on both ends.

22           MR. PAPANTONIO:  Judge, If I might be heard, what they

23   want to do is retry whether or not the EPA's conduct was

24   appropriate or not.  That's not the issue of the consent decree.

25   The consent decree order is a notice issued to tell them they are

450

1    doing things wrong; and as a result of them doing things, A,

2    science has been stifled; and B, don't do it anymore.

3         And to go back and retry whether or not that's

4    appropriate is a completely collateral issue.

5         THE COURT:  There are couple ways this can be viewed.  I

6    want to drill down on that.  I am concerned -- We have the same

7    issue with the consent decree.  I don't want to take the juror too

8    far into another proceeding that isn't directly involved in this

9    case but has some impact on it.  And this takes us into having to

10   explain to them what the notion of an accelerated decision means,

11   summary judgment.

12        Are you thinking of using this primarily on cross?

13        MR. MACE:  Yes, sir, primarily.  And, again, it's going

14   to depend on what the plaintiffs do with their experts.  But we

15   need to be able to rebut the fact.  And *Bartlett* --

16        THE COURT:  A simple issue, if an expert were to say,

17   there is absolutely no basis and support for position X.  And you

18   could say, the judge said just the opposite.  There was disputed

19   issue of material fact.

20        MR. MACE:  Well, we believe plaintiff's counsel is

21   opening the door to this in opening statement.  They are going to

22   imply with the jury, and then with their experts, that the EPA

23   believed that there was a reasonable support for the conclusion of

24   a substantial risk for injury to health.  That's exactly what at

25   page 39 the ALJ determined was a genuine disputed issue of fact.

451

1    The jury is going to --

2         THE COURT:  But the way you phrased that, the EPA didn't

3    believe that because they served it.

4         MR. PAPANTONIO:  That's right.

5         THE COURT:  But there was no finding made to that effect.

6    I want the jury to get this sort of in an unadulterated ruling.

7    This was the claim of the EPA.  It was not litigated to a final

8    decision.  And there was an agreement reached.  That's sort of the

9    long and the short of it, right?

10        MR. MACE:  But the jury needs to be clear there was no

11   finding of any material risk to health.

12        MR. BILOTT:  This is addressed in the limiting

13   instruction that you already agreed to before which outlined this

14   was disputed, and it was resolved in this consent.  Otherwise --

15        MR. PAPANTONIO:  We're retrying --

16        THE COURT:  What I mean is what you just said is pretty

17   much what I just said.  There was a proceeding.  It was contested.

18   It didn't go to a final decision.  But there was a consent decree.

19        MR. BILOTT:  Otherwise, if you allow in -- if we start

20   allowing in this, then we would want the complaint in, and it's

21   opening the door to all these documents.

22        MR. PAPANTONIO:  Judge, and that's what they want, they

23   want to retry --

24        THE COURT:  I get it.

25        MR. PAPANTONIO:  -- the EPA issue.

452

1    MR. MACE:  Only to the extent that they would want to

2    present it to the jury as if they found against us.

3    THE COURT:  That isn't what happened.  There was -- But

4    what the EPA internally decided to bring this case, there is no

5    question they will get to that part of it.  This document can be

6    used if the door is opened.  We'll just leave it at that.  We will

7    have to see how the trial goes.  And, you know, I want to be

8    clear, move to use it before you do.

9    MR. MACE:  Yes, sir.  Yes, sir.

10   THE COURT:  And then we get to the 64.  What's the issue

11   with 64?

12   MR. PAULOS:  Yes, Your Honor.  This is a -- This is a

13   letter to Mr. Stewart from Gary Viola.  And there's some

14   authentication issues with this, also Rule 106 issues.  First,

15   it's incomplete.  It references a study that's not attached.  It

16   references a study we can't identify.  And there's a lot of

17   questions that are unanswered on the face of this document that

18   cannot be answered by any other document that DuPont intends to

19   introduce into evidence.

20   THE COURT:  So how do you see this document being

21   offered?

22   MR. MACE:  Your Honor, it goes to government notice and

23   that DuPont was speaking with the government agencies.  Here the

24   State of West Virginia, Department of Health and Human Resources,

25   confirms the fact that they had a meeting with them.  It's part of

1    the historical context of the context between DuPont --

2         THE COURT:  To be precise, you're claiming this is a

3    business record?

4         MR. MACE:  Yes, sir.

5         THE COURT:  I'm going to overrule.  I let it in the last

6    trial, so I'm going to be consistent and keep it in.

7         All right.  And then D.92, this wasn't used, but it was

8    submitted in the last trial.

9         MR. PAULOS:  Yes, Your Honor.  This is what appears to be

10   3M lifetime drinking health advisory for PFOA, dated January 20 of

11   2002.  There is no author that's identified as to who wrote this.

12   We don't know whether or not this is a draft.  It also starts at

13   page 2.  So we don't know where page 1 is.

14        THE COURT:  Do you have page 1?

15        MR. PAULOS:  And there is no indication as to when DuPont

16   came into receipt of this document.

17        MR. MACE:  I do have page 1.  I'm not sure why it doesn't

18   appear there.

19        THE COURT:  This is a summary?

20        MR. MACE:  Page 1 has the signatures from 3M.  This is a

21   cover page.

22        MR. PAULOS:  It was not produced to us.

23        MR. MACE:  So I need to supplement.  I'm not sure what

24   happened with that, judge.  But this is a document, Your Honor,

25   that was considered by the plaintiff's expert.  This was used in

454

1    cross-examination.  It was used in --

2            THE COURT:  If it's going to be used in cross, let me

3    know.  That's puts it into a different coloration.  Is that how

4    you see this document?

5            MR. MACE:  Primarily, although Dr. Rickard will testify,

6    as he did in the first trial, that he was aware of 3M's lifetime

7    drinking water advisory.

8            THE COURT:  So you do claim you have somebody with

9    firsthand knowledge.

10           MR. MACE:  Yes, sir.

11           THE COURT:  As long as he testifies consistent with that,

12   then this will be admitted it.

13           MR. BILOTT:  Your Honor, I think this was subject to the

14   limiting instruction --

15           THE COURT:  Right.  Anything that has -- I don't know how

16   many times you want me to give the instruction.  But any time that

17   you have a report that's using a different standard than what the

18   Science Panel found, I will consider giving that instruction.

19           MR. O'BRIEN:  So, obviously, Your Honor, this will not be

20   used in opening unless they know that Dr. Rickard is going to come

21   and testify at trial.

22           MR. MACE:  Well, we do know that.

23           THE COURT:  He's your witness, so I am assuming.  He'd be

24   sure of that.

25           Let me go to the EPA fact sheet.  That's Exhibit 101.

455

1     What's the issue here?

2          MR. PAULOS:  Yes, Your Honor.  We thinks this falls under

3     your ruling regarding press releases from public agencies.

4          THE COURT:  All right.

5          MR. MACE:  This is a public document, Your Honor, on the

6     EPA's website.  It's not a press release.  It's the facts as EPA

7     saw them as of 2003.

8          THE COURT:  We were calling the horse trade.  If it's not

9     traded here it may affect other exhibits.  But it's probably right

10    in between.  It's not a Federal Register notice, but it doesn't

11    have the flavor of a press release --

12         MR. PAPANTONIO:  Judge, we will withdraw the objection to

13    that document.

14         THE COURT:  All right.  So that will come in.

15         Then we get to 173.  This is a letter from the --

16         MR. PAULOS:  We're actually going to withdraw this -- our

17    objections to this document as well, Your Honor.

18         THE COURT:  That will come in without objection.

19         And we get to 180.

20         MR. PAULOS:  Yes, Your Honor.  This a letter from Walter

21    Stewart -- apparently a letter from Walter Stewart to Gary T.

22    Viola at the Department of Health and Human Services in West

23    Virginia.  It's missing enclosures that are specifically cited.

24    It's an incomplete document.  It's also -- This document does not

25    show this was actually ever received by the Department of Health

456

1    and Human Services in West Virginia.  This is a document that was

2    produced by DuPont, but it doesn't appear to have actually been

3    received by Health and Human Services.  I think DuPont has to

4    prove --

5              THE COURT:  We have two exhibits, two attachments.  Do

6    you have those?

7              MR. MACE:  We have the --

8              MR. LEBER:  Yes, Your Honor, Nathan Leber for the

9    defense.  We do have a version with the attachments.

10             THE COURT:  Okay have you seen those?

11             MR. PAULOS:  We have not seen them.  We were not

12   produced -- or they were not produced to us.

13             MR. MACE:  Actually, I think it's Defendant's Exhibit

14   982.

15             THE COURT:  Defense 982.

16             MR. MACE:  Defense 982 had the attachments with it.

17             THE COURT:  Let's hold that first issue, whether the

18   attachments ought to be listed.  We can address that when we get

19   to the other exhibit.

20             Do you have any reason to think it wasn't received?

21             MR. PAULOS:  Well, it's not produced with a WV DEP HHS

22   Bates stamp.  It's simply a letter that may have been sent or

23   could have been sent, potentially a draft letter.  We don't -- We

24   don't know from this document.

25             THE COURT:  You're not going to have a witness with

457

1    firsthand knowledge of the letter being sent, I'm going to guess?

2           MR. MACE:  Well, it's in -- it's certainly a historical

3    record.  It comes from Mr. Playtis' file.  He was involved in

4    these issues.  It was sent certified, return receipt requested.

5    So this is not a draft.

6           THE COURT:  I'm not inclined on that basis to exclude it,

7    but we'll address the attachments when we get to the other

8    exhibit.

9           MR. PAULOS:  Would it be possible to get a limiting

10   instruction to inform the jury that there is no evidence this was

11   received by the WV DEP?

12          THE COURT:  No, I don't think that that's warranted, but

13   thank you.

14          MR. BILOTT:  Just for clarification, when you say it's

15   the same as 982, is 982 just the attachment or --

16          MR. MACE:  No, Your Honor, 982 is the letter with the

17   attachments.

18          THE COURT:  Well, we're not going to put them in twice.

19   So if I admit 928 with the attachments, we're going to delete the

20   one we just went through.

21          MR. MACE:  And I don't think 982 is in the stack of

22   disputed exhibits because that issue did not come up.  So we're

23   not going to -- that will not come up later in the pile.

24          THE COURT:  It's going to be admitted by agreement.  We

25   will strike the one we just went over.

458

1          MR. MACE:  And we will make it 982.

2          MR. PAULOS:  We would like to reserve our opportunity to

3     object to the attachments once we're given the opportunity to

4     observe them and evaluate them.

5          THE COURT:  All right.  Fair enough.

6          196, this is a DuPont memorandum.  What's the issue here?

7          MR. PAULOS:  Yes, Your Honor, it's titled DuPont

8     Memorandum, October 26, 2006.  There is no indication of who the

9     author is.  We believe that discusses the consent order and,

10    therefore, falls under the Court's previous ruling regarding

11    documents associated with the consent order or regarding the

12    consent order.  It's also an attack on general causation.  And

13    it's essentially an undisclosed expert report --

14         THE COURT:  Well, the attack on general causation, we can

15    pick it up with a limiting instruction again.  Looking at this --

16    Well, let me first ask:  Are you going to have a witness who will

17    testify as to the surrounding information, author, and so on, of

18    the report?

19         MR. MACE:  Yes, Your Honor, Dr. Rickard will have the

20    background on this and the fact that he was involved in the

21    preparation of it, summary of the --

22         THE COURT:  That part disappears, all right.

23         MR. MACE:  It goes to the state of the science as DuPont

24    believed it as of this time in 2006.

25         THE COURT:  So this is discussing matters with the EPA

459

1    and DuPont.  I don't want this to go too far into negotiations or

2    how either side viewed certain terms, just the science aspects of

3    it.

4         MR. PAULOS:  There are certainly sections of this

5    document where DuPont is providing its opinion as to the terms of

6    the consent order and how they feel about it.  I think that should

7    merit redaction.

8         THE COURT:  On page 196.4 there is a reference to class

9    action.  That is also coming out.

10        MR. MACE:  Your Honor, where were you at?

11        THE COURT:  Under the header DuPont is already providing

12   alternate water supply.  The next section says class action.

13        MR. MACE:  Okay.

14        THE COURT:  But I'm assuming this would be consistent

15   with Dr. Rickard's testimony anyway, and he would be able to say

16   that he participated in the draft of this.

17        MR. MACE:  Absolutely, Your Honor.

18        THE COURT:  So it will be subject to the same --

19        MR. BILOTT:  Your Honor, I'm sorry, actually the section

20   about DuPont providing an alternate water supply, that is all

21   about the class action settlement provision.

22        THE COURT:  Where are you?

23        MR. BILOTT:  On page 196.4.

24        THE COURT:  So that that's the whole --

25        MR. BILOTT:  .7.

460

1          THE COURT:  It talks about the settlement all throughout

2     here.  So at a minimum we take out anything involving the class

3     action and settlement.  Are you proposing anything more than that?

4          MR. BILOTT:  Providing the water at all was part of the

5     settlement agreement.

6          MR. O'BRIEN:  That came in the trial the last time.  The

7     jury was notified by both evidence and the instruction of the

8     Court that the efforts undertaken by DuPont with respect to the

9     water supply filtration was because of and a result of the class

10    action.  So the jury was notified of that in the *Bartlett* trial.

11         MR. MACE:  Your Honor, you'll recall, I think it was a

12    Friday ago, I had recommended that we enter into a stipulation,

13    it's relevant for causation issues because Mr. Freeman started

14    using the bottled water program at a point.  And then his water

15    was being filtered at a point.  So he was having no further -- So

16    it's highly relevant for the jury to know that fact.

17         THE COURT:  Yes, I mean I don't disagree.  That's a fact

18    that will bear on the issues of this case.  But it will also be a

19    fact that this was part of the settlement, right?  So the question

20    is how do we --

21         MR. MACE:  Actually, there were different issues there,

22    Your Honor, because they had an earlier bottled water program --

23         THE COURT:  That was part of the settlement.

24         MR. MACE:  That was not part of the settlement.

25         THE COURT:  And he participated in that as far as you

461

1    know.

2              MR. MACE:  I need to check the facts on this.

3              MR. PAPANTONIO:  Judge, can I ask for this solution?

4              THE COURT:  Sure.

5              MR. PAPANTONIO:  Virtually every other paragraph begins

6    with, for example human exposure, when DuPont entered into these

7    discussions, etcetera, etcetera, it leads you to believe that

8    something has been happening between the parties.  Could we,

9    rather than a ruling on this right now, have more time to really

10   -- we needed to know what the Court's initial thought was.  Our

11   thought was that this was not tied up by anybody.  Now it's

12   represented that Rickard is going to do that.  Having heard that,

13   can we spend more time with this document, cleaning up that

14   problem?

15             THE COURT:  That, and you might also -- I don't know if

16   this was on your list of proposed stipulations or not stipulations

17   to this, but your proposed limiting instructions, this ought to be

18   a topic as well.

19             And by the way, I understand there's going to be a few of

20   these proposed limiting instructions you don't agree on?

21             MR. MACE:  Yes, sir.

22             THE COURT:  What I would like you to submit is what

23   you've agreed on; and those that you haven't, give me plaintiff's

24   version and defense version side by side, and we'll resolve them.

25             MR. MACE:  I believe that was done Monday night, Your

462

1      Honor, in terms of the existing ones.  Your Honor has referenced a

2      few --

3              THE COURT:  And I'm not accusing you, but I think I saw

4      them on the docket.

5              MR. MACE:  I thought you were just testing me again, Your

6      Honor.

7              THE COURT:  Conversation, not accusation.

8              MR. BROGDON:  But we did get a mountain of exhibits, Your

9      Honor.  So --

10             THE COURT:  All right.

11             MR. MACE:  We have mentioned a few additional limiting

12     instructions in the last couple of days, so there may be some

13     additions to it.  But I think there's about ten that have been

14     submitted, most by agreement, but some that we've given you --

15             THE COURT:  And I will resolve those before we start.

16             MR. PAPANTONIO:  My thoughts are three quarters of that

17     document we'll have to redact.  So we just have to have time to do

18     that.

19             THE COURT:  That will be fine.  We'll hold on this one.

20             MS. NIEHAUS:  Let me just ask:  Penny, did you get that

21     e-mail that I sent this?

22             THE LAW CLERK:  Yes.  He was referring to the new ones

23     that he had been talking about yesterday and today, the new

24     limiting instructions that the parties have an opinion on.

25             MS. NIEHAUS:  Okay.  I just wanted to make sure it was

463

1    received.

2            THE LAW CLERK:  Thank you, yes.

3            THE COURT:  All right.  Let's go to 200.  And this is a

4    letter from DuPont Safety Health and Environmental Manager to the,

5    it looks like, Ohio Division of Drinking and Groundwater.

6            MR. PAULOS:  And plaintiff is going to withdraw his

7    objections to this document.

8            THE COURT:  That will come in without objection.

9            Then we get to 209.

10           MR. PAULOS:  Yes, Your Honor, this is a document we think

11   has multiple problems that make it inadmissible, specifically

12   hearsay within hearsay within hearsay that we think is incurable

13   as well as self-serving hearsay regarding the results of the

14   meeting between --

15           THE COURT:  I can give you my heads up.  I'm thinking the

16   next-to-the-last paragraph on page 2, I have some serious problem

17   with that.  What else do you see as an issue?

18           MR. MACE:  I am sorry, did you mention the last

19   paragraph?

20           MR. LEBER:  Next-to-the-last.

21           MR. PAULOS:  Well, that's -- I believe Your Honor

22   actually redacted that in the *Bartlett* trial in one of your

23   previous rulings.  So we would agree that that's a problematic

24   paragraph and should be redacted.

25           There are statements that are unverifiable to the

464

1    plaintiff, including, the same information was also presented to

2    Mr. William Packard, Manager, Lubeck Public Service District, on

3    March 23.

4         THE COURT:  I am sorry?

5         MR. PAULOS:  That's the top paragraph on page 2.

6         Also it discusses charts that were used in the

7    presentation, which are not attached to the document.  So it's

8    incomplete.  We don't know what charts were provided to these

9    people or if, in fact, they ever were.

10        THE COURT:  So you are contending this is a business

11   record, I assume?

12        MR. MACE:  Yes, Your Honor, and there will be --

13        THE COURT:  And you don't care about that

14   next-to-the-last paragraph coming out?  I'm going to order it

15   anyway, but I thought I'd ask.

16        MR. MACE:  Well, I preserve my objection because I think

17   they could open the door to this, Your Honor, in terms of I have a

18   witness testify to this with testimony, and they say, you're

19   incorrect, you're mistaken and you're lying, I am entitled to get

20   a contemporaneous document --

21        THE COURT:  Again, if something like this comes up with

22   something new at trial, you can always ask to revisit this.  So

23   that's always an option.

24        MR. MACE:  So I will preserve my objection but note you

25   are instructing us to redact it.

465

1      THE COURT:  Yes.

2      And in terms of enclosures, were those exchanged?

3      MR. LEBER:  Your Honor, we found a version of 209 with

4  attachments so we can provide those to the plaintiff.

5      MR. PAULOS:  Do you have a defense exhibit number?

6      MR. LEBER:  I'll have to check.

7      THE COURT:  Take a look at that.  If you think that needs

8  to be added, we can address that.

9      MR. PAPANTONIO:  Judge, especially the things with

10  enclosures that we weren't provided the enclosures, we'd really

11  like the time to look at those before we get a solid ruling on

12  those.  The enclosure itself could change the whole nature of the

13  document.

14      THE COURT:  All right.  I know you will do this, but make

15  sure you get this resolved at least a few days before the trial.

16      MR. PAULOS:  Certainly.  There are some other redactions

17  that we will perhaps request or question --

18      THE COURT:  With this document that I have in front of

19  me, I'd like to do these now.

20      MR. PAULOS:  All right.  I'd call the Court's attention

21  to the last paragraph on the first page, the last sentence, the

22  presence off-site of very low concentrations of C-8 in the old and

23  new Lubeck Public Service District Wells was also communicated to

24  the regulatory agencies.

25      Again, that's hearsay within hearsay that we are unable

466

1    to cross-examine a witness on as to whether that did in fact occur

2    at this meeting, and it's a completely self serving statement to

3    DuPont.

4          MR. MACE:  Your Honor, I believe it's covered by the

5    business records rule.

6          MR. PAULOS:  That statement itself is not.  The document

7    is, but that statement contained in the document is not in a

8    business record.

9          MR. BROGDON:  I don't think it's relaying a statement of

10   anyone else.  It's a statement made in the document itself

11   directly.

12         MR. PAULOS:  It's talking about a statement that was made

13   to Lubeck.

14         THE COURT:  I get the issue.  It's whether --

15         MR. MACE:  It's just making a record of what happened at

16   the meeting, Your Honor.

17         THE COURT:  Right.

18         MR. MACE:  It's not a hearsay statement.  I mean that's

19   the difference between the second -- the paragraph you have

20   stricken that says, well received by the regulatory agency.

21         THE COURT:  I get it.  But this is laying right on the

22   edge.  If it's a matter of what happened at the meeting, but this

23   also is talking about what happened outside of the meeting.  So I

24   don't think --

25         MR. MACE:  Well, it is at the meeting.

467

1          THE COURT:  Here's what we're going to do.  We're going

2     to take out very low -- the very low language of this saying that

3     -- take out the unfair prejudice by saying, the presence of

4     off-site concentrations of C-8 were communicated.  So the very low

5     is coming out.  Anybody who has personal knowledge of that, they

6     can certainly testify to it.

7          All right.  That takes us over to 213.  This is a letter

8     from DuPont senior counsel to someone at GE Plastics.  What's the

9     issue here?

10          MR. PAULOS:  Your Honor, we believe that this is -- this

11     has not been properly authenticated.  Again, there is no evidence

12     to suggest that it was indeed sent and received.  It references

13     the documents and e-mails that are not attached.  And it is

14     missing its attachments.

15          THE COURT:  All right.  The response?

16          MR. MACE:  It's a business record, Your Honor, in terms

17     of whether attachments are --

18          MR. LEBER:  We can provide those to the plaintiff.  We

19     have the attachments to 213.

20          THE COURT:  So the attachments, you'll take a look at and

21     see if that changes anything.  Otherwise, I am going to admit it

22     as a regular business record.

23          All right.  237.

24          MR. MACE:  This is similar to the one we just addressed,

25     Your Honor.  It was used in the last trial.  It depends on what

468

1    they do with this whole consent decree with EPA regarding TSCA and

2    how far they open the door to these things.

3         THE COURT:  If you have any problem, we'll hold on

4    this --

5         MR. PAPANTONIO:  Judge, can I --

6         THE COURT:  We'll see where the testimony goes.  And if

7    you intend to use it, we'll have a side-bar before you do.

8         MR. MACE:  That's fine, Your Honor.  I think that's

9    right.

10        MR. PAPANTONIO:  Judge, he's -- Mr. Mace has raised this

11   a couple times; and since I'll be doing most of this, I think it

12   would be very helpful for me to understand what he perceives as

13   raising this issue or opening the door because the last time in

14   trial, that was what we heard again and again.  And I think it's

15   helpful -- I'm not -- I am trying to think why I would ever open

16   the door to the EPA -- or whether or not the EPA consent decree

17   should be retried in this case.  I simply -- I'm not going to do

18   it.  But I keep hearing that.  And if there's something specific,

19   I would like to know about because I think it will save the Court

20   much time.

21        If you're saying to me, don't do this.  If you do, I am

22   going to do -- If you do A, I'm going to do B, that would spend a

23   lot of time with the Court having to come down from the -- the

24   judge having to come down from the bench and --

25        THE COURT:  I'll tell you, my preference.  Again, I want

469

1    the jury to know exactly what happened.  There is a consent

2    decree, and there was a complaint filed.  But there was settlement

3    in between.  So we have all three steps that are important to a

4    full understanding of what happened.  DuPont didn't agree, but the

5    EPA didn't make the accusations.  The consent decree then says

6    what it says.

7             MR. PAPANTONIO:  Right, and that we dealt with in a

8    limiting instruction.  And I don't -- But I keep hearing this, if

9    they open the door.  I mean the simplicity of this presentation is

10   overwhelming.

11            MR. MACE:  Your Honor, you will see there is a dispute

12   between the parties on the limiting instruction because you know I

13   wasn't happy with it the last time, but we've tried to present it

14   more clearly present this time what we think the issues were.  And

15   if you want --

16            THE COURT:  Do you have a copy with you?

17            MR. MACE:  I do have a copy because part of one of our

18   objections on the limiting instruction as currently worded is that

19   it's using language that is not in the consent decree.

20            MR. PAPANTONIO:  Well, that gets at the issue --

21            THE COURT:  Do you have a copy of the proposed --

22            MR. MACE:  Oh, the limiters?

23            THE COURT:  Of the limiters.  That would be helpful if

24   you have a copy of that by chance.

25            MS. NIEHAUS:  I do.  I'm going to warn you that it's

1    imprinted out funny on my copy because some of top cut off the

2    letterhead. But I'm happy to share it.

3              THE COURT: Mr. Leber admitted that sort of language is

4    on there.

5              MR. PAPANTONIO: So this, judge, does identify the

6    problem here. And if we can clean up the limiting instruction,

7    I'm fine with it. But this idea that some word is going to be

8    spoken that, all of the sudden, is going to open up all this

9    information, it is just not the case.

10             MR. MACE: Well, part of the issue, Your Honor --

11             MR. BILOTT: Just for clarification, is the judge being

12   handed the --

13             THE COURT: The two versions are here. They are both

14   here.

15             MR. MACE: Part of the issue, Your Honor --

16             THE COURT: Give me one second to skim this. I don't

17   want to pretend I'm listening to you when I'm not. We'll see.

18             Well, you're not as far apart on this. There's a gulf

19   here but not that wide. I am going to blend these two together.

20   But substantively, they say the same thing. It's just really a

21   matter of emphasis, how much detail would get into the complaint.

22   I'll take a good hard look at it. But it still leaves us where we

23   are in terms of opening the door and so on.

24             What I suggest is -- well, unless you're prepared to --

25             MR. MACE: We are. I don't think we've got chapter and

471

1    verse as to how he's going to do it.  But clearly he did it in the

2    last trial repeatedly, both he and his experts.

3            MR. PAPANTONIO:  Your Honor, I have been doing this for

4    35 years.  I know when I open the door.  I will be conscious of

5    that.

6            THE COURT:  What we will do, if anybody claims we have

7    reached this point, we'll have a side-bar before anything changes

8    on these preliminary rulings on evidence.

9            MR. MACE:  Yes, sir.

10           THE COURT:  All right.  So that take us to 250, which is

11   a transcript of a meeting.

12           MR. O'BRIEN:  Right.  This is an unsworn meeting

13   transcript, and I agree that it can be used for impeachment and

14   perhaps for purposes of eliciting it.  So in impeaching

15   Mr. Griffin, if they call Mr. Griffin, Mr. Hartten or Mr. Bossert

16   if they call these gentlemen.  But we can't send this back to the

17   jury with this statement that is unsworn.

18           THE COURT:  Is that how you intend to use this?

19           MR. MACE:  That's primarily the use.  I notice, by the

20   way, Your Honor, it's listed on the Plaintiff's Exhibit list as

21   well as P1.2257.

22           THE COURT:  So potential cross-examination --

23           MR. O'BRIEN:  Right.

24           THE COURT:  -- and impeachment material, but that will be

25   all at this point.

472

1          So that takes us to 250.

2          MR. PAULOS:  I think that was 250.

3          THE COURT:  You're right.  295.

4          MR. MACE:  Finally got ahead of you.

5          MR. O'BRIEN:  Just so I'm clear on this, now --

6          THE COURT:  Which one are you talking about?

7          MR. O'BRIEN:  I'm sorry, on D.250, when I say -- I'm

8    talking about cross-examination of the declarants, not

9    cross-examination for all purposes.  So it's cross-examination of

10   the declarants --

11         THE COURT:  That's what I'm assuming --

12         MR. O'BRIEN:  Right.

13         THE COURT:  -- unless there's something that I am

14   missing.  But we'll have to take that as it goes.

15         And 280.

16         MR. PAULOS:  Yes, Your Honor.  This is another letter

17   that is missing the attachments that are discussed in the body of

18   the letter.

19         THE COURT:  All right.  So you probably don't have those

20   with you, but do you have the attachments?

21         MR. LEBER:  We do, Your Honor.  We will provide those.

22         THE COURT:  So beyond that is there -- Are you going to

23   -- You can reserve the final objection once you see the exhibits.

24   But beyond that, is there anything in this document that we need

25   to address now?

473

1    MR. PAULOS:  That was the predominant objection, to

2  discussing work history with individuals.

3    THE COURT:  If there's no issue with the attachments, I'm

4  going to admit it, but I'll let you take a look at the attachments

5  first.

6    MR. PAULOS:  Thank you, Your Honor.

7    THE COURT:  And then we go to 295.  This was admitted

8  with some redactions last time.

9    MR. PAULOS:  That's correct, Your Honor.  Again, this is

10  -- This is a letter from DuPont to William Packard, the manager of

11  the Lubeck Public Service District.  There's no indication that it

12  was actually received by Lubeck.  It's got hearsay, multiple

13  levels of hearsay, self-serving hearsay attachments that some are

14  included.

15    It also says on the bottom right-hand corner of the first

16  page, it says, letter to GE Plastics Document 4, suggesting that

17  this is a partial or a segment of a larger document --

18    THE COURT:  Refresh my memory, though.  The Lubeck Public

19  Service District had some wells.  And didn't ultimately DuPont buy

20  them?

21    MR. PAULOS:  That's correct, Your Honor.

22    THE COURT:  This letter would just indicate they're

23  talking, right?

24    MR. PAULOS:  That's what this letter alleges.

25    THE COURT:  What do you see in here that you think ought

474

1    to be excluded?  Because, otherwise, the fact of the negotiations

2    and the purchase, that's not going to be in dispute.

3        MR. PAULOS:  Well, in the second paragraph it says, we

4    wish to point out that Jim Cox, the former Lubeck Public Service

5    District Manager, made the initial contact late in 1986 to offer

6    to sell the wells to DuPont.

7        We believe that is hearsay and should be excluded.

8        THE COURT:  How do you feel about that, if it makes any

9    difference?

10       MR. MACE:  Well, Your Honor, it's a business record.  It

11   does have all the attachments.  So on this specific point -- I

12   mean that's a fact.

13       MR. LEBER:  Your Honor, it's also an ancient document,

14   1989.

15       THE COURT:  What's -- I want to make sure if I am missing

16   something.  What does that do either way?

17       MR. PAULOS:  Well, Your Honor, I would like to point out

18   to the Court that this was redacted for *Bartlett.*

19       THE COURT:  That line?

20       MR. PAULOS:  The hearsay statements that were contained

21   in this document were ordered to be redacted by the Court.

22       MR. MACE:  I think that was for purposes of opening

23   statement, and we never revisited it.  I mean there were some

24   things we did because we were on the fly right the afternoon

25   before opening, but we do not think it should be redacted.

475

1       MR. PAPANTONIO:  Judge, to make it easy, with the

2   redactions, we don't have objections on this if it comes in.  But

3   the hearsay issues have always been the type of self-serving

4   material they want to get into the documents consistently, and

5   this is one example.

6       THE COURT:  But this leads up to a deal between DuPont

7   and the Lubeck Public System -- Public Service District.  Again,

8   if I'm missing something, tell me.  Who's initiated the contact?

9   Or it doesn't make any difference, does it?

10      MR. PAULOS:  Well, Your Honor, we think it's self-serving

11  hearsay for DuPont to lay out -- or to create a document they

12  simply put in their files.  They can't prove it was ever sent or

13  received by DuPont.

14      THE COURT:  Is it your contention that DuPont initiated

15  this?

16      MR. PAULOS:  Initiated the contact with the Lubeck Public

17  Service --

18      THE COURT:  To make the purchase of the wells?

19      MR. PAULOS:  No, I don't have any information to suggest

20  that's what --

21      THE COURT:  I don't see any harm here.  I'm not going to

22  redact it.  If I saw any, I would spend more time with it; but it

23  will come in as is.

24      So on to 301.  It looks like minutes of a Health Advisory

25  Board Meeting.

476

1          MR. MACE:  Yes, sir.

2          THE COURT:  What's the issue here?

3          MR. PAULOS:  Your Honor, it basically is an out-of-court

4   statement by Chad Holliday, DuPont's CEO.  We think it's hearsay,

5   self-serving hearsay, and it should be excluded on those grounds

6   alone.  It doesn't appear to be a business document.

