UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

Civil Action 2:13-md-2433
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth Preston Deavers

This document relates to:

*David Freeman v. E. I. du Pont de Nemours and Company*, Case No. 2:13-CV-1103

## MOTIONS *IN LIMINE* ORDER NO. 11

### References to the Pollution of the Ohio River

This matter is before the Court on Plaintiff David Freeman's Motion *in Limine* No. 14, To Preclude Defendant's References to the Ohio River as One of the Most Polluted Rivers in Ohio and/or the United States ("Motion Related to the Ohio River") (ECF No. 4430), and Defendant's Memorandum in Opposition (ECF No. 4515), and Defendant's Supplement to its Opposition Memorandum (ECF No. 4537). For the reasons that follow, the Court **GRANTS** Plaintiff's Motion in accordance with this Opinion and Order.

I.

Plaintiff David Freeman's case is scheduled for trial on May 31, 2016, and is the second bellwether case to be tried in this multidistrict litigation ("MDL"). Carla Marie Bartlett was the first bellwether plaintiff, and her case was tried in September 2015. This MDL consists of approximately 3500 individuals who allege that they are members of a class ("*Leach* Class"). The *Leach* Class is permitted under a contractual agreement ("*Leach* Settlement Agreement") to

1

file claims against Defendant E. I. du Pont de Nemours and Company ("DuPont") based on six human diseases ("Linked Diseases") that they believe were caused by their exposure to ammonium perfluorooctanoate ("C-8" or "PFOA") discharged from DuPont's Washington Works plant. (*Leach* Settlement Agreement ("S.A."); ECF No. 820-8.) C-8 is an organic fluorinated compound that DuPont utilized as a manufacturing aid in the production of Teflon$^{TM}$.

In 2000, Mr. Freeman was diagnosed with testicular cancer, which is a Linked Disease. (http://www.c8sciencepanel.org/study.html) ("[T]he Probable Link reports [are] presented in detail in scientific articles (follow link [on the C-8 Science Panel website to the] Study Publications.")). After Mr. Freeman's oncologic surgeon performed a "right radical orchiectomy" ("surgical extraction of his right testis and teratoma"), Mr. Freeman "underwent a ten-year follow-up protocol which involved frequent observation via x-rays, CAT scans, and tumor markers." (Expert Report of Robert Bahnson, M.D., F.A.C.S. at 3, ECF No. 4311-1.)

By agreement of the parties, Mr. Freeman is not required to prove that C-8 is capable of causing his testicular cancer, but he is required to prove that C-8 caused his cancer. (S.A. § 3.3.) To meet his burden, Mr. Freeman has proffered the expert opinion of Robert Bahnson, M.D., F.A.C.S., who opines:

> David Freeman's exposure to C-8 in his drinking water was a substantial contributing factor in bringing about the development of his testicular cancer. Further, his cancer in the right testis now puts him at substantial risk (approximately 15% chance) for developing cancer in the left testis. Additionally, because Mr. Freemam underwent (appropriately so) frequent repeated CT scanning as part of his 10 year observation protocol, his risk for developing other cancers has also increased.

*Id.* at 7. The Court found Dr. Bahnson's opinion admissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Incorporated*, 509 U.S. 579 (1993). (Evidentiary Motions Order No. 4, ECF No. 4518.)

2

DuPont has offered the following two specific causation experts, one of whom will be called at Mr. Freeman's trial: Tony Luongo, M.D. (Luongo Report, ECF No. 4310-1; Luongo Dep., ECF No. 4308-2), FRCSC, F.A.C.S., and Mark Schoenberg, M.D. (Schoenberg Report, ECF No. 4310-3; Schoenberg Dep., ECF No. 4308-1). The Court excluded as inadmissible under *Daubert* and Rule 702 portions of Dr. Luongo's and Dr. Schoenberg's opinions. Specifically, neither offered reliable affirmative opinions as to the cause of Mr. Freeman's cancer.

