UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

          Civil Action 2:13-md-2433
          CHIEF JUDGE EDMUND A. SARGUS, JR.
          Magistrate Judge Elizabeth Preston Deavers

This document relates to: <u>ALL CASES</u>.

## DISCOVERY ORDER NO. 12

### Plaintiffs' Motion to Compel DuPont to Supplement its Discovery Responses and Motion for Sanctions

This matter is before the Court on Plaintiffs' Motion to Compel Defendant to Supplement its Discovery Responses and Motion for Sanctions ("Motion to Compel and for Sanctions") (ECF No. 4637), Defendant E. I. du Pont de Nemours and Company's ("DuPont('s)") Memorandum in Opposition (ECF No. 4661), and Plaintiffs' Reply in Support of their Motion (ECF No. 4665). For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion to Compel and for Sanctions.

I.

A. **Relevant Background**

This MDL consists of over 3500 individual personal injury and wrongful death cases that are a subset of cases that originated in *Leach v. E. I. Du Pont de Nemours & Co.*, No. 01-C-608 (W. Va. Cir. Ct. Wood County Aug. 31, 2001) ("*Leach* Case"). All of the plaintiffs contend that they were injured by perfluorooctanoic acid ("C-8 or PFOA"), which DuPont released from its

1

Washington Works Plant near Parkersburg, West Virginia. The *Leach* court certified a class of approximately 80,000 individuals who reside in six water districts where the water had been contaminated with the C-8 ("*Leach* Class"), including the Little Hocking Water District. The *Leach* Class and DuPont entered into a Settlement Agreement in which they agreed to stay any litigation until a world-class epidemiological study of the *Leach* Class could be conducted. (*Leach* Settlement Agreement "S.A.," ECF No. 820-8.)

To this end, the parties chose three completely independent, mutually-agreeable, appropriately credentialed epidemiologists ("Science Panel") to study human disease among the *Leach* Class. The seven year study concluded that "it is more likely than not that there is a link between exposure to C-8 and [six human diseases, including testicular cancer and kidney cancer ("Linked Diseases")] among Class Members" ("Probable Link Findings"). (S.A. § 1.49.) After the six Probable Link Findings were issued in 2012, the *Leach* Settlement Agreement permitted the members of the *Leach* Class to file personal injury and wrongful death actions.

Once the *Leach* Class began filing their cases, DuPont moved the United States Judicial Panel on Multidistrict Litigation for centralization of these individual actions pursuant to 28 U.S.C. § 1407. The Judicial Panel granted DuPont's request and on April 9, 2013, it transferred the action to this Court.

The Court has tried two bellwether cases, one chosen by DuPont and one chosen by the Plaintiffs' Steering Committee ("PSC") through a Court-supervised selection process. DuPont's choice was a kidney cancer case brought by Carla Marie Bartlett (Case No. 2:13-cv-170, "Bartlett ECF."), which resulted in a $1.6 million jury verdict in favor of Mrs. Bartlett. The PSC chose the case brought by David Freeman, who suffered from testicular cancer (Case No. 2:13-

2

1103, "Freeman ECF."). His case ended in a $5.1 million jury verdict award in his favor on the negligence claim and $500,000 on the claim for punitive damages. The Court and the parties are now in the process of preparing for trial of the non-bellwether cases, scheduling 40 that will be tried in the next year. (Case Management Order No. 17, ECF No. 4459.) As did Mrs. Bartlett and Mr. Freeman, all of the non-bellwether cases allege negligence and punitive damages claims.

