IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: E.I. DU PONT DE NEMOURS AND COMPANY C-8 PERSONAL INJURY LITIGATION | CASE NO. 2-13-MD-2433 |
| | JUDGE EDMUND A. SARGUS, JR. |
| | MAGISTRATE JUDGE ELIZABETH P. DEAVERS |

**This document relates to:**   **ALL ACTIONS**

**SPECIAL MASTER'S REPORT AND RECOMMENDATION REGARDING THE ALLOCATION AND DISTRIBUTION OF COMMON BENEFIT FEES AND EXPENSES**

On June 6, 2018, this Court appointed Daniel J. Stack, as Special Master, to provide a Report and Recommendation to this Court for the allocation and distribution of common benefit fees and expenses. *See Case Management Order ("CMO") No. 23* [Doc. 5136]. By subsequent Order, dated August 21, 2018, the deadline to submit this Report and Recommendation was extended from August 17, 2018 to September 20, 2018. *See August 22, 2018 Order* [Doc. 5145]. Pursuant to these aforementioned orders, the Special Master hereby reports as follows:

### I. BACKGROUND

This multi-district litigation ("MDL") was centralized in this Court by Transfer Order of the Judicial Panel for Multi-District Litigation ("JPML") entered on April 9, 2013. *See Transfer Order* [Doc. 1]. By way of brief background, the "litigation between the parties in this MDL began in 2001 in a class action in West Virginia state court captioned *Leach v. E. I. du Pont de Nemours & Co.*, No. 01-C-698 (Wood County W. Va. Cir. Ct.) ("*Leach* Case")." *See CMO 24*, at 3 [Doc. 5140]. "The *Leach* Case ended in November 2004 when the parties entered into a class-wide settlement ("*Leach* Settlement Agreement")." *Id.* In the *Leach* Settlement Agreement, the parties included a unique protocol whereby the

only *Leach* class members that would be permitted to file individual actions against DuPont would be those for which the an independent Science Panel found there to be a probable link between their particular diagnosed human disease and exposure to ammonium perfluorooctanoate ("C-8" or "PFOA"). *Id.*

Pursuant to the *Leach* Settlement Agreement, the parties were to jointly select three epidemiologists ("Science Panel") to study whether a connection existed between C-8 and human disease amongst approximately 80,000 *Leach* class members. *Id.* Further, the *Leach* Settlement Agreement provided that the Science Panel would then issue either a Probable Link[1] finding or a No Probable Link Finding for each human disease which it studied. *Id.* at 3-4. Again, for those human diseases for which the Science Panel found a Probable Link, a *Leach* class member was then free to pursue an individual personal injury lawsuit. *Id.* at 4.

Between the years 2011-2012, the Science Panel issued its Probable Link Findings with respect to forty different human disease states. The Science Panel found a Probable Link to exist for six different human diseases, which included kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, diagnosed high cholesterol (hypercholesterolemia), and pregnancy-induced hypertension and preeclampsia. Once these Probable Links were issued, then the *Leach* Settlement Agreement allowed "the individual members of the *Leach* Class who have or had any Linked Disease to pursue claims 'for personal injury and wrongful death, including but not limited to any claims for injunctive relief and special, general and punitive and any other damages whatsoever associated with such claims, that ... relate to exposure to C-8 of Class Members,' and DuPont agreed not to contest general causation in those actions." *See*

---

[1] Pursuant to the *Leach* Settlement Agreement, a Probable Link was defined to mean that based upon the weight of the available scientific evidence, it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among *Leach* Class Members. *See* CMO 24, at 4.

CMO 24, at 4.

As noted above, in April 2013, the JPML transferred all *Leach* class member C-8 personal injury lawsuits alleging a Probable Link disease resulting from exposure to C-8 from DuPont's Washington Works Plant to this Court. Subsequent to the transfer of this MDL to this Court, the Court appointed co-lead counsel and a plaintiffs' steering committee ("PSC") to lead and prosecute this litigation on behalf of all plaintiffs. (*See* CMO 1 [Doc. # 20]). This Court made clear that the PSC appointments were individual in nature. *Id.* In addition, the PSC was authorized to create sub-committees and to assign work to various firms who assisted in the litigation.

