UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

Civil Action 2:13-md-2433
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth Preston Deavers

This document relates to:  ALL POST-SETTLEMENT CASES.

PRETRIAL ORDER NO. 51
Consolidation of Cases for Trial

In Pretrial Order No. 50, this Court directed the parties to meet and confer to offer the
Court a proposed case management order regarding scheduling of the cases filed after the global
settlement ("Post-Settlement Cases"), that the parties believe will total between 40 and 50.  The
Court indicated that if the parties could not agree on a proposed case management order
scheduling the Post-Settlement Cases for trial, the parties were to brief the issue simultaneously.
The parties were unable to reach agreement and have timely filed their briefs.  (Pls' Brief, ECF
No. 5200; Def's' Brief, ECF No. 5201.)

I.    OVERVIEW

An overview of relevant aspects of this case is necessary to reach the issues presently
before the Court.

A.    West Virginia Class Action

In its Transfer Order (ECF No. 1), the Judicial Panel on Multidistrict Litigation ("JPML")
indicated that the cases that make up this multidistrict litigation ("MDL"), *In Re: E. I. Du Pont
De Nemours And Company C-8 Personal Injury Litigation*, are a subset of cases that originated
in *Leach v. E. I. Du Pont de Nemours & Co.*, No. 01-C-608 (W. Va. Cir. Ct. Wood County Aug.

31, 2001) ("*Leach* Case"). The *Leach* Case was brought by a group of individuals who alleged a variety of claims related to DuPont's contamination of their drinking water with a synthetic perfluorinated carboxylic acid and fluorosurfactant also known as perfluorooctoanoic acid or ammonium perfluorooctanoate ("C-8"). C-8 is in "a family of human-made chemicals that do not occur naturally in the environment." (*Public Health Statement* at 3, Dept. of Health and Human Serv., Public Health Service Agency for Toxic Substances and Disease Registry, https://www.atsdr.cdc.gov/toxprofiles/tp200-c1-b.pdf.) The stability of C-8 prevents the break down in the environment, with a half-life of approximately one million years. And, C-8 "stays in the body for many years. It takes approximately 4 years for the level in the body to go down by half, even if no more is taken in." *Id.*

For decades DuPont discharged C-8 into the water and unlined landfills from its Washington Works Plant near Parkersburg, West Virginia. It is undisputed that DuPont's release of the C-8 has contaminated six (6) water districts and several private wells in West Virginia and Ohio.

In 2002, the West Virginia trial court certified the case as a class action ("*Leach* Class"), *Leach*, 2002 WL 1270121, at *18 (April 10, 2002), and after three (3) years of litigation, involving extensive discovery and motion practice, including three issues taken to the West Virginia Supreme Court of Appeals, the parties executed the *Leach* Settlement Agreement to effectuate a class-wide settlement of the *Leach* Case. (*Leach* Settlement Agreement "S.A.", ECF No. 820-8.) In the *Leach* Settlement Agreement, the parties fashioned a unique procedure to determine whether the approximately 80,000 members of the *Leach* Class would be permitted to file actions against DuPont based on any of the human diseases they believed had been caused by their exposure to C-8 discharged from DuPont's Washington Works plant. The procedure

2

required DuPont and the plaintiffs to jointly select three (3) completely independent, mutually-agreeable, appropriately credentialed epidemiologists ("Science Panel") to study human disease among the *Leach* Class.

Until the Science Panel reached its conclusions, the *Leach* Class members' personal injury claims relating to C-8 exposure were stayed. For over seven (7) years, the Science Panel conducted an epidemiological study to determine whether any of the diseases suffered by members of the *Leach* Class were linked to their ingestion of C-8. The *Leach* Class consisted of those individuals who for at least one year had "consumed drinking water containing .05 ppb or greater of C-8 attributable to releases from Washington Works." (S.A. § 2.1.1.)

In 2012, the Science Panel delivered Probable Link Findings for six human diseases ("Linked Diseases"): kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, diagnosed high cholesterol (hypercholesterolemia), and pregnancy-induced hypertension and preeclampsia. The Probable Link Finding means that for that *Leach* Class member it is more likely than not that there is a link between his or her exposure to C-8 (*i.e.*, drinking water containing at least .05 ppb of C-8 for at least one year) and his or her Linked Disease.

In addition to a seven (7) year reprieve from defending any litigation related to its discharge of C-8 into the drinking water of approximately 80,000 people, DuPont received the benefit of No Probable Link Findings for over 40 diseases also studied by the Science Panel. Once a No Probable Link Finding issued, DuPont was "*forever discharge[d] from any and all claims,* losses, damages, attorneys' fees, costs, and expenses, whether asserted or not, accrued or not, known or unknown, for personal injury and wrongful death . . . ." (S.A. § 3.3) (emphasis added). In other words, all of the members of the *Leach* Class who received a No Probable Link Finding *were prohibited* from filing a personal injury action against DuPont as a result of being

3

subject to the *Leach* Settlement Agreement, regardless of whether any other study or expert disagreed with the Science Panel.

Out of the *Leach* Class, only 3,542 individuals alleged that they suffered from a Linked Disease. The benefit these class members received in return for waiting for the Science Panel to determine that it was more likely than not there is a link between their exposure to C-8 and their Linked Disease, (*i.e.*, the Probable Link Finding), is that DuPont agreed not to contest whether C-8 is *capable of causing* the Linked Disease in that particular class member (general causation). DuPont retained the right to contest whether C-8 *actually caused* the Linked Disease in that particular class member (specific causation).

## B. DuPont's Request for an MDL

In September 2012, the first case filed by a member of the *Leach* Class was brought in this Court. At the same time, members of the *Leach* Class were filing cases in the federal district court in the Southern District of West Virginia.

On January 11, 2013, DuPont moved the JPML, pursuant to 28 U.S.C. § 1407, for pretrial consolidation of the *Leach* Class cases, asserting that forming the MDL would "promote the just and efficient conduct of the actions," and because "consolidation in a single District will likely promote early and efficient resolution of all the cases." (Def.'s Mem. in Support of Mot. for Coordination and Consolidation at 7, JPML ECF No. 1-1.) DuPont argued in favor of consolidation, highlighting:

> The complaints each involve the same core factual allegations regarding DuPont's conduct, and also raise the same theories of legal liability.
>
> Transferring the pending and subsequent tag-along cases to one court pursuant to 28 U.S.C. § 1407 will eliminate duplicative discovery, including expert discovery, avoid repetitive and duplicative motion practice and inconsistent rulings on a number of pre-trial issues involving

discovery and substantive matters, and conserve the resources of the courts and the parties.

*Id.* at 1. DuPont continued, stating:

> Transferring the cases to one District for coordinated and consolidated pretrial proceedings will promote the convenience and conserve the resources of the courts, witnesses and the parties. Many witnesses in these cases will be current or former DuPont employees. Absent a transfer, these employees will be subjected to multiple depositions in multiple jurisdictions.

> Also, DuPont would be subjected to multiple document requests and other written discovery. Having to undergo such discovery multiple times would be unduly burdensome to the witnesses, the parties, and their counsel. Thus, a transfer will minimize the heavy burden that these cases proceeding separately will otherwise place on the witnesses, the parties, the attorneys, and the courts.

*Id.* at 6.

Finally, DuPont addressed settlement of the cases, specifically asserting that it sought centralization so that "[t]he transferee court will be able to explore various alternatives to resolve the case in an expeditious manner." *Id.*

On April 4, 2013, the JPML granted DuPont's request for centralization and chose this Court to preside over the MDL. At that time, the plaintiffs had waited over a decade for the opportunity to have their claims brought before a court.

## C.    Mediation and Settlement

In its briefing, DuPont has painted a far different picture of the course of these cases than is reflected by the record. For this reason only, the Court finds it necessary to chronical the history of these cases and squarely address the arguments raised. As this Court discussed at length in Case Management Order 20, DuPont stated throughout the early life of this MDL that the settlement discussions in which it sought to engage would be best suited to occur after certain triggering events occurred, (*e.g.*, in July 2013 – DuPont stated it wanted to engage in settlement discussion once it assessed the number of cases, basic discovery, initial expert report exchange;

5

in June 2014 – DuPont moved the triggering event to occur once dispositive motions were filed, but before the Court decided them; in October 2014 – DuPont moved it to once the Court decided the dispositive and *Daubert* motions; in August 2015 – DuPont pushed the triggering event back to after a Bellwether trial; and in December 2015 – DuPont moved it again to after post-judgment motions from the first bellwether trial were decided and appealed.)

