IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

> Civil Action 2:13-md-2433
> JUDGE EDMUND A. SARGUS, JR.
> Chief Magistrate Judge Elizabeth P. Deavers

This document relates to: *ALL CASES*

## DISPOSITIVE MOTIONS ORDER NO. 34

### Plaintiffs' Motion for Application of Issue Preclusion/Collateral Estoppel

This matter is before the Court on Plaintiffs' Renewed[1] Motion for Partial Summary

Judgment on the Application of the Doctrine of Issue Preclusion/Collateral Estoppel ("Plaintiffs'

Renewed Motion") (*In re: E.I. du Pont de Nemours and Company C-8 Personal Injury

Litigation*, 2:13-md-2433, MDL ECF No. 5274), Defendant DuPont de Nemours and Company's

("Defendant" or "DuPont") Memorandum in Opposition to Plaintiffs' Renewed Motion (MDL

ECF No. 5278), Plaintiffs' Reply Brief in Support of their Renewed Motion (MDL ECF No.

5280), Defendant's Motion to File Sur-Reply *Instanter* (MDL ECF No. 5281), Defendant's Sur-

Reply (MDL ECF No. 5281-1), Plaintiffs' Opposition to Defendant's Motion to File Sur-Reply

*Instanter* (MDL ECF No. 5282), and Defendant's Reply Brief in Support of its Motion to File

---

[1] On January 27, 2017, a similar motion was filed on behalf of the Group 1 Plaintiffs in this MDL. (Pls.' Mot. For Summ. J. on Pls.' Negligence Claims Pursuant to the Doctrine of Issue Preclusion/Collateral Estoppel, MDL ECF No. 5056.) DuPont did not file a reply to Plaintiffs' motion because a global resolution was reached before DuPont's reply was due. (Feb. 13, 2017 Order, MDL ECF No. 5086) (vacating all then current scheduling orders). Plaintiffs filed a second collateral estoppel motion on April 19, 2019 (MDL ECF No. 5202), and Defendant filed its response on May 19, 2019 (MDL ECF No. 5208). Plaintiffs withdrew their motion on May 23, 2019, after Pretrial Order No. 51 was issued. (MDL ECF No. 5220.)

Sur-Reply *Instanter* (MDL ECF No. 5283). For the reasons set forth below, the Court **GRANTS** both motions. (MDL ECF Nos. 5274, 5281.)

## I.

The facts underlying the cases in this multidistrict litigation ("MDL") were first brought before the judiciary over 20 years ago in a West Virginia state court case. The cases involve individual plaintiffs who are all part of a class certified 18 years ago that consisted of approximately 80,000 residents of Ohio and West Virginia who drank water contaminated by releases from DuPont's Washington Works facility. All the cases purport to be subject to a settlement agreement executed 15 years ago ("*Leach* Settlement Agreement") between the class and DuPont. The record in this Court spans six and one-half years, requiring two years of supplementary court staffing, docket entries exceeding 5,200 filings, including more than 450 decisions from the Court, four month-long jury trials with three trials going to verdicts all in favor of the plaintiffs—with nearly $9 million in liability damage awards on negligence claims and $11 million in punitive damage awards. DuPont appealed the verdicts in the first trial to the United States Court of Appeals for the Sixth Circuit, the appeal received full briefing, assignment of a judicial panel, and oral argument before the panel. DuPont withdrew the appeal before decision. On the same day the appeal was withdrawn, the fourth trial was ended in its third week without a verdict from the jury. DuPont filed notice with the Security and Exchange Commission ("SEC") of a $670.7 million global settlement of the 3500-plus then-pending cases, all of which were dismissed. Since that time, 50-plus post-settlement cases have been filed in this Court, with over 70 motions currently pending, and the first trial scheduled to commence in less than two months, on January 21, 2020.

In their Renewed Motion, Plaintiffs move for the application of collateral estoppel/issue preclusion on duty, breach, general causation, interpretation of the *Leach* Settlement Agreement, and the inapplicability of the Ohio Tort Reform Act to the cases currently pending before the Court in this MDL. Generally, the doctrine of issue preclusion bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to a prior judgment. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979); *Goodson v. McDonough Power Equip., Inc.*, 2 Ohio St. 3d 193, 195 (1983). "By 'preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate,'" collateral estoppel protects against "the expense and vexation attending multiple lawsuits, conserv[es] judicial resources, and foste[rs] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (alterations in original) (quoting *Montana v. United States*, 440 U.S. 147, 153–54 (1979)).

The Court herein provides an overview of only the aspects of this case necessary to reach the issues presently before it.

## A.     West Virginia Lawsuits

In 1998, in a case styled *Tennant v. E.I. du Pont de Nemours & Co., Inc.*, No. 6:99-0488 (S.D. W.Va.), discovery brought to light the fact that the drinking water supplies around DuPont's Washington Works facility in Parkersburg, West Virginia were contaminated with a synthetic perfluorinated carboxylic acid and fluorosurfactant also known as perfluorooctanoic acid or ammonium perfluorooctanoate ("PFOA" or "C-8"). (Pls' Mot. for Partial Summ. J., Bilott Aff. Ex. B, MDL ECF No. 820-4.) C-8 is in "a family of human-made chemicals that do not occur naturally in the environment." (*Public Health Statement* at 3, Dept. of Health and Human Serv., Public Health Service Agency for Toxic Substances and Disease Registry,

3

https://www.atsdr.cdc.gov/toxprofiles/tp200-c1-b.pdf.) C-8 "stays in the body for many years. It takes approximately 4 years for the level in the body to go down by half, even if no more is taken in." *Id.* Testimony before this Court, from experts presented by Plaintiffs and DuPont, indicates that the stability of C-8 prevents the breakdown not only in the human body, but also in the environment, resulting in half-life residuals of the chemical in a human body for decades of years. (*See, e.g.,* Bartlett Tr. Transcript at 22, *Carla Marie Bartlett v. E. I. du Pont de Nemours and Company*, Case No. 2:13-cv-170, Bartlett ECF No. 127.)

Eighteen years ago, a group of individuals who had ingested the contaminated water in Ohio and West Virginia filed a class action in West Virginia state court: *Leach v. E. I. Du Pont de Nemours & Co.*, No. 01-C-608 (W. Va. Cir. Ct. Wood County Aug. 31, 2001) ("*Leach* Case"). The *Leach* Case plaintiffs alleged that DuPont was liable under a variety of West Virginia common law tort theories for equitable, injunctive, and declaratory relief, along with compensatory and punitive damages, as a result of contaminating with C-8 the drinking water supplies of the communities surrounding Washington Works. DuPont did not, and still does not, dispute that from its Washington Works facility DuPont discharged C-8 into the water, air, and unlined landfills around the facility or that the landfills seeped C-8 into the soil, the Ohio river carried the C-8 down-river, and the air currents carried the ash that fell to the ground, all of which contributed to the contamination of the drinking water reservoirs.

After three years of litigating the *Leach* Case, including widespread discovery, extensive motion practice, and three appeals taken to the West Virginia Supreme Court of Appeals, the parties executed the *Leach* Settlement Agreement to effectuate a class-wide settlement of the *Leach* Case. (*Leach* Settlement Agreement ("S.A."), MDL ECF No. 820-8.)

In the *Leach* Settlement Agreement, the parties fashioned a unique procedure to determine whether the approximately 80,000 members of the *Leach* Class would be permitted to file actions against DuPont based on any of the human diseases they believed had been caused by their exposure to C-8 discharged from DuPont's Washington Works plant. The procedure required DuPont and the *Leach* Class to jointly select three completely independent, mutually-agreeable, and appropriately credentialed epidemiologists ("Science Panel") to study human disease among the *Leach* Class. The *Leach* Class consisted of those individuals who for at least one year, had "consumed drinking water containing .05 ppb or greater of C-8 attributable to releases from Washington Works." (S.A. § 2.1.1.)

Until the Science Panel reached its conclusions, the *Leach* Class members were not permitted to file any personal injury claims relating to C-8 exposure. For over seven years, the Science Panel conducted a massive epidemiological study costing over $24 million to determine whether any of the diseases suffered by members of the *Leach* Class were linked to their ingestion of C-8.

In 2012, the Science Panel delivered Probable Link Findings for six human diseases ("Linked Diseases"): kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, diagnosed high cholesterol (hypercholesterolemia), and pregnancy-induced hypertension and preeclampsia. The Probable Link Finding means that for each *Leach* Class member it is more likely than not that there is a link between his or her exposure to C-8 (*i.e.*, drinking water containing at least .05 ppb of C-8 for at least one year) and his or her Linked Disease.

In addition to the seven-year reprieve from defending any litigation related to its discharge of C-8 into the drinking water of approximately 80,000 people, DuPont received the benefit of No Probable Link Findings for 50 diseases also studied by the Science Panel. Once a

No Probable Link Finding issued, DuPont was "*forever discharge[d] from any and all claims,* losses, damages, attorneys' fees, costs, and expenses, whether asserted or not, accrued or not, known or unknown, for personal injury and wrongful death . . . ." (S.A. § 3.3) (emphasis added). In other words, under the terms of the *Leach* Settlement Agreement all of the *Leach* Class members who received a No Probable Link Finding *were prohibited* from filing a personal injury action against DuPont, regardless of whether any other study or expert disagreed with the Science Panel or later scientific studies were at odds with the Science Panel's No Probable Link Findings.

Under the *Leach* Settlement Agreement, the *Leach* Class and DuPont agreed that the members of the *Leach* Class who suffered from a Linked Disease were entitled to have the Probable Link Finding applied to them. That means that it is more likely than not that there is a link between the class members' exposure to C-8 and their Linked Disease, (*i.e.*, the Probable Link Finding), and DuPont agreed not to contest whether C-8 is capable of causing the Linked Disease in that particular class member (general causation). DuPont retained the right to contest whether C-8 actually caused the Linked Disease in that particular class member (specific causation).

## B.    DuPont's Request for an MDL

In September 2012, a few months after issuance of the Probable Link Findings, the first case filed by a member of the *Leach* Class pursuant to the *Leach* Settlement Agreement was brought in this Court. At the same time, members of the *Leach* Class were filing cases in the federal district courts in West Virginia and Ohio as well as in state courts in West Virginia and Ohio.

On January 11, 2013, DuPont moved the Judicial Panel on Multidistrict Litigation ("JPML"), pursuant to 28 U.S.C. § 1407, for pretrial consolidation of the *Leach* Class cases, asserting that forming the MDL would "promote the just and efficient conduct of the actions," and because "consolidation in a single District will likely promote early and efficient resolution of all the cases." (Def's Mem. in Support of Mot. for Coordination and Consolidation at 7, JPML ECF No. 1-1.) DuPont argued in favor of consolidation, highlighting:

> The complaints each involve the *same core factual allegations regarding DuPont's conduct,* and also raise the same theories of legal liability.
>
> Transferring the pending and subsequent tag-along cases to one court pursuant to 28 U.S.C. § 1407 will eliminate duplicative discovery, including expert discovery, avoid repetitive and duplicative motion practice and inconsistent rulings on a number of pre-trial issues involving discovery and substantive matters, and conserve the resources of the courts and the parties.

*Id.* at 1 (emphasis added). DuPont continued, stating:

> Transferring the cases to one District for coordinated and consolidated pretrial proceedings will promote the convenience and conserve the resources of the courts, witnesses and the parties. Many witnesses in these cases will be current or former DuPont employees. Absent a transfer, these employees will be subjected to multiple depositions in multiple jurisdictions.
>
> Also, DuPont would be subjected to multiple document requests and other written discovery. Having to undergo such discovery multiple times would be unduly burdensome to the witnesses, the parties, and their counsel. Thus, a transfer will minimize the heavy burden that these cases proceeding separately will otherwise place on the witnesses, the parties, the attorneys, and the courts.

*Id.* at 6.

