UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

          Civil Action 2:13-md-2433
          JUDGE EDMUND A. SARGUS, JR.
          Magistrate Judge Elizabeth Preston Deavers

This document relates to:  *Angela Swartz and Teddy Swartz v. E. I. du Pont de Nemours and Company*, Case No. 2:18-cv-00136.

## EVIDENTIARY MOTIONS ORDER NO. 27

### Defendant's Motion to Exclude Plaintiff's Specific Causation Expert

This matter is before the Court on Defendant's Motion to Exclude the Opinion and Testimony of Plaintiff Angela Swartz's Specific Causation Expert Dr. Vitaly Margulis (ECF No. 48, *Swartz* Docket[1]), Plaintiffs' Memorandum in Opposition (ECF No. 63), and Defendant's Reply Brief (ECF No. 75). For the reasons that follow, the Court **DENIES** Defendant's Motion.

I.

The litigation between the parties in this multidistrict litigation ("MDL") began in 2001 in a class action in West Virginia state court captioned *Leach v. E. I. du Pont de Nemours & Co.*, No. 01-C-698 (Wood County W. Va. Cir. Ct.) ("*Leach* Case"). The *Leach* Case ended in November 2004 when the parties entered into a class-wide settlement ("*Leach* Settlement Agreement"). (ECF No. 820-8.) In the *Leach* Settlement Agreement, the parties fashioned a unique procedure to determine whether the approximately 80,000 members of the class ("*Leach*

---

[1] Unless otherwise noted the ECF references are to the docket in *Swartz*, 2:18-cv-136.

Class") would be permitted to file actions against Defendant E. I. du Pont de Nemours and Company ("DuPont") based on any of the human diseases they believed had been caused by their exposure to ammonium perfluorooctanoate ("C-8" or "PFOA") discharged from DuPont's Washington Works plant. The procedure required DuPont and the plaintiffs to jointly select three completely independent, mutually-agreeable, appropriately credentialed epidemiologists ("Science Panel") to study human disease among the *Leach* Class.

The Science Panel engaged in what ultimately became one of the largest epidemiological studies ever convened, utilizing nearly 70,000 blood samples and medical histories of the *Leach* Class members, and lasting seven years. In 2012, the Science Panel delivered Probable Link Findings for six human diseases ("Linked Diseases"): kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, diagnosed high cholesterol (hypercholesterolemia), and pregnancy-induced hypertension and preeclampsia. The Probable Link Finding means that for the *Leach* Class members it is more likely than not that there is a link between their exposure to C-8 (*i.e.*, drinking water containing at least .05 ppb of C-8 for at least one year) and their Linked Disease. Ultimately, over 3,500 individuals filed cases in this MDL, all of whom alleged that they are *Leach* Class members, are subject to the *Leach* Settlement Agreement, have Linked Diseases, and that C-8 specifically caused their Linked Diseases.

The Science Panel also delivered No Probable Link Findings for approximately 50 diseases it studied. Any *Leach* Class member who received a No Probable Link Finding was prohibited from filing a personal injury action against DuPont as a result of being subject to the *Leach* Settlement Agreement, regardless of whether any other study or expert disagreed with the Science Panel' No Probable Link Finding.

2

Beginning in February 2015, this Court held four trials in this MDL: *Carla Marie Bartlett v. E. I. du Pont de Nemours and Company*, Case No. 2:13-cv-170; *David Freeman v. E. I. du Pont de Nemours and Co.*, 2:13-cv-1103; *Kenneth Vigneron, Sr. v. E. I. du Pont de Nemours Company*, Case No. 13-cv-136, and; *Larry Ogle Moody v. E. I. du Pont de Nemours Company*, Case No. 15-cv-803. Each trial lasted at least four weeks. The parties reached a global settlement of the 3,500 cases in February 2017.

