UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

Civil Action 2:13-md-2433
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth Preston Deavers

**This document relates to:** *Angela Swartz and Teddy Swartz v. E. I. du Pont de Nemours and Company*, Case No. 2:18-cv-00136.

## EVIDENTIARY MOTIONS ORDER NO. 28

### Plaintiffs' Motion to Exclude Defendant's Specific Causation Experts

This matter is before the Court on:

(1) Plaintiffs' Motion to Exclude the Specific Causation Opinions and Testimony of Defendant's Expert Dr. Samuel Cohen (ECF No. 53[1]), Defendant's Memorandum in Opposition (ECF No. 71), and Plaintiff's Reply Brief (ECF No. 78); and

(2) Plaintiffs' Motion to Exclude the Specific Causation Opinions and Testimony of Defendant's Expert Dr. Douglas Dahl (ECF No. 55), Defendant's Memorandum in Opposition (ECF No. 69), and Plaintiff's Reply Brief (ECF No. 79).

For the reasons set forth below, the Court **GRANTS** both of Plaintiffs' Motion.

### I.

The litigation between the parties in this multidistrict litigation ("MDL") began in 2001 in a class action in West Virginia state court captioned *Leach v. E. I. du Pont de Nemours & Co.*, No. 01-C-698 (Wood County W. Va. Cir. Ct.) ("*Leach* Case"). The *Leach* Case ended in

---

[1] Unless otherwise noted the ECF references are to the docket in *Swartz*, 2:18-cv-136.

November 2004 when the parties entered into a class-wide settlement ("*Leach* Settlement Agreement"). (ECF No. 820-8.) In the *Leach* Settlement Agreement, the parties fashioned a unique procedure to determine whether the approximately 80,000 members of the class ("*Leach* Class") would be permitted to file actions against Defendant E. I. du Pont de Nemours and Company ("DuPont") based on any of the human diseases they believed had been caused by their exposure to ammonium perfluorooctanoate ("C-8" or "PFOA") discharged from DuPont's Washington Works plant. The procedure required DuPont and the plaintiffs to jointly select three completely independent, mutually-agreeable, appropriately credentialed epidemiologists ("Science Panel") to study human disease among the *Leach* Class.

The Science Panel engaged in what ultimately became one of the largest epidemiological studies ever convened, utilizing nearly 70,000 blood samples and medical histories of the *Leach* Class members, and lasting seven years. In 2012, the Science Panel delivered Probable Link Findings for six human diseases ("Linked Diseases"): kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, diagnosed high cholesterol (hypercholesterolemia), and pregnancy-induced hypertension and preeclampsia. The Probable Link Finding means that for the *Leach* Class members it is more likely than not that there is a link between their exposure to C-8 (*i.e.*, drinking water containing at least .05 ppb of C-8 for at least one year) and their Linked Disease. Ultimately, over 3,500 individuals filed cases in this MDL, all of whom alleged that they are *Leach* Class members, are subject to the *Leach* Settlement Agreement, have a Linked Diseases, and that C-8 specifically caused their Linked Disease.

The Science Panel also delivered No Probable Link Findings for approximately 50 diseases it studied. Any *Leach* Class member who received a No Probable Link Finding was prohibited from filing a personal injury action against DuPont as a result of being subject to the

*Leach* Settlement Agreement, regardless of whether any other study or expert disagreed with the Science Panel' No Probable Link Finding.

Beginning in February 2015, this Court held four month-long trials in this MDL: *Carla Marie Bartlett v. E. I. du Pont de Nemours and Company*, Case No. 2:13-cv-170; *David Freeman v. E. I. du Pont de Nemours and Co.*, 2:13-cv-1103; *Kenneth Vigneron, Sr. v. E. I. du Pont de Nemours Company*, Case No. 13-cv-136, and; *Larry Ogle Moody v. E. I. du Pont de Nemours Company*, Case No. 15-cv-803. The first two trials were bellwether trials and the second two were non-bellwether trials. The parties reached a global settlement of the 3,500-plus cases in February 2017.

Since the global settlement, over 50 cases have been filed ("Post-Settlement Cases"). As did the plaintiffs in the pre-settlement cases, the plaintiffs in these Post-Settlement Cases allege that they are *Leach* Class members, are subject to the *Leach* Settlement Agreement, have a Linked Diseases, and that C-8 specifically caused their Linked Disease. Pursuant to the Court's trial schedule, the parties have filed their motions directed at experts.

## II.

The Federal Rules of Evidence, in particular Rule 702 and 104(a), govern the admission of expert witness testimony and require that the trial judge "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Because Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence,'" expert testimony "which does not relate to any issue in the case is not relevant and ergo, nonhelpful." *Daubert*, 509 U.S. at 590–90. "In other words, there must be a 'fit' between the proposed testimony and the question(s) presented by the case at bar." *Daubert*, 509 U.S. at 591.

3

To determine whether expert testimony is "reliable," the court's role, and the offering party's responsibility, "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Generally, the expert's opinions must reflect "scientific knowledge . . . derived by the scientific method," representing "good science." *Daubert*, 509 U.S. at 590, 593. The test of reliability is, however, a "flexible" one. *Kumho Tire Co.*, 526 U.S. at 140.

The Supreme Court mandates that a district court exercise its responsibility in acting as the "gatekeeper" for expert testimony. *Daubert*, 509 U.S. at 588; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). This role, however, is not intended to supplant the adversary system or the role of the jury. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 531–32 (6th Cir. 2008). Arguments regarding the weight to be given any testimony or opinions of an expert witness are properly left to the jury. *Id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596).

The burden is on the party proffering the expert report to demonstrate by a preponderance of proof that the opinions of their experts are admissible. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). Any doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility. Fed. R. Evid. 702 Advisory Committee's Notes ("[A] review of the case law. . . shows that rejection of the expert testimony is the exception rather than the rule."); *Jahn v. Equine Services, PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (stating

4

that in *Daubert* "[t]he Court explained that Rule 702 displays a liberal thrust with the general approach of relaxing the traditional barriers to opinion testimony") (internal quotations omitted).

## III.

Plaintiff moves for exclusion of the opinions and testimony of DuPont's specific causation expert, Samuel M. Cohen, M.D., PhD, for the same reasons this Court excluded Dr. Cohen's testimony and opinions in the first trial in this action, *Bartlett*. In *Bartlett*, DuPont offered Dr. Cohen as its specific causation expert and Plaintiff moved for exclusion of his opinions and testimony as irrelevant and unreliable. This Court addressed issues related to Dr. Cohen in Evidentiary Motions Order No. ("EMO") 1 and EMO 1-A. (EMO 1, Pls' and Def's Mots. to Exclude Expert Opinions Related to Causation, MDL ECF No. 4079; EMO 1-A, Pls' Mot. to Exclude Dr. Cohen Specific Causation Testimony, MDL ECF No. 4226.) Because the Court finds that the reasons for exclusion of Dr. Cohen's testimony and opinions in *Bartlett* are present in his testimony and opinions in this case, the Court incorporates both EMO 1 and EMO 1-A here and addresses portions of them herein in explanation of the issues at hand.

In *Bartlett*, Dr. Cohen offered the following opinions related to the specific cause of Mrs. Bartlett's kidney cancer:

> I conclude, to a reasonable degree of medical certainty, that Mrs. Bartlett's kidney tumor was most likely the result of her history of morbid obesity and not related to her claimed exposure to PFOA. Her cancer would have likely occurred even without any exposure to PFOA.
> . . . .
>
> The [PFOA] exposure that Mrs. Bartlett claims was not associated [in any study] with an increased risk of kidney cancer.
>
> In sum, it is my opinion . . . that the renal cell carcinoma of Mrs. Bartlett resulted from her history of morbid obesity, and was not caused by or related to her low exposure to PFOA.
> . . . .

5

> As indicated above, there has been a suggestion of a possible relationship in some studies between PFOA and kidney cancer. However, this only occurs at exposures considerably higher than Mrs. Bartlett's exposure.

(EMO 1-A, Pls' Mot. to Exclude Dr. Cohen Specific Causation Testimony at 6, MDL ECF No. 4226) (citing Cohen Report at 5, 22, 23, MDL ECF No. 2807, Ex. A).

In *Bartlett* and the second scheduled bellwether trial *John M. Wolf v. E.I. du Pont de Nemours and Company*, Case No. 2:14-cv-095, DuPont explained why it believed that its specific causation experts, Dr. Cohen and Dr. Hanauer, offered admissible testimony and opinions:

> Review of their expert reports and depositions shows that both ***Dr. Cohen and Dr. Hanauer properly considered and evaluated PFOA, but determined that Bartlett's and Wolf's individualized risk of developing their respective disease was not materially increased by their relatively low personal levels of PFOA exposure.*** *See e.g.*, Cohen Report at 22 ("Likewise, in all of the epidemiology studies, including the Science Panel studies, a possible relationship between PFOA and kidney cancer was only observed at much higher exposures than Mrs. Bartlett likely experienced. The exposure that Mrs. Bartlett claims was not associated with an increased risk of kidney cancer. In sum, it is my opinion . . . that the renal cell carcinoma of Mrs. Bartlett . . . was not caused by or related to her low exposure to PFOA."); Hanauer Report at 6-7 ("I have considered Mr. Wolf's claim that PFOA caused his ulcerative colitis . . . The 'Probable Link Evaluation' referenced by Dr. Gross showed only a small increased risk of developing ulcerative colitis with increasing levels of estimated cumulative exposure to PFOA . . . The Science Panel found no statistically significant results and no positive trend with increasing estimated cumulative dose in its prospective analysis, which appears to be the analysis that Mr. Wolf would fall into, since he was diagnosed after the C8 Health Project collected its data.")

(EMO 1, Pls' and Def's Mots. to Exclude Expert Opinions Related to Causation at 16, MDL ECF No. 4079) (quoting DuPont's Mem. in Opp. at 38–39, MDL ECF No. 3203) (emphasis by DuPont).

In EMO 1, this Court excluded Dr. Cohen's and Dr. Hanauer's ultimate causation opinions because, although the experts framed their "analysis as relating to specific causation, [] in actuality the analysis is directed at what the parties defined in the *Leach* Settlement

6

Agreement as general causation," which is not a triable issue. (EMO 1, Pls' and Def's Mots. to Exclude Expert Opinions Related to Causation at 11, MDL ECF No. 4079.) In EMO 1, the Court explained:

> The *Leach* Settlement Agreement unambiguously dictates the effect of the [Probable Link] Findings: If the Science Panel found that it was "more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members," the Panel issued a Probable Link Finding for that specific disease and DuPont waived its right to challenge whether "it is probable that exposure to C-8 is capable of causing" the Linked Disease, *i.e.*, general causation.
>
> . . . .
>
> Again, as the Court explained in [Dispositive Motions Order No. ("DMO") 1 and DMO 1-A, the plaintiffs are not required to prove that their dose of and/or exposure to C-8 is *capable* of causing their Linked Diseases. If the plaintiffs prove that they are a member of the *Leach* Class and that they have or had a Linked Disease, the Probable Link Finding applies to them. Application of the Probable Link Finding establishes that it is more likely than not that there is a link between that class member's exposure to C-8 and his or her Linked Disease, and DuPont is prohibited from challenging whether it is probable that exposure to C-8 is capable of causing that Linked Disease.

*Id.* at 9–10.

In EMO 1-A, the Court clarified its exclusion of Dr. Cohen's testimony and opinions as irrelevant, stating:

> Therefore, the Court [in EMO 1] excluded Dr. Cohen's general causation testimony and opinions, and it reaffirms that exclusion now. *Id.* at 11. Dr. Cohen's referenced testimony is not relevant because there is no "connection between the [opinion] being offered and [any] disputed factual issues" that are before the Court. *Price v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at 592). Because Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence,'" expert testimony "which does not relate to any issue in the case is not relevant and ergo, nonhelpful." *Daubert*, 509 U.S. at 590–90. "In other words, there must be a 'fit' between the proposed testimony and the question(s) presented by the case at bar." *Id.* at 591. Here, Dr. Cohen's testimony is not relevant because it cannot assist the trier of fact to understand the evidence or to determine *any fact in issue* [i.e., specific causation].

7

(EMO 1-A, Pls' Mot. to Exclude Dr. Cohen Specific Causation Testimony at 5–6, MDL ECF No. 422) (emphasis in original).

The Court also found Dr. Cohen's opinions unreliable for, *inter alia*, the following:

> These opinions contradict the threshold used in (a) the *Leach* Settlement Agreement, and (b) the Science Panel's Probable Link Finding. In other words, Dr. Cohen opines that C-8 has *not* been found to be capable of causing kidney cancer in a member of the *Leach* Class. He cannot testify to this.
>
> Because of Dr. Cohen's faulty premises, his differential diagnosis is unreliable. A differential diagnosis, which "is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 678 (6th Cir. 2011) (internal quotation marks omitted). The reliability of a differential diagnosis is determined by, *inter alia*, whether the "expert reliably *rule[d] in* the possible causes" of the disease under consideration. *Id.* (emphasis added, citations omitted). This Court previously held that Dr. Cohen's differential diagnosis is unreliable, explaining
>
>> that the Probable Link Findings are valid and reliable evidence admissible to establish that it is more likely than not that there is a link between the Trial Plaintiffs' exposure to and/or dose of C-8 and their Linked Diseases. . . .
>
> (EMO 1 at 17.)

*Id.* at 6 (footnote omitted, emphasis in original).

In the case *sub judice*, Dr. Cohen offers the following ultimate causation opinions as to Mrs. Swartz:

> In summary, it is my opinion, based on a reasonable degree of medical and scientific certainty, that Mrs. Swarts, with her long history of obesity and hypertension and relatively low exposures to C8, would have developed her renal cell carcinoma even without her exposure to C8.
>
> Her amount of increased risk of developing kidney cancer from her C8 exposure would have been very small, and insignificant compared to her substantial amount of increased risk from her hypertension and her increased BMI.

(Cohen Expert Report at 7, Swartz ECF No. 53-3.)

8

To reach his conclusion, Dr. Cohen uses the same methodology he used in *Bartlett*. That is, he does not accept the underlying Probable Link Finding (*i.e.*, that "it is more likely than not that among class members a connection exists between PFOA exposure and a [kidney cancer]") as he makes clear in his testimony:

> According to the scientific panel and these other publications, the average increased risk from C8 for kidney cancer is approximately 10 percent. Her exposure is below the average, so her increased risk would be anticipated to be less than that 10 percent, so that's what I went on.
>
> . . . . let me explicitly state what I'm saying is that I think she's at the low end of the Leach class members, and so her overall risk would be at the low end of the C8 class . . . .

(Dep. of Dr. Cohen, June 14, 2019 at 36, 99–100, ECF No. 53-2).

Mrs. Swartz argues that Dr. Cohen's report and opinions should be excluded, stating:

> Through the proposed expert report and opinions of Dr. Samuel Cohen, Defendant AGAIN makes it clear that it fully intends to dispute and challenge general causation in this litigation on at least two levels: (1) that the Probable Link Evaluation only increased class member's risk of getting cancer by 10%, instead of the defined "more likely than not" and (2) that class members with low C8 blood levels and water exposure had a lesser chance of getting cancer than other class members with higher C8 blood levels and water exposure. Defendant attempts to disguise this attack on general causation by directing it specifically at Plaintiff Angela Swartz but either opinion is still explicitly challenging general causation which is expressly prohibited under the parties' binding contract and this Court's prior Orders. Therefore, Dr. Cohen's report and opinions should AGAIN be precluded in this litigation on the same rationale as previously applied.

(Pls. Mot. to Exclude Specific Causation Opinions and Testimony of Dr. Cohen at 7, ECF No. 53.) This Court agrees.

In the instant action, Dr. Cohen states that there is only a 10% increased likelihood of developing a Probable Link Disease, and similarly in *Bartlett*, Dr. Cohen stated that there was only a small increased risk of developing the Probable Link Disease. Likewise, here and in *Bartlett*, Dr. Cohen opines that the increased risk was found only at much higher exposures than

9

that to which Mrs. Bartlett or Mrs. Swartz had been exposed. This Court rejects this position for the same reasons it has previously rejected it:

> DuPont's position would prevent the Probable Link Findings from applying to the Trial Plaintiffs [Mrs. Bartlett and Mr. Wolf]. DuPont relies upon its experts' ability to dissect the Science Panel's Probable Link reports to show what the Panel did not find. The Court has explained in detail *supra*, and in DMO 1 and DMO 1-A, why this analysis is prohibited by the *Leach* Settlement Agreement. In short, the parties contractually agreed to application of the Probable Link Findings and the No Probable Link Findings to every member of the *Leach* Class. Thus, each plaintiff in this MDL who can prove that he or she is a member of the *Leach* Class and has or had one of the six Linked Diseases receives the benefit of the Probable Link Finding in the same way that DuPont received the benefit of the No Probable Link Findings related to over forty human diseases.
>
> This means, as stated above, that the Probable Link Findings are valid and reliable evidence admissible to establish that it is more likely than not that there is a link between the Trial Plaintiffs' exposure to and/or dose of C-8 and their Linked Diseases.

(EMO 1, Pls' and Def's Mots. to Exclude Expert Opinions Related to Causation at 17, MDL ECF No. 4079.)

Dr. Cohen does not accept the application of the Probable Link Finding nor the covenants to which the parties agreed in the *Leach* Settlement Agreement. Dr. Cohen continues to engage in an increased risk analysis by delving into what the Science Panel's epidemiological study did not show in an attempt to glean specific causation. The Court has explained why this analysis is prohibited:

> By way of example, DuPont's experts' opine that the Trial Plaintiffs fit into a low dose quartile of some of the objective criteria and/or protocols the Science Panel utilized in its work, and in those groups there was no statistically significant evidence of a link between exposure to C-8 and kidney cancer or ulcerative colitis. In other words, as this Court recognized in DMO 1, DuPont's position is that the Probable Link Findings may not apply to a particular member of the *Leach* Class, such as Mrs. Bartlett and Mr. Wolf, who were in the lowest exposure groups. (DMO 1 at 8.)

*Id.* at 7. The Court further explained:

> DuPont's framing of its experts' inquiry as one into what the Science Panel did and did not find (*i.e.*, "the Science Panel *did not find* that all *Leach* Class members had an equal, materially increased risk of developing a Probable Link Disease") is prohibited by the *Leach* Settlement Agreement. The Court addressed this topic in DMO 1, which was issued before DuPont's experts issued their reports. (DMO 1 at 9–10) (concluding that "DuPont cannot now prevent a class member from the benefit of such a finding by pointing out the 'limitations' in the objective criteria and/or protocols the Science Panel utilized to make its conclusions or by extrapolating from the Science Panel's analysis what the Panel 'did not find' in its Probable Link Finding"). As pointed out in DMO 1-A, DuPont confuses the Probable Link *reports* with the Probable Link *Findings*. (DMO 1-A) ("DuPont's mistake is focusing on the Science Panel's *reports/evaluations* instead of its *Findings*."). The *Leach* Settlement Agreement unambiguously requires application to all members of the *Leach* Class the Probable Link *Findings*, which the parties defined as the *conclusion* reached by the Science Panel. (S.A. §§ 1.50, 12.2.3(b)(1)) (defining a Probable Link *Finding* as the Science Panel's "conclu[sion] that there is a Probable Link between C-8 exposure and Human Disease(s)").

*Id.* at 8–9 (emphasis in original).

DuPont attempts to differentiate its current analysis, stating that in the instant action Dr. Cohen's opinion and related testimony are admissible because his "entirely new opinions related to specific causation in this case were reached *following faithfully the methodology that this Court has repeatedly held is permitted* . . . ." (Def's Mem. in Opp. at 1, ECF No. 71) (emphasis in original). DuPont continues, asserting that the methodology to which it refers is based on "this Court's <u>prior rulings expressly allowing the exact type of opinions and testimony offered by Dr. Cohen in this case</u> . . . ." *Id.* (emphasis in original). DuPont asserts that Mrs. Swartz "ignore[s] the Court's repeated prior rulings that defense experts *are* allowed to weigh the amount of increased risk from various risk factors." *Id.* at 2 (emphasis in original).

The "repeated prior rulings" to which DuPont refers are three statements made by the Court: one at a discovery conference, one at a sidebar during the *Vigneron* trial, and one at pretrial conference where it reflected on causation in the tobacco litigation *Engle*-progeny cases. *Id.* (citing Tr. of Mar. 25, 2015 Tel. Discovery Conf. at 12, ECF No. 71-2; Oct. 27, 2016 Trial

11

Tr. at 42-45, ECF No. 71-3; Nov. 22, 2016 Trial Tr. at 221-24, ECF No. 71-4.) These statements were not "prior rulings." And, DuPont takes them entirely out of context. The statements have no application to the *Daubert* analysis currently before the Court. In any event, to the extent that the Court's statements may be construed to be incongruent with its written decisions, the decisions prevail. In those decisions the Court has excluded Dr. Cohen's causation opinions because they are both irrelevant and unreliable.

Moreover, DuPont's continued emphasis on a relative risk analysis not only violates the *Leach* Settlement Agreement, but is also unhelpful to the specific causation consideration at issue in this action. That is:

> Epidemiological studies cannot prove specific causation. "Epidemiology is concerned with the incidence of disease in populations, and epidemiologic studies do not address the question of the cause of an individual's disease. This question, often referred to as specific causation, is beyond the domain of the science of epidemiology. Epidemiology has its limits at the point where an inference is made that the relationship between an agent and a disease is causal (general causation) and where the magnitude of excess risk attributed to the agent has been determined; that is, epidemiologists investigate whether an agent can cause a disease, not whether an agent did cause a specific plaintiff's disease.

*Reference Manual on Scientific Evidence*, Third Edition, Michael D. Green, D. Michal Freedman, and Leon Gordis, Reference Guide on Epidemiology at 608–09.[2]

---

[2] "*The Reference Manual on Scientific Evidence*, here in its third edition, is formulated to provide the tools for judges to manage cases involving complex scientific and technical evidence." *Id.* at xv. "The search is not a search for scientific precision. We cannot hope to investigate all the subtleties that characterize good scientific work. A judge is not a scientist, and a courtroom is not a scientific laboratory... The law must seek decisions that fall within the boundaries of scientifically sound knowledge. Even this more modest objective is sometimes difficult to achieve in practice.... Judges typically are generalists, dealing with cases that can vary widely in subject matter. Our primary objective is usually process-related: seeing that a decision is reached fairly and in a timely way.

12

What is at issue in this case, based on the *Leach* Settlement Agreement, is only specific causation. The parties have utilized experts to apply differential diagnosis to determine specific causation and the experts are required, in this circuit, to "consider[] all relevant potential causes of the symptoms and then eliminate[] alternative causes based on a physical examination, clinical tests, and a thorough case history." *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 178 (6th Cir. 2009) (citing *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001) and Federal Judicial Center, Reference Manual on Scientific Evidence 214 (1994)).

As Plaintiff correctly notes, experts may offer "[c]ompelling arguments as to temporality, genetics, or other factors (none of which were attempted here) might be employed to demonstrate another specific cause of the cancer, but Defendants cannot redefine the Probable Link findings in order to lessen the relative risk percentage so as to boot strap an otherwise non-viable alternative differential diagnosis. Such an endeavor strips class members of everything for which they bargained in the *Leach* settlement." (Def's Reply at 7, n.2, Swartz ECF No. 78.)

## IV.

While DuPont will only present one specific causation expert at trial, it has named and provided reports for a second expert as well: Douglas M. Dahl, M.D. Dr. Dahl opines:

> After assessing the applicable risk factors for development of kidney cancer, it is my medical opinion that it is more probable than not that Mrs. Swartz developed a very small early stage kidney tumor because of her many years of obesity and hypertension, which greatly increased her risk of getting kidney cancer.
>
> I do not believe that Mrs. Swartz's tumor was caused by C8 exposure, nor was it a significant contributing factor. It is my opinion that Mrs. Swartz's kidney tumors would have developed without any exposure to C8.

(Dahl Expert Report at 6, ECF No. 55-2.)

Plaintiffs move to exclude the opinions and testimony of Dr. Dahl for the same reasons it moved to exclude the testimony and opinions of Dr. Cohen above. Specifically, Plaintiffs argue:

13

As discussed above, Dr. Dahl clearly does not believe that Plaintiff's exposure to C-8 could have caused Plaintiff's cancer and he directly attacked the probable link definition as the way to come to that conclusion.

Dr. Dahl testified that it is his opinion that there is no way to conclude that C-8 caused Plaintiff's cancer, that there is no data supporting Plaintiff's expert opinion that C-8 was a substantial contributing cause to Plaintiff's cancer, that the Science Panel's work is not "particularly compelling," that the science panel only ever determined there was a 10% increased risk of cancer for class members, that Plaintiff's C-8 level was in the "lower" levels, and that all of this was the foundation for his other opinions as to the cause of Plaintiff's cancer. (6/20/19 Dahl Dep. Tr. at 18:10–16, 40:21–41:11, 42:19–25, 43:21–44:9, 46:5–16, 23–74:6, 95:13-25; *see also* 11/10/16 Dahl Dep. Tr. at 281:13-19, 285:12-16, 294:5-13).

(Pls' Mot. to Exclude Dr. Dahl Specific Causation Testimony at 13–14, ECF No. 55.)

Plaintiffs' arguments are well taken. Dr. Dahl provides the same ultimate causation opinion as Dr. Cohen and utilized the same methodology to reach his conclusions. Consequently, for the same reasons explained above and in EMO 1 and EMO 1-A, the Court also excludes the opinions and testimony of Dr. Dahl.

## V.

Based on the foregoing, the Court **GRANTS** Plaintiff's Motion to Exclude the Specific Causation Opinion and Testimony of Defendant's Expert Dr. Samuel Cohen (ECF No. 53) and **GRANTS** Plaintiffs' Motion to Exclude the Specific Causation Opinions and Testimony of Defendant's Expert Dr. Douglas Dahl (ECF No. 55).

**IT IS SO ORDERED.**

12-31-2019
DATE

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE

14