UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

                               Civil Action 2:13-md-2433
                               JUDGE EDMUND A. SARGUS, JR.
                               Magistrate Judge Elizabeth Preston Deavers

This document relates to:

*Travis Abbott and Julie Abbott v. E. I. du Pont de Nemours and Company*, Case No. 2:17-cv-998.

## EVIDENTIARY MOTIONS ORDER NO. 33

### Plaintiffs' Motion to Strike and for Sanctions Regarding Supplemental Opinion

This matter is before the Court on Plaintiffs' Motion to Strike and for Sanctions Regarding Dr. Wheeler's Supplemental Opinion[1] (ECF No. 95), Defendant's Memorandum in Opposition (ECF No. 98, 99[2]), and Plaintiffs' Reply (ECF No. 101). For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion.

I.

Plaintiff Travis Abbott suffered from testicular cancer in 1994, when he was 16 years old, which led to the removal of his left testicle (an orchiectomy). Mr. Abbott suffered a second testicular cancer in 2015, which led to a right orchiectomy. Mr. Abbott is a member of the class of individuals contractually permitted to bring personal injury lawsuits against Defendant

---

[1] Plaintiffs also request a protective order. Because the Court finds it appropriate to strike Dr. Wheeler's opinion letter, the Court does not address this request.

[2] Docket number 98 is filed under seal and docket number 99 is the redacted version filed for public viewing.

1

DuPont de Nemours and Company for its contamination of their water supplies with C-8 (ammonium perfluorooctanoate). This class of individuals are plaintiffs in this multidistrict litigation ("MDL") and each suffer from one or more of six Probable Link Diseases. Testicular cancer is a Probable Link Disease.

Mr. Abbott's trial is scheduled for January 21, 2020, which is less than two weeks away. Mr. Abbott's case is the fifth one to go to trial in this MDL.

The following are the relevant events occurred pursuant to the schedule that was established in Case Management Order No. 27 (ECF No. 23):

- May 21, 2019 – Plaintiff's Specific Causation Expert Kamal S. Pohar, M.D., FRCSC submitted his Expert Report (ECF No. 33-1). Dr. Pohar is trained in urologic oncology.

- May 31, 2019 – Defendant's Specific Causation Expert Craig R. Nichols, M.D., FASCO, FACP submitted his Expert Report (ECF No. 63-1). Dr. Nichols is trained in medical oncology.

- June 6, 2019 – Plaintiff's Specific Causation Rebuttal Expert Report from Dr. Pohar was submitted (ECF No. 63-5).

- June 14, 2019 – Plaintiff's Specific Causation Expert Dr. Pohar was deposed.

- June 20, 2019 – Defendant's Specific Causation Expert Dr. Nichols was deposed.

- July 9, 2019 – *Daubert* and Dispositive Motions were filed:

    * Defendant's Motion to Exclude Plaintiff's Specific Causation Expert Dr. Pohar (ECF No. 63).

    * Defendant's Motion for Summary Judgment on Specific Causation (ECF No. 58).

    * Plaintiffs' Motion to Exclude Defendant's Specific Causation Expert Dr. Nichols (ECF No. 65).

- July 16, 2019 – Responses to *Daubert* and Dispositive Motions were filed:

    * Plaintiffs' Memorandum in Opposition to Motion to Exclude Plaintiff's Specific Causation Expert Dr. Kamal Pohar (ECF No. 72).

> \* Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment on Specific Causation (ECF No. 73).
>
> \* Defendant's Memorandum in Opposition to Motion to Exclude Defendant's Specific Causation Expert Dr. Nichols (ECF No. 79).

- July 23, 2019 – Replies in Support of the *Daubert* and Dispositive Motions were filed:

  > \* Defendant's Reply in Support of its Motion to Exclude Plaintiff's Specific Causation Expert Dr. Kamal Pohar (ECF No. 91).
  >
  > \* Defendant's Reply in Support of its Motion for Summary Judgment on Specific Causation (ECF No. 84).
  >
  > \* Plaintiffs' Reply in Support of their Motion to Exclude Defendant's Specific Causation Expert Dr. Nichols (ECF No. 87).

Plaintiffs bring the Motion at bar based on the following events:

- August 27, 2019 – Defense counsel emailed to Plaintiffs' counsel a "consultation letter" drafted by Thomas M. Wheeler, M.D., a pathologist, indicating that the letter "supplements Dr. Nichols' materials considered list." (ECF No. 95-2.)  The consultation letter included:

  \* A statement of Dr. Wheeler's opinion of the pathology slides of specimens from Mr. Abbott's removed testicle that had been stored since his 1994 orchiectomy.

  \* Dr. Wheeler's qualifications to make the opinions, including his education, training, and experience as a pathologist.

  \* Dr. Wheeler's *curriculum vitae*.

  \* Dr. Wheeler's declaration that his opinions were all held to a reasonable degree of medical and scientific certainty.

  \* The bases and reasons for Dr. Wheeler's opinions and the facts, data, and materials he reviewed in making the opinions.

- September 4, 2019 – Plaintiffs responded to Defense counsel with a request to withdraw the "consultation letter" because it is not a supplemented document to add to Dr. Nichol's "materials considered list," but instead was a new and previously undisclosed expert opinion.  (ECF No. 95-2.)  Plaintiffs also requested an immediate meet and confer.

- September 13, 2019 – Plaintiffs filed the instant motion asking that Dr. Wheeler's letter be stricken because it is an untimely report from an undisclosed expert.  (ECF No. 95.)

3

- <u>October 4, 2019</u> – Defendant filed its Memorandum in Opposition (ECF No. 98), arguing that Dr. Wheeler's consultation letter is an appropriate supplementation to Dr. Nichols' Expert Report.

- <u>October 18, 2019</u> – Plaintiffs filed their Reply (ECF No. 101).

## II.

"The Sixth Circuit and other courts have held that district courts have broad discretion to exclude untimely disclosed expert-witness testimony." *Estes v. King's Daughters Med. Ctr.*, 59 Fed. Appx. 749, 753 (6th Cir. 2003) (citing *Pride v. BIC Corp.*, 218 F.3d 566, 578–79 (6th Cir.2000) (upholding the exclusion of untimely expert-witness reports and affidavits); *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1446 (6th Cir. 1993) (noting that the district court "has the discretion to refuse the filing of untimely affidavits"); *Sexton v. Gulf Oil Corp.*, 809 F.2d 167, 170 (1st Cir. 1987) (affirming preclusion of testimony due to untimely designation of expert witness)).

The source of a district court's "discretion in this matter is Rule 16 of the Federal Rules of Civil Procedure, which grants district courts wide latitude to impose sanctions for failure to comply with their scheduling orders." *Estes*, 59 Fed. Appx. at 753 (citing *Clarksville–Montgomery County School System v. United States Gypsum Co.*, 925 F.2d 993, 998 (6th Cir. 1991)). "The district court has discretion to impose whatever sanction it feels is appropriate, under the circumstances." *Id.* (citing Advisory Committee notes to Fed. R. Civ. P. 16(f) (1983); *see also United States v. Rayco, Inc.*, 616 F.2d 462, 464 (10th Cir. 1980) (broad powers of enforcement inure to a pretrial order limiting issues to be tried and evidence to be introduced)).

### III.

Plaintiffs move to strike Dr. Wheeler's pathologic analysis and opinion of a specimen from Plaintiff's left testicle that was removed in 1994, arguing that it is an untimely expert report from an undisclosed expert. Specifically, Plaintiffs state:

> While DuPont couches its supplementation as further supporting Dr. Nichols' earlier expert report and deposition, Dr. Wheeler's consultation letter is in fact a new expert report by a previously undisclosed expert which DuPont failed to submit within the deadline set forth in the Court's scheduling order. DuPont is attempting to unilaterally submit this new expert opinion letter as support for Dr. Nichols' testimony in hopes of bypassing the deadline for expert designations, expert discovery, and *Daubert* motion practice, which have all long since expired. In doing so, DuPont would have effectively laid in wait until after Plaintiffs had issued their own expert opinions, issued their expert rebuttal opinions, put their experts up for deposition, deposed DuPont's experts, briefed their *Daubert* motions, and responded to DuPont's *Daubert* motions, before, for the first time, indicating any suggestion that it would ambush Plaintiffs with this last minute new expert report and opinion.

(Pls' Mot. to Strike at 1–2, ECF No. 95.)

It is undisputed that neither specific causation expert, Dr. Nichols and Dr. Pohar, have the expertise to provide an opinion on the pathology of Mr. Abbott's preserved specimen. Yet, neither Plaintiffs nor DuPont chose to engage a pathologist as DuPont has done in other cases in this MDL, including the *Swartz* case that is being tried with the *Abbott* case commencing on January 21, 2020. (*Angela and Teddy Swartz v. E. I. du Pont de Nemours and Company*, Case No. 2:18-cv-136.)

Instead, both experts accepted the 1994 pathology report about the 1994 specimen that is part of Mr. Abbott's medical records, as well as the other pathology reports that were contemporaneously drafted by other pathologists. Dr. Nichols testified in his deposition that he reviewed "all physician notes, all of the pathology reports, all the imaging reports and all that" when formulating his opinions, making no indication in either his report or his testimony that

5

there was the need for something further. (Nichols Dep. at 25.). Dr. Pohar indicates that he too relied upon the pathology reports from Mr. Abbott's 1994 orchiectomy, 1994 retroperitoneal lymph node dissection ("RPLND"), 2015 orchiectomy, 2016 RPLND, and 2017 pancreatic neuroendocrine tumor when formulating his opinions, also making no indication in either his report or his testimony that these was a need for something further. (Pohar Rep. at 3–5, ECF No. 64-4.)

Plaintiffs further contend that the evidence from which Dr. Wheeler's report was derived is not new and DuPont could have gotten the slides well before the expert opinion deadlines, stating:

> DuPont has known of Mr. Abbott's 1994 pathology report since *at least* August 28, 2018. Exhibit 1 (Plaintiffs' August 28, 2018, e-mail to counsel for defense including the Medical Records and HIPPA Authorizations) when Plaintiffs provided copies of the medical records and pathology during early case discovery and the slides have been in existence for over 25 years; however, DuPont failed to request the slides until the day before Dr. Nichols' deposition on June 20, 2019, and Plaintiffs were not made aware this request had been made until August 27, 2019, when Dr. Wheeler's new expert report was e-mailed to undersigned. Exhibit 2 (August 27, 2019 to September 4, 2019, e-mail thread, with attachments (omitted), between DuPont Counsel and Plaintiffs' Counsel).

*Id.*

In response, DuPont first addresses at length the proposition that Dr. Nichols, like all experts, has the right to rely on other expert's work, arguing:

> As even Dr. Pohar observed, it is "common practice" for a physician to rely "on the work of other experts in various fields." Pohar Report at 3; *see, e.g., Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 781-82 (3d Cir. 1996) ("[Testifying physician's] reliance on the pathology report to confirm his diagnosis does not reflect negatively on his qualifications or ability to diagnose his patient; to the contrary, it reflects routine procedure in medical treatment, as recognized by Rule 703."). Physicians like Drs. Nichols and Pohar routinely rely on data (*e.g.,* pathology reports/findings), such as Dr. Wheeler's Pathology Report and the five other pathology reports cited in both Drs. Pohar and Nichols's expert reports. *See, e.g.,* Pohar Report at 3-5.

(Def's Mem. in Opp. at 7, ECF No. 99.)

This argument misses the mark. The issue before this Court is not whether an expert may rely upon the work of others in formulating his or her opinions. The issue is whether, after the deadlines to disclose experts has passed, commissioning an undisclosed expert to provide an opinion based upon previously available and existing evidence is properly considered an untimely expert report from an undisclosed expert.

As to that inquiry, Dr. Wheeler's consultation letter contains all of the indicia of expert reports. *See* Fed. R. Civ. P. 26(a)(2)(B) (requirements of expert reports). Specifically, as stated above, Dr. Wheeler's letter contains his qualifications to make expert opinions, including his education, training, and experience as a pathologist; a statement of his opinion of the pathology slides of specimens from Mr. Abbott's removed testicle that had been stored since Mr. Abbott's 1994 orchiectomy; the bases and reasons for his opinions and the facts, data, and materials he reviewed in making the opinions; his *curriculum vitae*; and a declaration that his opinions were all held to a reasonable degree of medical and scientific certainty. Thus, it is clear to the Court that Dr. Wheeler offers an expert opinion.

Further, Dr. Wheeler's letter is not simply an existing pathology opinion or existing literature that Dr. Nichols reviewed to supplement his "materials considered list." Dr. Wheeler provides an entirely new analysis of an existing record (1994 left orchiectomy pathology slides) and formulates a new expert opinion about those records.

DuPont maintains that, even if the letter offers an expert opinion, it is appropriately considered a timely supplementation because it was generated in "direct response" to Dr. Pohar's "expanded opinions" made for the "first time" in his Rebuttal Report. (Def's Mem. in Opp. at 1, ECF No. 99.) DuPont further asserts that it retained Dr. Wheeler because, "[i]n his Rebuttal

7

Report, Dr. Pohar tried to shore up his differential etiology by asserting that in 1994, Mr. Abbott did not have intratubular germ cell neoplasia in either testicle and was pre-pubertal." *Id.* at 10. Specifically, DuPont states:

> Plaintiffs' expert, Dr. Kamal Pohar, provided a June 10, 2019 rebuttal report in which he opined for the very first time that in 1994 (when Mr. Abbott was a sixteen year old, six-foot-one-inch, 160-pound high school basketball player), Mr. Abbott was pre-pubertal and did not have intratubular germ cell neoplasia in either testicle. In response, DuPont promptly investigated whether the pathology slides from Mr. Abbott's 1994 orchiectomy still existed, obtained those slides when it confirmed they were available, and had them reviewed by a pathologist. DuPont's prompt actions were in direct response to Dr. Pohar's rebuttal opinions and aimed at obtaining objectively verifiable information as to whether Mr. Abbott, in fact, was pre-pubertal and had intratubular germ cell neoplasia in 1994.

*Id.* at 1. Further, Defendant contends that, "[e]ven if DuPont had known that the slides existed, their significance did not become apparent until Dr. Pohar gave his expanded bases—for the first time in his Rebuttal Report—to support his opinions." *Id.* at 14.

DuPont relies on *Confederated Tribes of Siletz Indians v. Weyerhaeuser Co.*, No. CV 00-1693-PA, 2003 U.S. Dist. LEXIS 25829, 2003 WL 237159812003 U.S. Dist. LEXIS 25829 (D. Or. 2003) for the proposition that Dr. Wheeler's opinion should not be stricken, explaining:

> In that case, "supplemental expert testimony was generated in direct response to Defendant's attack upon the original expert reports. Plaintiffs first learned of Defendant's contentions after the discovery deadline, and acted promptly to remedy the alleged deficiency." *Id.* at *6. The court allowed this belated supplementation:
>
>> Some courts have granted a motion to strike in similar circumstances, reasoning that a Plaintiff may not wait until the Defendant files for summary judgment, and points to the holes in the Plaintiff's case, before belatedly plugging those holes with a new expert opinion. However, that rationale places undo emphasis on law as a contest of skill between rival lawyers, at the expense of doing justice. At this stage of the proceedings, if there is sufficient evidence to support the Plaintiffs' case, I will not exclude that evidence simply because Plaintiffs failed to anticipate the need for it until the defect was pointed out by their opponent. . . . Finally, trial is not until [three months from now], so there is little risk of unfair prejudice.

8

*Id.* at *7.

(Def's Mem. in Opp at 9, ECF No. 99.) DuPont's arguments are not well taken.

DuPont is simply wrong that Dr. Pohar for the first time opined in *rebuttal* that neither of Mr. Abbott's testicular cancers was derived from intratubular germ cell neoplasia. The record, quoted next, shows that: (1) Dr. Pohar stated in his *original Expert Report* that intertubular germ cell neoplasia was not a risk factor in *either* testicle; (2) Dr. Nichols then stated that intertubular germ cell neoplasia was present in *both* testicles and that *both* cancers likely derived from it (even though the 1994 pathology report did not mention whether or not intertubular germ cell neoplasia was present); (3) in rebuttal Dr. Pohar disagreed with Dr. Nichols' conclusions that both cancers likely derived from intertubular germ cell neoplasia, and (4) both specific causation experts are qualified to and did testify about whether the 1994 cancerous tumor was pre- or post-pubertal.

1. Dr. Pohar's Expert Report:

- Dr. Pohar stated that intratubular germ cell neoplasia is a well-established risk factor and that in his opinion *neither* of Mr. Abbott's cancers was derived from intratubular germ cell neoplasia:

    > In regards to the underlying cause of testicular cancer, well established risk factors for developing testicular cancer include cryptorchidism, a family history of testicular cancer in a first-degree male relative, HIV infection, *presence of intratubular germ cell neoplasia* and a personal history of testicular cancer.
    >
    > Mr. Abbott had none of the risk factors for developing *either testicular cancer* other than he was at higher risk of developing a second testicular cancer given his personal history of testicular cancer.

    (Pohar Report at 9, ECF No. 64-4) (emphasis added).

9

2. Dr. Nichol's Expert Report:

- Dr. Nichols states that the 2015 pathology report found intratubular germ cell neoplasia present in the right orchiectomy:

    The fact that Dr. Pohar did not mention the risk factor of intertubular germ cell neoplasia in the non-cancerous portion of Mr Abbott's right testicle removed in November 2015 is stunning, and suggests that either he was unaware of the meaning of this finding in the context of this case or that he had come to his conclusions in advance of reviewing all the data available.

    (Nichols Report at 8. ECF No. 64-1.)

- Dr. Nichols admits that the "1994 pathology report" of Mr. Abbott's left orchiectomy, "did not mention one way or another the presence of carcinoma in situ [intertubular germ cell neoplasia] (as is routine pathology practice today)." (Nichols Report at 5, ECF No. 64-1.)

    Nevertheless, Dr. Nichols opines that the 1994 cancer would have derived from intertubular germ cell neoplasia, stating:

    Mr. Abbott's testicular germ cell cancers present a classic case of invasive malignancy arising from the backdrop of fetally-derived intertubular germ cell neoplasia, and over time resulted in metachronous testicular germ cell cancers.

    (Nichols Report at 8, 9, ECF No. 64-1.)

3. Dr. Pohar's Rebuttal Report

- Dr. Pohar addressed Dr. Nichol's criticism about the lack of emphasis placed on the risk factor of intratubular germ cell neoplasia found in the 2015 orchiectomy, stating:

    The fact that Mr. Abbott had IGCN [intratubular germ cell neoplasia] detected in his orchiectomy specimen in 2015 should be no surprise. In over 90% of post-pubertal germ cell cancers this entity is found in the surrounding normal testicular parenchyma, both seminoma and non-seminoma, and is the well-known obligate precursor of adult testicular cancers. Its presence in the 2015 radical orchiectomy specimen has very little relevance in determining causation of Mr. Abbott's testicular cancers . . . .

    (Pohar Rebuttal at 4, ECF No. 63-5.)

- Dr. Pohar notes that with regard to the 1994 cancer "Dr. Nichols stated in his report that there was no comment on whether [intratubular germ cell neoplasia] was present in the left orchiectomy specimen" and the "orchiectomy and the pathology was very much consistent with a prepubertal tumor." (Pohar Rebuttal at 4, ECF No. 63-5).

10

- Dr. Pohar directly addressed his disagreements with Dr. Nichols opinions related to intratubular germ cell neoplasia:

  > Dr. Nichols' report places tremendous emphasis on prenatal factors and inherited genetic influences as the root cause of the majority of germ cell testicular cancers, including both of Mr. Abbott's testicular cancers. Dr. Nichols' report implies that intratubular germ cell neoplasia (IGCN) is the obligate precursor of essentially all germ cell cancers, including both of Mr. Abbott's testicular cancers, and invariably IGCN arises in the fetal testis and is present before the male child is born. Based on his knowledge of gonad development and descent and hormonal signaling in the fetal gonad, Dr. Nichols incorrectly postulates that IGCN must arise in the context of a testicular dysgenesis syndrome that manifests early in embryogenesis. Based on his assessment of Mr. Abbott's medical history, Dr. Nichols concludes that Mr. Abbott's testicular cancers are a classic case of Mr. Abbott being born with "fetally-derived intertubular germ cell neoplasia and over time resulted in metachronous testicular germ cell cancers." . . . . I disagree with the logic and interpretations of Dr. Nichols on many salient points related to causation of testicular cancer in reference to Mr. Abbott. . . . .

(Pohar Rebuttal at 2, ECF No. 63-5.)

4. <u>Dr. Nichols' Deposition</u>

- Dr. Nichols testifies that he believes the 1994 cancer and the 2016 cancer was derived from intertubular germ cell neoplasia and that the 1994 cancer was post-pubertal.

  > Q: So is it your understanding that from the day Mr. Abbott was born, that he was destined to have testicular cancer?
  >
  > A: My belief is that that is the likelihood.
  >
  > Q: And that's based upon what objective record that you reviewed in his file?
  >
  > A: Several things. My -- the first thing is that I believe that there is overwhelming evidence in his case that he had a post pubertal -- which is type 2 germ cell tumor -- case both in 1994 and in 1916 -- or 2016; that the almost invariable precursor lesion is what is variably called carcinoma in situ or intertubular germ cell neoplasia [or ICGN] that has fetal origins; and that his case is also marked by what I feel is, in all likelihood, low or poor testicular functioning which is associated with testicular dysgenesis and the development of germ cell tumors.

(Nichols Dep. Tr. at 56–57.)

11

5. Dr. Pohar's Deposition

- Dr. Pohar testified that he believed the 1994 cancer was pre-pubertal based on the medical records from when "he was evaluated at Children's Hospital here in Columbus" and viewing his "his scrotal ultrasound, you can look at the measurement of his testicles at the time."

(Pohar Dep. Tr. at 98.)

As can be seen from the above, a central focus of Dr. Nichols's report was to criticize Dr. Pohar for giving little import to the risk factor of intratubular germ cell neoplasia for *either* cancer, opining that Mr. Abbott was born with intertubular germ cell neoplasia in *both* testicles from which he derived *both* of his testicular cancers. He suggests that Dr. Pohar did not appropriately assess intratubular germ cell neoplasia as a potential cause of *both* Mr. Abbott's testicular cancers. Dr. Nichols offers his critique even though he admits that the 1994 pathology report does not show the presence of intertubular germ cell neoplasia. What DuPont labels Dr. Pohar's "expanded[] opinion," is simply a substantive response, through a scheduled rebuttal report submission, to an issue that Dr. Nichols injected into this case. Dr. Pohar's Rebuttal Report did exactly what rebuttal reports are designed to do – rebut opinions given by the opposing expert.[3]

---

[3] DuPont takes the position that "*Dr. Nichols does not provide an affirmative specific causation opinion as to the likely cause of Mr. Abbott's testicular cancer*. Rather, through reliance on his qualifications, experience and reference to scientific literature, Dr. Nichols's principal role is to *critically analyze and rebut the specific causation opinion offered by Plaintiffs' specific causation expert, Dr. Kamal Pohar*." (Def's Opp. to Pls' Mot. to Exclude Dr. Nichols' Opinion at 2, ECF No. 79) (emphasis in original). Dr. Nichols, however, does offer specific causation opinions, which have been excluded in EMO No. 32. Indeed, EMO 32 excludes some of the testimony addressed in the present decision, *i.e.*, Dr. Nichols' opinion that "intertubular germ cell neoplasia [carcinoma in situ or IGCN] and what he "feels is, in all likelihood, low or poor testicular functioning," was the likely cause of Mr. Abbott's testicular cancer in 1994 and in 2015. Because the parties were without the benefit of EMO 32 when briefing was ongoing related to Dr. Wheeler's letter, the impact of the letter may be of far less import than DuPont suggests that it could be.

Further, the disagreement between Dr. Nichols and Dr. Pohar with regard to whether the 1994 cancer was pre- or post-pubertal is addressed by both doctors in deposition, as is shown above. Unlike an opinion on pathology specimens, the topic of whether Mr. Abbott's cancer was pre- or post-pubertal is not a topic on which either expert lacked expertise. Both experts gave the conflicting opinions as to whether the 1994 cancer was pre- or post-pubertal. Neither party moved to exclude Dr. Nichols' or Dr. Pohar's testimony on this assessment based on the experts' lack of qualifications.

Dr. Wheeler is the only retained pathologist in this case. Dr. Wheeler was asked to opine on 25-year-old pathology slides, of which there was an existing pathology report upon which both Dr. Nichols and Dr. Pohar relied.

DuPont's contention that Dr. Nichols does not change his opinions based on the new Wheeler report is of no moment here. As noted above, Dr. Nichols was not retained to provide a specific causation opinion, but rather to provide a critique of Dr. Pohar's specific causation opinion. With the admission of Dr. Wheeler's report, Dr. Nichols has a newly-formulated expert opinion with which to critique Dr. Pohar's Expert Report, Rebuttal Report, and deposition testimony. Dr. Wheeler's report, however, was not in existence when Dr. Pohar wrote his Expert Report, wrote his Rebuttal Report, or sat for deposition. And, Dr. Wheeler is the only pathologist who has viewed the 25 year old specimens.

Mr. Abbott is not only prejudiced because his expert did not have the benefit of reviewing Dr. Wheeler's opinion before and/or during his review of Mr. Abbott's medical records, but he is also unquestionably prejudiced by having no option to retain his own pathologist, who may or may not agree with Dr. Wheeler's assessment of the slides. *See e.g., Why Pathologists May Disagree*, Harvard Health Publishing, Harvard Medical School,

https://www.health.harvard.edu/blog/why-pathologists-may-disagree-201104271632 ("Some disagreements involve objective factors, such as how biopsies are done. Usually, though, pathologists disagree when it comes to interpretation and judgment — both subjective qualities."); *Specimen Preservation and Degradation are Active Research Topics*, iSpecimen, https://www.ispecimen.com/blog/ specimen-preservation-and-degradation-are-active-research-topics/ ("Regardless of the sample type, preservation and proper storage of human specimens is of utmost importance. Otherwise, the sample begins to degrade, and its value to the research process begins to diminish.").

DuPont does not dispute that it failed to directly inform Plaintiffs' counsel that the 1994 slides had been ordered, received, or might be reviewed by a pathologist during any of these *Daubert* briefings, which process began in June 2019 – six months ago. As Plaintiffs point out, this is in contrast to DuPont's previous conduct. For example, when "DuPont believed there would be the need for other supplementation or a delayed expert report, namely by its use of Dr. Deshields as a psychologic expert, it informed Plaintiffs' counsel well before the deadline in order to get consent and allow Plaintiffs the opportunity to get their own expert if needed, and parties jointly informed the Court. No such 'place holder' or heads up was provided for Dr. Wheeler or any expert pathologist." (Pls Mot. at 5, n.3, ECF No. 95.) The Court would not be faced with the instant scenario if DuPont had done something similar here.

DuPont contends that Plaintiffs' counsel should have known that DuPont ordered the slides in June 2019 because DuPont contacted Medical Research Consultants ("MRC"), "which has been required throughout this MDL to notify both DuPont's counsel and Plaintiffs' counsel when 'requested records are ordered and collected.'" (Def's Mem. in Opp. at 4, ECF No. 99) (citing Case Management Order No. 5 ¶¶ 3-7, MDL ECF No. 128; *see* Ex. E, MRC Affidavit ¶¶

14

3-4, ECF No. 99-5)). DuPont asserts that MRC "notified both Plaintiffs' counsel and DuPont's counsel that the hospital still had the 1994 pathology specimens." *Id.* Plaintiffs strenuously dispute this statement, offering a laundry list of actions they are required to take to find within the MRC emails what records were ordered – and even then "the MRC portal user must click 'Purchase' to gain access, for the first time, to the 'Pathology Specimen Notification' that contained the information about the 1994 specimen slides. (Pls' Reply at 6, ECF No. 101) (citing Conlin Declaration, at ¶ 6, ECF No. 101-2).

There is no dispute, however, that DuPont retained Dr. Wheeler in July 2019 and even at that point failed to inform Plaintiffs' counsel of its actions. The Court is at a loss as to why DuPont would not have informed Plaintiffs that DuPont had engaged an expert pathologist to provide an opinion to a reasonable degree of scientific and medical certainty with regard to a 1994 specimen that already had a pathology report upon which both specific causation experts had relied. In any event, it is undisputed that Plaintiffs knew by August 27, 2019 that DuPont had retained Dr. Wheeler to opine on the 1994 specimens. On September 4, 2019, Plaintiffs requested withdraw of Dr. Wheeler's opinion and offered an immediate meet and confer. One-week later Plaintiffs moved this Court to strike the opinion.

In its response to Plaintiffs' request to strike Dr. Wheeler's letter as an untimely, undisclosed expert opinion, DuPont suggested that in lieu of excluding Dr. Wheeler's opinions, the Court should permit expanded expert discovery:

> In the event that the Court is inclined to preclude Dr. Nichols from supplementing his list of materials considered with Dr. Wheeler's Pathology Report, DuPont respectfully requests that the Court permit DuPont to revise its expert designations to include the Pathology Report and reopen discovery for the very limited purpose of enabling deposition testimony regarding the report for good cause. Moreover, the Court has not yet ruled on *Daubert* motions, and to the extent the Pathology Report has any impact on the pending motions, it primarily undercuts and does not support Plaintiffs' positions, so there is no prejudice to Plaintiffs. Nonetheless, and while DuPont believes it unnecessary, DuPont would also not

15

object to permitting supplemental *Daubert*/summary judgment briefing in the event the court deems it necessary. *See, e.g., Redmond v. United States*, 194 F. Sup. 3d 606, 613 (E.D. Mich. 2016) (finding that any surprise could be cured in part because the court permitted a second motion challenging the testimony). Here, there is good cause given that Dr. Pohar raised this issue in his rebuttal report, and DuPont promptly obtained the slides and Pathology Report after he did so.

(Def's Mem. in Opp at 13, n. 9, ECF No. 99.) This offer was three months ago.

However, during that time this case, *Abbott*, and the *Swartz* case were being worked up for trial together and over 40 motions were filed before this Court. DuPont could have moved for expedited consideration of re-opening expert discovery at any time via motion or in person at a management conference that were held regularly during that time period when there may have been time to accommodate the request if the Court were inclined to do so. DuPont and Plaintiffs have throughout this litigation asked and been granted expedited consideration of pressing issues in both of these ways. Yet, DuPont chose to allow the issue to wait its turn for decision pursuant to Plaintiffs' Motion to Strike and for Sanctions. Without any request for expedited consideration, it is unsurprising that the issue is only now before the Court – less than two weeks before trial.

There is simply no chance that the Court could allow time for Dr. Pohar to review both Dr. Wheeler's new expert report and formulate his response to Dr. Nichols in light of them; allow Plaintiffs to depose Dr. Wheeler on his new expert opinions; allow Plaintiffs to re-depose Dr. Nichols in light of his reliance on Dr. Wheeler's new expert opinion; allow Plaintiffs to retain and designate their own pathology expert witness and have her take the time necessary to digest the facts of this case, review the pathology slides, formulate her own opinions, and issue her own report; allow DuPont to depose Plaintiffs' new pathology expert, all of which might well lead to the parties' experts having to modify their prior reports to counter opinions given by opposing experts—which, in turn, could lead to additional depositions to examine revised

opinions; and allow the parties to make new, or modify existing, *Daubert* motions, including responses and replies.

Consequently, even if the Court were inclined to revise the expert designation schedule, there is just no time to do so. The Court therefore is left with no choice but to strike Dr. Wheeler's expert opinion as an untimely report from an undisclosed expert. The Court is not, however, inclined to grant any sanctions against DuPont as requested by Plaintiffs.

## IV.

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion to Strike and for Sanctions Regarding Dr. Wheeler's Supplemental Opinion (ECF No. 95.) Specifically, the Motion is **GRANTED** with regard to Plaintiffs' request to strike Dr. Wheeler's expert opinion and **DENIED** with regard to Plaintiffs' request for sanctions.

**IT IS SO ORDERED.**

\_\_\_1-15-2020_____
**DATE**

_____
EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE