UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

                         Civil Action 2:13-md-2433
                         JUDGE EDMUND A. SARGUS, JR.
                         Magistrate Judge Elizabeth Preston Deavers

This document relates to:

*Angela Swartz and Teddy Swartz v. E. I. du Pont de Nemours and Company*, Case No. 2:18-cv-00136.

*Travis Abbott and Julie Abbott v. E. I. du Pont de Nemours and Company*, Case No. 2:17-cv-998.

## EVIDENTIARY MOTIONS ORDER NO. 34

### Plaintiffs' Motion to Exclude Defendant's Environmental Health Expert

This matter is before the Court on:

(1) Plaintiffs' Motion to Exclude the Opinions and Testimony of Defense Exert Stephen T. Washburn (ECF No. 56, *Swartz* Docket), Defendant's Memorandum in Opposition (ECF No. 66), and Plaintiffs' Reply Brief (ECF No. 81); and

(2) Plaintiffs' Motion to Exclude the Opinions and Testimony of Defense Exert Stephen T. Washburn (ECF No. 68, *Abbott* Docket), Defendant's Memorandum in Opposition (ECF No. 75), and Plaintiffs' Reply Brief (ECF No. 90).

For the reasons that follow, the Court **GRANTS** Plaintiffs' Motions.

# I.

The litigation between the parties in this multidistrict litigation ("MDL") began in 2001 in a class action in West Virginia state court captioned *Leach v. E. I. du Pont de Nemours & Co.*, No. 01-C-698 (Wood County W. Va. Cir. Ct.) ("*Leach* Case"). The *Leach* Case ended in November 2004 when the parties entered into a class-wide settlement ("*Leach* Settlement Agreement"). (MDL ECF No. 820-8.) In 2013, DuPont moved the Judicial Panel on Multidistrict Litigation to consolidate the individual actions derived from the *Leach* Case before this Court, which was granted. Ultimately, over 3,500 individuals filed cases in this MDL over which this Court has presided since April 2013.

Beginning in February 2015, this Court held four month-long trials: *Carla Marie Bartlett v. E. I. du Pont de Nemours and Company*, Case No. 2:13-cv-170; *David Freeman v. E. I. du Pont de Nemours and Co.*, 2:13-cv-1103; *Kenneth Vigneron, Sr. v. E. I. du Pont de Nemours Company*, Case No. 13-cv-136, and; *Larry Ogle Moody v. E. I. du Pont de Nemours Company*, Case No. 15-cv-803. The first two trials were bellwether trials and the second two were non-bellwether trials. The parties reached a global settlement of the 3,500-plus cases in February 2017.

Since the global settlement, over 50 cases have been filed ("Post-Settlement Cases"). As did the plaintiffs in the pre-settlement cases, the plaintiffs in these Post-Settlement Cases allege that they are *Leach* Class members, have a Linked Diseases, that C-8 specifically caused their Linked Disease, and that DuPont acted with actual malice permitting the imposition of punitive damages. Pursuant to the Court's trial schedule, the parties have filed their motions directed at experts.

A.  **Relevant Facts**

In the *Leach* Settlement Agreement, the parties fashioned a unique procedure to determine whether the approximately 80,000 members of the class ("*Leach* Class") would be permitted to file actions against DuPont based on any of the human diseases they believed had been caused by their exposure to ammonium perfluorooctanoate ("C-8" or "PFOA") discharged from DuPont's Washington Works plant. The procedure required DuPont and the plaintiffs to jointly select three completely independent, mutually-agreeable, appropriately credentialed epidemiologists ("Science Panel") to study human disease among the *Leach* Class.

The Science Panel engaged in what ultimately became one of the largest epidemiological studies ever convened, utilizing nearly 70,000 blood samples and medical histories of the *Leach* Class members, and lasting seven years. In 2012, the Science Panel delivered Probable Link Findings for six human diseases ("Linked Diseases"): kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, diagnosed high cholesterol (hypercholesterolemia), and pregnancy-induced hypertension and preeclampsia.

The Probable Link Finding means that for the *Leach* Class members it is more likely than not that there is a link between their exposure to C-8 (*i.e.*, drinking water containing at least .05 ppb of C-8 for at least one year) and their Linked Disease. In the *Leach* Settlement Agreement DuPont agreed that in the event the Science Panel issued a Probable Link Finding for any particular disease, DuPont waived its right to challenge whether "it is probable that exposure to C-8 is capable of causing" the Linked Disease, *i.e.*, general causation. (S.A. § 3.3) In other words, "[a]pplication of the Probable Link Finding establishes that it is more likely than not that there is a link between that class member's exposure to C-8 and his or her Linked Disease, and DuPont is prohibited from challenging whether it is probable that exposure to C-8 is capable of

3

causing that Linked Disease." (Evidentiary Motions Order No. ("EMO") 1 at 9–10, MDL ECF No. 4079.)

Based on the *Leach* Settlement Agreement, therefore, general causation is not a triable issue. This means that Plaintiffs are "not required to prove that their dose of and/or exposure to C-8 is *capable* of causing their Linked Diseases." *Id.* In the *Leach* Settlement Agreement, DuPont retained the right to contest specific causation.

## B. Relevant Inquiries

Since the centralization of this MDL in April 2013, the Court has issued numberous decisions, many of which guide the analysis herein. To start, the issues Mrs. Swartz and Mr. Abbott must prove are that: 1) they are *Leach* Class members, 2) they have a Probable Link Disease that was specifically caused by their ingestion of C-8, and 3) whether DuPont acted with conscious disregard for the rights and safety of persons in their communities that had the great probability of causing substantial harm.

### 1. *Leach* Class Membership

To prove class membership, Plaintiffs must show that he or she, "for the period of at least one year," has "consumed drinking water containing .05 ppb or greater of C-8 attributable to releases from [DuPont's] Washington Works" plant from any of the "six specified Public Water Districts" or any of the Covered Private Sources" identified in the Contract. (*Leach* Settlement Agreement § 2.1.1, MDL ECF No. 820-8).

To meet this burden, Mrs. Swartz and Mr. Abbott retained (as did approximately 40 other Plaintiffs) David L. MacIntosh, ScD, CIH., who is an expert in environmental health, including chemical fate and transport in the environment. Dr. MacIntosh earned a doctorate in Environmental Health from the Harvard School of Public Health as well as M.S. and B.S.

4

degrees from Indiana University. He is the Chief Science Officer and Director of Advanced Analytics at Environmental Health & Engineering, Inc. in Newton, Massachusetts, and has over 20 years of experience in public health, specializing in environmental and occupational health. Dr. MacIntosh is also an Adjunct Associate Professor of Environmental Health at the Harvard School of Public Health where each fall he teaches a course to graduate students entitled, Fundamentals of Human Environmental Exposure Assessment. Dr. MacIntosh states the purpose of his engagement:

> I was asked to determine whether Angela Swartz[1] had sufficient exposure to PFOA through her drinking water to qualify as a "Class Member" under the following specific criteria established by the Court for purposes of settling the *Leach* Case:
>
>> Based on the foregoing, it is, therefore, hereby accordingly ORDERED, ADJUDGED, AND DECREED that:
>>
>> A. the Class is certified as those individuals: (1) who for the period of at least one year up to and including December 3, 2004, consumed drinking water containing .05 ppb or greater of C-8 attributable to releases from Washington Works from (a) any of six specified Public Water Districts (each as particularly described in Schedule 2.1.1(A) of the Settlement), (b) any Eligible Private Source within the geographic boundaries of the Public Water Districts that is the individual's sole source of drinking water at that location or (c) any Eligible Private Source more particularly described in Schedule 2.1.1(B) attached to the Settlement that was the individual's sole source of drinking water at that location; and (2) who (a) did not exercise their right to Opt Out of the Certified Class or (b) have not elected to waive their rights as a Class Member through execution of a Notice of Clarification Regarding Class Member Status filed with the Court in the Lawsuit;

(MacIntosh Expert Report at 2–3, ECF No. 27-2); (MacIntosh Expert Report at 2–3, *Abbott* ECF No. 33-2.)

---

[1] Dr. MacIntosh was retained for the same purpose by Mr. Abbott and sets forth this same information in his Expert Report completed for Mr. Abbott.

5

To complete his Expert Report, Dr. MacIntosh described the chemical composition of C-8, its half-life in humans, and how C-8 accumulates in the human body. He describes how the C-8 was released from DuPont's Washington Works plant into landfills, ponds, the Ohio river and the air and that one or more of the transport pathways caused the C-8 to enter the six water districts named in the *Leach* Settlement Agreement. Dr. MacIntosh further explained his methodology, his scientific approach and calculations, and discussed the documents he reviewed.

Additionally, Dr. MacIntosh reviewed documents to determine where Mrs. Swartz and Mr. Abbott lived, worked, and drank the water from the six districts that are part of the *Leach* Settlement Agreement and records of the historical PFOA levels in drinking water attributable to the Washington Works plant.

Dr. MacIntosh concluded:

I offer the following opinions to a reasonable degree of scientific certainty:

1. Ms. Swartz is a "Class Member" under the Leach Case settlement, because she regularly consumed drinking water provided by the Village of Pomeroy Water District (VPWD) and the Tuppers Plains-Chester Water District (TPCWD) for more than one year prior to December 4, 2004, that contained PFOA at a concentration of 0.05 parts per billion or greater and attributable to releases from the DuPont's Washington Works plant. 2. Based on her PFOA exposure history from VPWD and TPCWD, Ms. Swartz first met the criteria for Class Member status no later than January 1990.

(MacIntosh Expert Report at 2, ECF No. 27-2)

And for Mr. Abbott, Dr. MacIntosh opined:

I offer the following opinions to a reasonable degree of scientific certainty:

1. Mr. Abbott is a "Class Member" under the Leach Case settlement, because he consumed drinking water provided by the Village of Pomeroy Water District (VPWD) and the Tuppers Plains-Chester Water District (TPCWD) for more than one year prior to December 4, 2004, that contained PFOA at a concentration of 0.05 parts per billion or greater and attributable to releases from the DuPont's Washington Works plant.

6

2. Based on his PFOA exposure history from VPWD and TPCWD, Mr. Abbott first met the criteria for Class Member status no later than January 1989 and possibly as early as January 1984.

(MacIntosh Expert Report at 2, Abbott ECF No. 33-2.)

At the Final Pretrial Conference, DuPont briefly addressed the testimony of Mr. Washburn, stating that he was a fate and transport expert as is Plaintiffs' expert, Dr. MacIntosh. DuPont has, in the past, offered Mr. Washburn to opine on class membership. *See Ryan Balsey v. E.I. du Pont de Nemours and Company*, Case No. 2:13-cv-1155 (Expert Rep. of Stephen T. Washburn at ECF No. 65). Mr. Washburn, however, was not retained in *Swartz* or *Abbott* to opine on class membership.

### 2. Specific Causation

Mrs. Swartz suffered from kidney cancer and Mr. Abbott twice contracted testicular cancer. Both of these cancers are Probable Link Diseases. Thus, the remaining burden upon Plaintiffs is to prove that C-8 was a substantial contributing factor in causing their cancers (specific causation). While DuPont does not carry the burden of proving specific causation, in the previous four trials DuPont retained its own specific causation experts to offer specific causation opinions and also to critique Plaintiffs' specific causation experts. All of the specific causation experts utilized the methodology of differential diagnosis in reaching their specific causation opinions.

Mrs. Swartz offers Vitaly Margulis, M.D., FACS. as her specific causation expert and DuPont offers Samuel M. Cohen, M.D., Ph.D. and Douglas M. Dahl, M.D. Dr. Cohen and Dr. Dahl offered their opinions as to the specific cause of Mrs. Swartz's cancer and critiqued Dr. Margulis' specific causation opinion.

Mr. Abbott offers Kamal S. Pohar, M.D., FRCSC as his specific causation expert and DuPont offers Craig R. Nichols, M.D., FASCO, FACP. Dr. Nichols was retained only to critique Dr. Pohar and was not asked to provide an opinion as to the specific cause of Mr. Abbott's cancers.

These Plaintiffs and DuPont have moved for exclusion of the others' experts and this Court has issued several decisions addressing the motions. (EMO 27, Def's Mot. to Exclude Pls' Specific Causation Expert in *Swartz*, MDL ECF No. 5294); (EMO 28, Pls' Motion to Exclude Defendant's Specific Causation Experts in *Swartz*, MDL ECF No. 5294); (EMO No. 31, Def's Mot. to Exclude Pls' Specific Causation Expert in *Abbott*, MDL ECF No. 5297); (EMO 32, Pls' Motion to Exclude Defendant's Specific Causation Experts in *Abbott*, MDL ECF No. 5294).

### 3. Punitive Damages

To prove punitive damages, Plaintiffs must show that DuPont's behavior in releasing the C-8 into the environment exhibited a conscious disregard for the rights and safety of persons that had a great probability of causing substantial harm. What DuPont knew or should have known throughout the time it released the C-8 into the environment is relevant to this inquiry.

In its defense, DuPont avers that it "neither knew, nor should have known, that any of the substances to which Plaintiffs were allegedly exposed were hazardous or constituted a reasonable or foreseeable risk of physical harm by virtue of the prevailing state of the medical, scientific and/or industrial knowledge available to DuPont at all times relevant to the claims or causes of action asserted by Plaintiffs." (Def's Answer ¶ 85; ECF No. 47.) DuPont further answered that it has "complied with all applicable statutes and regulations set forth by local, state and/or federal government(s) with regard to the conduct alleged in the Complaint, and" that "all conduct and activities of DuPont related to matters alleged in the Complaint conformed to industry standards

8

based upon the state of medical, scientific and/or industrial knowledge which existed at the time or times that Plaintiffs are alleged to have been exposed." *Id.* ¶¶ 87, 90.

DuPont and the MDL plaintiffs have retained experts to opine on whether DuPont conformed to the industry standards based upon the state of the medical, scientific and/or industrial knowledge available to DuPont during the relevant time period. DuPont has offered and in some instances has utilized for trial: Shane A. Snyder, Ph.D; Thomas C. Voltaggio, B.S., M.A.; Douglas L. Weed, M.D., M.P.H., Ph.D,; Robert W. Rickard, Ph.D, D.A.B.T., Marianne L. Horinko, Dominik D. Alexander, Ph.D., M.P.H., and Andrew Maier, Ph.D.

The MDL plaintiffs have offered and in some cases have called at trial: Barry S. Levy, M.D., M.P.H.; Michael B. Siegel, M.D., M.P.H.; Stephen E. Petty, P.E., C.I.H., C.S.P.; Steven Amter, B.S., M.S.; James S. Smith, Ph.D., CPC.; and, Carrie Redlich M.D., M.P.H.

The parties refer to these witnesses generally as "corporate conduct" experts and have brought the issue of whether these experts offer testimony that is admissible in numerous motions, on which this Court has issued several decisions. *See e.g.,* (EMO 2, MDL ECF No. 4129); (EMO 3, MDL ECF No. 4178); (EMO 5, MDL ECF No. 4532); (EMO 6, MDL ECF No. 4551); (EMO 10, ECF No. 4808); (EMO No. 11, ECF No. 4835) (EMO 23, ECF No. 5001).

DuPont and Plaintiffs have offered many of these experts within the parameters this Court has previously allowed.

## II.

The Federal Rules of Evidence, in particular Rule 702 and 104(a), govern the admission of expert witness testimony and require that the trial judge "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Because Rule 702 "requires that the evidence or

testimony 'assist the trier of fact to understand the evidence,'" expert testimony "which does not relate to any issue in the case is not relevant and ergo, nonhelpful." *Daubert*, 509 U.S. at 590–90. "In other words, there must be a 'fit' between the proposed testimony and the question(s) presented by the case at bar." *Daubert*, 509 U.S. at 591.

To determine whether expert testimony is "reliable," the court's role, and the offering party's responsibility, "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Generally, the expert's opinions must reflect "scientific knowledge . . . derived by the scientific method," representing "good science." *Daubert*, 509 U.S. at 590, 593. The test of reliability is, however, a "flexible" one. *Kumho Tire Co.*, 526 U.S. at 140.

The Supreme Court mandates that a district court exercise its responsibility in acting as the "gatekeeper" for expert testimony. *Daubert*, 509 U.S. at 588; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). This role, however, is not intended to supplant the adversary system or the role of the jury. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 531–32 (6th Cir. 2008). Arguments regarding the weight to be given any testimony or opinions of an expert witness are properly left to the jury. *Id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596).

The burden is on the party proffering the expert report to demonstrate by a preponderance of proof that the opinions of their experts are admissible. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). Any doubts regarding the admissibility of an expert's testimony

should be resolved in favor of admissibility. Fed. R. Evid. 702 Advisory Committee's Notes ("[A] review of the case law... shows that rejection of the expert testimony is the exception rather than the rule."); *Jahn v. Equine Services, PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (stating that in *Daubert* "[t]he Court explained that Rule 702 displays a liberal thrust with the general approach of relaxing the traditional barriers to opinion testimony") (internal quotations omitted).

## III.

DuPont offers Mr. Washburn to "render opinions related to Mrs. Swartz's C-8 exposure and DuPont's historical ability to assess the risk of harm to her from that exposure." (Def's Mem. in Opp. at 1, *Swartz* ECF No. 66.[2]) Mr. Washburn is a Principal of Ramboll, an environmental and health sciences consulting firm, with over 30 years of experience as an environmental professional. When Mr. Washburn was offered previously as an environmental expert, with fate and transport expertise sufficient to opine on class membership, no plaintiff requested exclusion based upon his qualifications[3] to render class membership opinions.

Mr. Washburn does not offer any opinions as to class membership and, instead offers the following opinions:

> 1. Median serum PFOA concentrations in fluorochemical plant workers are generally considerably higher (i.e., roughly 2 to 3 orders of magnitude higher) than the geometric mean background serum PFOA concentrations reported in larger studies of the general non-occupationally exposed U.S. population.
>
> 2. Median serum PFOA concentrations reported in the water district populations near DuPont Washington Works are substantially lower (i.e., roughly 1 to 2 orders of magnitude lower) than the median serum PFOA concentrations in fluorochemical plant workers, but higher (i.e., roughly 3 to 30-fold higher) than the geometric mean background concentrations reported in larger studies of the general U.S. population.

---

[2] The Court cites to DuPont's Memorandum in Opposition only from *Swartz* because it makes the exact same arguments in both *Swartz* and Abbott.
[3] Plaintiffs moved for exclusion based upon relevance and reliability, however. The parties never completed this briefing because of the global settlement.

11

3. There is very wide and substantial variability (typically covering several orders of magnitude) in the reported serum PFOA concentrations across individuals in each of the individual water districts near DuPont Washington Works. For example, the reported serum PFOA concentrations range over four orders of magnitude (a factor of 10,000) in the Tuppers Plains-Chester Water District and two orders of magnitude (a factor of 100) in the Mason County Public Service District and the Village of Pomeroy Public Water System.

4. Theoretical estimates generated by the C8 Science Panel Exposure Model predicts that PFOA concentrations in drinking water from the Pomeroy Public Water System would have been approximately 0.08 ppb or lower between 1990 and 1993. This concentration is well below the voluntary CEG for PFOA in drinking water established by DuPont in 1991 (1 ppb), and below the USEPA action level for PFOA in drinking water established in 2006 (0.5 ppb). It is marginally higher than the USEPA Health Advisory for PFOA in drinking water (0.07 ppb) that was not issued until 2016, more than 20 years after Ms. Swartz's claimed exposure to water from the Pomeroy Public Water System.

5. PFOA was reported as "non-detect" (less than 0.6 ppb) in water collected from the Tuppers Plains-Chester Water District in 1984; otherwise, I have not identified any measurements of PFOA concentrations in drinking water from the system prior to 2002. The maximum PFOA concentration measured in finished water from the Tuppers Plains-Chester Water District between 2002 and 2006 (when a granulated activated carbon [GAC] system was installed) was 0.35 ppb. This concentration is well below the voluntary CEG for PFOA in drinking water established by DuPont in 1991 (1 ppb), and below the USEPA action level for

PFOA in drinking water established in 2006 (0.5 ppb). After the GAC filtration system was installed in 2006, all PFOA measurements in finished water from the Tuppers Plains-Chester Water District have been below USEPA's 2016 Health Advisory for PFOA.

6. Theoretical estimates generated by the exposure model used by the C8 Science Panel Exposure Model predict that PFOA concentrations in drinking water from the Tuppers Plains-Chester Water District between 1988 (when Ms. Swartz's claimed exposure began) and 2002 (when measurements became available) range from approximately 0.23 to 0.85 ppb. These concentrations are below the voluntary CEG for PFOA in drinking water established by DuPont in 1991 (1 ppb). During most of the years during this period, concentrations are also estimated to be below the USEPA action level for PFOA in drinking water that was not established until 2006 (0.5 ppb), with a median concentration of less than 0.35 ppb.

> 7. Ms. Swartz does not claim that either the Village of Pomeroy Public Water System or the Tuppers Plains-Chester Water District was ever the source of her residential drinking water or the primary source of her drinking water. I estimate that only about 10-20% of Ms. Swartz's drinking water consumption from 1988 to the present day has been supplied by the Tuppers Plains-Chester Water District. Similarly, only about 20% of Ms. Swartz's drinking water from 1990 to 1993 was supplied by the Village of Pomeroy Public Water System.
>
> 8. As summarized above, there is no evidence that PFOA concentrations in drinking water from the Village of Pomeroy Public Water System, the Tuppers Plains-Chester Water District, or the private well at her residence in Mason County were higher than applicable health-based criteria in place during the exposure periods identified by Ms. Swartz. It should be noted that a federal drinking water standard has not been established for PFOA; as indicated above, the current USEPA Health Advisory for PFOA serves as informal technical guidance and is not an enforceable standard.

(Washburn Expert Report at 2–4, *Swartz* ECF No. 56-2.) Mr. Washburn also followed this same process when stating his opinions directed to Mr. Abbott, with the facts from his background. (*Abbott* ECF No. 63-3.)

Plaintiffs move for exclusion of Mr. Washburn's report and testimony because allegedly "he proffers irrelevant and inadmissible General Causation opinions, because he offers some opinions without first establishing the foundational expertise necessary, and because he failed to employ a proper methodology in reaching any case-specific causation opinions." (Pls' Mot. to Exclude Washburn at 2, ECF No. 56.)

DuPont disagrees, arguing:

> [Mr. Washburn's opinions and testimony] are highly probative of two fundamental liability issues: (1) the reasonableness of DuPont's conduct; and (2) the weighing of competing risks when evaluating specific causation."

(Def's Mem. in Opp. at 4, *Swartz* ECF No. 66.) The Court will address each argument in turn.

### A. Reasonableness

#### 1. Reasonableness of DuPont's Conduct

As stated above, the reasonableness of DuPont's conduct is relevant to Plaintiffs' punitive damages claims. DuPont posits:

> When DuPont was not seeing adverse human health effects in persons exposed to much higher levels of C-8 (whose blood levels and health were being monitored by DuPont), it was reasonable for DuPont to not expect any harm at the relatively low levels of C-8 to which Mrs. Swartz claims that she was exposed when she visited various water districts.

(Def's Mem. in Opp. at 5, ECF No. 66.)

DuPont maintains that Mr. Washburn's report and testimony inform this relevant reasonableness inquiry of DuPont's conduct based upon "DuPont's historical ability to assess the risk of harm to her from that exposure." *Id.* at 1, 7. This Court, however, disagrees.

To inform DuPont's historical ability to assess the risk of harm to any plaintiff, Mr. Washburn would have to know what it was that DuPont historically knew, which he does not. Mr. Washburn compares the C-8 in the water of the districts subject to the *Leach* Settlement Agreement to the guidelines set by, *inter alia*, the C-8 Assessment of Toxicity Team ("CATT"), the West Virginia Department of Environmental Protection ("WVDEP"), the United States Environmental Protection Agency ("USEPA"), the Community Exposure Guidelines set by DuPont ("CEG"), and "other advisories and guidelines":

- German Ministry of Health: 0.3 ppb
- UK Drinking Water Inspectorate37: 5.0 ppb
- Danish Ministry of the Environment: 0.3 ppb
- 

   Additional health-based guideline values for PFOA in drinking water include:

- Australia 0.56 ppb
- Canada 0.2 ppb

14

- European Commission40 0.1 ppb

(Washburn Rep. at 36, ECF No. 56-2.)

This comparison of the amount of C-8 in the water Plaintiffs' drank to standards set by other agencies, including DuPont, does nothing to inform whether DuPont was aware of any of these guidelines when it made its decisions about releasing the C-8 from Washington Works or why it set its CEG. Nor could Mr. Washburn testify as to what DuPont knew with regard to the monitoring of persons blood, toxicology or other studies in which DuPont or its laboratories engaged, or what DuPont knew or did not know about information that was available in the national and international public sphere.

DuPont, however, offers an abundance of testimony related to the relevant inquiry of what it knew, when it knew it, and what it did with the information through numerous qualified experts and fact witnesses who were employed by or worked with DuPont during the relevant time period.

For example, Robert W. Rickard, Ph.D., D.A.B.T., has offered expert reports and testimony. Dr. Rickard is employed by DuPont and holds the position of Distinguished Scientist, Health & Environmental Sciences. Dr. Rickard testified in all four trials held in this MDL at length about what DuPont knew about C-8 from decades of toxicological studies and other research about which DuPont knew and/or performed at its own laboratories. Dr. Rickard was qualified to and did testify as to why the CEG was set, and what DuPont knew of the data from CATT, WVDEP, and USEPA. Dr. Rickard offers this same evidence in *Swartz* and *Abbott*.

This issue is very similar to what was considered and resolved in the Second Final Pretrial Conference held January 15, 2020. There, Plaintiffs objected to DuPont's use of two exhibits, numbered 4122 and 4123, which showed Danish regulations related to C-8. DuPont

15

argued that the exhibits reflected what DuPont knew of the state of the science at the time DuPont was making its decisions relating to the release of the C-8 from Washington Works. The Court ruled that DuPont could use the exhibits only if DuPont knew of these regulations, which DuPont assured the Court it did through Dr. Rickard and others.

Additionally, DuPont has offered numerous Corporate Conduct experts to opine on whether DuPont conformed to the industry standards based upon the state of the medical, scientific and/or industrial knowledge available to DuPont during the relevant time period. As stated above, DuPont has offered and in some instances has utilized for trial: Shane A. Snyder, Ph.D; Thomas C. Voltaggio, B.S., M.A.; Douglas L. Weed, M.D., M.P.H., Ph.D,; and, Robert W. Rickard, Ph.D, D.A.B.T. DuPont does not contend that Mr. Washburn is qualified to opine on the subject matter on which these experts were offered.

## 2. Reasonableness of the .05 ppb utilized by the Science Panel

Plaintiffs contend that Mr. Washburn's opinions are also excludable as irrelevant because they go to general causation, a fact that is not in issue. Plaintiffs maintain that "Mr. Washburn's purpose is to lay the foundation to attack the Science Panel's Probable Link findings by claiming Plaintiff, and all class members, are at different risks dependent on their level of exposure above the 0.05 ppb threshold." (Reply at 2, ECF No. 81.)

More specifically, Plaintiffs point out that Mr. Washburn "does not dispute that Plaintiff drank water from qualifying water districts for a year or more at levels which were at or above 0.05 ppb and thus more than sufficient to satisfy the *Leach* class membership criteria." (Pls' Mot. to Exclude Washburn at 5, ECF No. 56.) Plaintiffs continue, arguing that:

> DuPont is trying to proffer opinions that all relate to the relative dose of C-8 in either Plaintiff or other *Leach* Class Members' blood or drinking water, the extent to which such C-8 dose levels are either higher or lower than levels found in other persons/groups/exposure media, and the extent to which there are other thresholds

16

> for C-8 exposure which contradict the *Leach* agreement on what level (0.05 ppb) was sufficient for the establishment of a probable linked disease for Plaintiff specifically or class members as a whole [citing Def's Mem. in Opp.] at 2–4).
>
> . . .
>
> [A]ll of Mr. Washburn's statements are simply disguised attacks at the reasonableness of the *Leach* contracted 0.05 ppb threshold in the form of summarizations of otherwise irrelevant, inadmissible, and publicly accessible standards that could only be meant to confuse the jury and unnecessarily muddy the general causation water by asserting that higher threshold levels existed and allowing the jury to conclude they are more appropriate.

(Pls' Mot. to Exclude Washburn at 5, 7–8, ECF No. 56.) Plaintiffs' arguments are well taken.

The *Leach* Settlement Agreement provides for the Probable Link Findings to apply to anyone who meets the definition of a class member who has one or more of the Linked Diseases. This means that any plaintiff who meets the definition of "Class Member," by definition under the *Leach* Settlement Agreement, has a sufficient exposure to or "dose" of C-8 to be capable of causing his or her Linked Disease, whether they are in the highest or lowest "dose" group or any other subcategory or subgroup within the Class, resulting in "any issue about the C-8 dosage and whether it's sufficient to have caused this [Linked Disease being] off the table." (Dispositive Motions Order No. ("DMO") 1, Class Membership and Causation at 8–9, MDL ECF No. 1679).

This Court has explained that DuPont cannot prevent a class member from the benefit of the Probable Link Findings by "pointing out the 'limitations' in the objective criteria and/or protocols the Science Panel utilized to make its conclusions or by extrapolating from the Science Panel's analysis what the Panel 'did not find' in its Probable Link Finding." *Id.* at 9–10. The Court recognized that the Science Panel "'did not limit [its Findings] to only certain exposure groups or only people that were quartile one versus quartile two – they said the link existed among the entire group.'" *Id.* at 10. The Court's rulings in this regard were clarified in DMO 1-A and expounded upon in connection with the prior *Daubert* Motions in EMO 1, EMO 5, and in

17

DMO 12. (DMO 1-A, Clarification of Class Membership and Causation, MDL ECF No. 3972); (EMO 1, Expert Opinions Related to Causation, MDL ECF No. 4079); (EMO 4, Causation Experts, MDL ECF No. 4518); (EMO 5, Causation Experts, MDL ECF No. 4532).

DuPont seeks, through Mr. Washburn's testimony and opinions, to attack two *Leach* Class members' level of exposure (Mrs. Swartz and Mr. Abbott) in comparison to the broader Science Panel Study to show they are at less risk than other Leach Class members. As Plaintiffs correctly conclude, this is the exact same "quartile" argument without the word "quartile" which was previously excluded by the Court. Mr. Wasburn cannot provide opinions and/or testimony for the purpose of showing that Mrs. Swarz and Mr. Abbott are at a more decreased risk of injury than the defined Probable Link Finding solely because of their quartile exposure placement.

## B. Assessing the Risk of Harm to Plaintiffs from C-8 Exposure

DuPont contends that Mr. Washburn's opinions and testimony are probative to the triable issue of specific causation. DuPont states:

> Mr. Washburn's testimony is also directly relevant to weighing the competing amounts of increased risk of kidney cancer that Mrs. Swartz had due to her obesity, hypertension, and exposure to C-8. Plaintiffs wish to ignore the critical probative value Mr. Washburn's testimony has in weighing competing risks when evaluating specific causation.
>
> . . .
>
> With respect to C-8 exposure, the evidence shows that Plaintiffs' exposure levels were relatively low . . . In short, consideration of Mrs. Swartz's dose or amount of C-8 exposure is critically necessary to weigh whether her amount of increased risk of developing kidney cancer from C-8 was greater than her amount of increased risk of developing kidney cancer from her longstanding obesity or hypertension.

(Def's Mem. in Opp. at 5–6, ECF No. 66.) DuPont's arguments are not well taken.

In two recently issued decisions, this Court explained why the type of specific causation opinions DuPont seeks to support are inadmissible. In EMO 28 and EMO 32, this Court

18

explained at length why this analysis is violative of the *Leach* Settlement Agreement and will not repeat its analyses here. (EMO 28, Pls' Mot. to Exclude Def's Specific Causation Experts at 9, 14, MDL ECF No. 5294); (EMO 32, Granting in Part and Denying in Part Pls' Mot. to Exclude Def's Specific Causation Expert, ECF No. 5301.)

The Court notes that, DuPont did not have the benefit of EMO 28 or EMO 32 before the briefing on Mr. Washburn was completed. Because, however, the Court excluded the specific causation analysis that Mr. Washburn's opinions and testimony are offered to support, his testimony is not relevant or helpful.

### IV.

For the reasons set forth above, the Court **GRANTS** Plaintiffs' Motion to Exclude the Opinions and Testimony of Defense Expert Stephen T. Washburn. (*Swartz* ECF No. 56); (*Abbott* ECF No. 68).

**IT IS SO ORDERED.**

1-19-2020
DATE

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE

19