# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

                                       **Civil Action 2:13-md-2433**
                                       **JUDGE EDMUND A. SARGUS, JR.**
                                       **Magistrate Judge Elizabeth P. Deavers**

**This document relates to:**

*Travis Abbott and Julie Abbott, et al. v. E. I. du Pont de
Nemours and Co., et al.*, **Case No. 2:17-cv-00998**

*Angela Swartz and Teddy Swartz v. E. I. du Pont de
Nemours and Company*, **Case No. 2:18-cv-00136**

## DISPOSITIVE MOTIONS ORDER NO. 42

This matter is before the Court on Defendant's Motion for a Mistrial (*Abbott* ECF No.
178, *Swartz* ECF No. 188) and Defendant's Renewed Motion for a Mistrial (*Abbott* ECF No.
180), Plaintiffs' Memorandum in Opposition (*Abbott* ECF No. 227, *Swartz* ECF No. 233), and
Defendant's Reply (*Abbott* ECF No. 229).  For the reasons that follow, the Court **DENIES**
Defendant's Motions.

## I.

These cases, *Abbott* and *Swartz*, are part of the multidistrict litigation ("MDL") *In Re:
E. I. Du Pont de Nemours and Company C-8 Personal Injury Litigation* ("*C-8 Personal Injury
MDL*").  The individual plaintiffs int the C-8 Personal Injury MDL are all part of a class ("*Leach*
Class") certified nearly twenty years ago in a West Virginia state court.  The *Leach* Class
consists of approximately 80,000 residents of Ohio and West Virginia who drank water

contaminated by releases of a chemical referred to as C-8 from DuPont's Washington Works facility near Parkersburg, West Virginia.

All C-8 Personal Injury MDL cases are subject to a settlement agreement executed over 15 years ago ("*Leach* Settlement Agreement") between the *Leach* Class and Defendant Du Pont. The *Leach* Class consisted of those individuals who for at least one year, had "consumed drinking water containing .05 ppb or greater of C-8 attributable to releases from Washington Works." (*Leach* Settlement Agreement § 2.1.1, MDL ECF No. 820-8.)  After a massive epidemiological study that lasted over seven years and cost over $24 million a Science Panel, in 2012, delivered findings that linked C-8 to six human diseases including kidney cancer and testicular cancer ("Linked Diseases").  The *Leach* Settlement Agreement provided for the over 3,500 individual *Leach* Class members who suffered from one or more of the the of the Linked Diseases to file individual personal injury cases against DuPont.  DuPont moved to have those cases centralized into the C-8 Personal Injury MDL.

This Court has previously held four other month-long trials of other C-8 Personal Injury MDL cases with three trials going to verdicts all in favor of the plaintiffs.  DuPont appealed the verdict from the first trial to the United States Court of Appeals for the Sixth Circuit, the appeal received full briefing, assignment of a judicial panel, and oral argument before the panel. DuPont withdrew the appeal in February 2017 before a decision was issued.

On the same day the appeal was withdrawn, the fourth trial was ended in its third week without a verdict from the jury as part of a global settlement.  DuPont filed notice with the Security and Exchange Commission of a $670.7 million global settlement of the 3500-plus then-pending cases, all of which were ultimately dismissed.

Since that time, 100-plus post-settlement cases have been filed.  DuPont has indicated to the Court that it intends to take to trial all the post-settlement cases.  Mr. Abbott and Mrs. Swartz were the first two post-settlement cases tried in a consolidated trial.

Plaintiffs Mrs. Swartz and Mr. Abbott contend that C-8 from the Washington Works plant entered their drinking water and caused Mr. Abbott to twice develop testicular cancer, requiring removal of both of his testicles, and Mrs. Swartz to develop kidney cancer, requiring removal of part of her kidney.  Both Mrs. Abbott and Mr. Swartz brought loss of consortium claims.  After over five weeks of trial, the jury deliberations began on February 27, 2020.  On the first day of deliberations, the jury sent five notes to the Court:

(a) two asking for the specific causation expert testimony provided by Plaintiffs' and Defendant's experts regarding only Mr. Abbott's testicular cancers,

(b) one requesting a white board,

(c) one asking to break at 4:00 p.m., and

(d)  one requesting the Science Panel Report.

(Trial Tr., Vol. 23 at 36–44, *Abbott* ECF No. 207; Jury Questions/Court Responses, *Abbott* ECF No. 242.)

At the receipt of each note, the Court provided copies of the note to counsel and met with them on the record to determine how the questions should be answered.  (Trial Tr., Vol. 23 at 36–44, *Abbott* ECF No. 207.)  After discussion, the Court, with the parties' approval, provided the jury with the requests listed above in (a), (b), and (c).  (*Id*.)

With regard to the request for the Science Panel Report, which was not in evidence, Plaintiffs and Defendant agreed that it should not go to the jury.  Defendant objected to the Court providing anything further than the answer "no" in response to the question of whether the jury could have the Science Panel Report.  (Trial. Tr., Vol. 23 at 42, *Abbott* ECF No. 207.)  The

3

Court, however, indicated its concern regarding that answer and that it was going to "make sure the jurors don't have some speculation as to why it's not in [evidence] and that we're hiding the ball from them so I am going to give [a short explanation] as well," *i.e.*, "No, the Science Panel Report was not offered by either party and was therefore not admitted as evidence.  The purpose of the Science Panel is set forth on page 19 of the Jury Instructions."  (*Id.* at 41–43; Jury Questions/Court Responses, *Abbott* ECF No. 242).

The jury returned to deliberations the following morning, February 28, 2020.  Right after the jury began their deliberations, Jury Coordinator Ms. Frances Green, informed the Court that she received a text from a juror that morning.  The Court brought Ms. Green into open court outside of the presence of the jury and had her read the text into the record:

> THE COURT: Counsel, we're at a very sensitive stage of the trial, as you know, and the only person who is required to speak to the jurors is Ms. Fran Green because she has to make sure their parking is paid and they're reimbursed and their lunch is ordered.  She received a text to which she has not responded, but she is here.  I also want to again thank her for all the great work in this difficult case in getting a jury.

> If, Ms. Green, if you wouldn't mind, would you read into the record the text you have received from one of the jurors?

> MS. GREEN: Yes, Your Honor.  Well, the text started off saying "also, the reason being" -- because someone left an energy drink downstairs and asked me to bring it upstairs, and I did.

> THE COURT: And, to be clear, the jury assembly room is also your office.

> MS. GREEN: My office, that's correct.  And it says, "Also, there probably isn't any chance they're going to be a part of deliberations.  Can we have a meeting with the judge?"

> THE COURT: All right. Now, my intention would be to reduce that to writing in a letter to the jury from me and instruct the jurors that if they have anything they wish to discuss, they must put it in writing and submit it to me and I will in turn give all of you a copy, and then we'll decide where to go from there.  Is there anything else, would anybody like to be heard on with that?

4

[Defense counsel] MS. LASLEY: Could we have her repeat that just one more time?

THE COURT: Sure.

MS. GREEN: It states, "Also, there probably isn't any chance they're going to be a part of deliberations. Can we have a meeting with the judge?"

THE COURT: And I'm not going to guess what that means, but I think that's why we invite a more formal question from the jury or jurors. And I am going to refer them again to the part of the instructions where I've instructed them to only communicate in writing. Again, Ms. Green, thank you very much.

MS. GREEN: Thanks, Your Honor.

[Defense counsel] MR. MACE: Thank you, Your Honor.

THE COURT: All right. With that, we'll be in recess.

(Trial Tr., Vol. 24 at 3–4, *Abbott* ECF No. 208.)

Approximately 50 minutes later, around 10:10 a.m., the Court received two notes from the jury, both questioning Juror Number 54's ability or willingness to participate in the deliberation process. One of the notes was signed by seven of the eight jurors.

Your Honor,

The jury requests that Juror 54 be removed from deliberations. The Juror refuses to assist in looking at the evidence due to having made their decision ahead of time and refuses to engage in jury deliberations and will not agree with the evidence that is presented and what it shows. The Juror will not have an open mind when we attempt to engage in any deliberation.

(Jury Questions/Court Responses, *Abbott* ECF No. 242). The note was signed by seven jurors.

The other note stated:

Juror refuses to follow jury instructions to consider as fact that the science panel determination that drinking water containing .05 ppb for at least 1 year is linked to testicular and/or kidney cancer. The juror also refuses to follow the jury instructions to use the standard of proximate cause on the claims of Travis Abbott & Angela Swartz.

(*Id.*)

The Court copied the notes, provided them to counsel, and brought counsel into open court outside of the presence of the jury:

> THE COURT: Counsel, you have received copies of two written communications I've received from the jury. I do want to indicate you're looking at the same sheet I'm assuming I'm looking at. There are two notes, we've put them on one page. The note on the left actually was signed by seven jurors. I took their names off, but I wanted you to know everything that I know, but I don't want to make their names public for good reason. So they're a view, and, of course, it's not the jury's decision to decide if there's good cause for excusing another juror, but I am informed by the Sixth Circuit case *U.S. vs. Patterson* from 2014. If you have time, you may want to take a quick look at this. It's 587 Fed. Appx. 878 from 2014. It's from this district, and it involves a somewhat similar circumstance. It's a criminal case, but it has to do with essentially when a juror may be excused. I think a fair reading of that case -- and there's a lot of citations that go with it and, I mean no disrespect to the Court of Appeals, but it's a great abstraction.
>
> There are two principles. One is a disagreeable juror cannot be excused for good cause simply because they disagree with the other jurors. But if a juror refuses to act as a juror, refuses to deliberate, refuses to sign a verdict form, things of that sort, then that is good cause to remove. The concerns I've had over the years is sometimes they exist simultaneously. That's what we are paid for at the district court level, to try to figure that out.

(Trial Tr., Vol. 24 at 4–5, *Abbott* ECF No. 208.)

The Court then proposed a procedure to move forward, asking for input from counsel:

> *So my initial thought is to make a record here. To bring in the juror, give some very careful preliminary instructions before any testimony is given.* Those instructions would be along the lines that we want to know nothing about deliberations or anything done while the jury was together looking at this case, but then to ask some specific questions about what is raised in both of these notes and to make sure that she either is or isn't functioning as a juror as directed by the instructions. I would say, and I've done this before, I'm going to do all the questioning.
>
> However, if you wish another area of inquiry before we excuse the person after testimony, I will ask you if you have anything additional you would like me to ask. Again, the reason for that is this is not going to be wide-open questioning. This is going to be focused on the matters in the notes we've gotten. Rule 606(b) only applies after verdicts, but the principles are the same. The jury deliberations are meant to be extremely private, and there will be no inquiry into anything of that sort.

*At this point I'd invite any additional comments* starting . . . . Mr. Mace, the floor is yours.

MR. MACE: Yes, Your Honor. We would ask that the jury be instructed that the 0.05 parts per billion has nothing to do with specific causation or actual malice. The note indicates that they've been confused by that, Your Honor.

THE COURT: That's probably step two. Step one is this juror. We can address that and, if necessary, I can give that instruction.

MR. MACE: It ties into it, Your Honor, because what the jurors are saying, we can all infer different things from this, but I believe that the juror that's being referred to has understood your instructions that are essentially what I've just said. The .05 deals with general causation. It's really neither of the issues this jury needs to consider. So the fact that the one juror [who]'s being talked about understands that and the others are trying to come up with something different and then they're characterizing it as she won't deliberate, I mean it ties into the two. So we would ask that be given right from the beginning.

THE COURT: Once I've charged the jury, I'm not going to direct them to particular facts. So I appreciate that request, but right now I'm focused on this juror and whether there is good cause. If there's not good cause, she's staying on this jury. We're sure of that. If there is good cause, I would be inclined to release her. This is going to take a while. We're not going to do this in 30 seconds.

*But my next inclination would be to bring her in and ask her some fairly general questions about what's in these two documents and see what her response is. And then she won't be off the stand and you'll have an opportunity if you wish to submit to me any additional questions in writing. And then at that point I'll excuse her, and then we'll talk again about what the best course is to go forward and I'll hear from you again.*

MR. MACE: We would ask for 10 minutes, Your Honor, to go look at this case that you cited to us.

THE COURT: We're short for time, but 10 minutes is fine. We'll be back here and *I will have her in here at 10:25.*

MR. CONLIN: Your Honor, if plaintiffs can respond quickly to Mr. Mace's statements. We vigorously disagree with his inference that he made. We disagree with his suggestion about trying to give a new instruction, and we completely disagree with his reading of this note.

THE COURT: We're not going to finalize this issue either. We'll address this issue again after we hear from the juror. Mr. Mace and Mr. Conlin, one thing, they say

7

that it's linked to testicular and/or kidney cancer. I don't see anything in here that gets into specific causation where this would not be applicable.

MR. CONLIN: Plaintiffs agree, Your Honor.

THE COURT: We'll debate this later, but that's just an observation.  With that, we'll be in recess for 10 minutes.

(Trial Tr., Vol. 24 at 6–9, *Abbott* ECF No. 208) (emphasis added).

Instead of 10 minutes, the Court waited 25 minutes, which permitted extra time for the parties to discuss the Court's suggestions and review the applicable law related to the removal of jurors.  Neither side lodged any objections to the Court questioning Juror 54 in the manner it discussed on the record with counsel.  Therefore, the Court did exactly what it said it would do and brought in Juror 54 and questioned her in the manner it discussed with counsel, in the presence of counsel, on the record, cited below in relevant part:

THE COURT: Let me start by thanking you. . . .

So I instructed you during the course of the case to keep an open mind as you heard all of the evidence.  Do you feel you've done that?

A JUROR: Yes.
. . .

THE COURT: One of the other things that I instructed all of you to do was to deliberate, meaning to discuss the case with everyone else who's heard the same evidence and sat through the same trial. Have you deliberated yourself?

A JUROR: Yes, since yesterday.

THE COURT: All right. I'm asking you this again from what I have received.

A JUROR: Okay.

THE COURT: I wouldn't ask you this otherwise.

A JUROR: Uh-huh.

THE COURT: So these aren't questions I've made up. The instructions contain a reference, and you heard this all through the trial, to a finding of the science panel.

That's the .05 parts per billion consumed for more than a year by an individual having a probable link to both testicular cancer and kidney cancer. You'll remember all that.

A JUROR: Yes.

THE COURT: Are you able to accept the law and the facts that were directed before this case began? Can you accept that finding and the other law stated in the instructions?

A JUROR: Yes.

THE COURT: Do you have any trouble with that?

A JUROR: I have no trouble with it.

THE COURT: All right. And, as far as the causation, proximate cause standard, you remember that from the instructions.

A JUROR: Yes.

THE COURT: Do you have any trouble following that instruction?

A JUROR: I have no problem, Your Honor.

THE COURT: All right. And I don't want to talk to you about the deliberations themselves, anything you've said or the other jurors have said. Is there anything else you feel you need to tell me?

A JUROR: Yes, Your Honor.

THE COURT: All right. Now, again, this is a sensitive part of the case. I want to maintain your confidentiality. I also want to maintain the other jurors' confidentiality. So let me start with please don't tell me anything to do with what was said about the case itself.  Is there anything else you would like to tell me?

A JUROR: That makes it difficult, but –

THE COURT: Here's what I would ask you to do.

A JUROR: Let me say this –

THE COURT: I don't mean to interrupt you. There's probably a lot you would like to tell me, but there's a lot we shouldn't hear in this situation. This is what I would ask you to do, give me sort of a general sense of what you would like to talk about.

A JUROR: Okay. Let me say this. My no to the other jurors' decision doesn't mean that I'm not deliberating. I've been deliberating since yesterday morning.

THE COURT: Okay.

A JUROR: I was the one that asked for the science panel. I asked for Dr. Nichols. This morning we came, we deliberated. But I think the problem is I'm saying no when they are saying yes.

THE COURT: Do you think that's the whole problem?

A JUROR: That's the only problem.

(Trial Tr., Vol. 24 at 9–13, *Abbott* ECF No. 208.)

The Court made the determination that the juror should not be removed for cause and sent her back to the jury room to continue deliberations.  After the juror left the courtroom, the Court informed the parties that if the jury sent another note regarding inability to reach a verdict, the Court would administer the *Allen* charge,[1] stating:

THE COURT: This is what I expect to happen.  Somewhere along the way we'll get another note saying they're deadlocked, then my inclination would be to give the *Allen* charge.  There's a pattern Sixth Circuit Court of Appeals instruction on that which I typically give. We'll give them the *Allen* charge and see if that makes any difference. Anything else we need to discuss before we adjourn?

MR. MACE: Not at this time, Your Honor.

MR. CONLIN: No, Your Honor.

THE COURT: All right. With that, we'll be in recess.

---

[1] An *Allen* charge is a supplemental jury instruction that the trial judge may give when the jury announces that it is unable to agree on a verdict. "Without being coercive, an *Allen* charge urges jurors to keep trying to reach verdict, and is designed to assist them in finding common ground by reminding them of their duties as jurors, encouraging them to give due deference to arguments of fellow jurors, and to reexamine their own views without abandoning their deeply felt beliefs."  *Bhat v. U. of Cincinnati*, 23 Fed. Appx. 280, 282 (6th Cir. 2001).  An *Allen* charge is named after the case of *Allen v. United States,* 164 U.S. 492 (1896), in which the charge was first approved.

(Trial Tr., Vol. 24 at 13–14, *Abbott* ECF No. 208.)

Approximately 15 minutes after the juror was sent back to deliberations, the Court received two notes from the jury. One asked for case specific causation testimony related only to Mrs. Swartz, and the other stated that the jury was deadlocked. (Jury Questions/Court Responses, *Abbott* ECF No. 242.) As it had informed the parties it would do, the Court gave the entire Sixth Circuit pattern *Allen* charge, with the addition of one sentence: "If this case had to be tried again, it would be at great expense and great emotional harm to all the parties in this case, defense and the plaintiff." (Trial Tr., Vol. 24 at 16, *Abbott* ECF No. 208.)

The Court sent the jury back to its deliberations and at that time also provided the requested specific causation expert testimony of the experts retained to opine on the specific cause of Mrs. Swartz's cancer. The jury concluded their deliberations for the day at approximately 12:05 p.m. as previously scheduled.[2]

Deliberations resumed Monday morning at 9:00 a.m. The jury continued with its requests regarding only Mrs. Swartz that it had started before the Court gave the *Allen* charge. (Trial Tr., Vol. 25 at 3–6); (Jury Questions/Court Responses, *Abbott* ECF No. 242.)

At approximately 11:30 a.m., DuPont filed a Motion for a Mistrial in both *Swartz* and *Abbott*, and at approximately 12:30 p.m. the Court received a note that indicated the jury was deadlocked on the *Swartz* case. (*Id.* at 6.) The Court discussed this with counsel and all agreed that the jury would be instructed to deliberate for another hour. *See id.*

At approximately 1:50 p.m., the jury sent a note that indicated that they were still deadlocked on the Swartz's case. (*Id.* at 11.) The jury delivered their verdicts at approximately 2:00 p.m. finding in favor of the Abbotts and awarding them a total of $50 million and indicating

---

[2] The Court had previously approved concluding early as requested by a juror who had a necessary appointment.

11

it was deadlocked on the Swartz's case. Defense counsel asked for a polling of the jury, which was done. Each juror indicated that the verdicts were his or her true and accurate verdicts. (Trial Tr., Vol. 25 at 11–16, *Abbott* ECF No. 209.) The Court accepted the *Abbott* verdict and declared a mistrial in the *Swartz* case.

The following day, DuPont filed a Renewed Motion for Mistrial as to Travis and Julie Abbott. (*Abbott* ECF No. 180.) Both of DuPont's Motions are ripe for review.

## II.

The grant or denial of a request for a mistrial is at the discretion of the district court. *Bhat v. U. of Cincinnati*, 23 Fed. Appx. 280, 289 (6th Cir. 2001) (citing *Grossheim v. Freightliner Corp.,* 974 F.2d 745, 752 (6th Cir. 1992)).

## III.

Defendant moves for a mistrial in the *Abbott* case on two bases: (A) "the circumstances surrounding the jury deliberations had an unconstitutionally coercive effect" and, (B) "the Court's denial of DuPont's requested instruction in response to the jury's communications" was unduly prejudicial. (Mot. for Mistrial at 18, *Abbott* ECF No. 178; Renewed Mot. for Mistrial at 1, *Abbott* ECF No. 180.)

## A.     Jury Deliberations

DuPont contends that it is entitled to a mistrial (1) because of this Court's unprompted choice to give the *Allen* charge and the content of that charge were unconstitutionally prejudicial, and (2) because the "sole juror in the minority was singled out and subjected to unduly coercive pressure to change her vote." (Mot. for Mistrial at 10, 13, *Abbott* ECF No. 178.)

12

1.      *Allen* **charge**

DuPont maintains that the *Allen* charge was unconstitutionally prejudicial because it was given (a) *sua sponte* by the Court with no indication from the jury that it was deadlocked, and (b) that the charge was improperly and prejudicially modified.

a.      **Choice to Give the *Allen* Charge**

DuPont first expresses doubt that there was a note from the jury indicating that it was deadlocked, stating that "[t]he Court went into recess, and came back fifteen minutes later, immediately giving the *Allen* charge without, to DuPont's knowledge, having received another note from the jury."  (Reply at 6, *Abbott* ECF No. 229.)  DuPont suggests the Court had planned to give the *Allen* charge without receiving the note, because "[t]here is nothing in the record demonstrating that the jury sent a note that it was deadlocked in the few minutes after Juror 54 was questioned and sent back to the jury room and before the modified *Allen* charge was given." (Mot. for Mistrial at 2, n. 1, *Abbott* ECF No. 178; Reply at 7–8, *Abbott* ECF No. 229.)

DuPont, however, is mistaken.  There is evidence in the record that the Court received the note as can be seen in its statement on the record in open court:

> THE COURT: Ladies and gentlemen of the jury, *you have passed a note to me indicating you are at deadlock*.  I am going to ask that you return to the jury room and deliberate further, . . .

(Trial Tr., Vol. 24 at 16, *Abbott* ECF No. 208) (emphasis added).

The Court did not provide to the parties the particular note regarding deadlock, instead following the unopposed plan to provide the *Allen* charge if it heard from the jury again that it was deadlocked.  The Court certainly would have provided copies of the note if it had been asked.  And, the Court has since filed the jury notes –including the one at issue here—on the

*Abbott* and *Swartz* dockets.  (Jury Questions/Court Responses, *Abbott* ECF No. 242, *Swartz* ECF No. 236.)

### b.    Content of the *Allen* Charge

The Sixth Circuit prefers judges to stick closely to its approved pattern instructions but has "never explicitly mandated the use of that or any instruction to the exclusion of others." *United States v. Clinton*, 338 F.3d 483, 488 (6th Cir. 2003).  When a trial judge does change the wording from the pattern instruction, it is not prejudicial if the charge as given "included all those elements of the original charge designed to ameliorate its coercive effect, and . . . avoided language which might heighten it."  *United States v. Scott*, 547 F.2d 334, 337 (6th Cir. 1977) (citation omitted).

The constitutionality of a modified *Allen* charge turns on whether it was "coercive," when viewed "in its context and under all the circumstances."  *United States v. Brika*, 416 F.3d 514, 519 (6th Cir. 2005).  This due process inquiry "focuses on the circumstances that triggered the charge, as well as the language of the charge itself."  *Henderson v. Collins*, 262 F.3d 615, 619 (6th Cir. 2001).  An unduly coercive *Allen* charge violates the defendant's right to a fair trial. *See, e.g.*, *United States v. Scott*, 547 F.2d 334, 337 (6th Cir. 1977).

In the instant action, this Court gave the entire Sixth Circuit pattern instruction with no deletions from the instruction and the addition of only one sentence that is underlined:

> THE COURT: . . . .  I am going to ask that you return to the jury room and deliberate further.  I know this is difficult.  I realize you're having some difficulty reaching unanimous agreement, but that is not unusual and sometimes, after further discussions, jurors are able to work out their differences and agree.
>
> Please keep in mind how important it is that you reach unanimous agreement. If you cannot agree and if this case has to be tried again, there is no reason to believe any new evidence will be presented or that the next jurors will be any more conscientious than any of you are or any more impartial than any of you are.

Again, let me remind you that your duty as jurors is to talk to each other about the case, to listen carefully and respectfully to each other's views, and to keep an open mind as you listen to what your fellow jurors have to say. And let me remind you it is your duty to make every reasonable effort that you can to reach unanimous agreement.

Each of you, whether you are in the majority or in the minority, ought to seriously reconsider your position in light of the fact that other jurors who are just as conscientious and impartial as you are have come to a different conclusion. None of you should hesitate to change your mind, if after reconsidering things, you are convinced that other jurors are right and that your original position might be wrong.

But remember this. Don't just change your mind because other jurors see things differently or just to get the case over with. As I told you before, in the end your vote must be exactly that, your vote. As important as it is for you to reach unanimous agreement, it is important that you do so honestly and in good conscience.

Now, what I just said is not meant to rush or pressure you into agreeing on a verdict. Take as much time as you need to discuss things. There is no hurry. <u>But remember, too, that if this case had to be tried again, it would be at great expense and great emotional harm to all the parties in this case, defense and the plaintiff.</u>

So I would ask you now to return to the jury room and resume your deliberations. With that, we'll be in recess.

(Trial Tr., Vol. 24 at 9–13, *Abbott* ECF No. 208.)

DuPont contends that the addition of this sentence was so coercive that it violated its right to a fair trial for several reasons discussed below. Plaintiffs respond that "[t]he Court's slight modification to the *Allen* charge was harmless, balanced, and far from coercive." (Opp. at 5, Abbott ECF No. 227.) This Court agrees.

First, DuPont contends that the added sentence led the "jury [to] consider external effects of a deadlock, including the expenses and emotional burdens of retrial [and therefore] was improper." (Mot. for Mistrial at 11, ECF No. 178.) DuPont continues, that a "judge may not ask the jury to consider the external effects of their inability to reach a verdict, *e.g.*, delay to other litigants caused by having to retry the case." *Id.* (citing *Brika*, 416 F.3d at 522). The quotation

upon which DuPont relies is found in a section of *Brika* that reviews case law to determine what elements the Sixth Circuit has found necessary to avoid an unconstitutionally coercive *Allen* charge. The *Brika* court explains:

> A review of the case law clearly indicates what may and may not appear in a modified *Allen* charge if it is to avoid becoming unconstitutionally coercive. First, the charge must include "the reminder that no juror should merely acquiesce in the majority opinion." *Scott*, 547 F.2d at 337. Second, the judge may not instruct the jury that it is required to agree. *Jenkins*, 380 U.S. at 446; *Williams*, 741 F.2d at 850. Third, the instruction must "direct [ ] both majority and minority jurors to reconsider their positions . . . ." *United States v. Frost*, 125 F.3d 346, 374–75 (6th Cir. 1997) (calling this "language which this circuit has identified as critical to any *Allen* charge"); *United States v. Tines*, 70 F.3d 891, 896 (6th Cir. 1995). Fourth, the judge cannot tell the jury that they are the only ones who can decide the case. *Jones v. Norvell*, 472 F.2d 1185, 1185 (6th Cir. 1973). <u>Fifth, the judge may not ask the jury to consider the external effects of their inability to reach a verdict, e.g., delay to other litigants caused by having to retry the case.</u> *Scott*, 547 F.2d at 337. Finally, the reviewing court should consider whether the modifications to the *Allen* charge, when "viewed as a whole, were . . . confusing, misleading, or prejudicial." *Tines*, 70 F.3d at 896.

*Id*. at 521–22 (alterations other than underlining in original).

The *Allen* charge given by this Court meets all of these requirements, including the fifth one which DuPont suggests was not met (*i.e.*, "the judge may not ask the jury to consider the external effects of their inability to reach a verdict, *e.g.*, delay to other litigants caused by having to retry the case). That quote is from *U.S. v. Scott*, which was reviewing an *Allen* charge given by the trial court that in relevant part stated:

> The second thing that I would state to you by way of advice is that this, of course, is a very important case, important to the defendant, important to the Government. It has another importance from this standpoint, that should, based on our experience, a sufficient time elapse that you indicated that you were totally unable to agree, it would then be necessary for the Court to declare a mistrial by reason of that fact, and then we would, of course, just be submitting it all over again on retrial to another Jury, if that's what the election was, and to what avail. Is there something that another Jury could do by way of a better job than this Jury could do?
>
> The factors that come to my mind on that are these. Next week I will be in Grand Rapids and we will be trying a civil case that has been filed and pending for four

years. Four years people are waiting to have a case heard, and that's all I do, night and day, day after day, day after day, cases people have been waiting for. The criminal cases have a priority, and so it gets to be another two or three days. Well, it does get to be that. Instead of three days of time devoted to a case, it gets to be six days for another Jury.

Now, I am only saying that so that you should be mindful of these things. I say, it's very important to the defendant, very important to the Government, if you can possibly agree.

*Scott*, 547 F.2d at 338.

In finding the *Allen* charge unduly coercive, the Sixth Circuit explained that the trial judge did not "remind the jurors" that "no one of them should surrender an honest conviction about the case simply because other jurors disagreed, which is "one of the most important parts of the *Allen* charge." *Id.* In the instant action, this Court did not omit this important part, nor did it omit any part, of the approved pattern instruction.

DuPont admits that this Court did not omit this important part of the pattern instruction, or any part, yet it argues that *Scott* supports its position regardless, stating:

The Sixth Circuit [in *Scott*], however, specifically held that it was "impermissibly coercive" to instruct the jury to consider external effects on other civil parties. *Id.* That statement was independently coercive because "[t]hese remarks could be understood by the jury as an admonishment to reach a verdict in order to get the case out of the way, for the sake of a harried judge and *long-suffering civil parties*." *Id.* (emphasis added); *see also id.* ("Any variation upon the precise language approved in *Allen* imperils the validity of the trial.").

(Reply at 4, *Abbott* ECF No. 229.)

However, the *Scott* trial court did not suggest that only the parties before it would be impacted by the jury's inability to reach a verdict as did this Court, but that in addition *an entire other group of individuals* would be severely impacted – individuals who had been waiting for four years would have to wait longer if that jury failed to reach unanimity. The subject matter of the potential harm to a retrial is not the same where the *Scott* court was concerned with its docket

17

and the other litigants before it and this Court directed its comment to the cost to the parties that are before the jury to which the direction was given.  The additions in the instruction given in *Scott* simply bears no resemblance to the one sentence this Court.

Second, DuPont's contention that the added sentence unduly prejudiced it because the case entailed emotional testimony from Plaintiffs on the one side and testimony of a large corporation on the other is unpersuasive.  This Court balanced its comment by specifically indicating how each party would be equally affected.  While it is true that DuPont is a large corporation, testimony on its behalf was provided by individuals, many of whom provided tense, emotional testimony related to their life's work.  It is unhelpful speculation as to how the jury assessed any emotional or financial costs.  The Court instructed that both sides would be equally impacted.

Third, Dupont takes issue with the timing of the *Allen* charge in that is was give before the jury broke for the weekend.  The Court, however, informed the parties of its intention to give an *Allen* charge prior to charging the jury, and neither party objected to this Court's proposed plan or the potential of the charge being given before a weekend.  DuPont was free to raise the issue of timing but did not do so.

In any event, "[t]he timing of an *Allen* charge is left to the trial judge's sound discretion." *U.S. v. Tines*, 70 F.3d 891, 896 (6th Cir. 1995).  Typically, the *Allen* charge is given "as soon as the jury announce[s] its deadlock."  *Id.* (citing *United States v. Sawyers,* 902 F.2d 1217, 1220 (6th Cir. 1990) (holding court within its discretion to give *Allen* charge when jury announced a deadlock after three hours of deliberation), *cert. denied,* 501 U.S. 1253 (1991); *United States v. Clark,* 988 F.2d 1459, 1469 (6th Cir. 1993) (holding *Allen* charge appropriate when given 50 minutes after jury announced a deadlock two days into deliberations), *cert. denied,* 510 U.S. 832

(1993)). "In fact, [the Sixth Circuit] has determined that the possibility of coercion is reduced if the charge is given early rather than after days of deadlocked deliberations." *Id*. (citing *Sawyers*, 902 F.2d at 1220). Here, the timing of the *Allen* charge was not unduly coercive and any impact caused by giving the charge on a Friday equally impacted both sides.

Indeed, the Sixth Circuit has found that the fact that a jury continued to deliberate, and an individual juror was not compelled to an immediate verdict weighs in favor of a finding of non-coerciveness. The supplemental language held permissible in *U.S. v. Levit*, 39 Fed. Appx. 97, 104 (6th Cir. 2002) is very similar to the language DuPont now argues is coercive: "[T]his case will end and have to be retried at considerable expense and grief to everybody in this case. . . ." *Id*. at 105. However, the Sixth Circuit found this language and the circumstances in the *Levit* case were "neither coercive to the juror nor prejudicial to [the defendant]." *Id.* at 106. The Sixth Circuit explained its decision by, *inter alia*, the following:

> Moreover, the individual juror was not compelled to an immediate verdict. The jury retired for the evening and reconvened the following morning for another hour.
>
> Clearly, one juror reevaluated her position, but the timeline does not suggest that coercion was probable. . . . Finally, the court polled the jurors individually, allowing each the opportunity to recant their verdict if in fact they had been improperly coerced into casting a vote contrary to their true belief as to Levit's guilt.

*Id.* at 106–107.

In the instant action, Juror 54 was not compelled to an immediate verdict. The jury deliberated nearly another hour before breaking for the weekend and then deliberated for several more hours on the following Monday morning. And, as did the *Levit* court, this Court polled the jurors individually, allowing each the opportunity to recant their verdict if in fact they had been improperly coerced into casting a vote contrary to their true belief.

Fourth, and last, DuPont contends that certain comments of Juror 54 were directed at the *Abbott* case and the charge unduly coerced her into changing her decision in the *Abbott* case. (Renewed Mot. for Mistrial at 2, ECF No. 180) ("Based on the timing and content of the jury notes and subsequent questioning of Juror 54, Juror 54 apparently disagreed with her fellow jurors regarding whether specific causation was established on the Abbotts' claims."). There is simply no factual basis for this claim. To the extent any knowledge can be gleaned by what the jury asked in its questions, DuPont's conclusion is not only speculative but is also in contradiction to certain facts.

It is just as likely, and perhaps more probable, that Juror 54, after testifying and listening to the *Allen* charge, continued to support a defense verdict in *Swartz* but not in *Abbott*. The fact that the jury asked only for evidence relating to the *Swartz* case after Juror 54's testimony and the *Allen* charge supports this view. While the Court believes this is more likely than what DuPont posits, all of this is mere speculation and neither position can be established from the record. This is another way of emphasizing that jury deliberations and pre-verdict votes are designed to be confidential.

Given the circumstances just reviewed, any variation from the approved *Allen* charge was *de minimis* and was neither unduly coercive nor unfairly prejudicial.

### 2. Juror Number 54

DuPont takes issue with the process of inquiry of Juror 54, asserting that because of the nature of the questioning, the deliberative process was compromised so significantly that the Court should declare a mistrial. DuPont's arguments are not well taken because (a) DuPont agreed to the procedure and, even if it had not, (b) the questioning was appropriate under Sixth Circuit law.

### a.    DuPont's Agreement to the Questioning of Juror 54

DuPont previously agreed to the process of questioning Juror 54 and has therefore waived any objection it may have had.  As quoted in detail above, this Court requested DuPont's input on the process to be utilized, stating that the Court's "initial thought is to make a record here.  To bring in the juror, give some very careful preliminary instructions before any testimony is given. . . . designed to determine whether she either is or isn't functioning as a juror as directed by the instructions. . . . [and] [a]t this point I'd invite additional comments. . . .  Mr. Mace the floor is yours." (Trial Tr., Vol. 24 at 4–9, *Abbott* ECF No. 208; Jury Questions/Court Responses, *Abbott* ECF No. 242.)

At that point, defense counsel made comments regarding the content of the notes and his request for additional jury instructions but did not object to the procedure of questioning the juror in open court, a procedure that has been approved by the Sixth Circuit.  *See Levit*, 39 Fed. Appx. at 104 (affirming trial court's denial of mistrial in case where the trial court questioned of juror in open court).  The Court then *again* stated it was inclined to bring the juror into open court for questioning and it received no objection or comment whatsoever from DuPont:

> But my next inclination would be to bring her in and ask her some fairly general questions about what's in these two documents and see what her response is. And then she won't be off the stand and you'll have an opportunity if you wish to submit to me any additional questions in writing. And then at that point I'll excuse her, and then we'll talk again about what the best course is to go forward and I'll hear from you again.

(Trial Tr., Vol. 24 at 8, *Abbott* ECF No. 208.)

The Court provided DuPont over double the time it requested to consider the notes and the Court's suggested procedure.  DuPont made no further request of the Court, instead agreeing to the procedure.

### b.     Questioning of Juror 54

DuPont maintains that regardless of whether it agreed to the procedure suggested by the Court, it is still entitled to a mistrial because "Juror 54 was singled out and pressured to reconsider her vote" as is shown by the fact that she "was questioned alone, on the witness stand, in open court, in front of Plaintiffs and the media, about allegations of misconduct that all of her fellow jurors had secretly lodged against her with the Court." (Mot. for Mistrial at 17, *Abbott* ECF No. 178.) Further, DuPont argues that the additional sentence in the *Allen* charge, given "fifteen minutes after Juror 54 returned to the jury room after being questioned, [and] the Court brought the jury back in and, while Juror No. 54 was in tears, delivered the modified, prejudicial *Allen* charge . . . ." (*Id*. at 17–18.) DuPont concludes that the "flawed instruction to the jury here added to rather than counteracted the coercive pressure brought to bear on a single juror as a result of having been identified in open court as the lone dissenter." (*Id*. at 18.) This assessment, however, is not supported in the record or the law of the Sixth Circuit.

First, this issue of Juror 54 allegedly crying during the giving of the *Allen* charge was discussed by the Court in its decision granting DuPont permission to file a document under seal with its Motion for a Mistrial. (Order, *Abbott* ECF No. 179.) In that Order, the Court indicated that DuPont's assertion that Juror 54 was crying during the reading of the *Allen* charge was not seen by any of the Court's staff (the court reporter, courtroom deputy, career law clerk, three term law clerks, and the Court Security Officer who walked the jury to and from the jury room on that occasion) and was unsupported by the record, stating:

> Importantly, this factual assertion [about Juror 54 crying] is completely unsupported in the record. Indeed, even though DuPont's counsel took the opportunity immediately following the *Allen* charge to make a record with regard to Juror 54, he made no mention of this alleged conduct:

> MR. MACE: . . .

22

> But while we're on the record, I did want to note that Juror Number 54 was very emphatic in her statements that she was deliberating and that she was following the Court's instructions.
>
> And also note our objection to the Court's addition to the Sixth Circuit pattern instruction for the *Allen* charge about emotional distress at the end.  We object to that.

(Tr. at 16–17, Vol. 24.)

(*Id*. at 2.)

The Court was concerned that there was no contemporaneous record made as to DuPont's later contention that Juror 54 was crying, even though defense counsel made a record unrelated to any crying at that time related to Juror 54.  In an attempt to alleviate the Court's concern, DuPont provided support for its later assertions related to Juror 54 by offering a declaration from lead counsel and a senior associate who is part of DuPont's trial team.

In the declaration lead counsel avers, *inter alia*, the following:

> As the jury walked past me, I noticed that Juror 54 had tears in her eyes.  Prior to the Court entering the courtroom, Juror 54 removed her glasses and wiped her eyes, at which point I received the note attached as Exhibit 1.

(Mace Aff. ¶ 4, *Abbott* ECF No. 182-1.)  Exhibit 1 is a handwritten note from his co-counsel that indicates that the juror "is crying."  *Id*. Ex. 1.  The second declarant similarly states that as the jury walked past her, she "noticed that Juror 54 had tears in her eyes."  (Spicer Aff. ¶ 5, *Abbott* ECF No. 182-2.)

DuPont contends that it "submitted the attached two declarations that provided the basis for DuPont's statement that Juror 54 was visibly in tears when she returned to the courtroom prior to the reading of the *Allen* charge."  (Response at 1, *Abbott* ECF No. 182.)  DuPont, however, never said in its Motion for a Mistrial that "Juror 54 was visibly in tears when she

23

returned to the courtroom prior to the reading of the *Allen* charge." Instead, DuPont twice said

that Juror 54 was in tears during the reading of the *Allen* charge:

> [T]he modified *Allen* charge with its improper emphasis on "great expense and great emotional harm" being given while Juror 54 was in tears, . . .

> [T]he Court brought the jury back in and, while Juror No. 54 was in tears, delivered the modified, prejudicial *Allen* charge . . . .

(Mot. for a Mistrial at 15, 17, Abbott ECF No. 178.)

The Court is unsure of what to make of these inconsistencies. At best, different people

observed different conduct of Juror 54 ***and*** counsel was unaware that the wording utilized in the

Motion for a Mistrial that he signed and filed was incongruent with that to which he now swears

in his declaration. Yet, even still, lead counsel provides no explanation as to why neither he, nor

any other defense attorney, made a contemporaneous record with the Court of this now

emphasized issue. Nevertheless, even under DuPont's current version of the facts, this Court

could not have seen the alleged crying nor have known it happened because it was outside of the

undersigned's presence and DuPont did not inform the Court or any of its staff and therefore

cannot form any basis for a mistrial.

Second, Rule 47(c) of the Federal Rules of Civil Procedure allows a judge to excuse a

juror from service during deliberation for good cause. Similar to the facts before the Sixth

Circuit in *Bhat* (discussed in more detail below), this Court "stated that its reason for questioning

[the juror] was to determine whether she should be struck from the jury for cause." *Bhat*, 23

Fed. Appx. at 288. Based on the notes from the jury, this Court "could have reasonably

suspected that [Juror 54] was unwilling or unable to follow the court's instructions, [and

therefore] its actions were proper given the circumstances." *Id.* (citing as comparisons *United

States v. Baker,* 262 F.3d 124, 129–30 (2d Cir. 2001) (noting that the question whether "just

24

cause" under Fed. R. Crim. P. 23(b) exists to excuse a juror is a matter within the discretion of the district court, and approving of district court's in chambers discussion with juror who refused to deliberate); *United States v. Reed,* 167 F.3d 984, 989 (6th Cir. 1999) (noting that the district court has discretion to manage reported jury misconduct); *United States v. Shackelford,* 777 F.2d 1141, 1145 (6th Cir. 1985) (noting that the district court has a duty to investigate juror misconduct, and has discretion in deciding the scope of the proceedings necessary to discover the misconduct)).

Last, DuPont argues that the law of the Ninth Circuit requires a mistrial because this Court was aware of the nature or extent of numerical division of the jury before giving the *Allen* charge, and there was therefore a danger that Juror 54 would believe that the Court was directing the charge to her instead of to the jury as a whole. (Mot. for Mistrial at 17, ECF No. 178) (citing *United States v. Parsadanyan*, 727 F. App'x 432, 433 (9th Cir. 2018); *United States v. Williams*, 547 F.3d 1187, 1207 (9th Cir. 2008); *United States v. Ajiboye*, 961 F.2d 892, 894 (9th Cir. 1992)). DuPont relies most heavily on *U.S. v. Sae-Chua*, 725 F.2d 530, 531–32 (9th Cir. 1984). (Mot. for Mistrial at 2, 17–18, ECF No. 178; Reply at 8–9, ECF No. 229.) That case and the law of the Ninth Circuit on this issue, however, is neither precedential nor persuasive as to the facts before this Court.

The Sixth Circuit has "held that the trial court's mere knowledge of the jury's numerical split is not dispositive under *Brasfield* [*v. United States,* 272 U.S. 448, 450 (1926)], if the information was volunteered by the jury, but that it is incumbent on the court, in such a case, to instruct both sides to reconsider their positions." *Bhat*, 23 Fed. Appx. at 289–90 (citing *United States v. Reed,* 167 F.3d 984, 991 (6th Cir. 1999); *United States v. Lash,* 937 F.2d 1077, 1086 (6th Cir. 1991)). The Sixth Circuit explained:

In the instant case, the judge learned inadvertently of the numerical split during polling, as Ms. Marrow happened to be the final juror polled. Moreover, Ms. Marrow's statements regarding what she believed to be the positions of her fellow jurors were unsolicited by the court, and were not necessarily accurate. Although the district court was aware that Ms. Marrow was the lone hold-out, it was within the district court's discretion to give a properly worded *Allen* charge. *See Reed*, 167 F.3d at 991.

. . . .

The instruction was even-handed, and did not single out Ms. Marrow. Rather, the instruction reminded all the jurors that they should deliberate with an open mind, and that no one was required to give up an honestly held belief. It in no way suggested that a verdict was necessary, nor did it suggest that the jurors should surrender conscientious positions in light of the views of other jurors. The court made clear that the charge was leveled at all the jurors when it indicated that the court had already discussed the issue with Ms. Marrow. Ms. Marrow might well have felt support in the district court's statements to her fellow jurors that she had a right not to give up her honestly held beliefs.

*Id.* at 291.

The same can be said of the case *sub judice* regarding the Court inadvertently discovering the numerical split. That DuPont did not approve of the additional sentence in the *Allen* charge does not change this analysis. That is, similar to the instruction in *Bhat*, this Court's instruction was even-handed, and did not single out Juror 54. Rather, the instruction reminded all the jurors that they should deliberate with an open mind, and that no one was required to give up an honestly held belief. It in no way suggested that a verdict was necessary, nor did it suggest that the jurors should surrender conscientious positions in light of the views of other jurors. As could the juror in *Bhat*, Juror 54 might well have felt support in this Court's statements to her fellow jurors that she had a right not to give up her honestly held beliefs. *See also United States v. Frost*, 125 F.3d 346, 375 (6th Cir. 1997) (finding that the district court did not abuse its discretion by delivering an *Allen* charge where the minority juror volunteered their minority status and the judge knew of the minority juror at the time of the charge); *Lash*, 937 F.2d at

26

1085–86 (finding the court's knowledge of the numerical split and supplemental charge did not coerce the minority as each side was instructed to reconsider its position).

*Bhat* continues to be helpful with regard to this Court's assessment of DuPont's arguments.  In that case, the plaintiff-appellant Dr. Bhat alleged gender and national origin discrimination in employment against the University of Cincinnati and two individual doctors. During deliberations, the jury sent multiple notes to the judge indicating a possible deadlock, including mentioning a juror who was not deliberating:  "If one of the jurors refuses to adhere to the juror's instructions and is holding up the progress, is there anything that can be done so that we can move forward.?"  *Id*. at 283.  Ultimately the jury returned a unanimous verdict for the defendants.  *Id*. at 283.

Upon polling, however, Juror Number 8 stated "I can't say yes, I can't say yes" in response to the question of whether the verdict was her true and accurate verdict.  *Id*.  The trial court sent the other jurors back to the jury room and questioned Juror 8 individually in chambers, where the juror indicated she felt pressure from the other jurors so she signed the verdict form. The questioning in relevant part is as follows:

> COURT: Miss Marrow, when [the clerk] read the jury's verdicts, each of which had your signature on it—
>
> Ms. Marrow: Uh-huh.
>
> COURT:—you indicated that you were hesitant to say that was your true and accurate verdict. Obviously we need to know what is the problem. Would it be helpful for you to go back to the jury room to continue your deliberations with your fellow jurors?
>
> MS. MARROW: I don't think so. I—basically, well, I signed, but some of it I felt like I was under pressure from the other jurors, and maybe my interpretation was a little different than what theirs was of it.  And I think what actually happened is that I basically let them convince me.  I mean, we have been going through it, I have been holding out for a long time, and everybody was getting antsy, and some of the

things I agreed with. And we sent, you know, notes to try to clarify some things. And after our last note, I—guess I went along with the majority.

*Id.* at 284.  The district court then asked the juror if she could follow the instructions, to which she replied she could.  The court gave the individual juror the following modified *Allen* charge and sent her back to deliberate:

> COURT:  Okay. We will print new verdict forms that are blank, send them up to the jury room to the foreman, and you all should begin your deliberations again. There is no other jury that can do a better job, that will hear more evidence, receive more exhibits.
>
> Each side has put a great deal of time and effort into the case. And if the jury is unable to reach a verdict, another trial may have to occur, and each side will incur additional time, effort and expense.  So if at all possible, you should attempt to reach a verdict. Okay?
>
> MS. MARROW: (Indicating Affirmatively).  Okay.

*Id.* at 285.

The Court returned the juror to further deliberations at 3:11 p.m.  At 3:25 p.m. the Court a second time summoned the juror to her chambers for questioning, this time discussing a note from the jury that was signed at 3:23 pm.:

> COURT: Ms. Marrow, I have a note from your foreman, and he says that you do not intend to change your mind on Interrogatories 6 and 8, which are the issues of constructive discharge, with regard to Dr. Walsh, on the basis of gender and national origin; is that correct?
>
> MS. MARROW: As to today, right, that's correct.
>
> COURT: You leave open the possibility that if you were given the opportunity to deliberate further, your mind might be changed, or you believe that you might change the minds of the other members of the jury?
>
> MS. MARROW: I don't think I will be able to change their minds, but my mind might be changed. But I have gone through all the evidence that was there, and that—those are the two things that I was really stuck on, because I truly believe that.

> COURT: Well, all right. He says that you are—the jury is at a permanent impasse on Items 6 and 8. Do you think if you had some more time to discuss it, you all might be able to reach a unanimous verdict on those two issues?
>
> MS. MARROW: Not today, I don't think so. I can go through the material again, but not today I don't think so.
>
> COURT: All right. Thank you.
>
> MS. MARROW: Okay.

*Id*. at 286–87.

The court then sent Ms. Marrow back to the jury room to continue deliberations.  The

Sixth Circuit explained, and ultimately approved of, what happened next:

> The judge indicated that she was inclined to bring the whole jury back into the courtroom and read them the previously prepared *Allen* charge. The court suggested that the jury could then be asked to return on Monday to continue deliberations. Dr. Bhat's attorney stated his belief that a mistrial was the only option, as an *Allen* charge would create more pressure on Ms. Marrow as well as her fellow jurors to come to a unanimous verdict.  In response, the court stated:
>
>> I have not heard anything from her that differs significantly from any other jury dynamics situation. I am inclined to call the jury back, give them the *Allen* charge; if they don't reach an agreement within a reasonable period of time, or if they come back and say that they are at impasse, then I will declare a mistrial. . . . But I think we should give the jury a fair opportunity to try and reach consensus on these other two verdicts. She indicates that she was willing, despite what her foreman says, to change her mind, if she has the opportunity to review the information. If she doesn't, and she is still convinced that she is correct, then I am certainly not going to beat up on her. That's why we have juries. But I don't think we should give up on them prematurely. . . .
>
> (J.A. at 253).
>
> The jury reentered the courtroom at 3:40 p.m. The court stated that it had received the jury foreman's note indicating that the jury was at an impasse. The court prefaced the *Allen* charge with the following: "In speaking to Ms. Marrow, I have explained what I am about to tell you." (J.A. at 254).

*Id*. at 287 (alterations in original).

The jury left the courtroom at around 3:45 p.m. to continue deliberations.  At 5:18 p.m., the jury returned a unanimous verdict in favor of the defendants on all the interrogatories, and when polled Juror 8 stated that the verdict was her true and accurate verdict.  *Id*. at 287.

Based on this, and all of the events leading up to it, Dr. Bhat argued that "[i]t is difficult to imagine a more coercive set of circumstances than existed when the District Court, over the objection of counsel, issued the *Allen* charge to the entire jury in the instant case."  *Id*. at 291. The Sixth Circuit reviewed the totality of the circumstances and determined that it was not coercive to twice individually question the juror, give a modified *Allen* charge to the individual juror, question the juror as to whether she understood the preponderance of the evidence standard, and give an *Allen* charge to the entire jury after knowing the numerical split and that Juror 8 was the lone holdout.

The appellate court approved the individual questioning of the juror because, while the juror spoke about the pressure she felt from her fellow jurors, the "dialogue between the court and Ms. Marrow in chambers, set forth above, reveals that the district court was interested in determining whether Ms. Marrow was able to understand and apply the law and the court's instructions. Ms. Marrow's statements regarding the jury's deliberative process were unsolicited and serve mainly to cloud the issue."  *Id*. at 289 ("The district court was asking Ms. Marrow a series of questions designed to reveal whether Ms. Marrow was capable of following the court's instructions. . . . [including] whether she understood the burden of proof.").

Again, the same can be said for this Court's questioning of Juror 54.  Indeed, this Court much more narrowly tailored its questions and its time questioning Juror 54 to determine whether she was able to understand and apply the law and the Court's instructions.

### 3. Conclusion Jury Deliberations

As stated above, DuPont had numerous opportunities to object to the procedure utilized to determine whether Juror 54 could deliberate and instead agreed to the procedure utilized. Even if DuPont had not waived its ability to object, however, the totality of the circumstances show that Juror 54 was not unduly coerced nor the deliberative process impaired – Juror 54 was polled and stood by her verdict as her verdict and was firm in her statements to the Court that she was deliberating.  Further, the Court gave the entire Sixth Circuit pattern *Allen* charge, which therefore included all elements that are designed to ameliorate its coercive effect.  The Court's addition of one sentence provides no support for an inference that a verdict would be more or less beneficial for either party.  The additional language did not heighten any coercive effect of the charge, especially when considering the surrounding circumstances, including the jury's inability to reach a unanimous decision on the *Swartz* case.  Accordingly, the jury deliberations were not unconstitutionally coercive, and declaration of a mistrial is not appropriate.

## B. Jury Supplemental Instructions

DuPont contends that, "[s]eparately, a mistrial should be granted due to the Court's denial of DuPont's requested instruction in response to the jury's communications."  (Mot. for Mistrial at 18.)  "When a party objects to jury instructions, [the Sixth Circuit] will reverse 'only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial.'"  *U.S. v. Tines*, 70 F.3d 891, 896 (6th Cir. 1995) (citing *Beard v. Norwegian Caribbean Lines,* 900 F.2d 71, 73 (6th Cir. 1990); *Kitchen v. Chippewa Valley Schs.,* 825 F.2d 1004, 1010-11 (6th Cir. 1987)).

As set out above, DuPont asked the Court to give an additional instruction to the jury when it sent two notes about Juror 54, indicating in relevant part to this argument that she

refused to follow the jury instructions regarding class membership and the instruction on proximate cause.  (Mot. for Mistrial at 18–19.)  DuPont concludes that, "[b]ecause the other jurors appear to be under the misapprehension that the 0.05 parts per billion standard and the Science Panel's conclusions have an outcome-determinative bearing on specific causation, a new trial is warranted.  DuPont's arguments are not well taken.

Initially, the Court highlights that DuPont's contention that the jury's misapprehension would have an outcome-determinative bearing on specific causation did not hold true.  That is, the jury was unable to reach agreement on specific causation as to Mrs. Swartz but were able to on Mr. Abbott.

Further, as Plaintiffs correctly note:

The relevant note states:

> Juror refuses to follow instructions to consider as fact that the science panel determined that drinking water contained .05ppb for at least 1 year is linked to testicular cancer or kidney cancer.

The next sentence states:

> The juror *also refuses* to follow the jury instruction to use the standard of proximate cause in the claims of Travis Abbott and Angela Swartz. (emphasis added).

The note does not mix the ideas of proximate cause/specific causation with the Science Panel's general causation finding.

(Pls Mem. in Opp. at 14, *Abbott* ECF No. 227.)

Finally, as DuPont correctly explains, it has objected to the jury instructions given in this case on this issue in all of the six trials held in the C-8 Personal Injury MDL. There are hours of transcripts where the issue has been debated, which reflects the Court's efforts to provide a balanced set of instructions.  DuPont's suggestion that the

ourt somehow created error with its decision not to change those instructions mid-deliberations in unpersuasive.

**IV.**

Based on the foregoing, the Court **DENIES** Defendant's Motion for a Mistrial (*Abbott* ECF No. 178, *Swartz* ECF No. 188) and **DENIES** Defendant's Renewed Motion for a Mistrial (*Abbott* ECF No. 180).

      **IT IS SO ORDERED.**


**12/31/2020**                      **/s/ Edmund A. Sargus, Jr.**
**DATE**                                **EDMUND A. SARGUS, JR.**
                                            **UNITED STATES DISTRICT JUDGE**