7          MR. MACE:  Well, it's a business record.  We are going to

8   use this with a witness that was at that meeting, Your Honor.

9          MR. O'BRIEN:  The problem is, Your Honor, it's like

10  sending an expert report back to the jury.  It's testimony back in

11  the jury box.

12         THE COURT:  Here's what I recommend.  Sometimes I think

13  we stretch a little bit here.  If you've got a witness who can go

14  through all this independent of the document, you don't get to

15  have them testify and get the document back summarizing what their

16  actual in-court testimony is going to be.  So why don't we leave

17  it for that first.  If the witness has a good recall of the

18  meeting and it's something they can testify to, do you really need

19  this?

20         MR. MACE:  Well, I guess, again, it would depend on what

21  they try to do with that witness on cross-examination and whether

22  we need to prove up that that did in fact happen with the

23  contemporaneous documents.

24         THE COURT:  I'll put it in that category of redirect or

25  rehabilitation.  But I think we will just put that on hold, and

477

1     we'll see how the cross goes.  So I am not excluding it yet, but
2     I'm not admitting it yet.
3               All right.  Exhibit 334.
4               Basically this last document tracks the principles that
5     we have in a couple other exhibits, right?
6               MR. MACE:  Well, to some degree, Your Honor.  To some
7     degree.
8               THE COURT:  Then we get to 334.
9               MR. PAULOS:  Yes, Your Honor, this is a letter to
10    Mr. Bilott that we believe your ruling from the motion *in limine*
11    hearing would exclude it.
12              MR. MACE:  Well, Your Honor, what we heard your ruling to
13    be is that we need to redact Mr. Bilott's name and leave the Taft
14    name --
15              THE COURT:  That's the short end of this.  Now this is a
16    point by point -- Well, it says -- This is a response to
17    Mr. Bilott.
18              MR. MACE:  Well, we can go through and wherever his name
19    is --
20              THE COURT:  That point is easy.  We can take care of that
21    without a whole lot -- In other words, what's left is a letter to
22    the Taft, Stettinius & Hollister firm, but there's more than that.
23    So that's the objection.
24              MR. PAULOS:  That's correct.  It's hearsay.  We don't
25    believe it fits any exception to the hearsay rule --

478

1          THE COURT:  So it's from the director of the Ohio EPA.

2     Is that a record or statement of a public office?

3          MR. PAULOS:  Well, it's a letter to Mr. Bilott from the

4     director.  This doesn't appear to be a report or does not appear

5     to be published anywhere publicly.

6          THE COURT:  You know, we were all kidding about the

7     ancient document rule.  I think 803(8) needs some serious review.

8     But it says a record or statement.

9          MR. O'BRIEN:  Well, keep in mind the Ohio EPA and the CAT

10    Team were just an observer.  They were not an active participant

11    as was the WV DEP.  So they are a third-party observer to the CAT

12    Team report.  So it's nothing they have undertaken.  It's just

13    their local rank opinion about what the CAT Team did.

14         MR. MACE:  That's a total incomplete statement, Your

15    Honor.

16         THE COURT:  But I don't think their -- I want to get to

17    the rule.  So the record or statement has to set out the office's

18    activities -- and these are all the -- they are connected by an

19    "or" -- or a matter observed while under a legal duty to report.

20    It excludes any criminal matters.

21         Isn't that part of the office's activities?

22         MR. O'BRIEN:  But --

23         THE COURT:  It doesn't mean that they had to have done

24    anything.

25         MR. O'BRIEN:  It goes beyond that, it goes beyond what

479

1    they did, to:  Here's what we think.  Here's our opinion in

2    response to a letter written by you, Mr. Bilott.  And it's not

3    being generated for the public.  It's not.  It's being generated

4    for a very limited purpose.  It's not fulfilling the obligation of

5    the agency's office under 803(8).  Instead, it's simply --

6            THE COURT:  Well, the trouble is one -- I mean there's --

7    One of these parts, it says there has to be a legal duty to

8    report.  But it's connected by an "or."

9            MR. O'BRIEN:  Right.

10           THE COURT:  The other part is the office activities.  And

11   this would be an activity of the EPA, wouldn't it?

12           MR. O'BRIEN:  Not of the Ohio EPA.  This is an

13   observation.  This is basically like they went and watched a

14   movie.  And they said, hey, this movie --

15           THE COURT:  They still have to report --

16           MR. O'BRIEN:  -- we thought it was a good movie.

17           THE COURT:  -- outlining their activities.  The letter

18   could say, we went to the movies today.  That could be an activity

19   arguably.

20           MR. MACE:  Well, the fact that the Ohio EPA did -- When

21   they got letters from Taft challenging the CATT report, because

22   we're going to come to another one that Your Honor let into the

23   last trial as well --

24           THE COURT:  But the other problem is the Ohio River

25   touches both states.

480

1        MR. O'BRIEN:  But I believe that it -- I may be wrong,

2    maybe it's just Florida's version of the public records -- but

3    isn't it imposed upon, a duty imposed upon, by law?  They had no

4    obligation.  They had no regulatory requirement, per Mr. Stewart's

5    deposition.  Mr. Stewart said Ohio EPA had no regulatory purview

6    over Washington Works.

7        MR. MACE:  That's because the air emissions came over

8    into Ohio.  The Ohio EPA did get involved, fully involved --

9        MR. BROGDON:  That's a separate subsection, Your Honor.

10   The legal duty is a separate subsection.

11       THE COURT:  This is a fairly important document.  So I

12   don't know -- I know you have better things to do --

13       MR. PAPANTONIO:  We do.

14       THE COURT:  -- but a quick brief on this, if you don't

15   mind?  I don't think we need time for a reply, do we?  So why

16   don't we have simultaneous filings -- This is Wednesday.  How

17   about Monday?

18       MR. MACE:  By which day, Your Honor?

19       THE COURT:  Monday.

20       MR. PAPANTONIO:  We can do -- One thing that makes this

21   particularly interesting is DuPont -- Ohio had no concept of what

22   the CAT Team is about.  If they brought an Ohio representative

23   from right down the road to come testify about this, the

24   cross-examination would be clear.  It would be:  You didn't know

25   Staats, what she did with the CAT Team.  You didn't know TERA.

481

1   You didn't know what she had actually been paid.  All these are

2   critical --

3            MR. MACE:  And those are complete misrepresentations of

4   what Ohio did because they were very actively involved in looking

5   into the allegations that were being made and trying to protect

6   the citizens of Ohio.  These were all activities stated by a

7   public office.

8            THE COURT:  I am going to inject some Ohio history.  Who

9   owns the Ohio River?  Is it Ohio or West Virginia?

10           MR. MACE:  The line is pretty close to the Ohio side of

11  the river.

12           THE COURT:  Essentially the water side is all West

13  Virginia.  Do you want to know why?

14           MR. MACE:  Not Aaron Burr, is it?

15           THE COURT:  West Virginia was the state first, and they

16  owned the river.  When Ohio was created as a separate state, the

17  river was already gone.  So if you are going to go fishing when

18  you're doing these trials in Wheeling, make sure you have a West

19  Virginia license, not an Ohio license.

20           All right.  613.  This is the CAT Team report.

21           MR. PAULOS:  Correct, Your Honor, this is the final CAT

22  Team report.  We believe this requires a limiting instruction and

23  also should not be going back to the jury under 803(18).

24           MR. MACE:  Well, Your Honor, we don't mind the limiting

25  instruction --

482

1          THE COURT:  The limiting instruction --

2          MR. MACE:  -- but when it was used, it was admitted in

3     the last case.  It went back to the jury is my memory.

4          MR. LEBER:  It goes to notice, Your Honor,

5     reasonableness, conduct.

6          MR. PAULOS:  So does every 803(18) treatise ever cited.

7     It doesn't mean it goes back to the jury.  This is essentially an

8     undisclosed expert record, attack on general causation, as you

9     know, as corrected by a limiting instruction.

10          THE COURT:  Yes.

11          MR. O'BRIEN:  It's something that's beyond the ken of the

12     jury, and that's why it's treated, if at all, under 803 as opposed

13     to a substantive exhibit which goes back.

14          MR. MACE:  Your Honor, it's the facts regarding what

15     happened, what the activity of this committee was at the time.  It

16     also rebuts their arguments that certain information wasn't

17     available.  It has the notes from the committee and what their

18     deliberations were, and it goes through chapter and verse to rebut

19     these spurious allegations they're making.

20          THE COURT:  It's different than the learned treatise's

21     rule, the treatment of the science articles, because this is about

22     matters we're dealing with in this case.  The other articles

23     wouldn't be like that.

24          But it is not self evident to the jurors when they read

25     this.  That's always my concern.

483

1          MR. PAPANTONIO:  Judge, here's the problem with that

2     document.  No limiting instruction overcomes that document being

3     back there when one juror says, read this paragraph, and it looks

4     like a causation issue.  It looks like they are struggling with

5     causation.

6          THE COURT:  I'm going to hold on this.  I'm going to

7     think about it.

8          MR. MACE:  Your Honor, you are holding whether it goes to

9     the jury --

10         THE COURT:  Right --

11         MR. MACE:  -- not on whether it can be used.

12         THE COURT:  -- not as to testimony or admissibility.

13    It's all going to be about whether it goes back to the jury or

14    not.

15         And then this is -- it is probably a little bit similar.

16    You may want to wrap this into the briefing we're going to do with

17    the next document, 614, is an inter-office communication also

18    involving the Ohio EPA.  It seems to me that would encompass what

19    we just talked about, isn't it?

20         MR. MACE:  Well, it was submitted in the last trial, Your

21    Honor.  You will recall we actually gave you a copy -- actually

22    gave you the original of the affidavit from the EPA saying that

23    this was a true and accurate copy of the record within.  We met

24    all the elements for admissibility.

25         MR. PAULOS:  Actually, all this did was lay the

484

1    foundation for authentication.  It did not clear up the hearsay

2    issue, which this is internal documents --

3         THE COURT:  You're going to brief this issue and this

4    document, too.  I don't think it's going to change the analysis,

5    but it's going to be the same analysis as both.

6         Then we get to 615.  This is a letter from Mr. Bilott.

7    We'll take his name out and leave Taft, Stettinius & Hollister.

8         MR. MACE:  This was admitted in the last trial, Your

9    Honor.

10        THE COURT:  What's the issue here?

11        MR. PAULOS:  Again, Your Honor, it's -- we think it

12   contains hearsay statements and also contains Mr. Bilott's name,

13   is a letter directly to Mr. Bilott.

14        MR. MACE:  Your Honor, this was one that we have already

15   agreed under Your Honor's ruling we will take Mr. Bilott's name

16   off.  Look at the CC's.  You will see this went to Ms. Heather

17   Jones, who was another counsel representing DuPont.  So this is

18   notice and knowledge to DuPont and the fact that EPA -- I'm sorry,

19   West Virginia DEP was standing behind the CATT report, was not

20   making -- buying into the allegations being made, that this was

21   somehow rigged or a conflict-of-interest proceeding, which is one

22   of the plaintiff's main themes --

23        THE COURT:  I understand the relevance.  It's a bit

24   argumentative, but I think it stands as a public document.  This

25   issue with the Ohio EPA doesn't arise here.  This is the West

485

1    Virginia DEP, and they obviously have jurisdiction over a village

2    of West Virginia.

3         That takes us to 747.  That means his name is coming out

4    of the document as well.

5         MR. O'BRIEN:  So we're clear on this redaction of

6    Mr. Bilott's name, no argument can be made about a firm, in other

7    words, and Mr. Bilott's firm received this letter.

8         THE COURT:  Yes.  What I am trying to do is, consistent

9    with the motion *in limine,* to avoid any sort of connection that

10   was objected to in the motion.  So the name comes off, but the

11   letters still comes in, unless there's some other issue with it.

12        MR. O'BRIEN:  No argument can be made to link up, oh,

13   that's Mr. Bilott firm, and he's sitting right there at counsel's

14   table and he knows this.

15        THE COURT:  Actually, you're not planning on doing that,

16   are you?

17        MR. MACE:  Only if the plaintiffs open the door to it,

18   Your Honor.

19        THE COURT:  Well, that means to me the answer is no,

20   unless there's a side-bar or in advance of a jury discussion

21   before anybody does that.  So I'm always satisfied with that.

22        All right.  747.

23        MR. O'BRIEN:  Again, Your Honor, this is an incomplete

24   document.  It also has a redaction that -- it redacts information

25   that DuPont in the letter itself says is relevant for notice to

486

1    public entities.  So if anything, we would certainly like to see

2    an un-redacted version of this document to determine its

3    relevance.

4         MR. MACE:  This is one, Your Honor, these issues were

5    discussed, although I don't think it was offered to go back to the

6    jury, it was used in the *Bartlett*, an ancient document, a business

7    record, sent certified mail.

8         THE COURT:  Well, I don't think that's the issue with the

9    exhibit.  The issue is the exhibit's redaction.

10        MR. PAULOS:  The issue is there is no proof that it was

11   actual was, if somebody typed "sent by certified mail" at the top

12   doesn't mean it actually was put in the mail and was received by

13   the person that it was addressed to.

14        THE COURT:  I would be more focused, I would want to see

15   the redaction before I make -- It's going to come in unless

16   there's some redaction that you would like to address after you've

17   seen the redaction.

18        MR. BILOTT:  Your Honor, this is an issue that came up in

19   the *Bartlett* case, and I think it is the same issue here, and that

20   is this is not the complete attachment.  And I believe that the

21   Court had said that DuPont needed to attach a complete document

22   that actually was attached to this letter if they wanted to use

23   the letter, and that never happened in the *Bartlett* case.  And

24   that's the same document being presented again without the further

25   attachment.

487

1        MR. MACE:  What your Honor's actually ruling was was that

2    as long as we did not misrepresent, since things are displayed

3    electronically anyway, as long we make clear any later part of the

4    document, and we didn't misrepresent that it was only a two-page

5    document.

6        THE COURT:  Right.  But I don't remember -- Have not seen

7    -- They've seen the attachments?

8        MR. MACE:  This one may be that this is the only version

9    that exists now 25 years later.

10        MR. BROGDON:  Your Honor, we dealt with exhibits, I

11    believe it was 1943 and 1937 the last time.  I think that's what

12    Mr. Bilott is referring to.  I don't know if it's the same one,

13    but if it isn't, we can take a look and see that has been handled

14    already.

15        THE COURT:  Find out as much as you can about this

16    document.

17        MR. BROGDON:  We produced something the last time in

18    *Bartlett*.  I'm satisfied we can do the same thing this time.

19        MR. BILOTT:  The concern, Your Honor, was that this makes

20    it appear as if this information was highlighted to the agency,

21    when, in fact, this was within a very big document.

22        THE COURT:  I agree with that issue.

23        MR. BROGDON:  We gave them a more fulsome version that

24    satisfied them the last time.  We can do it again.

25        THE COURT:  I would recommend -- you know, I'm just

488

1    suggesting this, not ordering, this is a 100-page document.  The

2    jury knows that.  I want them to know that.  But whether you need

3    to attach all 100 pages or not, I will leave that up to your

4    judgment.  That may be overkill.

5         All right.  So that one, until you have seen the

6    attachments, we're going to hold on that.  That's 749.

7         750.

8         MR. BILOTT:  I believe that was 747, Your Honor.

9         THE COURT:  I am trying to just stay ahead of you here.

10   747.

11        MR. PAULOS:  Your Honor, I believe this is hearsay.

12   There's no evidence that this was in DuPont's possession.  This is

13   a letter from Amy Swann from the Public Service Commission in West

14   Virginia to --

15        THE COURT:  Wait a minute.  Am I on the right --

16        MR. MACE:  That's 749.

17        THE COURT:  Now I'm on 749.

18        MR. PAULOS:  It's a letter from a DuPont employee to a

19   non-DuPont employee.  It's not -- There's no indication that this

20   was ever in DuPont's possession.  And there's, again, no evidence

21   that this was actually sent, received.  There is no witness that

22   we can ask to authenticate this or to examine as to the contents.

23        MR. O'BRIEN:  And it's incomplete.

24        MR. LEBER:  Your Honor, this is an ancient document.  It

25   shows that DuPont was communicating with the government regarding

489

1    C-8.

2        MR. PAULOS:  Your Honor, the letter also references to

3    test results that aren't appended to this document.

4        MR. PAPANTONIO:  That aside, judge, this is a document

5    floating out somewhere.  That -- The idea of issues like what are

6    we talking about, state of the art, what we're talking about is

7    historical narratives, whatever, there has to be some connection

8    up to have this arbitrary document floating around and say, well,

9    gee, we want to use this document because it's ancient now we're

10   in trial in 2016, that's not -- That is not the spirit of --

11       THE COURT:  Let me ask you this.  If this had with it a

12   seal of a record keeper, does that allay the issue?

13       MR. PAPANTONIO:  I don't think that this fixes it either,

14   judge.  This is not something that -- This is merely a

15   conversation between -- an arbitrary conversation.

16       MR. O'BRIEN:  Your Honor, the other issue --

17       THE COURT:  Whether DuPont had it.

18       MR. O'BRIEN:  Right.  The other issue is Mr. Stewart, who

19   was the environmental controller at DuPont, actually during this

20   time frame, he testified in his deposition that C-8 was not

21   regulated as a VOC, which is a volatile organic compound.

22       This document, I don't see C-8 anywhere on it.  They talk

23   about VOCs.  And what they want to get to is the second page, that

24   very first line reads, in view of the fact that there is no known

25   health hazard --

490

1        THE COURT:  Let's go back.  Does VOC include C-8?

2        MR. O'BRIEN:  No, it should include per Stewart because I

3    asked him that question about VOCs.

4        THE COURT:  Let's stay with that limited issue.  There

5    are several issues here.

6        MR. MACE:  The fact is that C-8 is a VOC.  It's not very

7    volatile, but it is a VOC.  But more importantly it does refer to

8    FC-143 in the last paragraph, which is C-8.

9        THE COURT:  Let me back up.  So there's some -- one or

10   two easy issues, and then they get harder.  The first is -- I

11   guess the blunt question is how does -- If this were in DuPont's

12   file and they had notice of this letter, that would go to their

13   historical knowledge.  But it doesn't sound to me that you can say

14   that on DuPont's side.

15       MR. MACE:  I can't say that sitting here.

16       THE COURT:  All right.  So then the second question would

17   be:  Is it a public record and --

18       MR. MACE:  Which the Lubeck Public Service District is a

19   state entity.  Unlike Little Hocking, which is a separate,

20   incorporated company, this is a --

21       THE COURT:  So this is guarantied by a record keeper or

22   at least get it under seal of the public body.  I assume you can

23   do that.  That solves that issue.

24       Then the question becomes:  What's the relevance?

25       MR. MACE:  Although we say, Your Honor, because it's on

491

1    the letterhead of the organization, it's self authenticating

2    because of the letterhead and it has got the right people on it,

3    there's no genuine issue raised --

4        MR. O'BRIEN:  It does because --

5        MR. MACE:  I'm still speaking, counsel.  Ancient document

6    takes care of both.

7        THE COURT:  A letter and a seal does makes it nice and

8    clear.  That issue is fixable.  That's not really the question.

9    The question is relevance.

10       MR. O'BRIEN:  Right, relevance and how do you link it up?

11       THE COURT:  I'm talking about authentication.  Now

12   relevance.

13       MR. O'BRIEN:  The relevance is what is it?  It's a

14   conversation between two people.  It was never in the public's

15   sphere.  It was never in the ken or the knowledge of DuPont.  So

16   how is it relevant?  Particularly since it contains opinion

17   testimony -- or opinion statements.

18       MR. MACE:  It rebuts the allegation claim being made by

19   plaintiff's counsel and their experts that DuPont did not have any

20   contact with the government entities or the water suppliers, never

21   told them anything.  Here's a contemporaneous document that comes

22   up in June of '89.  There were such disclosures.

23       MR. O'BRIEN:  But the problem is in this document,

24   they're referring to documents that is not in this document.

25       THE COURT:  Let me back up.  So I think there's a bit of

1    stretch here.  This is not a document from a DuPont file.  It is

2    not addressed to DuPont.  I'm going to assume -- For example,

3    there are attachments that the letter said they were received from

4    DuPont.  That's an easy way to get at what DuPont sent to them,

5    rather than to a document that they didn't receive, didn't author

6    and didn't have in their files.

7            MR. PAPANTONIO:  Judge, there are just -- This is a class

8    of documents that they want to get in.  It's broader than this

9    one.  It is to suggest that they can simply grab a document that

10   has somehow surfaced in history and say, we move that in --

11           THE COURT:  I'm taking a broad view about the historical

12   knowledge of DuPont.  That -- we have already dealt with that.

13   But that isn't in that category.  At this point I am going to

14   exclude this document.  I also want to know this is not the same

15   water district that the plaintiff is involved with either.  So,

16   again, if DuPont had been CC'd on that, I would probably have a

17   different view.

18           All right.  Now we are to 750.

19           MR. PAULOS:  Yes, Your Honor, this is another internal

20   memorandum from DuPont that summarizes meetings that they've had

21   with regulators and contains basically a summary of hearsay

22   statements that were made to the regulators.

23           If you look at page 2 and 3, you'll see that there's

24   statements attributed to a gentleman named Chaney and McCoy and

25   other members that were alleged to have been at this meeting

493

1    between WV DNR and DuPont, and it summarizes statements that were

2    made at that meeting, and that makes this hearsay within hearsay.

3    And there's no witness that we will be able to examine as to the

4    accuracy of DuPont's reflections in this document.

5         MR. MACE:  Your Honor, it's a business record.  It's also

6    -- It was admitted in the *Bartlett* trial without any redactions.

7         THE COURT:  Well, let's start with it's a summary of a

8    meeting.  I would start with the idea that that is a business

9    record.

10        But the real question is whether there's hearsay within

11   hearsay.  The first hearsay is the exception for a business

12   record.  And do you want to point to me what your contention is

13   the hearsay within the hearsay is saying?

14        MR. PAULOS:  Well, there's, first of all, there are

15   self-serving statements in here.  First of all, the first page at

16   the bottom, we felt that the technical data presented was strong

17   enough that Dr. McCoy is considering re-evaluation of the WRS

18   position on the Letart Landfill and that a five year permit is

19   possible for the facility.

20        And is rank speculation about what a non-DuPont employee

21   may or may not be thinking.

22        Look at page 2, top paragraph, it says, our long history

23   of complying with surface water and solid waste regulations and

24   making timely permit applications and modifications was

25   recognized.

1       By who?  And how was it recognized?  The recognition

2    itself is hearsay.

3       They also state that they derived comfort -- some comfort

4    from this.  Again, speculation as to what other people are feeling

5    or how they reacted to the representation.

6       It also references MSDS sheets for Teflon and FC-143 were

7    reviewed in detail.  This is not appended to this, and we have no

8    opportunity to determine what MSDS sheets or complete MSDS sheets

9    were presented.

10       Further on down in the last paragraph it says, the WV-DNR

11    representatives agreed that treatment was not necessary.  That is

12    hearsay.  It's not curable.

13       THE COURT:  Where is that?

14       MR. PAULOS:  This is the last paragraph on page 2.  The

15    WV-DNR representatives agreed that treatment was not necessary.

16    One ppm FC-143 was not an issue.  One ppm is equivalent to

17    discharge of about 140 ppy FC-143 from the sedimentation basin to

18    the Ohio River.

19       THE COURT:  All right.

20       MR. MACE:  Your Honor, this is a classic business record

21    reporting a meeting that was conducted between DuPont and these

22    representatives of a public agency.  It's an ancient document as

23    well.  It's reporting on what happened at the meeting.

24       THE COURT:  Well --

25       MR. MACE:  It came in in *Bartlett* without any redactions.

495

1          THE COURT:  Here's my view.  It starts with this is a

2     business record.  In addition, it's an ancient document.  But that

3     gets by the first of several gates here.

4          Within that, I think we all understand from evidence

5     class that some of this within this to say, and then she told me

6     X.  That's hearsay within hearsay.  That's going to be out.

7          There are actually several of these, and there are a

8     couple of opinions in here that need to come out.  The first page,

9     the last paragraph, is going to come out.  That's the opinion.

10    The first paragraph on the second page comes out.

11          MR. MACE:  Your Honor, the point that counsel made was to

12    "was recognized."  If we could limit the redaction to the "was

13    recognized"?

14          THE COURT:  It's all going to come out.

15          Then the last paragraph of the second page, what was said

16    by -- Now this I want to be specific on.  WV-DRN --

17          MR. MACE:  Where are you at, Your Honor?  Okay.  WV-DRN.

18          THE COURT:  Agreed that treatment was not necessary.  All

19    right.  That is probably hearsay within hearsay.  But what it also

20    is is some sort of notice to DuPont or knowledge of DuPont.  So

21    that's stays in.  That's a statement that's reported, which

22    otherwise would be hearsay.  But when it comes to the issue of

23    notice, that a different rule applies.  All right.  So that takes

24    us through 750.

25          We will go to 758.

496

1          MR. PAULOS:  Your Honor, real quickly, on page 2 of the

2     paragraph regarding MSDS sheets, the statement, all important

3     issues, including biopersistence and the accumulation of FC-143 in

4     the blood of humans were mentioned.

5          THE COURT:  Back me up for a second.  I think there are

6     several of these.  Are you back on the --

7          MR. PAULOS:  This is page 2.  It's the center --

8          MR. PAPANTONIO:  He's on the prior document.

9          MR. PAULOS:  The sixth bullet point, page 2 of 750.

10         MR. MACE:  They are describing what they did, Your Honor.

11    They are not describing what anybody else is saying.

12         THE COURT:  I think that's going to stay in.

13         MR. PAULOS:  And on page 3, there's an entire section of

14    things, Mr. Chaney contributed the following comments.  All of

15    that is hearsay within hearsay.

16         THE COURT:  He is --

17         MR. PAULOS:  On the first page, David Chaney is a permit

18    writer, a geologist.

19         THE COURT:  Department of Natural Resources.

20         MR. MACE:  We don't need that bullet point, Your Honor.

21         THE COURT:  So that will all come out.  All right.

22         MR. PAULOS:  Last -- I'm sorry, Your Honor, the last

23    bullet point on page 3, the meeting was adjourned on a friendly

24    basis with the permit writer saying, quote, when he prepared our

25    permit, unquote.  He was already thinking of the fact sheets --

497

1          MR. MACE:  We don't need that bullet point, Your Honor.

2          THE COURT:  Where was that?

3          MR. MACE:  The very last bullet before path forward.

4          THE COURT:  That's out, too.

5          MR. MACE:  Yes, sir.

6          THE COURT:  All right.  Then we get to 758, C-8

7    investigation reports.

8          MR. PAULOS:  We believe this falls under the purview of

9    your ruling or of the trade horse -- or the horse trading

10   agreement about press releases and statements about public

11   entities websites.

12         MR. MACE:  This is not a press release.  This is

13   information that's posted on the West Virginia website.  Self

14   authenticating.  It's not a press release.

15         THE COURT:  Here's the only -- Are you -- It lists

16   documents here.

17         MR. MACE:  We don't need those listed, Your Honor.

18         THE COURT:  I was afraid they would make the jury guess.

19         MR. MACE:  We don't need the documents.

20         THE COURT:  How about also consider deleting the

21   documents of the reports?

22         MR. MACE:  Yes, sir.

23         THE COURT:  So if we are -- All right.  This will have a

24   date on it, of course, right?  It's somewhere on here.

25         MR. MACE:  It's up at the upper left corner, Your Honor.

498

1    8-25-13.  Okay.  It got cut off of that one.  That's part of the

2    copying.

3              THE COURT:  Put the date in.

4              MR. MACE:  Okay.

5              THE COURT:  Otherwise, I'm inclined to admit it.  It will

6    be admitted.

7              Now we get to the Responsible Care Team.  Refresh my

8    memory what that group is.

9              MR. MACE:  Your Honor, starting in the 1990s, DuPont had

10   two different organizations that it set up.  One was the Employee

11   Responsible Care Team, where different employees of the plant met

12   with management, expressed any concern that were addressed but

13   they were separate.

14             But at the same time they had the Community Responsible

15   Care Team that had a representative of Lubeck and various other

16   community members on the team.  They are given tours of the plant.

17   They are free to raise whatever issues they wanted to, any

18   concerns they had.  Information was given to them about what was

19   going on at the plant.

20             But the relevance of this particular document is in

21   January of '00, they discussed C-8 with this Community Responsible

22   Care Team.  So this is long before Mr. Bilott ever filed the *Leach*

23   lawsuit, long before he wrote to any of the agencies.  The fact

24   that DuPont was in fact communicating with community members about

25   C-8 long before the lawsuits is highly relevant.  That's over,

499

1    Your Honor, at page .5 with the C-8 update, an update being that

2    it was discussed before.

3         THE COURT:  Well, I mean to skin this a little bit back.

4    I take this to mean that they were involved with the community as

5    far as C-8.  That's really the long and short of what this goes

6    to.

7         MR. PAPANTONIO:  We are going to withdraw our objection.

8         MR. PAULOS:  We are withdrawing our objections to 768 and

9    767.

10        THE COURT:  So the jury will hear about the turkey

11   population increasing.

12        MR. PAULOS:  We thought this was important for them to

13   know.

14        THE COURT:  All right.  That will all come in.

15        MR. BILOTT:  The lawsuit was in 1999.  It was after the

16   lawsuit.

17        THE COURT:  I actually caught that.  You're educating me

18   as we go.

19        768 this is another --

20        MR. MACE:  They withdrew that.

21        THE COURT:  -- in response to the turkey.  That's in.

22        Then we get to 852.

23        MR. PAULOS:  This, Your Honor, is a power point that was

24   prepared by Dr. Rickard for the Epidemiology Review Board.  It

25   contains multiple levels of hearsay.  It has 23 plus citations to

500

1    803(18) documents, treatises, studies that were either published,

2    not published, that were in progress.  Basically it represents

3    Dr. Rickard's cherry picked toxicology studies summarized and

4    cited.  We think if anything, if the Court is inclined to admit

5    this, it certainly should not go back to the jury.  Basically it's

6    a demonstrative exhibit for Dr. Rickard's testimony.

7            MR. O'BRIEN:  As a power point, it was --

8            THE COURT:  Well, this was back in '06.  And I assume you

9    offered this, so you're going to use this in his direct testimony.

10   Is that the plan?

11           MR. MACE:  Yes, Your Honor.  I will point out it was

12   admitted in *Bartlett*.  It's one of the plaintiff's exhibits.  It's

13   in the backup materials for Petty, Ampter and Siegel.  It's a

14   document used by the plaintiff's experts in coming up with their

15   opinions.  I do intend to use it with Dr. Rickard and potentially

16   on cross of the plaintiff's experts.

17           THE COURT:  He's going to come in and talk about the

18   history and what DuPont knew and so on.  He's going to -- Do you

19   expect him to go through every page -- pretty close to every page

20   of this?

21           MR. MACE:  Not every page, but there's -- the plaintiffs

22   are making some arguments about the Epi Review Board, not being

23   properly informed about C-8.  The fact that Dr. Rickard met with

24   the Epi Review Board and did go over the information is highly

25   relevant --

501

1          THE COURT:  I'm of the view that this -- specifically we

2     need to talk about this.  Let me give a general ruling first.  He

3     can testify to this assuming all the proper foundation is laid.

4     I'm not sure that's not going to be a problem.

5          Sending it back to the jury, are you proposing that?

6     Because my concern is this does start to feel like an expert

7     report.  And with the other experts -- He is testifying as an

8     expert, right?  He did at the last trial.

9          MR. MACE:  He's both a fact and expert.

10          THE COURT:  He's both.  This has the feel of an expert

11     report.  The jurors can see all this.  But I'm not inclined to

12     this point to send it back.

13          Anything else on this document from the plaintiff's side?

14          MR. PAULOS:  Nothing else, Your Honor.

15          THE COURT:  All right.  Let's jump over to 858.  What's

16     the issue here?

17          MR. PAULOS:  Your Honor this is -- It's an e-mail that

18     attaches two documents.  And the version that was provided to us

19     includes only one of the attachments that's sent attached to that

20     e-mail.  The attachment that is included is the Epidemiology

21     Research Plan Regarding PFOA, dated April 21, 2006, and revised on

22     April 28.

23          What is not included is the agenda for the meeting that

24     was going to discuss this particular document.  And therefore,

25     it's an incomplete version of the exhibit.

502

1          MR. MACE:  They didn't object to it on that ground, so we
2    haven't been able to investigate that yet.  But we will
3    investigate for the second attachment.
4          MR. PAPANTONIO:  Then we'll just reserve our objection
5    once we're able to --
6          THE COURT:  Until you see the attachments.  All right.
7          MR. MACE:  Again, I would note this in its current format
8    was in the expert's files of the plaintiffs.  And it was admitted
9    at the *Bartlett* trial.
10          THE COURT:  All right.  That takes us to 879.  I do note
11    with a smile you both have objected to the other objections to
12    other exhibits admitted in the last trial.  So we are kind of
13    evening this out as we go.
14          Again, I'm of the view we don't want to do this ten
15    trials into this with this many documents.  But we went through
16    one trial.  You've had a chance to take a step back and see what
17    you didn't like or want to do differently.  This is -- I assume
18    with each trial this should get a little bit narrower, the number
19    of documents, as we do this.  But now we are going through each.
20          MR. PAULOS:  Your Honor, Exhibit D.879 we are going to
21    withdraw our objections to that.
22          THE COURT:  That will come in without objection.
23          Now 886.
24          MR. PAULOS:  We are also going to withdraw our objections
25    to this document.

503

1          THE COURT:  That will come in then.

2          893.

3          MR. PAULOS:  This document is a mish-mash of two

4    documents, Your Honor.  The first two pages appear to be maybe

5    part of the same document.  They are part of the same document --

6    excuse me, the first four pages.  And then the last four pages are

7    an entirely different document.  That is an e-mail dated March 13,

8    1991.  As you'll see, it has a Dr. Playtis Bates stamp, which does

9    not match the Bates stamp, the EID Bates stamp, on the front page.

10          THE COURT:  So the first four pages you are not objecting

11    to?

12          MR. O'BRIEN:  Well, I still, as with the other one that

13    went yesterday, there was simply a graph without the referenced

14    document.

15          MR. MACE:  Let me clear this up, Your Honor, because this

16    is obviously to me a clerical issue.  My document, which is

17    supposed to be 893, is a three-page document which appears to be

18    an 893.5, 6 and 7 in the current version.  Maybe it's a four page

19    because it carries over.  But it's -- So 893 should appear as what

20    is currently being given to the Court as mistakenly as 893.5, 6, 7

21    and 8.  That's the only thing we are requesting prescreened --

22          THE COURT:  So you're offering 5, 6, 7 and 8.  Not the

23    first four pages?

24          MR. MACE:  We will renumber it as just 893.1, 2, and 3.

25          THE COURT:  All right.  So the first four pages we should

504

1    disregard.

2              MR. MACE:  Are withdrawn.

3              THE COURT:  Now we're on .5 of 893.5, 6 and 7, which will

4    become 1, 2, 3 and 4.

5              MR. MACE:  Yes, sir.

6              THE COURT:  So what do we have here?

7              MR. PAULOS:  With that correction, we will withdraw our

8    objection to what will be the new 893 exhibit, beginning with

9    893.5.

10             THE COURT:  New and improved.

11             MR. MACE:  I apologize, Your Honor.

12             THE COURT:  All right.  That's not a problem.

13             902.

14             MR. PAULOS:  Again, Your Honor, this is a document that

15   references documents that are not attached.  It also contains

16   hearsay within hearsay regarding the statements made by Bill Gibbs

17   about the LPSD wells.

18             THE COURT:  So Gibbs is -- Who is he, again?

19             MR. PAULOS:  I'm not sure who Bill Gibbs is.  That is one

20   of the problems with this document, Your Honor.  We also have

21   statements about Jim Cox from the Lubeck Public Service

22   department.

23             MR. MACE:  Your Honor, this is a business record that is

24   -- that needed the discussions or reports on between DuPont and

25   Lubeck.  Mr. Gibbs was a Lubeck employee.  That's clarified in the

505

1    second e-mail at the bottom.  It mentions that, Bill is the Lubeck

2    employee who sat in my discussion.

3         THE COURT:  Anything in here particularly harmful that

4    you want to address my attention to?

5         MR. PAULOS:  Well, Your Honor, without knowing what was

6    attached to it, we would simply want to see what was attached.

7    You will see the first --

8         MR. MACE:  We have looked for that, and there is no -- We

9    can't --

10        MR. PAULOS:  A development with respect to Lubeck water

11   system.  See attached.

12        THE COURT:  What year was this -- the wells purchased?

13        MR. MACE:  It was in that '89 time frame, Your Honor, and

14   then -- yeah.

15        THE COURT:  This is 2000, though.

16        MR. BROGDON:  Ten years later.

17        THE COURT:  So it wouldn't be -- it wouldn't be for the

18   purchase.

19        MR. MACE:  No, sir.

20        THE COURT:  So what do you see is the probative value of

21   this document?

22        MR. MACE:  Well, Your Honor, with regard to the fact that

23   Lubeck sat in on this meeting, several -- two employees, I think,

24   of Lubeck sat in on the meeting where they discussed the primate

25   study, the monkey study.  So plaintiffs have made an argument that

506

1    DuPont was hiding this monkey study --

2         THE COURT:  Let me ask you a blunt question.  You will

3    have some live testimony about the meeting itself?

4         MR. MACE:  I believe so, Your Honor.  But this is a

5    business record that was recorded contemporaneously.

6         THE COURT:  That would confirm what you want to show is

7    this would confirm that people from that water district were at

8    the meeting.

9         MR. PAPANTONIO:  From Lubeck.  This is Little Hocking.

10   That's what -- They keep coming back to Lubeck and other

11   districts --

12        MR. MACE:  But that's important, Your Honor, because

13   Lubeck was the only water district in which DuPont had any

14   knowledge prior to 2002 that there was C-8.

15        MR. PAPANTONIO:  That is not true at all.

16        THE COURT:  I want to make a simple point.  You're not

17   sure you have a witness who can say who was at the meeting?

18   Because they would pick this up with the live testimony.

19        MR. MACE:  Right.  I'm not sure sitting here.  So it's a

20   business record that reflects the fact that the meeting took place

21   and who was there.

22        THE COURT:  Your contention that it's a business record

23   comes from the fact it's sent by Robert Ritchey, who is a DuPont

24   employee?

25        MR. MACE:  Yes, Your Honor.

507

1          MR. PAPANTONIO:  Judge, it's about Lubeck -- They're

2    making this giant leap that this took place.  Therefore, this is

3    somehow notice, I suppose, to Little Hocking I guess is what they

4    are --

5          MR. O'BRIEN:  Your Honor, copied on this e-mail is Andrew

6    Hartten, who DuPont has listed as a will call witness.  So we need

7    to know if they're taking him down from the will call list because

8    that may obviate the need --

9          MR. MACE:  Dr. Playtis is on here.  I mean we have

10   several witnesses --

11         THE COURT:  Let me be clear.  It's notice of DuPont and

12   conduct of DuPont.  It's not notice necessarily to a water

13   district.  But in the abstract, a notice to an unrelated water

14   district doesn't have any probative value unless it has some

15   bearing on how the jury might view the conduct of DuPont.  So that

16   has got to be brought back that way somehow.

17         MR. MACE:  Which we intend to do.

18         THE COURT:  Why don't you check with your witnesses.  I

19   would like to avoid this.  I think this is a close call.  If we

20   need to address it, you will let me know.

21         MR. MACE:  Okay.

22         THE COURT:  All right.  Then we have the Tennant Farm

23   Herd Health Investigation.  Is this going to be offered in your

24   case-in-chief or do you see this more as a --

25         MR. MACE:  That's going to depend on what they do, Your

508

1    Honor.  I think it's relevant for cross-examination.  It was

2    certainly part of the materials that the plaintiff's experts

3    considered before coming to their opinions.  It was admitted into

4    the --

5            THE COURT:  Just for my edification, do you expect the

6    jury in your case-in-chief to hear about the Cattle Team report?

7            MR. PAULOS:  Well, Your Honor, we were just frankly

8    surprised that this was on the defense's exhibit list because they

9    didn't want any mention of the *Tennant* lawsuit, and this is

10   directly derived from the *Tennant* lawsuit.

11           THE COURT:  Right, but I'm hearing you say, Mr. Mace,

12   that you are not going to use this if it doesn't come up in the

13   plaintiff's case.

14           MR. MACE:  Right, but they made it a big part of their

15   last case with --

16           MR. PAPANTONIO:  Your Honor, we don't intend to make it a

17   major part of the case.

18           THE COURT:  So this will on hold.  If you need this, let

19   me know, and we will address it at the time.

20           That takes us to 896.

21           MR. O'BRIEN:  I believe it's 986.

22           THE COURT:  I got it backwards.  All right.  What's the

23   issue here.

24           MR. PAULOS:  Your Honor, it's another incomplete

25   document.  It's an internal letter from William Vogler to Y. L.

509

1    Power at Washington Works Plant.  It says, please find attached

2    charts of data developed from reviewing medical records on 51

3    employees with the highest measured levels of C-8 in their blood.

4    Those aren't attached.  It talks about what their opinions are

5    from having -- having reviewed that information that would have

6    been appended to this document.  We think without the attachments,

7    this document is worthless as far as evidence.

8            THE COURT:  All right.  Well, I want to focus on -- what

9    caught my eye is the second paragraph, in my opinion, very little

10   evidence of disease due to C-8 was found.

11           That is pure opinion testimony.

12           MR. MACE:  But it's the state of the knowledge of what

13   the belief was at the time.

14           MR. PAPANTONIO:  Well, somebody's opinion --

15           MR. MACE:  The historical fact.

16           THE COURT:  Who is William Vogler?  He is listed as CR&D.

17   Do you have any idea what that stands for?

18           MR. MACE:  He was part of Haskell Lab.  I am trying to

19   remember.  He was, I think, a physician's assistant.  And

20   Dr. Power, Y. L. Power, is the medical doctor at the Washington

21   Works Plant for 36 years.

22           MR. PAPANTONIO:  Judge, the reason -- the reason those

23   types of terms are so important, very little evidence of disease,

24   what does that mean?  It's the jury -- It's put out there as this

25   is some type of colloquialism, and everything is okay with C-8.

510

1      THE COURT:  Well, I would need a lot more foundation for

2   him to say.  He can describe what was shown in the studies, and I

3   think the rest of that paragraph does that.  But that first

4   sentence of the second paragraph has to come out.

5      And your other complaint is that you don't have the

6   attachments.  Do we have a way to locate the attachments?

7      MR. MACE:  We'll look into it, Your Honor.

8      THE COURT:  All right.  So that first part of the ruling

9   is definite.  The second part, we'll wait and see if we can find

10  the attachments.

11     MR. MACE:  And I guess we have to take out the first

12  clause of the next sentence, too, if you're taking out that first

13  sentence because it's referring back.

14     MR. BILOTT:  Your Honor, also the --

15     THE COURT:  Let me address this one at a time.

16     So you're talking about the, we did find several

17  employees?

18     MR. MACE:  No, perhaps C-8, it's referring back to the

19  sentence you just struck.

20     THE COURT:  Well, that comes close to an admission, but

21  on the other hand, it's still a part of an opinion.  So they both

22  come out.  All right.

23     MR. BILOTT:  Your Honor, also it would seem that the

24  second sentence in the first paragraph also was an opinion of the

25  medical doctor.

511

1    THE COURT:  Yes.  Without any credentials or other way of

2    knowing what this person's background is, that's going to come

3    out, too.

4        MR. MACE:  So the entire second paragraph?

5        THE COURT:  No, this would be the first -- the second

6    sentence of the first paragraph.  The first --

7        MR. BROGDON:  It would be logical.

8        THE COURT:  The first sentence of the second paragraph

9    and the third sentence of the third paragraph will come out.  And

10   we're going to check on the attachments that are a part of this.

11       MR. MACE:  So in terms of the, it would be logical,

12   you're striking that, Your Honor?

13       THE COURT:  Yes.

14       1019.

15       MR. PAULOS:  We are going to withdraw our objections to

16   this document, Your Honor.

17       THE COURT:  That will be admitted without objection.

18       1035.  What exactly is this?  It looks like it's -- the

19   Bates stamp looks like it's from the West Virginia Department of

20   Environmental Protection.  What exactly is this document?

21       MR. MACE:  This is similar to the other transcript, Your

22   Honor, that we would use as potentially in cross-examination of

23   witnesses, but we would not intend at this point to offer it as a

24   stand alone exhibit that would go back to the jury.

25       THE COURT:  Who authored this, do you know?

512

1          MR. MACE:  Well, it's a transcript.

2          THE COURT:  Oh, no, the other one.  You're on -- You

3     jumped ahead.  1035 is a --

4          MR. PAULOS:  1035 appears to be a power point potentially

5     created and presented by Pam Nixon of the WV DEP.  We don't -- We

6     don't know that for sure.  It's a WV DEP document, but it doesn't

7     -- There's no indication this was ever in DuPont's possession or

8     when DuPont came into possession of it or what the foundations for

9     the opinions are that are presented in this power point.  And Pam

10    Nixon's credentials to render those opinions are -- are not

11    available to us either.

12         MR. MACE:  Your Honor, you will recall, I think maybe,

13    that this was an exhibit at Dr. Staats's deposition.  It was used

14    and admitted at the first trial.  And it's also Plaintiff's

15    Exhibit 4867.

16         THE COURT:  She testified to this --

17         MR. MACE:  And it says Staats C-8 presentation.  It's not

18    Nixon.

19         THE COURT:  So she's -- but to refresh my memory -- You

20    probably think my memory is perfect in this case, but it's very

21    close -- she testified to this document that she prepared it?

22         MR. MACE:  Right, and it's in the designations for trial.

23         MR. O'BRIEN:  But just so we're clear, in the deposition

24    of Dr. Staats, she was not asked anything about this document

25    other than to identify it.  She was not asked about the opinions

513

1    contained.  She's obviously not an expert in this case.  She has

2    not been listed as an expert.  And so there's nothing that -- They

3    have published nothing from this through Dr. Staats.  So this was

4    something that she created.

5              MR. MACE:  She's testified, Your Honor, that these were

6    the slides that she prepared and presented to a meeting.  We will

7    also have witnesses who were at the meeting that saw the slides.

8    That goes to the notice and knowledge that DuPont had back in '02.

9              There were also DuPont's representatives at her

10   deposition.  These were statement --

11             THE COURT:  At this meeting where she presented this?

12             MR. MACE:  Both at the meeting and at her deposition,

13   which was held in 2002.  And so in terms of -- If they want a

14   limiting instruction, fine.  But in terms of what DuPont was being

15   told by a representative of West Virginia DEP back in 2002, it's

16   part and parcel of the historical knowledge.

17             MR. O'BRIEN:  Your Honor, if you look at 1035.4, there's

18   opinion testimony which has been excluded by the Court in her

19   transcript, which is, oh, the cancer in rodent's mechanisms is not

20   relevant to humans.  That is expert opinion.

21             THE COURT:  Let's go through --

22             MR. PAPANTONIO:  Blood levels and toxicity --

23             THE COURT:  Well, let's go through this page by page.

24   Let's start with 1035 -- I'm sorry, again, this is what I'm

25   hearing.  DuPont said she testified she prepared this.

514

1          MR. MACE:  Yes, sir.

2          THE COURT:  There will be a lot of other testimony that

3     she prepared this and presented it to a meeting.

4          MR. MACE:  Yes, sir.

5          THE COURT:  And there were DuPont employees who were at

6     the meeting?

7          MR. MACE:  Yes, sir.

8          THE COURT:  And testified to that and saw this

9     presentation?

10         MR. MACE:  Both then, Your Honor, when she presented it

11    and at the deposition because it was an exhibit used at the

12    deposition.

13         MR. O'BRIEN:  But, Your Honor, it was not used.  It was

14    just identified at the deposition.  And I believe the person from

15    DuPont -- and correct me if I am wrong, Mr. Mace -- was

16    Mr. Kennedy, who I am sure you are not going to call at trial.  So

17    it's not simply:  Was there a DuPonter there?  It has to be

18    somebody who can lay that foundation who was in fact there.

19         THE COURT:  The key here is what DuPont knew.  So all

20    right.  Step one is she prepared it.  So we know who the author

21    is.  Step two, how do you show DuPont knew about this?

22         MR. MACE:  Because we are going to show that somebody was

23    at the meeting -- both two ways.  One, that somebody was at the

24    meeting where she presented it at the public meeting.

25         THE COURT:  And your witness will say that?

515

1          MR. MACE:  Yes.  And that they were at -- we had a DuPont

2     representative at the deposition who got a second copy of it.

3          THE COURT:  So this was notice in --

4          MR. MACE:  2002.

5          THE COURT:  2002.  That's why you keep saying --

6     Normally, notice in a deposition wouldn't count for notice.  In

7     this case you are saying it's so old --

8          MR. MACE:  Right.

9          MR. PAULOS:  I just want to be clear.  We're going to

10    attribute DuPont's knowledge to the lawyers that are present at

11    the deposition where these documents were used?

12         THE COURT:  That's an alternative that I hear, that there

13    was somebody at the meeting where this was presented, as opposed

14    to just -- A deposition I think is a little more of a stretch.

15    But you represented that there was someone who will say that?

16         MR. MACE:  Yes, sir.

17         THE COURT:  Let's just assume -- That's the condition for

18    this being used.  All right?  I'm assuming Staats' testimony has

19    been given so you know that.  We will have to deal with somebody

20    from DuPont who saw the presentation.

21         MR. PAPANTONIO:  Judge, who will say that?  That's --

22    Because, otherwise, we're going to wait, and it's going to pop up

23    in trial, just like it did the last time.  Well, judge, it's all

24    on the fly.  It puts us on the fly.  It puts the Court on the fly.

25    Who is going to say they were at the meeting, and they'd heard

516

1    these opinions by Dr. Staats?

2            MR. MACE:  And I don't know that sitting here.  I know

3    there were people, and I have to go back and look at that.

4            THE COURT:  Well, I will give you the opportunity.  And,

5    again, for this to be used, that has to be met.

6            MR. BILOTT:  Just to be clear, no portion of Dr. Staats'

7    deposition was read in the last trial.

8            MR. O'BRIEN:  Right.

9            MR. MACE:  But the document was still admitted to the

10   jury, and it's been used by the plaintiff's experts, considered by

11   them.

12           MR. O'BRIEN:  Of course plaintiff's experts can rely on

13   any of this that's not evidence.

14           MR. MACE:  And they can be cross-examined on it.

15           THE COURT:  Well, then we start splitting hairs because

16   the jury will hear a lot about this.  It may not be coming into

17   evidence.  All right.

18           Well, there are a couple things in here I think I have

19   already ruled on.  She's not an expert.  So is there anything

20   before the fourth page of this we need to talk about that we

21   haven't already addressed?

22           MR. O'BRIEN:  Your Honor, so at 1035.3?

23           THE COURT:  Yes.

24           MR. O'BRIEN:  What is the current level of C-8 in the

25   Lubeck water.  And then the second part of that is, blood levels

517

1    in workers with no signs of toxicity 1,000 to 10,000 ppb, that's

2    either an expert opinion or it's hearsay being repeated, something

3    that DuPont told Dr. Staats.

4         MR. MACE:  But this is not -- Again, this goes to notice

5    to DuPont.  It is not for the truth.  None of these are for the

6    truth of the matter asserted.  It's for what DuPont was being

7    informed by this representative of West Virginia DEP in terms to

8    what they believed at the time.

9         MR. O'BRIEN:  But DuPont would already have that

10   knowledge.  So you can't say, we were on notice since we gave this

11   information to Dr. Staats, and then she repeated it back to us in

12   a power point.

13        THE COURT:  The thing is this case is not about the

14   workers.  So that second part is going to come out.

15        MR. PAPANTONIO:  Judge, it is not about Lubeck either.

16        MR. MACE:  Actually, it is Your Honor.

17        THE COURT:  It's at least some two different districts

18   close to each other.

19        But -- Now if I let her talk about a how toxic C-8 is,

20   isn't that pure opinion?

21        MR. PAPANTONIO:  Every bit of it is, judge.  That's the

22   problem here.  This is -- Again, the problem with Dr. Staats, not

23   being able to take her deposition --

24        THE COURT:  And what they would know is two things:  What

25   she presented and what her background is.

518

1          MR. MACE:  Right.

2          THE COURT:  This is beyond the scope of her expertise,

3     isn't it?

4          MR. MACE:  No, it's not, Your Honor.  She's a Ph.D.,

5     toxicologist.

6          MR. PAPANTONIO:  She's not --

7          MR. MACE:  Absolutely a Ph.D. toxicologist --

8          THE COURT:  We need to slow down for a second.

9          MR. O'BRIEN:  She has not been listed as an expert.  So

10    she is a fact witness, and that is all she is, and the Court has

11    ruled that previously.

12         MR. MACE:  And we're using this for the facts of what

13    DuPont was informed back in '02.

14         THE COURT:  You agree or disagree that she -- this is

15    within her area of expertise?

16         MR. PAPANTONIO:  It is not.  It is not.  As a matter of

17    fact, the problem that we have with this, this all ties into the

18    manufacturing of evidence for the CAT Team.  The double whammy

19    here is the stuff she's relying on she has manufactured.  She

20    hired TERA to manufacture it.  She met with DuPont and got paid to

21    manufacture it.  She worked for them.  Judge, this is why we must

22    take her deposition again.  This type of thing is going to come up

23    in the next 40 trials.  We're going to hear the same thing.

24    They're splitting hairs about Staats.  We can solve all this whole

25    thing by taking her deposition, which we're willing to do.

519

1          MR. MACE:  A couple of points, Your Honor.  One, they

2     never addressed your question.  She's a Ph.D. toxicologist.  These

3     are toxicology statements.  We're bringing this in for the facts

4     of what was said regardless of the truth, and --

5          THE COURT:  I get your position.

6          MR. MACE:  -- and if you look at the analogy to what you

7     are looking in on TSCA, because you are letting in statements that

8     EPA believed something, well, these are statements that the West

9     Virginia DEP believed something.

10          THE COURT:  What is your position on a deposition?

11          MR. MACE:  I don't believe she's going to cooperate.  We

12     have no control over her, unless she's going to cooperate with her

13     deposition.

14          THE COURT:  But --

15          MR. MACE:  I think we're far past the rule for --

16          THE COURT:  -- if she doesn't --

17          MR. MACE:  She was deposed for two days.  And Your Honor

18     had an order two years ago that if anybody wanted to re-depose

19     somebody they had to show good cause back then, not now.  So to

20     get it --

21          THE COURT:  In a nutshell, that's your position.

22          MR. MACE:  Yes.  We're opposed to on the eve of trial

23     doing this.

24          MR. PAPANTONIO:  We are seeing good cause develop right

25     before our eyes, judge.  This is good cause.  Because what they're

520

1   trying to do is split hairs with this witness.  She's right --
2   She's an hour away -- two hours away from us in Pensacola.
3          THE COURT:  I mean this is the classic -- This is
4   admissible on the issue of notice.  I don't doubt that.  But it's
5   not admissible with regard to opinions given.  She's not an
6   expert.  She has not been designated.  And a lot what's in here,
7   of course, contradicts the Science Panel.  So we have this mixed
8   issue.  It's admissible for one purpose but not admissible for
9   another.
10          MR. O'BRIEN:  And that's the problem --
11          THE COURT:  I am reluctant, though -- She is an important
12   witness in this case.
13          MR. PAPANTONIO:  She's critical.
14          THE COURT:  That cuts two ways.  One is a deposition on
15   the eve of trial is disruptive.  The other is her deposition
16   testimony comes all the way from 2002, and so many things have
17   happened since then, and I am not saying that she's necessarily a
18   part of that.  But I suppose, though, I think in the final
19   analysis, whatever she says is not going to change the issue
20   before me right now.
21          MR. MACE:  True.
22          THE COURT:  You're still going to offer it --
23          MR. BROGDON:  Your Honor, it seems a limiting instruction
24   here could solve the problem.  As you said --
25          MR. PAPANTONIO:  No --

521

1        MR. BROGDON:  -- it's clearly admissible for notice, but

2    a limiting instruction as to what it's not admissible for covers

3    the issue.

4        THE COURT:  Sometimes that works, not always.

5        MR. O'BRIEN:  The problem is this.  So DuPont chose in

6    the deposition of Dr. Staats not to go through this or how she

7    came to this and whether this is her opinions or something that

8    she is simply repeating from what DuPont told her because DuPont

9    was on the CAT Team.  So it's not notice.  It's simply parroting

10   what DuPont told them.

11       THE COURT:  Well, you weren't in the case in 2002, I'm

12   assuming.

13       MR. O'BRIEN:  I was not in the case, but I read those

14   pages --

15       MR. BROGDON:  Your Honor, this goes to credibility issues

16   and issues of fact where they can dispute where she got her

17   information, but it doesn't change what she told DuPont, and

18   that's a fact.

19       THE COURT:  I don't want to -- listen.  I enjoy everyone

20   in the room, but at a certain point you need a decision.  I think

21   what weighs on my mind is there was an opportunity to depose her.

22   Now before the next trial, you may want to do that.  I will

23   certainly make that opportunity available.  As far this trial

24   goes, we are too close in time to do that.

25       Now let's go through this document page by page and see

522

1      where we are.  So, again, this is all premised on somebody from

2      DuPont being at a meeting where this presentation was made.  There

3      are going to be some exclusions, though.  I have already mentioned

4      on page 3, the last part about blood levels in workers is coming

5      out.  How toxic is C-8, I would suggest to the plaintiff's side

6      this is the sort of thing where you want me to continue to give

7      the limiting instruction about the Science Panel.

8                  MR. O'BRIEN:  I think it's out as opinion.  I think it's

9      expert opinion.

10                 MR. PAPANTONIO:  It is totally opinion.

11                 THE COURT:  It is that, but it also goes to knowledge of

12     DuPont.  It cuts in two different directions.

13                 MR. O'BRIEN:  But it doesn't.  It's simply repeating what

14     DuPont told her.

15                 THE COURT:  But, again, that could have been asked in a

16     deposition, and it wasn't.  So I can't fill that in at this point.

17     You can do that in the next case.

18                 MR. O'BRIEN:  But DuPont is a proponent of the evidence,

19     and they should lay the foundation.  They chose not to for this

20     evidence.

21                 THE COURT:  I think at this point I have ruled.

22                 Now the Lubeck water comparison is out.  This case isn't

23     about Lubeck.  So page 5 is out.

24                 MR. BROGDON:  The whole page, Your Honor?

25                 THE COURT:  Yes.

523

1          MR. BROGDON:  Okay.

2          MR. MACE:  And when we say okay, that means we understand

3     what you are saying, but we're preserving our objections.

4          THE COURT:  Understood.  Well, this is what I will call

5     scientifically wrong from the way this case was being tried -- I'm

6     looking at page 6 -- but it goes to the knowledge of DuPont.  So

7     that will stay in.

8          The:  What actions have been taken, I'm going to find

9     this is, first of all, we're getting into the consent decree is

10    problematic.  We have sort of capped that as much as we could.

11         MR. MACE:  Understand that as you rule, Your Honor, this

12    is the November 15, 2001, consent decree between West Virginia and

13    DuPont, not TSCA.

14         THE COURT:  Not the second one.

15         MR. MACE:  Yes.

16         THE COURT:  But all of this is going to come from other

17    witnesses.  So what's on page 7 is going to be excluded.

18         And likewise everything on page 8.

19         Page 9 will stay in.

20         And page 10.

21         All right.  1038 is another transcript.  Should I assume

22    this is available if you see the need for cross-examination only?

23         MR. MACE:  Yes, sir.

24         THE COURT:  We'll hold on that.

25         MR. MACE:  Could I plead with the Court within about 15

524

1    minutes for a restroom break?

2         THE COURT:  Sure.  Well, we're going to take a lunch

3    break here.  So why don't we plan on being back here at 20 after

4    1:00.

5         MR. O'BRIEN:  Just so -- I'm sorry to be pedantic, that

6    transcript is the same ruling as the prior one, which is you can

7    cross-examine the declarant with it?

8         THE COURT:  That's what I understand so far.  You will

9    let us know if there is something else at side-bar.  But that's

10   what I'm assuming.

11        MR. PAPANTONIO:  Judge, one other thing.  Would it be

12   appropriate if we start trying to get the deposition of

13   Mrs. Staats --

14        THE COURT:  Since you are all here, you can probably

15   schedule it at a convenient time for everybody.

16        MR. PAPANTONIO:  Okay.

17        THE COURT:  If you can persuade DuPont to do it now, I

18   wouldn't discourage you.

19        MR. PAPANTONIO:  I don't think --

20        THE COURT:  I know everyone in the room is pretty

21   persuasive.

22        MR. PAPANTONIO:  I don't agree --

23        THE COURT:  But there has been no violence in the room

24   either.  Very good.  We will see you at 20 after 1:00.

25        (Recess from 12:00 p.m. to 1:20 p.m.)

525

1                                   Wednesday Afternoon Session.

2                                   May 18, 2016

3                                   - - - - -

4          THE COURT: All right.  Where we left off, we disposed of

5   1038.  We were going to use that only if appropriate on cross.

6          MR. MACE:  Yes, Your Honor.

7          THE COURT:  And then we get to 1060.

8          MR. PAULOS:  Chris Paulos for the plaintiffs.

9          Real quickly, I wanted to let you know over the lunch

10  break I endeavored to go through these documents; and based on

11  your previous ruling from the morning, I think there's going to be

12  some documents we will be pulling down.

13         THE COURT:  All right.

14         MR. PAULOS:  So as we get to that, I will let the Court

15  know that based on the rulings that you provided, the guidance the

16  Court has provided us today, that we -- that we understand those

17  rulings we will be -- we'll be withdrawing our objection and

18  pulling those objections down to certain documents.

19         THE COURT:  All right.

20         MR. PAULOS:  Also I wanted to clarify with the Court,

21  too, that as we get into documents this afternoon, we are going to

22  start seeing documents that we saw earlier this morning that

23  redactions have been applied to.  I just wanted to confirm the

24  Court's redaction rulings will -- well be across the board.  For

25  any iteration of those particular documents that the Court has

526

1    redacted, those redactions will be applied to -- to any version of

2    that document.

3         THE COURT:  That will be my understanding.

4         MR. PAULOS:  Thank you.  This first document here,

5    D.1060, is another internal memorandum from -- from Walt Stewart

6    to e-mail addresses on a DuPont distribution list.  It's -- Again,

7    it's -- it's a -- it's basically hearsay within hearsay.  It's a

8    rendition of a meeting that occurred where a summary of hearsay

9    statements is being provided to --

10        THE COURT:  So in terms of -- This is a DuPont employee.

11        MR. PAULOS:  That's correct.

12        THE COURT:  An internal document.  But your argument is

13   that there are things within this are not going to be covered by

14   the hearsay exception.

15        MR. PAULOS:  That's correct, Your Honor.

16        THE COURT:  Let's go right to those then.

17        MR. PAULOS:  The first -- the section of the document I

18   would like the Court to look at is the second paragraph where

19   there's an assessment of how the -- the meetings and presentations

20   were received, that they were well received and appreciated by

21   both audiences.  There's also a statement that meeting questions

22   and comments by the regulatory personnel were of good depth and

23   quality --

24        THE COURT:  That's the whole second part of the second

25   paragraph is what you're objecting to.

527

1          MR. PAULOS:  That's correct.

2          MR. MACE:  Our position, Your Honor, these are a

3     description of what happened at the meeting.  It's a business

4     record and an ancient document, a present sense impression in

5     terms of the DuPont attendees impression was of what was going on.

6     It doesn't contain any statements of hearsay.  Also, this is in

7     terms of notice and knowledge historic, not for the truth of the

8     matters being asserted.  It contains historical knowledge of

9     DuPont.

10         MR. PAULOS:  Your Honor, at present sense impression,

11    that is made at the immediate moment that something is being

12    perceived.  This document is created daily after this meeting.

13         THE COURT:  As a business record, it has to have some

14    connection to the activity.  That is beyond that.  So that second

15    part of the second paragraph will be excluded.

16         Anything else that you are objecting to?

17         MR. MACE:  Your Honor, so we're clear, you're taking out:

18    Meeting questions.

19         THE COURT:  Yes, to the end of the paragraph.

20         MR. MACE:  Okay.

21         MR. PAULOS:  The next section, I believe should be

22    adapted --

23         THE COURT:  Now you can have a witness testify to that.

24    But in terms of a cold document, that's the problem.

25         MR. MACE:  And then, again, there would be the potential

528

1    to use it in redirect if there's a claims made where:  You are

2    inaccurate about that.  That never really happened.

3            THE COURT:  Sure.  All of these are provisional.  So you

4    can come back and ask me to reconsider this based on what I have

5    heard in the trial.

6            MR. MACE:  Yes, sir.

7            MR. PAULOS:  The next section we believe should be

8    redacted, the last sentence in the third paragraph where it say,

9    LPSD personnel were most grateful for our assistance in this

10   matter.

11           THE COURT:  Same ruling.  That will come out, too.

12           MR. PAULOS:  And then the fourth -- or, excuse me, in the

13   fifth paragraph it says, Ed Hamrick, WV DNR Director, summarized

14   the meeting with him by thanking us for coming to his office and

15   reviewing this information.  He stated that a continued dialogue

16   with Dupont and his office in this manner would be highly

17   desirable.

18           THE COURT:  That takes out the second sentence, not

19   necessarily the first.  In fact, not the first.

20           MR. PAULOS:  And then the last thing about this document,

21   Your Honor, is that it references meeting charts that were used at

22   this meeting that were going to be sent to all the recipients in

23   brief summary, that we were not provided with this summary to us

24   in production.

25           THE COURT:  Do you know if you have those?

529

1          MR. MACE:  A, they were not attachments to this; and, B,

2     we are going to come to them in a little while.

3          THE COURT:  If they're coming up, I think we can wait on

4     this.

5          MR. PAULOS:  And I think we will see this summary, again,

6     in some of the documents Mr. Mace is referring to.

7          THE COURT:  We will address it at that point.

8          Then we get to 1126.

9          MR. PAULOS:  Your Honor, this is a just another e-mail

10    that we believe contains hearsay within hearsay that can't be

11    cured with any hearsay exception.

12         THE COURT:  I know who Dr. Playtis is.  Who is -- and

13    Dawn Jackson that's a familiar name.

14         MR. MACE:  Yes, she is government affairs/public

15    affairs/public relations at the plant, Your Honor.

16         THE COURT:  So let's see this.

17         MR. PAULOS:  And, Your Honor, I think one of the issues

18    with this document, we're now starting to see repeated e-mails

19    about the same meetings, the same public entities, over and over

20    and over.  It is very cumulative.  And it gives the false

21    impression they are routine meetings over and over again --

22         THE COURT:  Walk me through this.  I'm -- Starting with

23    this, there's an aspect, so this is a business record.  But the

24    C-8 primate study, there's going to be testimony on that, right?

25    That's nothing new.

530

1      MR. MACE:  Well, the fact is it exists, Your Honor.  But

2  the plaintiffs are trying to leave the jury with the impression

3  that nobody outside of DuPont and 3M knew about it, which isn't

4  the case.

5      THE COURT:  Well, I'm just looking -- I have a pretty

6  narrow focus here.  The first sentence I get.  The second

7  sentence, Dawn Jackson delivered to them, meaning, I suppose, Jim

8  Cox and Lubeck and Bill Gibbs from LPSD, a copy of the C-8 primate

9  study.  There is going to be testimony about the C-8 primate

10  study.  This would add they were delivered to other people.

11      MR. MACE:  Right, and it gets into -- because what she is

12  delivering is the communication to the employees.  You will recall

13  Dr. Siegel's testimony that DuPont did a great job --

14      THE COURT:  Let me interrupt you here --

15      MR. MACE:  I'm sorry.

16      THE COURT:  -- but you're winning here.  I am going to

17  rule in your favor.  I think this stays in.  And, again, it's a

18  study we're going to get into in some detail, I assume.

19      Then we get to 1173.  This is a --

20      MR. PAULOS:  Your Honor, this is a document purports to

21  be from the CDC.  However, there is no identifying mark aside from

22  this emblem.  And we don't know what the date that this was

23  created, when this was created --

24      THE COURT:  Isn't there a date on the back of it?

25      MR. MACE:  Yes, sir.

531

1        MR. PAULOS:  There's a date up here -- down here, but we

2   don't know whether it's the date of this document, when it was

3   pulled off a website, when it was obtained by DuPont.  There is no

4   DuPont Bates stamp.  There is no indication that this was in

5   DuPont's file materials.

6        MR. MACE:  My understanding is that this is a public

7   document posted on the CDC website as of that time, 2009.

8        MR. PAULOS:  There is no indication that this came off

9   the worldwide web.

10        THE COURT:  Do you know how you received it?  You're just

11   looking at it cold, you don't know.

12        MR. MACE:  I'm just looking at it cold.  Maybe it's self

13   authenticating.  There is the CDC symbol.  There is no credible

14   statement or showing that it's not --

15        THE COURT:  I mean you can, I am sure Google this, and

16   tell me if you think there's some question of authenticity.

17   Otherwise, it's a statement of a public agency.  If you find

18   anything else you want to bring to my attention, I will give you

19   that opportunity.  Otherwise, it's going to come in.

20        MR. PAULOS:  Thank you, Your Honor.

21        THE COURT:  Now 1375.

22        MR. PAULOS:  1375 is a document that based on the Court's

23   prior ruling this morning, we will be withdrawing our objection.

24        THE COURT:  All right.  That takes us to 1414.

25        MR. PAULOS:  And this is another one that we will be

532

1    withdrawing our objections to based on the Court's guidance.

2              THE COURT:  Thank you.  1428 then.

3              MR. PAULOS:  1428 is another document that we will be

4    withdrawing our objections to.

5              THE COURT:  All right.  1455.

6              MR. PAULOS:  We're on a role.  We will be withdrawing

7    that as well.

8              THE COURT:  All right.  You are making me a happy judge.

9              So 1631 is --

10             MR. PAULOS:  1673?

11             MR. O'BRIEN:  1631, that's mine.

12             THE COURT:  Another power point presentation more or

13   less?

14             MR. O'BRIEN:  Well, it's a little bit different because

15   this one was not used in the deposition of Dee Ann Staats, it was

16   not marked, and no foundation was laid for it.  And so it contains

17   -- It's much like the other one where it contains opinion

18   testimony, but the foundation hasn't been laid for it.

19             THE COURT:  Well, let me start.  Your argument -- and I

20   am going to hear from Mr. Mace -- it's not a DuPont document, not

21   in DuPont's file as far as you know from discovery.  So this is a

22   presentation made by the West Virginia Department of Environmental

23   Protection to Blennerhassett Junior High School.

24             MR. MACE:  It was made at the junior high school, Your

25   Honor.  It was a public --

533

1          THE COURT:  Not a junior high school.  I was reading too
2     much into the description of the location.
3          MR. MACE:  So it's a presentation made in a public
4     meeting that DuPont representatives were at on May 15 '02.
5          THE COURT:  You have witnesses who say they attended?
6          MR. MACE:  Yes.
7          THE COURT:  Where does this take us?
8          MR. PAPANTONIO:  Well, I think, if there were witnesses,
9     I think it's just Mr. Bossert and Mr. Hartten.  So they would have
10    to lay the foundation.  So it couldn't be Rickard saying, I know
11    that Bossert went there because that would be relying on a hearsay
12    statement from Bossert or Hartten.
13         THE COURT:  And correct me, Bossert is coming?
14         MR. MACE:  Bossert is coming, yes, sir.
15         THE COURT:  Would he be the one among others who --
16         MR. MACE:  Among others, he would be able to, yes.
17         THE COURT:  Again, as long as DuPont had particularly
18    someone at his level present, heard this, then this will have to
19    do with DuPont's historical knowledge.  So it will be admitted.
20         MR. O'BRIEN:  Your Honor --
21         MR. DOUGLAS:  Well, there are redactions you want to talk
22    about.
23         MR. O'BRIEN:  That's right.  If you direct your attention
24    to the 1631.12, there's pure opinion testimony.  Pure opinions
25    here, talking about high degree of confidence, methodology used --

534

1          THE COURT:  All right.  So that high degree of

2     confidence, that comes out.

3          MR. O'BRIEN:  The unanimous decision, which is

4     bolstering --

5          THE COURT:  The screening level for water, I assume

6     DuPont wants to use that for historical knowledge.  Of course that

7     was not in sync with the Science Panel.  But you would be entitled

8     to a limiting instruction.

9          MR. MACE:  But even in the high degree of confidence,

10    this is the West Virginia Health and Human Resources and the DEP

11    making that statement of meeting DuPont's status.

12         THE COURT:  It's predicting the future.  It's

13    speculative.  It's --

14         MR. BROGDON:  Unanimous decisions is back.  And that's a

15    number of --

16         THE COURT:  I'm not -- I'm not taking that out.  That

17    will stay.  It's the second paragraph, high decree of confidence

18    that won't change in the future, that will come out.

19         MR. O'BRIEN:  And the third bullet point about the

20    methodology?  That just smacks of expert opinion.

21         THE COURT:  Well --

22         MR. MACE:  It's a fact, Your Honor.

23         THE COURT:  As I'm reading this, I take this to mean this

24    was a threshold that they established?

25         MR. MACE:  Yes, sir.

535

1    MR. O'BRIEN:  Right.  And they have got that through a

2 CAT Team report itself, which Your Honor has already ruled upon.

3 So, again, we're getting into some cumulative issues, some things

4 they don't even need because now this is basically going beyond

5 the report and explaining a little bit better, perhaps, than the

6 report itself does, which is --

7    MR. MACE:  It goes beyond that, Your Honor.  They're

8 saying, well, that may have been done behind closed doors in this

9 CAT Team meeting, but you didn't tell the public.

10    THE COURT:  Right.

11    MR. MACE:  This shows that the public --

12    THE COURT:  What the jury will see and what the public

13 heard are two different things.  All right.

14    The screening levels, I will give the instruction again,

15 that this is not the standards that are going to apply.

16    And the oral risk factor, I don't see how the jury can

17 use that in any helpful way.  You are going from parts per billion

18 to kilograms per day unless somebody is going to give some -- and

19 we don't have a witness to explain what this all means.  I think

20 that's going to come out just to avoid confusion.  I don't think

21 it adds anything either.

22    MR. MACE:  Well, the fact they used EPA methodology --

23    THE COURT:  I'm just talking about the second line, oral

24 risk factor with the numbers that follow.

25    MR. MACE:  I see, Your Honor.  I understand your ruling.

536

1          THE COURT:  I don't think that is a plus or a minus for

2    either side.  That's going to confuse people.  So that will come

3    out.  So on that page, two lines come out, the oral risk factor

4    line and the high degree of confidence line.

5          MR. O'BRIEN:  Then on page 1631.13, this is all expert

6    data.  I mean this is really not notice without an expert

7    explaining who was there to explain what this all means.  It's for

8    the same reason as Your Honor was talking about the oral risk

9    factor.

10         MR. MACE:  But it was part of the presentation, Your

11   Honor, and the fact that these studies were disclosed to the

12   public --

13         THE COURT:  Do you think they were really discussed with

14   the public as listed on here?

15         MR. MACE:  Yes, sir.  I think this slide was shown at the

16   meeting.

17         MR. O'BRIEN:  Your Honor, this is backdoor expert

18   opinion.

19         MR. MACE:  No, it's not.

20         MR. O'BRIEN:  I mean it's --

21         MR. MACE:  I mean all these studies are coming in through

22   the plaintiff's experts and DuPont's experts anyway.  But this is

23   the fact that they were presented to the public.  They were made

24   aware of these things.

25         MR. O'BRIEN:  Your Honor, this is getting into

537

1    methodology.  It's not getting into notice.  It's getting into

2    reliance materials.  It's getting into an expert foundation.  And

3    if the jury doesn't see this, what are they going to make of this

4    standing on its own in terms of notice?

5              THE COURT:  By the way, there's language in here, this

6    meeting -- that the CAT Team meeting was pursuant to a consent

7    order.

8              MR. MACE:  What page?

9              THE COURT:  That's on .7.  I'm not overlooking your

10   objection to that page.

11             MR. MACE:  That's the separate consent order, Your Honor,

12   the November of --

13             THE COURT:  Right.  But I'm wondering if the jury will

14   confuse that.

15             MR. O'BRIEN:  Your Honor, we have no problem with that.

16   We're not asking that to be redacted.

17             MR. PAPANTONIO:  Excuse me, either way, I think it's

18   confusing for the jury.

19             THE COURT:  Yes.

20             MR. MACE:  I have no objection if Your Honor wants to

21   strike that --

22             THE COURT:  Take the whole line out.

23             MR. MACE:  Yes.  So those two lines, meeting held and

24   action --

25             THE COURT:  Meeting held pursuant to consent order, part

538

1    of the enforcement action -- only applies to DuPont in West

2    Virginia.

3            MR. MACE:  Yes, Your Honor.

4            THE COURT:  And the rest of that will stay in.

5            Well, you know, I'm of two minds of this document.

6    Assuming that the public heard it, that would lean towards

7    admissibility.  What the jury could do with this, that's a whole

8    other matter.

9            My concern is it's not being offered through an expert.

10    So it will be offered to show what DuPont knew.  But if the jury

11    can't really interpret all this data, then it just adds to

12    confusion.  It doesn't -- It doesn't add to a proven fact.

13            How much memory does your witness have to all this?  Do

14    they recall this document being used or is that too specific?

15            MR. MACE:  I don't know without checking.

16            THE COURT:  Probably too specific.

17            MR. O'BRIEN:  And, judge, you will recall Mr. Bossert on

18    redirect in the last trial really couldn't recall the public

19    meeting at which this was presented.  When Mr. Woods tried to

20    rehabilitate, his recollection could not refreshed.

21            MR. MACE:  That's why there is a need for it, Your Honor.

22            THE COURT:  Yeah.  Well, again, it's not going to the

23    truth of the matter.  It's going to what was disclosed to the

24    public and what DuPont heard.  But it still comes down to what

25    this jury can do with it, though.  That can't be forgotten either.

539

1    And, you know, the numbers here, the -- just the top line, with

2    the breakdown in categories, I have no idea what they mean.

3            MR. O'BRIEN:  And I don't think Mr. Bossert will either.

4            THE COURT:  Right now I'm going to exclude this.  If

5    something changes in his testimony or anywhere else in the case, I

6    will revisit this.  But, again, I want to be clear, the reason

7    that I am excluding, it's not self explanatory --

8            MR. BROGDON:  When you say this, you mean that page?

9            THE COURT:  Just that page, that's coming out.  But I

10   will review it if things change.

11           MR. MACE:  Because I think there will be explanations for

12   this because this is the same page that was used at the CAT Team.

13           THE COURT:  Well, is the CAT Team going to explain it?

14           MR. MACE:  It's actually in 613, I believe.  It's one of

15   the exhibits we have already addressed.  It was a page that was

16   taken out of the part analysis that was done by the CAT Team.

17           THE COURT:  Well, if it comes in in a different way,

18   remind me, and we will revisit this.

19           MR. MACE:  Yes, sir.

20           MR. O'BRIEN:  Then on page 1631.14, the question is:  Why

21   the difference in water screening level?  In general -- I don't

22   think this goes to notice at all.  And it really -- particularly

23   question no. 2, that's really bolstering.  It doesn't give DuPont

24   notice of anything since they are a part of the CAT Team.

25           THE COURT:  So -- But they're advising the public that

540

1    there has been a change in the water screening level.

2            MR. O'BRIEN:  There really hasn't been.  I mean --

3            THE COURT:  But it says what it says.  I'm inclined to

4    take out the second line but leave everything else in.

5            MR. MACE:  But, Your Honor, again that goes to what

6    DuPont and the public were being told by officials from the State

7    of West Virginia.

8            THE COURT:  I mean you will be able to cross on all that.

9    We have had a lot of testimony about how the CAT Team operated.

10    So I'm going to leave that in.

11            So we get back to this -- I don't know is this is

12    milligrams dash -- oh, mg-Kg, I assume that's milligrams/kilograms

13    per day.

14            MR. MACE:  Milligram per kilogram per day.

15            MR. O'BRIEN:  We're looking at 1631.15?

16            THE COURT:  It's milligram per kilogram.

17            MR. MACE:  Right, it's milligrams per kilogram of body

18    weight per day.

19            THE COURT:  I see.  Okay.  There are two measurements.

20    The milligram dosage of C-8 --

21            MR. MACE:  In relation --

22            THE COURT:  Kilogram per day of the --

23            MR. MACE:  The person or the animal being exposed to it.

24            THE COURT:  The weight of the person compared to the

25    dosage of C-8.

541

1        MR. MACE:  Yes, sir.

2        THE COURT:  You're all good at converting pounds to

3    kilograms to get to this.

4        MR. MACE:  Sure.

5        THE COURT:  Just checking.

6        MR. O'BRIEN:  Your Honor, in this, this particular page,

7    1631.15, is so rife with problems because it's -- it's really the

8    notice to the people hearing it.  This is not saying anything new

9    to DuPont.  And it's pure opinion that, therefore, C-8's risk

10   factor is far more conservative or health protective than that for

11   the average chemical.

12       THE COURT:  Right.  There's general knowledge of DuPont,

13   notice to them.  That's one issue.  And notice to the public might

14   be an issue, but not notice by West Virginia DEP.  By DuPont,

15   perhaps, but not by -- this is not a DuPont document.

16       MR. BROGDON:  Well, Your Honor, by any means, the public,

17   would rebut the argument that DuPont was somehow hiding things.

18       MR. MACE:  That the public wasn't informed, and that

19   DuPont should have been saying something else when the government

20   agencies are telling the public --

21       THE COURT:  All right.  As long as you can establish --

22   and the witness you're talking about is the plant manager, right?

23       MR. MACE:  Among others, too.

24       THE COURT:  And he was there.

25       MR. MACE:  I believe so, yes.

542

1    MR. O'BRIEN:  So Mr. Bossert has to lay the foundation.

2  If he does not recall this being --

3    THE COURT:  Well, he has to recall the meeting, and he --

4  He doesn't have to recall every paragraph.  He's not going to be

5  used to -- I am assuming nobody is offering him to verify every

6  paragraph in here, just that he was the meeting where this was

7  presented in public.

8    MR. O'BRIEN:  But I think he does still have to --

9    MR. MACE:  It is consistent with his memory of the

10  meeting.

11    MR. O'BRIEN:  I would permit -- I would ask that the

12  judge, because of this, I don't think Mr. Bossert is going to

13  recall this, I will permit -- I would ask that the Court permit

14  *voir dire* on this document --

15    MR. PAPANTONIO:  We do --

16    MR. O'BRIEN:  -- before it is used.

17    THE COURT:  Why don't we do -- Let's do that.  But I

18  don't want to necessarily run the jury out of the courtroom.  Why

19  don't you -- You're going to have to lay a foundation for that.

20    MR. MACE:  Yes, Your Honor.

21    THE COURT:  We will do that and then have a side-bar.

22    MR. PAPANTONIO:  One further note, I don't know if you

23  remember the witness that started off his testimony with top of

24  the morning, it was Mr. Dourson.  That's --

25    MR. MACE:  That's unforgettable.

543

1    MR. PAPANTONIO:  This is the type of thing that they used

2    for Dourson.  Now if Mr. Dourson is coming, this is very clear.

3    But, otherwise, they are just walking around the edges of this

4    with arbitrary witnesses.  I think it's going to be a difficult

5    issue, but I hear the Court on it.  I just wanted the Court to

6    understand that this document takes special attention.

7    THE COURT:  Well, what I want to explain with 15, again,

8    is really just more of a:  What will the jury make of this?  That

9    second paragraph, just to explain that the measurement system is

10   going to take a few minutes.  I just don't want them giving --

11   given documents as exhibits they don't understand.

12   So who would you have to explain milligrams-kilograms per

13   day, for example?

14   MR. MACE:  I can do it through their experts.  I can do

15   it through Dr. Rickard.

16   THE COURT:  If that's through an expert, that becomes a

17   lot easier.  But in terms of having the plant manager verify this,

18   it's going to take more to get some of that type of evidence in.

19   MR. O'BRIEN:  Your Honor, he can't with our expert

20   because with this document, that a foundation will not have been

21   laid for the document.

22   THE COURT:  But he can ask for a preliminary ruling, that

23   it's going to be laid later, and we can treat that as provisional

24   testimony.

25   All right.  Anything else in this document that we

544

1    haven't talked about?

2            All right.  Let's go to 1673.

3            MR. PAULOS:  Your Honor, this is another document that

4    plaintiff will be withdrawing their objection on in light of the

5    Court's previous ruling.

6            THE COURT:  All right.  1674.

7            MR. PAULOS:  Your Honor, this is a letter from DuPont's

8    corporate counsel to Mr. Hefter of the U.S. EPA.  It's regarding

9    the consent order.  It's an actual response to the -- DuPont's

10   initial response to the EPA in terms -- in response to the

11   allegations that are contained in --

12           THE COURT:  So this sort of goes to how far we wade into

13   -- In other words, from DuPont's end, you want to minimize the use

14   of the language in the complaint.  And this is -- the response to

15   the complaint essentially?

16           MR. MACE:  No, sir.  This was before even the complaint.

17   You notice the date of June of '03.

18           THE COURT:  But there's an exchange going back and forth,

19   we're investigating this, and this is DuPont's response?  Right?

20           MR. PAULOS:  That's correct, Your Honor.

21           MR. MACE:  I believe that's the context.

22           THE COURT:  We're going to discuss this because this

23   begets either a widening or narrowing process.  So this whole

24   process winds up with the consent decree at the end.  Right?

25           MR. MACE:  That's correct, Your Honor.

545

1       THE COURT:  The question becomes:  How much of the back

2   and forth?  There's a dispute as each side looked at this.  EPA

3   had one view.  DuPont had another.  It results in a consent

4   decree.

5       I'm assuming you don't know how much is coming in yet,

6   but you are putting a lot of this stuff up.  But maybe we should

7   have a more general discussion about how much or how little can

8   come in -- You know the consent decree is going to come in.  The

9   complaint is going to come in in part.  I guess beyond that, what

10  else are you proposing?  If a lot of it comes in, this will come

11  in with it.

12      MR. MACE:  That's the problem, Your Honor.  Some of this

13  is going to depend on what you end up doing with the TSCA limiting

14  instruction, which we were extremely concerned about in the first

15  trial and, frankly, thought that was contrary to what the

16  discussions had been prior to the trial.

17      But in any event, Your Honor's prior statements were that

18  in the limiting instructions, you try to tell the jury how they

19  should consider evidence, not repeat the factual statements of the

20  evidence.  So that was one of the big issues there.  But in any

21  event, you've indicated already that you're going to let the

22  plaintiffs go beyond the language in the consent agreement into

23  this 558, P1.558 --

24      THE COURT:  You're going to have to refresh my memory.

25  What is that?

546

1          MR. MACE:  That's the internal deliberations of EPA,

2     whether they were going to enter into the settlement or not.  And,

3     frankly, we can live with the statements in the consent decree.

4     But the salacious 403 issues are heightened by this 558.  And if

5     they are going to be allowed to get into that and get into

6     repeatedly stating what the EPA believed, we need to be able to

7     rebut that with what DuPont believed contemporaneously.

8          MR. PAPANTONIO:  They hate -- they hate 558 because it

9     says -- I will show it to Your Honor.  It lays out specifically

10    what they have done wrong.  They really don't like it because they

11    spend the entire trial talking about what they have done right.

12    And all of sudden, 558 says, you lied to us about toxicity.  And

13    all these -- it's a list, the same list we used all through the

14    last trial.  I understand they don't like it.  But the point is

15    this is what the EPA told them, and they still took no action.  As

16    a matter of fact, after the EPA told them, they continued to cover

17    it up and spin it.

18          MR. MACE:  We don't like it because the plaintiff's

19    counsel is misusing it contrary to what Your Honor's ruling have

20    been, and we need to be able to rebut it because counsel is

21    presenting these things as if they're governmental findings made.

22    And we are allowed -- we should be allowed to rebut.  There were

23    not governmental findings made.  And if you are letting it in to

24    show what the government believed, the distinction, I don't think

25    the jury is going to pick up the difference.  P1.558.

547

1          MR. PAULOS:  And, Your Honor, there were extensive

2     redactions to 558 in the *Bartlett* trial --

3          MR. MACE:  That's because they didn't identify it among

4     their 300, Your Honor.  So it's not even been ruled on for this

5     trial because it's not in the prescreened pile for this trial.

6          MR. PAPANTONIO:  Judge, just --

7          THE COURT:  I am confused.  Has that been offered?

8          MR. MACE:  Your Honor, this is what happened.  So on

9     DuPont's -- each party agreed to identify 300 prescreened

10    exhibits.  That's what we've been taking up Your Honor's time

11    with.

12         MR. PAULOS:  Which have been --

13         MR. MACE:  If I could finish my statement.  So we

14    identified to 300, which are largely duplicative, overlapping,

15    with what was used in *Bartlett.*  They largely did not identify in

16    their 300 what they used in *Bartlett.*  They're different exhibits.

17    Nowhere in their 300 prescreened exhibits is 558.  So that's why

18    it's not in your pile.

19         MR. PAULOS:  The reason that 558 was not in the 300 was

20    that the agreement amongst the parties is that we did not need to

21    include the actual exhibit that was referenced deposition

22    designations.  And 558 is prominently featured in many of the

23    depositions, and that's why it wasn't included in here.

24         THE COURT:  I need to see a copy of it.

25         MR. PAPANTONIO:  This is -- This is the portion we're

548

1    getting a copy right now -- This is the portion that you may

2    recall from the first trial, where it says the EPA is saying, this

3    is what you have done wrong.  And the reason it became so

4    important is even after they were told this, they continued the

5    same course of conduct.  Almost --

6         THE COURT:  Here is my question.  If I let you go into

7    the allegations of the EPA that this is what DuPont did wrong, how

8    could I possibly exclude DuPont's response?

9         MR. PAPANTONIO:  Because here's the difference.  What

10   they are trying to do is they are trying to retry the elements of

11   how the EPA came up with their decision.  They want to retry the

12   case.  They want to second guess the EPA and create an entire new

13   trial --

14        THE COURT:  But to be fair, the EPA did not -- In the

15   end, they have an administrative process.  It did not run its

16   course.  So there was not a hearing with a decision.  There was a

17   consent decree instead.

18        MR. BROGDON:  There is reference to the decision, the

19   only ultimate document is the consent decree.  Your Honor is

20   exactly right.

21        THE COURT:  My current way --

22        MR. MACE:  What he is trying to do, just like he

23   portrayed to the jury, that these were findings made by the EPA,

24   which they weren't.

25        THE COURT:  Well, let's be blunt.  Quick lesson in

549

1    administrative law, which you all know.  So we have got the

2    litigating side of the EPA.  They bring this.  This is what they

3    concluded.  But, in turn, have to offer you a right to a hearing

4    in front of ALJ, and that ALJ -- all the ALJ did was find that

5    there was no basis for a summary judgment for either side.  The

6    case would have gone to a full blown hearing.  Instead, there was

7    a consent decree.  I want the jury to know all of that if we're

8    going to get into the weeds here.

9         But then we get back to that side of the EPA that brings

10   the complaint, has reasons for bringing the complaints, these are

11   essentially a prosecutor's accusations that haven't been

12   resolved it -- It would be sort of if I let an indictment in but

13   not the defense.

14        MR. BROGDON:  Your Honor, if I may, I think you have hit

15   on a key point.  I don't think a jury will appreciate there are

16   distinct duties of the EPA.  They'll think that if EPA says it,

17   it's the law.

18        MR. MACE:  Nor will they appreciate the difference

19   between what Your Honor had characterized, well, this is just what

20   the EPA or part of the EPA believed at the time, versus a finding.

21   They are not going to see a difference like that, and they're not

22   going to understand there are two different parts of the EPA.

23        THE COURT:  Well, I mean I think we all -- I certainly

24   let in the last time the complaint.  That can come in.  But if you

25   do that, then, of course, DuPont gets to say, we completely

550

1    disagreed with that.  We demanded a hearing.  And in the process

2    of all of this, we entered a consent decree.

3           MR. PAPANTONIO:  Judge --

4           MR. BILOTT:  Your Honor --

5           MR. PAPANTONIO:  Just one second.  By the time this was

6    all over, the conclusion was they had done nothing wrong.  And I

7    think the problem was then we weren't able to talk about the

8    penalties.  We weren't able to talk about --

9           THE COURT:  Well, I changed --

10          MR. PAPANTONIO:  That solved -- that may solve that

11   problem.

12          But the point is the way that this digressed into a he

13   said/she said, and the -- and really a mini administrative hearing

14   is what they wanted, was that we almost walked away thinking, we

15   did fine.  The EPA said we did fine.  Nobody said this was a

16   settlement.  They had to pay their way out of that.

17          THE COURT:  That was a big deal at the trial, but, you

18   know, there are two ways to look at this, and that's what the

19   trial is about.  So I'm going to let you to take the gloves off

20   and go at this, but I want the jury to get the full picture.

21   That's the important thing.

22          MR. BILOTT:  Your Honor, this was -- I don't know how

23   many times, and DuPont just keeps rearguing --

24          MR. PAPANTONIO:  The same issue.

25          MR. BILOTT:  But it was raised in the *Bartlett* case, and

551

1    Your Honor crafted a limiting instruction that walked the line

2    between these issues, which we agreed was the appropriate limiting

3    instruction.  This was briefed again, DuPont raised it again, with

4    another motion *in limine*.

5            Your Honor, you know, we have got -- This has been

6    raised.  It has been briefed.  We've submitted that we believe

7    that the same limiting instruction should be used because it did

8    balance that.  And we didn't --

9            THE COURT:  You have the limiting instruction handy?

10           MR. BILOTT:  Those were submitted again this morning,

11   Your Honor.

12           THE COURT:  Let me get back to this.

13           MR. BILOTT:  And the aspect --

14           THE COURT:  Neither of these are what I gave the last

15   time.  These are the new iterations, right?

16           MR. BILOTT:  Well, Your Honor, I believe that the version

17   we're asking for is the same.  We are asking for you to give the

18   same instruction that was provided in the *Bartlett* case.

19           DuPont wants to take out the portion of that limiting

20   instruction which repeated the language from U.S. EPA about their

21   concern that if the information had been provided sooner, it could

22   have acted sooner --

23           MR. MACE:  And then --

24           MR. BILOTT:  -- which is exactly from -- Those were the

25   allegations.

552

1          And what Your Honor did was to lay out:  Here's what was

2     alleged.  Here's how it was resolved.  The parties disagreed on

3     it.  It was resolved in the consent order.

4          MR. MACE:  In fairness to Your Honor, we pushed this out

5     a lot more since your initial rulings in Mrs. Bartlett.  When you

6     go back and look at the consent decree, you will see that

7     paragraph 4 is nowhere to be seen in there.  In fact, none of

8     those four paragraphs that are in here are in the consent decree.

9          What they had persuaded you to do for *Bartlett* is to

10     excise some of the allegations that were made in the complaint,

11     but completely excise from what you repeatedly told the jury --

12          THE COURT:  No offense, but I'm looking at it.  It was

13     described as what the EPA claimed.  It didn't say it came from the

14     consent decree.

15          MR. MACE:  Understood.  But what you did in the *Bartlett*

16     case was you gave various allegations from the complaint without

17     giving the detail of the denials of these.  You say, well, here's

18     what they said.  All these things.  And, by the way, DuPont denied

19     it.  It short shrifted us on our side of the whole story --

20          THE COURT:  I would call that truthfully a legal nuance.

21     I told them DuPont denied the claims.  That was as clear as day.

22          Now what I want to get to -- We're really arguing the

23     case here.  We're not making much headway.  Here's what I want to

24     talk about.  Perhaps we need another paragraph to explain very

25     briefly but succinctly and effectively, hopefully, how the

553

1       administrative process works.

2               MR. PAPANTONIO:  That would be fine.  That solves the

3       problem.  Because otherwise we're having to -- the jury is having

4       to get the nuance of the administrative.  I think it solves the

5       problem.  It is probably the safest thing to do.  I hear your

6       concern.  I just want to solve this to where it doesn't -- This is

7       about the fifth time this has been brought up.  They are so

8       concerned about what the EPA said.  And the reason they are is

9       because it does not allow them to say, we complied with government

10      agencies.  It's a problem for them.  No question.

11              THE COURT:  That's the first issue.  There is another

12      issue here's what I really want to get to.

13              We had the complaint and we -- the denials is the issue

14      what we are talking about.  The complaint lays out the

15      allegations.  The consent decree lays out the party's ultimate

16      result.  It's what in between.  And that has to do with the answer

17      of DuPont -- By the way, did you offer that as one of the

18      exhibits?

19              MR. MACE:  I think that's coming up, Your Honor.

20              THE COURT:  Let's just go ahead.  Are you objecting to

21      the use of the answer that the EPA -- that DuPont filed to the

22      EPA?

23              MR. MACE:  I believe I misspoke.  I believe we addressed

24      that this morning.

25              THE COURT:  It's in.

554

1        MR. MACE:  It's conditionally in based on how far they go

2    in getting into this and what kind of impressions they leave.

3        THE COURT:  Here's what is going to happen.  If we get in

4    these kinds of documents, we are going to get into -- I assume

5    DuPont has some documents to respond to.  How far do we get into

6    this?  It's either going to be bilateral, or it's going to be out.

7        MR. BILOTT:  Judge, the very things we used the first

8    time is what is all we're asking for.  They're making it sound

9    like we're making some expansion.  The reason they are making this

10   argument is to lead the Court to believe there is something is

11   different now.  There is nothing different about what they are

12   saying now and what they said three other times.

13        But, judge, here is what -- Just to make this clear, if

14   the Court wants it in a draft whatever kind of limiting

15   instruction -- obviously, we will agree to any limiting

16   instruction -- that explains what happened, I'm fine with that.

17   But, otherwise, we are going to get a mini trial, and they're

18   going to make it sound like almost they almost got a scout badge

19   for their conduct.

20        MR. MACE:  In addition to the point that you raised --

21   and in fairness I know that you haven't had a chance to study the

22   two parties' two proposals, and you said that you were going to do

23   that, but let me just highlight as you do that.  So you raised the

24   one that we probably need to add a paragraph or few sentences on

25   process.  Our two other huge issues is one in paragraph 4, which

555

1    there was a specific motion *in limine* on, which talks about --

2    reasonably support the conclusion that there was a substantial

3    risk of injury to health.  They want to misuse that --

4              MR. PAPANTONIO:  No, we don't --

5              MR. MACE:  -- to make it a finding of the EPA.

6              And we also, as Your Honor had discussed, nobody can

7    infer that the EPA would have done anything different, that it

8    would have had any effect on Mr. Freeman.  So we also included a

9    paragraph 3 in our proposed which mimics the words you said last

10   Friday, that they are not allowed to make those types of

11   inferences.

12             But in addition to that, we have a strenuous objection to

13   paragraph 4 in theirs, that is focusing the jury on this

14   misleading statement that reasonably supported a conclusion of

15   substantial risk of injury when that was the key finding -- We

16   have referred to this ALJ several times.  That was the key

17   disputed issue of fact that prevented either side from getting

18   summary judgment.

19             THE COURT:  All right.  I get it.

20             So back to this document that we started this discussion

21   with, 1674, is going to, to some extent, depend on what else is

22   coming in.

23             MR. MACE:  I agree with that, Your Honor.

24             THE COURT:  So if we limit this to the complaint and the

25   answer and the consent decree, what's wrong with that?

556

1          MR. MACE:  We can live with that, Your Honor.

2          MR. PAPANTONIO:  Well, we would want -- For example, he

3     wants to already -- The paragraph that he is talking about trying

4     to remove here is the paragraph that says, had you given us this

5     information, science would not be behind.  That became a major

6     feature of the trial because what they then do is they stand up in

7     2014 and 2012 and say, gee whiz.  In 2012, nobody knew anything.

8     The key factor there is they are being told, your conduct, by

9     hiding this stuff, has cost the progress of science.  They want to

10    keep that out.  We will live with what the Court does.  But to

11    remove that is patently unjust.  We would rather everything come

12    in.

13         MR. MACE:  His very statement, Your Honor, shows that he

14    wants the jury to assume the truth of this statement when it

15    wasn't true.  It was never proved to be true.  In fact an ALJ

16    ruled there was a hotly disputed issue on this.

17         THE COURT:  Right.  But it was true it was also the EPA's

18    litigating side's position.

19         MR. MACE:  In the complaint.  Not in the consent decree.

20         THE COURT:  Understood.  But I mean those statements are

21    true.  There was no resolution, but there was an accusation by the

22    EPA.

23         MR. MACE:  But it has got heightened for the reasons in

24    our MIL 2, I think it was, heightened trying to have the jury

25    inferring anything would have been difficult.

557

1          THE COURT:  As far as the plaintiff goes, that's right.

2      But what about the general state of science?

3          MR. PAPANTONIO:  That's the weight of the evidence.

4      That's what the jury can conclude, judge.

5          THE COURT:  Well, no, you can't -- I don't want -- I

6      don't think any way to take their accusation with regard to

7      Mr. Freeman's injuries.  As far as DuPont's conduct maybe.

8          MR. PAPANTONIO:  Yes, that's correct.

9          THE COURT:  If they went in that --

10         MR. PAPANTONIO:  That's correct.  That's correct.

11         MR. MACE:  We had given you the case law in our motion *in*

12     *limine*, judge, that's says that's an improper inference that is

13     allowing the jury to speculate, and there's numerous cases on

14     that.

15         THE COURT:  I will take a look at that.

16         But I want to go back.  In terms of documents we are

17     going to put into this universe, this is December 14, 2005, this

18     is PX 558, this is -- I assume this is from the same section that

19     -- yes, this is the Office of Enforcement of the EPA.  This is

20     their recommendation to higher ups in the EPA to approve the

21     consent decree.

22         MR. PAULOS:  That's correct, Your Honor.

23         THE COURT:  You still insist on offering this?

24         MR. PAULOS:  That's absolutely correct, Your Honor.

25         THE COURT:  That's going to open up for DuPont to put

558

1      their side in of why --

2           MR. PAPANTONIO:  Judge, we're fine with that.  I think

3      the Court will see what is happening when it plays itself out in

4      court.

5           THE COURT:  So to make sure I don't -- thank you.  So

6      that's already coming in.  And you're saying that this really --

7      it's a different time frame.  This was before the complaint, but

8      it is still sort of what each side was positing before this thing

9      became litigated.

10          MR. MACE:  Yes, sir.

11          THE COURT:  Now assuming that I buy that, there's still

12     some -- Are there any other issues that you would like me to

13     address?  I have some concern about the newspaper articles.

14          MR. PAULOS:  I was going to point the Court as to the

15     attachments of this, some of which you have already redacted, and

16     we have already had rulings on this morning, our communications

17     that are appended to this letter.

18          THE COURT:  To be clear, the newspaper articles -- To

19     make this easier, the reassignment of 50 women, that came into the

20     testimony the last time.

21          MR. MACE:  Your Honor, but the reason it's relevant here,

22     and, frankly --

23          THE COURT:  Just so you're clear, what I am saying,

24     that's certainly within the type of evidence that's going to come

25     in in this case.

559

1          MR. MACE:  Right, DuPont's conduct.

2          THE COURT:  From firsthand witnesses, first of all.

3          MR. MACE:  Yes, sir.

4          THE COURT:  And it's probably in this letter, too, isn't

5     this they just used -- all through the letter.

6          MR. MACE:  These new --

7          THE COURT:  This narrow issue of the newspaper article.

8     The information is, I'm saying, certainly relevant.  It is the use

9     of the newspaper article that concerns me.

10         MR. MACE:  I think we entered separately as individual

11    exhibits on the newspaper articles.  But the reason they are

12    relevant -- and we can address it then or now -- is that it gets

13    into the fact that this was widely publicized.  Plaintiff's whole

14    spiel is that DuPont was hiding these things, sweeping it under

15    the carpet.  This was widely in the media by *The New York Times*,

16    *The Wall Street Journal,* everybody under the sun was highly

17    interested in this chemical back in 1981.  I mean this was not

18    some big secret.

19         THE COURT:  All right.

20         MR. PAULOS:  Your Honor, DuPont's arguments against our

21    newspaper articles that we tried to proffer yesterday should --

22    should carry over to their -- their own evidence.  These are

23    newspaper articles that are clearly hearsay.  They have --

24         THE COURT:  Well --

25         MR. PAULOS:  -- plenty --

560

1      THE COURT:  But if there is some evidence that the

2   DuPont's press evidence what the allegations would be, then what

3   was public becomes relevant, particularly information they made

4   public.  But there is no counterclaim like that against your

5   client where he's -- In other words, he's not accused of

6   suppressing anything.  So showing what other newspaper articles

7   published had nothing do with this issue that DuPont has raised.

8   I don't get the -- why one begets the other.

9      MR. PAULOS:  Well, Your Honor, I think to quote DuPont's

10  arguments yesterday, the newspaper article are per se hearsay and

11  shouldn't be included or allowed into evidence.  There's plenty of

12  testimony from firsthand witnesses that will discuss DuPont's

13  conduct surrounding the removal of the female Teflon workers from

14  the plant line.  From what I recall in the *Bartlett* trial, we did

15  not make any assertion that they hid that fact from the public.

16  And so to suggest that we did and to allow them to have evidence

17  on hand to introduce or to rebut something that we have not --

18      THE COURT:  I guess I do see that a little bit.  This is

19  sort of rebuttal.  If you get a taste in the case, you know, that

20  there is a claim put in a position that nobody could know about it

21  and certainly someone can testify, if they have firsthand

22  knowledge, this was widely disseminated to the press, that's a

23  fact.  It's, again, the articles.  I did see this more as rebuttal

24  at this point.

25      So the document, unless there are other issues, will come

561

1    in without the newspaper articles, again subject to restrictions

2    if the case takes a different turn.

3           MR. MACE:  Yes, sir.

4           MR. PAULOS:  Your Honor, there is the letters that are

5    appended to this document are letters that have been subject to

6    redaction and other rulings that have occurred today.  So I would

7    request that --

8           THE COURT:  Well, this is where -- In this case, are we

9    looking at what the EPA received?

10          MR. MACE:  Yes, sir.

11          THE COURT:  But they were redacted to the EPA.  We want

12   the jury to see what was sent to the EPA.  Right?

13          MR. PAULOS:  We're just going to eliminate the redactions

14   that we -- that applied to the -- to the other documents.  It's

15   just a way to backdoor the documents without redactions.

16          MR. O'BRIEN:  Right, because there were other documents

17   that we were the proponent of the evidence that went to the EPA --

18          THE COURT:  I thought I ordered them to give those to

19   you.  In other words, these redactions in the other -- These are

20   copies of other exhibits.  When we went through the other

21   exhibits, I thought we had a discussion that you would give to

22   them what had been redacted, and you would review it.

23          MR. MACE:  Yes, sir.

24          MR. O'BRIEN:  There are two separate issues.  There's one

25   that was a pre-litigation redaction or a redaction that on the

562

1    face of the document that wasn't ordered by the Court for trial

2    purposes.  And so that's not an issue.  Obviously, there's a lot

3    of correspondence or information that we're the proponent of the

4    evidence, one, that for whatever reason had to be redacted, such

5    as the Little Hocking letter to EPA.  So it's not so much an issue

6    that we have to see everything that the EPA says because the rules

7    of evidence still apply because that was applied by the Court.

8    And we're talking --

9              THE COURT:  I mean to the extent we redacted anything

10   from these letters that were attached --

11             MR. PAPANTONIO:  They should be redacted.

12             THE COURT:  -- they should be redacted here.

13             MR. PAPANTONIO:  That's all --

14             MR. MACE:  But the jury would need to be told that those

15   redactions in this, when this was used, they would have to be told

16   those items were not redacted when they were sent to the EPA.  We

17   don't want the jury thinking that the EPA was given --

18             MR. PAPANTONIO:  That's fine.

19             MR. PAULOS:  And the other thing, too, Your Honor --

20             THE COURT:  Remind me of that, but I will give an

21   instruction that redacted in this case, not in the letters that

22   the EPA received.

23             MR. PAULOS:  The letters that were appended to this are

24   also the documents that were created for trial or for the purposes

25   of exhibits that are excerpts of larger documents.  And so you

563

1    will recall Mr. Bilott was informing the Court there was one

2    document where they -- the alleged disclosure of the public entity

3    about FC-143 surfactant being in the water was actually buried in

4    the document and that it had been excerpted and was made to appear

5    it was a two-page document.  That is, again, appended to this

6    letter.  And this is exactly what they were trying to show the

7    EPA.  Look at we told you years ago that this -- that this was an

8    issue.  And -- But what they didn't tell the EPA when they

9    submitted this very letter that it was buried in a 100-page

10   document and made it appear it was a two-page document.  It a --

11            THE COURT:  That's cross examination, though.  You're

12   going to have to use it that way.  But that was what was sent.

13            MR. MACE:  Yes, sir.

14            THE COURT:  So we'll start with this.  Anything omitted.

15   You can certainly delve into.

16            All right.  That takes us through volume 1.  I don't

17   think this is using the same system.

18            MR. MACE:  I have a red one.

19            THE COURT:  This one is a little smaller.  All right.

20   Let's get to 1695.

21            MR. PAULOS:  Your Honor, this is a list of drinking water

22   standards for the Ohio public water system, and it's irrelevant.

23            THE COURT:  Well, here's what with this, you know, it

24   would otherwise -- It's a public record, but that doesn't solve

25   the relevance issue.  How can a jury compare arsenic to C-8?  I

564

1    mean there is not going to be any testimony about these chemicals.

2            MR. MACE:  You will recall, Your Honor, on a couple

3    occasions both plaintiff's counsel and plaintiff's expert misled

4    the jury, that C-8 was on the MCL list or there had been a draft

5    MCL, both of which were patently false and untrue.

6            THE COURT:  So you want to use this for impeachment

7    basically?

8            MR. MACE:  Primarily, yes.

9            THE COURT:  So if somebody says, it's on this list.  And

10   this is a list of all the regulated chemicals, it's not on there.

11   You can use the list for that purpose.

12           MR. MACE:  Yes, sir.

13           THE COURT:  But it won't be admitted for this.  Use it

14   for cross, and we'll take it from there.

15           MR. MACE:  Yes, sir.

16           THE COURT:  All right.  1673.  Does that have to do with

17   names?

18           MR. PAULOS:  I think it's 1763, Your Honor.  And we're

19   prepared to withdraw our objection to this.  However, it does

20   include a document -- The first two pages of this document are a

21   document that the Court redacted earlier today, and I mean we

22   would simply ask those same redactions apply here.

23           THE COURT:  All right.  You see it that way.  Is that

24   agreeable?

25           MR. MACE:  We are not agreeable, but we will do what the

565

1    Court ordered.

2         THE COURT:  There are no additional objections.  We will

3    preserve your earlier objection.

4         MR. MACE:  Thank you, sir.

5         THE COURT:  Does that take care of the whole document?

6         MR. MACE:  Yes, sir.

7         THE COURT:  All right.  1767.

8         MR. MACE:  And I think, Your Honor, this is the --

9    remember the earlier document that said enclosures will be

10   separately circulated.  So these were the enclosures for that

11   meeting between the state and DuPont that was discussed in this

12   earlier document.  We said we would get to the separate

13   circulation of the attachments.

14        THE COURT:  So these are the attachments.  Any objection?

15        MR. PAULOS:  Your Honor, again, this is page 1767.23

16   contains the summary of the meeting with the WV DNR --

17        THE COURT:  Before we get to that, I'm actually smiling

18   here, all that time we spent yesterday with the numbers, operating

19   expenses and so on --

20        MR. PAPANTONIO:  It's being offered.

21        MR. O'BRIEN:  This is how it came in.  This is actually

22   how it came in.

23        MR. PAPANTONIO:  This is being offered.

24        THE COURT:  Right.  I mean do we want to redact that?

25        MR. O'BRIEN:  No, no.  The Court has ruled that it's in.

566

1          THE COURT:  Well, we're not playing checkers.  Nobody has
2     taken their finger off yet.
3          MR. MACE:  I'm sorry, what page were we on, sir?
4          THE COURT:  1767.2.  You probably know it by heart.  You
5     don't need the actual page in front of you.
6          MR. MACE:  Yes, sir.
7          THE COURT:  But it has got the payroll -- I don't know
8     what year this is, '92 --
9          MR. MACE:  Yes, sir.
10          THE COURT:  Operating costs, $600 million, everything we
11     agreed to.
12          MR. MACE:  You had asked to look into those and come up
13     with a way that would be agreeable --
14          MR. O'BRIEN:  We drilled down.  What you said yesterday
15     was that you can use $600 million.  There would be representation
16     of what percentage --
17          THE COURT:  Of the C-8 operations information.
18          MR. O'BRIEN:  Right.  That was the resolution.  I have no
19     problem with taking the payroll out and the other numbers out.
20     But we fashioned a compromise on that 600 million.
21          THE COURT:  All right.  So they are going to hear about
22     the 600 million which the 25 percent applied to it.  All right.
23          But we will take out the payroll --
24          MR. MACE:  Your Honor, frankly, I mean that's part of the
25     operating costs, so it's part of putting that into context.

567

1          THE COURT:  So you want to leave that in?

2          MR. MACE:  Yes, sir.

3          THE COURT:  I assume you have no objection.

4          MR. O'BRIEN:  Well, what they're doing that for is to

5     tell the jury, we contribute --

6          MR. PAPANTONIO:  Judge, it's either one thing or the

7     other.  It's either we take it out or we just put the entire thing

8     in.

9          MR. MACE:  Well, if we take it out --

10          MR. PAPANTONIO:  They didn't talk about it yesterday.  We

11     knew it was coming down the pike.  We said, well, okay.  Let's do

12     a compromise.  So today it shows up they want everything in.

13          MR. MACE:  If they want everything out, then you take the

14     600 million out.  But we should be able to be put it in context.

15          THE COURT:  Well, the 600 million is coming in anyway.

16     The 110 million, not necessarily.

17          MR. MACE:  Why is that?

18          MR. O'BRIEN:  It's not relevant to anything.

19          THE COURT:  I thought you had an agreement that we would

20     use the operating cost --

21          MR. PAPANTONIO:  We did, judge.

22          THE COURT:  -- and we should tell them 25 percent was

23     related to C-8.

24          MR. MACE:  And they should be told the same percentage

25     applies to the payroll.

568

1      MR. O'BRIEN:  But what is that relevant to?

2      MR. MACE:  Because it puts -- they want to make the jury

3   think that there's $600 million sitting around in Bossert's desk

4   that he can spend it on whatever he wants to spend it on.  It's

5   actually tied with all these other required expenses to operate a

6   plant.

7      MR. O'BRIEN:  Your Honor, it's pandering to the jury, to

8   the jury pool --

9      THE COURT:  I'm not sure I agree with that.  They are a

10  million -- The more numbers you put out like this, the more chance

11  of speculation.  A juror can look at this and say, all that money

12  spent and only one sixth gets to the employees.  Somebody might

13  say that.  And on the other hand, somebody else might say, gee,

14  it's really helping the local economy.  It can go anywhere.  If

15  you want a game analysis, it's like a billiard ball.  You don't

16  know where it is going to bounce.

17     I think the payroll -- Really I think we ought to exclude

18  everything from that except the date the plant began operation and

19  the annual operating manufacturing costs.  And that's it.

20     MR. O'BRIEN:  Okay.

21     MR. PAPANTONIO:  Okay.

22     THE COURT:  That's one thing.  If we go to into second

23  phase, it's all a different analysis.  That takes care of that

24  exhibit, right?

25     MR. PAULOS:  One moment, Your Honor.  Again, it's just

569

1    the -- On page 1767.23, we just like the redactions that Your

2    Honor applied to this summary of the meeting to apply to this --

3    this version.

4          THE COURT:  Subject to your earlier objection, nothing

5    new, right?

6          MR. MACE:  Yes, Your Honor.

7          THE COURT:  It will come out again.

8          Now we get to 1837.

9          MR. PAULOS:  Your Honor, this is another document.  That

10   is actually one of the attachments that was on U.S. EPA letter

11   that we were just discussing, and it's a document that is an

12   excerpt of a much larger document.

13         MR. BROGDON:  Your Honor, we dealt with 1837 and 1943

14   again in the *Bartlett* trial.  Mr. Bilott and I conferred.  We were

15   able to supply the fulsome document and met their satisfaction.

16   We can do the same thing here.

17         THE COURT:  That sounds agreeable.

18         MR. BILOTT:  Yes, Your Honor.

19         THE COURT:  Very good.  It will be admitted subject to

20   you working the details out.

21         MR. PAULOS:  And, also, Your Honor, subject to notifying

22   the jury, if this is shown visually on a screen where you can't

23   tell how many pages to this document there are, the document

24   appears to be a much larger document, that this is simply an

25   excerpt of it.

570

1          THE COURT:  All right.  I think that takes us to 1854.

2          MR. O'BRIEN:  Your Honor, 1006 is an exhibit offered by

3     the defendant, and here's the problem.  The problem is they have

4     never -- When we produced our 1006 summary for the emissions data,

5     we had all the references in the tab of the index which

6     immediately followed the voluminous record summary, and we also

7     provided all of those supporting data documents so that the

8     veracity of the documents can be reviewed and confirmed by the

9     opponent of the evidence.

10         Here we have not received the documents.  We have not

11    received the underlying documents.  The second sentence of 1006

12    requires, as follows, the proponent must make the originals or

13    duplicates available for examination or copying or both by other

14    parties --

15         THE COURT:  Your contention is this is a summary exhibit,

16    and the backup document wasn't provided.

17         MR. O'BRIEN:  Right.  What we did in the last trial, and

18    I think it got mooted because it never got tendered as a 1006,

19    they then produced -- We said, where are the data?  And they

20    produced another spreadsheet.  Well, the spreadsheet is not the

21    data.  The spreadsheet is a summary of the data, and then they

22    excerpt the portion they like out of the spreadsheet.  So we get

23    to review the actual data to show whether folks had kidney cancer

24    or whether they worked in Teflon or whether they worked in

25    Beauticide.

571

1              MR. MACE:  Yes, Your Honor.  There were documents Your

2       Honor had ruled could come in the last trial.

3              You will recall what happened was -- We gave them all the

4       information on a CD.  We produced the CD to them.  Your Honor took

5       an extended lunch hour to let them review it with regard --

6              THE COURT:  Only because of the CD.  But go ahead.

7              MR. MACE:  Yes.  But, you know, they have known about

8       these summaries.  These are the same summaries that were prepared

9       for that trial.  They have the data.

10             THE COURT:  That's my question.

11             MR. MACE:  I am trusting Mr. O'Brien's statement --

12             MR. PAPANTONIO:  No, we don't have the data.

13             MR. MACE:  They've had it since September.

14             MR. PAPANTONIO:  That's not true.

15             MR. O'BRIEN:  We got the spreadsheet summarizing the

16      data, a larger spreadsheet summarizing the data, and then a

17      excerpt of that spreadsheet/ we don't have the underlying data

18      itself.  We are completely unable to determine whether the facts

19      represented on either of the two spreadsheets are correct.

20             MR. MACE:  The data is the CD.  That is the data, and

21      they were given -- They were given it again during the *Bartlett*

22      trial.  They had it since 2004 when it was produced as discovery.

23             MR. PAPANTONIO:  Judge, this is far different from us

24      saying, how much poison was put in the river every year?  Well, we

25      can show this year this much poison was put in.  This year there

572

1    was this much.  And we have the data to do it.

2            Here there is -- What they are talking about data is --

3    are conclusions in and of themselves.  The conclusions are not

4    going to --

5            THE COURT:  We need to drill down.  So let's just take

6    the first person on here, age 52 in 1971.  If we go to the

7    spreadsheet, tell me what would be on there about this person?

8            MR. BROGDON:  The spreadsheet is kept by Haskell

9    Laboratories, the epidemiologists who record the data.  This is

10   the business record where this information is kept.  And it tracks

11   the doses.  It tracks the dates.  It tracks all the screening that

12   was done over the years.

13           THE COURT:  That's all on the spreadsheet.

14           MR. BROGDON:  It was in the spreadsheet that was produced

15   in '04.

16           THE COURT:  How many years worked?

17           MR. BROGDON:  Yes.

18           THE COURT:  Years of water.

19           MR. BROGDON:  All the information columned in the

20   spreadsheet, where they worked, the positions, all those things.

21           THE COURT:  My assumption this was -- well, the person

22   was diagnosed in 1971.  What year would you expect that document

23   to be created?

24           MR. PAPANTONIO:  More importantly, what is the diagnosis,

25   what is the underlying elements of the diagnosis, judge?  We don't

573

1    have the --

2            MR. O'BRIEN:  We don't have the raw data.

3            MR. PAPANTONIO:  They're jumping to the conclusion that a

4    particular diagnosis took place without any supporting data.

5            THE COURT:  I haven't seen it.  I am trying to figure out

6    what's there.  On the spreadsheet --

7            MR. MACE:  Your Honor, if I can have ten more seconds on

8    the objection background, what this goes to is rebuttal of their

9    misuse of the surveillance.  The plant every five years or so

10   would do surveillance where they would compare:  What types of

11   diseases are we are seeing in the overall plant?  And you have

12   heard other testimony about going to check:  Were this people in

13   the Teflon area or another area?  This gets to:  What did DuPont

14   know back at the time regarding the people that were showing up

15   with diseases?

16           THE COURT:  I get that.  But now we get into the weeds

17   under 1006.  So were there backup documents that are not the

18   spreadsheet?  I guess that's the question.

19           MR. PAPANTONIO:  Judge, if there were a disease.  We

20   ought to be able to see who made the -- how the determination was

21   made of the disease?  Simply because somebody says they have this

22   type of cancer, we have the right, under 1006, to understand:

23   What is that?

24           THE COURT:  What you are really getting into is broader

25   than 1006.  How did the company know when somebody did or didn't

574

1    get renal cell carcinoma?

2           MR. O'BRIEN:  It is tied up in there.  In other words, we

3    have an unknown scrivener --

4           THE COURT:  There may be an answer to this.  So there's a

5    medical department at the plant.  Would these be the people who

6    collected the data?

7           MR. BROGDON:  It is likely have come from them.  They

8    worked with the people in Wilmington with this.  But it's

9    important to note that the spreadsheet itself is a business record

10   that's been kept now -- over a decade ago it was produced.  It was

11   provided in 2004.  That data was recorded in the due course of

12   operations of Haskell Labs.

13          THE COURT:  And that could very well come in as a

14   business record.  But when we get a summary, it might take us into

15   a different field.

16          For some of those, I don't know what years.  When we look

17   at the diagnosis here, we're going pretty far back, are the paper

18   backups to this gone?

19          MR. MACE:  That's my understanding, Your Honor.

20          MR. BROGDON:  I believe that's the case for most of

21   the --

22          THE COURT:  Wait, wait, wait.

23          MR. BROGDON:  What DuPont captured is the business

24   record.  That's the way they are kept.

25          THE COURT:  What is left is on the spreadsheet?

575

1          MR. BROGDON:  It's a record that's kept, yes.

2          MR. O'BRIEN:  And then there's some spoliation of

3     evidence.

4          MR. PAPANTONIO:  Exactly.

5          THE COURT:  This is -- The first person on here is 1971.

6     If they were destroyed ten years later, it would be well beyond

7     the lawsuit.

8          MR. O'BRIEN:  Right, but the data were actually collected

9     not in 1971 they were collected in the 2000s.  Is that right, Mr.

10    Bilott?

11         MR. BILOTT:  If I can clarify for a moment, this data

12    that DuPont's referring to, one of the reasons we have great

13    concern about seeing what the backup information is that was the

14    same data that was supplied to the Science Panel.  The Science

15    Panel said, we don't understand where these tallies are coming

16    from.  They had to redo it.

17         So in some sense -- I mean what we are trying to do is

18    put in their version of the Science Panel data.  The Science Panel

19    redid this and looked at the worker data again.

20         THE COURT:  When you say redid, what did you mean?

21         MR. BILOTT:  They did their own study and analysis of the

22    workers because we looked at DuPont -- whatever DuPont gave

23    them --

24         THE COURT:  What did they use?

25         MR. BILOTT:  They did it themselves.

576

1        THE COURT:  They dug out from the treating physician the

2   information?

3        MR. BILOTT:  I don't know exactly what sort of raw data

4   they were given access to, but they ended up redoing --

5        THE COURT:  I think this is bigger than 1006.  The

6   question is:  How do you know?  That's the question.

7        MR. BILOTT:  Exactly.

8        MR. MACE:  Your Honor, again, it's for this record that's

9   kept by Haskell.  It's the basis for what DuPont was making its

10  decisions on.

11       THE COURT:  This would be prepared for litigation.  This

12  is not a business record.  The backup document very well might be.

13       MR. BROGDON:  But the backup documentation is thousands

14  of pages of spreadsheet.  That's why we have the 1006 summary of

15  that document, which is a business record.

16       MR. MACE:  Which they have had for twelve years.

17       THE COURT:  I disagree.  The backup documentation that is

18  kept in the regular course is the business record.

19       MR. BROGDON:  You're right, Your Honor.  I'm not saying

20  this is.  The backup document is the business record.  It's to

21  thousands of pages of spreadsheet --

22       THE COURT:  To make it easy, I get it.

23       MR. BROGDON:  Thus the brief 1006 of a voluminous

24  document.

25       MR. PAPANTONIO:  At the end of the day, who said this is

577

1    a malignant neoplasm of the kidney?  Those documents are the very

2    essence of these conclusions.

3        THE COURT:  So, in other words, if we look -- if we look

4    at the backup document, it will say this.  But it won't say who

5    made the diagnosis.  Would that be accurate?

6        MR. MACE:  I think that's accurate.  But, again, this

7    data that's coming from the voluminous records, that was the

8    business record, is the basis on which DuPont was making its

9    decision.  Now that's where -- When you come up with the nine

10   cases or whatever, they want to use the summary document from '89,

11   '97, there are several of these, where they said, oh, you had

12   seven cases of kidney cases.  Well, these are the seven cases.  So

13   it's their diagnosis.  But it's the other information that DuPont

14   also had.  So it looked back at, not only what the job history --

15       THE COURT:  Is it on here?

16       MR. MACE:  I am sorry?

17       THE COURT:  The other information that you are referring

18   to?

19       MR. MACE:  This information along with other information

20   about each of these individuals is in this voluminous record.

21       MR. O'BRIEN:  But we don't know who authored this

22   voluminous record.  There's no indicia of reliability other than

23   it's a spreadsheet, it's an excel spreadsheet.  We can't

24   cross-examine.  We are in an impossible -- We don't accept this at

25   face value.

578

1      THE COURT:  Well, you can't cross-examine about the

2  limitation of the information behind it.

3      MR. O'BRIEN:  The underlying information behind where

4  there's no way of us knowing that's true other than some unknown

5  declarant entered it into an excel spreadsheet.

6      MR. PAPANTONIO:  We are cross-examining -- For example,

7  if we're cross-examining a differential diagnosis, we would

8  understand how to cross-examine of this differential diagnosis,

9  what are the parts of what that doctor did when he said, well,

10  this is neoplasm kidney disease.  We have no information about

11  this disease.  They have it.  If they can get it to us, fine.  But

12  to simply say --

13      THE COURT:  What do you think they have that you don't

14  have?

15      MR. O'BRIEN:  They should have it.  If they are

16  extracting this information and putting it into a spreadsheet,

17  they should have that information, the actual information, whether

18  it's a questionnaire of the worker or whether it's records from

19  the worker's comp doctor or whether it's from the plant doc, such

20  as Dr. Powell or Dr. Karrh.  They should have the underlying data

21  because they are representing it as true, and we have no way to

22  confirm that.  We have no way to even cross-examine --

23      MR. MACE:  Your Honor, that's --

24      MR. O'BRIEN:  May I finish, please?  May I finish,

25  please?  We have no way to cross-examine this unknown scrivener --

579

1          THE COURT:  I get it.

2          MR. MACE:  It is no different than a database that is

3     kept of the billing records for your light bill.  I am sure AEP or

4     whomever doesn't keep every monthly bill they send to you.  But

5     they have a record --

6          THE COURT:  I think, you know, what I was billed in 1980

7     is different than a diagnosis of informing me I have cancer.  One

8     is a perfunctory act.  The other is something that requires

9     judgment and expertise and so on.

10          But having said that, how are you going to use it?  How

11     do you so as a defense exhibit?

12          MR. MACE:  This is going to be used in rebuttal when they

13     are trying to mischaracterize -- They're going from another

14     summary, this '89 summary report of surveillance data from the

15     plant, which lists seven kidney cancer cases.  I'm not sure about

16     the numbers exactly.  But so many kidney cancer and so many

17     testicular cancer.  But at the same time, DuPont had the data on

18     those individuals, whether they worked in Teflon or not, whether

19     they had tobacco exposure, which is a risk factor for kidney

20     cancer, the various data that made -- allowed them to investigate:

21     What does this mean with respect to C-8?  Which they did.

22          THE COURT:  There is an employee ID number, which is I

23     assume the first number at the left, on each of these people.

24     You're confident that if you went back and looked at their file,

25     this information would all be gone?

580

1          MR. MACE:  We actually walked through this, Mr. Brogdon

2     did over the lunch hour, I thought it was with Mr. O'Brien --

3          MR. BROGDON:  McWilliams.

4          MR. MACE:  Mr. McWilliams in detail to show him this is

5     where it comes from, the column --

6          MR. PAPANTONIO:  We are -- Judge, we have the same

7     problem, if I might --

8          THE COURT:  What I want to do is clear this up.  The

9     information you are confident doesn't exist in any --

10          MR. MACE:  Any form other than kept business record.

11          MR. BROGDON:  This record has existed in some form for

12     many years.  So, yes, the underlying documents from the '70s,

13     '80s, as far as we can tell aren't there because they were

14     captured in this method of reporting which is what the corporation

15     uses.  This is the spreadsheet, the record it uses --

16          THE COURT:  Now let me go back.  I know I'm jumping

17     around here, but I'm trying to get my arms around this issue.  Are

18     any of the experts going to use this list?

19          MR. MACE:  Well --

20          MR. PAPANTONIO:  We are not because our experts are going

21     to say, well, in order to diagnose malignant neoplasm, is it oat

22     cell carcinoma?  Where did it initially metastasize?  How long did

23     it take it to develop?  All --

24          THE COURT:  The reason that I ask, this is a defense

25     exhibit.  What I'm getting at is what do you need this for?

581

1          MR. MACE:  Dr. Rickard would use this because he went

2     back into the database with the in-house epidemiologist and made

3     sure he was interpreting this right.  He was involved in helping

4     to create the summary and make sure it was an accurate summary.

5          And you will recall that we used one of these -- I mean

6     we have got several of these from different years.  We used at

7     least one of at least type of them in the first trial.  And

8     Rickard was the witness to say this is a true and accurate.

9          MR. O'BRIEN:  May I speak to something here?

10         THE COURT:  Hang on a second.  So Rickard has a high

11    level role.  And he's not a medical doctor?

12         MR. MACE:  He's a toxicologist.

13         THE COURT:  What I am asking -- First of all, the -- tell

14    me if I am missing this -- so DuPont every so many years do

15    surveys to see if they have big jump in certain types of medical

16    conditions?  That's the whole point of this, right?

17         MR. MACE:  Right.  There's a little more to it than that.

18         THE COURT:  You know, that's something that goes to their

19    conduct.  That's all admissible.  Assuming you have somebody with

20    the right knowledge and credentials.

21         But these small groups, over a period of years,

22    scientists and epidemiologists couldn't do much with this.  This

23    is a fairly small group of people.

24         MR. MACE:  This not an epidemiology study.  It's a

25    surveillance.  But at most it is an identifier is there more to

582

1       look at or not.  But what they did was looked back at the

2       individuals to see:  Where did they work?  Is that something that

3       we need to look into?

4              THE COURT:  And that goes to corporate conduct.

5              MR. MACE:  Which is what they were looking at.

6              THE COURT:  This doesn't rule out anything in a medical

7       sense.  You're not going to make that argument, are you?

8              MR. MACE:  No, sir.

9              THE COURT:  That's why I think we're kind of chasing our

10      tail here.

11             MR. O'BRIEN:  If I may speak to a couple things.  I

12      disagree that it is a business record because a business record

13      has a contemporaneity requirement.

14             THE COURT:  This particular document, I am sure is.

15             MR. O'BRIEN:  Right.  But the underlying data, there is a

16      contemporaneity requirement.

17             THE COURT:  I get it.  But here's my question.  Do we

18      need any of these, showing what happened to people at the plant?

19             MR. O'BRIEN:  The issue is not whether these are correct

20      so much as to whether they missed a bunch, and they under

21      reported.  That's --

22             THE COURT:  But no expert in the case is going to look at

23      -- These are all employees, right?

24             MR. MACE:  These are employees, Your Honor.

25             THE COURT:  There is no particular study about employees,

583

1     is there?

2          MR. PAPANTONIO:  There is one, judge.  But it wasn't done

3     by us.  We didn't put the documents together.  Scientists did.

4     And their own people were involved --

5          MR. MACE:  We need to rebut it, Your Honor, because

6     they're using this '89 surveillance report with Dr. Siegel,

7     perhaps Petty, with their experts to say, ah-ha.  These terrible

8     people, they saw an excess of kidney cancer in their plant, and

9     they didn't do anything about it.  They did do something about it.

10          THE COURT:  Are you expecting that?

11          MR. PAPANTONIO:  Yes, that will happen.  It's not that

12     they didn't do anything.  They can say we did something about.

13     But to say that what we're doing, we're now telling the jury that

14     based on completely guesswork, that this person, 1890 had kidney

15     neoplasm, judge, this is a huge leap.

16          We have no trouble saying they had a monitoring process.

17     Our is not anything -- The document we offer is nothing like this.

18          MR. O'BRIEN:  The other issue here is not so much what

19     did they use it as.  Number one, they tried to use it on cross

20     with our folks, which, obviously, they can't do because they

21     haven't established a foundation for it.  Number two, it's not so

22     much -- the issue about whether they misdiagnosed is a huge issue.

23     The more important issue is where these folks worked.  Did they

24     work in Teflon or did they ever work in testify?  Because what

25     they say is, hey, when we looked at the spot where the Teflon was,

584

1    we didn't find such a signal.  We didn't find the numbers.  They

2    came from outside the Teflon group.

3         The point is the data came from a claims database, and

4    that that evidence should never be destroyed because it is

5    insurance information.  It should never be destroyed.

6         MR. PAPANTONIO:  It's not there.

7         MR. O'BRIEN:  Amd if it was destroyed, particularly at

8    the time these records were created, the underlying spreadsheet

9    for the data, that's a destruction of evidence from which they

10   should not profit.

11        MR. BILOTT:  And an important point here is that the

12   documents plaintiffs have used are documents that were prepared by

13   DuPont's corporate epidemiologist as part of their routine

14   business, and it was actually prepared by the DuPont

15   epidemiologist.  We used them with our experts who are

16   epidemiologists to review that data.

17        What DuPont is saying they are going to do is to give

18   what in essence an epidemiology results to non-epidemiologists,

19   Dr. Rickard is not an epidemiologist.  Mr. Playtis is not an

20   epidemiologist.  They don't have an epidemiologist.

21        MR. PAPANTONIO:  Not even a medical doctor.

22        MR. MACE:  This is not epidemiology evidence.  This is:

23   What was the significance, if any, when they saw seven kidney

24   cancers?  They looked back at -- The testimony was in *Bartlett* --

25   they looked back at:  Where did these people work?  Was there a

585

1    cluster around the people working in C-8?  No.  Were there other

2    things these were exposed to like tobacco that could explain it?

3    Yes.  And this is why -- it rebuts their statement:  You saw a

4    excess of kidney cancer at the plant.  You should have done more.

5    It should have alerted you to do more.  We did more.  We went and

6    investigated it.

7         MR. DOUGLAS:  If you're looking at cluster, you're

8    talking about epidemiology.

9         THE COURT:  Well, you know what?  Way -- I am guessing

10   this sounds like a fairly important document.

11        MR. PAPANTONIO:  It is, judge.

12        THE COURT:  You are going to brief this.  I don't feel

13   comfortable doing this on the fly.  I do see a lot of different

14   issues.  Are you satisfied if we do simultaneous filings, in that

15   sufficient.  Is that by Monday?

16        MR. O'BRIEN:  Yes, Your Honor, there are several

17   documents to which they apply so I can announce those so we can --

18   we don't want to rehash this this afternoon.  I think that this

19   would -- the common objection would apply this common objection

20   would apply to D.1854, D.1858, D.1860, D.1857, D.1861 and D.1863

21   and D.2453 and D.2452.

22        MR. PAPANTONIO:  Judge, just to ease this, our

23   fundamental complaint is the inability to cross-examine is the

24   most essential part of our right.  It just removes our possibility

25   of cross-examination entirely.

586

1          MR. O'BRIEN:  So it goes to unfair notice, there are

2     really two avenues of records which should have been kept.  One is

3     the medical records.  Two is the employment records.  It is

4     inconceivable a pension company, such as DuPont, has destroyed

5     employment records, and here's why this is important.

6          THE COURT:  Well, you can address this in the brief.  I

7     don't want to decide this on the fly.

8          So is the --

9          MR. O'BRIEN:  And all I'm doing is giving them fair

10    notice as to what to brief since we're doing contemporaneous

11    briefing, Your Honor, is that we're going to make the

12    representation at that time employment records were destroyed, and

13    we would like them to know that.

14         THE COURT:  So there are a number of these.  That are the

15    next exhibit is covered by what we just discussed, right.

16         MR. MACE:  Right.  This is one of the type -- one of

17    these types.  I think the one from '89 instead of '97, which was

18    expressly admitted in *Bartlett*.

19         THE COURT:  Just so I'm clear on 1857, it says kidney

20    work history.  It doesn't have a condition listed.  What do I make

21    of that?

22         MR. MACE:  Yes, sir.  So you see the employee numbers in

23    the left column.

24         THE COURT:  Right.

25         MR. MACE:  So you see the shading separates individuals.

587

1    So it shows their work history over time and what different jobs

2    they had at the plant.

3         THE COURT:  But it doesn't show the conditions.  Are

4    these all people with kidney issues?

5         MR. MACE:  Exactly, kidney, work history.  So the people

6    that showed up with an observed case of this kidney cancer in

7    1997, when you went back and looked at their employee records,

8    which was done at the time, what was their job history, did they

9    work in Teflon or not.

10        THE COURT:  And how about when we get to --

11        MR. LEBER:  I believe 1874, Your Honor, is the next

12   document at issue.

13        MR. PAULOS:  Your Honor, this is a document that has a

14   date of September 20, 2000.  And it is simply a list of certain

15   CEGs and AELs that developed over time at DuPont.  We believe that

16   at a minimum this would require the Court to give a limiting

17   instruction regarding those values.

18        MR. MACE:  And this is one of the documents in the

19   plaintiff's experts' backup.  We have the author on the back of --

20   the second page of the bottom the date this was created.  But

21   there is no contention this isn't an accurate list of the various

22   AEL --

23        THE COURT:  You want a limiting instruction with this?

24        MR. PAULOS:  Right, Your Honor.

25        THE COURT:  Otherwise, you are satisfied with this?

588

1    MR. PAULOS:  Yeah, we have no objection aside from the

2    Court providing its limiting instruction regarding AELs and CEGs.

3    THE COURT:  Then we get to 1927.

4    MR. PAULOS:  Your Honor, we're going to go ahead and

5    withdraw our objection to this in light of the Court's guidance

6    this morning.

7    THE COURT:  1936?

8    MR. PAULOS:  1936 is a list of known uses of chemicals of

9    carcinogenic potential.  It appears to be a list of chemicals I

10   believe at use at the Washington Works Plant.  It's not clear.  We

11   believe that this has no relevance to any issues in the case.

12   THE COURT:  What's the issue here?

13   MR. MACE:  Two, Your Honor.  Again, with this cancer

14   surveillance reports, so they're saying, my goodness.  You had

15   cancer cases showing up in your plant.  And they want the jury to

16   think that the only chemical being used at the plant was C-8 --

17   THE COURT:  We got into this before.

18   MR. MACE:  In fact all these other chemicals that are

19   capable of causing cancer.  So just because somebody --

20   THE COURT:  Isn't that dangerous on your end to --

21   MR. MACE:  But that's my choice.

22   THE COURT:  It is.  But that's -- that's really going to

23   rebuttal, right?

24   MR. MACE:  Yes, sir.

25   THE COURT:  Let's see how this plays out.  If that

589

1    becomes an issue -- Well, at the plant these would have to be --

2    We're not talking about an employee.  It's the plaintiff.

3              MR. MACE:  We are for these surveillance reports.  Again,

4    they are trying to say, you are on notice, big, bad DuPont --

5              THE COURT:  Right.  But then for people who are not in

6    this case, we're going to be using them.  And then we're going to

7    be using what other causal factors -- I mean we are getting a

8    little -- two steps removed from what's at trial in the case.  I

9    want to be careful this doesn't turn out to be a trial about

10   employees who aren't even parties in this case.

11             MR. MACE:  But to the extent they're going to use

12   employee data to attack my client --

13             THE COURT:  I mean we're only going to go so far with

14   this --

15             MR. PAPANTONIO:  Judge, we don't intend to use employees

16   data unless we're given the employees data.

17             THE COURT:  Your experts aren't going to --

18             MR. PAULOS:  We are going to use the cancer incidence

19   registry.

20             MR. PAPANTONIO:  Well, cancer incidence registry --

21   that's what I'm saying.  They're going to be tied up to the cancer

22   incidence registry.

23             THE COURT:  The cancer?

24             MR. O'BRIEN:  The cancer incidence registry.

25             THE COURT:  You are planning on using that.

590

1        MR. O'BRIEN:  Right, and both sides unless --

2        THE COURT:  This is all going to be in play.  It's not

3    going to go away.

4        MR. PAPANTONIO:  No, I don't see it going away, judge.

5        THE COURT:  All right.  In looking at my watch, I have

6    it's five until three.  I have to take a break in five minutes.  I

7    have another matter at three.

8        MR. BROGDON:  The next one is 1943.  I think we can move

9    on.  Again, that is Mr. Bilott and I will work to correct with

10   1837.

11       THE COURT:  Very good.

12       MR. PAULOS:  That is the record of another excerpt of a

13   much larger document.

14       THE COURT:  And 1947.

15       MR. PAULOS:  Your Honor, our only objection to this

16   document is the fact that it's labeled page 10 of what appears to

17   be in fact it's incomplete.  Other than that, if DuPont could

18   produce the complete document that this is part of, we would

19   withdraw our objection.

20       MR. MACE:  We can check into it, judge, but it is a

21   standing alone document.  The fact that it may be faxed to

22   somebody else with something else, it is a single-page document

23   that Dr. Playtis will be one of the witnesses at the trial.  It's

24   his document.

25       MR. PAPANTONIO:  The reason we keep coming back to this

591

1      arbitrary numbering system is what we saw them do already.  Taking

2      one page out of a 160-page document, we don't know if we're

3      getting into the same thing here.

4              THE COURT:  Well, I'm not going to guess.  There is no

5      other page number on here.  There might be some other indication.

6      But take a look and see what else went with this.  If they are

7      unrelated, let the plaintiff's side know.  If they are related,

8      meet and --

9              MR. BROGDON:  If I may, the past reference, these 1837

10     and 1943, we have talked about which are -- we've talked about as

11     smaller documents out of larger ones, these are as kept.  They are

12     in multiple places in the production.  So to the extent they said

13     they were found and pulled out, it wasn't an intentional parsing

14     out of pages from a larger document.  They are larger documents

15     that are together --

16             THE COURT:  But they are related --

17             MR. BROGDON:  I don't want to give the impression that we

18     were parsing them out for this purpose.

19             THE COURT:  Understood.  All right.  1947 -- 1974, excuse

20     me.

21             MR. PAULOS:  We're going to -- plaintiff is going to

22     withdraw its objection to document 1974.

23             THE COURT:  2129.  This is -- So we have a series of --

24     actually articles in, and we're going to use the same 803(18)

25     process with these.  These will be testified to by experts, I

592

1    assume?

2            MR. MACE:  Yes, sir.

3            MR. PAULOS:  That's certainly true for D.2129, Your

4    Honor.  On D.2136, this is the actual Emmett study that has Mr.

5    Freeman's name and the author --

6            MR. MACE:  You were going to give an opinion.

7            THE COURT:  That's going to be on hold.  You are going to

8    get a decision from me in writing on that one.

9            And then we get to 2338.

10           MR. PAULOS:  Yes is the Science Panel study, Your Honor.

11           THE COURT:  We had talked about this the last time.

12           MR. PAULOS:  That's correct.

13           THE COURT:  Refresh my memory.  The ruling was that you

14   can refer to three eminent epidemiologists --

15           MR. MACE:  Yes, sir.

16           THE COURT:  But not name them by names.

17           MR. PAULOS:  The names of -- and this particular document

18   my recollection of *Bartlett* is the names or reference to the

19   specific authors were redacted from this document.

20           MR. MACE:  Actually, what you had done, Your Honor, you

21   had asked us to redact the lower right-hand under the line

22   there --

23           THE COURT:  This research was funded by, that sort of

24   thing?

25           MR. MACE:  The trial copy of this has that redacted.  But

593

1    did not have us redact the names.  You just had us refer to them

2    --

3                THE COURT:  Right, I -- The jurors wouldn't know the

4    names.

5                MR. MACE:  Right.

6                THE COURT:  But we don't want them -- I don't want them

7    to know essentially the Science Panel.

8                MR. PAULOS:  That's correct.  Our position is the

9    *Bartlett* ruling should apply.

10               THE COURT:  That's what I did in Bartlett, so we will do

11   the same thing.

12               MR. MACE:  Yes, sir.

13               THE COURT:  All right.  You know we're going to take a

14   break at this point for about 15 minutes now.  We still have

15   probably 80 exhibits.  I assume you would like to wrap it up

16   today.

17               MR. MACE:  Yes, sir.

18               THE COURT:  So it will probably take me about 15 minutes,

19   and then we'll come back to this.

20               MR. MACE:  Yes, sir.

21      (Recess from 3:05 p.m. to 3:20 p.m.)

22               THE COURT:  I think that we made it through 2338.  So now

23   we are at 2423.

24               MR. PAULOS:  Your Honor, Chris Paulos for the plaintiffs.

25   This is an e-mail, an internal e-mail, between Anthony Playtis and

594

1    a DuPont employee communicating from overseas regarding blood

2    levels found in employees at the plant.  We believe that this

3    document has some 403 issues with it that would require its

4    exclusion from evidence, particularly along the same lines as this

5    Court's prior ruling with personal use.

6              THE COURT:  What's the position -- This is Dr. Playtis?

7              MR. MACE:  Yes, Your Honor.

8              THE COURT:  What's his position?

9              MR. MACE:  He's the Occupational Health Coordinator for

10   the Washington Works Plant.

11             THE COURT:  On site?

12             MR. MACE:  Yes, at the plant.  And he's corresponding

13   with his colleague at a similar -- a plant overseas that also

14   deals with C-8.

15             THE COURT:  Your concern with 403 -- and he's -- He's

16   also basically giving an opinion.

17             MR. PAULOS:  That's correct.  There is improper opinions

18   being rendered in regard to blood levels and safety associated

19   with high blood levels of C-8.  And it implies to the jury these

20   sort of levels are safe and would not result in injury.  And we

21   think that is misleading.  We also think it's contrary to the

22   Science Panel's findings --

23             THE COURT:  We have a lot of that in here.  That would

24   beget an instruction.  All right.

25             MR. MACE:  This goes to the state of knowledge of DuPont.

595

1    Mr. Playtis was one of the principal people involved in

2    investigating the C-8 issues and --

3              THE COURT:  So it goes to what he believes.

4              MR. MACE:  Exactly.

5              THE COURT:  That's a bit different than DuPont's

6    knowledge, isn't it?

7              MR. MACE:  But he's one of the primary people, key

8    people, at DuPont charged with looking into these issues.

9              THE COURT:  A decision maker --

10             MR. MACE:  Yes.

11             THE COURT:  -- in what regard?

12             MR. MACE:  He's deciding what follow up needs to be done

13   in terms of further conduct.

14             THE COURT:  Well, I have a problem with the second

15   paragraph.  I think we can fix it.  The second sentence and the

16   first sentence say the same thing.  The first sentence is probably

17   more prejudicial in an unfair way.  He says, certain levels have

18   no observed health effects, but he's pretty much giving his own

19   personal opinion with the first part, that none of these are cause

20   for alarm.  I think that comes out.

21             MR. MACE:  Excuse me, in the very first sentence --

22             THE COURT:  The second.  We're going to leave in:  My

23   apologies for the late reply.

24             You are supposed to laugh at the jokes.

25             MR. MACE:  You're talking about taking out the sentence

596

1    that starts:  Blood levels?

2            THE COURT:  None of those blood levels are a cause for

3    alarm.  So the --

4            MR. MACE:  But that sentence.

5            THE COURT:  Yes.

6            MR. MACE:  Okay.

7            THE COURT:  I think that takes care of that exhibit.

8            All right.  Let's go to 2435.

9            MR. PAULOS:  Your Honor, this -- this document appears to

10   be a power point presentation; and according to the handwritten

11   marginality at the top right on the first page, it's dated the

12   18th of March.  And I am not sure -- I think it says 1999?  I

13   can't quite tell, and it says, presented by 3M.

14           There's no indication that DuPont had any involvement in

15   creating this document and presenting this information.  We're not

16   quite sure who it was presented to.  And this document involves

17   many other chemicals other than C-8, including PFOS, and is highly

18   confusing to the lay person and for our jury.

19           THE COURT:  What is this exactly?

20           MR. MACE:  This is a business record from DuPont's files.

21   There were regular meetings between 3M --

22           THE COURT:  The RCB, is that where -- Is that how you

23   know that?

24           MR. MACE:  Yes, sir.

25           THE COURT:  Who would that be?

597

1          MR. MACE:  Do you know?  Mr. Brogdon had to leave.  Our

2     catalog --

3          THE COURT:  Your expert.

4          MR. MACE:  Our expert.

5          THE COURT:  That's a DuPont employee --

6          MR. MACE:  Yes, sir.

7          THE COURT:  -- whose file was turned over to you when in

8     discovery.

9          MR. MACE:  So there were regular meetings between 3M and

10    DuPont about this chemical over the years, and 3M would make these

11    types of presentations to DuPont.

12         THE COURT:  You think it's 1989?

13         MR. MACE:  Yes, sir.

14         THE COURT:  It looks like.

15         MR. MACE:  Yes.

16         THE COURT:  All right.  In general, I'm going to let it

17    in.

18         Is anything else -- On the issue of knowledge of DuPont

19    only, is there anything else you wish me to look at here?

20         MR. PAULOS:  Your Honor, I'm not quite sure that

21    Mr. Mace's representation as to the date is correct.  There's

22    information in here where they're talking about the early '90s.

23         THE COURT:  Yes, that's true.  There is a --

24         MR. MACE:  We can look for a better copy of that, Your

25    Honor.  I think in the multiple copying process, it may be '99

598

1    instead of '89.

2            THE COURT:  Well, we'll probably need to clear that up.

3            MR. MACE:  Yes, sir.

4            MR. PAULOS:  Along the -- In congruence with the Court's

5    rulings regarding power point presentations, we have seen today,

6    there are very confusing analytical discussions and --

7            THE COURT:  There are things in here that the jury can

8    use, and there are things -- Really, if you look at 2435.7, is

9    this at all going to help the jury with anything that it would be

10   considering?  It's a long chemical compound formula.

11           MR. MACE:  No, sir.  We don't need that page.

12           THE COURT:  All right.  It will make the document

13   somewhat incomplete.  You don't care if we take that page out.

14           The same way, how about when we get to 2435.29, the

15   charts?

16           MR. MACE:  We don't need that page either or the next.

17           THE COURT:  And what is your view of 2435.11?  It has C-8

18   mentioned but has these other chemicals of carbon.  There won't be

19   any testimony about that?

20           MR. MACE:  We don't need it if Your Honor has a concern

21   about it.

22           THE COURT:  Let's take that out.

23           MR. PAULOS:  Just to be clear, that's 2435.11?

24           THE COURT:  Right.

25           All right.  That leads us to 2438.

599

1          MR. PAULOS:  This is an internal e-mail from DuPont that

2     it's summarizing, again, discussions with a third party at the

3     plant -- an employee of GE who works at the plant.  I believe it's

4     a neighbor to DuPont.  There's statements in here that we believe

5     are prejudicial and are also hearsay and believe they require

6     redaction.

7          THE COURT:  What would you propose to be redacted?

8          MR. PAULOS:  The first section I would like to call your

9     attention to the very last paragraph where it says, he indicated

10    he has had past experience with similar issues involving a

11    material that caused staining of red blood cells but no other

12    known effects over a long history of study.  He thus understands

13    the concern over blood detections even without known effects.

14         We believe that that's hearsay that's incurable.

15         THE COURT:  This would be -- This would be presumably

16    Mr. Dale Van De Velde?

17         MR. PAULOS:  That's what this document --

18         THE COURT:  So hearsay within hearsay.

19         MR. MACE:  But it's not being offered for the truth of

20    the matter asserted.  This is a contemporaneous document in

21    DuPont's business record of what it was being told by its

22    industrial neighbor that it was talking about these issues on.  So

23    it's something that's entitled to be considered whether it's true

24    or not.

25         THE COURT:  Well, if you were -- If you were giving

600

1     information of a scientific nature here, he just says, past

2     experience with a similar issue involving a material.  Not C-8.

3     So it's hearsay.  If it was just issues of knowledge, I might

4     consider it; but I don't think it really adds anything.  So I'm

5     going to take that paragraph out.

6          Then we get to 2452.

7          MR. LEBER:  That's another one of --

8          THE COURT:  It goes with the matter that you're going to

9     brief --

10         MR. LEBER:  -- the 1006 documents.

11         THE COURT:  Thank you.

12         And how about 2453?  Is that another one?

13         MR. LEBER:  Same, Your Honor.

14         THE COURT:  And then we have a letter from -- actually --

15         MR. PAULOS:  I believe we are on D.2538.  This is a --

16     This document is not a business record of DuPont.  This document

17     actually is a fax from Mr. Bilott to a consultant in the *Leach*

18     matter, David Gray.  It was produced as part of Mr. Gray's expert

19     files in the *Leach* matter.  And it contains an e-mail from Dee Ann

20     Staats to various individuals at the EPA.  There is no DuPont

21     recipient.  It's not addressed to DuPont.  There's no DuPont Bates

22     stamp.

23          THE COURT:  What's the purpose of this document?

24          MR. MACE:  It could potentially be used on

25     cross-examination of plaintiff's experts if they mischaracterize

601

1      certain things.

2              THE COURT:  It won't be in at this point.  If you are

3      going to use it, you're going to let me know, and we'll address it

4      at that point.

5              MR. MACE:  Yes, sir.

6              MR. PAULOS:  Thank you, Your Honor.

7              THE COURT:  If we do use this, we're going to do what we

8      can to leave Mr. Bilott's name out of this.

9              MR. MACE:  Understood, sir.

10             THE COURT:  So keep that in mind with that document.

11             MR. PAULOS:  There is significant --

12             THE COURT:  The whole letter.

13             Then we get to Defendant's 2554.

14             MR. PAULOS:  Your Honor, this is a document from 3M to

15     the U.S. EPA.  There's no evidence that this was ever received by

16     DuPont, that DuPont had any hand in creating this document or

17     involvement in this document.  It's about 3M's plants in

18     Minnesota.  And it's also one of 3M's required submissions as part

19     of the stewardship program.  I believe it's completely irrelevant.

20             THE COURT:  So what's the issue here?

21             MR. MACE:  Your Honor, it's a public document.  This is

22     AR226.  That's the public docket for this chemical that EPA

23     maintains.  The only use of this would potentially be in -- as we

24     currently foresee is cross-examination of plaintiff 's experts.

25             THE COURT:  We will not admit it at this point but

602

1    possibly usable for cross-examination.

2         MR. O'BRIEN:  Again, approach at side-bar before it is

3    published.

4         THE COURT:  Yes.

5         And then we get to D.2555.

6         MR. PAULOS:  This would be the exact same issues as the

7    prior document.

8         THE COURT:  You would use it the same way.

9         MR. MACE:  Same way.

10        THE COURT:  Same ruling as the issue before this.

11        2587.

12        MR. PAULOS:  We understand the Court's prior rulings

13   regarding Mr. Bilott, and we would just request that the document

14   be redacted as the Court has instructed.

15        THE COURT:  We'll take -- I think his name only appears

16   in one place.  So we'll --

17        MR. MACE:  It's two, Your Honor.  It's, Dear Mr. Bilott.

18        MR. PAULOS:  It's on each page, on the top of each page.

19        THE COURT:  We will take those off.

20        MR. MACE:  Yes, sir.

21        THE COURT:  Otherwise, it will be admitted.

22        And 2604.

23        MR. O'BRIEN:  This one is not a DuPont document.  There

24   is no evidence it was received by DuPont.  It is hearsay.  It's a

25   rank expert opinion.  There is no evidence that the defendant

603

1    received this.  And no notice can countervail the hearsay issue.

2    And this is simply an expert opinion.  We can't confront.  We

3    can't cross-examine.

4              THE COURT:  What is this going to be used for?

5              MR. MACE:  Yes, Your Honor.  This is a contemporaneous

6    document with the fact that as part of this monkey study, they had

7    a peer review group come in and look at whether the low dose

8    monkey would be tied to effects of C-8.  And the independent

9    review board considered it not to be.  It's going to be used in

10   rebuttal of plaintiff's experts.

11             THE COURT:  This is peer reviewed pathology.

12             MR. MACE:  Yes.

13             THE COURT:  This is pathological work done by other

14   members of -- another pathologists basically.

15             MR. MACE:  Right.

16             THE COURT:  How would you use this, what witness, and how

17   would the witness --

18             MR. MACE:  Well, at least two.  Potentially, in

19   cross-examination of plaintiff's experts if they misstate what the

20   scientific facts were back at the relevant time.  It's also part

21   of the body of knowledge that was available to Dr. Rickard and

22   DuPont as they were examining what to do with regard to this

23   chemical and how to evaluate this monkey study.

24             THE COURT:  Are you -- If we're talking about

25   cross-examination, then it's an easy decision for me.  If we're

604

1    talking about -- With Dr. Rickard, would you expect to use this in

2    direct?

3            MR. MACE:  Potentially, Your Honor.

4            MR. O'BRIEN:  But, Your Honor, it doesn't cure the

5    evidentiary foundation issue.

6            THE COURT:  No, I just want to -- It could be used for

7    cross depending on how the question is phrased.  Let's see how

8    this goes.

9            MR. O'BRIEN:  But it doesn't cure the underlying issue,

10   which is it's an out-of-court opinion.

11           THE COURT:  I'm assuming that somebody knows this.

12           MR. O'BRIEN:  Pardon me?

13           THE COURT:  I would want to hear the questions first.

14   That's the reason I'm doing this in the abstract.  I don't know if

15   the -- if the witness were talking about seeing this before, was

16   familiar with it.  If they're not, then we will have problems.

17           MR. MACE:  The witness that we would be taking about,

18   Your Honor, is somebody they're presenting as an expert on the

19   state of the knowledge.  And what they didn't know is just as

20   relevant as what they did know, just like it is for the fact

21   witnesses.

22           THE COURT:  There's a monkey study that goes with it,

23   right?

24           MR. MACE:  True.

25           THE COURT:  And a lot of the witnesses know about the

605

1    monkey study.

2              MR. PAPANTONIO:  It does not go with it, judge.  He just

3    made it sound like this goes with the monkey study.  This is --

4    Judge, imagine that this is simply another entity.  This is not

5    something you can put in front of a witness and, say,

6    cross-examine.  It's not -- It's not even admissible.

7              THE COURT:  Well, it's a peer review.  Explain to me -- I

8    don't understand.  We have got the monkey study, and there was

9    some medical material reviewed by a pathologist, and this is the

10   peer reviewed.  Was that person part of the study?

11             MR. MACE:  No, sir.  It's a separate -- It's related to

12   the study in that when the scientific findings are made as a

13   result of a study and an evaluation is made, do we want to have a

14   peer review of, so in this one they had a peer review done of one

15   of the findings.

16             THE COURT:  When you say they, would this be the --

17             MR. MACE:  The study authors.

18             THE COURT:  So that's what I mean.  The study was done,

19   and this is part of the peer review process.

20             MR. MACE:  Right.

21             MR. O'BRIEN:  Not for -- Not for journal publication.

22             MR. PAPANTONIO:  It is not -- That is just not accurate.

23   They're trying to make it sound like this is a peer reviewed

24   opinion for some type of treatise.  This is -- I could take a half

25   a dozen other opinions like this that have no connection at all to

606

1 the monkey --

2   THE COURT:  I mean that's a fact question.  If I am

3 getting two different versions, I don't want to put either of you

4 under oath -- no offense -- but if it's part of the study, then I

5 see this as if the study is going to be discussed, then this will

6 be discussed.  If it is a stand alone, not part of the study, just

7 someone who reviewed -- I don't know how that would happen.  They

8 would have to get access --

9   MR. PAPANTONIO:  I don't know how a witness -- what

10 witness --

11   MR. MACE:  I will be able to link it up with Dr. Rickard

12 in any event.

13   THE COURT:  He knew about this --

14   MR. MACE:  Exactly.

15   THE COURT:  Right now it's not in evidence.  You can

16 attempt to lay a foundation.  Then we will see what happens.

17   MR. MACE:  All right.

18   MR. O'BRIEN:  Obviously, Your Honor, if they've got a

19 copy, that is a DuPont document.  Otherwise, how do they prove

20 with Dr. Rickard that they got it back in 2000?  Because that's

21 when the document was authored.  So if there's a DuPont document

22 that reflects DuPont actually received it, we are entitled -- we

23 should have that.

24   THE COURT:  Do you recall the background?

25   MR. MACE:  It will be linked up with testimony, Your

607

1    Honor.

2         THE COURT:  Well, if he received this on a certain date

3    with a letter, you would have disclosed that in discovery, I would

4    assume.

5         MR. MACE:  Would have, yes.

6         MR. PAPANTONIO:  Judge, before he uses it for

7    cross-examination, we would like it linked up.

8         THE COURT:  Actually, it's going to be on direct

9    examination, right?  If you lay a foundation first.

10        MR. MACE:  Right.

11        THE COURT:  We will leave it at that.

12        2605.

13        MR. PAULOS:  Your Honor, this appears to be an

14   advertisement for 3M for their Fluorad brand surfactant.  The

15   relevance to the case is --

16        THE COURT:  What's this for?

17        MR. PAULOS:  -- perplexing.

18        MR. MACE:  Well, it's to show, Your Honor, how 3M was

19   portraying its product in the public literature.

20        THE COURT:  And that goes to?

21        MR. MACE:  Plaintiffs are trying to make this sound like

22   it's some -- They're trying to characterize this in front of the

23   jury as if this were some skull and crossbones chemical that

24   required all these warnings and labels.  That's not how it was

25   being presented by 3M.

608

1      THE COURT:  Well, but 3M is not a party, and it sounds

2    like it would be offered as an assertion this is safe.  So at this

3    point I am not convinced.  If something comes up in the trial and

4    you want me to revisit this, I will do so.  But at this point, I'm

5    going to exclude it.

6          Then we get to the newspaper article again.

7          MR. PAULOS:  Yes, Your Honor.  You heard our argument on

8    this.  We believe it is hearsay and should be excluded.

9          MR. MACE:  Judge, this is where you took it out of the

10   earlier one.  I said we would come back to it later.

11         THE COURT:  It will come in once, not twice, of course.

12         MR. MACE:  And that's why I made the point, Your Honor,

13   this goes to rebutting the plaintiff's characterization to the

14   jury that nobody knew about this chemical.  It was some big, kept

15   secret by 3M and DuPont when both --

16         THE COURT:  It's part of what you sent to the EPA.

17         MR. MACE:  True.

18         THE COURT:  So it's not going to be admissible here, but

19   it will be admissible as part of the exhibits that went with the

20   letter.

21         MR. MACE:  I think that is a flip from what you said

22   before.  Before you said it would come in now but not there.  Now

23   it's going to go in there --

24         THE COURT:  Are you accusing me of flip-flopping?

25         MR. MACE:  I said the flip.  I didn't do the flop.

609

1    THE COURT:  I don't think this comes in as a stand alone.

2    My view now is that whatever you sent to the EPA in response to

3    their initial indication that they might be filing a complaint

4    would be what the jury gets.

5    MR. MACE:  Yes, sir.  That's also the next one, too, Your

6    Honor.

7    THE COURT:  You have offered it three times, but we'll

8    let it in once.  Actually, one is from *The Wall Street Journal*,

9    and one is from *The New York Times.*

10    MR. MACE:  Yes, sir.

11    THE COURT:  If they were both attached, they will be

12    admitted.

13    MR. MACE:  They were.

14    MR. PAULOS:  Just so I'm clear, Your Honor, these stand

15    alone exhibits are excluded.

16    THE COURT:  No, they will be part of the attachments that

17    were sent to the EPA.

18    Then 2656.  And this looks like it comes from the Federal

19    Register.

20    MR. PAULOS:  Yeah, this is -- yes, Your Honor.  This is a

21    synopsis from the Federal Register regarding TSCA.

22    MR. MACE:  This falls in the same category of several we

23    talked about earlier, Your Honor.  It just depends to what extent

24    they get into the TSCA issues that I may need to use this in

25    cross-examination of their experts.

610

1        THE COURT:  Well, we will just reserve for now.  It may

2   or may not be used.  That's how we will leave it.

3        MR. PAULOS:  Again, we would just ask that there be a

4   side-bar called prior to the use of these --

5        THE COURT:  With all of these, that's the rule.

6        MR. PAULOS:  Thank you, Your Honor.

7        THE COURT:  And then we get to 2667.  And just to be

8   blunt, this is a report to Senate Environmental Committee.  It is

9   not a report of.  So where does that take us?

10        MR. MACE:  Well, the potential use of this, Your Honor,

11   would be if plaintiff's experts mischaracterize some of the facts,

12   that we mean to use it with some of the experts.

13        MR. O'BRIEN:  Your Honor, this is being used as a

14   backdoor shoehorn.

15        MR. PAPANTONIO:  Exactly.

16        MR. O'BRIEN:  That doesn't make it admissible.

17        MR. PAPANTONIO:  We have 17 of these.

18        THE COURT:  As much as we would like to be able to

19   predict what's going to happen in a trial, we can't.  So none of

20   these are coming in yet.  But, again, I think you all understand

21   if things change in the trial with all of these exhibits, you can

22   ask me to revisit based on what evidence is going to be presented.

23   That's all we are doing at this point.

24        MR. PAULOS:  That is about 3M's plant site in Minnesota,

25   and the relevancy of it --

611

1          THE COURT:  It may very well not come in.  We will have

2    to play it by ear.

3          MR. MACE:  I need to grab my other folder, judge.

4          THE COURT:  All right.  I'm disappointed.  That means

5    we're getting towards the end.

6          MR. MACE:  I'm on my last one, yes, Your Honor.

7          MR. PAULOS:  Your Honor, the next document is 2669.

8          THE COURT:  You're taking advantage of Mr. Mace.  He's

9    trying dig out his files.

10          MR. PAULOS:  They're his exhibits.

11          THE COURT:  So this comes from where?  Minnesota

12    Department of Health, right?

13          MR. MACE:  Yes, Your Honor.

14          MR. PAULOS:  That's correct, Your Honor.  Again, it's

15    specific to 3M's Cottage Grove facility.  So the relevance to this

16    is zero.  And it's basically the Minnesota Department of Health

17    talking about 3M's plant facility and the PFOS that had been

18    released on site.

19          MR. MACE:  It's a self-authenticating document, Your

20    Honor, by the Minnesota Department of Health.  The potential use,

21    again, would be in cross-examination of the plaintiff's expert.

22          MR. O'BRIEN:  It's a case against DuPont, though.

23          THE COURT:  We will have to get into all that.  If it's

24    not being offered, I'm going to defer until there is an attempt to

25    use it.

612

1          And that will be the same thing with 2670.

2          MR. O'BRIEN:  It sounds like a lot of side-bars.

3          MR. PAPANTONIO:  Judge, excuse me, how do we do side-bars

4     in your courtroom?  The same as in --

5          THE COURT:  Just a quick thought I had, how many will be

6     at each counsel table?

7          MR. MACE:  I think we have four or five.

8          THE COURT:  And you will have --

9          MR. PAPANTONIO:  The same.

10         THE COURT:  We may want to platoon people.  I am not sure

11    you can do eight attorneys at side-bar.  It's sort of tight.

12         MR. MACE:  We tried to keep it to two.

13         THE COURT:  We can fit four attorneys there.

14         MR. PAPANTONIO:  It never -- It rarely will be more than

15    four, judge.

16         THE COURT:  I mean if it's more than four, it gets

17    crowded.  It doesn't mean you can't do it.

18         MR. PAPANTONIO:  You typically go off to -- As I'm

19    looking at your bench --

20         THE COURT:  The side.  I come in over to the right.  And

21    there's a little step there that is Ms. Samuels' perch.  We don't

22    want to invade that, so we'll let her go first and get ready to

23    go.

24         MR. O'BRIEN:  Do you have Miles Davis in side-bars?

25         THE COURT:  Judge Marbley and I agree on a lot of things,

613

1    but the jazz, that's not one of them.  So we use white noise.

2    It's a little bit more staid, I would call it.

3        MR. O'BRIEN:  And when you have -- That's right by the

4    witness box, correct?

5        THE COURT:  Yes.  If -- you know, Mr. Quisumbing is very

6    good about moving the witness away.  The witness will not be

7    hearing the side-bar.

8        MR. O'BRIEN:  Okay.

9        THE COURT:  All right.  So we're up to 2671.

10       MR. PAULOS:  Again, Your Honor, this is a pollution

11   report to the Minnesota legislature from April, 2014.  We

12   believe --

13       MR. MACE:  Same category.

14       THE COURT:  Same category.  We will hold on this.

15       More on 3M on the next one, 2673.

16       MR. PAULOS:  Correct, Your Honor.  This appears to be

17   some sort of pamphlet or brochure from 3M regarding its chemical

18   businesses.  I'm not sure if it bears a date.

19       THE COURT:  Is this also in that category or not?

20       MR. MACE:  Partially for that category.  If we would use

21   it in our case, we would link it up with a witness.

22       MR. PAPANTONIO:  Judge, I hear that, but I'm sitting here

23   thinking what event would possibly give rise to bringing in a 3M

24   pamphlet on either cross-examination or --

25       THE COURT:  Well, I mean to make this process helpful, if

614

1    we can focus this a little bit.  Who is the witness?  What's the

2    purported relevance to the case?  Otherwise, I'm not going to be

3    able to give you a decision.

4         MR. MACE:  Right.  So let's -- Let's just hold on this

5    for now in the same category that we just had.

6         THE COURT:  All right.  Then we get to 2683.

7         MR. PAULOS:  Yes, Your Honor.  This is a 3M business

8    document that has no, from my understanding, no DuPont employee

9    received any of this.

10        THE COURT:  Let me just -- Is this another similar issue

11   or is it something else?

12        MR. MACE:  Actually, it's a meeting among 3M with DuPont

13   employees, and it comes from DuPont's business files, the RJZ

14   Bates numbers.

15        MR. PAULOS:  It's a mystery as to how DuPont came into

16   possession of this, and it does have a DuPont Bates number, but

17   there is no DuPont recipient and no DuPont author.  And it's

18   summarizing hearsay statements of a meeting that occurred between

19   3M and DuPont.

20        THE COURT:  Pure business record offering.  No witness to

21   go with it?

22        MR. MACE:  No -- I mean yes, it's a business record.  But

23   we also -- I mean Mr. Zipfel is on our witness list, is one of

24   ones at the meeting.

25        MR. PAPANTONIO:  So you're going to call -- Judge, if

615

1    they're going to call Zipfel, and that certainly -- if he's a

2    direct witness for something like that, if he was at the meeting.

3    But I don't think he still should be able to talk about hearsay

4    that took place at the meeting and opinions and -- such as that.

5             THE COURT:  So this is a '96 document of a meeting at the

6    plant.  There's a discussion of C-8.  There's a lot of -- I've got

7    the impression of that sorts of things in here.  But your position

8    is you may have a witness directly to testify --

9             MR. MACE:  If we use it, it would be with a witness.

10            THE COURT:  We need to address:  I got the impression

11   that these were internally synthesized or available compounds.

12            That's speculation.  We will take that out.

13            MR. MACE:  Where is that?  I got the impression.

14            THE COURT:  Bottom third of the page.

15            MR. PAULOS:  I'm sorry, where was that at?

16            THE COURT:  Bottom third of 2683.  The paragraph starts

17   with:  DuPont has been testing candidates as C-8 replacements.

18            The next line comes out.

19            MR. MACE:  That whole line.

20            THE COURT:  Well:  If they -- that will stay in.

21            All right.  I think that takes us to 2709.  And this

22   is --

23            MR. MACE:  This gets to the public notice, Your Honor, of

24   the fact that the -- You will recall that some of the early rat

25   studies that the plaintiff's experts talked about heavily, there

616

1    was an issue of whether the EPA knew about them.  These documents

2    are off the public docket, and they show that EPA was informed

3    timely about the rat studies.

4            THE COURT:  We get into a lot of studies.  Is this one of

5    the studies you expect there to be testimony about?

6            MR. MACE:  Absolutely.  This is a -- This relates to the

7    study regarding the false positive on the islands --

8            THE COURT:  The jury is going to hear about the study.

9            MR. MACE:  Yes.

10           THE COURT:  Do we really need -- The cover letter takes

11   us into a stretch?  It's a 3M letter.  You're going to have

12   testimony that this was in the -- within the knowledge of the

13   scientific community, in a peer published review.

14           MR. MACE:  The important --

15           THE COURT:  You have another witness testifying about it.

16           MR. MACE:  The important key thing is the cover letter

17   because it was sent registered mail, and we have the receipt

18   stamped by EPA, that they got it back in 1981.  And that rebuts

19   the argument that EPA didn't know about these studies.  And the

20   law is clear, which I think their own experts will admit, that if

21   one company reports it, the other one doesn't have to.

22           THE COURT:  The document is in its own category.  You are

23   going to use that with an expert.  The letter will come in for

24   that limited purpose.

25           MR. MACE:  Yes, sir.

617

1      THE COURT:  If there's an issue that we get into about

2  why didn't the EPA investigate this earlier, this is at least some

3  evidence that goes to that issue.  You can make of it what you

4  want it to be, but --

5      MR. PAULOS:  We would also request that the attached

6  study not go back to the jury.

7      THE COURT:  Well, if it's going to some type of a notice,

8  it's a bit different.  It wouldn't just be used by an expert.

9      MR. BILOTT:  The concern, Your Honor, would be that the

10  only study would the study from 3M saying, no health effects.

11      THE COURT:  Right.

12      MR. O'BRIEN:  We could make the same arguments on any

13  other LT.

14      THE COURT:  Well, maybe we should give this sort of

15  designation the jury can follow.  The letter for a limited purpose

16  will be coming in.  I want the jury to be able to identify what

17  was sent with it.  We could do that without sending the document

18  back.  So think of some way we can call this by a name they could

19  recognize.  This is --

20      MR. MACE:  And it may be as simple, Your Honor, as --

21      THE COURT:  Is this the only rat study?

22      MR. MACE:  According to the title, no, unfortunately,

23  Your Honor.

24      THE COURT:  How many rat studies are there?

25      MR. MACE:  Well, there's several.  There are at least two

618

1      that are important for the case.

2              THE COURT:  This is a -- What year is this?

3              MR. MACE:  '81.

4              THE COURT:  Why don't we call this the 1981 rat study,

5      C-8/rat study.

6              MR. BILOTT:  The cover letter actually says, please find

7      enclosed a reprint of the article, and it gives the title.

8              THE COURT:  Right.  And the title is not going to be very

9      helpful.  It's a long -- You can pronounce it better than I can.

10     But I just want them to be able to link this up to what we're

11     talking about.  So I will suggest 1981 Rat Study.  If you can come

12     up with a better description.

13             MR. PAPANTONIO:  Judge, just to be clear, what kind of

14     situation would he be able to use this 3M document?

15             THE COURT:  This document?

16             MR. PAPANTONIO:  Yes.

17             THE COURT:  If the contention is the EPA didn't have the

18     information in a timely way to do an investigation of C-8, this at

19     least is one indication of what they had in their possession.

20             I think that's the extent of it, isn't it?

21             MR. MACE:  Yes, sir.

22             THE COURT:  2711.

23             MR. MACE:  Same issue, Your Honor.

24             MR. PAULOS:  Your Honor -- and we have the same

25     objections except for this document is in such poor condition,

619

1    it's almost unreadable, and that's, I think, a concern.  If Your

2    Honor flips through it, you will see there's certain pages where

3    you can't even see what is supposed to be depicted in some of

4    these charts, and some you can't read the names of the chemicals

5    that are being studied and to bring to the study.  So it's the

6    condition of the document itself that is a concern of ours.

7          THE COURT:  Do you expect testimony on this document?

8          MR. MACE:  Again, this gets into the fact that the

9    government was sent these studies.  They are trying to say that

10   3M --

11         THE COURT:  What I mean you're going to -- What you're

12   proposing is this one go back to the jury, and we would be able to

13   argue there is more information that the EPA had?

14         MR. MACE:  Limited to that purpose and notice to EPA.

15         THE COURT:  The problem with that is so much of this is

16   -- will not be helpful.  You know, they won't be able to have any

17   idea what this chart means.  I'm always reluctant to send things

18   like that back.

19         MR. MACE:  We can, I suppose, talk about --

20         THE COURT:  Maybe the --

21         MR. MACE:  -- what goes back.  Maybe read the cover page

22   of the articles that are attached.

23         THE COURT:  The first 15 page are the narratives.  They

24   are in pretty bad shape, but I think these are readable.  But,

25   again, this would also entitle you, the defendants, to a limiting

620

1     instruction, that this is historical knowledge only.  And in this

2     case it is being offered to show what information was sent to the

3     EPA.  That's the only purpose for it.

4          MR. MACE:  Yes, sir.

5          MR. PAULOS:  And, again, this is a 3M document.  There's

6     no evidence that DuPont received this.

7          THE COURT:  It doesn't go to any issue -- It involves

8     really the EPA only.

9          MR. PAPANTONIO:  And, judge, again, just so it's clear,

10    we don't intend to try the EPA.  I'm just trying to think of the

11    scenario.  The EPA is not on trial.  We are not saying that the

12    EPA failed to process information.  We're not --

13         THE COURT:  Here's what I'm getting, and I'm just trying

14    to see what's probative and what isn't.  I am not drawing any

15    conclusions.  The issue in the consent decree about whether this

16    delayed, the failure to report, delayed the EPA's efforts to at

17    least investigate C-8.  I assume that's what you are talking

18    about.

19         MR. MACE:  Yes.

20         MR. PAPANTONIO:  So opening statement I would say, for

21    example, that you'll see that some of the material was sent to the

22    EPA; and after it was sent, they concluded that they still didn't

23    have enough information.

24         THE COURT:  It's -- That's the debate.  It would be in

25    that area.  But it's a narrow issue.  It's not being offered for

621

1      the truth, of course.

2                  So now we're up to 2729.

3                  MR. MACE:  I think it's 2717, Your Honor.

4                  THE COURT:  You're right, 2717.

5                  MR. PAULOS:  Yes, Your Honor.  This is a -- appears to be

6      an e-mail that was prepared to go to the U.S. EPA from DuPont.

7      However, if you will notice the handwritten statement by, it looks

8      like, A. Michael Kaplan:  DuPont letter was not sent on 15th day

9      because we were in possession of 3M letter which informed the

10     agency of the new findings.

11                 I believe this letter was in fact never sent to the EPA.

12                 MR. MACE:  That's inaccurate, Your Honor.  That note

13     refers to the fact that under TSCA, if you are going to send in

14     data, you have got to send it in within the 15th working day after

15     you have the data.

16                 THE COURT:  Your argument goes to the timing.

17                 MR. MACE:  Timing.

18                 THE COURT:  Not whether or not the letter was being sent.

19                 MR. MACE:  Right.  Since they knew 3M had already sent

20     the earlier letter --

21                 THE COURT:  There could be another way to read that.  So

22     if I -- DuPont letter was not sent, and I could stop there.

23                 MR. O'BRIEN:  That takes an interpretation --

24                 THE COURT:  -- on the 15th working day.

25                 MR. O'BRIEN:  This takes as interpretation of Mr. Kaplan,

622

1    whoever Kaplan is, and also this is stricken out.

2            MR. PAPANTONIO:  A line was written right through it.  We

3    didn't do that.

4            MR. O'BRIEN:  At the very least DuPont should be required

5    to prove that this letter was sent.

6            THE COURT:  Well, let me ask you this.  This two-year

7    study in rats, is that what we just got into?

8            MR. MACE:  No.  This was a follow -- yes.  The two-year

9    biopsy, yes.

10           MR. PAULOS:  There was one in 1981 --

11           MR. MACE:  There were two different rat studies.  So we

12   talked about two different ones.  So I'm not --

13           THE COURT:  Have we covered this rat study yet?

14           MR. MACE:  In '93, I don't think -- I don't think we've

15   talked about that one yet because we were talking about the '81

16   study.

17           THE COURT:  I don't -- I think a fair reading of this is

18   the one 3M sent in.

19           MR. MACE:  There were two notices.  So 3M had sent a

20   notice and --

21           THE COURT:  But we're not using the 3M notice, are we?

22           MR. MACE:  We may come to that.

23           THE COURT:  So that would be -- That's probably easier

24   than trying to guess what this means, if it's the same study.

25           MR. MACE:  Right.

623

1          MR. PAPANTONIO:  Judge, this will definitely require a

2     witness to say --

3          THE COURT:  Are we -- Is the 3M study coming in?

4          MR. MACE:  I think we may get to that.  I will be linking

5     these up with a witness because our state of the knowledge expert,

6     Dr. Rickard, is very knowledgeable about what was given to EPA.

7          THE COURT:  And I'm focusing on a very narrow issue.  If

8     we know 3M sent this, then I will be inclined, for the reason we

9     have already talked about, goes to the knowledge of EPA, to let it

10    in on that basis rather than really stretching here trying to

11    interpret what this handwritten note meant.  Because if it

12    contained documents, then it kind of disappears and isn't an

13    issue.

14         MR. MACE:  I mean part of what you will see, the business

15    practice is things aren't signed until they are sent.  So the fact

16    that Dr. Reinhardt signs this, we'll be able to prove up this was

17    sent.

18         MR. PAPANTONIO:  Judge, I know -- I keep hearing, we are

19    going to prove it up.  I don't know how in the world somebody is

20    going to prove it up unless they bring in this man that says, you

21    know, I put a line through here and, yes, I said, let's not send

22    it, but we did.  This is so extreme, we are going to prove it up,

23    but we continue to hear that.

24          And I'm afraid what's going to happen at trial, judge, is

25    this is all going to merge into a different argument by Mr. Mace.

624

1    You remember at the hearing we allowed this testimony in -- We saw

2    this happen in the first trial.  It's the same --

3         MR. MACE:  We will probably be able to bring you another

4    copy of this off the EPA docket because these are all public

5    documents.

6         THE COURT:  Let's do it from that end.

7         MR. MACE:  Okay.

8         THE COURT:  Although I will say, I do read this to say

9    this wasn't sent on the 15th working day.  It is a matter of where

10   you end the clause for the analysis.  But, hopefully, that won't

11   make any difference.  It's better not to guess.

12        MR. BILOTT:  Your Honor, just for clarification, what the

13   U.S. EPA and the TSCA consent order was dealing with DuPont's

14   failure to send in information about C-8 crossing the human

15   placental and the fact that C-8 was contaminating thousands of

16   people's water supply, the documents that we're seeing here, that

17   DuPont wants to submit as alleged evidence that they sent to EPA,

18   the information they were asking, don't relate to any of that.

19        THE COURT:  What are you saying it relates to?

20        MR. BILOTT:  It relates to -- It relates to other

21   information 3M sent that the U.S. EPA never --

22        THE COURT:  What do the rat studies cover?

23        MR. BILOTT:  The rat -- I don't know which rat study.

24        MR. PAULOS:  The tumor.

25        MR. BILOTT:  This is information that was apparently sent

625

1    by 3M --

2            THE COURT:  What was the study about?  Water containing

3    C-8 or some other contact?

4            MR. BILOTT:  No.

5            THE COURT:  What was it about?

6            MR. BILOTT:  This was about rats being exposed to C-8.

7            THE COURT:  Exposed in what way?

8            MR. BILOTT:  I guess in a laboratory setting.

9            THE COURT:  No, I mean by water, air, skin contact?

10           MR. BILOTT:  I believe it is a feeding study.

11           MR. MACE:  Your Honor, this is one of the studies that

12    plaintiffs rely on heavily to say, you knew it caused cancer, and

13    you didn't tell anybody.  Well, they are telling EPA about the

14    studies contemporaneously --

15           THE COURT:  If you get this on the EPA's part, it would

16    make it a lot easier.

17           MR. MACE:  Yes, sir.

18           THE COURT:  Then we will get away from who sent it and

19    was it sent?

20           MR. PAPANTONIO:  Judge, just to be clear, though, is

21    being -- what Mr. Bilott is saying the way we say is that -- the

22    way we tie up this issue about the EPA saying, you know, you never

23    gave us this specific information, they thought it was so

24    important that the EPA was given information that the water that

25    people were drinking was contaminated, that's one of those points.

626

1   The other one was that it was passing through the placenta.  That

2   was the second part of it.  The other one, that it was being

3   stored in blood, they make very specific -- they make very

4   specific points about why it is these things caused us to not be

5   able to advance in science.

6           I don't talk about rats.  Rats, this is such a -- This is

7   such a sideshow with these rats.  That's not what the EPA is

8   saying.  I'm not -- I don't intend to open this door in any form

9   or fashion.

10          THE COURT:  Then, again, as this is framed, that will be

11  the context of the ruling on the objection, if there is one.

12          All right.  Let's get to 2729.

13          MR. PAULOS:  Your Honor, just so I'm clear, DuPont is

14  going to need to prove --

15          THE COURT:  This is not coming in yet.  We are going to

16  see if this can be retrieved from an EPA document docket instead.

17          MR. MACE:  Yes, sir.

18          THE COURT:  So 2729.

19          MR. PAULOS:  This, Your Honor will recognize, this is a

20  summary of the same meeting that we discussed earlier today where

21  we did some significant redactions --

22          THE COURT:  Is this the same document?

23          MR. PAULOS:  It's the same summary.  But yet it is

24  attached -- got attachments and things --

25          THE COURT:  Aren't we looking at it twice?

627

1      MR. PAPANTONIO:  Three times actually.

2      MR. MACE:  There are actually -- Sorry, I didn't mean to

3  interrupt you, counsel -- I think there are three different

4  versions of it that are related.  So I think the second page

5  contains -- I think the cover page is different.  The second page

6  may contain some of the same language.  So we are willing to work

7  with counsel and make sure the same redactions get in.

8      THE COURT:  Why would we want three of these?

9      MR. MACE:  Well, there are some differences between who

10  they are being sent to and some other --

11      THE COURT:  You are not trying to pad your exhibit list,

12  are you?

13      MR. MACE:  No, sir.  There are plenty --

14      THE COURT:  I think we have enough.

15      I mean is there -- are there some differences among the

16  three?

17      MR. MACE:  I will have to look back at this one in

18  particular.  But I think they are different in terms of who it was

19  being sent to.

20      THE COURT:  This is a subtle difference, I get it, but I

21  think it says pretty much the same.  You might want to think about

22  scaling it back.  It does look like I read this document a couple

23  times.

24      MR. MACE:  So if I understand, we're saying not if it's a

25  duplicate.  And if it's coming in, we have to coordinate the

628

1    redaction --

2              THE COURT:  Even if it's very similar.  But if there's a

3    substantive difference, then that's a different matter.

4              How about anything else in here?

5              MR. MACE:  I think we agree if there's redactions on the

6    other one that need to be made, we would make them.

7              THE COURT:  All right.

8              MR. PAULOS:  I think at this point, Your Honor, that

9    that's our main objections.

10             THE COURT:  That's fine.  And I think we go to 2744.

11             MR. PAULOS:  This is --

12             THE COURT:  This is a -- no, I'm sorry.  Go ahead.

13             MR. PAULOS:  This is an e-mail that attaches a fax from

14   Chris Jones, Director of Ohio EPA -- or, excuse me, from Cindy

15   Hafner, who is the Chief of DERR, to Chris Jones, and it's

16   regarding the CAT Team report on C-8.  There's references to

17   Mr. Bilott.  His name is on here.

18             THE COURT:  So we will redact that.

19             And the consent order, the jury is going to hear about.

20   So we don't need to redact that.  Is that your main issue,

21   Mr. Bilott?

22             MR. PAULOS:  There is some reference to the plaintiff's

23   letter and some terminology that we understand from Court rulings

24   may not --

25             MR. MACE:  We will coordinate with them on the

629

1    redactions.

2          THE COURT:  Anything like that will come out.

3          All right.  2745.  Is this the same thing we saw -- Let

4    me see this for a second.

5          MR. PAULOS:  That's correct.

6          THE COURT:  Same document.  I don't think we want to do

7    this twice.

8          MR. MACE:  Well, actually, Your Honor, the cover page is

9    different.  And so, again, the reason this might become relevant

10   depends on what the plaintiffs do in their case-in-chief, but the

11   fact that the U.S. EPA -- both the U.S. EPA and the West Virginia

12   DEP knew about Ohio's analysis, Ohio's review of the CAT Team

13   findings, which may or may be relevant based on what the

14   plaintiffs put in their case.

15         THE COURT:  So -- But the first one --

16         MR. MACE:  So what's new is the cover e-mail.

17         THE COURT:  The Chris Jones cover -- I'm sorry, the Chris

18   Jones document that says 2744 has a cover page where someone from

19   DuPont is e-mailing this to other people at DuPont.

20         MR. MACE:  Okay, you went back on a document.

21         THE COURT:  It's the same -- It's the cover to the same

22   document in each case, the Chris Jones document.

23         MR. MACE:  The attachments are the same.

24         THE COURT:  The attachments are the same.  But the first

25   one has a cover letter from a David Rurak at DuPont --

630

1          MR. MACE:  Right.

2          THE COURT:  -- to a bunch of other people at DuPont with

3     the attachment -- same attachment.  This is from Dee Ann Staats,

4     Dr. Staats, to all these people, right?

5          MR. MACE:  Yes, U.S. EPA.  It comes out of the EPA's

6     files.

7          On that prior document, Your Honor, you will recall that

8     one of the issues we had with this was whether we could only use

9     the state of the knowledge at the time or use it for DuPont's

10     knowledge.  This links it up, that DuPont did in fact have it.

11          THE COURT:  That's the first one of these.

12          MR. MACE:  Right.

13          THE COURT:  The second one is a Dee Ann Staats document.

14          MR. MACE:  Yes, sir.

15          THE COURT:  So how do you -- How do you contend that's

16     admissible?

17          MR. MACE:  Because it was produced under the U.S. EPA's

18     file.  There is no contention this isn't authentic.  It's self

19     authenticating because of the e-mail addresses.

20          THE COURT:  Authentication, you're referring to --

21          MR. PAULOS:  This isn't authenticating documents, Your

22     Honor.

23          MR. LEBER:  The heading on the one before has pretty

24     distinctive characteristics.

25          THE COURT:  What I want to talk about is whether this

631

1     qualifies as a business record -- or, I'm sorry, a record of -- as

2     a public record, a record or statement.  I mean certainly the

3     Chris Jones document does.  But you have got an employee of the

4     West Virginia DEP just sending an e-mail to other people.

5               MR. MACE:  To the U.S. EPA.

6               THE COURT:  Well, to a lot of people.

7               MR. MACE:  It proves up, if needed -- and I don't know if

8     it's needed or not -- but it proves up that both West Virginia and

9     U.S. EPA had OEPA's analysis.

10              MR. LEBER:  We're not trying to prove the truth of the

11    matter asserted in these documents, Your Honor, just the fact they

12    were sent.

13              MR. MACE:  If it becomes relevant, were they on notice of

14    this?

15              THE COURT:  When I was in law school, I heard a professor

16    say, it's not about the money.  Think of that when you hear

17    someone say, it's not for the truth of the matter.  I'm just

18    kidding you.  But you get my point.  It always seems to come in

19    for the truth regardless.

20              Well, the only thing we're arguing about is the Dee Ann

21    Staats cover letter.  The document itself, I'm not worried about.

22    And you're saying you are not sure you're going to use --

23              MR. MACE:  Right.

24              THE COURT:  We'll do a side-bar before we do.

25              MR. MACE:  Okay.

632

1    THE COURT:  All right.  2761.

2    MR. PAULOS:  Yes, Your Honor.  This appears to be a

3  letter to Todd Kelleher at the Division of Drinking and Ground

4  Water --

5    THE COURT:  Let me back you up.  Who is David Boothe?

6    MR. MACE:  He's a DuPont employee, Your Honor, who was

7  giving the context with some of the regulatory agencies with

8  regard to C-8.

9    MR. PAULOS:  It's an unsigned letter.  And I think that

10  Mr. Mace just said that letters were signed when they were sent.

11  There is no proof this was ever sent, or received, to the person

12  who it was intended to be sent.  So --

13    MR. MACE:  But these are -- I'm sorry, I didn't mean to

14  interrupt you.

15    MR. PAULOS:  That's okay.  I just -- We believe it is

16  hearsay and should be excluded as such.

17    MR. MACE:  It's the Bates number -- and I don't purport

18  to have them all memorized, but I believe this is out of the

19  production of U.S. EPA.  So we do know they got it -- I'm sorry,

20  the Ohio EPA because of the Bates number.

21    THE COURT:  How hard is that to dig out?

22    MR. MACE:  We should be able to link that up for you.

23    MR. PAPANTONIO:  Link it up --

24    THE COURT:  If this is in the EPA's files, that's what

25  you are saying.

633

1          MR. MACE:  Yes, sir.  Ohio EPA.

2          THE COURT:  It shows that EPA received it, then that

3     addresses your issue.  So right now we don't have that.  But if it

4     is produced, it will be a different matter.

5          MR. PAPANTONIO:  That's correct.

6          MR. MACE:  Yes, sir.

7          THE COURT:  All right.  The next, 2764, is an excerpt

8     from the Federal Register.

9          MR. MACE:  Yes, sir.  This gets in that same category.

10    Depending on where they go with these TSCA issues, we may need to

11    use this with regard to what the guidance was over the years --

12         THE COURT:  All right.

13         MR. MACE:  -- on when you report.

14         THE COURT:  On reporting requirements.

15         MR. MACE:  Yes, sir.

16         THE COURT:  It's not being offered at this point.

17         MR. MACE:  We may to --

18         THE COURT:  What we are doing -- and sometimes this is

19    unavoidable -- but wading into the law, and that's always

20    something that --

21         MR. PAPANTONIO:  It's no different, judge, talking about

22    what a statute was on a particular issue, and you're getting to a

23    law interpretation but --

24         THE COURT:  Well, that's a concern that I have.  We will

25    hold on this now until we see if it's offered.  It's not being

634

1    offered at this point --

2             MR. BILOTT:  Your Honor, I apologize for going backwards.

3             THE COURT:  We only have two left, and you are going to

4    take us backwards?

5             MR. BILOTT:  I'm afraid so.  On D.2745.

6             THE COURT:  Hold on one second.

7             All right.  This is a Dee Ann Staats matter.  I held on

8    this.  This is not in.

9             MR. BILOTT:  Correct.  But one thing we want to note is

10   it's incomplete.  At least the version I have only has the first

11   two pages.

12            THE COURT:  So you have the two copies of, and they both

13   -- It's -- The first one is complete.  The second one isn't?

14            MR. BILOTT:  Correct, Your Honor.

15            THE COURT:  That, I am assuming, was a copying error.

16            MR. MACE:  I am assuming.

17            THE COURT:  So it's going to be the whole document,

18   that's what you are suggesting, Mr. Bilott?

19            MR. BILOTT:  Yes, that would be -- Well, we want to make

20   sure that on 2745, which they're representing is the version that

21   allegedly was sent to EPA --

22            THE COURT:  Oh, I see, whether the whole was sent by

23   Dr. Staats.

24            MR. BILOTT:  Correct.

25            THE COURT:  Can you check on that?

635

1          MR. MACE:  Yes, sir.

2          THE COURT:  Now we're at 2873.  Who is Stuart Bruny,

3   Chief-SEDO, who would that be?  Anybody know what SEDO means?

4          MR. MACE:  I think that was one of the -- that's one of

5   the departments in Ohio EPA.  This is out of the Ohio EPA

6   production.  You can see that at the bottom.

7          THE COURT:  What's the objection here to 2873?  It's the

8   first paragraph, right?  No, there's more.  It looks like the

9   whole.

10         MR. MACE:  It's the C-8 update.  So we don't need any of

11  the topics that are discussed below that.  Only the C-8 update

12  section.

13         MR. BILOTT:  Is this being used to be something --

14  allegedly notice or notice or knowledge of DuPont?  Because as

15  indicated here, it actually came out of the Ohio EPA files, not

16  DuPont -- and then was produced by us actually to DuPont later.

17  So I'm not sure how this would relate to what DuPont knew at the

18  time.

19         MR. MACE:  It describes the facts back at the time in

20  terms is what was being done with this public meeting and with the

21  GIST team and the sampling that was going on.

22         THE COURT:  Would this arguably be both the business

23  record and also public record?  It's going to come in on that

24  basis.  All right.

25         And 2885.  Who is Michael Neal, who was the author?

636

1          MR. PAULOS:  Your Honor, this is an e-mail from Mike Neal

2     to the fluoropolymers group at DuPont.  It had attached to it two

3     poster presentations allegedly -- since we don't know, and they

4     are not attached to this document -- that are about how C-8 was

5     used to treat cancer patients.

6          THE COURT:  What's the problem?  Is Mr. Neal in?

7          MR. MACE:  Well, Mr. Neal, Your Honor, is -- he's a third

8     party, but he was sending these.  You can see down below

9     Mr. Kennedy, who's from DuPont, he's corresponding with Mr. Neal

10    who's with Plastics Europe, which is a trade group in Europe, and

11    also to Bock --

12         THE COURT:  Is he in public relations?

13         MR. MACE:  Kennedy is a toxicologist.

14         THE COURT:  How about Neal?

15         MR. MACE:  Neal is -- I'm not sure what his title is, but

16    he's with this trade organization.  And you will recall there was

17    some discussion about this clinical trial that was done where

18    doses of C-8 were being given to cancer patients for treatment

19    purposes, and Your Honor had a concern at the last trial that we

20    did not link up when DuPont knew about that.  Because I had

21    represented to the Court this was part of what DuPont was

22    considering when it was evaluating its conduct, what to do prior

23    to the Science Panel's finding, and you had a concern that we

24    hadn't adequately proven up that we knew about that prior to 2012,

25    prior to the Science Panel's report.  So this helps link up the

637

1     date of when DuPont knew about that.

2           MR. PAPANTONIO:  Judge, if we use that, we will have

3     other documents to say -- If they use that, we'll have other

4     documents that say not only is it not a treatable use for cancer

5     but also don't even try to go forward with this study.  There's a

6     lot more to this story.

7           THE COURT:  There are so many issues in the case -- and

8     this doesn't come out as addressing this particular issue with the

9     exhibit -- but as a general matter, it turned out not to work,

10    first of all.

11          MR. MACE:  That's not true, Your Honor.  So these are

12    screening studies that were done.  And the fact was they couldn't

13    get a response out of the people even though they were giving them

14    very high doses.

15          MR. PAPANTONIO:  They had to stop giving it to them

16    because it had the risk of killing people.

17          MR. MACE:  No, sir, that's not true.  Your Honor, that is

18    a total mischaracterization and --

19          THE COURT:  Wait, wait, wait.  What I am simply asking is

20    nobody is being treated with C-8 for cancer today, right?

21          MR. PAPANTONIO:  They're not, judge.

22          THE COURT:  The reason I say that is I want to get this

23    out of the case.  It doesn't seem to go -- It's going to get us

24    down a blind alley.

25          MR. MACE:  Plaintiffs are trying to picture to the jury

638

1    that decades ago DuPont should have concluded -- and they are

2    contending did conclude but tried to hide it -- that C-8 was a

3    very hazardous material.  Nobody would allow one molecule to be

4    exposed to anyone.

5         The fact that with DuPont's knowledge, they were actually

6    doing a clinical trial, intentionally giving it to people in

7    extremely high doses prior to the Science Panel's finding helps

8    rebut their claim that DuPont knew or should have known, that this

9    was extremely hazardous, and nobody should be exposed to.

10        THE COURT:  I want to scrub this pretty hard.  Now this

11   document really doesn't take it -- I mean this is minimal, right?

12   It doesn't have anything specific about who was treated, how they

13   were treated, when they were treated.  We have got a reference

14   literally to a poster, right?

15        MR. PAPANTONIO:  That's all this is.

16        MR. MACE:  That's with this document.

17        THE COURT:  But anything else to go it, with the whole

18   theory --

19        MR. MACE:  Yes, there's Dr. Rickard's testimony about

20   what he knew about that as he was evaluating DuPont's conduct and

21   what steps they should take prior to the Science Panel's finding.

22   And the reason it's important was to address Your Honor's concern,

23   well, I hear all that from Dr. Rickard, but I haven't seen proof

24   that they knew that --

25        THE COURT:  At what time?

639

1          MR. MACE:  The timing --

2          THE COURT:  So you're saying this goes with time -- This

3     is pretty much a timing issue.

4          MR. MACE:  The timing of the knowledge.

5          MR. O'BRIEN:  It's a 403 issue at some point in the

6     treatment because with chemotherapy, you give people poison to

7     kill stuff like tumors.  So they give this -- We're getting into a

8     pharmacological/pharmokinetics trial here --

9          THE COURT:  That's a logical leap I can't make when

10    somebody -- I assume these are pretty seriously ill cancer

11    patients we are talking about?

12         MR. MACE:  Yes, sir.

13         THE COURT:  So medical science would say if you are in a

14    grave risk of death, that's the time to take grave risks with

15    treatment.  That doesn't mean -- I don't think you can medically

16    imply from that, just as a lay person implies, because people *in*

17    *extremis* would be given, that that meant the chemical wasn't

18    harmful.  I'm not prepared to make that link.

19         MR. DOUGLAS:  Like baby aspirin to prevent a heart

20    attack.

21         MR. PAPANTONIO:  We would be opening such a door here, we

22    would have a totally different case, and it is not even necessary.

23         MR. MACE:  I think it is highly probative, Your Honor, to

24    DuPont's evaluation --

25         THE COURT:  I've been caught cold on this, and I hate to

640

1    keep making you brief things, but let's do another -- By the way,

2    if you would like, I can do you all a favor if you want a page

3    limit on these or not?  It's important enough if you want to go

4    ahead or if you can think you can agree?

5              MR. MACE:  I think both parties are fairly reasonable.  I

6    don't think we need a page limit to keep it down.

7              THE COURT:  But this is going to be the issue:  Should

8    the jury hear about --

9              MR. MACE:  Clinical trials.

10             THE COURT:  -- clinical trials with cancer patients using

11   C-8 as a possible treatment?  In other words, on DuPont's side

12   tell me why it's relevant, probative, not unfairly prejudicial.

13   And the other side, tell me the opposite.

14             MR. PAPANTONIO:  A ruling would be helpful because we

15   would be asking our doctors, Dr. Bahnson, would you treat somebody

16   for cancer with C-8?  I think there might be an interesting

17   response to that from our witness.

18             THE COURT:  All right.  We will address that.

19             Now we are on the last exhibit by my count.

20             MR. MACE:  The record shows applause.

21             THE COURT:  After two whole days of this, I can see the

22   light at the end of the tunnel.

23             DuPont Acts on Suspect Chemical.  This an *Industrial*

24   *Chemical News*.  This goes to what issue?

25             MR. MACE:  Well, again, in terms of DuPont's activities

641

1    being public knowledge, I mean their claim, the plaintiff's claim,

2    id that DuPont is sweeping everything under the carpet, and nobody

3    knows what's going on.  But the fact is that the trade publication

4    *Industrial Chemical News* was reporting on this.  So it gets -- You

5    will recall you had *The Wall Street Journal* and *The New York Times*

6    articles earlier, you get them in one time.  But this is a similar

7    article that was also in the trade publication.

8              THE COURT:  Do we know the year?

9              MR. MACE:  1981.

10             MR. PAPANTONIO:  There's not -- Two thing about this,

11   judge.  This -- He keeps saying, we've made the argument that they

12   hid it from everyone.  No, our argument is they hid it from the

13   people that were drinking it every day for 50 years.  That's our

14   argument, not this hide this broadly from the community, that they

15   hid it from the very people they were poisoning with it.

16             THE COURT:  Let me make a --

17             MR. PAPANTONIO:  It's a broad generalization.

18             THE COURT:  I have a narrower question, *The Wall Street*

19   *Journal* and *The New York Times*, they don't serve it anywhere in

20   Ohio or West Virginia in great numbers, but people read it; and

21   local papers oftentimes will pick up stories.  I'm not concerned

22   about those two journals.  This is the *Industrial Chemical News*.

23   This wouldn't be read by the average consumer of water in these

24   districts.  Wouldn't you agree?

25             MR. MACE:  That's true, Your Honor.

642

1    MR. PAULOS:  Your Honor, I believe your prior ruling was

2    the other articles were admissible because they were submitted to

3    EPA.

4        THE COURT:  That's true.

5        MR. PAULOS:  This was --

6        THE COURT:  I am going to let you get into *The Wall*

7    *Street Journal* and *The New York Times*.  But this is a trade

8    journal.  It isn't widely disseminated.

9        I think that's all the exhibits, right?

10        MR. O'BRIEN:  Your Honor, may we address one issue --

11    yes, it is.  May we address one issue because yesterday we learned

12    for the first time that Laura Korte would be the corporate rep or

13    corporate designee of the trial of this case.  When DuPont in 2013

14    filed a Rule 26 disclosure at the commencement of this MDL, there

15    was no disclosure of Laura Korte as a person with knowledge.

16        THE COURT:  Let me back up.  Counsel, she's going to be

17    at counsel table?

18        MR. MACE:  She's the corporate representative, so she'll

19    be at counsel table.

20        THE COURT:  It was Dr. Rickard at the last trial.

21        MR. MACE:  Yes, sir.

22        MR. O'BRIEN:  And she was not identified any time as a

23    witness in *Bartlett*.  The first time she was ever identified in

24    this case was in February of 2016, when DuPont's witness list

25    identified her with 49 other may call witnesses.  Compared to --

643

1        THE COURT:  Has she be deposed?

2        MR. MACE:  She has been three times, Your Honor.

3        MR. O'BRIEN:  That was in the *Little Hocking* case.  So

4    here's the good cause, that we understand that she --

5        THE COURT:  What are you asking for?

6        MR. PAPANTONIO:  A deposition, Your Honor.

7        MR. O'BRIEN:  Next week.

8        THE COURT:  All right.  When was she first identified on

9    the witness list?

10       MR. O'BRIEN:  February 15, 2016.

11       MR. MACE:  She was actually identified, Your Honor, back

12   in 2013 when the list of depositions was reviewed with regard to

13   depositions in the prior cases.

14       THE COURT:  We kept that -- I have made a ruling, that

15   you wouldn't -- you would have to move to add to these.

16       MR. MACE:  It's more than that, Your Honor.  In PTO no.

17   8 --

18       THE COURT:  It bears my signature.  I do remember this

19   part.

20       MR. MACE:  In PTO 8, what you said was with regard to

21   these past cases, there were a bunch of depositions taken --

22       THE COURT:  We weren't going to undo it all --

23       MR. MACE:  All of it was available for use in this MDL.

24   Depos in prior cases may used.  No party may re-depose any such

25   witness except on motion and showing of good cause.  Any such

644

1    motion shall be filed no later than three months from the date of

2    this order.

3         We had put in a placeholder for about three people we

4    thought we might want to re-depose.  We ended up not seeking that.

5    But it was expressed at the beginning of the --

6         THE COURT:  We debated this a long time.  I remember

7    well.

8         MR. PAPANTONIO:  She has gone from may call on the bottom

9    of the witness list to now she's corporate rep.  She's sitting

10   here.

11        THE COURT:  I want to get the facts here.  How many

12   people are on the may call list?

13        MR. O'BRIEN:  Forty-nine.

14        THE COURT:  And how many are on the will call list?

15        MR. O'BRIEN:  Five.

16        THE COURT:  That's the problem.  How long a deposition do

17   you think this would take?

18        MR. O'BRIEN:  Five hours.

19        MR. PAPANTONIO:  I think five hours.

20        THE COURT:  Extensive.

21        MR. MACE:  We are on the eve of trial.  All she's doing

22   is sitting there, Your Honor.  She's the corporate representative.

23   She's on the may call list.  We do not intend to call her.

24        THE COURT:  Wait.  She's coming, but she's not

25   testifying.

645

1          MR. MACE:  She's sitting there as the corporate rep.

2          THE COURT:  As we speak, you are not planning on calling

3     her.

4          MR. MACE:  Right.

5          MR. PAPANTONIO:  Judge, we have the right to call her

6     adversely.

7          THE COURT:  You do.  The question is whether you have the

8     right to depose her.

9          MR. PAPANTONIO:  What I am trying to say, the first time

10    we heard this was the first time the Court heard, well, Ms. Korte

11    is going to be here, not Dr. Rickard.  So they have, of course,

12    they have held this off to the last minute.  I ought to be able to

13    question her.  Nobody in this MDL has been able to question her at

14    all.

15         THE COURT:  Tell me about her background.  What's her

16    title, first of all?

17         MR. MACE:  John, do you know Korte's title?

18         MR. GALL:  My first chance to speak on the record.  I am

19    sorry, I do not recall the title.

20         MR. MACE:  Mr. Brogdon could have --

21         THE COURT:  Generally, what's her background with DuPont?

22         MR. O'BRIEN:  She's a business manager of sustainability.

23         MR. GALL:  I have not spoken with her, but I believe she

24    had something to do with in the later stages organizing the

25    monitoring DuPont's response to some of the C-8 issues.

646

1      MR. MACE:  I don't think she had any involvement with C-8

2  not until 2009.

3      MR. PAPANTONIO:  Your Honor, this very response gives you

4  an idea of how late this has developed.  That's what I am trying

5  to say.  This is what she -- This is the background on her.  So

6  they wait until yesterday.  And they say, oh, we are not going to

7  put Rickard as our PR.  And Ms. Korte is just going to sit there

8  and watch the trial.  We still have a right to be able to call the

9  public rep --

10      THE COURT:  Again, there is no question you have a right

11  to call her.  There is no dispute about that.

12      Your argument is you really didn't feel like taking 49

13  depositions --

14      MR. PAPANTONIO:  That is correct.  Plus we -- excuse me.

15  We said to the Court back then the use of the -- the use of time

16  and expense going through 49 witnesses, first of all, is unheard

17  of in an MDL.  They always are required to narrow their witnesses.

18  They didn't do that here, and they didn't do it for a reason.

19  Rickard didn't go well for their PR.  Great.  Now they're going to

20  try this woman.

21      Judge, I ought to be able to ask her from the MDL -- from

22  the MDL standpoint some questions before she sits in that chair as

23  a PR.

24      MR. MACE:  That's totally inaccurate.  Rickard did an

25  excellent job as the corporate rep.  We can choose whomever we

647

1   want --

2           THE COURT:  We don't have a jury here to decide that.

3           MR. MACE:  But that's not the issue.  The issue is she

4   was deposed three times.  The understanding and agreement was if

5   anybody wanted to depose anybody again, they had to show this back

6   in 2013 so we wouldn't get in this situation.

7           THE COURT:  Do you know when she was deposed?  What years

8   are we talking about?

9           MR. MACE:  Yes, she was deposed twice in 2013 and once in

10  2014.

11          MR. BILOTT:  All of the cases before we've talked about

12  in the prior C-8 actions involved some of the attorneys in this

13  room.  The *Little Hocking* case involved none of the plaintiffs'

14  attorneys in this room.  DuPont's attorneys sitting here were

15  involved in those depositions, but none of us were.  So none of

16  the attorneys here had any opportunity to depose --

17          THE COURT:  It does mention the *Leach* case in terms to

18  what discovery would be used from that case to this case.

19          MR. MACE:  Actually, Your Honor, and there are other

20  lawyers, but it was defined as the past C-8 cases, which *Little*

21  *Hocking* was expressly listed -- and I don't have that order with

22  me --

23          MS. NIEHAUS:  Excuse me.  CMO 13 is the Case Management

24  Order for this case, for Freeman.  It actually identified *Little*

25  *Hocking* as one of the prior cases.

648

1      MR. PAPANTONIO:  Judge, this is being presented as if --

2      THE COURT:  In all honesty --

3      THE LAW CLERK:  It refers to *Little Hocking*.  It refers

4  to like the four cases that were on there and --

5      THE COURT:  In this particular case.  This is a general

6  order.  This particular case lists them all?

7      MS. NIEHAUS:  CMO 13, I think it's 4B -- A maybe --

8      THE LAW CLERK:  It was all, referring to your order, that

9  you didn't want them to redo everything that had been done in the

10  C-8 cases.  So they all agreed.  This was never really debated,

11  this issue.

12      THE COURT:  But the other, the order in this case is

13  saying, you mentioned all four.

14      MR. MACE:  And it also indicated -- It also indicated, as

15  your Court's order did in *Bartlett*, if somebody showed up on a

16  witness list that they hadn't been deposed, so it wouldn't even

17  fall into that, they would have 45 days from the day of

18  identification to depose them.  So identified in February, we're

19  sitting here at the end of May or the middle to May --

20      THE COURT:  So what I -- I guess the other issue is the

21  depositions are already taken.  Did it cover the areas involved in

22  this case?

23      MR. PAPANTONIO:  No, it do not, judge.  Can I ask the

24  Court, please, as a matter to equity, if nothing else, yesterday I

25  sat here, and I explained that they had passed on complying with

649

1    the Court order on more than 120 documents.  The Court said -- We

2    went forward with that anyway.  We said fine.  This is just a

3    matter of equity.  They are trying to say, well, we did something

4    wrong by not taking 49 witnesses?  I am talking about four -- four

5    or five hours with this witness to be able to talk to her before

6    she comes.  That's equitable, judge.  I know this isn't a court of

7    equity, but we have seen that, on playing this very --

8              THE COURT:  This is both a court of law and a court of

9    equity.

10             MR. MACE:  But it's beyond that, and that's a different

11   issue, Your Honor.  It's not that we've sprung them with 49 new

12   names.  These were people largely that had been previously

13   deposed, and these are worth sitting here with the defendant

14   rebutting what they throw at us.  So we, obviously, need a little

15   flexibility, why this list is may call.

16             THE COURT:  The problem is it's not just a deposition.

17   It's that only -- We're getting into different areas.  And then --

18   I'm just to look at this both ways.  You will be opening up doors

19   that can't be opened any further because it's too late in the

20   discovery process.

21             MR. O'BRIEN:  But the issue is, it's in good cause in

22   2013 at the commencement of this MLD, when they were supposed to

23   identify the witnesses with pertinent information, they don't

24   identify her.  They don't identify the deposition that had been

25   taken of her.

650

1          THE COURT:  I mean one way to look at this, I understand

2     you're speaking of optics.  I'm speaking of, legally speaking,

3     she's just sitting there.  Her satisfying being the corporate rep

4     doesn't change, other than the fact that she's going to be present

5     in the courtroom.

6          MR. PAPANTONIO:  Well, judge, here is -- There are no new

7     doors that will be opened.  The only issues that I will be

8     questioning her about are the issues we've been talking about here

9     for two days.

10          THE COURT:  All right.  Here's what I am going to do.  I

11     want this to be a relatively short deposition.  I definitely don't

12     want it to exceed five hours, hopefully a lot shorter.  And I want

13     it to be confined to what we all know are the triable issues in

14     the case.

15          MR. PAPANTONIO:  Yes, sir.

16          THE COURT:  Nothing new.

17          MR. PAPANTONIO:  Not at all.

18          THE COURT:  And I will let you work out the schedule.

19          MR. PAPANTONIO:  Thank you.

20          THE COURT:  Now I think everybody looks pretty whipped.

21     I feel pretty whipped.  The only other matter we could address

22     today, if you would like with all of us here, is the issue of

23     other matter discharged in the Ohio River.  Do you have enough

24     energy to continue?

25          MR. DOUGLAS:  Your Honor, I have been here all day.  This

651

1    was my one solo assignment to argue this.

2          THE COURT:  And you're ready to go.

3          MR. DOUGLAS:  I'm faced, however, with a flight that's

4    leaving.  I could make it quick or ask for the opportunity to just

5    brief what we would have --

6          THE COURT:  What time is your flight?

7          MR. DOUGLAS:  It's six o'clock.

8          THE COURT:  You have got to get out of here.

9          I think -- I have DuPont's supplemental.  Are we done

10   with the briefing?  I think we are, aren't we?  Anything else you

11   want to file?

12         MR. DOUGLAS:  We would like to put -- file a brief.  If

13   we could have until Monday.

14         THE COURT:  All right.  Any objection to that?

15         MR. MACE:  No, Your Honor.

16         THE COURT:  Truthfully, I don't want to waste your time.

17   I am going to grant the motion *in limine*.  I just want to tell you

18   that not simply because I want to give you an opinion, but I want

19   you to be prepared for the case rather than make you do a useless

20   exercise.  Briefly, you will get the opinion -- I want a summary

21   -- By the way, tremendous arguments.  I don't want to just piece

22   this apart, but there are several things in here.  You can't

23   compare pounds of different chemicals, and that's throughout here.

24   You know, a pound of C-8 versus a pound of some other chemical,

25   there would have to be expert testimony that would make those

652

1    anywhere near -- We're going to use some sort of hazard basis.

2            The other thing is I don't doubt there are other

3    chemicals that can cause testicular cancer, but this becomes an

4    expert opinion, particularly with regard to causation.  So if

5    there were medical testimony and expert testimony to go with this,

6    I slight have a somewhat different view, but it would take a lot

7    to do that.  So at this point there is no expert, to my knowledge,

8    who has given an opinion based on these chemicals.  So that's the

9    long and the short.

10           MR. DOUGLAS:  I would also just add that the articles,

11   the three articles they have cited in support of any connection

12   between the chemicals and testicular cancer, are some of the

13   flimsiest things I have ever seen in the medical literature.  One

14   has to do with seamen and testicular cancer.

15           MR. MACE:  Your Honor, if I could just --

16           THE COURT:  What I want to be clear, we have the Sixth

17   Circuit conference for four days next week, and I have got to be

18   there all four.  I want to make sure we have everything.  If you

19   need to go to catch your plane, go ahead any time you need to.  I

20   just want to clear up what's left to be decided.

21           I will give you a final decision on the proposed limiting

22   instructions.  You can expect that.  We have a couple of

23   outstanding motions *in limine* to be ruled on.  And you're going to

24   brief a couple of the issues we debated today about exhibits.  And

25   I think that's everything.

653

1       MR. MACE:  And the *Daubert* issue on Redlich.

2       THE COURT:  That's right.

3       THE LAW CLERK:  And the tort reform and the bifurcation.

4       THE COURT:  That's right.  We will try to get those to

5  you as -- again, you're owed an opinion on this, but there I will

6  do you a favor by giving a heads up.  On the bifurcation, it's

7  going to remain the same.  You will get an opinion on.  I don't

8  want you to be up in the air on how you prepare your case.  The

9  other matters, we will go through the briefing.

10      MR. MACE:  Your Honor, I did want to make my record,

11  clarification, if needed, on the Ohio River issue because -- So

12  the points you raised and counsel raised went to the process of

13  cross-examining the specific causation doctor about the

14  thoroughness of the investigation.  So I heard and understood

15  that.

16      But we had three independent bases for getting into it.

17  One, that was relevant to breach of duty industry standard of

18  care, and that these were lawful --

19      THE COURT:  I just wanted to give you a summary so you

20  wouldn't have to waste more time on it.  I get it.  I considered

21  all these arguments.

22      MR. MACE:  And the claimed fear of future cancer.

23      THE COURT:  I saw that.

24      MR. MACE:  Right, and then --

25      THE COURT:  The issue of punitive damages.

654

1      MR. MACE:  Right, reprehensibility.  So even for the

2  second phase.

3      THE COURT:  At this point, you might ask me to

4  reconsider, but at that this point I'm not prepared to say yes.

5      MR. PAPANTONIO:  Judge, is there any way that I can -- we

6  can get a few minutes to walk around your courtroom so I can look

7  at some logistics?

8      THE COURT:  You can be here as long as you want to be.

9      MR. PAPANTONIO:  Thank you.

10      THE COURT:  You have the tech people on both sides, you

11  have been there already?

12      MR. MACE:  We have.  And what we had talked about, Your

13  Honor, I think we talked about this yesterday, perhaps was that

14  they're going to, after the jury is selected, set up behind the

15  rail --

16      THE COURT:  So you know, next week, if you want to send

17  people over to just become familiarized with the technology, it's

18  the exact same system as Judge Marbley, different display system.

19  That's all.

20      MR. MACE:  We are going to move our refrigerator and

21  supplies into the work room.  Thank you, sir.

22      THE COURT:  All right.  Well, thank you for two intense

23  days.  Nice to see all of you.  We'll meet -- We are starting a

24  week from this coming Tuesday.  Let's plan around 8:15 in the

25  morning to make sure there are no big snags.  I am reachable by

655

1     phone any time.  I will be in on Friday.  So if you have -- any

2     things that really can't wait, just call Ms. Barrick.  We will try

3     to take care of things.  We can typically take care of that by

4     conference call.

5               MR. PAPANTONIO:  Meet in your office?

6               THE COURT:  Yes.

7               MR. MACE:  And I think that Mr. Butler and Mr. Gall are

8     conferring on the jury forms.  They were not complete yesterday

9     apparently.

10              THE COURT:  All right.  Do either of you have grave

11     concerns that we have a problem or -- I don't care if you have a

12     couple people to debate, but is it more systemic?  Or how do you

13     see this?  Mr. Gall.

14              MR. GALL:  I think Mr. Butler and I will be able to come

15     up with a list.  I think there are somewhere between five and ten

16     that look like they shouldn't be a part of it.  But I will talk

17     about that.  We only saw part of the material from the jurors, not

18     the complete set.

19              THE COURT:  So what -- We'll leave it in an official way.

20     If you both agree that somebody should be excluded, then that

21     person will be excluded.  And I don't -- You don't have any issue

22     with the people who have already been excluded, do you?  I am

23     happy to resolve those.

24              MR. GALL:  Not really, Your Honor.  The group is mostly

25     people who have prepaid vacations or --

656

1    THE COURT:  I have great confidence in Fran Green, who is

2    not a lawyer, but if you think they've made an error in the

3    review --

4    MR. MACE:  One issue.  As I understand Mr. Gall, Your

5    Honor sent out two questionnaires.  There was one complete set --

6    stack that did not have the second questionnaire.

7    MR. GALL:  I am color blind, apparently like Your Honor,

8    so that the court sent out a jury questionnaire that's a darker

9    color, and then there was a supplemental set.  As to the 70 that

10   are in the precertified group, there are none of the standard

11   forms.  And they aren't in there.  So I understood from Fran that

12   we were going to get those --

13   THE COURT:  Okay.  She has those --

14   MR. GALL:  She has them.  We're not going to get that

15   stack until next week.  I will work with that stack --

16   THE COURT:  Take a look at those.  Let me know if you

17   have a disagreement.  I think our goal is between 50 and 60

18   people.  We have gone through the first couple of chutes,

19   including anybody who can't sit for four weeks.  That will be the

20   biggest impediment.

21   MR. GALL:  There were five to ten that fall -- a couple

22   that are just outliers, that made comments on the form that seemed

23   very peculiar.  But there are some that said they were not

24   available.  Of the group of 70, I think 35 claimed they are

25   unavailable, and some of those offered prepaid vacations excuses

657

1    and the like that would have been excused.

2            I don't think there's going to be an issue, but there's

3    -- we need to take a look at both sets before we're going to see

4    what's there.

5            THE COURT:  All right.  Very good.  Thank you both.  All

6    right.  We will be in touch.

7                              -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

658

C E R T I F I C A T E

- - -

I, Laura L. Samuels, do hereby certify that the foregoing is a true and correct transcript of the Continued Proceedings of the Final Pretrial Conference on the Deposition Designations and the Admissibility of Exhibits in the case of:  E. I. du Pont de Nemours and Company C-8 Personal Litigation, case no. 2:13-md-2433, before the Honorable Edmund A. Sargus, Jr., Chief Judge, in the United States District Court, Southern District of Ohio, Eastern Division, on the date indicated, reported by me in shorthand and transcribed by me or under my supervision.


/s/ Laura L. Samuels
Laura L. Samuels
Official Federal Court Reporter