Mr. Freeman has lived in Cutler, Ohio, since 1993. The water to his residence was supplied from the Little Hocking water district, a named district in the *Leach* Settlement Agreement. Mr. Freeman offers the expert opinion of David L. MacIntosh, Sc.D., C.I.H., to prove that he is a member of the *Leach* Class. (ECF No. 4311-3.)

On May 6, 2016, the Court held oral argument on the parties' fifty-three motions *in limine*. (Motions *in Limine* Hearing Tr., ECF No. 4527.) After reading the briefing and taking oral argument on Ohio River issue, the Court requested additional briefing, and indicated that it would issue a written opinion on the motion.

## II.

Neither the Federal Rules of Evidence nor the Federal Rules of Civil Procedure explicitly authorize a court to rule on an evidentiary motion *in limine*. The United States Supreme Court has noted, however, that the practice of ruling on such motions "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States,* 469 U.S. 38, 41 n. 4 (1984). The purpose of a motion *in limine* is to allow a court to rule on issues pertaining to evidence in advance of trial in order to avoid delay and ensure an evenhanded and expeditious trial. *See Ind. Ins. Co. v. Gen. Elec. Co.,* 326 F. Supp.2d 844, 846 (N.D. Ohio 2004)

(citing *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997)). Notwithstanding this well-meaning purpose, courts are generally reluctant to grant broad exclusions of evidence *in limine*, because "a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Koch v. Koch Indus., Inc.*, 2 F. Supp.2d 1385, 1388 (D. Kan.1998); *accord Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975).

To obtain the exclusion of evidence under such a motion, a party must prove that the evidence is clearly inadmissible on all potential grounds. *See Ind. Ins. Co.*, 326 F.Supp.2d at 846; *Koch,* 2 F. Supp.2d at 1388; *cf. Luce,* 469 U.S. at 41, n.4. "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Ind. Ins. Co.*, 326 F. Supp. 2d at 846.

The Federal Evidence Rules at issue in Mr. Freeman's Motion *in Limine* Regarding the Ohio River 401, 402, and 403. Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Evidence Rule 402 provides that "[e]vidence which is not relevant is not admissible." Even if evidence is relevant, a court may still exclude the evidence, under Federal Rule of Evidence 403, which provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

## III.

Mr. Freeman asks for exclusion as irrelevant any evidence related to the level of pollution in the Ohio River and how it compares to other rivers about the country. DuPont opposes exclusion, arguing that the evidence it seeks to introduce is relevant to (A) "issues of duty, breach, and the industry standard of care"; (B) specific causation; (C) punitive damages; and (D) Mr. Freeman's "claimed fear of cancer." (Def.'s Supp. to Mem. in Opp. at 1, 2, 10.)

**A.     Duty, Breach, and Industry Standard of Care**

DuPont contends that the evidence it seeks to introduce is relevant to determining whether it was negligent. To prove his negligence claim, Mr. Freeman must show that (1) DuPont owed him a duty of care; (2) DuPont breached its duty of care to him; and (3) he suffered an injury as a proximate result of DuPont's breach of the duty of care. *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75 (1984). To prove the existence of a duty, Mr. Freeman must show that a reasonably prudent person would have foreseen that injury was likely to result to someone in Mr. Freeman's position from DuPont's conduct. *Id.* at 77.

DuPont maintains that Mr. Freeman cannot meet his burden of proof because the evidence shows that DuPont conformed to the industry standards based upon its appropriate use of the medical, scientific, and/or industrial knowledge that was available to DuPont at all times relevant to the claims asserted by the plaintiffs in this MDL. Thus, the parties offer expert testimony on the state of the medical, scientific, and/or industrial knowledge available and how that information developed into the standards of conduct employed in those fields to help the jury determine whether a reasonably prudent corporation would have foreseen that injury was likely to result to someone in Mr. Freeman's position from DuPont's conduct.

In this regard, DuPont contends:

5

> [O]n the issues of duty, breach, and the industry standard of care, DuPont plans to introduce evidence that its industrial neighbors lawfully emitted millions of pounds of toxic chemicals into the Ohio River during the relevant time period, and that DuPont's lawful emissions of C8 were miniscule in comparison. . . .

(Def.'s Supp. to Mem. in Opp. at 1.)

### 1. Duty and Breach

DuPont argues that Mr. Freeman cannot show that DuPont either owed or breached a legal duty and seeks to supports this defense with the evidence at issue, positing:

> Evidence of the amount of toxic and cancer-causing chemicals that were being lawfully discharged in the same period of time by DuPont's industrial neighbors is relevant to foreseeability because it contextualizes DuPont's lawful emission of much smaller amounts of C8.

*Id.* at 4. Specifically, DuPont contends that the evidence is relevant to foreseeability:

> The evidence at issue puts DuPont's ability to foresee injury from its lawful emissions of C8 into the River in context by demonstrating how small DuPont's emissions of C8 were in comparison to the hundreds of thousands of pounds of toxic and cancer-causing chemicals being lawfully put into the River by DuPont's industrial neighbors.

*Id.* at 2. DuPont further explicates:

> Putting DuPont's relatively small emissions of C8 into context is highly probative in supporting the point that DuPont should not reasonably have expected its lawful emissions of C8 to cause harm when they were miniscule compared to the lawful emissions of toxic and cancer-causing chemicals made by surrounding corporations.

*Id.* at 5.

In other words, DuPont's position is that it had no legal duty to Mr. Freeman because no reasonably prudent corporation would have foreseen that injury was likely to result to someone in Mr. Freeman's position from DuPont's conduct because DuPont discharged much smaller amounts of C-8 into the Ohio River than its industrial neighbors discharged of other chemicals.

6

DuPont's arguments miss the mark. That is, comparing the amount of raw chemicals a company discharges into the Ohio River is probative of foreseeability of harm if harm was measured only by the quantity of any particular chemical. But it is not merely the quantity of a chemical that is put in the water that measures harm, but instead it is the quality of the chemicals that must also be assessed. For example, one pound of a toxic, cancer-causing chemical that biopersists in humans for decades and bioaccumulates in the environment for millennia may cause more harm than a 100 pounds of a toxic, cancer-causing chemical that metabolizes and/or degrades quickly. This is not information that can be gleaned from the documents DuPont seeks to offer such as the Ohio River Toxic Release Inventory Analysis (TRI), which lists the amount of chemicals that is released into the Ohio River in a particular year. (Def.'s Supp. at Ex. A.) C-8 is not listed on the TRI. To make any meaningful comparison, the evidence would have to offer some scientific information as to the comparison of the listed chemicals and C-8. This seems almost certain to require expert opinion testimony.

Further, knowing that other toxic chemicals were released in the Ohio River tells us nothing about whether Mr. Freeman drank water with any of those chemicals in it. Mr. Freeman drank water from the water supplied by the Little Hocking Water District, a public water supply. Mr. Freeman offers the expert testimony of Mr. MacIntosh to show that the water he drank contained C-8. (MacIntosh Report, ECF No. 4311-3.) Mr. MacIntosh is the Chief Science Officer and Director of Advanced Analytics at Environmental Health & Engineering, Inc. in Needham, Massachusetts, and has over 20 years of experience in public health, specializing in environmental and occupational health. Mr. MacIntosh's Advanced Analytics practice focuses on design, development, and implementation of systems that support data driven decisions. He regularly directs or participates in teams of contributors with expertise in engineering, computer

science, statistics, medicine, meteorology, chemistry, and other fields. He has published numerous peer reviewed papers in scholarly journals and has taught at several universities, inducing Harvard School of Public Health and the Harvard Extension School. Mr. MacIntosh evaluated Mr. Freeman's drinking water as it related to C-8, stating in his report:

> PFOA releases from the Washington Works to air and water, deposition to ground surfaces, entry into the Ohio River, infiltration into well fields, and distribution through public and private drinking water supplies is described in detail in peer-reviewed publications and in reports.
>
> . . . .
>
> With regard to PFOA levels in public drinking water, I relied upon the annual average concentrations of PFOA for the Little Hocking Water Association (LHWA) attributable to the Washington Works plant reported by the Panel in Figure 2 of Shin et al. 2011. To extract values from Shin Figure 2, I followed a method previously described in the peer-reviewed scientific literature. In brief, I digitized the information in Figure 2 and then extracted values for annual average PFOA in drinking water for each year from 1955 – 2005. The [Science] Panel used a similar approach to estimate PFOA emissions to air from a figure provided by DuPont. The PFOA concentrations that I extracted are presented in Attachment 4 of this report. Sensitivity analyses that I conducted indicate that PFOA concentrations determined from Figure 2 by this method are precise to within 1.8% on average, and the concentrations extracted for LHWA after 1993 are highly unlikely to be less than 0.05 ppb on the actual figure. To further evaluate the reliability of the values that I extracted for LHWA from Shin Figure 2, I also examined the reported levels of PFOA measured in water of the LHWA and found that the PFOA levels estimated by the C8 Science Panel were within a factor of two on average for the years in which both estimated and measured data were available.

(MacIntosh Report at 4, 5) (footnotes and exhibits omitted).

This same type of testimony is necessary to show that any of the chemicals that were released into the Ohio River could be a risk factor for Mr. Freeman's testicular cancer.

2.   **Industry Standards**

As indicated above, the information available and the standards of conduct utilized in light of that information in the medical, scientific, and/or industrial communities informs the jury of whether a reasonably prudent corporation would have foreseen that injury was likely to result

8

to someone in Mr. Freeman's position from DuPont's conduct. DuPont contends that evidence that other companies lawfully discharged chemicals into the Ohio River is relevant to establish that DuPont complied with the industry standard of care. (Def.'s Supp. to its Mem. in Opp. at 5.) DuPont explains:

> By demonstrating that neighboring entities were lawfully releasing hundreds of thousands of pounds of toxic and cancer-causing chemicals into the Ohio River, DuPont also seeks to establish that its lawful release of much smaller amounts of C8 was reasonable and in line with the industry standard of care.

*Id*. Similar to DuPont's arguments *supra*, its argument here side-steps the relevant inquiry.

Raw data as to the quantity of chemicals released into the Ohio River offers no insight into whether DuPont's "lawful release of much smaller amounts of C8 was reasonable and in line with the industry standard of care," as DuPont proposes. Not only is a quality comparison of the chemicals necessary to provide any relevant information, but some opinion as to how the standards applied to unregulated chemicals like C-8 would also appear necessary.

In the instant action, it is not disputed that C-8 was unregulated, but the parties offer conflicting evidence as to why it was unregulated, and as to whether DuPont handled it appropriately in light of the fact that it was unregulated. DuPont maintains that it was unregulated because there was no evidence that it was harmful; Mr. Freeman's position is that it was unregulated because DuPont did not provide the information it possessed as to C-8's toxicity to the regulators. And, if C-8 was appropriately unregulated, the parties disagree as to whether DuPont's conduct was reasonable because of the biopersistent nature of the chemical.

Thus, while industry standards are helpful to measure the reasonableness of a corporation's conduct, in the context of this case expert opinion on those standards is necessary. Indeed, Mr. Freeman and DuPont both offer experts for this purpose. But the raw data with which an expert works is irrelevant.

9

### 3. Rebuttal of the Suggested Pristine Nature of the Ohio River

DuPont offers this last argument to support its position that it should be permitted to proffer evidence about the amount of chemicals that are released into the Ohio River:

> The evidence also provides the context needed to rebut Trial Plaintiff David Freeman's experts' misleading suggestion that the Ohio River was pristine but-for DuPont's release of C8.

(Def.'s Supp. at 1.) DuPont indicates that during Mrs. Bartlett's trial, her counsel implied that the Ohio river was pristine. However, as the Court pointed out at the Motions *in Limine* Hearing,

> THE COURT: You say implied. That wasn't said that I remember. The idea that this river is pristine, nobody is making that claim.

(Mots. *in Limine* Hearing Tr. at 124.) No further evidence was offered to support DuPont's suggestion. Thus, there is no need of rebuttal testimony in this regard.

### B. Specific Causation

As explained above, the *Leach* Settlement Agreement provides that Mr. Freeman must prove that C-8 specifically caused his testicular cancer. DuPont maintains that the evidence it seeks to introduce related to the chemicals released into the Ohio River is relevant to the following:

> To defend against Plaintiff's arguments on specific causation, DuPont should be allowed to cross-examine Plaintiff's expert about the thoroughness of his investigation into the potential causes of Plaintiff's injury. . . .
>
> Plaintiff's claim that C8 discharged by DuPont into the Ohio River caused his cancer makes relevant the other potentially cancer-causing chemicals that were also discharged into the Ohio River at the same time by others. . . . Of the many toxic chemicals released into the Ohio River by other companies during the relevant time period, several have been linked to testicular cancer and would have been mixed with the traces of C8 that Plaintiff claims contaminated his drinking water and caused his cancer.

(Def.'s Supp. to its Mem. in Opp. at 7–8.) DuPont's arguments are not well taken.

10

DuPont offers no support for its supposition that several of the cancer-causing chemicals "would have been mixed with the traces of C8 that Plaintiff claims contaminated his drinking water and caused his cancer." As shown above, Mr. Freeman offered expert testimony to determine whether C-8 was in the water that Mr. Freeman drank and the number of years Mr. Freeman drank the water that contained C-8 (since 1994). Simply because there were other chemicals released in the Ohio River offers no support for the proposition that Mr. Freeman drank any of those chemicals, and if he did drink them, whether he drank enough to cause cancer.

Without any knowledge as to whether Mr. Freeman drank any of the alleged cancer-causing chemicals it is completely irrelevant whether his specific causation expert considered any of these chemicals as a risk factor. Indeed, DuPont's specific causation expert Dr. Luongo did not consider any of these chemicals as risk factors. (Luongo Report at 2) (considering as risk factors cryptorchidism, family history of testicular cancer, a personal history of testicular cancer, and intratubular germ cell neoplasia, and as potential risk factors maternal lifestyle/exposures, marijuana use, microcalcification, geography, ethnicity, infertility, and AIDS). And, DuPont's other specific causation expert Dr. Schoenberg not only did not consider any of these chemicals as risk factors, but also reviewed "environmental exposure and testis cancer," and reported that investigations "found no convincing evidence of a connection between the extensive list of examined exposures and the development of testicular cancer." (Schoenberg Report at 4.) (listing the risk factors as "(1) cryptorchidism; (2) family history of testis cancer; (3) personal history of testis cancer; and (4) intratubular germ cell neoplasia").

11

### C.  Punitive Damages

Mr. Freeman filed a claim against DuPont for punitive damages.  To prove his punitive damages claim, Mr. Freeman must show by clear and convincing evidence that DuPont acted with a "conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St.3d 334, syllabus (1987).  DuPont contends that "[e]vidence of other companies emitting toxic chemicals into the Ohio River is also relevant to Plaintiff's claim for punitive damages. . . . [because it informs] [t]he degree of reprehensibility [which] is 'the most important indicium of the reasonableness of a punitive damages award.'" (Def.'s Supp. to its Mem. in Opp. at 9) (citing *Clark v. Chrysler Corp.*, 436 F.3d 594, 600 (6th Cir. 2006)).  DuPont concludes that "[e]vidence of other companies' emissions of toxic chemicals into the Ohio River is directly relevant to whether DuPont's emission of C8 represented such an indifference or recklessness because it contextualizes DuPont's emissions within the industry." *Id.* at 10.  DuPont's arguments are not well taken.

While evidence of how other companies behaved in their disposal of unregulated toxic chemicals could certainly inform whether DuPont's conduct was reckless or indifferent, that is not the evidence DuPont offers.  For the same reasons explained above, this raw data of chemical releases into the Ohio River is unhelpful to this determination.

### D.  Fear of Cancer

DuPont directs its final argument to Mr. Freeman's claimed cancerphobia, which this Court has explained as follows:

> Mr. Freeman alleges that he suffers from cancerphobia, which is "a claimed present injury consisting of mental anxiety and distress over contracting cancer in the future, as opposed to risk of cancer, which is a potential physical predisposition of developing cancer in the future." *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1012 (6th Cir. Ohio 1993) (quoting *Lavelle v. Owens–Corning Fiberglas Corp.*, 30 Ohio Misc. 2d 14 (1987)). "Therefore, if Mr. Freeman proves that DuPont is negligent,

12

he may not only recover damages, which may include emotional distress and pain and suffering that resulted from the diagnosis of cancer and the operation removing his cancerous testicle, but he may also recover damages for his mental anxiety and distress over contracting cancer in the future." (Dispositive Mot. Order No. 14, Def.'s Mots. For Summ. J. on Freeman's Fraud and Emot. Distress Claims at 8, ECF No. 4458.) "To recover for the alleged cancerphobia, Mr. Freeman must show that he is aware that he in fact possesses an increased statistical likelihood of developing cancer, and that from this knowledge springs a reasonable apprehension which manifests itself as emotional distress." *Id.*

(Dispositive Motions Order No. 17, Defendant's Motion for Reconsideration of Court's Decision on Bifurcation, ECF No. 4549.)

DuPont argues that it "should be allowed to establish that other entities upstream from Little Hocking's wells were releasing cancer-causing chemicals—such as nitrate compounds, ethylene glycol, chromium, and lead—during the relevant time period. . . . [because] this evidence is directly relevant to the reasonableness of Plaintiff's claim that DuPont's conduct (but not the other cancer-causing substances to which he has been exposed) causes him to suffer from cancerphobia." (Def.'s Supp. to its Mem. in Opp. at 9–10.) This Court disagrees.

There is no evidence that Mr. Freeman "has been exposed" to any of the chemicals DuPont lists. Thus, asking Mr. Freeman about chemicals that he did not drink provides no relevant evidence.

IV.

Mr. Freeman additionally requests that, "[i]f this Court determines that evidence relating to levels of pollution in the Ohio River are somehow relevant (which Plaintiff denies), such evidence should nonetheless be excluded under Federal Rule of Evidence 403, because it will do nothing more than prejudice Plaintiff, confuse the jury and waste the Court's time." Mr. Freeman's request is well taken.

13

Introducing evidence of other toxic chemicals released into the Ohio River would suggest the unwarranted inference that those chemicals could have caused Mr. Freeman's testicular cancer. As explained above, there is no admissible expert testimony before the Court that any of the chemicals cause testicular cancer that any of the chemicals reached Mr. Freeman's drinking water. This type of unwarranted inference constitutes unfair prejudice. It would also be confusing, misleading, and a poor use of time.

### V.

Based on the foregoing, the Court **GRANTS** Mr. Freeman's Motion Related to the Ohio River. (ECF No. 4430.) As with all *in limine* decisions, this ruling is subject to modification should the facts or circumstances at trial differ from those which have been presented in the pre-trial motions and memoranda.

**IT IS SO ORDERED.**

5-30-2016
DATE

EDMUND A. SARGUS, JR.
CHIEF UNITED STATES DISTRICT JUDGE