In Dispositive Motions Order No. ("DMO") 7, the Court set out the punitive damages standard applicable to Ohio plaintiffs as requiring clear and convincing evidence that DuPont exhibited "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (ECF No. 4185 at 3–4) (quoting *Preston v. Murty*, 32 Ohio St. 3d 334, 336 (1987)). Based on its experts' testimony and opinions, DuPont has consistently argued that there is no evidence to support a punitive damages claim because the available evidence "shows that DuPont exhibited a *proactive concern* for safety in its use of PFOA at its Washington Works plant, consistently going beyond the regulatory requirements and the typical conduct of most chemical companies." (DuPont's Mot. for Partial Summ. J. on Punitive Damages in the Bartlett and Wolf Cases at 1, ECF No. 2825) (emphasis in original). According to DuPont:

> [T]he undisputed evidence shows that . . . ***DuPont never believed that there was any probability that PFOA exposure at the extremely low levels found in drinking water around the Washington Works plant*** would cause human disease.
>
> . . . .
>
> DuPont had *no* knowledge or expectation based upon any of the animal studies, 3M's extensive research, and/or DuPont's own monitoring of its workers that there was *any* likelihood of *any* harm at the relatively low levels [of C-8] found outside the plant," and that "Trial Plaintiffs have no evidence of any state-of-the-art knowledge of *any* increased risk of *any* harm from low community levels of exposure."

(*Id.* at 2, 30) (emphasis in original).

3

Consequently, this Court has repeatedly held that post-injury conduct is relevant at a minimum to the determination of whether DuPont's release of C-8 into the environment surrounding its Washington Works plant reflected a conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm. The knowledge DuPont possessed about potential dangers associated with C-8, the time frame in which DuPont obtained that knowledge, DuPont's decisions regarding its continued release of C-8 into the environment, and its decisions to inform the public of the potential dangers or not to inform it, are all relevant and probative of whether DuPont exhibited a conscious disregard for the rights and safety of persons that has a great probability of causing substantial harm.

**B.    Plaintiffs' Motion to Compel and For Sanctions**

On August 11, 2016, the PSC sent DuPont a letter requesting "that DuPont supplement its prior responses to Plaintiffs' Rule [26] document requests, as set forth in Plaintiffs' Initial Master and Second Set of Document Requests" for this MDL." (Pls.' Mot. to Compel and for Sanctions, Ex. A, ECF No. 4637-1.) Specifically, the PSC informed DuPont that "additional responsive documents should exist within DuPont's possession, including but not limited to . . . documents relating to investigation of PFOA contamination at DuPont's former Dordrecht, Netherlands, facility and documents relating to new governmental guidelines/enforcement actions/health effects relating to PFOA." *Id.* The plaintiffs also note that their request encompasses the confidential settlement agreement reached between DuPont and Little Hocking Water Association in *Little Hocking Water Ass'n. v. E.I. du Pont de Nemours & Co.*, No. 2:09-cv-1081 (S.D. Ohio). (*Id.*, at 2, n.2.)

On August 17, 2016, DuPont responded that it failed "to see how any of the described post-July 2014 documents might in any way fall within the scope of Rule 26(b)" and that DuPont

4

does "not see how it could fairly or reasonably be argued that the materials . . . are relevant to any of the pending claims and defenses, which turn solely on alleged pre-2004 acts and omissions occurring at Washington Works . . . ." (*Id.*, Ex. B at 1, ECF No. 4637-2.) DuPont indicates that the "[p]laintffs offered no explanation in response" to this statement of DuPont's position. (Def.'s Mem. in Opp. at 3, ECF No. 4661) (noting that "[d]espite the obvious invitation to explain their position and having been given several subsequent opportunities to respond to this fundamental objection, Plaintiffs still have not (even in their motion) provided any explanation of how they believe these post-2014 materials are relevant and proportional under Rule 26, effectively rendering any further efforts to meet and confer pointless.")

The plaintiffs, however, have submitted to the Court a letter dated August 18, 2016 that replies to DuPont's August 17, 2016 letter. (Pls.' Mot. to Compel and for Sanctions, Ex. C at 1, ECF No. 4637-3.) In that reply, the PSC does offer an explanation in response to DuPont's position, stating that DuPont's position that "documents related to post-2004 events are somehow outside the scope of discovery in the context of this litigation . . . . has been rejected – *repeatedly* – by the Court in numerous contexts, including summary judgment and motion *in limine* rulings, where the Court has made clear that this more recent documentation is highly relevant, particularly with respect to the punitive damage claims in this MDL." (*Id.*, Ex. C at 1, ECF No. 4637-3) (emphasis in original). The PSC also stated that "DuPont's position is inherently inconsistent with DuPont's own conduct during both of the last two trials in this MDL during which DuPont, itself, used and referenced post-2004 documents and information – *repeatedly.*" *Id.* (emphasis in original). The PSC offered to meet and confer on this issue, and indicated that it intended to seek judicial relief, including fees and costs, if DuPont failed to respond or supplement. *Id.* DuPont did not respond to this letter.

5

On August 23, 2016, the PSC requested the assistance of Mr. Frank Ray, the Court-appointed Mediator, which ultimately failed to resolve the parties' dispute on DuPont's duty to supplement discovery. On September 6, 2016, Mr. Ray gave the PSC permission to request judicial decision on the issue.

On September 13, 2016, the plaintiffs filed their Motion to Compel and for Sanctions, which is ripe for review.

## II.

The scope of discovery is set forth in Rule 26 of the Federal Rules of Civil Procedure, which provides:

> Unless otherwise limited by court order, the scope of discovery is as follows:
>
> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).[1] Supplementing discovery disclosures and responses is governed by Rule 26(e), which provides:

> A party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production, or request for admission--must supplement or correct its disclosure or response:
>
> (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or

---

[1] This amended version of this Rule applies only to civil cases commenced after December 1, 2015, "and, insofar as just and practicable, all proceedings then pending." 2015 U.S. Order 0017; 28 U.S.C. § 2074(a).

6

(B) as ordered by the court.

Fed. R. Civ. P. 26(e).

Rule 37, the enforcement mechanism for Rule 26 requirements, provides in pertinent part that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e) . . . the court, on motion and after giving an opportunity to be heard . . . may order payment of the reasonable expenses, including attorney's fees, caused by the failure." Fed. R. Civ. P. 37(c)(1)(A). The award of fees and costs under Rule 37(c) is discretionary with the Court. Fed. R. Civ. P. 37(c).

The Local Rules of this Court provide that motions "relating to discovery shall not be filed in this Court under any provision in Fed. R. Civ. P. 26 or 37 unless counsel have first exhausted among themselves all extrajudicial means for resolving the differences. S. D. Ohio Civ. R. 37.1. Additionally, Case Management Order No. 8 prohibits filing any discovery motion in this case until the Court-appointed Mediator is permitted the opportunity to resolve the issue. (ECF No. 1297.) The Court is satisfied that the plaintiffs have complied with these prerequisites.

### III.

The plaintiffs move for an order (A) compelling DuPont to supplement its prior discovery responses, and (B) for an award of the costs and fees associated with preparing and filing their Motion to Compel and for Sanctions.

**A. Discovery Supplementation**

The plaintiffs provide to the Court eight discovery requests that were made to DuPont, which the plaintiffs contend require supplementation pursuant to Federal Rule of Civil Procedure 26(e). (Pls.' Mot. to Compel and for Sanction at 3–4, ECF No. 4637.) As mentioned *supra*, the documents the plaintiffs request fall into three categories: (1) documents relating to

7

investigation of C-8 contamination at DuPont's Dordrecht, Netherlands, facility, (2) the settlement agreement from *Little Hocking Water Ass'n. v. E.I. du Pont de Nemours & Co.*, No. 2:09-cv-1081 (S.D. Ohio), and (3) documents relating to new governmental guidelines/ enforcement actions/health effects relating to C-8.

DuPont does not argue that the plaintiffs' prior requests fail to encompass their current demand for supplementation. Instead, DuPont maintains that the requests do not meet the requirements of Rule 26 because they are irrelevant and not proportional to the needs of the cases that make up this MDL.

### 1. Dordrecht, Netherlands Facility

The plaintiffs request the supplementation of discovery related to DuPont's facility in Dordrecht, Netherlands, that ceased operation in 2014. Recently, a Dutch prosecutor launched a criminal investigation into the use of C-8 at the Dordrecht plant and stated that there is "hard evidence that criminal acts have been committed" regarding its release of C-8 into the environment. (Pls.' Mot. to Compel and for Sanctions, Ex. F, ECF No. 4637-6) (citing to D. Williams, *Dutch Probe DuPont's Use of C8 at Dordrecht*, CHEManager Int'l, July 22, 2016); (*Id.*, Ex. G at 50) (The Chemours Co., Quarterly Report (Form 10-Q) (June 30, 2016) notifying the Securities and Exchange Commission of the Dutch criminal investigation).

DuPont contends that the plaintiffs' request for supplemental discovery from the Dordrecht facility

> amounts to a quintessential "fishing expedition," [wherein the] Plaintiffs seek the production of wholly irrelevant documents that were generated post-2014, a year after DuPont had ceased its use of C8 at the Washington Works plant, two years after the Science Panel released its findings, and six years after any Plaintiff in this MDL (all of whose water was filtered to non-detect levels by 2008) could claim exposure through drinking water.

(Def.'s Mem. in Opp. at 1, ECF No. 4661.) *Id.* This Court, however, disagrees.

8

First, as stated above, the Court has repeatedly held in this MDL that DuPont's post-injury conduct is relevant to, at a minimum, a punitive damages analysis. (Aug. 24, 2015 *Bartlett* Motions *in Limine* ("MIL") Hr'g Tr. at 50–54, ECF No. 4209); (MIL Order No. 1, *Bartlett* ECF No. 103; MIL Order No. 6 at 7–8, ECF No. 4239); (DMO 12 at 63–64, ECF No. 4306). As the Court set out in the jury instructions in the punitive damages phase of the *Freeman* trial, the plaintiffs have the right to introduce evidence relating to DuPont's continued physical harm to nonparties "if the harm to the nonparties was caused by the same conduct that allegedly harmed Mr. Freeman." (Instruction No. 4, Final Jury Instructions for Punitive Damages Phase, Freeman ECF No. 103) (relying on *State Farm v. Campbell*, 538 U.S. 408, 419 (2003)).

The fact that DuPont's plant is located in the Netherlands does not prohibit introduction of this evidence, because *State Farm* allows the consideration of out-of-state conduct in assessing the reprehensibility of a defendant's conduct in a punitive damages analysis as long as there is "a nexus to the specific harm suffered by the plaintiff" that is not "dissimilar to the conduct that harms the plaintiff." *Simon II Litig. v. Philip Morris USA Inc.*, 407 F.3d 125, 139 (2005) (citing *State Farm*, 538 U.S. at 422–23.) The conduct DuPont is accused of in the Netherlands is not dissimilar to the conduct that allegedly harmed the plaintiffs in this MDL. In March of 2016, The Ministry of the Environment for the Netherlands concluded that "[p]eople living in the direct neighborhood of [the plant] have been exposed to PFOA" for as long as twenty-five years. (Pls.' Mot. to Compel and for Sanction, Ex. E, ECF No. 4637-5) (Nat'l. Inst. For Public Health and the Env't., *Risk Assessment of the Emission of PFOA: Location: DuPont/Chemours, Dordecht, The Netherlands* (Mar. 24, 2016) at 5). There is, therefore, a nexus, or connection, with the

alleged harm suffered by the plaintiffs in this MDL and the alleged harm suffered by the people living in the area of the Dordrecht. (Mots. *in Limine* Order No. 6, Calculation of Punitive Damages at 5–8, ECF No. 4239.); *Philip Morris USA v. Williams*, 549 U.S. 346, 355 (2007) (holding that "[e]vidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible").

DuPont readily admits, "thousands of documents relating or referring to Dordrecht have been included in past productions (as evidenced by references at trial)." (Def.'s Mem. in Opp. at 8, ECF No. 4661.) DuPont refers here to *DuPont's own use* of the evidence from Dordrecht in the *Freeman* trial to support its defense that it had no knowledge or expectation that there was any likelihood of any harm from its release of the C-8 into the environment. For example, in opening statement in the *Freeman* trial, DuPont's counsel addressed why DuPont reasonably did not "expect harm to humans [like] someone in Mr. Freeman's situation," stating:

> And you're going to hear more evidence than that about the consistency, the similarity of the data from every source, all across the data . . . that was available at the time was the same [and showed] that DuPont used C-8 not only at this plant, this Parkersburg plant, West Virginia, . . . but they used it at other DuPont plants. *They used it at Dordrecht in The Netherlands.* They used it at Chambers Works in New Jersey. We talked about 3M, they made it at one of their plants, but there are three other plants where they used it. . . .
>
> And what you're also going to hear about [are] the facts that ***these companies compared notes***. . . . So in terms of reasonableness of what DuPont would expect and what its evaluation was. You will be able to consider that.

(June 1, 2016 Trial Tr. at 195–97, ECF No. 107) (emphasis added); (*see also* June 21, 2016 Trial Tr. at 64, ECF No. 122) (discussing "DuPont monitors the blood not only at the Washington Works plant but also at Shimizu and Dordrecht" and the "Dordrecht and samples

being analyzed at experimental station"); (*Id.* at 67) (addressing testing of "employees in the Teflon division at Dordrecht Works in May '81").

Additionally, DuPont addressed not only the testing of the C-8 exposure of the Dordrecht employees, but also the filtering of C-8 at Dordrecht and its relationship to equipment used to filter C-8 at the Washington Works plant. In questioning one of its own witnesses, DuPont presented the following testimony:

> Q. Let's go to the page before on Dordrecht in the Netherlands. Now, in terms of the percent recovered or destroyed, one percent of the feed. Is that what it showed?
>
> A. Yes.
>
> Q. And emissions go into water, land and air?
>
> A. The large bulk of their material.
>
> Q. Let's look at the page before, page 7, on the Washington Works. Now with regard to the percent that's recovered or destroyed, does it show a higher number or a lower number?
>
> A. Looks like percent is 11.4 percent, which is much higher
>
> . . . .
>
> Q. So, sir, to just sort of jump towards the end of the story, how was it that the scrubber efficiency problem was ultimately solved?
>
> A. At the same time we were installing this air filter in the United States, as part of our C-8 global team, our sister plant in Holland, which had the same problem, chose a different vendor to supply their filtration. And that vendor's equipment functioned. So we dismantled the equipment we put in and *replaced it with equipment very similar to what we had installed at the Dordrecht plant*. And that equipment functioned correctly. And, actually, the efficiency of the recovery facility was higher than 95 percent, more around 98 percent.

(June 22, 2016 Trial Tr. at 204, 264, Freeman ECF No. 123) (emphasis added). (*See also* June 15, 2016 Trial Tr. at 39, Freeman ECF No. 118) (questioning one of Mr. Freeman's expert witnesses, DuPont's counsel asked: "In terms of the knowledge that DuPont had back at

11

the time, you're aware that back in -- and this document was from '87, just to keep everybody on the same page -- back in the '80s, even, DuPont was comparing notes with its other plants, *Dordrecht, and what was going on there, both in terms of controls and what the employee exposures were*? Were you aware of that?).

Similarly, the discovery requests related to Dordrecht are not simply for post-2014 conduct, as the plaintiffs rightly point out:

> Even though the post-2004 evidence is clearly relevant to Plaintiffs' claims *and* DuPont's defenses, *much of the evidence involving DuPont's Dordrecht plant occurred over the course of the last twenty-five years.*

(Pls.' Mot. to Compel and for Sanctions at 8–9) (emphasis added).

As to the requests for post-2014 discovery, the Court agrees with the plaintiffs that "even if it were true that DuPont ceased its own C-8 use and/or production by 2014, that in no way supports the notion that DuPont does not possess any potentially relevant documents generated after 2014 related to C-8 and DuPont's involvement in C-8 issues." (Pls.' Reply at 4, ECF No. 4665.) The post-2014 Dutch criminal investigation of DuPont's conduct involving C-8 in the Netherlands is relevant to DuPont's claims presented at trial that DuPont "exhibited a proactive concern for safety in its use of [C-8] . . . consistently going beyond the regulatory requirements and the typical conduct of most chemical companies." (Mots. *in Limine* Order No. 6 [ECF No. 4239] at 7) (quoting DuPont's Mot. for Summ. J. on Punitive Damages at 1-2 [ECF No. 2825]).) Indeed, DuPont has already relied in trial upon post-2014 conduct in support of this defense. For example, during the *Freeman* trial, DuPont presented the following:

> Q. Are you familiar, sir, with how many companies participated in that, the 2010, 2015 C-8 stewardship program?
>
> A. There were eight companies that participated.

> Q. Did you say eight?
>
> A. Eight.
>
> Q. And how did DuPont's progress compare to the other companies?
>
> A. To the best of my knowledge, we actually were ahead of all the other companies in meeting the commitments.

(*Freeman* Trial Tr. at 241:1-9, June 28, 2016, *Freeman* ECF No. 127.)

Another example of DuPont putting its post-2014 conduct at issue is during its open to the punitive phase of the *Freeman* trial where DuPont's attorney stated:

> By 2014, [DuPont] had effectively ended its use of C-8 all together in the manufacturing process. In fact, DuPont did the EPA one better. DuPont's CEO committed the company in 2007 to no longer make, buy or use C-8 by 2015. This was more than what the EPA voluntary stewardship program had asked. He made that commitment even before the company knew that it could come up with a suitable alternative for C-8. And you'll hear that at the cost of many millions of dollars, the company was able to accomplish this aggressive goal. As a result, DuPont has not made, bought or used C-8 in its manufacturing processes since 2014. We ask you to take these things into consideration as you consider whether or not to punish DuPont further for –

(July 7, 2016 Freeman Trial Tr. at 37, Freeman ECF No. 135.)

With regard to Rule 26's proportionality requirements, DuPont argues that the plaintiffs' request is "sweeping" and that they have failed to show how the request is proportional to the needs of the case. DuPont further states that it has produced a "massive volume of documents . . . [o]ver the course of roughly fifteen years of PFOA litigation" and has "supplemented its discovery responses in 2014, when thousands of pages of additional documents were produced from the files of over 30 different custodians." (Def.'s Mem. in Opp. at 2, ECF No. 4661.) DuPont's appropriate participation in discovery in this MDL and the *Leach* Case, however, does not provide a basis for relief from the duty to supplement

13

under Rule 26(e). DuPont remains under a continuing duty to supplement, and its last supplementation two years ago does not suffice to meet this continuing obligation.

Further, the Court finds that while the C-8 litigation (the *Leach* Case and this MDL) has resulted in extensive discovery, it is "proportional to the needs of the case, considering the importance of the issues at stake in the action [and] the amount in controversy." Fed. R. Civ. P. 26(a)(1). The over 3500 plaintiffs in this MDL all allege a Linked Disease, *i.e.*, a disease that the Science Panel found "is more likely than not" linked to "exposure to C-8 . . . among Class Members." (S.A. § 1.49.) Thus, the importance of the issues at stake cannot be overstated for these thousands of plaintiffs, as well as for DuPont and its ability to appropriately defend its position. Further, the amount in controversy is substantial, with two of the 270 cancer cases resulting in over $7 million in jury verdicts.

Finally, while DuPont asserts that it would result in undue burden or expense to supplement the discovery requests, the Court finds that the cost is not "outweighed by the likely benefit." Fed. R. Civ. P. 26(a)(1). As the plaintiffs suggest, presumably DuPont has been required to produce the information related to its activities at the Dordrecht plant pursuant to the pending criminal investigation by Dutch authorities. DuPont can provide Plaintiffs with the same materials that it supplies to the Dutch government without a significant burden.

    2.    **Little Hocking Water Association Case Settlement**

The plaintiffs ask the Court to compel DuPont to supplement discovery by providing the confidential settlement agreement form *Little Hocking Water Ass'n. v. E.I. du Pont de Nemours & Co.*, No. 2:09-cv-1081 (S.D. Ohio). The plaintiffs note that DuPont has been provided a confidential settlement agreement from a case in which one of their experts, Robert Bahnson, M.D., F.A.C.S., was sued for defamation for the purpose that, in DuPont's view, may

be relevant for impeachment. DuPont responds that the plaintiffs "have made no argument (as they cannot) why a confidential agreement to resolve claims with the Little Hocking Water Association in 2016 might be relevant to their claims." (Def.'s Mem. in Opp. at 9, n.4, ECF No. 4661.)

With regard to the discoverability of confidential settlement agreements, this Court has explained:

> In *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 981 (6th Cir. 2003), the Sixth Circuit Court of Appeals recognized a "settlement privilege" which protects settlement negotiations from discovery but does not extend to the terms of the final agreement. In line with this decision, courts within this Circuit have compelled the disclosure of settlement agreements, including a breakdown of the claims actually settled and the settlement amounts. *See, e.g., Scheurer Hospital v. Lancaster Pollard & Co.*, 2012 WL 5471135 (E.D. Mich. November 9, 2012); *Gardiner v. Kelowna Flightcraft, Ltd.*, 2011 WL 1990564 (S.D. Ohio May 23, 2011); *Oberthaler v. Ameristep Corporation*, 2010 WL 1506908 (N.D. Ohio April 13, 2010); *Thomas & Marker Const. Co. v. Wal–Mart Stores, Inc.*, 2008 WL 3200642 (S.D.Ohio August 6, 2008).
>
> In doing so, courts have not been persuaded by any claim of confidentiality as grounds for precluding the disclosure of a settlement agreement. As explained by the court in *Oberthaler*:
>
>> [A]greements are not protected from discovery simply because they have been denominated "confidential" by the parties. "[A] general concern for protecting confidential information does not equate to privilege [...]. [I]n the context of settlement agreements the mere fact that settling parties agree to maintain the confidentiality of their agreement does not serve to shield the information from discovery. Simply put, litigants may not shield otherwise discoverable information from disclosure to others by agreeing to maintain its confidentiality."
>
> *Id.* at *1; *see also American Guar. and Liab. Ins. Co. v. CTA Acoustics, Inc.*, No. 05–80–KKC, 2007 WL 1099620, at *4 (E.D.Ky. April 10, 2007) ("the confidential settlement agreement is not privileged . . . [and] is not protected from discovery simply because it has been denominated 'confidential' by the parties"). Rather, the analysis regarding discovery of a settlement agreement, like the one involved here, has focused on the issue of relevance under Fed. R. Civ. P. 26.

15

In light of the above, the only issue before the Court is that of relevance under Fed. R. Civ. P. 26. Because there is no issue of privilege here, the Court will not conduct the *in camera* review Ms. Wagner suggests. *See Gardiner, supra; Thomas & Marker, supra.*

*Wagner v. Circle W Mastiffs*, 2:08-CV-431, 2013 WL 2096655, at *4 (S.D. Ohio May 14, 2013)

Consequently, the issue for the Court is whether the settlement agreement from the *Little Hocking* case is relevant and discoverable under Rule 26. The plaintiffs contend that it is discoverable under Rule 26, stating:

> [T]his MDL involves the claims of many [Little Hocking Water Association] LHWA customers, including those of the next Plaintiff whose case is scheduled for trial in November, Mr. Kenneth Vigneron Sr. As noted in Plaintiffs' original Motion papers and above, DuPont has cited and presumably intends to continue to cite to its agreement to pay for the filtration of class member water supplies under the 2004 *Leach* Class Settlement Agreement, including LHWA, as evidence of its "good faith" and "good character" in defense of the plaintiffs' claims in this MDL, including in defense of punitive damages claims.

(Reply at 6, n.3.) The plaintiffs' arguments are well taken.

In both the *Bartlett* and the *Freeman* trials, DuPont put forth evidence that it filtered the water supplies to the six water districts it contaminated with C-8, including Little Hocking Water District, to support its defense that it exhibited proactive concern for the public's safety in its use and disposal of C-8. The plaintiffs, contrarily, put forth evidence that DuPont's strategy was to wait until it was sued or forced by an environmental agency before taking any remedial action to limit the C-8 contamination, *i.e.*, the opposite of proactive action. This settlement agreement is relevant to this inquiry, is proportional to the needs of the cases that make up this MDL, and is of no undue burden or expense to produce.

16

The Court is, however, sensitive to DuPont's desire to keep the terms of the settlement agreement confidential and will permit the designation of "Attorneys' Eyes Only" to alleviate any concern. The admissibility of information contained in the settlement agreement will, of course, depend upon the way in which the case is presented.

3. **EPA 2016 Guidelines/Enforcement Actions/Health Effects Relating to C-8**

The United States Environmental Protection Agency recently released a new lifetime drinking water guideline for C-8. This Court inquired into the parties' intent related to offering this information and/or any documents related to it at a telephone conference held a few days before the *Freeman* trial. (May 27, 2016 Ph. Conf. Tr. at 36–38, ECF No. 4675.) At that conference, counsel for DuPont indicated that the defense team "see some potential relevance" to the documents and could not, at that time, rule out offering it at trial. The Court directed the parties to address this issue at side bar or at a morning conference before the information is used by either side. *Id.* During the *Freeman* trial the parties addressed this issue on one occasion, when a witness unexpectedly mentioned the guidelines. (June 3, 2016 Trial Tr. at 237–245, Freeman ECF No. 109).) Ultimately both parties chose not to pursue any line of questioning related to the new guidelines.

For the same reasons the Court found the requests directed at the Dordrecht plant relevant, so too is any evidence related to new governmental guidelines/enforcement actions/health effects relating to PFOA. Again, however, the Court notes that because this information is discoverable does not dictate whether it is admissible. The admissibility of this evidence will, if necessary, be determined at a time when the Court can assess the way in which the case is presented to the jury.

B.   **Sanctions / Fees and Costs**

The plaintiffs request sanctions in the form of payment of their expenses and costs to pursue their Motion to Compel and for Sanctions. The Court is not inclined to grant this request since DuPont had some basis for its arguments, in that the Court had not specifically given direction on the relevancy of post-2012 evidence (*i.e.*, post-Science Panel Findings).

Yet, because of DuPont's own use of evidence from Dordrecht to support its defenses in this case (including not only its monitoring of employees' C-8 exposure, but also its attempts at filtering C-8 from reaching the environment at Washington Works with the same equipment used at Dordrecht), DuPont's stated belief that the evidence regarding the 2016 C-8 guidelines could be relevant, and DuPont's own requested discovery of a confidential settlement agreement that would only potentially be relevant to impeach an expert witness, DuPont should not be surprised by this Court's decision herein. Accordingly, in light of the fact that the next trial in this MDL is scheduled for next month and the motions *in limine* deadlines are nearly upon us, the Court will order DuPont to produce the documents that are the subject of the Plaintiffs' Motion to Compel and for Sanctions on a much expedited basis, as stated below.

### IV.

Based on the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion to Compel and for Sanctions. (ECF No. 4637.) Specifically, the Court **GRANTS** the plaintiffs' request for an order compelling DuPont to supplement its discovery requests and **DENIES** the plaintiffs' request for sanctions. DuPont shall provide the requested supplementation to the PSC as quickly as it can, but in no event later than five (5) days from the date of this Opinion and Order, and DuPont shall continue to supplement the discovery as

information is gathered regarding the investigation of DuPont's former plant in Dordrecht, Netherlands.

**IT IS SO ORDERED.**

10-7-2016
DATE

EDMUND A. SARGUS, JR.
**CHIEF UNITED STATES DISTRICT JUDGE**