After nearly four years of complex, hard-fought, and often contentious litigation, including three complete C-8 trials resulting in three plaintiffs' verdicts, two with punitive damages, and half way through a fourth C-8 trial, on February 13, 2017, the parties announced their intention to globally resolve the approximately 3500 hundred pending C-8 lawsuits for approximately $671 million dollars. "The global settlement was administered by a special master, with procedures that required evidence of each plaintiff's *Leach* Class membership and evidence of a medical diagnosis of a Linked Disease." *See* CMO 24, at 5. Finally, "[o]ver 3500 individual plaintiffs received an award through these procedures." *Id.*

In order to provide a mechanism to compensate attorneys who performed work for the common benefit of all plaintiffs in this complex litigation and to reimburse those attorneys for common benefit expenses, this Court entered an order setting forth a "holdback" from each settlement to create a common benefit fund.[2] *See* CMO 6 [Doc. # 32] (at times herein referred to as the "Common Benefit Order"). This order further provided that no amounts will be distributed from the common benefit fund without further order of

---

[2] The Common Benefit Order was later modified to change the amount of this holdback. *See* PTO 6-C [Doc. No. 5108].

the Court. *Id.* at 11-12. In addition, this Court set forth the procedures to be employed for reporting common benefit time and expenses. *Id.* at 11.

Specifically, all time and expenses must be (a) for the common benefit, (b) within the limitations and guidelines set forth in PTO 6 and provided by Co-Lead counsel (c) timely submitted, and (d) approved by the Court. *See* PTO 6, at 11. All firms with claims for common benefit time and/or expenses were provided forms, which were to be certified by a partner in each firm, identifying their common benefit work and expenses. Finally, the Common Benefit Order provided that this Court would appoint a Fee Committee to review and make recommendations to this Court on the issue of how any money in the MDL 2433 Fee and Expense Funds shall be distributed (the "Fee Committee").

On June 6, 2018 this Court appointed four members to serve as the Fee Committee, which was charged with the task of creating processes and making recommendations to the Court on appropriate allocations. *See* CMO 23 [Doc. # 5136]. CMO 23 also appointed the undersigned as Special Master to oversee and assist the Fee Committee in carrying out its duties under CMO 23, which included "participation in the Fee Committee's allocation process and any presentations made to the Fee Committee by attorneys and/or the law firms who claim to have performed common benefit work." *Id.* at 5. The Fee Committee's allocation was to focus on the "actual contribution made by the attorneys and staff of the law firm who submitted [common benefit time] and not the hours billed." *Id.* at 3. More specifically, this Court provided "that the Fee Committee's ultimate recommendation shall focus on the quality and significance of the work performed, as well as the value conferred on all plaintiffs by the work generated, recognizing that simply multiplying a number of hours by an hourly rate is not the

4

appropriate manner to assess the quality of the work and the value conferred". *Id.* at p. 4.

Moreover, the Special Master was directed "to mediate any objections to the Fee Committee's recommendation with the goal of obtaining a globally agreed-to allocation of the common benefit fees and expenses." *Id.* at 5. In addition, the Special Master is to issue a Report and Recommendation. *Id.* This work has been completed.

## II. EXPERIENCE AND METHODOLOGY OF THIS REPORT

### A. Personal Observation of Work Performed

It should be noted that I was previously appointed as Special Master to perform appellate review of Phase One Awards as well as to allocate dollar values to Phase Two Awards pursuant to the terms of the Master Settlement Agreement. Thus, I was given the unique opportunity to interact with most of the attorneys involved in this litigation through this process. In addition, this role provided me with the opportunity to gain understanding of the nature of the claims, the severity of the injuries and the substantial common benefit work that resulted in the global settlement.

In addition, through my review of the large volume of materials provided to me by the Fee Committee, I gained a far greater understanding of the substantial amount of general discovery, briefing, document review, liability and expert witness deposition, document preparation, trial preparation, trial and settlement negotiations that went into securing this favorable global resolution on behalf of the approximately 3500 plaintiffs. This review gave me insight into which lawyers and/or firms were responsible for which aspects of this common benefit work, and what was contributed, by whom, and the value of the individual contributions to the common benefit work.

**B. Methodology**

I reviewed the fee declarations submitted by ten firms.[3] I was present for phone conferences of the Fee Committee and was an observer of the discussions had and the methods they utilized at arriving at assessing the contributions made by each of the firms. And while I did not actually participate in the Fee Committee decision, the opportunity to listen and observe their extensive work was most informative and helpful. I found that the methodology utilized by the Fee Committee was fair and in accordance with the law and directions of this Court. The Fee Committee provided ample opportunities for the various firms to advocate for their allocations. The Fee Committee, after completing its work, provided its recommendation for allocations among the firms for my review.

As directed by this Court and independent of the Fee Committee work, the undersigned reviewed the time and expenses submissions from fifteen different law firms. Over the course of several months, I reviewed in substantial detail these submissions; some I reviewed one entry at a time and others I reviewed in excel filtered sets of entries because the time submissions were impossibly voluminous as the total individual time entries across the fifteen firms exceeded over 45,000 different entries. I could not possibly justify the thousands of hours that would have been required in order to review and audit each and every time entry; however, I did review detailed summaries of the time submitted for the ten firms that submitted written declarations.

My methodology allowed me to evaluate and make appropriate judgments as to the work performed by each firm. I was able to compare the type, quantity, and value

---

[3] It should be noted that while fifteen firms submitted common benefit hours and expenses, five of these firms chose not to provide a supporting position and elected to stand on their submitted hours and the description of their activity performed as well as their submitted expenses.

6

of the work performed by various firms, and how a particular firm's work contributed to the successful advancement of the litigation - including a comparison of the time submitted across the firms.

This exercise made clear that there were issues of timekeeping records submitted by the various firms including, excessive time submissions, time submissions with inadequate description of the task performed, duplicative time submissions, block-billing time entries, time submitted that was inconsistent with the procedural posture of the litigation, time that conferred little or no common benefit, time working on individual cases, and other inaccuracies not in compliance with PTO 6. Moreover, irreconcilable differences in the quality of record keeping of the various firms were significant. My various experiences in other MDLs in serving as a Special Master in the role of making allocations among common benefit firms is that it is common place that time entries are simply not accurate in many instances.

Accordingly, trying to make precise lodestar calculations would only provide illusory mathematical precision unsupported by the realities of the time keeping practices and disconnected to the *value* that the work provided to the litigation. Therefore, I did not (and could not) simply use the lodestar method to create a recommended allocation of common benefit fees, because such an approach would be completely arbitrary. Moreover, I was directed by CMO 23 not to simply multiply a rate times hours, but I was to consider the "value" and "quality" for the work performed to determine allocations. For all these reasons, a lodestar analysis cannot be a meaningful factor in a proper, reasonable and fair fee allocation in this case.

In assessing the value and quality of each firm's contribution to the overall litigation and ultimate settlement, I took into account: (1) the results obtained for a particular task, (2) the difficulty of the task performed, (3) the skill required to perform the legal work, (4) the time and labor expended by counsel, (5) the contribution of a task in advancing the litigation, and (6) the contributions to the overall settlements that have been achieved. This process allowed me to assess the nature of the work performed by counsel, its relative importance, and its overall value to the ultimate prosecution and resolution of the case.

For example, those attorneys who spent their time passively involved in meetings, reviewing emails, telephone conferences, or attending hearings or depositions to merely observe were viewed as not having contributed to the common benefit on a level as high as those attorneys and firms who undertook critical aspects of the litigation, such as (1) preparing for and taking generic liability depositions, (2) meeting and working with bellwether experts, (3) preparing bellwether experts for and defending their depositions, (4) presenting written and oral arguments before the Court, (5) preparing for the bellwether trials, (6) being lead or co-lead counsel in trials (7) setting litigation strategy, and (8) leading settlement negotiations. In fact, a number of firms submitted time that conferred no common benefit whatsoever. I also looked at the length of each firm's involvement in the litigation, its overall time commitment to the case, whether attorneys in the firm assumed a leadership role, and the experience of the attorneys performing work. I did consider that PSC firms contributed substantial capital to fund the litigation, including the risk they undertook for this financial contribution.

The Sixth Circuit Court of Appeals requires that awards of attorney's fees by federal courts in common fund cases be reasonable under the circumstances. *Rawlings v. Prudential-Bache Props.*, 9 F.3d 513, 516 (6th Cir. 1993)(citing *Smillie v. Park Chem. Co.*, 710 F.2d 271, 275 (6th Cir. 1983).). As such, in the Sixth Circuit, district courts can use "either the lodestar or percentage of the fund method of calculating attorney's fees...in common fund cases, and that the determination of which method is appropriate in any given case will depend upon its circumstances." *Id.* at 517; *see also, Feiertag v. DDP Holdings, LLC*, No. 14-CV-2643, 2016 U.S. Dist. LEXIS 122297, at *19 (S.D. Ohio Sep. 9, 2016)(holding that the court "has the discretion to use either the lodestar method or a percentage of the common fund to award attorney fees" so long as the fee is reasonable.).

"To evaluate whether the amount of an award is reasonable, courts consider: '(1) the value of the benefit rendered for the class, (2) society's stake in rewarding attorneys who produce such benefits, (3) whether the services were undertaken on a contingent fee basis, (4) the value of the services on an hourly basis, (5) the complexity of the litigation, and (6) the professional skill and standing of the attorneys involved.'" *Id.* (citing *Kritzer*, 10-cv-729, 2012 WL 1945144, at *9 (S.D. Ohio May 30, 2012).).

I am satisfied that the methods employed by the Fee Committee, as well as my methodology and my extensive and robust review before making allocations, is consistent with Sixth Circuit precedent, as well as the specific directives given to me in CMO 23.

## III. COMMON BENEFIT FEE DOCTRINE

The common benefit doctrine has been approved and implemented in dozens, if not hundreds, of multidistrict litigations, including, among others, *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, MDL 1401, 290 F. Supp. 2d 840, 845 (N.D. Ohio, Oct. 31, 2003), *enforced*, 398 F.3d 778 (6th Cir. 2005); *In re Oral Sodium Phosphate Solution-Based Products Liability Action*, 2010 U.S. Dist. LEXIS 128371 (N.D. Ohio 2010); *Phipps Group v. Downing (In re Genetically Modified Rice Litig.)*, 764 F.3d 864 (8th Cir. 2014); *In re Vioxx Products Liability Litigation*, 760 F. Supp. 2d 640 (E.D. La. 2010); *In re Medtronic Inc.*, No. 05-1726, 2008 U.S. Dist. LEXIS 110259 (D. Minn. Oct. 20, 2008), *adopted by*, 2008 U.S. Dist. LEXIS 110214 (D. Minn., Nov. 10, 2008); *In re NuvaRing Products Liability Litigation*, MDL 1624; *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, MDL 2385; and *In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*, MDL 2100.

In its Common Benefit Order, this Court established the Common Benefit Fund, stating:

> The governing principles are derived from the United States Supreme Court's common benefit doctrine, as established in *Trustees v. Greenough*, 105 U.S. 527 (1881); refined in, *inter alia, Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1884); *Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); and approved and implemented in the MDL context, in *inter alia, In re MGM Grand Hotel Fire Litigation*, 660 F. Supp. 522, 525-29 (D. Nev. 1987); and *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019-21 (5th Cir. 1977).

Pre-Trial Order No. 6 at p. 1-2.

In its Common Benefit Order, this Court initially provided for a 4% holdback for common benefit attorneys' fees and 3% as expenses. *See* PTO 6, at 8. Pursuant to motion, and

on consent of the PSC, this holdback was modified to a 6% holdback for common benefit attorneys' fees while the 3% holdback remained for expenses. See PTO 6-C, at 2. Taking into account the work performed by the common benefit attorneys and the result obtained, 6% of the total settlement fund is not only reasonable, but undercompensates the common benefit attorneys' fees, and the 3% for the necessary expenses is reasonable. These percentages are well within the percentages that courts have routinely awarded in similar cases.[4]

When this litigation began, there was an enormous amount of uncertainty as to whether plaintiffs would be able to obtain any financial recovery. DuPont strongly defended itself throughout this litigation with highly regarded, aggressive, and tenacious legal counsel. Certain attorneys invested enormous amounts of time and money into litigating this case without any certainty of recovery. As a result, they took on a substantial risk that they would receive nothing if the litigation was unsuccessful. The result obtained from the fruits of the common benefit attorneys' labor is extraordinary given the circumstances of this litigation.

Given the circumstances of this litigation, it is my recommendation that this Court's 6% holdback should be distributed to the common benefit attorneys, as the amount is more than reasonable for the efforts expended and the results obtained. In my recommended fee allocations, I assume that this Court will approve distribution of the entire 6% holdback for common benefit attorneys.

---

[4] See *In re Oral Sodium Phosphate Solution-Based Products Liability Action*, 2010 U.S. Dist. LEXIS 128371 at n. 10 (N.D. Ohio 2010) (observing that a survey of common benefit fee awards entered in state and federal court in 1,120 common fund cases found percentages of the total recovery for common benefit awards (both fees and expenses) average 18.4% across all 1,120 cases).

## IV. REIMBURSMENT OF COMMON BENEFIT EXPENSES

The common fund doctrine also authorizes reimbursement of the reasonable amounts paid out-of-pocket to achieve a common benefit recovery or to advance the common goals of all plaintiffs in MDL litigation. *See Pradaxa* MDL 2385 (approving a 2% expense fund) and *NuvaRing* MDL 1624 (approving a 4.5% expense fund); *Case: 3:12-md-02385-DRH-SCW [Doc. # 61] and Case: 4:08-md-01964-RWS [Doc. # 1129]*. This Court previously ordered that 3% of the settlement funds be held back and set aside for common benefit expenses incurred by attorneys performing common benefit work in its Common Benefit Order. The common benefit attorneys have incurred a substantial amount in common benefit "held" expenses and the PSC funded substantial "shared" expenses to advance the litigation.[5] These expenses include, but are not limited to: housing all of the discovery produced by the parties to this litigation and making it searchable and accessible to all common benefit attorneys; travel costs for attending depositions around the Country; expert fees and expenses; deposition transcript and video costs; hearing transcript costs; mediator fees and related costs; PSC group administration matters, such as meetings and conference calls; significant trial expenses and other litigation expenses. All the submitted expenses were audited and inappropriate or excessive expenses were disallowed or reduced.

The undersigned reviewed the expenses submitted by each common benefit attorney, ensuring that each request complied with this Court's direction as set forth in the Common Benefit Order, such that expenses were: (1) incurred for the common benefit of all plaintiffs; (2) properly reported and supported by appropriate documentation; and, (3) properly verified. In addition, reimbursable expenses were

---

[5] The capital contributions still held in the PSC account for "shared" expenses are included in my expense recommendations.

adjusted, when necessary, to comply with this Court's limitations on travel and non-travel expenses for reasonableness and unsupported expenses were disallowed.

Thereafter, as necessary I reached out to firms requesting that they provide appropriate explanations, as well as documentation for all submitted expenses, so that the expenses could be evaluated within the guidelines of the Common Benefit Order. All the expenses that I recommend for reimbursement were incurred in the ordinary course of litigation, for the common benefit of all plaintiffs, and are reasonable.

I also reviewed the Fee Committee's recommendation that compounding interest be applied to Court-approved held and capital expenditures. Based on the memorandum that I have reviewed, I agree with the Fee Committee's recommendation that each firm should be reimbursed their common benefit expense awards with compounded interest calculated at the rate prescribed by Ohio Rev. Code § 5703.47.[6] This is particularly appropriate, where, as here, there is sufficient funds available to make each firm fully whole in this way.

I also note that additional common benefit expenses will be incurred for the further administration of the litigation, and therefore, any excess expense funds should be maintained in the common benefit fund until the litigation is concluded. At an appropriate time, I can make a recommendation to this Court that such additional expenses should be reimbursed.

---

[6] *See In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1457-58 (N.D. Cal. 1994)(holding that in common fund cases where there is a contingent attorney fee arrangement, "interest on the fund generated by the litigation is typically apportioned pro-rata between counsel and their clients based on their respective percentage ownership of the recovery. As contingent fee lawyers, class counsel are in every sense part-owners of the litigation claims in suit and entitled to the interest accruing on that portion of the claims in which they hold an ownership or equity interest." Further, "in the absence of any explicit contrary agreement, standard approach to interest should apply...[wherein] class counsel will receive an award of interest to the extent that interest arises directly out of their portion of the settlement (i.e., class counsel's fees and expenses award)"; see e.g., *In re Orthopedic Bone Screw Prods. Liab. Litig.*, No. MDL Docket No. 1014, CA No. 97-381, 2000 U.S. Dist. LEXIS 15980, at *39-40 (E.D. Pa. Oct. 23, 2000)(holding that both plaintiff's leadership counsel as well as individual firms would be reimbursed their respective expenses, together with interest).

## V. ALLOCATION OF COMMON BENEFIT FEES AND EXPENSES

Based upon all of this work, I made my determination for each firm independently of the Fee Committee. While I am convinced that the Fee Committee process was thorough and fair, I did reach different conclusions as to a number of firms - including adjusting allocations for firms on the Fee Committee. Thereafter, I communicated with all firms and provided them my recommendation for the allocation of fees and expenses. Thereafter, I engaged in discussions with all firms in an attempt to reach a global consensus. These extensive mediation efforts have resolved all objections to the fee and expense allocations. The allocations of fees and expenses are attached as Exhibit 1, and for the detailed reasons set-forth herein, I make the recommendation that this Court approve these allocations.

Further, if additional monies are added to the common benefit fee fund as additional C-8 cases are settled, although the precise amount is incapable of determination at this time, I recommend that future distributions from the fee fund should take into account any additional work to be performed by those attorneys continuing to work for the common benefit, including lead and liaison work duties, and thereafter a *pro rata* distribution to those firms that made substantial contributions to this litigation. Any future distributions should be at an appropriate time and method as directed by this Court.

## VI. CONCLUSION

For the reasons set forth above, the Special Master respectfully requests that this Court adopt his Report and Recommendation, including the following recommended order:

1. To approve as fair and reasonable the aggregate amount of the 6% holdback for work performed, and yet to be performed, by the common benefit attorneys;

2. To approve as fair and reasonable the aggregate amount of 3% holdback for reasonable and necessary common benefit expenses;

3. To approve the allocation of common benefit fees as set forth in Exhibit 1, and order that those funds be distributed from the Common Benefit Fund Account to those firms on November 1, 2018;;[7]

4. To approve the reimbursement of common benefit expenses as set forth in Exhibit 1, and order that those amounts be distributed from the Common Benefit Fund on October 15, 2018; and

5. To maintain the residual balances in the Common Benefit Fee and Expense funds until such time as the Special Master recommends to this Court an appropriate future distribution,

Respectfully submitted,

Daniel J. Stack
Special Master

Dated: October 1, 2018

---

[7] Based upon interest being accrued, I calculated the allocations based upon its anticipated value as of October 31, 2018.

| Firm | Fee Allocations | Total Expenses & Interest |
|---|---:|---:|
| Cochran Firm - Dothan | $75,000 | $13,211.05 |
| Cochran Firm - Washington | $50,000 | $7,995.29 |
| Cory Watson Crowder & DeGaris | $3,000,000 | $1,399,485.92 |
| Curry, Roby & Mulvey Co., LLC | $3,000 | $5,817.88 |
| Davis & Young (and Ethan Vessels, co-counsel) | $270,000 | $400,515.49 |
| Douglas & London, P.C. | $13,050,000 | $2,251,583.80 |
| Hill, Peterson, Carper Bee & Deitzler, PLLC | $430,000 | $2,258,825.17 |
| Kathy Brown Law, PLLC | $28,000 | $6,236.00 |
| Kennedy & Madonna | $1,025,000 | $383,434.15 |
| Levin, Papantonio, Thomas, Mitchell, Rafferty and Proctor, P.A. | $10,450,000 | $2,292,807.98 |
| Schlichter, Bogard & Denton, LLP | $1,775,000 | $503,253.50 |
| Taft, Stettinius & Hollister LLP | $19,350,000 | $4,124,872.31 |
| The Nelson Law Firm, PLLC | $2,000 | $267.34 |
| Winter Johnson & Hill PLLC | $190,000 | $4,345.64 |
| Wright & Schulte, LLC | $300,000 | $401,375.81 |
| Roger Denton, Esq. | $0 | $33,476.07 |
| **Total** | **$49,998,000.00** | **$14,087,503.40** |