Ultimately, DuPont did not engage in settlement negotiations until February 2017: After this case had been pending for nearly four (4) years; after the bellwether process had been complete for eight (8) months; after two (2) bellwether and two (2) non-bellwether trials had been held; after three (3) cases went to the jury; after those three (3) juries found that DuPont's negligence caused the plaintiffs' cancer, and two (2) of the juries found that the plaintiffs had proven by clear and convincing evidence that DuPont acted with conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm; after trial schedules for the first 40 of the 260 cancer cases had been set; after this Court sought and gained budgeting and staffing approval to staff the first 40 trials; after the Court hired the staff necessary to hold the trials; and after the Court sought, obtained, and prepared numerous volunteer judges and courthouses for the trials.

**D.    Decisions**

This MDL was centralized before this Court on April 4, 2013 and was reported settled on February 14, 2017. After the case was reported settled, the Court appointed a Claims Administrator and Special Master to administer the settlement reached between the parties, including appeals of any award determinations. (CMO No. 22, ECF No. 5095.) Only in October 2018 did the parties enter stipulated dismissals of the 3,500+ settled cases.

During the nearly four (4) years this case was active, this Court issued the following decisions categorized as Dispositive Motions Orders ("DMOs"), Case Management Orders ("CMOs"), Pretrial Orders ("PTO's), Discovery Orders ("DOs"), Evidentiary Orders ("EMOs"), and written and oral Orders on Motions *in Limine* ("MILs"):

## 1. *Dispositive Motion Orders*

The Court issued the following decisions on the parties' dispositive motions.

- DMO 1, Class Membership and Causation, ECF No. 1679

- DMO 1-A, Order on Dupont's Motion for Clarification of Dispositive Motions Order No. 1, Class Membership and Causation, ECF No. 3972

- DMO 3, Order on Choice of Law, ECF No. 3551

- DMO 4, Order on Defendant's Motion for Partial Summary Judgment, ECF No. 3973

- DMO 5, Order on Defendant's Motions for Summary Judgment Related to Specific Causation, ECF No. 4113

- DMO 6, Order on Plaintiffs' Motion for Summary Judgment on the Issue of Duty, ECF No. 4184

- DMO 7, Order on Defendant's Motion for Summary Judgment on Punitive Damages, ECF No. 4184

- DMO 8, Order on Defendant's Motion to Bifurcate Punitive Damages, ECF No. 4197

- DMO 9, Order on Defendant's Motion on Fraud and Emotional Distress, ECF No. 4211

- DMO 9-A, Reconsideration of Defendant's Motion for Summary Judgment on Emotional Distress, ECF No. 4234

- DMO 10, Order on Application of the Ohio Tort Reform Act, ECF No. 4215

- DMO 11, Order on Defendant's Motion for Judgment as a Matter of Law on Punitive Damages, ECF No. 4235

- DMO 12, Order on Defendant's Motion for Judgment as a Matter of Law or, Alternatively, for a New Trial and Remittitur on Plaintiff Carla Bartlett's Claims, ECF No. 4306

- DMO 13, Order on Plaintiff's Motion to Alter or Amend Judgment to Add Pre- and Post-Judgment Interest, ECF No. 4352

- DMO 14, Order on Defendant's Motions on Mr. Freeman's Fraud and Emotional Distress Claims, ECF No. 4458

- DMO 15, Order on Defendant's Motions for Summary Judgment Related to Specific Causation, ECF No. 4519

- DMO 16, Order on Defendant's Motions for Summary Judgment Related to Punitive Damages, ECF No. 4520

- DMO 17, Order on Defendant's Motion for Reconsideration of Court's Decision on Bifurcation, ECF No. 4549

- DMO 18, Order on DuPont's Motion for an Order to Apply Ohio Tort Reform Act, ECF No. 4597

- DMO 19, Order on DuPont's Rule 50 Motions, ECF No. 4598

- DMO 20, Order on Defendant's Motion for Summary Judgment Related to Cancerphobia Damages and Fear of Developing Other Probable Link Diseases, ECF No. 4809

- DMO 21, Order on Defendant's Motion for Summary Judgment Related to Specific Causation, ECF No. 4810

- DMO 21-A: *Nunc Pro Tunc* Order Related to DMO 21, ECF No. 4833

- DMO 22, Order on Defendant's Motion for Summary Judgment on Punitive Damages, ECF No. 4930

- DMO 23, Order on Defendant's Motion for Summary Judgment on Application of Ohio Tort Reform Act, ECF No. 4931

- DMO 24, Order on Defendant's Motion to Bifurcate or Alternatively to Issue Limiting Instruction and Allow Introduction of All Evidence of Malice, ECF No. 4932

- DMO 25, Order on Defendant's Motion for Time Limits, ECF No. 4933

- DMO 26, Order on Defendant's Motion for Summary Judgement on Punitive Damages in Moody Case, ECF No. 4989

- DMO 27, Order on Defendant's Motion for Summary Judgement Related to Cancerphobia Damages and Fear of Developing Other Probable Link Diseases in Moody Case, ECF No. 4990

- DMO 28, Order on Defendant's Motion for Summary Judgement Related to Specific Causation in Moody Case, ECF No. 5000

- DMO 29, Order on Defendant's Motion for Summary Judgement on Application of the Ohio Tort Reform Act in Moody Case, ECF No. 5007

2.    **Case Management Orders**

The following CMOs issued to manage all aspects of the cases, from discovery to trials:

- CMO 1, Order Appointing Plaintiffs' Leadership Positions, ECF No. 20

- CMO 2, Order Setting Initial Scheduling, ECF No. 30

- CMO 3, Order on Service of Plaintiffs' Complaints, Defendant's Abbreviated Answer and Affirmative Defenses, Initial Disclosures, ECF No. 31

- CMO 3-A, Amended Case Management Order No. 3, ECF No. 5176

- CMO 7, Selection of the Initial Trial Cases and Expert Disclosures Schedule 6, Order Directing Identification & Selection of Discovery Pool Plaintiffs, ECF No. 602

- CMO 8, Order on Utilization of a Mediator, ECF No. 1297

- CMO 9, Pretrial Schedule for Initial Two Trial Cases, ECF No. 3549

- CMO 10, Pretrial Schedule for Bartlett Trial, ECF No. 4183

- CMO 10-A, Final Pretrial Order for Bartlett Trial, ECF No. 4248

- CMO 11, Pretrial Schedule for Wolf Trial, ECF No. 4247

- CMO 12, Final Pretrial Order for Wolf Trial, ECF No. 4250

- CMO 12-B, *Nunc Pro Tunc* Order in Reference to Case Management Order No. 12, ECF No. 4252

- CMO 13, Pretrial Schedule for Freeman Trial, ECF No. 4263

- CMO 13-A, Final Pretrial Order for Freeman Trial, ECF No. 4595

- CMO 13-B, Freeman Trial, ECF No. 2433

- CMO 14, Pretrial Schedule for Dowdy Trial, ECF No. 4268

- CMO 15, Pretrial Schedule for Baker Trial, ECF No. 4269

- CMO 16, Order on DuPont's Motion to Stay Freeman, Dowdy, and Baker Trials, ECF No. 4382

- CMO 17, Initial Pretrial Schedule for the 40 Cancer Trials to Begin in May 2017, ECF No. 4459

- CMO 17-A, Schedule of Group 1 Cases, ECF No. 5009

- CMO 18, Pretrial Schedule for Vigneron Trial, ECF No. 4588

- CMO 19, Pretrial Schedule for Moody Trial, ECF No. 4591

- CMO 20, Order on Defendant's Objection to the November 2016 and January 2017 Trial Schedules, ECF No. 4624

- CMO 21, Initial Trial Schedules for the First Group of Non-Bellwether Trials, ECF No. 4741

- CMO 22, Appointment of Claims Administrator and Special Master, ECF No. 5095

- CMO 23, Order Granting Motion to Appoint Fee Committee, ECF No. 5136

- CMO 24, Order on Management of Newly-Filed, Post-Settlement Cases, ECF No. 5140

- CMO 25, Initial Scheduling of Post-Settlement Cases, ECF No. 5159

- CMO 26, Pretrial and Trial Schedule for Swartz Trial, 2:17-cv-998, ECF No. 5185

- CMO 27, Pretrial and Trial Schedule for Abbott trial, 2:17-cv-998, ECF No. 5186

- CMO 28, Discovery, Pretrial, and Trial Management of Post-Settlement Cases, ECF No. 5188

### 3. Pretrial Orders

The Court issued the following Pretrial Orders to memorialize the monthly case management conferences, and to consider and determine procedural and legal pretrial issues.

- PTO 1, Order Outlining Initial Procedures for the MDL, ECF No. 2

- PTO 2, Order Memorializing May 21, 2013 Status Conference, ECF No. 19

- PTO 3, Order Memorializing July 2, 2013 Status Conference, ECF No. 24

- PTO 5, Order on Correct Spelling of Defendant's Name, ECF No. 28

- PTO 6, Order on Common Benefit Fund, ECF No. 32

- PTO 6-A, Amendment to PTO 6, ECF No. 49

- PTO 7, Order Memorializing July 29, 2013 Status Conference, ECF No. 33

- PTO 8, Order Memorializing Sept. 5, 2013 Status Conference, ECF No. 50

- PTO 10, Order Memorializing Oct. 23, 2013 Status Conference, ECF No. 83

- PTO 11, Order and Stipulations Regarding Selection of a Mediator, ECF No. 84

- PTO 12, Order Extending December 1, 2013 Deadlines, ECF No. 117

- PTO 13, Order Memorializing Dec. 11, 2013 Status Conference, ECF No. 133

- PTO 14, Order Memorializing Jan. 15, 2014 Status Conference, ECF No. 154

- PTO 15, Order Memorializing Feb. 28, 2014 Status Conference, ECF No. 198

- PTO 16, Order Memorializing Apr. 1, 2014 Status Conference, ECF No. 222

- PTO 17, Order Memorializing Apr. 17, 2014 Status Conference, ECF No. 244

- PTO 18, Order on DuPont's Motion to Modify Case Management Orders Based on State-Court Filings, ECF No. 262

- PTO 19, Order Memorializing May 6, 2014 Status Conference, ECF No. 265

- PTO 20, Order on *Pro Hac Vice* Requirements, ECF No. 273

- PTO 20-A, Order on Additional *Pro Hac Vice* Requirements, ECF No. 4628

- PTO 21, Order Memorializing June 9, 2014 Status Conference, ECF No. 277

- PTO 22, Order on Status in Lieu of July 10, 2014 Status Conference, ECF No. 341

- PTO 23, Order Memorializing Aug. 13, 2014 Status Conference, ECF No. 708

- PTO 24, Order on DuPont's Motion to Drop Misjoined Plaintiffs from Gregory and Bauman Actions, ECF No. 712

- PTO 25, Order Modifying Deadlines Set Forth in Case Management Nos. 3 and 4, ECF No. 872

- PTO 26, Order Memorializing Sept. 10, 2014 Status Conference, ECF No. 873

- PTO 27, Order Memorializing Oct. 16, 2014 Status Conference and Modification of Case Management Order No. 7, ECF No. 1206

- PTO 28, Order Memorializing Oct. 29, 2014 Status Conference, ECF No. 1350

- PTO 29, Order Memorializing Nov. 20, 2014 Status Conference, ECF No. 1466

- PTO 30, Order on Status Report in Lieu of Dec. 17, 2014 Conference, ECF No. 1731

- PTO 31, Order Memorializing Jan. 26, 2015 Status Conference, ECF No. 2032

- PTO 32, Order Memorializing Feb. 26, 2015 Status Conference, ECF No. 2478

- PTO 33, Order on Emails to Chambers and Request to Amend Pretrial Order No. 29Order Memorializing Aug. 13, 2014 Status Conference, ECF No. 2806

- PTO 34, Order on Filing Under Seal, ECF No. 2925

- PTO 35, Order Memorializing May 6, 2015 Status Conference, ECF No. 3442

- PTO 36, Order Memorializing June 11, 2015 Status Conference, ECF No. 3968

- PTO 37, Order Memorializing July 22, 2015 Status Conference, ECF No. 4116

- PTO 38, Order Memorializing July 24 and 25, 2015 Conference, ECF No. 4198

- PTO 39, Order on Exhibits for the Bartlett Trial, ECF No. 4213

- PTO 40, Order Memorializing December 2, 2015 Conference, ECF No. 4267

- PTO 41, Order Granting DuPont's Motion to Preserve and Clarify the Record of Appeal, ECF No. 4274

- PTO 42, Order Memorializing January 27, 2016 Conference Order, ECF No. 4294

- PTO 43, Order on Plaintiffs' Motion for Leave to Amend Terry Pugh's Complaint, ECF No. 4326

- PTO 44, Order Memorializing March 23, 2016 Status Conference, ECF No. 4381

- PTO 45, Order Memorializing April 18, 2016 Conference, ECF No. 4584

- PTO 46, Order on Notice and Opportunity to be Heard on Transfer of Venue, ECF No. 4608

- PTO 47, Order on Transfer of Venue; Suggestion of Remand, ECF No.4633

- PTO 48, Order on Changed Directions for Selection of Trial Cases, ECF No. 5178

## 4.    Discovery Orders

The parties agreed to utilize the discovery collected and assembled in the years of exchanges in the *Leach* Case, which consisted of millions of documents. Additionally, this Court supervised discovery that continued for over two years, resulting in the following Discovery Orders and other decisions related to discovery:

- PTO 4, Order Setting Out Protective Order, ECF No. 27

- PTO 9, Order Regarding Discovery and Use of Electronically Stored Information, ECF No. 65

- CMO 4, Order on Plaintiff Fact Sheets and Records Authorizations, ECF No. 68

- CMO 4-A, Amended CMO 4, ECF 5177

- CMO 5, Order on Plaintiff Medical Record(s) Procurement, ECF No. 128).

- DO 1, Order on the Costs of Obtaining C8 Health Project Records & Extension of the Deadline for Selection of the Discovery Pool Plaintiffs, ECF No. 213

- DO 2, Order on Plaintiff Procurement Costs of Obtaining C8 Health Project Records from MRC, ECF No. 223

- DO 5, Order on Plaintiffs' Motion for Protective Order—Limits of Discovery on Discovery Pool Plaintiffs, ECF No. 251

- DO 6, Order Scheduling the Depositions of Treating Physicians, ECF No. 264

- DO 7, Order on Permissible Scope of Plaintiffs' Counsel's *Ex Parte* Contact With Treating Physicians, ECF No. 270

- DMO 2, Order on DuPont's Prior Admissions, ECF No. 2557

- DO 9, Order on DuPont's Motion to Compel Discovery Responses from Trial Plaintiffs Carla Bartlett and John Wolf, ECF No. 3550

- DO 10, Confidential Order Under Seal, ECF No. 4601

- DO 11: Order on Plaintiffs' Motion for Protective Order and Sanctions Regarding Expert Witness Discovery, ECF No. 4688

- DO 12, Order on Plaintiffs' Motion to Compel Dupont to Supplement its Discovery Responses and Motion for Sanctions, ECF No. 4689

## 5.    Evidentiary Motions Orders

The Court addressed the parties' *Daubert* motions in its Evidentiary Motions Orders.

- EMO 1, Order on Plaintiffs' and Defendant's Motions for Expert Opinions Related to Causation, ECF No. 4079

- EMO 1-A, Order on Defendant's Specific Causation Expert, ECF No. 4226

- EMO 2, Order on Defendant's Motion to Exclude Expert Opinions Related Corporate Conduct, ECF No. 4129

- EMO 3, Order on Defendant's Motion to Exclude Expert Opinions Related to Narrative Testimony, ECF No. 4178

- EMO 4, Order on Defendant's Motion to Exclude Expert Opinion Related to Specific Causation, ECF No. 4518

- EMO 5, Order on Plaintiff's Motions for Partial Exclusion of Defendant's Causation Experts, ECF No. 4532

- EMO 6, Order on Defendant's Motion to Exclude Opinion of Carrie Redlich Related Corporate Conduct, ECF No. 4551

- EMO 7, Order on Defendant's Motion to Exclude Expert Opinions Related Corporate Conduct, ECF No. 4596

- EMO 8, Order on Defendant's Motion to Exclude Expert Opinions Related Narrative, ECF No. 4617

- EMO 9, Order on Motions Directed at Plaintiff's Expert Dr. Bahnson and Defense Expert Dr. Luongo, ECF No. 4777

### 6. Motions *in Limine*

This Court held two (2) final pretrial conferences in each of the cases tried in this MDL. At one of the final pretrial conferences, the Court gave its decision orally on over 40 *in limine* motions, and issued the following decisions on the remaining motions *in limine*:

- MIL 1, Order Memorializing Decisions Made at the August 24-25, 2015 Hearing on Motions *in Limine*, ECF No. 4199

- MIL 2, Order on Evidence Regarding Obesity as a Causal Factor, ECF No. 4206

- MIL 3, Order on Issues Related to the Tennant's Farm, ECF No. 4207

- MIL 4, Order on Evidence Regarding the Weinberg Group, ECF No. 4212

- MIL 5, Order on Defendant's Motion *in Limine* No. 20, to Exclude Deposition Testimony and Exhibits, ECF No. 4233

- MIL 6, Order on Calculation of Punitive Damages, ECF No. 4239

- MIL 7, Order Memorializing Decisions Made at the May 6, 2016, Hearing on Motions *in Limine*, ECF No. 4538

- MIL 8, Order on the Questioning of Plaintiff's Treating Physician on Causation, ECF No. 4539

- MIL 9, Order on Evidence Related to the Emmett Studies, ECF No. 4552

- MIL 10, Order on Evidence Related to Mr. Freeman's Prior Conduct, ECF No. 4554

- MIL 11, Order on References to the Pollution of the Ohio River, ECF No. 4555

## E. Bellwether Trials and Settlement of Bellwether Trials

Within the first few months of this MDL, the Court and the parties focused upon the selection of cases to be utilized as bellwether trials. The bellwether cases were chosen for a special purpose that all parties and this Court recognized: information gathering that would facilitate valuation of cases to assist in global settlement. *See* Eldon E. Fallon, Jeremy T.

Grabill, Robert Pitard Wynne, *Bellwether Trials In Multidistrict Litigation* at 2332, Tulane Law

Review (2008) ("The ultimate purpose of holding bellwether trials in [*In re Propulsid Products*

*Liability Litigation* (MDL No. 1355) and *In re Vioxx Products Liability Litigation* (MDL No.

1657)] was not to resolve the thousands of related cases pending in either MDL in one

'representative' proceeding, but instead to provide meaningful information and experience to

everyone involved in the litigations."); Alexandra D. Lahav, *Bellwether Trials*, at 577–78, The

George Washington Law Review (2008) ("Judges currently use bellwether trials informally in

mass tort litigation to assist in valuing cases and to encourage settlement.").

 The Manual for Complex Litigation, a litigation manual produced by federal judges for

use by other judges, states that bellwether trials are meant to "produce a sufficient number of

representative verdicts and settlements to enable the parties and the court to determine the nature

and strength of the claims . . . and what range of values the cases may have." *The Manual for*

*Complex Litigation*, § 22.315. In accord with this direction, the parties all agreed to choose

representative cases as opposed to cases that most strongly favored to either side.

 By February 2014, the parties selected six representative cases to be utilized as the

bellwether trials. (CMO 6, Identification & Selection of Discovery Pool Plaintiffs, ECF No.

194); (CMO 7, Selection of the Initial Trial Cases and Expert Disclosures Schedule, ECF No.

602). The Court ultimately accepted the six (6) cases to serve as bellwether trials – three (3)

Plaintiffs' Steering Committee ("PSC") choices and three (3) chosen by DuPont. (CMO 2, § VI,

ECF No. 30; PTO 19, May 6, 2014 Conf. Order at 2, ECF No. 265); (CMO 7, Selection of the

Initial Trial Cases and Expert Disclosure Schedule, ECF No. 602); (CMO 9, Pretrial Schedule

for Initial Two Trial Cases, ECF No. 3549); (CMO 10, Pretrial Schedule for Bartlett Trial, ECF

No. 4183); (CMO 11, 12, Pretrial Schedules for Wolf Trial, ECF Nos. 4247, 4250); (CMO 13,

Pretrial Schedule for Freeman Trial, ECF No. 4263); (CMO 14, Pretrial Schedule for Dowdy Trial, ECF No. 4268); (CMO 15, Pretrial Schedule for Baker Trial; ECF No. 4269).

From this list of six (6) bellwether plaintiffs, the first tried was a case selected by DuPont and involved the claims of Carla Marie Bartlett, who had suffered from kidney cancer. Mrs. Bartlett's case began on September 14, 2015, as scheduled, and lasted five weeks. The jury found in favor of Mrs. Bartlett, awarding her $1.6 million.

At the January 2016 conference, the Court established the initial parameters for trying the non-bellwether cases, setting out the plan to try the remaining 3,538 cases. Specifically, after considering the parties' submissions, the Court indicated that it would establish a schedule setting 40 cases for trial per year, scheduled in four tranches. (PTO 42, January 27, 2016 Conf. Memorialization, ECF No. 4294.)

On March 22, 2016, DuPont moved the Court to stay the next three bellwether trials (ECF No. 4353), which the Court denied on March 29, 2016 (CMO 16, ECF No. 4382). The Court stated:

> Understanding the gravity of this case to all parties involved, a bellwether process was supported by the parties and the Court since the earliest stages of this MDL. With the Court's approval and direction, the parties developed and engaged in a selection process for the bellwether trials to which all discovery was directed. It was envisioned that, regardless of the results of the jury verdict (whether it would have necessitated DuPont or the bellwether plaintiff to appeal) the Court would press on with the anticipated bellwether trials.

(CMO 16 at 4, ECF No. 4382) (further explaining that it is the normal process for MDL courts to continue to try bellwether cases while the losing parties from the first bellwether trials appeal) (citing *In re Levaquin Prod. Liab. Litig.*, 2014 U.S. Dist. LEXIS 163777, at 11–14 (Jud. Panel on MDL Nov. 21, 2014); *In Re: C. R. Bard inc., Pelvic Repair Sys. Prod. Liab. Litig.*, MDL No.

2187, 2013 U.S. Dist. LEXIS 119177 at *6–7 (S.D. W.V. Aug. 22, 2013) (denying the defendant's Motion to Stay or Alternatively to Certify for Immediate Interlocutory Appeal)).

The Court further explained in CMO 16, that "celerity is mandated here, considering that the over 3,500 plaintiffs have waited fifteen (15) years to bring the issue of DuPont's release of C-8 into their drinking water to trial (and DuPont has waited as long to present evidence that it was not negligent or reckless)." (CMO 16, Denying DuPont's Motion to Stay at 5–6, ECF No. 4382.)

On February 3, 2016, three (3) days after the Court issued CMO 16 denying DuPont's request to stay the bellwether trials, DuPont settled the second bellwether case that was scheduled for trial the following month.

On May 31, 2016, a jury was seated for the third bellwether trial, which was the second to be tried. *Freeman v. E. I. du Pont de Nemours and Co.*, 2:13-cv-1103. The jury returned a verdict in favor of Mr. Freeman for $5.6 million.

On June 10, 2016, DuPont's counsel informed the Court that the last two (2) bellwether cases were settled. As the Court indicated in CMO 20, it "was, to put it mildly, surprised [by the settlements because] [f]or over three years the parties had taken the position that the purpose of the bellwether trials was to gather information regarding the valuation of cases. The Court was granted special staffing to provide the resources to engage in this endeavor. The parties and the Court had worked for several years choosing and preparing the bellwether plaintiffs for trial." (CMO 20 at 15, ECF No. at 4624.) The Court, therefore, informed the parties of its intention to replace the bellwether trials with two (2) of the first tranche 2017 trials. The Court vacated the August 29, 2016 trial date, kept the November trial date, and added a January 2017 trial date.

On August 1, 2016, DuPont filed a document titled "Objection to the Acceleration and Selection of Trial Cases for November 2016 and January 2017 and [the Governing] Case Management Orders Nos. 18 and 19" ("Objection"). (ECF No. 4603, 4604.) In the Objection, DuPont requested that the Court place an approximate 11 month hold on any trial activity to advance the broader goals of the MDL, that is, global settlement, and fair and just administration of the cases that make up this MDL.

The Court, however, disagreed with DuPont's suggestion that "facilitat[ing] broad resolution of the MDL" was any longer a point of emphasis. (CMO 20 at 20, ECF No. 4624.) The Court had previously explained to the parties on several occasions that once the bellwether process was complete, the Court would focus its attention on the effective administration of the thousands of cases that constitute this MDL.

Additionally, as the Court and parties discussed and understood, even if the Sixth Circuit reversed this Court on every issue DuPont raised on appeal, the *ruling would not have a dispositive effect on any case. Every single case would have remained pending and necessarily brought to trial or settled. Id.* at 28.

## F.    Non-Bellwether Trials

On July 18, 2016, the PSC selected Kenneth Vigneron, Sr. for the November 2016 trial and Larry Moody for the January 2017 trial. The Court then issued CMO 18 and CMO 19, setting out the trial schedules for these two plaintiffs. (CMO No. 18, Pretrial Schedule for Vigneron Trial, ECF No. 4588); (CMO 19, Pretrial Schedule for Moody Trial, ECF No. 4591.)

Mr. Vigneron's trial lasted approximately five weeks. The jury returned a verdict in favor of Mr. Vigneron for $12.5 million.

Mr. Moody's trial was in its fourth week, when, on February 14, 2017, the parties reached a global resolution of the MDL.

**F.      Appeal to the Sixth Circuit**

As anticipated and discussed by all parties since the inception of this MDL, the unsuccessful party would appeal. DuPont was the unsuccessful party and on October 27, 2015, DuPont filed its Motion for Judgment as a Matter of Law or, Alternatively, for a New Trial and Remittitur, which was fully briefed by the end of 2015. (Bartlett Docket, ECF Nos. 151, 158, 159.) On February 17, 2016, this Court issued DMO 12, a 125-page opinion addressing each of DuPont's numerous arguments, and denying its Motion. (ECF No. 4306.)

On March 17, 2016, DuPont appealed four (4) of those issues to the Sixth Circuit. (Notice of Appeal, Bartlett ECF No. 162; Sixth Circuit Case No. 16-3310.) Once briefing was complete, the court held oral argument on December 9, 2016. On February 14, 2017, DuPont informed this Court that it had contacted the Sixth Circuit *asking it to hold any decision* on the appeal because the case had been settled. DuPont filed the stipulated dismissal with the Sixth Circuit on May 25, 2017 as part of an overall settlement.

In summary, DuPont itself prevented an appellate review of decisions from this Court. The dismissal came *after* oral argument before a three judge panel, the transcript of which is of record. http://www.opn.ca6.uscourts.gov/internet/court_audio/aud2.php?link=audio/12-09-2016%20-%20Friday/16-3310%20Carla%20Marie%20Bartlett%20v%20E%20I%20DuPont%20de%20Nemours%20et%20al.mp3&name=16-3310%20Carla%20Marie%20Bartlett%20v%20E%20I%20DuPont%20de%20Nemours%20et%20al). This Court notes that the Sixth Circuit itself takes steps to prevent a party from avoiding a

particular panel of its judges by refusing to grant continuances of oral argument once the names

of the panel members are known. *See* 6 Cir. R. 34(b), (d); 6 Cir. I.O.P. 34(a), (c).

## G.  Post-Settlement Cases

Since the global settlement, numerous Post-Settlement Cases have been filed. The parties

expect approximately 40 to 50+ to be filed. *The plaintiffs in these Post-Settlement Cases all*

*make the same allegations previously made by the 3,542 plaintiffs who were part of the global*

*settlement.*

Once the Post-Settlement Cases were filed, DuPont moved the JPML "to vacate [its]

orders that conditionally transferred" these actions "for inclusion in MDL No. 2433." (First

Post-Settlement Cases Transfer Order, ECF No. 5130.) The JPML stated:

> Movants' primary argument against transfer is that pretrial proceedings in MDL No. 2433 are complete. This litigation at its height encompassed approximately 3,500 actions and involved two bellwether trials, two individual case trials, and innumerable pretrial rulings by the transferee court. In early 2017, the parties reached a global settlement. Movants contend that, as a result, all of the actions in this MDL are resolved, obviating any benefit from further transfer of tag-along actions.
>
> We are not persuaded by this argument. Following the settlement, at least seventeen related actions have been filed in the transferee court. These actions, like the five actions at issue here, are personal injury or wrongful death actions arising out of plaintiffs' alleged ingestion of drinking water contaminated with a chemical, C-8 (also known as perfluorooctanoic acid (PFOA) or ammonium perfluorooctanoate (APFO)), discharged from DuPont's Washington Works Plant near Parkersburg, West Virginia. These actions are in their infancy and will benefit from centralized management with the actions listed on Schedule A.
>
> To the extent common discovery remains, such discovery is best coordinated by the Honorable Edmund A. Sargus, Jr., who is intimately familiar with the factual and legal issues in this litigation. Similarly, these actions will involve similar, if not identical, pretrial motion practice. Coordination within the MDL will ensure consistent pretrial rulings and minimize any potential for duplicative efforts. Should the litigation progress to the point where the transferee judge determines that further adjudication of these actions should occur in the transferor district, he is free to suggest remand under Section 1407. *See* Panel Rule 10.2(a).

Movants' other arguments against transfer are no more convincing. Movants insist they do not intend to waive their right to trial in the Southern District of West Virginia, *see Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998), and therefore transfer will not serve judicial economy. Whether defendants waive their *Lexecon* rights, though, is irrelevant to the question of whether centralization will result in efficiency benefits and enhance the convenience of the parties. Moreover, movants do not dispute that the transferee judge has indicated his willingness to seek an inter-circuit assignment to conduct trials in West Virginia should the need arise.

Id. at 1 – 2

The JPML then concluded:

Therefore, after considering the argument of counsel, we find that the actions listed on Schedule A involve common questions of fact with the actions transferred to MDL No. 2433, and that transfer under 28 U.S.C. § 1407 will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. The actions in MDL No. 2433 share factual questions arising from allegations that plaintiffs were injured by ingesting drinking water contaminated with C-8 that was discharged from DuPont's Washington Works Plant. *See In re E. I. du Pont de Nemours & Co. C-8 Personal Injury Litig.*, 939 F. Supp. 2d 1374, 1374 (J.P.M.L.2013). The actions listed on Schedule A involve substantially similar allegations. Transfer of these actions to the MDL thus will eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel, and the judiciary.

IT IS THEREFORE ORDERED that the actions listed on Schedule A are transferred to the Southern District of Ohio and, with the consent of that court, assigned to the Honorable Edmund A. Sargus, Jr., for inclusion in the coordinated or consolidated pretrial proceedings in this docket.

*Id*. at 2–3.

Following the familiar, well-trodden path, the Court has met monthly with the parties and has issued numerous Case Management Orders and Pretrial Orders directed at the Post-Settlement Cases. The first two (2) cases that will be tried in these Post-Settlement Cases have been selected and are currently being prepared for trial.

The Court now turns its attention to the fair and efficient resolution of all of the Post-Settlement cases.

## II.

As directed by this Court, the parties address why the Post-Settlement Cases (A) should not be scheduled for trial forthwith, and why the cases (B) should not be tried with multiple cases in each trial.

### A.    Setting Trials Forthwith

DuPont contends that this Court's current schedule of each side choosing one trial at a time is a sufficient schedule, and argues that the following reasons "strongly counsel against scheduling additional cases for trial at this time." (Defs.' Brief at 1, ECF No. 5201.)

> First, the cases currently scheduled for trial beginning in October 2019 and January 2020 present an opportunity for the first appellate rulings and guidance on key issues as applied to the pending post-global settlement cases, as well as the additional cases sure to follow in coming years. These issues include the applicability of Ohio tort reform to cases where the claimed injuries first occurred a decade or more after the effective date of the tort reform statute, the application of the *Leach* Agreement with respect to specific causation, and critical evidentiary matters that fundamentally affect the way these cases are evaluated for settlement and, if necessary, are tried. Accordingly, appellate review should be allowed to conclude before additional cases are scheduled for trial.
>
> Second, because many of the pending cases suffer from fatal defects on threshold issues like class membership, no probable link disease, and statute of limitations, the parties should be permitted to complete their review and discussion on those cases to narrow the pool.

*Id.* DuPont's arguments are not well taken.

### 1.    Appeal

The Court disagrees with DuPont's contention that "the Sixth Circuit has *never* addressed the myriad first impression issues DuPont had identified for appeal—issues that without question are central to the way these cases are tried." (Def's Brief at 4, ECF No. 5201.) The Sixth Circuit *did have the opportunity* to address these issues, and indeed spent *over a year* engaged in addressing the issues. The only matter left for the Sixth Circuit in the appeal was to issue its

23

decision, which was imminent at the time of settlement. For resolution of appeals, "the Sixth Circuit averaged just 9.9 months as of December 2013—and the average for 2014 so far has been just 8.7 months." (*Sixth Circuit Dramatically Lowers Time to Resolve Appeals*, Squire Patton Boggs Sixth Cir. App. Blog, https://www.sixthcircuit appellateblog.com/news-and-analysis/sixth-circuit-dramatically-lowers-time-to-resolve-appeals/). DuPont's appeal pended for 13 months. Only because *DuPont* dismissed the appeal was it denied appellate review.

The theories of liability raised in the Post-Settlement cases are the exact same as those that were raised in the pre-settlement cases, argued on motion, tried, appealed, and globally settled. The Post-Settlement Cases do not raise any issues[1] that were not only raised before this Court, but also *before the Sixth Circuit*. That is, "the applicability of Ohio tort reform, specific causation, evidentiary, and other critical legal issues" were already extensively litigated. Specifically, application of the *Leach* Settlement Agreement has been extensively briefed by the parties in dispositive motions and evidentiary motions prior to Mrs. Bartlett's trial. (DuPont's Motions/Briefs at MDL ECF Nos. 1031, 1032, 2813, 2816, 3560, 3563); (Pl.'s Motions/Briefs at MDL ECF Nos. 820, 1152, 1519, 2285, 2417, 2822, 2824, 3196, 3201, 3443, 3554, 3555, 4085, 4090, 4091, 4103, 4224). The Court issued several decisions explaining in detail why DuPont's position on causation conflates the parties' unambiguous definitions of general and specific causation that they set forth in the *Leach* Settlement Agreement and effectively rewrites the Agreement's provisions related to the function and application of the Probable Link Findings.

After Mrs. Bartlett's trial, DuPont *appealed the exact issues* it now submits it should have the opportunity to appeal. In its appellate brief, DuPont argued that this Court "adopted an

---

[1] Just this week, DuPont filed a motion related to the Tort Reform Act's application to the Post-Settlement Cases. That motion will be timely resolved, when briefing is complete.

24

erroneous and prejudicial interpretation of the [*Leach*] Agreement," which led to "distorted evidence at trial." The issues were extensively explored at oral argument, as can be gleaned from the transcript, cited *supra*.

Based on the appellate history, the Court is not persuaded by Dupont's claim that the Sixth Circuit should be allowed to address the myriad of first impression issues DuPont has identified for appeal. DuPont pursued its appellate review, and then voluntarily dismissed the appeal *after* oral argument.

DuPont now urges the Court to delay the pending cases so DuPont may have another shot at appellate review of the first trial in the Post-Settlement cases, which is not set for trial for another six months. Given the decades long course of this case, DuPont's request is simply unreasonable.

### 2. Motion Practice

DuPont contends that the second reason that strongly counsels against scheduling the pending cases for trial is that "many of them suffer from fatal defects on threshold issues like class membership, no probable link disease, and statute of limitations, the parties should be permitted to complete their review and discussion on those cases to narrow the pool." (Def's Brief at 2, ECF No. 5201.)

DuPont made this same point in June 2018, at the first case management conference on the Post-Settlement Cases. This Court gave permission then for either side to file dispositive motions on the threshold issues, or any other issue, at any time. In the 11 months since that first conference, DuPont has not filed any motion on any of these threshold issues. Instead, two days *before* this order is issued, DuPont first filed the two motions for summary judgment, on the eve of a status conference scheduled for the day *after* this order is issued.

The fact that DuPont has not chosen until this week to seek dismissal of any case it sees as having unmet threshold requirements does nothing to counsel against setting trial schedules. If DuPont ultimately files more motions, and any are successful, such case will be dismissed.

**B.    Multiple Plaintiff Trials**

As DuPont highlights in its Brief, the PSC has on numerous occasions moved this Court to hold multi-plaintiff trials. DuPont has each time opposed the PSC's request. This Court has each time denied the PSC's request. However, as explained below, the Court finds, and case law supports, a different procedure at this juncture.

This Court has expended enormous resources on this MDL issuing literally thousands of pages of opinion over the last six (6) years, in the form of 32 Dispositive Motions Orders, 36 Case Management Orders, 49 Preliminary Pretrial Orders, 10 Evidentiary Motions Orders, and issued 11 written Motions *in Limine* Orders and made oral decisions on over 150 motions *in limine*, completed a bellwether process, began the work-up and staffing for trying the cases at 40 cases per year, held four (4) trials, three (3) jury verdicts, a global settlement of over 3,500 claims for approximately $671 million. The trial time alone in these cases exceeded 24 weeks. The Sixth Circuit spent over a year on the abandoned appeal.

Nothing has changed since January 2013, when DuPont explained to the JPML that "[t]he complaints [of the *Leach* Class members] each involve ***the same core factual allegations*** regarding DuPont's conduct, and also ***raise the same theories of legal liability***." (Def.'s Mem. in Support of Mot. for Coordination and Consolidation at 1, JPML ECF No. 1-1) (emphasis added). The only change upon which DuPont presently relies is merely the chance that it can convince the Court to reconsider its previous decisions in this next round of trials. Hoping that this Court will change any of the decisions it has already issued, reconsidered, tried, and decided

on post-trial briefs is a very thin reed upon which to place the heavy burden that these next 40+ cases will demand of the resources of the parties, this Court, and the Sixth Circuit. The Court, therefore, will address below the appropriateness of multi-plaintiff trials.

### 1. Standard

Rule 42 of the Federal Rules of Civil Procedure provides the authority to consolidate cases for trial. That Rule provides:

> **(a) Consolidation.** If actions before the court involve a common question of law or fact, the court may:
>
> > **(1)** join for hearing or trial any or all matters at issue in the actions;
> > **(2)** consolidate the actions; or
> > **(3)** issue any other orders to avoid unnecessary cost or delay.

Fed. R. Civ. P. 42(a); *State of Ohio v. Louis Trauth Dairy, Inc.*, 163 F.R.D. 500, 503 (S.D. Ohio 1995).

While recognizing that consolidation is within the discretionary authority of the trial court, *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1011 (6th Cir. 1993), the Sixth Circuit has additionally considered other factors relevant to the exercise of that discretion:

> Whether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Id.* (citing *Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1495 (11th Cir. 1985)). In evaluating the prudence of consolidation, courts balance "the value of time and effort saved by consolidation against the inconvenience, delay, or expense increased by it." *Louis Trauth Dairy, Inc.*, 163 F.R.D. at 503.

The Manual for Complex Litigation discusses consolidation and provides:

Once cases have been assigned to a single judge, that judge can determine the nature, extent, and purpose of the coordination or consolidation . . . if there are some variations among cases within a single district, subdividing them into groups or clusters of cases that raise similar issues or present similar case-management needs can also be an efficient approach.

Manual for Complex Litig., Fourth § 23.32. Further, when a court determines what devices to use in a trial format, it must recognize that methods such as, *inter alia*, consolidation, "can have a significant effect on the fair and efficient resolution of complex litigation." *Id.* §11.63.

### 2.    Analysis

DuPont maintains that multiple plaintiff trials are not appropriate, arguing:

> Consolidating multiple plaintiffs for trial from the currently-pending cases in this MDL will not pay dividends in judicial economy sufficient to outweigh the unavoidable and unfair spill-over prejudice to Defendants on key issues of both liability and causation if jurors are permitted to consider complex evidence regarding highly individualized claims of multiple plaintiffs at the same time.

(Def.'s Brief at 17, ECF No. 5201.)

Contrarily, the PSC posits:

> In short, the PSC is in support both of scheduling the totality of the pending cases for trial as expeditiously and efficiently as possible and setting these cases with multiple cases in each trial, as was done in *Atwood* [v. *UC Health*, Case No. 1:16-cv-593 (S.D. Ohio)]. Although this is a mature mass tort, there are currently no settlement negotiations occurring between the parties, despite the parties having successfully resolved over 3,500 cases in this multidistrict litigation ("MDL") through a global settlement.

> Moreover, because of the practical realities of this MDL, including that it would take over ten (10) years to try all the pending cases at the current rate of approximately four (4) trials per year, the PSC respectfully submits that having multiple cases tried in each trial setting is necessary in order to ensure that the approximately 40 litigants (based on undersigned's canvasing of known Plaintiff firms vetting these cases, this number will increase) are afforded the right to just and speedy resolution of their claims, especially considering that all the cases involve potentially life-threatening cancer.

(Pl.s' Brief at 1–2, ECF No. 5200.)  With regard to DuPont's declination to engage in any settlement negotiations, the PSC further asserts:

Although it is DuPont's right and prerogative to determine when/if it wants to engage in settlement discussions, it is also the right of the plaintiffs who still have cases pending in this MDL, and who have suffered terrible injury, to have their claims resolved in an expeditious manner. A number of these plaintiffs are part of an older population, and thus may be deceased before having their day in Court, should it take a decade to get through all the remaining trials. Because of this, a more aggressive trial timetable is necessary, rather than having cases sit in what would be a nearly endless holding pattern.

*Id.* at 3.

Last, the PSC submits that the cases in this MDL are particularly well suited to be tried in multiple plaintiff trials because each case involves similar, if not identical, testimony from various experts and corporate witnesses, and the personal injury or wrongful death is in connection with one of only two cancer types. (Pls' Brief at 7–8.) The PSC's arguments are well taken.

As the PSC correctly points out, the majority of the time in the trials that have been held in this MDL was spent exploring what DuPont knew about the dangers of C-8, when it knew it, and what it did with the knowledge it had. The case-specific damages and causation testimony was but a small percentage of the testimony and evidence at trial. For example, in Mr. Vigneron's trial, less than four (4) days out of the 24 trial days, were dedicated to case-specific witnesses, and DuPont's only case-specific witness was on the stand for less than one day of testimony. Similarly, in Mr. Freeman's trial, less than three (3) days out of the 25 trial days, were dedicated to case-specific testimony.

To relieve DuPont's stated fear of prejudice, this Court will utilize limiting instructions to properly explain to the jury which case-specific witnesses pertain to which plaintiff. As this Court has explained in a similar context:

If plaintiffs' claims were not joined under Rule 20, the court would consolidate their actions *sua sponte* under Rule 42 because they involve so many common questions of law and fact. The common questions of law and fact predominate over

the issues unique to each case and there will be no unfair prejudice to the defendant in trying the plaintiffs' separate claims before the same jury. Any possible prejudice can be cured by appropriate instructions by the court.

*Hamilton v. Breg, Inc.*, 2:09-CV-146, 2011 WL 221919, at *2 (S.D. Ohio Jan. 24, 2011); *see also In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Products Liab. Litig.*, MDL 3:11-MD-2244-K, 2016 WL 10719395, at *2 (N.D. Tex. Jan. 8, 2016) (consolidating five bellwether cases for trial before one jury because even though "the individual damages will require separate evidence, including evidence relating to Plaintiffs' individual treating physicians . . . and differences between the Plaintiffs can be easily explained to a jury, and any potential risks of prejudice or confusion may be avoided through the organized presentation of evidence and cautionary jury instructions. A single jury will be empaneled to hear the consolidated trial of the Bellwether Cases, but the jury will be instructed to consider liability as to each Bellwether Plaintiff and his or her damages, if any, separately.").

Courts have routinely consolidated multiple plaintiffs for joint trial because the benefits of consolidation outweigh any prejudice that a defendant may incur. *See e.g., Fisher v. Ciba Specialty Chemicals Corp.*, 245 F.R.D. 539, 544 (S.D. Ala. 2007) ("In short, the Court finds that defendants have failed to make a showing of prejudice sufficient to justify the heavy burden that would be visited on the litigants and this Court alike by virtue of the proposed fragmentation of the plaintiffs' claims into five overlapping trials."). Indeed, consolidating cases for trial is a regular practice in MDL litigation. *See e.g., In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Products Liab. Litig.*, MDL 3:11-MD-2244-K, 2016 WL 10719395 (consolidating five (5) cases); *(In re Actos PIOGLITAZONE) Prods. Liab. Litig.*, MDL 2299 (W.D. La. Feb. 23, 2015) (consolidating five (5) cases for trial) (Pls' Brief, Ex. B, ECF No. 5200-2); *In re Zyprexa Prods Liab. Litig.*, MDL No. 1596 (E.D. N.Y. Nov. 1, 2007) (consolidating five (5) cases for trial) (Pls.' Brief, Ex. C, ECF No. 5200-3); *In re NutraQuest, Inc.*, Civil No. 03-5869 (D. N.J.

Nov. 24, 2004) (granting the plaintiffs' application for consolidation of their cases for trial) (Pls'
Brief, Ex. D, ECF No. 5200-4).

Additionally, consolidation of cases for trial will benefit the parties through the sharing of
trial expenses, benefit the witnesses by minimizing the inconvenience of duplicate testimony,
and benefit the parties and the Court by resolving several cases during one trial setting. *See e.g.,
Hamilton v. Breg*, No. 2:09-CV-146, 2011 U.S. Dist. LEXIS 9426, at *6 ("Consolidation will
result in the substantial saving of time and expense to the parties and the witnesses and will
promote judicial economy.") A helpful example is found in the asbestos litigation. In *Hendrix v.
Raybestos-Manhattan, Inc.*, 776 F. 2d 1492, 1495 (11th Cir. 1985), the court selected four (4)
plaintiffs from 44 pending asbestos cases for a single consolidated trial based on the
qualifications that they were, "similarly situated in terms of the manner in which they had been
exposed to asbestos and the extent of their disease." *Id.* In affirming that decision, the Eleventh
Circuit held that "the cases here present precisely the kind of tort claims a court should consider
consolidating for trial." *Id.* at 1497.

As to the PSC's contention that this MDL is a mature mass tort, DuPont disagrees,
arguing in its Reply[2]:

> The concept of "mature" versus "immature" mass torts originated in a 1989
> law review article published by Professor Frances McGovern of the University of
> Alabama Law School as part of a three-part "series of articles designed to propose
> a functional approach for managing complex litigation." McGovern, 69 B.U.L.

---

[2] The PSC has filed a Motion to Strike DuPont's Reply. (ECF No. 5207.) In that Motion, the
PSC argues that the Court should strike the Reply because DuPont "was not authorized or
allowed under PTO 50, nor did Defendants seek nor obtain any permission to make any such
filing in contravention of the express terms of PTO 50." *Id.* at 1. While it is true, the Court
neither directed nor authorized the parties to file any responsive memoranda to the simultaneous
briefing, the Court finds it appropriate to consider DuPont's brief, noting that Plaintiffs suffer no
prejudice from the Court's consideration of it. As all parties have come to know, in its endeavor
to reach the merits of important issues, the Court is inclined when necessary to favor substance
over form. Therefore, the Court **DENIES** the PSC's Motion to Strike.

Rev. at 659. McGovern notably published this series at a time when many courts were grappling with an overwhelming amount of asbestos litigation—the archetypal "mature" mass tort. In the article, McGovern wrote that a "mature mass tort" is one in which:

> vitality in the plaintiffs' contentions. Typically at the mature stage, *little or no new evidence will be developed,* **significant appellate review of any novel legal issues has been concluded,** *and at least one full cycle of trial strategies has been exhausted. Id.* (emphasis supplied); *see also* Manual for Complex Litigation, Fourth (June 2017) § 22.314 ("A mature mass tort is one that rests on clearly established law and tested and accepted evidence. In a mature mass tort, the cases have a predictable range of values produced through a number of trials and settlements in a variety of tribunals.").

(Def's Reply at 4–5, ECF No. 5205) (emphasis added by DuPont). DuPont contends that

> in the case of "immature" mass torts, it is recognized that "courts should 'proceed with extreme caution' in setting consolidated trials." *In re Allied Chem. Corp.,* 227 S.W. 3d at 655. For example, in *In re Allied Chem. Corp.,* the Fourth Circuit found alleged chemical exposure claims to be an immature tort and reversed the lower court's consolidation of five plaintiffs for trial where they "had little in common—ranging in age from 29 to 74, residing in various directions from two different sites, alleging exposure over different parts of seven decades, and suffering [varying] injuries." *Id.*

*Id.* at 4.

This Court, however, disagrees with DuPont's assessment.

This case is not analogous to *In re Allied Chemical Corp.,* where the Texas Supreme Court reversed the Texas state trial court's decision to consolidate five (5) cases for the *first trial* and schedule that trial *before* discovery was complete. The mass tort in that case is in no way similar to this MDL, in that

> "[r]oughly 1,900 plaintiffs sued 30 defendants in Hidalgo County, alleging exposure to chemical fumes and leaks from several sites where pesticides were mixed or stored before the sites were placed in receivership in 1967 and remediated in 1980. The plaintiffs identified no particular incidents or products, instead alleging exposure to a "toxic soup" of emissions in the air for many decades. As we recently noted, no such claim "has ever been tried or appealed in Texas," and thus "the tort is immature."

*In re Allied Chem. Corp.*, 227 S.W.3d 652, 654 (Tex. 2007). In the mass tort before this Court, the chemical exposure is specific, the defendant is known and does not contest that it is the entity that released the specific chemical into the plaintiffs' water supply, much testing and environmental protection agency involvement has occurred with respect to C-8, and there have been four trials and one appeal of the specified negligence claims filed by each plaintiff.

While the instant mass tort is certainly not immature, "determining the precise time when a mass tort reaches maturity is 'hard to pinpoint.'" (Def's Reply at 3) (citing *In re Dow Corning Corp.*, 211 B.R. 545, 576 (Bankr. E.D. Mich. 1997)). *In re Dow Corning Corp.* provided a lengthy discussion of the phases of mass torts, with the overarching view that while there are certain signposts, maturity is tied to the unique details of each mass tort, which dictate the process due to each party. The Court finds that this mass tort, as explained below, has reached maturity and is headed into its dotage.

The PSC accurately explains:

> [A]s this Court is well-aware, this litigation is now a mature mass tort. This MDL involved thousands of Plaintiffs Fact Sheets, a bellwether process, a secondary "bellwether" process that worked up forty (40) cases for trial, extensive dispositive briefing and decisions, an abandoned sixth circuit appeal, four (4) trials, three (3) jury verdicts, as well as a global settlement of over 3,500 claims for approximately $671 million, and, as such, the parties have a thorough understanding of the trial issues at play, are thoroughly versed in how those trial issues play out with respect to both types of cancer, and have a general understanding of the value of these claims both by way of verdict as well as by way of settlement.

> As such, multi-plaintiff trials are not being requested in the context of initial discovery of these cases, initial trials, or before the parties understand the intricacies and complexities of these trials, but rather, only after every other path of potential resolution of these claims has been fully vetted, including but not limited to a bellwether process and the structuring and implementation of a global resolution. In sum, because DuPont will not resolve the remaining cases or engage in meaningful good faith negotiations for same, despite the significant litigation history between the parties surrounding nearly identical claims, the only effective

and expeditious means available to resolve the remaining cases is a multi-plaintiff trial approach.

(Pl.'s Brief at 10–11.)

In *Castano v. The Am. Tobacco Co.*, 84 F.3d 784 (5th Cir. 1996), the Fifth Circuit explained the impact maturity has on a court's approach in comparison to new mass tort cases:

> Fairness may demand that mass torts with few prior verdicts or judgments be litigated first in smaller units even single-plaintiff, single-defendant trials until general causation, typical injuries, and levels of damages become established. Thus, "mature" mass torts like asbestos or Dalkon Shield may call for procedures that are not appropriate for incipient mass tort cases, such as those involving injuries arising from new products, chemical substances, or pharmaceuticals.

*Id.* at 748-49 (quoting *Manual for Complex Litig.* § 33.26); *see also In re Asbestos Liab. Litig.*, 771 F. Supp. 415, 419 (Judicial Panel of Multidistrict Litig. July 29, 1991).

In its Reply, DuPont addresses the PSC's position, arguing that the PSC "appears to have lost sight of Defendants' fundamental due process right to evaluate each individual case on its merits. Despite this absolute right, the PSC Response contains repeated and not-so-thinly-veiled arguments that this Court should pressure or somehow punish Defendants for not settling all of the pending cases." (Def's Reply at 10, ECF No. 5205.) DuPont concludes: "The bottom line is that Defendants are *not* trying 'to avoid any meaningful resolution' as the PSC accuses. PSC Response at 11. To the contrary, Defendants are actively exercising their right to evaluate each case on its merits. Defendants should not—and cannot under the law—be punished for not acquiescing to plaintiffs' unreasonable positions." *Id.* at 12. DuPont relies upon the following law to support its position:

> The PSC's settlement pressure tactics are wholly improper, and this Court should not be swayed by them or buy into them. *Kothe v. Smith*, 771 F.2d 667, 669 (2nd Cir.1985) ("in short, pressure tactics to coerce settlement simply are not permissible."); *see also, e.g., In re NLO*, 5 F.3d 154 (6th Cir. 1993) ("Although judges should encourage and aid early settlement . . . they should not attempt to coerce that settlement."); *In re: Dow Corning Corp.*, 211 B.R. at 576 (noting that

"while settlement can and should be both encouraged and facilitated by a court . . . it cannot be forced upon the parties."); *Newton v. A.C. & S., Inc.*, 918 F.2d 1121 (3d Cir. 1990) ("The court's efforts to expedite the settlement of cases must be consistent with the dictates of due process.").

*Id.*

The cases upon which DuPont relies, however, are inapposite. In *Kothe*, at the pretrial conference, the trial judge "recommended that the case be settled for between $20,000 and $30,000. He also warned the parties that, if they settled for a comparable figure after trial had begun, he would impose sanctions against the dilatory party," which he did impose when the case settled the second day of trial. *Kothe*, 771 F.2d at 669.

In *In re: Dow Corning Corp.*, 211 B.R. at 576, while offering an extensive explanation of how to handle mass torts, the case offers nothing in the way of supporting a proposition that consolidating cases in inherently coercive. Indeed, the *Dow Corning* court aggregated cases for trial, stating, *inter alia*, that while "there is the concern that both plaintiffs and defendants may be denied the constitutional guarantees of due process and the right to a jury trial, . . . the Court is of the firm opinion that through the careful and prudent design and implementation of the proposal [it is implementing,] the legitimate rights of all parties can be safeguarded." *In re: Dow Corning Corp.*, 211 B.R. at 579.

Similarly unhelpful to DuPont's position is *In re NLO*, in which the trial judge certified a class of employees of a uranium processing contractor, and informed the parties that if the case did not settle the court would require a public summary jury trial. The Sixth Circuit stated:

> District courts struggle to deal effectively with caseloads expanding at a precipitous rate. The utilization of procedures designed to facilitate settlement whenever possible is expressly encouraged by Rule 16, for a case that settles obviously consumes much less of the court's scarce resources than a case that proceeds to a full trial on the merits. Although judges should encourage and aid early settlement, however, they should not attempt to coerce that settlement. "Rule 16 . . . was not intended to require that an unwilling litigant be sidetracked from the normal course

of litigation." *Strandell,* 838 F.2d at 887. Requiring participation in a summary jury trial, where such compulsion is not permitted by the Federal Rules, is an unwarranted extension of the judicial power.

*In re NLO, Inc.,* 5 F.3d 154, 157–58 (6th Cir. 1993).

And, last, in *Newton v. A.C. & S., Inc.,* 918 F.2d 1121 (3d Cir. 1990), the trial court imposed fines upon the defendants for failure to settle cases by the pretrial settlement deadline imposed by the court.

This Court has never set a deadline for the parties to settle and has never suggested what the cases are worth for settlement. DuPont has every right to assess its settlement positions and engage in settlement discussions, or not engage in settlement discussions. The Court has been very clear that its focus in on its duty to provide the litigants before it an opportunity to have their case heard in a timely manner – not punishing any party for its position on settlement. "In any event, the point cannot be stressed enough that use of the only alternative to aggregation— individualized adjudication of tort claims—would be 'tantamount to denying [most] litigants their due process . . . rights altogether.'" *In re Dow Corning Corp.,* 211 B.R. 545, 578–79 (Bankr. E.D. Mich. 1997)) (citing Saks and Blanck, 44 Stan. L.Rev. at 826; Weinstein, *Individual Justice* 1; Kenneth R. Feinberg, *Response to Deborah Hensler, A Glass Half Full, A Glass Half Empty: The Use of Alternative Dispute Resolution in Mass Personal Injury Litigation,* 73 Tex. L.Rev. 1647, 1648 (1995) (stating that with respect to the efficient treatment of mass torts: "The answer is aggregation. Aggregation. You must get all of the cases in one forum. Until you do that, any piecemeal solution, however beneficial it may be, does not offer either the plaintiff or the defendant global peace."); Coffee, 95 Colum. L.Rev. at 1345–46 (recognizing judicial system's fundamental movement toward collectivized treatment of mass torts, strongly supporting this trend, and concluding that any attempt to "return to a traditional system of individual case litigation" would be "quixotic [and] . . . costly"); Schwarzer, Hirsch and

Sussman, 73 Tex. L.Rev. at 1550 ("[T]he growth of large-scale litigation may eventually leave no alternative to aggregation procedures if the court's adjudicatory function is to survive."); Schuck, 80 Cornell L.Rev. at 958 ("The number of individual claims currently pending and reasonably anticipated in the future is in some mass tort litigations so large that it is simply not practicable to provide individual trials in the traditional fashion."); Hensler and Peterson, 59 Brook. L.Rev. at 1031 ("Efficient disposition of a large volume of litigation concentrated within one or a small number of courts requires some type of aggregative or collective procedure."); Sherman, 10 Rev. Litig. at 231 *passim* (recognizing value of aggregating related cases and discussing ways in which current barriers to aggregation can be overcome); Resnik, 54 Law & Contemp. Probs. at 21 ("[M]ost agree that aggregate processing—in some forum—and aggregate treatment of some mass torts in federal courts are essential."); *id.* at 45 (concluding that the question "is not whether to aggregate mass torts but what if any limits to impose").

Finally, unlike the asbestos litigation or most other mass torts, the cases that constitute this MDL will never be tried in a variety of tribunals. This MDL has a unique attribute that makes multi-plaintiff trials even more appropriate: The plaintiffs are almost exclusively from Ohio and West Virginia. As a result, the proper trial venue for nearly every case pending in this MDL is either this Court or the Southern District of West Virginia. Because there are only two viable trial venues, the available remand options for this Court are extremely limited, and thus remand likely would not accomplish the goal of quickly moving cases to trial. While the MDL strategy of remand has become an increasingly popular means to efficient resolution of an MDL, this strategy, which increases the litigation pressure on both parties by typically requiring both sides to try cases simultaneously all over the country, is not available here in its traditional

framework. Because this tool is not available to this Court, alternative means to bring about resolution are necessary, including multi-plaintiff trials.

In conclusion, the Court finds that this MDL, at this stage, calls for procedures that this Court did not find appropriate when the MDL was incipient. The Court is of the firm opinion that through the careful and prudent design and implementation of consolidated trials, the legitimate rights of all parties can be safeguarded. The Court additionally finds that any prejudice to DuPont will be eliminated or sufficiently mitigated by limiting instruction and is far outweighed by the prejudice the plaintiffs will suffer if no larger scale trial approach is taken. Consolidated multi-plaintiff trials will conserve the resources of the parties, conserve the scarce resources of this Court, and will promote the just, efficient, and fair resolution of the cases in this MDL, which all present the same claims for relief that have been extensively litigated and globally settled.

## IV.

Based on the foregoing, the Court will combine approximately five (5) cases in each trial of the Post-Settlement Cases. The Court has reviewed Plaintiffs' Proposed Case Management Order (Pls' Brief, EX. E, ECF No. 5200-5); however, DuPont has not had an opportunity to offer its input on the proposed order with the benefit of this Opinion and Order. Therefore, the parties are **DIRECTED** to meet and confer, and to jointly propose a case management order within 21 days of the date of this decision.

**IT IS SO ORDERED.**

5-13-2019
DATE

EDMUND A. SARGUS, JR.
**CHIEF UNITED STATES DISTRICT JUDGE**