Finally, DuPont addressed settlement of the cases, specifically asserting that it sought consolidation so that "[t]he transferee court will be able to explore various alternatives to resolve the case in an expeditious manner." *Id.*

On April 4, 2013, the JPML granted DuPont's request for centralization and chose this Court to preside over the MDL. In its Transfer Order (MDL ECF No. 1), the JPML indicated

7

that the cases that make up this MDL, *In Re: E. I. Du Pont De Nemours And Company C-8 Personal Injury Litigation*, are a subset of cases that originated in the *Leach* Case. It held:

> On the basis of the papers filed and the hearing session held, we find that these actions involve common questions of fact, and that centralization under Section 1407 in the Southern District of Ohio will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. All the actions are personal injury or wrongful death actions arising out of plaintiffs' alleged ingestion of drinking water contaminated with a chemical, C-8 (also known as perfluorooctoanoic acid (PFOA) or ammonium perfluorooctanoate (APFO)), discharged from DuPont's Washington Works Plant near Parkersburg, West Virginia. All of the plaintiffs in this litigation allege that they suffer or suffered from one or more of six diseases identified as potentially linked to C-8 exposure by a study conducted as part of a 2005 settlement between DuPont and a class of approximately 80,000 persons residing in six water districts allegedly contaminated by C-8 from the Washington Works Plant. *See Leach v. E.I. Du Pont de Nemours & Co.*, No. 01-C-608 (W. Va. Cir. Ct.). Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel and the judiciary.

*Id.* at 1.

## C.    MDL

Through direct filing, removals, and Conditional Transfer Orders from the JPML, this Court ultimately had over 3,500 cases before it as part of this MDL. Beginning in the first month this MDL was centralized, the Court held monthly Case Management Conferences. The Court managed pretrial discovery and motion practice, issuing hundreds of Dispositive Motions Orders ("DMOs"), Case Management Orders ("CMOs"), Pretrial Orders ("PTO's"), Discovery Orders, Evidentiary Orders, and written and oral Orders on Motions *in Limine,* many of which are specified individually in PTO 51. (PTO No. 51 at 6–15, MDL ECF No. 5214.)

### 1.    DMO 1 and DMO 1-A: Collateral Estoppel and Contract Interpretation

The initial issues brought by the parties to this Court for disposition were issues that impacted all of the plaintiffs that were a part of this MDL. Specifically, Plaintiffs filed a Motion

for Partial Summary Judgment (MDL ECF No. 820), asking this Court to apply the doctrine of collateral estoppel to certain issues established in the *Leach* Settlement Agreement. (MDL ECF No. 820-1.) DuPont filed a Counter Motion for Partial Summary Judgment Regarding Application of the *Leach* Settlement Agreement. (MDL ECF No. 1032.) In that motion, DuPont stated:

> DuPont respectfully requests that this Court enter an Order finding as a matter of law that there are no material issues of fact as to the application of the *Leach* Settlement Agreement to the individual personal injury and wrongful death actions consolidated in this MDL, and that DuPont's statements of the issues regarding: (1) the definition of "Class Member;" (2) the scope of "General Causation;" and (3) proof of dose required to establish specific causation are accurate.

(Def's Mot. for Summ. J. at 1, MDL ECF No. 1032.)

In reply, Plaintiffs focused on the points of agreement between them and DuPont. (*See* Pls.' Reply at 4–10, MDL ECF No. 1152.) Specifically, that both agreed that the unambiguous language of the *Leach* Settlement Agreement was binding upon all parties to this MDL. *Id.* And, the *Leach* Settlement Agreement dictated the issues of class membership, the scope of general and specific causation, and the application of the Probable Link and No Probable Link Findings as those terms are defined in the Agreement. *Id.*

In deciding these cross-motions for summary judgment, the Court issued its first order on dispositive motions directing it to "ALL CASES," titling it: "DMO 1, Class Membership and Causation." (MDL ECF No. 1679.) In DMO 1, the Court denied DuPont's Counter Motion for Partial Summary Judgment Regarding Application of the *Leach* Settlement Agreement and granted in part Plaintiffs' Motion for Partial Summary Judgment.

With regard to class membership, the Court held:

> As to class membership, both sides agree, and this Court finds, that as part of the individual plaintiffs' cases, they must show that they are a class member and

9

that they have one or more of the Linked Diseases. To prove class membership, a plaintiff must show that he or she, "for the period of at least one year," has "consumed drinking water containing .05 ppb or greater of C-8 attributable to releases from [DuPont's] Washington Works" plant from any of the "six specified Public Water Districts" or any of the Covered Private Sources named in the *Leach* Settlement Agreement. (S.A. § 2.1.1.)

(DMO 1, Class Membership and Causation at 7, MDL ECF No. 1679.)

As to causation, the Court reviewed both parties' interpretations of the *Leach* Settlement Agreement and analyses of its application to evidence of general and specific causation and concluded: "For several reasons, DuPont's analysis is not tenable under the *Leach* Settlement Agreement." *Id.* at 9. The Court then provided a detailed interpretation of the *Leach* Settlement Agreement, including the Probable Link Findings and the No Probable Link Findings, general and specific causation, and application of these terms to the members of the defined *Leach* Class.

Thereafter, DuPont filed a document titled: "DuPont's Overview Brief on Causation Issues," which reargued its positions related to interpretation of the *Leach* Settlement Agreement. (MDL ECF No. 2813.) On the same day, DuPont filed a Motion to Clarify DMO 1, which "incorporate[ed] by reference its separate Overview Brief on Causation Issues." (MDL ECF No. 2814.)

After full briefing, the Court issued DMO 1-A, which granted DuPont's Motion "to the extent it requested the Court to clarify DMO 1" and denied the Motion "in all other regards." (DMO 1-A, DuPont's Motion for Clarification of DMO 1, Class Membership and Causation at 11, MDL ECF No. 3972) ("Nothing DuPont brings before the Court in its Motion for Clarification or Overview of Causation calls into question any of the Court's analysis in DMO 1. However, the Court will provide further explanation of this important issue here and address the arguments DuPont highlights in its current briefing."). The Court then endeavored to articulate

in more detail the terms of the *Leach* Settlement Agreement and explain again why DuPont's suggested interpretation was incorrect.

### 2. Ohio Tort Reform Act

Under the Ohio Tort Reform Act of 2004, effective April 7, 2005, the Ohio Revised Code was amended to, *inter alia*, cap the amount of noneconomic damages recoverable in tort actions and cap the amount of punitive damages. Ohio Rev. Code §§ 2315.1–21. This Court has considered whether this Act applies several times during the pendency of this MDL, and has consistently determined that the Tort Reform Act does not apply. (DMO 10, Order on Application of Ohio Tort Reform Act, MDL ECF No. 4215); (DMO 12, Order on Defendant's Motion for Judgment as a Matter of Law or, Alternatively, for a New Trial and Remittitur, MDL ECF No. 4306); (DMO 18, Order on DuPont's Motion for an Order to Apply Ohio Tort Reform Act, MDL ECF No. 4597); (DMO 23, Order on DuPont's Motion for an Order to Apply Ohio Tort Reform Act, MDL ECF No. 4931); (DMO 29, Order on DuPont's Motion for an Order to Apply Ohio Tort Reform Act, MDL ECF No. 5007).

### 3. Trials

Within the first few months of this MDL, the Court and the parties focused upon the selection of cases to be utilized as bellwether trials. The Manual for Complex Litigation, a litigation manual produced by federal judges for use by other judges, states that bellwether trials are meant to "produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims . . . and what range of values the cases may have." *The Manual for Complex Litigation*, § 22.315.

By February 2014, the parties selected six representative cases to be utilized as the bellwether trials. (CMO 6, Identification & Selection of Discovery Pool Plaintiffs, MDL ECF

No. 194); (CMO 7, Selection of the Initial Trial Cases and Expert Disclosures Schedule, MDL ECF No. 602). The Court ultimately accepted the six cases to serve as bellwether trials – three Plaintiffs' Steering Committee ("PSC") choices and three chosen by DuPont. (CMO 2, § VI, ECF No. 30; PTO 19, May 6, 2014 Conf. Order at 2, MDL ECF No. 265); (CMO 7, Selection of the Initial Trial Cases and Expert Disclosure Schedule, MDL ECF No. 602); (CMO 9, Pretrial Schedule for Initial Two Trial Cases, MDL ECF No. 3549); (CMO 10, Pretrial Schedule for Bartlett Trial, MDL ECF No. 4183); (CMO 11, 12, Pretrial Schedules for Wolf Trial, MDL ECF Nos. 4247, 4250); (CMO 13, Pretrial Schedule for Freeman Trial, MDL ECF No. 4263); (CMO 14, Pretrial Schedule for Dowdy Trial, MDL ECF No. 4268); (CMO 15, Pretrial Schedule for Baker Trial; MDL ECF No. 4269).

The first bellwether case was selected by DuPont and involved the claims of Carla Marie Bartlett, who had suffered from the Linked Disease kidney cancer: *Carla Marie Bartlett v. E. I. du Pont de Nemours and Company*, Case No. 2:13-cv-170. Mrs. Bartlett's trial began on September 14, 2015, and lasted approximately one month. The jury found in favor of Mrs. Bartlett on her negligence claim, meaning that they unanimously concluded that she proved by a preponderance of the evidence each of the following: "(1) DuPont owed Mrs. Bartlett a duty of care; (2) DuPont breached its duty of care to Mrs. Bartlett; and (3) Mrs. Bartlett suffered an injury as a proximate result of DuPont's breach of the duty of care." (Final Jury Instructions at 20, Negligence – Generally, Ordinary Care, Bartlett ECF No. 139.)[2] The Court instructed the jury as follows:

---

[2] The parties do not dispute that it matters not whether Ohio or West Virginia law applies to an individual Plaintiff's claim because, as this Court has recognized, "[w]ith regard to the issue of duty, the law in Ohio and West Virginia is nearly identical." (DMO 6 at 6, MDL ECF No. 4184.)

## NEGLIGENCE - DUTY

To prove the existence of a duty, Mrs. Bartlett must show by a preponderance of the evidence that a reasonably prudent person would have foreseen that injury was likely to result to someone in Mrs. Bartlett's position from DuPont's conduct. In deciding whether reasonable prudence was used, you will consider whether DuPont should have foreseen, under the circumstances, that the likely result of an act or failure to act would cause injuries. The test for foreseeability is not whether DuPont should have foreseen the injuries exactly as it happened to Mrs. Bartlett. The test is whether under the circumstances a reasonably prudent corporation would have anticipated that an act or failure to act would likely cause injuries.

*Id.* at 21.

## NEGLIGENCE – BREACH

If you find that DuPont owed Mrs. Bartlett a duty, you must next determine whether DuPont breached that duty. A corporation breaches a duty by failing to use ordinary care. As I have just instructed, ordinary care is the care that a reasonably careful corporation would use under the same or similar circumstances.

If you decide that DuPont did not use ordinary care, then DuPont breached its duty of care to Mrs. Bartlett. If you decide that DuPont did use ordinary care, then DuPont did not breach its duty of care to Mrs. Bartlett.

*Id.* at 22.

## NEGLIGENCE – PROXIMATE CAUSE

Mrs. Bartlett must prove not only that DuPont was negligent, but also that such negligence was a proximate cause of her injuries. Proximate cause is an act or failure to act that was a substantial factor in bringing about an injury and without which the injury would not have occurred.

*Id.* at 23.

## NEGLIGENCE – PROXIMATE CAUSE – FORSEEABLE INJURY

I will now discuss how to determine whether Mrs. Bartlett's injury was the natural and probable consequence of DuPont's conduct. To prove proximate cause, Mrs. Bartlett must show that her injuries were a natural and probable consequence of DuPont's conduct.

> For Mrs. Bartlett's injuries to be considered the natural and probable consequence of an act, Mrs. Bartlett must prove that DuPont should have foreseen or reasonably anticipated that injury would result from the alleged negligent act. The test for foreseeability is not whether DuPont should have foreseen the injury exactly as it happened to Mrs. Bartlett. Instead, the test is whether under the circumstances a reasonably careful person would have anticipated that an act or failure to act would likely result in or cause injuries.

*Id.* at 24.

The Jury found in favor of Mrs. Bartlett on her negligence claim, awarding her $1.1 million and also awarding her $500,000 on her negligent infliction of emotional distress claim. (Jury Verdict, Bartlett ECF No. 142.) The Court accordingly entered judgement in favor of Mrs. Bartlett. (Civil Judgment, Bartlett ECF No. 144.)

On February 3, 2016, DuPont settled the second bellwether case that was scheduled for trial the following month.

On May 31, 2016, a jury was seated for the third bellwether trial, which was the second to be tried: *Freeman v. E. I. du Pont de Nemours and Co.*, 2:13-cv-1103. Mr. Freeman suffered from the Linked Disease testicular cancer. The trial lasted six weeks. The jury instructions were an exact duplicate of those provided in the *Bartlett* trial. (Final Jury Instructions at 19–24, Freeman ECF No. 102.)

On July 6, 2016, the jury delivered a verdict in favor of Mr. Freeman on his negligence claim, awarding him $5.1 million. (Jury Verdict Form For Negligence Claim at 1, Freeman ECF No. 97.) Additionally, the jury answered affirmatively the single interrogatory:

> If you found in favor of Mr. Freeman on his negligence claim, do you find that Mr. Freeman has proven by clear and convincing evidence that DuPont acted with actual malice and that Mr. Freeman has presented proof of actual damages that resulted from those acts or failures to act of DuPont? ("Actual malice" means a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.)

(Jury Verdict Interrogatory at 2, Freeman ECF No. 97.)

The Court therefore moved into phase two of the trial, which lasted less than one (1) day. (Civ. Minutes at 1, Freeman ECF No. 98.) The jury found in favor of Mr. Freeman on his punitive damages claim, awarding him $500,000. (Jury Verdict Form at 1, Freeman ECF No. 100.) The Court thus entered judgment in favor of Mr. Freeman. (Judgment in a Civ. Case, Freeman ECF No. 101.)

Thereafter, DuPont's counsel informed the Court that the last two bellwether cases had settled. No bellwether cases remained; the parties notified the Court that there were no ongoing negotiations. The Court, therefore, turned its attention to the effective administration of the thousands of cases that constituted this MDL, as explained in CMO 20. (CMO 20, Order on Defendant's Objection to the November 2016 and January 2017 Trial Schedules, MDL ECF No. 4624.)

On July 18, 2016, the PSC selected Kenneth Vigneron, Sr., for the already scheduled November 2016 trial: *Kenneth Vigneron, Sr. v. E. I. du Pont de Nemours Company*, Case No. 13-cv-136. (CMO No. 18, Pretrial Schedule for Vigneron Trial, MDL ECF No. 4588.) Mr. Vigneron had suffered from the Linked Disease testicular cancer. Mr. Vigneron's trial began on November 14, 2016, and lasted approximately five weeks. The jury instructions on the negligence claim were the same as those provided in the *Bartlett* and *Freeman* trials. (Final Jury Instructions at 20–24, Vigneron ECF No. 195.)

On December 21, 2016, the jury delivered a verdict in favor of Mr. Vigneron on his negligence claim, awarding him $2 million. (Jury Verdict Form For Negligence Claim at 1, Vigneron ECF No. 176.) Additionally, as was the case in the *Freeman* trial, the jury answered affirmatively the single interrogatory that led to the punitive damages phase of the trial, which lasted less than one day. (Jury Verdict Form For Negligence Claim, Vigneron ECF No. 176 at 2;

Civ. Minutes at 1, Vigneron ECF No. 192.) The jury found in favor of Mr. Vigneron, awarding him $10.5 million in punitive damages. (Jury Verdict Form at 1, Vigneron ECF No. 193.)

The fourth trial began on January 18, 2017: *Larry Ogle Moody v. E. I. du Pont de Nemours Company*, Case No. 15-cv-803. (CMO 19, Pretrial Schedule for Moody Trial, MDL ECF No. 4591.) The plaintiff, Larry Ogle Moody, had suffered from the Linked Disease testicular cancer. During the third week of Mr. Moody's trial, the case was reported settled, and the trial was discontinued at DuPont's request. (Civ. Minutes at 1, Moody ECF No. 60.)

## D. Appeal to the Sixth Circuit

On October 27, 2015, DuPont filed in the *Bartlett* case its Motion for Judgment as a Matter of Law or, Alternatively, for a New Trial and Remittitur, which was fully briefed by December 2015. (Bartlett ECF Nos. 151, 158, 159.) DuPont argued that it was entitled to judgment as a matter of law or a new trial. DuPont highlighted this Court's interpretation of the *Leach* Settlement Agreement as set forth in DMO 1 and DMO 1-A, stating:

> Pursuant to Fed. R. Civ. P. 50(b) and Fed. R. Civ. P. 59(a), Defendant E. I. du Pont de Nemours and Company ("DuPont") hereby moves for judgment as a matter of law or alternatively, for a new trial and/or remittitur on Plaintiff Carla Bartlett's claims.
>
> Most fundamentally, the Court's erroneous interpretation of the *Leach* Class Action Settlement Agreement ("*Leach* Settlement") constituted a threshold error that pervasively impacted the trial and negated fundamental terms that were the very basis for resolving the *Leach* class action. The Court rewrote the unambiguous agreement not to contest general causation and interjected an improper assumption that a *prima facie* case on specific causation existed—in direct contradiction of both the *Leach* Settlement and the Science Panel's probable link finding.

(Def's Mot. for Judgment and New Trial at 1, Bartlett ECF No. 151.)

In denying DuPont's post-trial motion, the Court explained in detail "why DuPont's position on causation conflates the parties' unambiguous definitions of general and specific causation that they set forth in the *Leach* Settlement Agreement and effectively rewrites the

Agreement's provisions related to the function and application of the Probable Link Findings." (DMO 12 at 35, Bartlett ECF No. 161.)

On March 17, 2016, DuPont filed an appeal with the United States Court of Appeals for the Sixth Circuit, bringing four issues before it, with only three being relevant to the issues currently before the Court.[3] (*Barlett v. E. I. du Pont De Nemours and Company*, Sixth Circ. Case No. 16-3310, Appellant Brief.)

As to the first and second issues appealed, DuPont steadfastly presented the argument that this Court's interpretation of the *Leach* Settlement Agreement was the fundamental error that subjected DuPont to an unfair trial not only in *Bartlett* but also in each and every case that was before the Court in this MDL:

> A threshold contract interpretation error eliminated the heart of a critical defense for DuPont in each of the 3,500 cases in this MDL. . . .

> The district court's contract interpretation error can best be understood as an improper interpretation of the class definition, the defined terms "Probable Link," "General Causation," and "Specific Causation," and how those terms interrelated and fit in the context of the Agreement.

(*Id.*, Appellant Brief at 1, 18.)

DuPont's second assignment of error related to certain evidence heard by the jury from one of Mrs. Bartlett's expert witnesses, which DuPont tied to this Court's interpretation of the *Leach* Settlement Agreement, titling the section: "The District Court's Erroneous Interpretation Of The Agreement Distorted The Evidence At Trial." *Id.* at 32. Thus, this issue also hinged on whether the Sixth Circuit agreed with DuPont that this Court erroneously interpreted the *Leach* Settlement Agreement.

---

[3] DuPont also appealed the jury instructions setting out the law of Mrs. Bartlett's negligent infliction of emotional distress claim. No other MDL plaintiff has alleged a stand-alone claim for negligent infliction of emotional distress.

As to the Tort Reform Act, DuPont's third assignment of error, DuPont argued that this Court erred by refusing to reduce the jury award under the Ohio Tort Reform Act. DuPont asserted that, "[i]f the [Sixth Circuit] agrees with some or all of the arguments [made in this appeal], it would remand for a new trial, clarifying that the Tort Reform Act applies. If it does not grant a new trial, it would still remand for application of the Act to the jury's verdict reducing the total damages to $250,000." *Id.* at 51 n.4.

DuPont and the PSC on behalf of Mrs. Bartlett fully briefed the appeal, were assigned a judicial panel, and vigorously presented their case at oral argument. *See:* http://www.opn. ca6.uscourts.gov/internet/court_audio /aud2.php?link=audio/12-09-2016%20-%20Friday/16-3310%20Carla%20 Marie%20Bartlett %20v%20E%20I%20 DuPont%20de%20Nemours %20et% 20al.mp3&name =16-3310%20Carla%20Marie%20 Bartlett%20v%20E%20I%20 DuPont%20de%20Nemours%20et%20al (full transcript of oral argument).

Before the Sixth Circuit had the opportunity to issue its decision on DuPont's appeal, DuPont informed this Court that it had contacted the Sixth Circuit asking it to hold the decision because the *Bartlett* case had been settled along with the other cases in the MDL. On that day, February 13, 2017, the Court was nearing the end of the fourth trial held in this MDL, *Larry Ogle Moody v. E. I. du Pont de Nemours Company*, Case No. 15-cv-803. DuPont asked this Court to wait to inform the litigants of the settlement because DuPont was required to file certain documents with the SEC before publicizing the settlement.

On that same day, February 13, 2017, DuPont filed with the SEC a notice of its settlement, indicating that it would pay $670.7 million to the *Leach* Class, "half of which will be

paid by Chemours[4] and half paid by DuPont." https://www.sec.gov/Archives/edgar/data/30554/000110465917008291/a17-4311_18k.htm DuPont specified in the SEC Notice how future Washington Works C-8 liability would be paid, stating:

> DuPont and Chemours have also agreed, subject to and following the completion of the Settlement, to a limited sharing of potential future PFOA liabilities (*i.e.*, "indemnifiable losses," as defined in the separation agreement between DuPont and Chemours (the "Separation Agreement")) for a period of five years.

> During that five-year period, Chemours would annually pay future PFOA liabilities up to $25 million and, if such amount is exceeded, DuPont would pay any excess amount up to the next $25 million (which payment will not be subject to indemnification by Chemours), with Chemours annually bearing any further excess liabilities.

> After the five-year period, this limited sharing agreement would expire, and Chemours' indemnification obligations under the Separation Agreement would continue unchanged.

*Id.*

## II.

As anticipated by DuPont, the C-8 litigation did not end with the global settlement. The JPML continued to conditionally transfer cases to this Court after the global settlement, and the Court currently has over 50 new cases that are a part of this MDL – all cases brought by alleged *Leach* Class members suffering from the Linked Disease testicular cancer and/or the Linked Disease kidney cancer ("Post-Settlement Cases").

DuPont moved the JPML "to vacate [its] orders that conditionally transferred" these actions "for inclusion in MDL No. 2433" for several reasons, but primarily because "pretrial

---

[4] The SEC Notice states that DuPont owned the Washington Works plant during the time period the C-8 was released and the facility "is now owned and/or operated by The Chemours Company." https://www.sec.gov/Archives/edgar/data/30554/000110465917008291/a17-4311_18k.htm

proceedings in MDL No. 2433 [we]re complete." (Transfer Order, MDL ECF No. 5130.) The JPML denied DuPont's request, finding that the actions are "best coordinated by the Honorable Edmund A. Sargus, Jr., who is intimately familiar with the factual and legal issues in this litigation." *Id.* at 1. The JPML highlighted that "these actions will involve similar, if not identical, pretrial motion practice." *Id.* It further found that "[t]ransfer of these actions to the MDL thus will eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel, and the judiciary." *Id.* at 2.

Therefore, the Court followed the familiar, well-trodden path, meeting monthly with the parties and issuing numerous management, pretrial, and evidentiary orders directed at the Post-Settlement Cases. (CMO 24, Management of Newly-Filed, Post-Settlement Cases, MDL ECF No. 5140); (CMO 25, Initial Scheduling of Post-Settlement Cases, MDL ECF No. 5159); (PTO 48, Changed Directions for Selection of Trial Cases, MDL ECF No. 5177); (CMO No. 26, Pretrial and Trial Schedule for Swartz Trial, MDL ECF No. 5185); (CMO No. 27, Pretrial and Trial Schedule for Abbott Trial, MDL ECF No. 5186); (CMO No. 28, Discovery, Pretrial, and Trial Management of the Post-Settlement Cases, MDL ECF No. 5188); (PTO No. 49, Memorializing January 29, 2019 Conference, MDL ECF No. 5191); (PTO 50, Memorializing May 18, 2019 Conference, MDL ECF No. 5197); (PTO No. 51, Consolidation of Cases for Trial, MDL ECF No. 5214); (Discovery Order No. 13, Defendant's Motion to Permit Rule 35 Medical Examination in *Swartz*, 2:18-cv-136, MDL ECF No. 5238); (DMO No. 30, Granting in Part Plaintiffs' Motion for Clarification Regarding the Inapplicability of the Ohio Tort Reform Act, MDL ECF No. 5231); (DMO No. 31, Denying Defendants' Motion to Apply Tort Reform Act to the *Swartz* Case, 2:18-cv-136, MDL ECF No. 5232); (PTO No. 52, Case Selection for Post-Settlement Joint Trial No. 1, MDL ECF No. 5233); (CMO No. 29, Initial Pretrial Schedule for

Joint Trial No. 1, MDL ECF No. 5234); (PTO No. 53, Joint Status Report, MDL ECF No. 5236); (DMO No. 32, Defendant's Motion to Reconsider Prior Rulings, MDL ECF No. 5241); (DMO No. 33, Denying Defendant's Motion to Reconsider Prior Rulings on Science Panel, MDL ECF No. 5245); (CMO No. 30, Pretrial and Trial Schedule for Joint Trial No. 1, MDL ECF No. 5248); (PTO No. 54, Clarification of PRO Numbers, MDL ECF No. 5253); (EMO No. 25, Defendant's Motion to Exclude Corporate Conduct Expert Opinion, MDL ECF No. 5254); (EMO No. 26, Defendant's Motion to Exclude or Limit Dr. Barry S. Levy's Trial Testimony, MDL ECF No. 5255); (Discovery Motions Order No. 16, Plaintiffs' Motion for a Protective Order from Deposition of Bernard Reilly, JDL ECF No. 5256); (Pretrial Order No. 51-A, Consolidation of Cases for Trial, MDL ECF No. 5279).

The first two of the Post-Settlement Cases to be tried have been selected and are currently being prepared for trial. *Angela and Teddy Swartz v. E. I. du Pont de Nemours Company*, Case No. 2:18-cv-136; *Travis and Julie Abbott v. E. I. du Pont de Nemours Company*, Case No. 2:17-cv-998. These two plaintiffs allege that they are members of the *Leach* Class who suffer from kidney and testicular cancers, respectively. The plaintiffs' spouses also bring loss of consortium claims. Mrs. Swartz and Mr. Abbott, as well as the other plaintiffs who have filed Post-Settlement cases, make the same allegations previously made by the 3,500-plus plaintiffs who were part of the global settlement.

Plaintiffs' claims for strict product liability under the Ohio Product Liability Act, Ohio Rev. Code § 2307.71(B), consumer protection claims under Ohio and West Virginia Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 *et seq.*, W. Va. Code § 46A-6-106(a), trespass to persons, and ultrahazardous or abnormally dangerous activity were precluded from trial based on this Court's grant of summary judgment to DuPont on these claims. (DMO 4, Def's Mot. for

Summ. J., MDL ECF No. 3973.)  Pursuant to this Court's previous interpretation of the *Leach* Settlement Agreement, the parties will try their negligence and punitive damages claims.

DuPont utilizes the same defenses it has since the inception of this MDL.  In that vein, similar to its requests made before the first trial in this MDL in DuPont's Counter Motion for Partial Summary Judgment (MDL ECF No. 1032), DuPont's Overview Brief on Causations Issues (MDL ECF No. 2813), DuPont's Motion for Clarification Regarding DMO No. 1, Class Membership and Causation (MDL ECF No. 2814), DuPont's Post Trial Motion (Bartlett ECF No. 151), and before the Sixth Circuit (App. No. 16-3310), DuPont again moved the Court to adopt its interpretation of the *Leach* Settlement Agreement.  DuPont presented the request as one for this Court to modify its previous interpretations of the *Leach* Settlement Agreement, which, DuPont continues to maintain are mischaracterizations of the terms of the contract.  DuPont made its request in two motions:  "DuPont's Motion to Exclude Mischaracterizations Related to the Science Panel and the Probable Link Findings from the *Swartz* Case" and "DuPont's Motion for Interpretation of the *Leach* Agreement with Respect to Specific Causation in the *Swartz* Case."  (Swartz ECF Nos. 50, 51.)

DuPont framed its request as follows:

> While the Court has previously made various rulings regarding contract interpretation and causation issues, DuPont presents new arguments, new facts, and new case law.  DuPont also focuses here on the critical specific causation issues that will be a key part of the *Swartz* trial, and therefore seeks modifications of the Court's prior rulings involving contract interpretation in the context of the *Swartz* case.

(DuPont's Mot. for Interp. of the *Leach* Settlement Agreement at 1–2, Swartz ECF No. 51.)

Regardless of how DuPont titled the two motions or couched its arguments in them, there are no "new arguments, new facts, [or] new case law" that impact the Court's interpretation of the *Leach* Settlement Agreement – nor does DuPont claim that there are.  Instead, the

"arguments" have been made *numerous* times to this Court, as well as before the Sixth Circuit. Nevertheless, even if any of the arguments were considered to be "new," (which they are not) nothing prevented DuPont from previously raising them. Any arguments that were available but not made do not justify this Court revisiting final and binding decisions interpreting the *Leach* Settlement Agreement. DuPont points to no law that supports this proposition.

Additionally, the "facts" that are different between class members (*e.g.*, their age, sex, medical histories, illnesses, water consumption locations, etc.), are relevant to specific causation (which will not be precluded) but have no relevance to the Court's contract interpretation. There are no individualized facts from any of the prior trials that had any effect at all on this Court's interpretation of the *Leach* Settlement Agreement. This Court's interpretation of the *Leach* Settlement Agreement has remained consistent and the Court has applied its interpretation of the Agreement to the facts of each of the four prior cases that went to trial.

Finally, no "new law" issued after this Court's decisions interpreting the *Leach* Settlement Agreement that has changed the applicable legal landscape. Indeed, DuPont does not claim that there is. Rather, DuPont merely contends that it "*presents* . . . new case law." *Id.* at 1 (emphasis added). In other words, the new case law to which DuPont refers is merely a selection of cases that DuPont contends support its position and upon which it previously did not rely. To the extent that DuPont may reference cases issued after this Court's judgment and/or DuPont's appeal, nothing changed the law upon which this Court relied. And, again, DuPont makes no claim otherwise.

Consequently, the day after DuPont filed the two motions asking for modification of the *Leach* Settlement Agreement, this Court denied them both in DMO 32, highlighting that it would not reconsider its contract interpretation. (DMO 32, Defendant's Motion to Reconsider Prior

Rulings, MDL ECF No. 5241, Swartz ECF No. 57.) The Court issued DMO 32 before it permitted briefing on the issue, explaining *inter alia* that:

> A Court does a grave injustice to the judicial system if it continues to utilize scarce judicial resources to address issues that the parties have had a full and fair opportunity to litigate. The Court's declination to address these issues again not only protects judicial resources but also protects the parties from the expense and vexation attendant to multiple, repetitive briefing of the same issue and fosters reliance on judicial action.

*Id.* at 3.

As to the issue of the Tort Reform Act, Plaintiffs filed a Motion for Clarification Regarding the Inapplicability of the Ohio Tort Reform Act to Plaintiffs' Claims, in which they asked this Court to rule consistently with the prior decisions. The Court granted that motion, indicating that the "Court indeed intends to stay consistent with its prior decisions." *Id.* at 4.

### III.

Plaintiffs move for partial summary judgment "[b]ased upon issue preclusion (collateral estoppel), [because] there are no genuine issues of fact relating to duty, breach, and general causation in Plaintiffs' negligence claim, no issues of fact relating to the interpretation of the *Leach* agreement and no genuine issues of fact relating to the inapplicability of the Ohio Tort Reform Act." (Pls' Mot. at 1, MDL ECF No. 5274.) DuPont contends that Plaintiffs' Renewed Motion should be denied because it relies upon the "wrong substantive law," fails to properly apply the law to the facts, and seeks to deprive DuPont of its "fundamental right to defend itself against the individual personal injury actions pending in this MDL." (Def's Mem. in Opp. at 1, MDL ECF No. 5278; Def's Sur-Reply at 1, MDL ECF No. 5281-1.) DuPont also contends that the Court should not even review the substantive arguments in Plaintiffs' Renewed Motion because it is untimely. The Court will address the substantive arguments in this section of this

decision and will address the procedural argument below in section V, with Plaintiffs' procedural arguments related to DuPont's request to file a sur-reply.

## A.   Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A motion for summary judgment is an appropriate vehicle for presenting prior judgments." 18 Moore's Federal Practice § 132.05[27], 132-184 (summary judgment is proper procedure for asserting issue preclusion).

## B.   Collateral Estoppel

In their Renewed Motion, Plaintiffs initially relied upon federal preclusion law. In its memorandum in opposition, however, DuPont contends that Ohio preclusion law applies. DuPont appropriately addresses both federal and state law, arguing that, under either, Plaintiffs are not entitled to issue preclusion on any of the issues raised in their current motion for partial summary judgment. DuPont bolstered its arguments in its Sur-reply. In Plaintiffs' Reply, they disagree that Ohio law applies, but maintain that even if it did, they are still entitled to issue preclusion. As explained below, however, it is of no moment in the instant analysis because under either federal or state law the doctrine of issue preclusion applies to the issues presented in Plaintiffs' Renewed Motion.

### 1.   Collateral Estoppel / Issue Preclusion

Federal preclusion law "'bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Gen. Elect. Med. Sys. Europe v. Prometheus Health*, 394 Fed. Appx. 280, 283 (6th Cir. 2010) (citing *Taylor v. Sturgell*, 553 U.S. 880, 891–93

(2008) and *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001)). The Sixth Circuit has explained the elements necessary for a prior decision to have preclusive effect:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 908 (6th Cir. 2001) (citations omitted).

Under Ohio law, collateral estoppel applies to an issue that "(1) was actually and directly litigated in the prior action; (2) was passed upon and determined by a court of competent jurisdiction, and (3) when the party against whom collateral estoppel is asserted was a party in privity with a party to the prior action." *State ex rel. Davis v. Pub. Emps. Ret. Bd.*, 174 Ohio App. 3d 135, 144 (Ohio App. 10th Dist. 2007), *aff'd*, 120 Ohio St. 3d 386 (2008) (citing *Whitehead*, 20 Ohio St. 2d 108, paragraph two of the syllabus (1969)).

2. **Federal Law**

DuPont argues that federal law dictates that state preclusion law applies to judgments of a federal district court when it hears cases in its diversity jurisdiction:

> In determining the preclusive effect of a prior federal-court judgment rendered within the Court's diversity jurisdiction, "the federally prescribed rule of decision [is] the law that would be applied by state courts in the State in which the federal diversity court sits." *Semtek Int'l Inc.*, 531 U.S. at 507-08; *see also Taylor*, 553 U.S. at 891 n.4 (reaffirming *Semtek*); *Leonard v. RDLG, LLC (In re Leonard)*, 644 F. App'x 612, 616 (6th Cir. 2016) (embracing and applying *Semtek*).

(Def's Mem. in Opp. at 7, MDL ECF No. 5278.)

Plaintiffs disagree, asserting that "*Semtek* involved the preclusive effect of a dismissal with prejudice under Rule 41(b) -- *not* issue preclusion -- and therefore has limited application to the issue before this Court." (Pls' Reply at 3, MDL ECF No. 5280) (citing *Zanke-Jodway v. Fifth Third Mortg. Co.*, 557 B.R. 560, 565 (Bankr. E.D. Mich. 2016) ("Essentially, *Semtek*

means that when a federal court dismisses an action while incorporating state law, it does not

necessarily mean that the action is barred from being brought in another state where the law is

different.").

In *Semtek* the Supreme Court reaffirmed that it has "the last word on the claim-preclusive

effect of all federal judgments." *Semtek Intern. Inc. v. Lockheed Martin Corp.*, 531 U.S. 497,

507 (2001). In reviewing precedent, the Court explained that,

> in *Dupasseur* [*v. Rochereau*, 88 U.S. 130 (1874)] the State was allowed (indeed,
> required) to give a federal diversity judgment no more effect than it would accord
> one of its own judgments only because reference to state law was *the federal rule
> that this Court deemed appropriate.*
>
> In short, federal common law governs the claim-preclusive effect of a dismissal by
> a federal court sitting in diversity. *See* generally R. Fallon, D. Meltzer, & D.
> Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 1473 (4th
> ed.1996); Degnan, Federalized Res Judicata, 85 Yale L.J. 741 (1976).

*Id.* at 508 (emphasis in original).

In other words, federal common law applied to the trial court's analysis, and that law

dictated that the "claim preclusive effect of the federal diversity court's dismissal was governed

by federal rule that in turn incorporated the forum state's law of claim preclusion." *Id.* at 497;

*see id.* at 509 ("Because the claim-preclusive effect of the California federal court's dismissal

'upon the merits' of petitioner's action on statute-of-limitations grounds is governed by a federal

rule that in turn incorporates California's law of claim preclusion (the content of which we do

not pass upon today), the Maryland Court of Special Appeals erred in holding that the dismissal

necessarily precluded the bringing of this action in the Maryland courts.").

This Court, however, need not determine whether the federal common law would

incorporate Ohio's claim preclusion law under the facts of the cases that make up this MDL

because *Semtek* made clear that "[t]his federal reference to state law will not obtain, of course, in

situations in which the state law is incompatible with federal interests." *Id.* at 509. In *Semtek*, "there [wa]s no conceivable federal interest in giving [the California] time bar more effect in other courts than the California courts themselves would impose." *Id.*

But in the case *sub judice*, Plaintiffs contend that significant federal interests are at issue that could prevent incorporation of Ohio law if it were to dictate a different result than federal law:

> Here, this Court clearly has a compelling and overriding federal interest in the effective and uniform administration of justice. This Court has overseen three trials on identical issues against the same defendant and three separate juries issued identical rulings on the issues that are the subject of Plaintiffs' Renewed Motion. DuPont appealed numerous issues to the Sixth Circuit which heard oral argument on DuPont's appeal. DuPont voluntarily dismissed its appeal and a final judgment has been entered in the three cases that went to trial. This Court clearly has a significant federal interest in administering its docket, streamlining litigation proceedings, conserving judicial resources and preventing "panel shopping."

(Pls' Reply at 4–5, MDL ECF No. 5280.) This Court agrees.

The JPML entrusted these cases to this Court under a uniquely federal statutory scheme with no Ohio law analogue to "promote the just and efficient conduct of this litigation" and "conserve the resources of the parties, their counsel and the judiciary." (Transfer Order at 1, MDL ECF No. 1.) Moreover, "[o]ne of the strongest policies a court can have is that of determining the scope of its own judgments." *J.Z.G. Resources, Inc. v. Shelby Ins. Co.*, 84 F.3d 211, 214 (6th Cir. 1996) (evaluation application of res judicata). *See also* § 4472 Effect of State Law on Federal Res Judicata Rules, 18B Fed. Prac. & Proc. Juris. § 4472 (2d ed.) ("[S]tate law might not always be incorporated. For example, the federal interest in the integrity of federal procedure might justify enforcement of a federal claim-preclusion rule following dismissal for willful violation of discovery orders despite a contrary state rule.").

As to Plaintiffs' clam that DuPont is panel shopping in the Court of Appeals, the undersigned is confident that the Sixth Circuit is better suited to address such concerns.[5] This Court considers the issue only with regard to its own administration of the cases on the Court's docket.

It remains that DuPont presented its assignments of error to a panel of the Sixth Circuit. Instead of waiting for a decision, DuPont chose to settle the case. DuPont could easily have excluded the *Bartlett* case from settlement, since it was ripe for decision, pending at that time for over one year at the Sixth Circuit. (*See Sixth Circuit Dramatically Lowers Time to Resolve Appeals*, Squire Patton Boggs Sixth Cir. App. Blog, https://www.sixthcircuit appellateblog.com/news-and-analysis/sixth-circuit-dramatically-lowers-time-to-resolve-appeals/) ("the Sixth Circuit averaged just 9.9 months as of December 2013—and the average for 2014 so far has been just 8.7 months"). DuPont chose not to do so.

In the event of another loss at trial, DuPont has stated repeatedly to this Court in its Post-Settlement filings that it seeks to have the exact same issues brought before another panel of the Sixth Circuit. (*See e.g.,* DuPont's Notice of Preservation of Arguments, Objections, and Positions Set Forth in Previously-Addressed Motion in *Limine,* Swartz ECF No. 92) ("DuPont

---

[5] The Court notes that the Sixth Circuit takes steps to prevent a party from avoiding a particular panel of judges with its rule that subsequent appeals may be returned to the original panel:

> **Subsequent Appeals Returned to Original Panel.** In appeals after this court returns a case to the lower court or agency for further proceedings, or after the Supreme Court of the United States remands a case to this court, the original panel will determine whether to hear the appeal or whether it should be assigned to a panel at random.

6 Cir. I.O.P. 34(b)(2). Under this rule it is unclear whether an appeal in this case would be returned to the same panel, and even if the case did fit within the rule, the assignment is discretionary. Additionally, the Sixth Circuit also limits continuances of oral argument once the names of the panel members are known. *See* 6 Cir. R. 34(b), (d); 6 Cir. I.O.P. 34(a), (c).

expressly preserves for appeal all of its positions, objections, and arguments as set forth and incorporated in each of the motions listed above and, to the extent applicable, also preserves all claims of error and its positions, objections, and arguments as to why different rulings should have been made."); (Def's Opposition to Pl's Mot. to Exclude Expert Opinion at 2, fn. 1, Swartz ECF No. 66) ("DuPont continues to preserve, and does not waive, any of its arguments and positions regarding causation and the proper meaning and application of the *Leach* Agreement in these cases, and incorporates by reference all current and prior relevant briefing and oral arguments in the MDL and the individual cases on these issues.").

All of these claims serve to (1) require considerable analysis and opinion writing from this Court; (2) necessitate further, lengthy, multiple week trials; and (3) involve additional delay on future appeals. All of this docket congestion, delay, and expense could have been avoided had DuPont simply maintained its original appeal. Instead, DuPont voluntarily dismissed a nearly completed appeal and now seeks to avoid the consequences.

DuPont contends that there is no federal interest that warrants setting aside state preclusion principles:

> First, "offensive use of issue preclusion does not promote judicial economy" because it has the ability to "increase rather than decrease the total amount of litigation." 18 Moore's Federal Practice § 132.04[2][c], 132-166; *see also S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 740 F.2d 1011 (D.C. Cir. 1984) (offensive use of issue preclusion could be employed in a manner that promotes "judicial diseconomy."). Offensive issue preclusion gives Plaintiffs "every incentive to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment." 18 Moore's Federal Practice § 132.04[2][c][iii]. The imposition of offensive non-mutual collateral estoppel in this litigation is highly likely to increase, rather than decrease, the total amount of litigation. This is particularly so where additional Plaintiffs with claims based on ever more attenuated claims of exposure seek to benefit from determinations reached in earlier trials relying on different plaintiff-specific facts.

> Second, PSC's stated interests in judicial economy are present in *every* case in which collateral estoppel might apply. The Supreme Court squarely addressed

these interests when it determined that state collateral estoppel law should apply to the judgment of a federal court sitting in diversity, absent specific federal interests that are plainly not present here.

Third, PSC concedes that collateral estoppel cannot apply to Plaintiffs' punitive damage claims, and each Plaintiff must still adduce largely the same evidence he or she uses to attempt to prove negligence claims in order to prove entitlement to punitive damages—thus eliminating any claimed trial efficiencies from issue preclusion.

(Sur-Reply at 6, MDL ECF No. 5281-1.)

In the first argument, DuPont selectively quotes Moore's Federal Practice. The treatise does not state that "offensive use of issue preclusion does not promote judicial economy." Instead, it states that "offensive use of issue preclusion does not promote judicial economy in the same manner as defensive use does" – a different proposition. 18 Moore's Federal Practice § 132.04[2][c], 132-166. The treatise then goes on to explain:

> Defensive use of issue preclusion precludes a plaintiff from relitigating identical issues by merely "switching adversaries." Therefore, defensive issue preclusion gives a plaintiff a strong incentive to join all potential defendants in the first action if possible. Offensive use of issue preclusion, on the other hand, creates precisely the opposite incentive. Inasmuch as a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a "wait and see" attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. Therefore, offensive use of issue preclusion could increase rather than decrease the total amount of litigation, because the potential plaintiffs will have "everything to gain and nothing to lose" by not intervening in the first action.

18 Moore's Federal Practice § 132.04[2][c], 132-166.

Unlike many plaintiffs, the plaintiffs before the Court in the Post-Settlement Cases are in a unique position related to any choice or strategy. There is no opportunity to "wait and see" in this action and intervention is simply not an option. These plaintiffs are bound by the *Leach* Settlement Agreement. They must each first suffer from a Probable Link disease. If they do, then each must timely file a negligence action, prove that they were subjected to the C-8

contaminated water for a particular amount of time, during a particular period of time, in a particular water district or wells in a particular geographic area. These plaintiffs' procedural options are circumscribed by the *Leach* Settlement Agreement.

Further, while the case relied upon by DuPont in the quoted passage above, *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 740 F.2d 1011 (D.C. Cir. 1984), did state that offensive use of issue preclusion could be employed in a manner that promotes "judicial diseconomy," that court went on to conclude:

> Nevertheless, the promotion of judicial economy remains a goal of offensive collateral estoppel. The court decided to leave to the district courts the task of protecting against abuse of the doctrine.

*Id.* at 1019 n.9 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)).

Next, DuPont contends that judicial economy does not warrant setting aside state preclusion issues because judicial economy interests are present in every case. DuPont further claims that there will be no efficiencies in future cases because a Plaintiff must still adduce largely the same evidence he or she uses to attempt to prove negligence claims in their attempt to prove their punitive damages claims. This Court has presided over four trials, knows the evidence that was presented, and disagrees. Application of issue preclusion would certainly conserve the resources of this Court, as well as those of the parties, by providing substantial trial and pretrial efficiencies.

Finally, DuPont argues that "[g]overning precedent recognizes that 'the Supreme Court [has] explicitly stated that offensive collateral estoppel could not be used in mass tort litigation,' further undercutting PSC's renewed motion." (Def's Mem. in Opp. at 2, MDL ECF No. 5278) (citing *In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300, 306 n.11 (6th Cir. 1984); *Parklane Hosiery Co.*, 439 U.S. at 330 & n.14). Initially, the Court notes that the statement upon which

DuPont relies is dicta. Even if it were not, it is certainly incongruent with the United States

Supreme Court pronouncement made in *Parklane Hosiery* that there is no blanket prohibition on

the application of collateral estoppel, as is highlighted by the Sixth Circuit:

> The nub of the holding [*in Parklane Hosiery*], however, was that the decision whether or not to apply collateral estoppel was left to the *broad discretion* of the district judge under the applicable circumstances:
>
>> We have concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied.

*City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157, 1165 (6th Cir. 1984)

(parallel citation omitted, emphasis in original) (quoting *Parklane Hosiery*, 439 U.S. at 331).

     In light of the broad grant of discretion which this Court is directed to exercise pursuant

to the *Parklane* factors, the Court agrees with our sister district court's assessment of the

statement in the footnote in *In re Bendectin Products Liability Litigation*:

> [T]his court is puzzled by the broad comment of the Sixth Circuit in *Bendectin* that, "[i]n *Parklane Hosiery* the Supreme Court explicitly stated that offensive collateral estoppel could not be used in mass tort litigation. A close reading of *Parklane Hosiery* reveals that the Court (1) authorized the use of offensive collateral estoppel, and (2) *only mentioned, but did not broadly accept, the arguments that have been advanced against the wholesale application of offensive collateral estoppel.*

*In re Air Crash at Detroit Metro. Airport, Detroit, Mich. on Aug. 16, 1987*, 776 F. Supp. 316,

324–25 (E.D. Mich. 1991) (citation omitted; emphasis in original). The court continued:

> Accordingly, this court cannot blithely accept the proposition that offensive collateral estoppel is inappropriate because [Plaintiffs] are part of "mass tort litigation." This court interprets *Bendectin* as precluding the utilization of offensive estoppel in a mass tort litigation situation that would be similar to that in Professor Currie's hypothetical and in other situations in which its application would be unfair to the defendant. The contours of when offensive collateral estoppel would be unfair—even in mass tort litigation—should be developed on a case-by-case basis. Invoking the term "mass tort litigation" is meaningless without contextual

analysis. The teaching of *Parklane Hosiery* is that the issue is delicate and must be handled in this manner.

*Id.* at 325.[6]

Consequently, the Court finds that if Ohio preclusion law applied here and if it were to dictate a different result than federal law, reference to state law could not obtain. However, the Court need not cross this bridge because, as shown below, Ohio preclusion law and federal preclusion law both support the application of collateral estoppel.

### 3. Ohio Law

Ohio's doctrine of collateral estoppel is very similar to the federal doctrine, and "has been explained by [the Ohio Supreme C]ourt to be preclusion of the relitigation in a second action of an issue or issues that have been actually and necessarily litigated and determined in a prior action." *Goodson v. McDonough Power Equip., Inc.*, 2 Ohio St. 3d 193, 195 (1983) (citing *Whitehead v. Gen. Tel. Co.*, 20 Ohio St.2d 108 (1969)).

---

[6] *Parklane Hosiery* provides an example of a situation in which offensive collateral estoppel might be unfair is when

> a railroad collision injures 50 passengers all of whom bring separate actions against the railroad. After the railroad wins the first 25 suits, a plaintiff wins in suit 26. *Professor Currie argues* that offensive use of collateral estoppel should not be applied so as to allow plaintiffs 27 through 50 automatically to recover.

*Id.* at n. 14 (emphasis added). This example most likely was used to illustrate the potential unfairness of inconsistent judgments. *See, e.g., Glictronix Corp. v. Am. Tel. & Tel. Co.*, 603 F. Supp. 552, 568 (D.N.J. 1984) (Professor Currie's example was to illustrate the potential unfairness of inconsistent judgments); *Robi v. Five Platters, Inc.*, 838 F.2d 318, 329 n.9 (9th Cir. 1988) (same); *Gen. Dynamics Corp. v. AT&T*, 650 F. Supp. 1274, 1285 (N.D. Ill. 1986) (same); *Algie v. RCA Global Commc'n*, 891 F. Supp 839, 856 (S.D.N.Y. 1994) (same); *Wash. Alder LLC v. Weyerhaeuser Co.*, 2004 U.S. Dist. LEXIS 9650, at *10 n.3 (D. Or. 2004) (two verdicts in favor of Plaintiffs support issue preclusion and "Defendant's citation to "Professor Currie's familiar example" is far off the mark.") In this MD,L there are no inconsistent judgments on any of the issues that Plaintiffs seek to exclude.

The main difference between Ohio and federal law, in DuPont's view, is that "Ohio law forbids the use of offensive non-mutual collateral estoppel in this MDL." (Def's Sur-Reply at 8, MDL ECF No. 5281-1.) Specifically, DuPont argues:

> Ohio law does *not* permit offensive non-mutual collateral estoppel:

> > In Ohio, the general rule is that mutuality of parties is a requisite to collateral estoppel, or issue preclusion. As a general principle, collateral estoppel operates only where all of the parties to the present proceeding were bound by the prior judgment. A judgment, in order to preclude either party from relitigating an issue, must be preclusive upon both.

> *Goodson*, 2 Ohio St. 3d 193, *syllabus* at 1.

(Def's Mem. in Opp. at 7, MDL ECF No. 5278.)

> DuPont further contends:

> > The strict mutuality generally required in Ohio may be relaxed only in rare and narrow circumstances such as where "the party to be precluded had the opportunity to fully litigate the issue, and . . . the preclusion is defensive."

*Id.* at 8 (quoting *Kiara Lake Estates, LLC v. Bd. of Park Comm'rs*, No. 2:13-cv-522, 2014 U.S. Dist. LEXIS 23603, at *14 (S.D. Ohio Feb. 24, 2014)).

This Court disagrees with DuPont's assessment.

First, DuPont's statement that "Ohio law does *not* permit offensive non-mutual collateral estoppel" is inaccurate. *Id.* at 7. Indeed, the next quote utilized by DuPont reveals as much – *i.e.*, "the *general rule* is that mutuality of parties is a requisite to collateral estoppel." *Goodson*, 2 Ohio St. 3d 193, *syllabus* at 1 (emphasis added). As explained this year by an Ohio appellate court, *Goodson*, the case upon which DuPont relies, specifically sets out an exception to this general principle:

> An exception to the principle of mutuality may be recognized where it is shown that the party against whom collateral estoppel is asserted "clearly had his day in court on the specific issue brought into litigation within the later proceeding."

> [*Goodson v. McDonough Power Equip., Inc.*, 2 Ohio St.3d] at 200; *see also Yeager v. Ohio Civil Rights Comm.*, 11th Dist. Trumbull No. 2004-T-0099, 2005-Ohio-6151, ¶40 (nonmutuality may be allowed where justice reasonably requires it).

*Schmitt v. Witten*, 2018-T-0086, 2019 WL 2172827, at \*4 (Ohio App. 11th Dist. May 20, 2019).

Second, DuPont's assertion that mutuality may be relaxed in situations "where 'the party to be precluded had the opportunity to fully litigate the issue, and . . . the preclusion is defensive" is also an inaccurate statement of law. (Def's Mem. in Opp. at 7, MDL ECF No. 5278.) Ohio law permits more than defensive preclusion. Indeed, as DuPont admits in a footnote, the Ohio Supreme Court in *Goodson* explained that it has permitted the use of offensive non-mutual collateral estoppel "where justice would reasonably require it." *Goodson*, 2 Ohio St. 3d at 199 (citing *Hicks v. De La Cruz*, 52 Ohio St. 2d 71 (1977)).

Thus, while Ohio law generally requires mutuality of parties, it makes exceptions when the party against whom estoppel is asserted "clearly had his day in court on the specific issue brought into litigation within the later proceeding" and/or "where justice would reasonably require it." *Id.* at 200.

Moreover, Plaintiffs suggest that here, actual mutuality of parties exists because Ohio defines privity broadly in the preclusion context, referring to "what constitutes" it as "somewhat amorphous." *Brown v. Dayton*, 89 Ohio St. 3d 245, 248 (2000). The Ohio Supreme Court explains:

> A contractual or beneficiary relationship is not required:
>
>> "In certain situations . . . a broader definition of 'privity' is warranted. As a general matter, privity 'is merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include that other within the *res judicata.*'

*Id.* (citations omitted). Indeed, "[p]rivity is defined broadly to include a 'mutuality of interest, including an identity of desired result.'" *Garnet v. Ohio Civ. Rights Commn.*, 2004-T-0099,

2005 WL 3097871, at *6–7 (Ohio App. 11th Dist. Nov. 18, 2005) (quoting *Brown*, 89 Ohio St.3d at 248).

In the instant action, Plaintiffs persuasively argue:

> Therefore, under the relaxed concept of privity that Ohio courts apply for purposes of collateral estoppel, neither a contractual nor a beneficial relationship is necessary. *Brown*, 730 N.E.2d at 962. Even though, Plaintiffs *do* have a contractual relationship with DuPont by virtue of the *Leach* Settlement Agreement, Plaintiffs *also* clearly have a mutuality of interest and an identity of a desired result. All Plaintiffs with cases pending in this MDL allege that they have been injured as a result of drinking water contaminated with DuPont's C-8, have a substantive legal contractual relationship with DuPont by virtue of being *Leach* class members, and share the identity of a desired result – namely damages as a result of contracting cancer. Moreover, DuPont and *Leach* class members are also in privity as they are both bound by the judgement in *Leach* which has preclusive effect on claims between the parties.

(Pls' Reply at 6–7, MDL ECF No. 5280.)

### IV.

For collateral estoppel to apply under Ohio and/or federal law, a plaintiff must show that the issue was actually and directly litigated, was necessary to the outcome of the prior proceeding, resulted in a final judgment on the merits, and the party against whom estoppel is sought had a full and fair opportunity to litigate in the prior proceeding. *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 908 (6th Cir. 2001); *State ex rel. Davis v. Pub. Emps. Ret. Bd.*, 174 Ohio App. 3d 135, 144, 2007-Ohio-6594, at ¶ 18. Plaintiffs argue:

> Based upon issue preclusion (collateral estoppel), there are no genuine issues of fact relating to duty, breach, and general causation in Plaintiffs' negligence claim, no issues of fact relating to the interpretation of the *Leach* agreement and no genuine issues of fact relating to the inapplicability of the Ohio Tort Reform Act. Three juries in this MDL already have found that defendant [DuPont] breached that duty by the negligent discharge of C-8 into the environment, and that the C-8 that each Plaintiff, as a *Leach* class member, was exposed to was capable of causing each such Plaintiff's kidney or testicular cancer. Plaintiffs therefore seek to use issue preclusion offensively to preclude DuPont from re-litigating, *once again*, the issues of duty, breach, and general causation with respect to Plaintiffs' exposures

to C-8, as *Leach* class members, being capable of causing Plaintiffs' kidney and testicular cancers.

This Court has also ruled numerous times on issues relating to the interpretation of the *Leach* Agreement, including on issues relating to class membership and causation, and the inapplicability of the Ohio Tort Reform Act, and further challenges to its prior rulings on these issues are a waste of the Court's and Plaintiffs' time and resources. Indeed, not only has this Court issued numerous rulings on these issues, but DuPont has also fully briefed and argued these issues before the Sixth Circuit only to dismiss its appeal at the eleventh hour. (Joint Mot. to Dismiss Appeal, *Bartlett v. E. I. du Pont de Nemours & Co*, No. 16-3310 (6th Cir) [ECF No. 41]). DuPont vigorously fought the three bellwether[7] lawsuits through verdict and post-trial motion, including one appeal to the Sixth Circuit. It had a full and fair opportunity to litigate all liability issues. And the jury's determinations on key issues were reduced to final judgments subject to appeal. To allow DuPont to continually re-argue these issues is an afront to judicial economy and interests of fundamental fairness and finality.

(Pls' Renewed Mot. at 1–2, MDL ECF No. 5274.)

The Court will address Plaintiffs' arguments in three groups: (A) contract interpretation of the *Leach* Settlement Agreement, which includes causation definitions, prohibition of trying general causation, and class membership, and the inapplicability of the Ohio Tort Reform Act; (B) the negligence claims; and (C) a full and fair opportunity to litigate.

## A.     Contract Interpretation and Tort Reform

There are prior judgments issued in the *Bartlett, Freeman,* and *Vigneron* cases, where the issue of the *Leach* Settlement Agreement was actually litigated and resolved in a judicial determination that was essential to the judgment. DuPont moved to reverse this Court's contract interpretation, first, in DuPont's Motion for Clarification of DMO 1, which led to the issuance of DMO 1-A; second, in its post-trial briefing that resulted in DMO 12, and; third, in its appeal to the Sixth Circuit in the *Bartlett* case. DuPont claims that the verdicts stemmed from this Court's

---

[7] The Court notes that of the six cases chosen to be bellwether trials, only two (2) went to trial with the others resulting in settlements. The third and fourth trials were chosen from a wider range of cases that had not developed as bellwether cases.

interpretation of the *Leach* Settlement Agreement, which—in DuPont's estimation—"constituted a threshold error that pervasively impacted the trial and negated fundamental terms that were the very basis for resolving the *Leach* class action" (Def's Mot. for J. and New Trial at 1, Bartlett ECF No. 15); "A threshold contract interpretation error eliminated the heart of a critical defense for DuPont *in each of the 3,500 cases in this MDL. . . .*" (*Barlett v. E. I. du Pont De Nemours and Company*, Sixth Circ. Case No. 16-3310, Appellant Brief at 1, 18) (emphasis added).

This Court agrees with DuPont that the Court's interpretation of the *Leach* Settlement Agreement was essential to the judgments that were entered in the *Bartlett*, *Freeman*, and *Vigneron* cases, and impacts all of the other cases in this MDL. And, there exists no tangible argument that the issue was not actually litigated in all the cases. DuPont brought the contract interpretation issue to this Court on numerous occasions and before the Sixth Circuit as its main assignment of error. Similarly, DuPont litigated the application of the Ohio Tort Reform Act before this Court on numerous occasions and also before the Sixth Circuit.

DuPont does not argue that the issue of contract interpretation or application of the Tort Reform Act was not actually litigated or essential to the judgments entered in each of the three trials. Instead, DuPont's main argument is that "offensive issue preclusion does not apply here." (Sur-Reply at 11, MDL ECF No. 5281-1.) DuPont simply contends that the Court's determination was not a final judgment as to the interpretation of the *Leach* Settlement Agreement or the Tort Reform Act, stating "[t]he *Bartlett* trial verdict did not bind any future case, and there was likewise no appellate decision that could possibly have bound any future case." *Id.* at 14, n.5. DuPont refers to the withdrawn *Bartlett* appeal as the "settlement of an appeal" and the "undecided *Bartlett* appeal," suggesting that these phrases somehow reduce the finality of this Court's Judgments.

This position is inconsistent with the law; it is inconsistent with DuPont's previous conduct in this MDL. That is, this Court has applied the same interpretation of the *Leach* Settlement Agreement to the facts of each of the four prior cases that went to trial and, as DuPont argued to the Sixth Circuit, the interpretation effected "each of the 3,500 cases in this MDL." (*Barlett v. E. I. du Pont De Nemours and Company*, Sixth Cir. Case No. 16-3310, Appellant Brief at 1, 18.) Additionally telling is that after Mrs. Bartlett's case was decided and appealed, the parties no longer asked the Court to make any changes to its interpretation of the *Leach* Settlement Agreement, recognizing that the *Bartlett* appeal would once and for all put to rest the contract interpretation issue. The same is true of the Tort Reform Act.

Even if, however, the parties had not recognized the impact of this Court's final and binding decisions, the law is clear. This Court's decisions interpreting the *Leach* Settlement Agreement and application of the Ohio Tort Reform Act (and the juries' findings of negligence) became final upon entry of final judgment. "[T]he established rule in the federal courts is that a final judgment retains all of its preclusive effect pending appeal." *Erebia v. Chrysler Plastic Prods. Corp.*, 891 F.2d 1212, 1215 n.1 (6th Cir. 1989) (citations omitted). Thus, this Court's final judgments in all three of the trials held in this MDL have never been anything other than final and binding.

As to the appeal, when DuPont withdrew it, those previously appealable issues simply retained their finality for purposes of collateral estoppel. Moore's Fed. Practice, 3d Ed. § 132.03[4][k][vii] ("Unappealed but appealable findings are given issue preclusive effect") (citing *Partmar Corp. v. Paramount Pictures Theatres Corp.*, 347 U.S. 89, 99 n.6 (1954) (plaintiff did not but might have appealed)). Under Supreme Court and Sixth Circuit precedent, dismissal of an appeal means that the trial court's rulings remain vital and preclusive. When "the losing party

has voluntarily forfeited" its appellate rights, it remains bound by the trial court's decision. *U.S. Bancorp Mortg. Co. v. Bonner Mail P'ship*, 513 U.S. 18, 25–26 (1994); *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 484 (6th Cir. 2004).

Further, the "settlement" of Mrs. Bartlett's claim while the case was on appeal simply has no impact on the finality and preclusive effect of this Court's Judgment. Indeed, the Sixth Circuit explains that when a party "voluntarily abandon[s] their request for reversal of the district court's decision . . . [the losing party] ha[s] lost their ability to contest the merits of [that] dispute." *Remus Joint Venture v. McAnally*, 116 F.3d 180, 185 (6th Cir. 1997). When a party decides to settle a case rather than complete an appeal, "[t]he judgment is not unreviewable, but simply unreviewed by his own choice." *Id.*

Moreover, the Sixth Circuit has recently held that a district court's judgment can still have issue-preclusive effect even if the judgment was set aside by the trial court at the request of the parties as a condition of settlement. *Watermark Senior Living Ret. Communities, Inc. v. Morrison Mgt. Specialists, Inc.*, 905 F.3d 421, 426–28 (6th Cir. 2018). In *Watermark Senior Living Retirement Communities*, the Sixth Circuit observed:

> [J]udgments may retain their finality and preclusive effect when they are set aside or vacated upon settlement. . . . In such circumstances, the losing party acquiesces in the court's decision, even if he disagrees with it. The party has had his day in court and waived his right to an appeal. That is all that is required. "One bite at the apple is enough."

*Id.* at 427 (citations omitted).

Here, this Court's judgment was not vacated nor set aside. Undoubtedly then, DuPont has acquiesced in this Court's decision, even though DuPont disagrees with it. DuPont has had its day in court and has waived its right to appeal.

DuPont's final argument is that the "PSC is trying to improperly convert the undecided *Bartlett* appeal into the law-of-the-case for all subsequent individual cases, despite the fact that the Sixth Circuit has expressly rejected applying law of the case across different cases." (Def's Sur-Reply at 12, MDL ECF No. 5281-1.) This argument is a red herring. Plaintiffs have not suggested that this Court's prior rulings are "law of the case," nor could they. "The doctrine of the law of the case is similar [to the doctrine of issue preclusion] in that it limits relitigation of an issue once it has been decided, but the law of the case doctrine is concerned with the extent to which the law applied in decisions at various stages of the same litigation becomes the governing principle in later stages." 18 Moore's Federal Practice § 134.04[1], 134-52.3 (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). The law of the case doctrine is simply inapplicable here.

**B.    Negligence**

Plaintiffs argue that "[t]he precise/identical issue of negligence in Plaintiffs' cases was raised and litigated in the *Bartlett*, *Freeman*, and *Vigneron* cases and this finding of negligence was necessary to support each verdict." (Pls' Renewed Mot. at 7–8, MDL ECF No. 5274.) DuPont responds that "[i]ssue preclusion does not apply unless—at a minimum—the plaintiff can show that all of the factual differences 'are of no legal significance whatever in resolving the issue presented' and here, Plaintiffs cannot "meet this high standard." (Def.'s Memo. in Opp. at 17, MDL ECF No. 5278) (citing *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 172 (1984)). Specifically, DuPont contends that Plaintiffs' "relevant water districts and time periods at issue in prior trials were different. The constantly changing state of the science, the changing knowledge over time, and the specific risks to any Plaintiff at the specifically relevant time and in a specific area are fundamental to the duty issues." *Id.* at 17. DuPont further argues that some

42

of the plaintiffs in the Post-Settlement cases have filed loss of consortium claims, which "distinguishes that case from the first three trials." *Id.* Additionally, DuPont contends that "binding DuPont to the results of two bellwether trials and one non-bellwether trial would be fundamentally unfair." (Def's Mem. in Opp. at 25.) And finally, DuPont maintains that "a number of Plaintiffs in the post-global settlement cases have sued an additional defendant, Chemours—an independent company that never used C-8 at the Washington Works facility or elsewhere and was not a defendant in the pre-GSA cases." *Id.* at 18. DuPont's arguments are not well taken.

The Court finds that Plaintiffs have shown that any factual differences between the Pre- and Post-Settlement cases are of no legal significance in a jury's consideration of a negligence claim. That is, the issue of negligence was actually and directly litigated in four prior trials, with three consistent verdicts. The fourth settled after four weeks of trial. As can be seen in the jury instructions *supra*, each jury was consistently instructed and each found that DuPont owed a duty to a particular *Leach* Class member, that it breached that duty, and that DuPont should have foreseen or reasonably anticipated that injury would result from the alleged negligent act.

Specifically, the "test" for duty "is whether under the circumstances a reasonably prudent corporation would have anticipated that an act or failure to act would likely cause injuries." (Final Jury Instructions at 21, Negligence – Duty, Bartlett ECF No. 139); (Final Jury Instructions at 20, Negligence – Duty, Freeman ECF No. 102); (Final Jury Instructions at 21, Negligence – Duty, Vigneron ECF No. 195). And for breach, the jury was required to determine whether DuPont exercised "ordinary care," which was defined as "the care that a reasonably careful corporation would use under the same or similar circumstances." (Final Jury Instructions at 22, Negligence – Breach, Bartlett ECF No. 139); (Final Jury Instructions at 21, Negligence – Breach,

Freeman ECF No. 102); (Final Jury Instructions at 22, Negligence – Breach, Vigneron ECF No. 195).

Finally, the jury had to determine whether Plaintiffs proved foreseeability, that is, whether they "prove[d] that DuPont should have foreseen or reasonably anticipated that injury would result from the alleged negligent act." (Final Jury Instructions at 21, Negligence – Proximate Cause – Foreseeable Injury, Bartlett ECF No. 139); (Final Jury Instructions at 24, Negligence – Proximate Cause – Foreseeable Injury, Freeman ECF No. 102); (Final Jury Instructions at 23, Negligence – Proximate Cause, Foreseeable Injury, Vigneron ECF No. 195). Again, the instructions made clear that the jury was determining not only whether DuPont's conduct caused injury to the individual plaintiff, but also to those who, like the *Leach* Class members, were in similar positions to Plaintiffs: "The test for foreseeability is not whether DuPont should have foreseen the injury exactly as it happened to [the plaintiff]. Instead, the test is whether under the circumstances a reasonably careful person would have anticipated that an act or failure to act would likely result in or cause injuries." (Final Jury Instructions at 21, Negligence – Proximate Cause, Foreseeable Injury, Bartlett ECF No. 139); (Final Jury Instructions at 21, Negligence – Proximate Cause – Foreseeable Injury, Freeman ECF No. 23); (Final Jury Instructions at 23, Negligence – Proximate Cause, Foreseeable Injury, Vigneron ECF No. 195).

The testimony that was presented at the *Bartlett*, *Freeman* and *Vigneron* trials and the resulting verdicts made clear that the duty DuPont breached was to the entire communities surrounding its Washington Works plant and not just to specific customers of individual water districts. The facts relating to DuPont's negligence were virtually identical. The experts in each trial testified about how DuPont's conduct affected surrounding communities – all six of the

water districts and private wells subject to the *Leach* Settlement Agreement – and not just to the individuals who were in a particular water district. The factual differences highlighted by DuPont (*i.e.*, water districts, diseases, and the timing and duration of C-8 exposure) go to specific causation, which is a live controversy that will be vigorously litigated in the upcoming trials, as will any loss of consortium claims, and punitive damages claims.

Meanwhile, the conduct supporting DuPont's negligence in the *Bartlett, Freeman*, and *Vigneron* cases is the same conduct in the Post-Settlement Plaintiffs' cases. As this Court noted previously, evidence "related to DuPont's conduct of releasing the C-8 from the Washington Works plant" is *"the same evidence that will be utilized in every single trial held in this MDL."* (CMO 20 at 33, ECF No. 4624.) "Not only will this evidence be consistent through each and every trial, it is also overwhelmingly the majority of all evidence that will be offered at each and every trial that will be held in this MDL." *Id.* The negligence phase of each prior case has taken substantial time at trial, and each verdict included a finding of negligence.

The addition of the entity that purchased Washington Works, Chemours, and was spun off from DuPont itself to, *inter alia*, take some or all of the C-8 liability from that facility is of no legal significance whatever in resolving the negligence issues under consideration here. Chemours' conduct is not *per se* at issue in this litigation. Instead, Chemours is, at best, merely an indemnitor of DuPont.

DuPont's argument that being bound to the result of three trials, two of which were bellwethers, misses the mark. While in certain factual situations courts have found it unfair to bind parties to a bellwether verdict, *Auchard v. TVA*, No. 3:09-CV-54, 2011 U.S. Dist. LEXIS 14771, at *11 (E.D. Tenn. Feb. 2, 2011), others have focused on whether a party had a full and

fair opportunity to litigate, *Adams v. United States*, No. CV 03-49-E-BLW, 2010 U.S. Dist. LEXIS 116051, 2010 WL 4457452 (D. Idaho Oct. 19, 2010).[8]

While this Court did hold two bellwether and two non-bellwether trials, every Plaintiff in this MDL is a member of the *Leach* Class and are subject to the *Leach* Settlement Agreement. Both Plaintiff class and DuPont benefit from the *Leach* Agreement and this Court's rulings related to what the trials under the Agreement will entail. Thus, to the extent that the bellwether process could impact the application of collateral estoppel, it does not do so here. The important aspect of the analysis is whether DuPont had a full and fair opportunity to litigate.

In the context of an MDL, the need to try multiple bellwether cases to facilitate settlement of all cases is an important component of the handling of a large number of related cases. *See The Manual for Complex Litigation*, § 22.315 (bellwether trials are meant to "produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims . . . and what range of values the cases may have"); Alexandra D. Lahav, *Bellwether Trials*, at 577–78, The George Washington Law Review (2008) ("Judges currently use bellwether trials informally in mass tort litigation to assist in valuing cases and to encourage settlement."). Applying collateral estoppel in an MDL before most or all bellwether cases are tried would not promote judicial economy insofar as a global settlement could be frustrated. But here, DuPont lost the first bellwether trial, filed an appeal, and asked to stay the remaining cases, which the Court refused. DuPont then simply settled the

---

[8] In *Adams v. United States*, DuPont actually argued that issue preclusion from bellwether trials was inappropriate, even though the court had previously suggested that some of the issues may be precluded in future trials. The *Adams* court found that issue preclusion applies to findings of bellwether trials where "DuPont had a full and fair opportunity to litigate" the relevant issue. *Adams*, 2010 U.S. Dist. LEXIS 116051, at *24.

only remaining bellwether cases, leaving no such cases outstanding. These facts are further

reasons to apply collateral estoppel, when no bellwether cases remain unresolved.

## C.    Full and Fair Opportunity to Litigate

As does federal law, Ohio law focuses on the "main legal thread which runs throughout

the determination of the applicability of ... collateral estoppel, [which] is the necessity of a fair

opportunity to fully litigate and to be 'heard' in the due process sense." *Goodson*, 2 Ohio St.3d

at 200–01. The Ohio Supreme Court cautions:

> Collaterally estopping a party from relitigating an issue previously decided against
> it violates due process where it could not be foreseen that the issue would
> subsequently be utilized collaterally, and where the party had little knowledge or
> incentive to litigate fully and vigorously in the first action due to the procedural
> and/or factual circumstances presented therein.

*Id.* And, non-mutuality of parties is acceptable in Ohio when the party against whom estoppel is

asserted "clearly had his day in court on the specific issue brought into litigation within the later

proceeding" and/or "where justice would reasonably require it." *Goodson*, 2 Ohio St. 3d at 200.

The United States Supreme Court similarly cautions:

> There are two situations in which it may be unfair to apply offensive issue preclusion:
> (1) where the defendant in the first action had little incentive to defend vigorously,
> particularly if future suits were not foreseeable; and (2) where the second action
> "affords the defendant procedural opportunities unavailable in the first action that
> could readily cause a different result."

*Guy*, 257 F. App'x. 965 (quoting *Parklane Hosiery Co.*, 439 U.S. at 330–31).

None of these situations is even arguably present here – nor does DuPont claim that any

are present. No doubt, DuPont had every incentive to vigorously defend the first three trials in

this MDL, knowing that there were over 3,500 cases that would be impacted by the outcomes of

those cases. And, obviously future suits were foreseeable in that there were over 3,500 cases in

line in this MDL – all of which would be tried in this Court or in the Southern District of West

Virginia. This MDL is geographically limited to only two districts because of the *Leach* Case

from which this MDL was born and the Settlement Agreement by which these cases are bound. DuPont has known since it moved the JPML for consolidation that there would never be the "nuclear option" available such that it may have the opportunity to potentially re-argue pretrial and trial rulings made by this Court in other trial courts across the country. Indeed, as the JPML itself has recognized, "the transferee judge has indicated his willingness to seek an inter-circuit assignment to conduct trials in West Virginia should the need arise." (Transfer Order at 2, MDL ECF No. 5130.) Consequently, there is no question that DuPont had strong motivation to defend vigorously and that it fully understood that future suits were not only foreseeable, but likely.

Further, DuPont made clear in its SEC filing that there was potential liability well into the future, dividing the responsibility for the potential future liabilities between it and Chemours. Finally, the Post-Settlement cases do not afford the parties any procedural opportunities that were unavailable in the *Bartlett*, *Freeman*, and/or *Vigneron* trials that could readily cause a different result.

Since the inception of this MDL six and one-half years ago, the pretrial motion practice and the trials were aggressively litigated by competent counsel on both sides. The trials alone were billed at approximately $6 million per side in attorney fees and over $1 million in costs. (Pl's Mot.. for Determination of Atty. Fees and Costs, Freeman ECF No. 147.) Given the caliber and number of counsel, the length of this action, a settlement of over $670 million, nearly $50 million in attorney fees and $4 million in costs for the trials, and a fully briefed and argued appeal before the Sixth Circuit, the time has come to conserve judicial resources as well as those of the parties.

The Ohio Supreme Court advises that, when balancing "[t]he benefits garnered from applying collateral estoppel in any cause . . . against the costs associated with its application[,]"

"[t]he major risk linked to such an application is that of an erroneous determination in the first

case." *Goodson*, 2 Ohio St. 3d at 201–02. In the instant action, there was not only a "first case,"

but a second case and a third case that all resulted in the same verdicts on a *Leach* Class

members' negligence claim.

The policy guiding the application of collateral estoppel in any given case is one of

fundamental fairness. As the Supreme Court observed:

> But as so often is the case, no one set of facts, no one collection of words or phrases,
> will provide an automatic formula for proper rulings on estoppel pleas. In the end,
> decision will necessarily rest on the trial courts' sense of justice and equity.

*Blonder-Tongue Laboratories*, 402 U.S. at 333–34.

After reviewing the situations in which it may be unfair to apply offensive collateral

estoppel, the Supreme Court stated:

> We conclude, therefore, that none of the considerations that would justify a
> refusal to allow the use of offensive collateral estoppel is present in this case. Since
> the petitioners received a "full and fair" opportunity to litigate their claims in the
> SEC action, the contemporary law of collateral estoppel leads inescapably to the
> conclusion that the petitioners are collaterally estopped from relitigating the
> question of whether the proxy statement was materially false and misleading.

*Parklane Hosiery Co.*, 439 U.S. at 332–33.

Similarly, in the instant action, this Court concludes that none of the considerations Ohio

or federal courts find would justify refusal to allow the use of offensive collateral estoppel are

present. Since DuPont has received a "full and fair" opportunity to litigate the proper

interpretation of the *Leach* Settlement Agreement, application of the Ohio Tort Reform Act, and

negligence with three separate juries finding DuPont liable for the same conduct that is at issue

in this motion, the contemporary law of collateral estoppel leads inescapably to the conclusion

that DuPont is collaterally estopped from relitigating these issues. DuPont has had its day in

court on these issues, and in view of the entire record before this Court, justice and equity demand application of issue preclusion as requested by Plaintiffs in their Renewed Motion.

## V.

The Court will next address Defendant's Motion to File, *Instanter*, a Sur-Reply (MDL ECF No. 5281), and Defendant's arguments that Plaintiffs' Renewed Motion was untimely.

### A.    Sur-Reply

DuPont filed a Motion for Leave to File, *Instanter*, a Sur-Reply (MDL ECF No. 5281), Plaintiffs then filed a Memorandum in Opposition (MDL ECF No. 5282), and DuPont filed its Reply (MDL ECF No. 5283). Pursuant to S.D. Ohio Local R. 7.2(a)(2), a party may seek leave of the Court to file a sur-reply in support of its opposition to a motion "for good cause shown." Good cause exists for a sur-reply where a party seeks to "respond to an argument raised by [a party] for the first time in its reply brief." *NetJets Large Aircraft, Inc. v. United States*, 2017 U.S. Dist. LEXIS 49232, at *12, (S.D. Ohio Mar. 21, 2017) (citing *Burlington Ins. Co. v. PMI Inc.*, 862 F. Supp. 2d 719, 726 (S.D. Ohio 2012)).

DuPont contends that Plaintiffs raised new arguments in their Reply, necessitating the need for it to file a sur-reply. This Court disagrees; however, the Court will provide to DuPont the opportunity it requests to address the issues before the Court. Thus, the Court **GRANTS** DuPont's Motion for Leave to File, *Instanter*, a Sur-Reply. (MDL ECF No. 5281.)

### B.    Timeliness of Motion

It is not disputed that Plaintiffs filed their Renewed Motion after the deadline set by this Court. DuPont contends that Plaintiff untimeliness is a "fatal defect" requiring denial of its request for partial summary judgment. (Def's Mem. in Opp. at 1, MDL ECF No. 5278.) This Court, however, disagrees.

Unlike certain defenses that must be raised by the parties, the doctrine of collateral estoppel is one in which "the judiciary retains an independent interest" so that it can "prevent[] the misallocation of judicial resources." *Sioux Nation of Indians*, 448 U.S. at 433. The Sixth Circuit sanctions, indeed encourages, a court to *sua sponte* raise the doctrine "in the interests of, *inter alia*, the promotion of judicial economy." *Holloway Const. Co. v. U.S. Dept. of Lab.*, 891 F.2d 1211, 1212 (6th Cir. 1989) (citing *Sioux Nation of Indians*, 448 U.S. at 432; *Commissioner v. Sunnen*, 333 U.S. 591, 597 (1948)). As the Supreme Court explained in its assessment of a *sua sponte* dismissal based on res judicata:

> The Court of Claims itself has indicated that it would not engage in reconsideration of an issue previously decided by the Court of Claims without substantial justification:
>
> > "It is well to remember that res judicata and its offspring, collateral estoppel, are not statutory defenses; they are defenses adopted by the courts in furtherance of prompt and efficient administration of the business that comes before them. They are grounded on the theory that one litigant cannot unduly consume the time of the court at the expense of other litigants, and that, once the court has finally decided an issue, a litigant cannot demand that it be decided again." *Warthen v. United States*, 157 Ct. Cl. 798, 800 (1962).
>
> It matters not that the defendant has consented to the relitigation of the claim since the judiciary retains an independent interest in preventing the misallocation of judicial resources and second-guessing prior panels of Art. III judges when the issue has been fully and fairly litigated in a prior proceeding.

*Sioux Nation of Indians*, 448 U.S. at 432–33 ("This result is fully consistent with the policies underlying res judicata: it is not based solely on the defendant's interest in avoiding the burdens of twice defending a suit, but is also based on the avoidance of unnecessary judicial waste.") (citing *Sunnen*, 333 U.S. at 597; *Blonder-Tongue Laboratories, Inc.*, 402 U.S. at 328; *Parklane Hosiery*, 439 U.S. at 322).

As can be seen from the Court's analysis above, it is clear that DuPont is asking to "unduly consume the time of the Court at the expense of other litigants," because this Court and

three juries have "finally decided" the issues of interpretation of the *Leach* Settlement Agreement, including the definitions and evidentiary applications of general and specific causation, class membership, application of the Ohio Tort Reform Act, and DuPont's negligence. DuPont, however, continues to "demand that [these issues] be decided again." *See id.* This DuPont cannot do.

The Court gave its attention fully to this MDL and has done what the JPML asked of it: to conduct the cases in a "just and efficient" manner. (Transfer Order at 1, MDL ECF No. 1; Transfer Order at 2, MDL ECF No. 5130.) The Court owes the same to the other cases before it, including a major MS-13 gang case involving five murder charges with 26 defendants, 16 of whom allegedly committed death-penalty-eligible crimes, the *In re: Davol, Inc./C.R. Bard, Inc. Polypropylene Hernia Mesh Products Liability Litigation Hernia* that currently consists of over 4,500 cases, and over 200 other civil cases, as well as over 100 criminal matters. It is incumbent upon this Court to protect its ability to give the same prompt and efficient administration of the cases before it that it has provided to DuPont.

## VI.

For the reasons set forth above, the Court **GRANTS** Plaintiffs' Renewed Motion for Summary Judgment on the Application of the Doctrine of Issue Preclusion/Collateral Estoppel (MDL ECF No. 5274), and **GRANTS** Defendant's Motion to File, *Instanter*, a Sur-Reply (MDL ECF No. 5281). The issues that remain for trial are: specific causation, damages, and, if malice is found by the jury, punitive damages, and in some cases loss of consortium.

**IT IS SO ORDERED.**

_____11- 25 -2019_____
**DATE**

EDMUND A. SARGUS, JR.
**UNITED STATES DISTRICT JUDGE**