Since the global settlement, over 50 cases have been filed ("Post-Settlement Cases"). As did the plaintiffs in the pre-settlement cases, the plaintiffs in these Post-Settlement Cases allege that they are *Leach* Class members, are subject to the *Leach* Settlement Agreement, have a Linked Diseases, and that C-8 specifically caused their Linked Disease. Pursuant to the Court's trial schedule, the parties have filed their motions directed at experts.

## II.

### A.  Expert Testimony

The Federal Rules of Evidence, in particular Rule 702 and 104(a), govern the admission of expert witness testimony and require that the trial judge "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Because Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence,'" expert testimony "which does not relate to any issue in the case is not relevant and ergo, nonhelpful." *Daubert*, 509 U.S. at 590–90. "In other words, there must be a 'fit' between the proposed testimony and the question(s) presented by the case at bar." *Daubert*, 509 U.S. at 591.

3

To determine whether expert testimony is "reliable," the court's role, and the offering party's responsibility, "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Generally, the expert's opinions must reflect "scientific knowledge . . . derived by the scientific method," representing "good science." *Daubert*, 509 U.S. at 590, 593. The test of reliability is, however, a "flexible" one. *Kumho Tire Co.*, 526 U.S. at 140.

The Supreme Court mandates that a district court exercise its responsibility in acting as the "gatekeeper" for expert testimony. *Daubert*, 509 U.S. at 588; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). This role, however, is not intended to supplant the adversary system or the role of the jury. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 531–32 (6th Cir. 2008). Arguments regarding the weight to be given any testimony or opinions of an expert witness are properly left to the jury. *Id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596).

The burden is on the party proffering the expert report to demonstrate by a preponderance of proof that the opinions of their experts are admissible. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). Any doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility. Fed. R. Evid. 702 Advisory Committee's Notes ("[A] review of the case law. . . shows that rejection of the expert testimony is the exception rather than the rule."); *Jahn v. Equine Services, PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (stating

4

that in *Daubert* "[t]he Court explained that Rule 702 displays a liberal thrust with the general approach of relaxing the traditional barriers to opinion testimony") (internal quotations omitted).

**B.     Specific Causation Testimony**

Defendant moves to exclude the testimony and opinion of Plaintiff's specific causation expert. As did all of the specific causation experts in the cases in this MDL, Plaintiff's expert utilized differential diagnosis to reach his ultimate conclusion, which the Sixth Circuit describes as follows:

> This circuit has recognized differential diagnosis as an "appropriate method for making a determination of causation for an individual instance of disease." *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001); *see also Best*, 563 F.3d at 178 (stating that a causation opinion based upon a reliable differential diagnosis may satisfy the requirements of Rule 702). Differential diagnosis is "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Hardyman*, 243 F.3d at 260 (internal quotation marks omitted). As we explained in *Best*, a physician who applies differential diagnosis to determine causation "considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history." 563 F.3d at 178 (internal quotation marks omitted).

*Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 678 (6th Cir. 2011).

> Calling something a 'differential diagnosis' or 'differential etiology' does not by itself answer the reliability question but prompts three more:
>
> > (1) Did the expert make an accurate diagnosis of the nature of the disease? (2) Did the expert reliably rule in the possible causes of it? (3) Did the expert reliably rule out the rejected causes? If the court answers "no" to any of these questions, the court must exclude the ultimate conclusion reached.

*Id.* (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010)).

"'The core of differential diagnosis is a requirement that experts at least consider alternative causes.'" *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 179 (6th Cir. 2009) (quoting *In re Paoli Railroad Yard PCB Lit.*, 35 F.3d 717, 759 (3d Cir. 1994)). Yet, "doctors need not rule out every conceivable cause in order for their differential-diagnosis-based opinions

5

to be admissible." *Id.* at 181. "'The fact that several possible causes might remain uneliminated . . . only goes to the accuracy of the conclusion, not to the soundness of the methodology.'" *Jahn*, 233 F.3d at 390 (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996)).

### III.

Plaintiff Angela Swartz offers Vitaly Margulis, M.D., F.A.C.S. as her specific causation expert. Dr. Margulis was presented as a specific causation expert in the case of Carla Marie Bartlett, the first trial in this MDL, which was held in September 2015. In Evidentiary Motions Order No. ("EMO") 1, this Court granted in part and denied in part DuPont's Motion to Exclude the Opinions of Dr. Margulis. (EMO 1, Pls' and Def's Mots. to Exclude Expert Opinions Related to Causation, MDL ECF No. 4079.) Du Pont contends that the portions of Dr. Margulis's Expert Opinion that the Court did not exclude in EMO 1 should now be excluded because Dr. Margulis (1) begins with an assumption or presumption of specific causation, (2) bases his opinion on a fiction that the Science Panel made a scientific determination and unreliably employs two different methodologies, (3) adopts the "no safe dose" theory, and (4) uses a made-for-litigation approach that differs from the approach he uses in his regular professional practice outside the courtroom.

**1.    An Assumption or Presumption of Specific Causation.**

DuPont first argues that Dr. Margulis' opinion should be excluded because he starts with the assumption of specific causation:

> First, contrary to DuPont's fully preserved, unlimited right to challenge specific causation in the *Leach* Agreement, Dr. Margulis improperly started with a presumption of specific causation based solely on: (1) the Science Panel's Probable Link report on kidney cancer; and (2) another expert's opinion (Dr. MacIntosh) regarding *Leach* class membership.

6

> [I]nstead of conducting any independent scientific or medical analysis, Dr. Margulis started and finished his purported differential analysis with a false presumption of specific causation from exposure to C-8. Dr. Margulis presumed that the Science Panel determined that Mrs. Swartz was at some unknown increased risk of kidney cancer from exposure to C-8, and summarily excluded all other risk factors for kidney cancer from his differential analysis . . . .

(Def's Mot. to Exclude Dr. Vitalis Specific Causation Testimony at 2, 5, Swartz ECF No. 48.)

This is the same argument DuPont made with regard to Dr. Margulis in the *Bartlett* case. Specifically, DuPont argued that "[l]ike Dr. Bahnson, Dr. Margulis started from an *assumption* of *specific* causation." (Def's Mot. to Exclude Bartlett and Wolf Specific Causation Experts: Dr. Bahnson, Dr. Margulis, and Dr. Gross at 26, MDL ECF No. 2823) (emphasis in original). DuPont argued that because Dr. Margulis started with the assumption of specific causation, he "did not undertake any independent scientific analysis to weigh the respective risks to Bartlett of her exposure to PFOA and the amount of her increased risk from other risk factors before 'ruling out' the other risk factors, including her morbid obesity." *Id.* at 26–27. This Court disagreed and explained its decision in detail in EMO 1 and incorporates that explanation here. (EMO 1, Pls' and Def's Mots. to Exclude Expert Opinions Related to Causation at 1–3, 6–14, 17–29, MDL ECF No. 4079.)

In the case at bar, Dr. Margulis utilizes the exact same methodology in evaluating Mrs. Swartz as he did evaluating Mrs. Bartlett. He rules in a number of epidemiologically supportable risk and/or causal factors as potential causes of Mrs. Swartz' kidney cancer. Dr. Margulis then rules out all potential causes, providing a reasonable basis for their exclusion, except for obesity. As to obesity, Dr. Magulis states that "[t]he evidence with respect to obesity as a potential risk factor is still evolving and remains conflicting and merely observational at best with no evidence of actual causal link." (Margulis Expert Report at 7, n.1, Swartz ECF No. 27-1.)

7

DuPont's specific causation expert, Samuel M. Cohen, M.D., PhD, agrees that Dr. Margulis did not leave out any risk factors in his analysis. (Dep. of Dr. Cohen at 57, Swartz ECF No. 63-1.) Dr. Cohen simply disagrees with Dr. Margulis' interpretation of the data, stating:

> My major disagreement with Dr. Margulis is his dismissal of obesity and hypertension as major causes of kidney cancer. This is not consistent with extensive literature on both issues as described above. Mrs. Swartz was clearly obese in her adult life, with a BMI reaching over 40 at times, which is defined as morbid obesity. Also, she is known to have had hypertension for several years and was being treated for it.

(Cohen Expert Report at 7, Swartz ECF No. 53-3.)

These are the same disagreements Dr. Cohen lodged against Dr. Margulis in the *Bartlett* case and upon which DuPont relied to request exclusion of Dr. Margulis' expert opinion in that case. In EMO 1, this Court explained:

> DuPont's objection as to Dr. Margulis' interpretation of the data goes to its weight, not its admissibility. *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 531–32. The appropriate avenue to explore the bases for Dr. Margulis' opinions is cross examination. *Id.*

(EMO 1, Pls' and Def's Mots. to Exclude Expert Opinions Related to Causation at 27, MDL ECF No. 4079.)

Similarly, here, and in accordance with EMO 1, DuPont's trial counsel may explore why Dr. Margulis came to his conclusions of what the data shows in its examination of the expert in the same way that counsel for Mrs. Swartz may explore through examination of Dr. Cohen why he disagrees with Dr. Margulis's conclusions of what the data shows.

In its current motion, DuPont makes additional or clarifying arguments related to its request for exclusion of Dr. Margulis's testimony. Specifically, DuPont states that "Dr. Margulis ignores that a *specific* causation expert cannot simply rely on a finding of *general* causation (or an agreement not to contest general causation) to establish *specific* causation in an individual."

8

(Def's Mot. to Exclude Dr. Margulis Specific Causation Testimony at 6, Swartz ECF No. 48) (emphasis in original). DuPont contends that " '[a]n expert . . . cannot merely conclude that all risk factors for a disease are substantial contributing factors in its development. 'The fact that exposure to [a substance] may be a risk factor for [a disease] does not make it an actual cause simply because [the disease] developed.'" *Id.* (quoting *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1255 (11th Cir. 2010) (ellipses and alterations by DuPont). *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1255 (11th Cir. 2010). In *Guinn*, the court observed that, "'[A]lthough the differential diagnosis technique is well accepted . . . [, a finding] that all possible causes are causes does not appear to have gained general acceptance in the medical and scientific communities." *Guinn*, 602 F.3d at 1255 (alterations in original, citation omitted).

The case upon which DuPont relies is inapposite. That is, the expert in *Guinn* admitted that the "other risk factors alone were sufficient to explain the onset of [the plaintiff's] diabetes." *Guinn*, 602 F.3d at 1249–50. In the instant action, contrary to the expert in *Guinn*, Dr. Margulis does not find that there are other risk factors alone that were sufficient to cause Mrs. Swartz's cancer.

Further, Dr. Margulis does not simply rely on a finding of general causation, or merely conclude that all risk factors for kidney cancer are substantial contributing factors in its development. Indeed, he did the opposite. Dr. Margulis' Expert Report reflects his review of numerous scientific studies and other documents, Mrs. Swartz's medical records, his own physical examination of Mrs. Swartz, which included taking a medical and familial history, and his knowledge, training, and experience as a urologic surgical oncologist. Dr. Margulis utilized differential diagnosis, appropriately "eliminating the likely causes until the most probable one [wa]s isolated," *Pluck*, 640 F.3d at 678, resulting in his conclusion:

9

> It is my opinion to a reasonable degree of medical certainly, based on my education, training, and experience, together with my review of the documents and information referenced herein, along with my examination of Ms. Swartz, that it is more likely than not that her exposure to C8 was a substantial contributing factor in causing Mrs. Swartz's RCC [renal cell carcinoma].

(Margulis Expert Report at 8, Swartz ECF No. 27-1.)

Accordingly, DuPont's first argument provides no support for the Court to exclude the specific causation report and testimony of Dr. Margulis.

### 2. Scientific Determination

DuPont's next argument in support of its request to exclude Dr. Margulis' specific causation opinion is as follows:

> Second, Dr. Margulis based his primary specific causation opinion on the fiction that the Science Panel made a scientific determination of causation for C-8. Dr. Margulis compounded this fundamental error by subjectively and unreliably employing two different methodologies: one for C-8, and a different one for summarily dismissing all alternative explanations for Plaintiff's kidney cancer.
>
> Dr. Margulis gave unwarranted weight to C-8 in his differential etiology because he falsely assumed that the Science Panel made a scientific determination that C-8 was a "cause" of kidney cancer. Margulis Report at 2, 6 (*Swartz* ECF No. 27-1); Margulis Depo. at 47:21-48:4. But the Science Panel did not make any such determination; instead, the Science Panel's 'probable link' findings were based on a much lower standard of proof than a finding of causation.

((Def's Mot. to Exclude Dr. Vitalis Specific Causation Testimony at 2, 6, Swartz ECF No. **48**.)

DuPont made this same argument related to the Science Panel in its "Overview on Causation" (MDL ECF No. 2813) that it related to all cases in this MDL and in the *Bartlett* case (MDL ECF Nos. 2823, 3203). In DMO 1, DMO 1-A, and EMO 1 this Court found DuPont's argument not well taken, addressing it in detail. (EMO 1, Pls' and Def's Mots. to Exclude Expert Opinions Related to Causation at 6, 9, MDL ECF No. 4079) (DMO 1, Class Membership and Causation, ECF No. 1679); (DMO 1-A, DuPont's Mot. for Clarification on DMO 1 at 11–14, ECF No. 3972).

10

As explained in the Reference Manual on Scientific Evidence,[2] which DuPont has cited extensively throughout this MDL: "Epidemiology focuses on the question of general causation (i.e., is the agent capable of causing disease?) rather than that of specific causation (i.e., did it cause disease in a particular individual?). *Reference Manual on Scientific Evidence*, Third Edition, Michael D. Green, D. Michal Freedman, and Leon Gordis, Reference Guide on Epidemiology at 552. "Epidemiology has its limits at the point where an inference is made that the relationship between an agent and a disease is causal (general causation) and where the magnitude of excess risk attributed to the agent has been determined[.]" *Id*. at 609 (parenthetical in original). Here, the Science Panel was directed to determine the whether it was "more likely than not" (magnitude of risk) that there was a relationship between C-8 (an agent) and a disease, which resulted in the Probable Link Findings. The study produced by the Science Panel, and funded by DuPont, was one of the largest epidemiological study ever conducted. The physicians were selected by class counsel and DuPont. Without question, Dr. Margulis did not err in relying on the study, the only of its sort, in ruling in C-8 as a potential causal factor in a differential diagnosis. Such an approach did not conflate general and specific causation.

---

[2] "*The Reference Manual on Scientific Evidence*, here in its third edition, is formulated to provide the tools for judges to manage cases involving complex scientific and technical evidence." *Id*. at xv. "The search is not a search for scientific precision. We cannot hope to investigate all the subtleties that characterize good scientific work. A judge is not a scientist, and a courtroom is not a scientific laboratory... The law must seek decisions that fall within the boundaries of scientifically sound knowledge. Even this more modest objective is sometimes difficult to achieve in practice. . . . Judges typically are generalists, dealing with cases that can vary widely in subject matter. Our primary objective is usually process-related: seeing that a decision is reached fairly and in a timely way.

11

Specific causation, the issue to which Dr. Margulis's analysis is directed, "is a necessary legal element in a toxic substance case." *Id.* at 609 (addressing the section on "What Role Does Epidemiology Play in Proving Specific Causation?").

> The plaintiff must establish not only that the defendant's agent is capable of causing disease, but also that it did cause the plaintiff's disease. Thus, numerous cases have confronted the legal question of what is acceptable proof of specific causation and the role that epidemiologic evidence plays in answering that question. This question is not a question that is addressed by epidemiology. Rather, it is a legal question with which numerous courts have grappled.

*Id.* at 609–10 (citing Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28 cmt. c(3) (2010) ("Scientists who conduct group studies do not examine specific causation in their research. No scientific methodology exists for assessing specific causation for an individual based on group studies. Nevertheless, courts have reasoned from the preponderance-of-the-evidence standard to determine the sufficiency of scientific evidence on specific causation when group-based studies are involved").

Thus, DuPont's second argument provides no support for this Court to exclude the specific causation report and testimony of Dr. Margulis.

### 3. "No Safe Dose" Theory

DuPont's third argument as to why Dr. Margulis's Expert Report and his testimony should be excluded is that "he adopted a 'no safe dose' theory that failed to account for Mrs. Swartz's specific level of exposure to C-8." (Def's Reply in Support of Mot. to Exclude Dr. Vitalis Specific Causation Testimony at 2, Swartz ECF No. 75.) DuPont posits:

> Dr. Margulis's specific causation opinions are based on the "no safe dose" theory, which has been resoundingly rejected by other courts as an unreliable specific causation methodology, and the Court should do the same here. *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671 (6th Cir. 2011) (affirming exclusion of specific causation expert partly because "he relied upon a 'no safe dose' theory that had been discredited by other courts as a basis for establishing specific causation"); *Stallings v. Ga. Pacific Corp.*, 675 F. App'x 548 (6th Cir. 2017) (rejecting "any"

12

or "every exposure" theory of causation); *Adams v. Cooper Indus.*, 2007 U.S. Dist. LEXIS 55131 (E.D. Ky. July 30, 2007) ("The court finds that the 'no-safe-dose' theory is not a reliable methodology, and it rejects the plaintiffs' claim that said theory entitled their specific causation experts to pay so little attention to the level of exposure in the bellwether plaintiffs.").

. . . .

>  Perhaps the clearest indicator that Dr. Margulis's opinions in this case are "junk science" that should be excluded is Dr. Margulis's scientifically indefensible testimony that *his opinion that C-8 caused Mrs. Swartz's kidney cancer would not have changed even if Mrs. Swartz "had only been exposed to one molecule of C-8."* See DuPont's Motion to Exclude the Specific Causation Testimony of Dr. Vitaly Margulis [ECF No. 48] ("DuPont's Motion") at 2-3; 9-10.

(Def's Mot. to Exclude Dr. Vitalis Specific Causation Testimony at 10, Swartz ECF No. 48; Def's Reply in Support of Mot. to Exclude Dr. Vitalis Specific Causation Testimony at 2, Swartz ECF No. 75) (emphasis in original).

DuPont's arguments are not well taken. DuPont relies on one answer given to a hypothetical posed by defense counsel during Dr. Margulis' deposition in Mrs. Swartz's case:

> Q. Give you another hypothetical, sir. Would your causation opinions, in this Case, be the same if Mrs. Swartz had only been exposed to one molecule of C8?
>
> A. Yes.

(Margulis Dep. at 27, ECF No. 48-1) (objection omitted).

Defense counsel did not follow up with any clarifying question to Dr. Margulis, and instead changed topics in the very next question. However, Dr. Margulis's answer is inconsistent with his expert opinion in this case and in Mrs. Bartlett's case. Indeed, Dr. Margulis has been deposed several times in the course of this MDL, for Mrs. Bartlett, Mrs. Swartz, and also for other *Leach* Class members whose cases were never tried. Nowhere in the record does Dr. Margulis suggest that one molecule of C-8 is capable of causing cancer, let alone that one

13

molecule of C-8 caused cancer in any *Leach* Class member. And, to be sure, no such testimony will be permitted in a trial.[3]

To the contrary, Dr. Margulis opines that, based on the *Leach* Settlement Agreement, the Science Panel's Probable Link Finding, and Mrs. Swartz's class membership, he assumes that the amount of C-8 that was consumed by Mrs. Swartz was capable of causing her cancer. He then engages in review of studies, assessment of Mrs. Swartz, and differential diagnosis to reach his specific causation opinion.

This Court's conclusion is supported by the case law relied upon by DuPont. For example, the Sixth Circuit in *Pluck* reviewed the district court's conclusion that the expert's opinion was unreliable because "it 'suffer[ed] significant methodological flaws and [was] apparently based upon speculation and conjecture rather than evidence and data.'" *Pluck*, 640 F.3d at 675 (alterations in original). In *Pluck*, the court reviewed the expert's specific causation opinion that the defendant's pipeline had released the chemical benzene which had caused the plaintiff's cancer. The district court observed:

> Similarly, here, the mere fact that benzene has been identified as a carcinogen and Plaintiff may have been exposed to benzene does not provide reliable scientific evidence that benzene from Defendant's pipeline caused Plaintiff's cancer.
>
> The only analysis that would support such a conclusion would be the analysis based solely upon Dahlgren's assertion that there is no safe level of benzene exposure. . . . Further, benzene is ubiquitous in the environment; therefore, if *any* exposure is sufficient to cause cancer, it would be virtually impossible to identify Defendant's gas leak as the source of benzene that caused Mrs. Pluck's cancer. It is apparent upon review of the record that Plaintiff was also chronically exposed to benzene as a heavy cigarette smoker, calling into question how Dahlgren could attribute Mrs. Pluck's NHL to Defendant alone under his "no safe dose" theory. . . .

---

[3] The Court is simply noting that such testimony, on its own, is inadmissible. Because trials in general, and cross examination in particular, are not always predictable, this finding of inadmissibility is provisional, subject to reconsideration should circumstances change.

14

> When asked to explain his calculations and notes on dose reconstruction, Dahlgren could not, stating, "I'm not sure about any of these scribbles." *Id.* at 153.

*Pluck v. BP Oil Pipeline Co.*, 5:08CV1545, 2009 WL 10679665, at *5–6 (N.D. Ohio Nov. 25, 2009), *aff'd*, 640 F.3d 671 (6th Cir. 2011).

In the instant action, Dr. Margulis had far more that the "mere fact" that C-8 is a carcinogen and that Mrs. Swartz "may have been exposed to" it. Moreover, a "no safe dose" level of C-8 exposure is not the "only analysis that would support" Dr. Margulis's opinions. Unlike the *Pluck* plaintiff who could not show any dose of benzene to which she was exposed, Mrs. Swartz was required to prove that she is a *Leach* Class member and that she suffered from a Probable Link disease. To do that, she had to prove that she drank water containing at least .05 ppb of C-8 for at least one year and that she suffered from kidney cancer. There is no dispute that the C-8 to which Mrs. Swartz was exposed was released into her drinking water by DuPont or that kidney cancer is a Probable Link disease. And, again unlike the plaintiff in *Pluck* who voluntarily subjected herself to benzene for many years through heavy cigarette smoking, DuPont makes no claim that Mrs. Swartz was subjected to C-8 through any other source than the C-8 DuPont released into the environment. And finally, the Science Panel's seven-year epidemiological study can hardly compare to the *Pluck* expert's scribbles related to his calculations on causation.

Therefore, DuPont's third argument too does not provide a reason for the Court to exclude the specific causation report and testimony of Dr. Margulis.

### 4. Professional Practices

Last, DuPont contends that Dr. Margulis, "in his regular professional practice of medicine outside the courtroom, tells patients the various risk factors that contribute to kidney cancer, but does ***not*** tell them that one thing was the cause or a substantial contributing cause of

15

their kidney cancer." (Def's Mot. to Exclude Dr. Vitalis Specific Causation Testimony at 11, Swartz ECF No. 48) (emphasis in original). The only exception, DuPont notes, is "if he is treating a patient with a known hereditary gene issue." *Id.* at 11, n. 7. DuPont concludes:

> For this additional reason, that the made for litigation approach he used here differs from the approach he has used in his regular professional practice outside the courtroom for the past 10 years, his opinions on specific causation should be excluded. *United States EEOC v. Rockwell Int'l Corp.*, 60 F. Supp. 2d 791, 797 (N.D. Ill. 1999) (excluding expert testimony where the expert "failed to employ the same level of intellectual rigor that characterizes the practice of experts in his field, or even his own normal practice."); *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 639 (S.D. Tex. 2005) (excluding expert testimony where "the gulf between" the methodology used in the litigation and the methodology the expert advocated for in his academic work "starkly contravene[d]" the requirements of *Daubert*).

*Id.*

DuPont's argument misses the mark. That is, DuPont does not contend that Dr. Margulis failed to employ the same level of intellectual rigor that characterizes the practice of experts in his field. Instead, DuPont contends that Dr. Margulis's regular work does not include providing expert opinions, but rather in his professional practice he treats patients. This fact, however, has no impact on the admissibility of Dr. Margulis's specific causation opinion, which DuPont does not claim he is unqualified to make.

Dr. Margulis was asked to determine whether C-8 was a substantial contributing cause of Mrs. Swartz's kidney cancer. Dr. Margulis made that determination. The contention that in his role as the Chief of Urology at Parkland Memorial Hospital he is not asked to perform differential diagnoses to determine whether a particular risk or causal factor was a substantial contributing cause to the cancer for which he is treating a patient does nothing to take away from his qualifications to make such an inquiry. Indeed, DuPont does not argue that Dr. Margulis is unqualified to make such a determination. DuPont's argument merely underscores that, in his medical practice, Dr. Margulis does not typically offer medical opinions on legal issues.

16

The cases upon which DuPont relies are unhelpful. In *Rockwell International*, the court excluded an expert's opinion because the expert admitted that he "failed to employ the same level of intellectual rigor that characterizes the practice of experts in his field, or even his own normal practice." *U.S. E.E.O.C. v. Rockwell Intern. Corp.*, 60 F. Supp. 2d 791, 797 (N.D. Ill. 1999), *aff'd sub nom. E.E.O.C. v. Rockwell Intern. Corp.*, 243 F.3d 1012 (7th Cir. 2001). The court explained,

> It is obvious that Brethauer, who candidly admitted such at the *Daubert* hearing, was directed to employ principles that contradicted his normal methodology in various respects. He performed analyses he would not normally perform. He included analyses that he would not normally include. He included calculations upon which he did not rely and did not fully believe should be followed. He relied on materials, reports and summaries given to him by counsel, and failed to verify the information from reliable, independent sources. Finally, he incorporated language drafted by [Attorney] Waldron. It is one thing for lawyers to make authorized revisions to an expert's prepared report. *See Marek v. Moore*, 171 F.R.D. 298 (D.Kan.1997). It is quite another for an expert to include calculations upon which he did not rely and he would not rely on simply to appease his client's attorney. A proffered expert must "bring to the jury more than the lawyers can offer in argument." *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir.1992).

*Id.*

In the present action, DuPont makes no argument that Dr. Margulis did even one of the actions the Seventh Circuit found objectionable. DuPont does not argue that Dr. Margulis was directed by counsel to employ principles that contradicted his normal methodology in any respect, that he utilized a methodology he would not normally utilize if asked to perform a causation analysis, that he included calculations upon which he did not rely and did not fully believe should be followed, or that he relied upon materials, reports and summaries given to him by counsel that he failed to verify.

Similarly, in *In re Silica Prods. Liability Litigation*, the court explained the requirement that "an expert . . . employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 398 F. Supp. 2d at 622 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). There is no suggestion here that

17

Dr. Margulis failed to employ the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Again, DuPont makes no argument that Dr. Margulis is unqualified to engage in the causation analysis he was asked to complete.

Thus, this last argument too provides no support for DuPont's request to exclude the specific causation report and testimony of Dr. Margulis.

## IV.

Based on the foregoing, the Court **DENIES** DuPont's Motion to Exclude the Opinion and Testimony of Plaintiff Angela Swartz's Specific Causation Expert Dr. Vitaly Margulis. (Swartz ECF No. 48.)

**IT IS SO ORDERED.**

\_\_\_12-18-2019\_\_\_
**DATE**

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE